IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: RARE BREED TRIGGERS PATENT LITIGATION | CASE NO. 4:26-md-03176-ALM |
| RARE BREED TRIGGERS, INC. et al., Plaintiffs, vs. AS DESIGNS, LLC et al., Defendants. | (CASE NO. 4:26-cv-00370-ALM) CHIEF JUDGE AMOS L. MAZZANT |

**DECLARATION OF STEPHEN A. BATZER, PH.D., P.E.**

I, Stephen A. Batzer, having personal knowledge of the facts stated herein, and being of legal age and sound mind and memory, do hereby declare as follows:

1. I have been retained to provide expert opinions on behalf of Defendants AS Designs, LLC, Matthew S. Karlovic, and Calvin Olson in this action.

2. I have been asked to provide my opinion regarding U.S. Patent Nos. 12,031,784 (the "'784 Patent"), 12,038,247 (the "'247 Patent"), 12,529,538 (the "'538 Patent"), and 12,578,159 (the "'159 Patent") (collectively, the "asserted patents") from the perspective of a person of ordinary skill in the art relevant to those patents ("POSA").

3. This declaration is specifically prepared in support of Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction filed on April 27, 2026, in this case and to the April 24, 2026 Declaration of Brian Luettke in support thereof ("Luettke Declaration").

1

**I.    QUALIFICATIONS AND CREDENTIALS**

4.    I have attached, as Exhibit 1 to this declaration, a current copy of my curriculum vitae which documents my education, employment history, and other credentials. I hold a B.S. degree in mechanical engineering from the Michigan Technological University, an M.S. degree in manufacturing systems engineering from the GMI Engineering and Management Institute (the former General Motors Institute, now Kettering), and a Ph.D. in mechanical engineering from the Michigan Technological University. I am a licensed professional engineer (P.E.) in Michigan meeting the requirements of education, experience, two written examinations, and the recommendation of my peers. I am the former vice president of the northern region of the Michigan Society of Professional Engineers (MSPE). I am regularly engaged in professional development, which is a requirement of engineering licensure. I am board certified in forensic engineering (DFE) and an elected fellow, the highest membership grade, of the National Academy of Forensic Engineers (NAFE).  I am a retired U.S. Army Lieutenant Colonel of Ordnance (i.e., munitions).  I served over twenty years in uniform. I have been a mechanical engineer for forty years, specializing in forensic engineering and failure analysis for the past twenty-five years. I hold three U.S. Patents regarding mechanical designs, U.S. Patent No. 9,352,714, U.S. Patent No. 9,487,171, and U.S. Patent No. 11,305,713. As is shown in the respective prosecution histories, my co-inventor and I submitted these patents through issue pro se.

5.    I am a member of various professional organizations, including the American Society of Mechanical Engineers, the National Academy of Forensic Engineers, the Society of Automotive Engineers, and the National Society of Professional Engineers.  I regularly review technical manuscripts at the request of the editor prior to their publication.  I have authored over seventy

2

peer-reviewed publications.  These manuscripts are based upon my research, analysis, and testing.  I have taught engineering coursework at five universities.  Upon invitation, I have given lectures at universities nationally and internationally on a variety of topics, principally dealing with insights derived from my career as a mechanical forensic engineer. I regularly teach continuing education to other licensed engineers at the request of private organizations.

6.      I have served as an expert witness in previous weapons patent / intellectual property cases, to include:

    a.      *Adcor Defense v. Beretta USA*, No. 03C15006837 (Maryland, Baltimore County Circuit Court);

    b.      *Evolusion v. Juggernaut*, No. 8:18-CV-1378-JLS-DFM (C.D. Cal.);

    c.      *Kyntec v. ITT Enidine*, No. 14-cv-271 A (W.D.N.Y.);

    d.      *TTC Performance v. Mossberg*, No. 3:18-cv-01270-KAD (D. Conn.);

    e.      *RTG Parts, LLC v. Schmeisser GmbH*, No. IPR2022-00083 (P.T.A.B.).

7.      I have no conflicts of interest regarding any party to this litigation.

8.      I am being compensated for my work in this matter at the rate of $380 per hour.  I also am being reimbursed for reasonable and customary associated case expenses.  My compensation is not contingent on the outcome of this matter or the specifics of my opinions.

9.      In preparing this declaration, I have reviewed a number of materials in order to inform and support my opinions. A list of those materials is attached to this declaration as Exhibit 2.

10.      In forming the opinions expressed herein, I have considered the materials cataloged in Exhibit 2, the relevant legal standards, and my own knowledge and experience in the field of firearms.

## II.    LEVEL OF ORDINARY SKILL IN THE ART

11.    I understand that a POSA is a hypothetical person who is presumed to have the skill and experience of an ordinary worker in the field at the time of the effective filing date of the relevant patent claiming the invention at issue, and who is presumed to know the relevant prior art.

12.    I understand that the effective filing date of a claimed invention is the filing date of the earliest patent application to which the claimed invention can properly claim priority.  I understand that the asserted patents claim the following effective filing dates:

        a.    '784 Patent – November 5, 2021;

        b.    '247 Patent and '159 Patent – September 8, 2022;

        c.    '538 Patent – December 4, 2023.

13.    I understand that various factors may guide the determination of the ordinary level of skill in the art, including the educational level of the inventor and active workers in the field, the type of problems encountered in the art, prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the patent's purpose.

14.    Based on my knowledge and experience in this field and review of the asserted patents and their prosecution history, I believe that a hypothetical POSA in the field of the asserted patents (firearms) as of November 2021 to December 2023 and later would have been a technical person who has had at least some experience working in the field of firearms, reviewing firearms or engineering related to firearms, and is generally familiar with prior art firearms.  Such a person would likely have at least a bachelor's degree in mechanical engineering or related discipline such as physics or, alternatively, would have at least five years of experience in the

4

field of firearms or testing or engineering related to firearms.  Lack of work experience can be remedied by additional education, and vice versa.

15.     Based on my education and experience, I believe that I am qualified and able to opine and testify regarding a POSA's knowledge and perspective on various technical issues, and the opinions in this declaration are made from that perspective.

## III.     LEGAL STANDARDS

16.     I am not an attorney, so I have been advised by counsel about the following legal standards applicable in this suit.  I have applied these standards in this declaration.

### A.     Claim Construction

17.     I understand that in determining whether a claim is infringed or invalid, the scope and meaning of the claim must first be ascertained, i.e., the claim must be construed.  I understand that this applies to various invalidity grounds, including those based on anticipation, obviousness, written description, enablement, indefiniteness, and improper dependent claims.

18.     I understand that claim construction must begin with the words of the claims themselves. I understand that the same claim term cannot be interpreted differently in different claims of the same patent (i.e., have one meaning in certain claims and a different meaning in other claims), but must be interpreted consistently.  I understand that, in contrast, different phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.  I understand that an independent claim presumptively should not be construed as requiring a limitation added by a dependent claim and that an independent claim should be given broader scope than a dependent claim.

19.     I understand that the claim terms are not considered in isolation but in light of the specification and prosecution history (i.e., the intrinsic evidence).  I understand that the

specification is always highly relevant to the analysis and usually is the single best guide to the meaning of a disputed term. Yet I also understand that importing a limitation from the specification into the claims is improper. Thus, I understand that there is a fine line between reading a claim in light of the specification (which is proper) and reading a limitation from the specification into the claim (which is improper).

20. I understand that the prosecution history is the entire record of the proceedings in the U.S. Patent and Trademark Office ("USPTO") from the first application papers to the issued patent, and includes the prior art cited during the examination of the patent. I understand that because the prosecution history represents an ongoing negotiation between the USPTO and the applicant, it often lacks the clarity of the specification and thus is less useful for claim construction. I understand that the intrinsic evidence also includes related patent applications in the same patent family and their prosecution histories, especially if the applications involve common subject matter. I understand that unless otherwise compelled, the same claim term in the same or related patents carries the same construed meaning.

21. I understand that claim construction may also rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history (e.g., expert and inventor testimony, dictionaries, and learned treatises). However, I understand that extrinsic evidence is usually less reliable, and thus less significant, than is intrinsic evidence. I understand that if the meaning of a claim term is clear from the intrinsic evidence, then there is no need to resort to extrinsic evidence, and similarly, extrinsic evidence may not be used to contradict the construction mandated by the intrinsic evidence.

22. I understand that there is a heavy presumption that a claim term carries its ordinary and customary meaning as of the patent's effective filing date, as understood by a POSA in light of

6

the intrinsic evidence.  I understand that there are only two exceptions to this rule: 1) when the patentee acts as a lexicographer and sets out a definition, or 2) when the patentee disclaims or disavows the full scope of a claim term either in the specification or during prosecution.  I understand that the standards for finding either exception are exacting.

23.    I understand that patent claims are either independent or dependent, where dependent claims include all the limitations of the claims from which they depend.

24.    I understand that, per 35 U.S.C. §112(f), a claim element may be expressed as a means for performing a specified function without reciting the structure that performs that function (also known as a "means-plus-function" element), and that a claim with a means-plus-function element is construed to cover the structure described in the specification as corresponding to the specified function, and equivalents of such structure.

25.    I understand that if a claim term includes the word "means," that creates a rebuttable presumption that the claim term is a means-plus-function limitation (i.e., that §112(f) applies).  Conversely, failure to recite the word "means" creates a rebuttable presumption that §112(f) does not apply to such a claim term.  The party challenging the presumption bears the burden of rebutting it by a preponderance of the totality of the available evidence.

26.    I understand that the essential inquiry is whether (using traditional claim construction principles) the claim term in its entirety is understood by a POSA to have a sufficiently definite meaning as the name for structure.  Thus, if a claim term recites a function and the structure for performing that function, it is not a means-plus-function term, even if it recites "means."

27.    Alternatively, the presumption that §112(f) does not apply can be rebutted if the challenger shows that the claim term fails to recite sufficient, or sufficiently definite, structure for performing that function.  If a POSA would understand the claim term to be a generic label

7

for a collection of parts, or any structure capable of performing the recited function, that term is a means-plus-function term.  I also understand that generic "nonce" terms like "module," "mechanism," "element," "unit," "member," and "device" can operate as a substitute for "means" in the §112(f) context in claiming a particular function rather than describing sufficiently definite structure.

28.     I understand that construing a means-plus-function claim term is a two-step process.  The first step is identifying the claimed function.  The second step is determining what structure, if any, disclosed in the specification corresponds to the recited function.

29.     A disclosed structure qualifies as "corresponding" if, from a POSA's perspective, the intrinsic evidence clearly links or associates that structure to the recited function.  If there are multiple claimed functions, the specification must disclose adequate corresponding structure to perform all of the claimed functions.  If no structure in the specification is linked to the recited function, or if adequate corresponding structure is not disclosed, I understand that the claim is indefinite and amounts to impermissible purely functional claiming.

30.     In forming my opinions in this declaration, I have used the above-discussed claim construction principles for all claim terms.

### B.     Infringement

31.     I understand that, per 35 U.S.C. §271(a), whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, directly infringes the patent (except as otherwise provided in Title 35).

32.     I understand that after the asserted claims have been construed, they are compared to the allegedly infringing product or process.  To establish literal infringement, every limitation set

8

forth in a claim must be found in an accused product exactly; if even one limitation is missing or is not met as claimed, there is no literal infringement of that claim.  I understand that a product that does not literally infringe a patent claim may nevertheless be held to infringe under the doctrine of equivalents; however, I understand from the Luettke Declaration that Plaintiffs are only asserting literal infringement and not under the doctrine of equivalents.

33.     I understand that literal infringement of a claim with a means-plus-function limitation (i.e., governed by §112(f)) requires that the relevant structure in the accused product perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.  The accused structure is equivalent if it performs the identical function in substantially the same way with substantially the same result; or stated alternatively, the differences between the accused structure and the structure disclosed in the specification must be insubstantial.  A claim governed by §112(f) cannot literally encompass technology developed after issuance of that claim.

34.     I understand that one who does not infringe an independent claim cannot literally infringe a claim dependent on that claim.

35.     I understand that Plaintiffs have also accused Defendants of indirectly infringing the asserted patents (namely, actively inducing and contributing to their infringement).  However, I understand that there can be no indirect infringement without underlying direct infringement.

36.     I understand that infringement is a question of fact and that the patent owner has the burden of proving infringement by a preponderance of the evidence, which means proving that the fact is more probable than not.

### C.    Anticipation

37.    I understand that a patent claim is anticipated (and thus invalid) under 35 U.S.C. §102 if each and every limitation of the claim is found, arranged as recited in the claim, expressly or inherently, in a single prior art reference.

38.    I understand that prior art includes patents, printed publications, public use activity, on-sale activity, or other availability to the public before a claimed invention's effective filing date.

39.    I understand that to establish that a claim limitation is inherently disclosed in a reference, that limitation must be necessarily (rather than merely probably or possibly) present in the reference.

40.    I also understand that a reference can anticipate a claim, even if it does not expressly spell out all the limitations arranged or combined as in the claim, if a POSA, reading the reference, would at once envisage the claimed arrangement or combination.

### D.    Obviousness

41.    I understand that a patent claim is obvious (and thus invalid) under 35 U.S.C. §103 if the differences between the claimed invention and the prior art are such that the claimed invention, as a whole, would have been obvious before the invention's effective filing date to a POSA.

42.    I understand that obviousness is determined by considering the following factors: a) scope and content of the prior art; b) differences between the claimed subject matter and the prior art; c) level of ordinary skill in the art; and d) any available secondary considerations.  I understand that secondary considerations can include evidence of a long-felt but unsolved need that was satisfied by the claimed invention, industry praise of a claimed invention, industry skepticism, copying of the claimed invention by others, commercial success of the claimed

invention, failure of others to make the claimed invention, unexpected results, and contemporaneous and independent invention by others.

43.     I understand that a finding of obviousness requires a showing that a POSA would have been motivated to combine or modify the teachings in the prior art to achieve the claimed invention, and that the POSA would have had a reasonable expectation of success in doing so.

44.     I understand that the Supreme Court has recognized various rationales for combining or modifying references to show obviousness of a claimed invention, including: combining prior art elements according to known methods to yield predictable results; simple substitution of one known element for another to obtain predictable results; use of a known technique to improve a similar device in the same way; applying a known technique to a known device ready for improvement to yield predictable results; choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success; and some teaching, suggestion, or motivation in the prior art that would have led a POSA to modify the prior art reference or to combine prior art teachings to arrive at the claimed invention.

45.     I understand that a prior art reference qualifies for an obviousness determination when it is analogous to the claimed invention, i.e., if the reference is either from the same field of endeavor as the claimed invention or reasonably pertinent to the particular problem with which the inventor of the claimed invention is involved.  I understand that a reference is reasonably pertinent if it is one that, because of its disclosed matter, logically would have commended itself to an inventor's attention in considering his problem, when viewed from a POSA's perspective.

### E.     Indefiniteness

46.     I understand that, per 35 U.S.C. §112(b), a patent must include one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint

11

inventor regards as the invention.  Failure to do so renders the claims indefinite and thus invalid.  I understand that this definiteness requirement requires the claims, when read in light of the patent specification and prosecution history using general claim construction principles (discussed above), to inform a POSA with reasonable certainty about the scope of the invention being claimed, measured at the time the patent was applied for.  A patent must be precise enough to afford clear notice of what is claimed and apprise the public of what is still open to them; otherwise there would be a zone of uncertainty that discourages further innovation and enterprise.

47.    I understand that the claims, when read in light of the specification and prosecution history, must provide objective boundaries for those of skill in the art.  Thus a claim is indefinite if a POSA cannot ascribe any meaning to a claim term, or if a claim term might mean several different things but no informed and confident choice is available among the contending alternatives.  I understand that a claim term that depends solely on the subjective opinion of a particular individual purportedly practicing the invention, without sufficient objective guidance in the specification, is also indefinite.  I understand also that a claim that is nonsensical, incomprehensible, or requires impossibility is also indefinite.

### F.    Improper Dependent Claims

48.    I understand that, per 35 U.S.C. §112(d), a claim in dependent form must contain a reference to a claim previously set forth, in which case the dependent claim is construed to incorporate by reference all the limitations of the claim to which it refers, and the dependent claim must then specify a further limitation of the subject matter claimed.  Thus, I understand that a dependent claim that contradicts, broadens, fails to overlap, or fails to add a further limitation to the claim on which it depends is invalid.  Furthermore, if a dependent claim

12

contradicts and is inconsistent with the claim on which it depends, this may prevent reasonable certainty regarding the scope of both claims, thus rendering both indefinite (see preceding section).

49.     I understand that the burden to prove patent invalidity in a District Court lawsuit is by clear and convincing evidence.  Such evidence should place in the fact-finder an abiding conviction that the truth of the factual contentions (underlying the invalidity challenge) are highly probable.  However, I also understand that at the preliminary-injunction stage, an accused infringer need only demonstrate a substantial question regarding the asserted patent's validity or infringement to defeat the patent owner's likelihood of success on the merits; showing a substantial question is a much lower standard than clear and convincing evidence.

## IV.     TECHNOLOGY OVERVIEW

50.     Firearms shoot projectiles using explosive force generated from combustion of a propellant.  Modern firearms use cartridges (or rounds), which are pre-assembled ammunition that packages a projectile (e.g., bullet), the propellant (e.g., gunpowder), and an ignition device (e.g., primer) within a brass or steel case.  A magazine stores multiple cartridges along with a feeding device (typically a spring) to sequentially push each cartridge into position for loading into the firearm's firing chamber.

51.     A firearm's "action" describes its loading, firing, and unloading cycle and falls into two broad categories.  Manual action is any type of action where the cartridge is loaded, and usually fired, one cartridge at a time manually by the user, rather than automatically.  Automatic action utilizes the discharge of the cartridge (namely, the energy, force, or gas generated by the discharge) to cycle the action.  In fully automatic firearms, once the user fires a round, a portion of the energy released from the discharged cartridge is used to eject the spent cartridge case, load

13

a new cartridge into the firing chamber, and ignite the propellant to discharge the new cartridge, repeating this cycle until the user releases the trigger or the ammunition runs out.  Semi-automatic firearms likewise use a portion of the energy released from the discharge of a cartridge to eject the spent cartridge case and chamber a new cartridge; however, the new cartridge will not be fired unless the user releases the trigger and pulls it again.

52.     A popular modern firearm is the AR-15 pattern rifle.  A typical such firearm is shown below:





53.     Common operational components of semiautomatic firearms (like the AR-15) include a receiver (often comprising an upper receiver and a lower receiver), a barrel, a chamber (furthest rear portion of the barrel), a bolt inside a bolt carrier (inside the upper receiver), a recoil (or return or action) spring, a trigger and firing mechanism (also known as the fire control group, housed inside the lower receiver), and a magazine.

54.    A cross-sectional view centered on the receiver is shown below:



55.    When a user pulls the trigger, the trigger pivots clockwise (with reference to the above diagram) on its pivot pin, which results in the trigger sear disengaging from the mating notch on the hammer.  Because the hammer is spring-biased to pivot (about its pivot pin) in the clockwise direction, disengagement of the trigger sear releases the hammer to pivot clockwise and strike the head (end) of the firing pin (held captive inside the bolt).  The hammer striking the firing pin causes the firing pin nose to strike the cartridge, causing the primer in the cartridge base to ignite the propellant and send the bullet forward through the barrel.

56.    When the propellant is ignited and the bullet is propelled forward, some of the gasses flow from the barrel and through a tapping port, into the gas tube leading back to the bolt carrier, and propel the bolt carrier rearwards.  As the bolt carrier moves rearwards, the bolt unlocks, moves rearward with the carrier, and extracts the spent cartridge and ejects it.  The rearward-moving bolt carrier contacts and pivots the hammer counter-clockwise, as shown in the following diagram, where the hammer hook snaps past the mating disconnector hook (since the disconnector is also pivotable and spring-biased in a clockwise direction):



57.    After the bolt carrier reaches the ends of its travel (as the recoil spring is compressed), the bolt carrier and bolt are then pushed forward by the recoil spring.  As it moves forward, the bolt loads the next cartridge into the chamber.  As the bolt carrier moves forward, its bottom surface no longer obstructs the spring-biased hammer, which begins pivoting clockwise.  If the user had released the trigger by this point, it would pivot counter-clockwise (since it is also spring-biased), and its sear would catch the receiving notch on the hammer, preventing the hammer from pivoting further clockwise.  If the user is still holding the trigger rearward when the bolt carrier and bolt move fully forward, then the hammer hook is held by the disconnector hook, which prevents the hammer from continuing to pivot clockwise and strike the firing pin.  When the user releases the trigger in the semi-automatic mode after the bolt carrier and bolt have moved fully forward, the trigger pivots counter-clockwise, which simultaneously causes (1) the disconnector to also pivot counter-clockwise and release the hammer hook, and (2) the trigger

sear to catch the hammer, as just explained. To fire another shot, the user is required to pull the trigger again, in which case the cycle would repeat.

58.     The safety has an external lever that can be pivoted (e.g., by 90 degrees). As shown in the preceding two diagrams, if the safety is pivoted so that the circular cross-sectional portion of the interacting cross member (in yellow) abuts the tail of the trigger, that portion will block the trigger tail from moving upwards, which will prevent the trigger from pivoting clockwise, thus preventing the trigger from being pulled. When the safety is pivoted so that a flat, recessed cross-sectional portion faces the trigger tail, that recess provides clearance for the trigger tail to be raised upwards, which permits the trigger to pivot, thus allowing the trigger to be pulled.

59.     Fully automatic firearms modify this design so that the disconnector does not engage the hammer on every shot, thereby not requiring the trigger to be released and pulled for each shot. However, fully automatic firearms (also known as machine guns) are subject to numerous restrictions, including the prohibition on further manufacture of machine guns for civilian sale after 1986. See, e.g., U.S. Patent No. 7,398,723 ("Blakley"), 8:44-63[1]; U.S. Patent App. Pub. No. 2013/0014417, [0012][2]; U.S. Patent App. Pub. No. 2007/0266845, [0015]; U.S. Patent App. Pub. No. 2009/0151213, [0008]. Thus, there is a marketplace demand for firearms that operate with an increased rate of firing without falling into the legal definition of a machine gun. See, e.g., U.S. Patent No. 7,398,723, 8:44-63.

60.     One approach that accomplishes an increased rate of firing while still actually pulling the trigger once per each shot utilizes the recoil of the bolt carrier to force the trigger to "un-pull" or reset (even with the user continuing to apply force to the trigger face). When the bolt carrier

---

[1] Citations to U.S. patents are in the format *column:line(s)*.
[2] Citations to U.S. patent application publications are to their bracketed paragraphs.

17

returns "into battery" (i.e., normal, ready-to-fire position), the forward displacing force on the trigger is released and the trigger can be pivoted normally to fire a subsequent shot. Thus, if a user continues to maintain pressure on the trigger, such a design will fire many shots quickly, with the trigger rapidly cycling through the pull/un-pull cycle for each shot. Such designs are known by various names including forced reset trigger, active reset trigger, positive reset trigger, assisted reset trigger, active trigger system, positive displacement trigger, and trigger forward displacement system. Examples include Blakley, U.S. Patent No. 9,568,264, U.S. Patent No. 9,939,221, U.S. Patent No. 10,514,223 ("Rounds"), and Tommy Triggers FRT-15-3MD. Indeed, such designs were known as early as 1934. See, e.g., U.S. Patent No. 2,056,975; U.S. Patent No. 2,139,691.

## V.  ASSERTED PATENTS

### A.  '784 Patent

61.    The '784 Patent was applied for, on application no. 18/052,606, on November 4, 2022. That application claimed priority to provisional application no. 63/276,090, which was filed on November 5, 2021. The '784 Patent issued on July 9, 2024, listing Lawrence DeMonico as the inventor.

62.    The '784 Patent is titled "Adapted Forced Reset Trigger." The Technical Field section states that the invention "relates to a semiautomatic firearm trigger adapted for use in certain weapons platforms or calibers." 1:5-6.

63.    The '784 Patent includes the following Abstract:

In a forced rest trigger mechanism, provided is an extended trigger member locking device having a locking member that is movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member. The locking member is configured to be movably supported by a frame and includes a generally upward extension portion configured to make actuating contact with a

18

surface of a bolt carrier. The locking member has a body portion that is movably supported and an upward extension portion that is separately movable relative to the body portion between an extended position and a deflected position.

64.    The '784 Patent has six claims, with claim 1 being independent.

65.    The '784 Patent refers to Rounds, noting that it discloses a forced reset trigger ("FRT") adapted for use in an AR15-pattern firearm.  The '784 Patent explains that An AR10-pattern firearm has certain dimensional differences from an AR15-pattern firearm, which hinders Rounds's FRT from operating as intended absent modification.  Namely, the upward extension of Rounds's locking member/bar is too short to be actuated by the rear portion of the bolt carrier; but if it were extended sufficiently, the locking member would interfere with the forward portion of the bolt carrier.  1:15-44.

66.    The '784 Patent thus discloses making the upward extension portion of the locking member be pivotable in one direction.  When the trigger is pulled and the bolt carrier moves rearwards, the forward portion of the bolt carrier pivots or deflects the upward extension portion of the locking member to not interfere with the bolt carrier.  And when the bolt carrier returns forward, its rear portion would contact and actuate the upward extension portion (which would not pivot), thus resetting the locking member.  1:48-65, 3:37-4:37.  The '784 Patent discloses two embodiments of the pivotable upward extension portion of the locking member: one shown in Figs. 1-4, and the other shown in Figs. 8-10.  3:30-60, 4:38-50.

67.    In other words, the '784 Patent's only alleged improvement over Rounds is making the upward extension portion of the locking member be pivotable (highlighted below):

19



FIG. 5

68.    During prosecution, the applicant filed an Information Disclosure Statement that listed seven references.  The applicant also rushed the '784 Patent through prosecution by filing a Track One request for prioritized examination.

69.    The USPTO issued a non-final Office Action on August 16, 2023, rejecting all of the claims under §112(b) as being indefinite (regarding the "upward extension portion) and under §102 as being anticipated by U.S. Patent No. 10,767,950.

70.    The applicant replied, amending several of the claims, changing the second "upward extension portion" to "upwardly extending deflectable portion" and adding, in claim 1, that the actuating contact (of the locking member's upward extension portion with the bolt carrier surface) causes the locking member to move from the first recited position to the second recited position.  The applicant argued that the amendments resolve the indefiniteness rejection and overcome the anticipation rejection.

20

71.    The USPTO then issued a Notice of Allowance on May 8, 2024, and the patent issued shortly thereafter.

### B.    '247 Patent

72.    The '247 Patent was applied for, on application no. 18/325,225 (the "'225 Application"), on May 30, 2023.  That application claimed priority to provisional application no. 63/374,941, which was filed on September 8, 2022.  The '247 Patent issued on July 16, 2024, listing Brian A. Blakley as the inventor.

73.    The '247 Patent is titled "Firearm Trigger Mechanism."  The Field of the Invention section states that the invention "relates generally to a firearm trigger mechanism . . . ."  1:12-13.

74.    The '247 Patent includes the following Abstract:

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a cam, and a "three position" safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer and pivoting of the cam from a first position to a second position such that a cam lobe forces the trigger member towards the set position, but prior to reaching the set position the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to their set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer and pivoting of the cam from the first position to the second position such that the cam lobe forces the trigger member to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, at which time the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

75.    The '247 Patent has 23 claims, with claims 1, 4, 9, 14, 15, and 20 being independent.

76.    The '247 Patent notes that firearm users want to increase the rate of fire of semiautomatic firearms and notes several designs for doing so, including Blakley (the named inventor's earlier

U.S. Patent No. 7,398,723).  1:38-2:13. The '247 Patent then discusses what it views as an improvement on Blakley.

77.    The '247 Patent discloses a "drop-in" (or cassette-style) replacement trigger module that includes a hammer, disconnector, trigger, cam, and safety selector.  Figs. 1-3, 2:30-56, 7:11-8:14. The safety selector can be rotated to one of three positions, which selects the firearm's mode. 8:43-44.  When the safety selector is in safe mode, the portion of the safety selector that faces the trigger tail and disconnector tail is rounded (full diameter) such that the cross-member of the safety prevents the trigger tail from moving upwards, thus preventing the trigger from pivoting and firing the firearm.  Figs. 4A-B, 7, 8:45-48.  When the safety selector is in standard semi-automatic mode, the cross-member portion of the safety selector that faces the trigger tail and disconnector tail is flat, with a reduced dimension from the safety selector's axis, which allows both trigger tails to move, allowing the trigger and the disconnector which is also captive to the trigger mounting pin to pivot.  This allows the user to pull the trigger and allows the disconnector to catch and hold the hammer until the user releases the trigger.  Figs. 5A-B, 8A-D, 8:49-54. When the safety selector is in forced-reset mode, the portion of the safety selector that faces the trigger tail differs from the portion of the safety selector that faces the disconnector tail.  Namely, the portion that faces the disconnector is rounded (like in safe mode), while the portion that faces the trigger tail (specifically, both sides of the trigger tail) is flat (like in standard semi-automatic mode); the safety selector portion that faces the disconnector protrudes beyond the portion that faces the trigger tail, resulting in disabling of the disconnector while allowing the trigger to be pulled.  Figs. 6A-B, 9A-D, 3:11-16, 8:54-65.

78.    In forced-reset mode, as the bolt carrier moves rearwards after firing, it pivots the cam such that the cam lobe presses down on the "cam follower" (a portion of the trigger tail

22

extending upwards in the preferred instantiation), forcing the trigger tail downwards and pivoting the trigger to the reset or "un-pulled" position.  When the bolt carrier thereafter moves forward, its rear portion pivots the cam in the opposite direction such that the cam lobe slides off the cam follower aspect of the trigger and allows the trigger to be pulled again.  Because the disconnector is disabled in forced-reset mode (as discussed above), the firing sequence continues until the ammunition runs out or the user ceases pulling the trigger.  8:3-14, 34-42, 9:28-10:7.  (In standard semi-automatic mode, the cam may similarly pivot and force the trigger tail downwards; however, the disconnector will catch and hold the hammer until the user manually releases the trigger, so the operation of the firearm in this mode is the typical, well-known semi-automatic operation.  8:66-9:27.)

79.    The '247 Patent's disclosure differs from Blakley only in that (1) the cam follower is integral with the trigger tail (unlike Blakley, which discloses the two as separate pieces), (2) the disconnector has a tail (unlike Blakley, which has no tail), and (3) the safety selector has a portion (corresponding to forced-reset mode) that blocks the disconnector tail while allowing the trigger tail to be moved (unlike Blakley, which had no blocking portion for the disconnector, which had no tail to block).  Compare '247 Patent Fig. 3 with Blakley Fig. 5.

80.    The '225 Application was filed with just 14 claims.  But before the USPTO Examiner examined the claims, the applicant added new claims 15-23 on April 4, 2024.  Notably, in the interim between the filing of the '225 Application and the preliminary amendment, Mr. Tim Hoffman of Hoffman Tactical released the details and design files of his Super Safety (discussed further below).

81.    During prosecution, the applicant filed an Information Disclosure Statement that listed 148 references.

82.     The USPTO issued a Notice of Allowance on May 22, 2024.  The Examiner opined that Blakley discloses most of the limitations of the independent claims.  However, the Examiner thought that Blakley does not show (in relevant part):

> a trigger mechanism whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm; and there is no teaching in the prior art that would have motivated one of ordinary skill in the art to modify Blakley in such a manner.

The '247 Patent issued shortly thereafter.

### C.     '159 Patent

83.     The '159 Patent was applied for, on application no. 18/761,606 (the "'606 Application"), on July 2, 2024.  That application is a continuation of the '247 Patent's application.  The '159 Patent issued on March 17, 2026, listing Brian A. Blakley as the inventor.

84.     The '159 Patent has the same title, Field of the Invention, and Abstract as the '247 Patent. Being a continuation of the '247 Patent, the drawings and specification of the '159 Patent are the same as in the '247 Patent (discussed above).

85.     The '159 Patent has 18 claims, with claims 1, 6, 10, and 14-18 being independent.

86.     The '606 Application was filed with just five claims.  But before the Examiner examined the claims, the applicant added new claims 6-13 in a first preliminary amendment filed January 7, 2025.  And on August 6, 2025, the applicant filed a second preliminary amendment, adding new claims 14-18 and making certain amendments to claims 1, 6, and 10.

24

87.    During prosecution, the applicant filed three Information Disclosure Statements that together listed 163 references.

88.    On January 6, 2026, the applicant filed a "Terminal Disclaimer to Obviate a Double Patenting Rejection over a 'Prior' Patent," disclaiming the terminal end of the '159 Patent that would extend beyond the expiration date of the '247 Patent.  While the USPTO had not issued any double-patenting rejection, the applicant apparently anticipated receiving one and thus filed the terminal disclaimer to overcome it.

89.    The USPTO issued a Notice of Allowance on February 9, 2026.  The Examiner opined that Blakley discloses most of the claim limitations.  However, the Examiner thought that Blakley does not show:

> the combination of elements wherein the trigger mechanism is operable in a first, standard semi-automatic mode and in a second, forced reset semi-automatic mode, whereupon in the first mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm, and whereupon in the second mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger member to fire the firearm.

In the Notice, the Examiner also amended claim 14 to fix what appears to be a typographical error, and the '159 Patent issued shortly thereafter.

### D.    '538 Patent

90.    The '538 Patent was applied for, on application no. 18/968,984, on December 4, 2024.  That application claimed priority to provisional application no. 63/605,793, which was filed on December 4, 2023.  The '538 Patent issued on January 20, 2026, listing Cameron Smith as the inventor.

91.     The '538 Patent is titled "Safety Mechanism for Firearm."  The Field of the Invention section states that the invention "relates generally to a safety selector mechanism" "for semi-auto firearms and rifles."  1:5-8.

92.     The '538 Patent includes the following Abstract:

> A safety mechanism for a firearm includes a cam selector, a lever, and a trigger. The cam selector comprises a first end, a second end, a top side, and a bottom side. The cam selector comprises a longitudinal slot positioned on the top side of the cam selector. The lever comprises a proximal end and a distal end. The longitudinal slot is configured to receive the lever. The cam selector further comprises a first recess and a second recess on the bottom side of the cam selector. The trigger comprises a first trigger tail portion. In addition to the standard semi-automatic and safe modes, the present invention provides an additional active reset mode in which the cam selector is configured to allow the first trigger tail portion to engage the second recess and be moved down by a cam portion of the second recess when the cam selector rotates.

93.     The '538 Patent has 13 claims, with claim 1 being independent.

94.     During prosecution, the applicant filed an Information Disclosure Statement that listed five references.

95.     The USPTO issued a Notice of Allowance on October 10, 2025.  The same Examiner that examined the '247 Patent and the '159 Patent also examined the '538 Patent; he did not issue any rejection during the prosecution of any of these patents.  The USPTO subsequently issued a Notice to File Corrected Application Papers, as the specification included an incomplete sentence, which the applicant fixed.

96.     Plaintiff ABC IP, LLC ("ABC") subsequently acquired the application for the '538 Patent, petitioned to withdraw the application from issue, and requested its continued examination, submitting an Information Disclosure Statement containing 10 references, including a link to Hoffman Tactical's YouTube video, "Introducing the Super Safety."  ABC also submitted a declaration from Mr. Smith (the individual named as inventor on the '538

Patent), alleging that Mr. Hoffman obtained the subject matter disclosed in the mentioned video from Mr. Smith, in an effort to avoid a rejection over that video. Concurrently, ABC filed a Track One request for prioritized examination.

97. In response, the (same) Examiner issued another Notice of Allowance on December 16, 2025, and the patent issued shortly thereafter. After the patent issued, ABC requested, and the USPTO issued, a certificate of correction to fix various errors.

## VI.   ACCUSED PRODUCTS

98. Plaintiffs have accused several products of infringing the asserted patents.

### A.   Super Safety

99. The Super Safety includes a cam, a lever, and a detent:



100. The cam replaces a safety selector in an AR15-pattern firearm and is able to rotate/pivot along an axis running through the cam. The lever is inserted into a slot in the upper side of the cam along its axis. When the firearm is fired, the bolt carrier moves rearwards, contacting the lever and moving it rearwards also, which pivots/rotates the cam. When the bolt carrier returns forward, it will contact the lever and move it forward also, which rotates the cam in the opposite direction.

101.    The cam's middle portion on the bottom side is designed to contact the trigger tail. Specifically, the trigger tail is often U-shaped in cross section, with two sides extending upwards.  One of those sides has its corner cut so that it does not contact or interfere with the cam, while the other side has its corner rounded – it is this rounded corner that contacts the cam in operation.  The cam can be pushed along its axis, which is transverse to the firearm's discharge axis, to select the mode of operation.  The cam has three tracks or grooves on its bottom side, each of which can receive the detent; the grooves aid in keeping the detent axially fixed within the respective track during operation, thus keeping the cam in the selected mode.

102.    If the cam is in safe mode, the rounded trigger tail contacts the portion of the cam that has a rounded curvature with minimal to no recess, which results in the trigger tail being unable to move upward sufficiently to allow the trigger to pivot to release the hammer and discharge the firearm.

103.    If the cam is in standard semi-automatic mode, the rounded trigger tail contacts the portion of the cam that has a recess/cutout along roughly 180 degrees of the cam's circumference.  This recess allows sufficient movement by the rounded trigger tail (when the trigger is pulled) to discharge the firearm.  When the bolt carrier moves the lever backwards, rotating the cam, the recess is sufficiently lengthy (along the cam's circumference) to accommodate the cam's rotation without the cam applying additional force to the trigger tail. Essentially, in standard semi-automatic mode, the lever and cam move but do not interfere with the operation of the other components (i.e., trigger, disconnector, hammer), which operate as usual in standard semi-automatic operation.

104.    If the cam is in forced-reset mode, the rounded trigger tail contacts the portion of the cam that has a recess/cutout along roughly 90 degrees of the cam's circumference.  The recess allows

28

the rounded trigger tail to be moved into the recess when the trigger is pulled (firing the firearm). When the bolt carrier moves the lever backwards, rotating the cam, the cam (its recess being smaller) is forced to press against the rounded trigger tail and force it downwards, resetting (or "un-pulling") the trigger. When the bolt carrier returns forward, the lever rotates the cam in the opposite direction, allowing the rounded trigger tail to slide back into the recess, allowing the trigger to fire the firearm again. This cycle continues until the ammunition runs out or the user manually releases the trigger.

### B. ARC-Fire

105. The ARC-Fire includes a cam, a lever, a detent bar, and a selector (ambi version with an additional ambi selector shown below):



106. This combination of components replaces a firearm's safety selector. The detent bar's reduced-radius shaft portion passes through an opening in the ARC lever, cam, and primary selector and is secured to the selector lever. The ambi version of the ARC-Fire includes a second position selector secured to the detent bar, making the safety selection ambidextrous. The ARC-Fire works with an otherwise mil-spec trigger, the tail of which has been modified in the same way as for the Super Safety.

29

107.    The cam includes a recess or cavity (intended to receive the trigger tail) as well as a protrusion along its outer circumference.  Furthermore, the cam includes angular mating portions that face similar angular mating portions on the lever.  The opposite side of the lever also has certain protrusions on the side that faces the detent bar; the detent bar also has protrusions that correspond to the lever protrusions.  The matching set of protrusions on the lever and detent bar cooperate, when rotated, to move the lever towards or away from the detent bar along the rotation axis.  The detent bar has a track/groove that receives a detent, which aids in keeping the detent bar in the selected mode.

108.    The ARC-Fire's operation is similar to that of the Super Safety, with certain differences. If the ARC-Fire selector is rotated to safe mode, a protruding portion on the primary selector covers the recess/cavity on the cam, thus preventing the trigger tail from moving into the cavity, which prevents the trigger from rotating and firing.

109.    If the selector is rotated to standard semi-automatic mode, the protruding portion on the primary selector rotates out of the way of the cam recess/cavity, thus allowing the trigger tail to enter into that cavity when the trigger is pulled.  Also, the engagement between the lever and the detent bar is such that the lever moves axially closer to the detent bar and further from the cam (thus disengaging from the cam).  When the firearm is fired, the bolt carrier moves rearwards, contacting the lever and moving it rearwards also.  However, because the lever is not engaged with the cam (via their interfacing angular portions), the lever does not cause the cam to rotate, which thereby does not force the trigger to reset.  When the bolt carrier returns forward, it will contact the lever and move it forward also; but because the lever and cam are not engaged, rotating the lever will not cause the cam to rotate.  When the rearward-moving bolt carrier resets

30

the hammer, the disconnector will catch the hammer and hold it until the user releases the trigger, as in standard semi-automatic mode.

110.    If the selector is rotated to ARC mode, the engagement between the lever and the detent bar is such that the lever moves axially away from the detent bar and closer to the cam (thus engaging with the cam).  The cam recess/cavity is not covered by the primary selector's protruding portion.  When the firearm is discharged, the bolt carrier moves rearwards, contacting the lever and moving it rearwards also (in addition to pivoting the hammer rearwards).  Because the lever is engaged with the cam (via their interfacing angular portions), the lever causes the cam to rotate, which thereby forces the trigger tail downwards, causing the trigger to reset and also causing the disconnector to release the hammer.  When the bolt carrier returns forward, it will contact the lever and move it forward also; because the lever and cam are engaged, rotating the lever will cause the cam to rotate, again allowing the trigger tail to rise into the cam recess/cavity, which allows the trigger to be pulled, firing another shot.  This cycle continues until the ammunition runs out or the user manually releases the trigger.

### C.    Other Components

111.    The "SS Cam" is the Super Safety cam discussed above.  The "SS Lever" includes spare Super Safety levers discussed above.  The "SS Cam + Lever" is a combination of the Super Safety cam and lever.

112.    The "Rounded Detent for SS" includes spare Super Safety detents discussed above.

113.    The "Centering Block for SS" is a small plastic part that helps keep the Super Safety lever properly aligned and centered inside a firearm's lower receiver's pocket.  As AS Designs' webpage states, this product is often used to prevent binding in M16-cut lowers, which have wider fire control group pockets than AR-15 pockets.

114. The "Precut Trigger for SS" includes a trigger modified to work with a Super Safety, as discussed above. Plaintiffs mention that Defendants sell multiple versions of trigger components specially modified for the Super Safety and ARC-Fire, but the only specific triggers identified (other than the one in the preceding sentence) are the Geissele SD-3G trigger and the Geissele SSP Curved trigger.

115. The "Lever Blocker" can help prevent over-travel of the Super Safety or ARC-Fire lever with certain triggers and tail-less hammers that result in the lever getting caught under the hammer.

116. Plaintiffs also mention that Defendants sell "slip trip kits and lower housings" for using the Super Safety and ARC-Fire with MCX- or MPX-pattern firearms, but the only ones specifically identified are the "MP5 Slip Trip V5," the "Super Safety MP5 Lower – AP5/ZF5/MAC-5/POF-5 Rev. 2," and the "Super Safety G3/91/MP5 Machined Lower." These lowers allow the Super Safety or ARC-Fire to be used in other (i.e., non-AR-15) pattern firearms, and the slip trip is an interfacing component that allows the Super Safety or ARC-Fire to work within an MP5-pattern lower.

117. The Luettke Declaration does not separately discuss any of these other components, except for the lowers and slip trip kits. Luettke Decl. ¶¶ 22-25, 42-57. Even on these, the Luettke Declaration just generally asserts that, since these lowers and kits allow the Super Safety or ARC-Fire to be used on non-AR-15-pattern firearms, those resulting assembled firearms must also infringe the asserted patents. Thus, the liability over these additional components is predicated on the infringement by the Super Safety or the ARC-Fire.

32

## VII.   <u>RESPONSE TO INFRINGEMENT ALLEGATIONS</u>

118.    The Luettke Declaration discusses Plaintiffs' infringement allegations in its Exhibits A-G as follows.  The Luettke Declaration asserts only literal infringement and does not assert infringement under the doctrine of equivalents.  Luettke Decl. ¶41.

### A.   <u>'784 Patent</u>

119.    Exhibit G to the Luettke Declaration accuses the Super Safety of infringing claims 1, 3, and 4 of the '784 Patent.  Exhibit F to the Luettke Declaration accuses the ARC-Fire[3] of infringing claims 1 and 4 of the '784 Patent.

120.    My response to these allegations is in Exhibit 3 to this declaration.  As discussed therein, certain claim limitations are unclear.  As further discussed therein, my opinion is that (as best understood in light of such indefiniteness) the accused products do not meet each and every claim limitation of the asserted claims and thus do not infringe those claims.

### B.   <u>'247 Patent</u>

121.    Exhibit D to the Luettke Declaration accuses the Super Safety of infringing claim 15 of the '247 Patent.  Exhibit C to the Luettke Declaration accuses the ARC-Fire of infringing claim 15 of the '247 Patent.

122.    My response to these allegations is in Exhibit 4 to this declaration.  As discussed therein, certain claim limitations are unclear.  As further discussed therein, my opinion is that (as best understood in light of such indefiniteness) the accused products do not meet each and every claim limitation of the asserted claim and thus do not infringe that claim.

---

[3] The header row of this exhibit refers to the "Atrius Super Selector"; in light of the rest of the disclosure, this is presumably an error.

33

### C.   '159 Patent

123.   Exhibit B to the Luettke Declaration accuses the Super Safety of infringing claims 1, 3, 6-7, 9-11, and 14-17 of the '159 Patent.  Exhibit A to the Luettke Declaration accuses the ARC-Fire of infringing claims 1, 3, 6-7, 9-11, and 14-17 of the '159 Patent.

124.   My response to these allegations is in Exhibit 5 to this declaration.  As discussed therein, certain claim limitations are unclear.  As further discussed therein, my opinion is that (as best understood in light of such indefiniteness) the accused products do not meet each and every claim limitation of the asserted claims and thus do not infringe those claims.

### D.   '538 Patent

125.   Exhibit E to the Luettke Declaration accuses the Super Safety of infringing claims 1-5 and 8-13 of the '538 Patent.

126.   Since the '538 Patent was drafted (after Mr. Hoffman's public release of the Super Safety) to specifically describe the Super Safety, at least some of its claims cover the Super Safety (though I do not agree with every detail alleged in Exhibit E).  However, this coverage matters only if the '538 Patent were valid (see following section).

## VIII.   INVALIDITY OF THE ASSERTED PATENTS

127.   As further explained below, it is my opinion that the asserted patent claims are invalid.

### A.   '784 Patent

128.   As noted above, the '784 Patent was applied for on November 4, 2022, and it claims priority to a provisional application filed on November 5, 2021.  While I understand that Plaintiffs bear the burden to show entitlement to the claimed priority date, I have assumed, *arguendo*, that the earlier date applies.

129.     U.S. Patent No. 10,514,223 (Rounds) lists Jeffrey Cooper Rounds as the inventor and issued on December 24, 2019, which is more than one year before the earliest claimed priority date of the '784 Patent.  I understand that Rounds is prior art to the '784 Patent under §102(a)(1) and (2).  Rounds is titled "Firearm Trigger Mechanism" and identifies the same field (firearm trigger mechanism).  1:1, 11.  Thus, Rounds is analogous art to the '784 Patent.

130.     U.S. Patent App. Pub. No. 2014/0338523 ("Daley") lists William C. Daley, Jr. as the inventor and was published on November 20, 2014, which is more than one year before the earliest claimed priority date of the '784 Patent.  I understand that Daley is prior art to the '784 Patent under §102(a)(1) and (2).  Daley is titled "Automatic Sear Assembly for a Rifle" and identifies its field as firearms.  [0002].  Thus, Daley is analogous art to the '784 Patent.

131.     U.S. Patent No. 4,023,465 ("Inskip") lists Thomas C. Inskip as the inventor and issued on May 17, 1977, which is more than one year before the earliest claimed priority date of the '784 Patent.  I understand that Inskip is prior art to the '784 Patent under §102(a)(1) and (2).  Inskip is titled "Firearm" and identifies its field as firearms and improved firing mechanisms.  1:4-7.  Thus, Inskip is analogous art to the '784 Patent.

132.     Additional relevant prior art includes the following:

a.     U.S. Patent No. 441,547, issued November 25, 1890, and listing Ivar R. Gilbert as the inventor;

b.     U.S. Patent No. 1,132,601, issued March 23, 1915, and listing John P. Moynihan as the inventor;

c.     U.S. Patent No. 4,449,627, issued May 22, 1984, and listing Ralph W. Kell as the inventor;

35

d.      U.S. Patent No. 5,463,984, issued November 7, 1995, and listing Leslie H. Hubbard as the inventor;

e.      U.S. Patent No. 9,945,083, issued April 17, 2018, and listing Mansheng Dong, Chao Zhang, Qin Shi, Yikai Chen, Zhibin Sun, Fei Tang, Shuqin Li, and Sangding Gu as the inventors;

f.      U.S. Patent App. Pub. No. 2010/0269302, published October 28, 2010, and listing Govindarajan Jagannathan as the inventor;

g.      U.S. Patent App. Pub. No. 2012/0198809, published August 9, 2012, and listing Nathan A. Scolari and George Reiter as the inventors;

h.      U.S. Patent App. Pub. No. 2013/0104344, published May 2, 2013, and listing Silas Brent Lacy as the inventor;

i.      U.S. Patent App. Pub. No. 2014/0329632, published November 6, 2014, and listing Christopher Kranz and Orhan Sahin as the inventors.

Each one of these references was patented or published more than one year before the earliest claimed priority date of the '784 Patent and thus is prior art to the '784 Patent under §102(a)(1) and (2). Each of these references is reasonably pertinent to the particular problem with which the '784 Patent is involved, as further explained in Exhibit 7 to this declaration, and is analogous art to the '784 Patent.

133.    Exhibits 6 and 7 to this declaration disclose how the cited prior art meets the claim limitations of the asserted claims of the '784 Patent.

134.    Exhibit 8 to this declaration explains how the cited prior art anticipates and renders obvious the asserted claims of the '784 Patent. Thus, the asserted claims of the '784 Patent are invalid over the cited prior art.

36

### B.    '247 Patent

135.    As noted above, the '247 Patent was applied for on May 30, 2023, and it claims priority to a provisional application filed on September 8, 2022.  While I understand that Plaintiffs bear the burden to show entitlement to the claimed priority date (which I do not believe they will be able to show), I have assumed, *arguendo* for this prior-art-based invalidity discussion, that the earlier date applies.

136.    U.S. Patent No. 3,045,555 ("Stoner") lists Eugene M. Stoner as the inventor and issued on July 24, 1962, which is more than one year before the earliest claimed priority date of the '247 Patent.  I understand that Stoner is prior art to the '247 Patent under §102(a)(1) and (2). Stoner is titled "Automatic Trigger Mechanism with Three Sears and a Rotatable Control Member" and identifies "a trigger mechanism for various types of guns" as its field.  1:11-15. Thus, Stoner is analogous art to the '247 Patent.

137.    As noted above, Inskip issued in 1977, more than one year before the earliest claimed priority date of the '247 Patent and is prior art under §102(a)(1) and (2).  As also noted above, Inskip is titled "Firearm" and identifies its field as firearms and improved firing mechanisms and thus is analogous art to the '247 Patent.

138.    U.S. Patent No. 7,398,723 (Blakley) lists Brian A. Blakley as the inventor and issued on July 15, 2008, which is more than one year before the earliest claimed priority date of the '247 Patent.  I understand that Blakley is prior art to the '247 Patent under §102(a)(1).  Blakley is titled "Trigger Forward Displacement System and Method" and identifies its field as trigger forward displacement systems and methods and increasing the cyclic rate of actuating the trigger and discharging a semi-automatic firearm.  1:7-10.  Thus, Blakley is analogous art to the '247 Patent.

139.    U.S. Patent No. 9,146,067 ("Stakes") lists Michael A. Stakes as the inventor and issued on September 15, 2015, which is more than one year before the earliest claimed priority date of the '247 Patent.  I understand that Stakes is prior art to the '247 Patent under §102(a)(1) and (2).  Stakes is titled "Trigger Mechanism" and identifies the same field (trigger mechanisms).  1:5.  Thus, Stakes is analogous art to the '247 Patent.

140.    Tommy Triggers sold a trigger assembly called FRT-15-3MD on or before February 21, 2022, as disclosed in the Complaint in *Rare Breed Triggers, LLC v. Strbac*, No. 1:22-cv-00280 (N.D. Ohio), ECF No. 1.  The FRT-15-3MD (referred to as "Tommy") is also described in U.S. provisional patent application no. 63/297,884, filed January 10, 2022, and listing Mladen Thomas Strbac as the inventor.  See also the YouTube video, "Tommy Trigger's Alamo 15 and Rare Breed FRT/E3 Safety Selector Guide," posted June 29, 2022, by user Bingly at https://www.youtube.com/watch?v=00mQ2mfjqfU ("Bingly").  Tommy was thus in public use, on sale, described in a printed publication, and otherwise available to the public before the earliest claimed priority date of the '247 Patent (and more than one year before the actual filing date of the '247 Patent) and is prior art to the '247 Patent under §102(a)(1).  Tommy is a forced reset trigger and thus is analogous art to the '247 Patent.

141.    Exhibit 9 to this declaration discloses how Stakes meets the claim limitations of the asserted claim 15 of the '247 Patent.

142.    Exhibit 10 to this declaration discloses how Blakley meets the claim limitations of the asserted claim 15 of the '247 Patent.

143.    Exhibit 11 to this declaration discloses how Tommy meets the claim limitations of the asserted claim 15 of the '247 Patent.

144.    Exhibit 12 to this declaration discloses how Stoner meets the claim limitations of the asserted claim 15 of the '247 Patent.

145.    Exhibit 13 to this declaration explains how the cited prior art anticipates and renders obvious claim 15 of the '247 Patent.  Thus, claim 15 of the '247 Patent is invalid over the cited prior art.

### C.    '159 Patent

146.    As noted above, the '159 Patent was applied for on July 2, 2024, as a continuation of the '247 Patent, and claims priority to September 8, 2022.  As for the '247 Patent, I have assumed, *arguendo* for this prior-art-based invalidity discussion, that the earlier claimed priority date applies.

147.    Stoner, Blakley, and Stakes (all discussed in the preceding section) are prior art to the '159 Patent for the same reasons as regarding the '247 Patent (since the '159 Patent is a continuation of, and shares the specification of, the '247 Patent).

148.    Exhibit 14 to this declaration discloses how Stoner meets the claim limitations of the asserted claims of the '159 Patent.

149.    Exhibit 15 to this declaration discloses how Blakley meets the claim limitations of the asserted claims of the '159 Patent.

150.    Exhibit 16 to this declaration discloses how Stakes meets the claim limitations of the asserted claims of the '159 Patent.

151.    Exhibit 17 to this declaration explains how the cited prior art anticipates and renders obvious the asserted claims of the '159 Patent.  Thus, the asserted claims of the '159 Patent are invalid over the cited prior art.

### D.    '538 Patent

152.    As noted above, the '538 Patent was applied for on December 4, 2024, claims priority to a provisional application filed on December 4, 2023, and specifically describes the Super Safety.

153.    I understand that Mr. Tim Hoffman claims to be the true inventor of the Super Safety and that he disagrees that Mr. Smith invented the Super Safety.

154.    I understand that Mr. Hoffman filed provisional patent application no. 63/377,498 describing the Super Safety on September 28, 2022.  I also understand that Mr. Hoffman released the Super Safety design files (including drawings and documentation titled "Super Safety – 3D Printed Active Trigger System v4.4") along with an explanatory YouTube video titled "Introducing the Super Safety" in July 2023.  These dates precede the earliest priority date of the '538 Patent (December 4, 2023).

155.    Exhibit 18 to this declaration discloses how all claim limitations of the asserted claims of the '538 Patent are met by Mr. Hoffman's provisional patent application no. 63/377,498, further supported by his July 2023 Super Safety release.

156.    In short, both Mr. Hoffman and Mr. Smith have disclosed the invention claimed in the '538 Patent, though Mr. Hoffman's disclosure is considerably earlier than Mr. Smith's based on the information currently available to me, which suggests that Mr. Hoffman is the true inventor of the invention claimed in the '538 Patent, as additionally discussed in Exhibit 20 to this declaration.

157.    As noted above, Blakley issued in 2008, more than one year before the earliest claimed priority date of the '538 Patent and is prior art under §102(a)(1) and (2).  As also noted above, Blakley identifies its field as trigger forward displacement systems and methods and increasing

40

the cyclic rate of actuating the trigger and discharging a semi-automatic firearm and thus is analogous art to the '538 Patent.

158.    U.S. Patent No. 2,539,447 ("Lochhead") lists John C. Lochhead as the inventor and issued on January 30, 1951, which is more than one year before the earliest claimed priority date of the '538 Patent.  I understand that Lochhead is prior art to the '247 Patent under §102(a)(1) and (2).  Lochhead is titled "Selector for Automatic Firearms" and identifies its field as selectors for selectively positioning the fire control mechanism of a firearm for semi-automatic or full-automatic fire.  1:5-8.  Thus, Lochhead is analogous art to the '247 Patent.

159.    European Patent No. EP 2,950,033 B1 ("Ostanin") lists Alexander Ostanin, Olaf Sauer, and Lutz Morgenroth as the inventors and issued on November 23, 2016, which is more than one year before the earliest claimed priority date of the '538 Patent.  I understand that Lochhead is prior art to the '247 Patent under §102(a)(1) and (2).  Ostanin is titled "Handgun and Trigger Lock for Same."  I have reviewed an English-language translation of Ostanin available on Google Patents ("Ostanin Translation").  Ostanin identifies its field as relating to trigger guards for handguns and handguns with trigger devices.  Ostanin Translation, p. 2.  Thus, Ostanin is analogous art to the '538 Patent.

160.    Exhibit 19 to this declaration discloses how the cited prior art meets the claim limitations of the asserted claims of the '538 Patent.

161.    Exhibit 20 to this declaration explains how the cited prior art anticipates and renders obvious the asserted claims of the '538 Patent.  Thus, the asserted claims of the '538 Patent are invalid over the cited prior art.

162.    I reserve the right to amend or supplement the opinions expressed in this declaration, including based on any new information that comes to light.  This is especially the case because,

41

as noted above, this declaration is being prepared in response to Plaintiffs' Motion for

Preliminary Injunction, on a preliminary and expedited record with no discovery conducted by

Defendants.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on: ___July 9,_____, 2026            _____
                      Date                                              Stephen A. Batzer, Ph.D., P.E.