**Exhibit 8 - <u>INVALIDITY ARGUMENTS</u>**

U.S. Patent No. 12,031,784 ("'784 Patent") — Claims 1, 3, and 4

## I.    <u>INTRODUCTION AND SUMMARY OF GROUNDS</u>

The asserted claims are directed to an extended trigger member locking device for a forced-reset trigger mechanism: a locking member movable between a position that locks the trigger against pulling movement and a position that frees it, actuated by contact between an upward extension of the locking member and a surface of the bolt carrier, and including a body portion and an upwardly extending deflectable portion that is separately movable relative to the body. The prior art relied upon is U.S. Patent No. 4,023,465 to Inskip ("Inskip"); U.S. Patent No. 10,514,223 to Rounds ("Rounds"); and U.S. Patent Application Publication No. 2014/0338523 to Daley ("Daley"). U.S. Patent No. 7,398,723 ("Blakley," the '723 patent) — the named inventor's own earlier patent — is cited as intrinsic-type evidence bearing on the meaning of "forced reset," not as a combination reference.

Two grounds are advanced. Ground 1 is presented in two forms: anticipation of claims 1, 3, and 4 by Inskip under 35 U.S.C. § 102, and, in the alternative, obviousness of those claims over Inskip alone under § 103. The alternative form addresses whether Inskip's cantilever spring 110 is a "deflectable portion" that "pivots relative to the body portion," and whether Inskip's "variable rate" mode is a "forced re[se]t trigger mechanism" within the meaning of the claim 1 preamble. Ground 2 is obviousness of claims 1, 3, and 4 over Rounds in view of Daley under § 103. Rounds is itself a forced-reset trigger patent and discloses every limitation of claim 1 except, arguably, that its upwardly extending portion is "deflectable" and "separately movable relative to the body portion"; Daley expressly supplies that feature, and a POSA would have been motivated to apply Daley's teaching to Rounds, as set forth in the Ground 2 section below. The two grounds are

complementary: Ground 1 rests on a single 1977 reference, while Ground 2 avoids Ground 1's preamble dispute entirely because Rounds is a forced-reset trigger mechanism on its face.

## II.     CLAIM-CONSTRUCTIONS

### A.     "In a forced re[se]t trigger mechanism" (claim 1 preamble)

Two independent positions could be advanced. First, the preamble is arguably non-limiting: it recites the intended environment of the "extended trigger member locking device" rather than a structural limitation of the device itself, and the body of claim 1 defines a structurally complete locking device without reliance on the preamble for antecedent basis of its operative elements. If the preamble is non-limiting, Inskip's locking device anticipates without any inquiry into forced reset.

Second, even if the preamble is limiting, "forced reset trigger mechanism" should be construed by operation, not nomenclature: a mechanism that mechanically forces the trigger forward to its set position during the bolt-carrier cycle notwithstanding continued finger pressure, while discharging one round per function of the trigger. Blakley supplies the governing definition of retained semi-automatic status: "The semi-automatic status of the firearm is retained as the firearm only discharges one round of ammunition for each pull of the trigger" — the "one round per function of the trigger" rule (Blakley, col. 8, lns. 24–63). As shown in Section IV, Inskip's variable-rate mode satisfies that operational definition.

### B.     "Pivots relative to the body portion" (claim 4)

Claim 4 requires that the deflectable portion "pivots relative to the body portion." So "pivots" encompasses flexural rotation about a fixed root — the kinematics of a cantilever or living hinge — and is not limited to rotation about a discrete pin. Claim 1 already requires that the deflectable portion be "separately movable relative to the body portion between an extended

position and a deflected position"; claim 4 further characterizes the geometry of that relative motion as rotational. A cantilever spring anchored at one end rotates its free end about the anchored root, which is pivoting in the ordinary kinematic sense. The same flexure-inclusive construction also serves Ground 2: to the extent the Rounds–Daley combination implements the deflectable portion as a flexing element, its flexure relative to the body portion is pivoting under this construction, while a pinned implementation meets "pivots" on any construction.

### C. "Frame" (claim 1)

The '784 Patent teaches that the claimed frame may be the trigger housing ('784 Patent, 3:30–36), and dependent claim 2 — which recites that the locking member is supported by a trigger housing — suggests that claim 1's "frame" may be broader and cover the receiver or any housing structure supporting the locking member. Support by the firearm receiver therefore meets the limitation under the broader construction.

### III. GROUND 1 — ANTICIPATION OF CLAIMS 1, 3, AND 4 BY INSKIP UNDER § 102 (ALTERNATIVELY, OBVIOUSNESS OVER INSKIP ALONE)

*Claim 1 preamble ("In a forced re[se]t trigger mechanism, an extended trigger member locking device")*. If the preamble is non-limiting (Section II.A), this element requires no showing. If limiting, Inskip's variable-rate mode is a forced-reset trigger mechanism in operation. First, it employs forced reset: "Upon further rearward movement of the carrier 20 as shown in FIG. 5 the cam surface 142 forces the trigger depressor plate 132 down against the upper surfaces of the trigger ribs 44 and 46, thereby causing the trigger 38 and the secondary member 56 to pivot counterclockwise (forwardly) even though the operator's finger may still be exerting pressure on the projection 42…. The trigger 38 is now held in its counterclockwise position and cannot be pulled clockwise." (5:55–67.) That is a mechanically forced trigger reset against continued finger pressure — the defining act of forced reset. Second, it satisfies the intrinsic "one round per function

of the trigger" definition of retained semi-automatic status drawn from Blakley (col. 8, lns. 24–63): after each shot the carrier cycles, the trigger is forced forward and unlocked only when the carrier returns, and "[a]t this point the operator's finger pressure on the trigger projection 42 may cause the rifle to fire again" (6:18–20) — one discharge per trigger function, with "[v]ariable finger pressures … produc[ing] firing rates between a single shot and maximum rate" (6:21–42). Third, Inskip's maximum rate of approximately 700 rounds per minute (6:24–31) sits at the low end of the range attributed to modern forced-reset triggers, corroborating functional identity. Inskip's pre-1986 nomenclature ("variable rate"/"fully automatic") does not change what the mechanism does; in 1975 there was no regulatory or commercial reason to distinguish "forced reset" from automatic fire, and anticipation turns on disclosed operation, not labels. Inskip's locking device comprises disengagement arm 98, pin 100, rod 106, sear 108, and spring 110 (col. 3, ln. 66 – col. 4, ln. 19).

*"A locking member … movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement."* Sear 108 is the locking member; trigger 38 carries pin 116. In the first position (Fig. 5), "[w]hen thus engaged with the pin 116 the sear 108 locks the trigger 38" (4:14–16), and the locked trigger "is now held in its counterclockwise position and cannot be pulled clockwise" (5:65–67). In the second position (Fig. 1), the carrier's cam surface 104 engages cam surface 102 on arm 98 "so as to pivot the arm 98, its rod 106 and its sear 108 clockwise to a position in which the sear 108 is out of contact with the sear pin 116" (6:10–15).

*"Configured to be movably supported by a frame."* The '784 Patent teaches that the claimed frame may be the trigger housing ('784 Patent, 3:30–36), and dependent claim 2's recitation that the locking member is supported by a trigger housing confirms that claim 1's "frame" is at least as broad. Inskip's arm 98 is "located at the right hand side of the receiver 10

and pivoted at its lower end to the receiver 10 by a pin 100" (col. 3, ln. 66 – col. 4, ln. 1) — support by the receiver/frame squarely meets the limitation.

"*Including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier, such actuating contact causing the locking member to move from the first position to the second position.*" Arm 98 is the upward extension; the carrier's cam surface 104 makes actuating contact with the arm's cam surface 102, pivoting the assembly so that sear 108 releases pin 116 (6:10–15).

"*A body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position.*" Sear 108 is the movably supported body. Spring 110 is the upwardly extending deflectable portion: "A spring 110 is rigidly attached at one end to the sear 108 and extends upwardly into the path of the bolt carrier 20." Inskip does not use the word "deflectable," but deflection is the inherent and necessary function of a cantilever spring placed in the carrier's path, and the deflection is visible on the face of the drawings: compare spring 110's position relative to sear 108 in Fig. 4 (not engaged by the carrier) with Fig. 5 (engaged and deflected). The limitation is inherently disclosed; at minimum, a POSA would find it obvious that Inskip's cantilever spring deflects relative to the body between extended and deflected positions, because that is the sole purpose of the component.

*Claim 3 ("the locking member body portion pivots between the first and second positions").* Sear 108, together with rod 106 and arm 98, pivots about pin 100 between the locking and releasing positions (4:14–16; 6:10–15).

*Claim 4 ("the locking member deflectable portion pivots relative to the body portion").* Inskip states that spring 110 is rigidly attached at one end to sear 108. A cantilever spring's flexure

about its fixed root is, kinematically, pivoting relative to the anchored body — the spring functions as a living hinge. If a pin-pivot construction is adopted, claim 4 is obvious: substituting a pinned, spring-biased pawl for a cantilever spring (or vice versa) is a classic, predictable design choice for a deflectable ratchet-style element in the carrier path, well within ordinary skill.

## IV.    GROUND 2 — OBVIOUSNESS OF CLAIMS 1, 3, AND 4 OVER ROUNDS IN VIEW OF DALEY UNDER § 103

Rounds discloses a forced-reset trigger mechanism 10 having an extended trigger member locking device 62 (Abstract; Figs. 1–5) — the same class of mechanism as the '784 Patent, so Ground 2 does not implicate the preamble dispute addressed in Ground 1. Rounds alone discloses every limitation of claim 1 except, arguably, the final one: Rounds shows an upwardly extending portion on locking member 62 but does not expressly describe that portion as "deflectable" or as "separately movable relative to the body portion." Daley (U.S. Patent App. Pub. No. 2014/0338523) supplies precisely that feature, together with an express statement of its advantages, and a POSA would have been motivated to apply Daley's teaching to Rounds with a reasonable expectation of success. Each limitation is addressed in turn.

*Claim 1 preamble ("In a forced re[se]t trigger mechanism, an extended trigger member locking device").* Rounds discloses a forced-reset trigger mechanism 10 that has an extended trigger member locking device 62 (Abstract; Figs. 1–5). The preamble is therefore met whether or not it is limiting.

*"A locking member ... movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement."* Rounds' locking member 62 is movable between a first position in which it locks trigger member 26 against pulling movement (Fig. 5) and a second position in which it does not restrict movement of trigger member 26 (Figs. 3–4). (Abstract; 4:61–6:9.) Daley discloses the same architecture: a locking

member (sear assembly 10) movable between a first position in which it locks the hammer from falling (Fig. 10A) and a second position in which it does not restrict the hammer's movement (Fig. 10B). (Abstract; [0063]–[0064].)

*"Configured to be movably supported by a frame."* Rounds discloses that locking member 62 is movably supported by frame 12 (Abstract; Figs. 1–2; 4:61–65; Rounds claim 1) — an express "frame," so the construction point developed for Inskip's receiver is not even needed here. Daley's locking member 10 is likewise movably supported by a receiver frame ([0057], [0060]; Figs. 1A, 10A–B).

*"Including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier, such actuating contact causing the locking member to move from the first position to the second position."* Rounds discloses that locking member 62 includes a generally upward extension portion configured to make actuating contact with surface 54 of bolt carrier 52, and that this actuating contact causes the locking member to move from the first position (Fig. 5) to the second position (Figs. 3–4). (Figs. 3–5; 4:65–5:6.) Daley discloses the same operation: upward extension portion 200 makes actuating contact with surfaces 922 and 923a–b of bolt carrier 920, and that contact moves the locking member from the first position (Fig. 10A) to the second position (Fig. 10B). (Figs. 10A–B; [0063]–[0064].)

*"A body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position."* Rounds discloses the body portion: locking member 62 is movably supported by frame 12 (Abstract; Figs. 1–5; 4:61–65; Rounds claim 1), and Rounds discloses an upwardly extending portion on that member (Figs. 3–5; 4:65–5:6). What Rounds does not expressly disclose is that the extending portion is deflectable and separately movable relative to the body. Daley

discloses that feature in terms: locking member 10 has a body portion 100 that is movably supported (by pin 600) (Figs. 1A–B, 10A–B; [0035]–[0040], [0057], [0060]) and an upwardly extending deflectable portion 200 that is separately movable relative to body portion 100 between an extended position (Fig. 10B) and a deflected position (Fig. 10A). (Abstract; Figs. 1A–B, 6A–B; [0025], [0050], [0063]–[0065].)

The motivation to combine is threefold. First, Daley teaches the advantages of the separately movable deflectable portion expressly: it aids in preventing binding of the firearm that would result from direct contact between the locking member body portion 100 and the bolt carrier 920, and it permits the length of the upwardly extending portion to be sized appropriately ([0031], [0046], [0065]) — teachings equally applicable to Rounds. Second, Rounds' own geometry presents the design problem Daley solves. The upwardly extending portion of locking member 62 must extend sufficiently above the housing to be reliably engaged (and pivoted) by surface 54 of the bolt carrier tail portion 56 as the carrier moves forward, in the direction of firing (Figs. 3–4), yet must not interfere with the forward portion of the bolt carrier body 58 (with surface 76) as the carrier travels rearward (Fig. 5) — a conflict aggravated by Rounds' rearward extension 64, which limits how far the extending portion can pivot rearward (5:6–9). Given those conflicting requirements and the narrow tolerances on the extending portion's working length and on the clearance between the bolt carrier group and the fire control group, a POSA would be motivated, in light of Daley's teachings, to design the extending portion with sufficient length above the housing to be reliably pivoted by tail-portion surface 54, and to have the extending portion bend or deflect out of the path of the rearward-moving bolt carrier. Third, one-way deflecting elements — components that deflect, bend, or pivot when force is applied in one direction but remain undeflected against force applied in the opposite direction — were a familiar, predictable

mechanical technique long before the '784 Patent's priority date. See, e.g., U.S. Patent No. 441,547 (Figs. 5–6; p. 2, left col., lns. 14–21); U.S. Patent No. 1,132,601 (Figs. 2–5); U.S. Patent No. 4,449,627 (Fig. 11; Abstract; 1:13–27, 49–68; 2:51–59); U.S. Patent No. 5,463,984 (Figs. 3–4; 2:13–20); U.S. Patent No. 9,945,083 (Abstract; Figs. 2a, 2c; 2:1–23; 4:40–47); U.S. Patent App. Pub. No. 2010/0269302 (Figs. 1–3A; [0010]); U.S. Patent App. Pub. No. 2012/0198809 (Figs. 1B–C; Abstract; [0018]–[0019], [0022]); U.S. Patent App. Pub. No. 2013/0104344 (Figs. 2–5; Abstract; [0001], [0017]–[0018], [0021]); U.S. Patent App. Pub. No. 2014/0329632 ([0002]). Applying a known technique to improve a similar device in the same way is a textbook basis for obviousness; the modification is a simple mechanical adaptation in a predictable art, and the expectation of success is correspondingly high. The result of the combination reads directly on the limitation: an upwardly extending deflectable portion that moves to a deflected position when the rearward-moving bolt carrier applies force to it, and that remains in the extended position when the rear of the bolt carrier applies force in the forward direction.

*Claim 3 ("the locking member body portion pivots between the first and second positions").* Rounds discloses that the locking member body portion pivots (on pin 68) between the first position (Fig. 5) and the second position (Figs. 3–4). (Abstract; Figs. 1–5; 4:61–5:6; Rounds claim 1.) Daley's modification of the extending portion leaves this pivoting body architecture untouched, so claim 3 falls with claim 1.

*Claim 4 ("the locking member deflectable portion pivots relative to the body portion").* In the combination, when Rounds' extending portion is modified per Daley to deflect rearward, the deflectable portion pivots relative to the body portion as it moves between the extended and deflected positions. If the deflection is implemented as a pinned or hinged element, "pivots" is met on any construction; if implemented as a flexing element, the flexure-inclusive construction

advanced in the claim-construction section above (rotation about a fixed root) applies with equal force here. The secondary references cited above disclose both implementations, and either was an obvious, predictable design choice.