███████████

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: RARE BREED TRIGGERS PATENT LITIGATION | CASE NO. 4:26-md-03176-ALM |
| RARE BREED TRIGGERS, INC. et al., <br><br> Plaintiffs, <br><br> vs. <br><br> AS DESIGNS, LLC et al., <br><br> Defendants. | (CASE NO. 4:26-cv-00370-ALM) <br><br> CHIEF JUDGE AMOS L. MAZZANT |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

I.      BACKGROUND ...........................................................................................1

II.     APPLICABLE LAW .....................................................................................3

III.    DISCUSSION ...............................................................................................4

        A.      Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits .............4

        B.      Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm...................7

                1.      Plaintiffs' Delay Undercuts Any Claim of Emergency Relief.....................7

                2.      Plaintiffs' Durable-Goods Theory Shows, At Most, a Damages Case........8

                3.      Product Differences and Customer Choice Break Plaintiffs' Causal Chain................11

                4.      Plaintiffs' Price-Erosion Theory Is Calculable and Not AS Designs-Specific ............12

                5.      Plaintiffs' Market-Share, Dealer-Lock-In, and Lead-Time Theories Are Speculative and Contradictory.............16

                6.      Plaintiffs Have Not Shown Irreparable Reputational Harm or Market Confusion.................19

                7.      Plaintiffs' Cascading-Entry and Collectability Theories Are Speculative.................21

        C.      The Balance of Harms Favors AS Designs............23

        D.      The Public Interest Favors Denial of the Requested Injunction ...........26

        E.      An Injunction Would Require a Sizeable Bond...................28

CONCLUSION...................................................................................................30

HEARING.........................................................................................................30

ii

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*ABC IP, LLC v. Peak Tactical LLC*,
  No. 26-cv-18, Dkt. #39 (D. Wyo. Feb. 13, 2026) ........................................................ *passim*

*Alpek Polyester, S.A. v. Polymetrix AG*,
  No. 2021-1706, 2021 WL 5974163 (Fed. Cir. Dec. 16, 2021) ........................................... 5

*Amstar Corp. v. Envirotech Corp.*,
  823 F.2d 1538 (Fed. Cir. 1987) ........................................................................................ 10

*Apple, Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) .............................................................................. 7, 14, 16

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013) .......................................................................................... 4

*Automated Merch. Sys., Inc. v. Crane Co.*,
  357 F. App'x 297 (Fed. Cir. 2009) ..................................................................................... 9

*BlephEx, LLC v. Myco Indus.*,
  24 F.4th 1391 (Fed. Cir. 2022) .......................................................................................... 3

*Commil USA, LLC v. Cisco Sys.*,
  575 U.S. 632 (2015) ....................................................................................................... 5, 6

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) ....................................................................................... 4, 5

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ......................................................................................... 13

*Duncan Parking Techs. v. IPS Grp.*,
  914 F.3d 1347 (Fed. Cir. 2019) .......................................................................................... 5

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ............................................................................................... 7, 25, 26

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ......................................................................................... 19

*Heil Trailer Int'l v. Kula*,
  542 F. App'x 329 (5th Cir. 2013) ...................................................................................... 30

**Page(s)**

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
    49 F.3d 1551 (Fed. Cir. 1995)............................................................................8

*Hybritech Inc. v. Abbott Lab'ys*,
    849 F.2d 1446 (Fed. Cir. 1988)........................................................................26

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
    656 F. App'x 504 (Fed. Cir. 2016) .................................................................5, 6

*Mallet & Co. v. Lacayo*,
    16 F.4th 364 (3rd Cir. 2021) .........................................................................28, 29

*Mead Johnson & Co. v. Abbott Labs.*,
    201 F.3d 883 (7th Cir. 2000) .............................................................................29

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017)......................................................................4, 16

*Mitek Sys. v. United Servs. Auto. Ass'n*,
    139 F.4th 1340 (Fed. Cir. 2025) ..........................................................................5

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
    106 F.4th 1369 (Fed. Cir. 2024) ..........................................................................7

*Novartis Pharms. Corp. v. Eon Labs Mfg.*,
    363 F.3d 1306 (Fed. Cir. 2004)............................................................................5

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ............................................................................10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013).........................................................................12

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
    843 F.3d 1315 (Fed. Cir. 2016)............................................................................5

*Richert v. Calderin*,
    No. 24-cv-21901-ALTMAN, 2025 WL 263454 (S.D. Fla. Jan. 22, 2025) ........6

*Spath v. Hayes Wheels Int'l-Ind., Inc.*,
    211 F.3d 392 (7th Cir. 2000) ...............................................................................6

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989)..........................................................................10

iv

**Page(s)**

*Tek Global, S.R.L. v. Sealant Sys. Int'l*,
    920 F.3d 777 (Fed. Cir. 2019)....................................................................................4, 5

*Tinnus Enter. v. Telebrands Corp.*,
    846 F.3d 1190 (Fed. Cir. 2017)......................................................................................3

*UATP IP, LLC v. Kangaroo, LLC*,
    No. 2022-2047, 2024 WL 658205 (Fed. Cir. Feb. 16, 2024) .............................................3

*United States v. Rare Breed Triggers, LLC*,
    690 F. Supp. 3d 51 (E.D.N.Y. 2023) ...............................................................................1

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................3, 7

*Yale Lock Mfg. Co. v. Sargent*,
    117 U.S. 536 (1886)....................................................................................................13

**STATUTES**

35 U.S.C. § 271...............................................................................................................4, 5

35 U.S.C. § 284...............................................................................................................11

**RULES**

Fed. R. Civ. P. 65..............................................................................................................28

Local Rule CV-7..................................................................................................................6

## I.    BACKGROUND

Plaintiffs Rare Breed Triggers, Inc. ("Rare Breed") and ABC IP, LLC ("ABC") move for a preliminary injunction ("PI") against Defendants AS Designs, LLC, Matthew S. Karlovic, and Calvin Olson based on alleged infringement of several asserted patents directed to forced reset trigger ("FRT") technology: U.S. Patent 12,031,784 ("'784 Patent," Dkt. #20-3), U.S. Patent 12,038,247 ("'247 Patent," Dkt. #20-2), U.S. Patent 12,529,538 ("'538 Patent," Dkt. #20-4), and U.S. Patent 12,578,159 ("'159 Patent," Dkt. #20-5). ("PI Mot.," Dkt. #28.) The requested injunction would reach AS Designs' products, even though AS Designs disputes infringement and validity and Plaintiffs have not yet proven any asserted claim.

Rare Breed's start in the FRT market (including all of their shenanigans) was well-documented in *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51 (E.D.N.Y. 2023). That includes the utter disregard and disrespect for the law by their star witness here, Lawrence DeMonico, and repeated findings of his lack of credibility. *Id*. at 68-73, 91-93, 99-101, 103 & n.39, 110-11, 114-18.

Rare Breed first launched an FRT product at the end of 2020. (DeMonico Decl., Dkt. #28-1, ¶10.) After Rare Breed resolved certain issues with the Department of Justice in May 2025, Rare Breed re-launched the FRT-15L3 at a $499 price point. (*Id*. at ¶¶ 40, 43.) By that time, however, the FRT market was no longer the market Rare Breed had entered in 2020. Rare Breed itself states that, by the May 2025 DOJ settlement, it had identified approximately seventy companies selling FRT products, most derived from publicly released Hoffman Tactical design files, and that additional sellers continued to appear. (*Id*. at ¶40.)

AS Designs is a later-formed business. It was formed in December 2024 and sells products under its own brand. (Accompanying Declaration of Matthew S. Karlovic ("Karlovic Decl.") ¶10;

accompanying Declaration of Eric J. Phillips ("Phillips Decl.") ¶55.) Its accused products include the Super Safety and ARC-Fire systems, as well as MP5-platform products and related components. (Karlovic Decl. ¶3.) The Super Safety uses a push-button mechanism, while the ARC-Fire was designed to use a rotating selector to choose firing mode in a manner familiar to users of standard AR-pattern rifles. (*Id*. at ¶4.) The ARC-Fire required months of independent development, hundreds of part revisions, samples in plastic and metal, additional work on a second version, and design tradeoffs that delayed other products. (*Id*. at ¶5.) Pre-orders for the ARC-Fire Version 1 did not open until the end of August 2025. (*Id*. at ¶13.)

The accused AS Designs products differ from Rare Breed's products in ways relevant to customer demand. Rare Breed's FRT-15L3 is a closed, drop-in assembly. By contrast, the accused ARC-Fire and Super Safety kits supply only certain components—such as the cam, reset lever, pre-cut trigger, and, for the ARC-Fire, safety selector components—and do not include items such as springs, hammer, disconnector, and pins. (*Id*. at ¶6; Phillips Decl. ¶36.) This allows customers to reuse existing parts and to install, service, or later upgrade the trigger of their choice, including higher-end or different-style third-party triggers. (Karlovic Decl. ¶6.)

Plaintiffs' own evidence shows that Rare Breed knew of AS Designs' accused products by August 2025. (Dkt. #28-1 at ¶¶ 31-32.) Rare Breed's counsel sent a cease-and-desist letter dated August 9, 2025, and Mr. DeMonico states that he personally handed the letter to Mr. Olson at a trade show. (*Id*. at ¶¶ 32-33.) AS Designs disputed infringement and continued selling. (*Id*. at ¶¶ 34-35.) Plaintiffs nevertheless did not seek preliminary injunctive relief against AS Designs until April 27, 2026, almost *nine months* after their asserted notice and cease-and-desist letter. Furthermore, Plaintiffs obtained one of the asserted patents (the '538 Patent) from an individual who stole the invention from its true inventor.  (*See* accompanying Declaration of Timothy S.

2

Hoffman ¶¶ 2, 14-23.)

Plaintiffs ask the Court to impose the same market exclusion they seek as final relief before claim construction, merits discovery, expert discovery, or trial. AS Designs disputes infringement and validity, disputes Plaintiffs' claimed irreparable harm, and contends that Plaintiffs' alleged injuries—if proven—can be addressed through ordinary patent-damages remedies.

## II.    __APPLICABLE LAW__

A request for a PI is generally governed by regional circuit law.  But the Federal Circuit has itself built a body of precedent applying the general considerations to patent cases and gives dominant effect to that precedent insofar as it reflects considerations specific to patent issues. *UATP IP, LLC v. Kangaroo, LLC*, No. 2022-2047, 2024 WL 658205, at *1 (Fed. Cir. Feb. 16, 2024) (citing *Tinnus Enter. v. Telebrands Corp.*, 846 F.3d 1190, 1202-03 (Fed. Cir. 2017)).  A PI "is an extraordinary remedy never awarded as of right." *Id*. at *2 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)).  A party seeking a PI must clearly establish (1) likelihood of success on the merits, (2) irreparable harm in the absence of a PI, (3) the balance of hardships tipping in its favor, and (4) the PI is in the public interest.  *Winter*, 555 U.S. at 20, 22.

On likelihood of success, the patentee must show that it will likely prove infringement and that it will likely withstand any challenges to the validity of the patent.  An accused infringer need only demonstrate a substantial question of validity or infringement to defeat a likelihood of success on the merits.  *Tinnus Enter.*, 846 F.3d at 1202.  Unlike proving invalidity at trial, an accused infringer "need not, to defeat a preliminary injunction, prove invalidity by clear and convincing evidence . . . ." *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022); *see also Tinnus Enter.*, 846 F.3d at 1205 (the burden to show a substantial question of invalidity at the PI stage is lower than what is required to prove invalidity at trial).

The patentee must also establish that it is likely to suffer irreparable harm (absent the PI) and that there is a causal nexus between the alleged harm and the alleged infringement. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017)*; see also Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (the causal-nexus requirement distinguishes between irreparable harm caused by infringement and irreparable harm caused by otherwise lawful competition). On the balance of hardships, a court weighs the harm to the movant if the PI is not granted against the harm to the non-movant if the PI is granted. *Metalcraft*, 848 F.3d at 1369.

## III.    **DISCUSSION**

### A.    **Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits.**

As an initial matter, it is not clear from the pleadings what specific causes of action Plaintiffs are actually asserting and against what products. The currently operative complaint includes two counts of indirect infringement and two counts of direct infringement. (*See* Dkt. #4 at p. 12-48[1]). But the proposed complaint scraps that approach, replacing it with four counts, each of which asserts direct, induced, "and/or" contributory infringement of one of four patents. (*See* Dkt. #20-1 at p. 11-93[2]). Furthermore, those counts (which are asserted against several different products) assert infringement "literally and/or under the doctrine of equivalents." (*See id.*).

Proving direct infringement (under 35 U.S.C. §271(a)) requires a patentee to establish that one or more patent claims read on the accused product literally or under the doctrine of equivalents (i.e., that the product embodies each claim limitation literally or its equivalent). *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005); *Tek Global, S.R.L. v.*

---

[1] Page citations to the record in this case are to the page numbers in the ECF header.

[2] Plaintiffs have since filed yet *another* motion to amend their complaint (Dkt. #38), but since their PI Motion (which was filed earlier) does not mention it, neither will this Opposition.

*Sealant Sys. Int'l*, 920 F.3d 777, 784 (Fed. Cir. 2019). That analysis entails two steps: (1) determining the meaning and scope of the asserted claims (i.e., claim construction), and (2) comparing the construed claims to the accused products. *Duncan Parking Techs. v. IPS Grp.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).

Proving induced infringement (under §271(b)) requires a patentee to establish that (1) a third party directly infringed the asserted claims (i.e., underlying direct infringement), (2) the defendant induced those infringing acts (i.e., causation), and (3) the defendant knew the acts it induced constituted infringement (i.e., intent). *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 843 F.3d 1315, 1332 (Fed. Cir. 2016); *Alpek Polyester, S.A. v. Polymetrix AG*, No. 2021-1706, 2021 WL 5974163, at *8 (Fed. Cir. Dec. 16, 2021). The second step requires the inducer to take an affirmative act to encourage infringement. *Power Integrations*, 843 F.3d at 1332.

The Federal Circuit has discussed contributory infringement (under §271(c)) using several different formulations. Synthesizing them, the required elements are: (1) an act of direct infringement, (2) the defendant knew that the combination for which its component was especially made was both patented and infringing (i.e., knowledge of the patent and knowledge of infringement), (3) the defendant's component is not a staple article of commerce suitable for substantial non-infringing uses, and (4) the component is a material part of the patented invention. *Cross Med.*, 424 F.3d at 1312; *Mitek Sys. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1351 (Fed. Cir. 2025); *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522 (Fed. Cir. 2016); *see also Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 639 (2015). "[T]here can be no inducement or contributory infringement absent an underlying direct infringement." *Novartis Pharms. Corp. v. Eon Labs Mfg.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004). If a defendant reasonably

5

believes that he does not infringe (e.g., by reading the claims differently from the plaintiff), that defendant is not liable for indirect infringement, even if his reading is ultimately wrong. *See Koninklijke Philips*, 656 F. App'x at 523 (citing *Commil*, 575 U.S. at 642).

The PI Motion dedicates a total of three pages to the likelihood-of-success factor – a mere three pages to discuss the applicable legal standards, claim construction, infringement of four patents by multiple products, and the patents' validity. (*See* Dkt. #28 at p. 12-15). To say that the discussion is sparse is a severe understatement; the PI Motion does not even identify *which* claims are asserted, much less go through each element of each claim and compare it against each accused product (as required to show direct infringement). The conclusory and undeveloped nature of the infringement arguments alone justifies denying the PI Motion. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).

Instead, the PI Motion offloads the discussion to *exhibits* of one of the supporting declarations. (*See* Dkt. #28 at p. 13 (citing Dkt. #29-22 to #29-28)). This effective incorporation by reference is a transparent attempt to circumvent this District's page limits. *See Richert v. Calderin*, No. 24-cv-21901-ALTMAN, 2025 WL 263454, at *1 (S.D. Fla. Jan. 22, 2025). Plaintiffs neither sought nor obtained an extension of the 15-page limit of Local Rule CV-7(a)(2). Yet incorporating the 18-page Luettke Declaration (Dkt. #29-21) and its seven exhibits results in a whopping 245 pages (!) added to the PI Motion's 15 pages. Such self-help should not be condoned. If the Court does not deny the PI Motion for its failure to show – within the motion itself – likelihood of success on the merits, then AS Designs' non-infringement and invalidity response must also largely rely on its expert's declaration.

And for the detailed reasons explained in the accompanying declaration of Dr. Stephen A. Batzer ("Batzer Decl."), the accused products do not infringe the asserted claims of the '784 Patent,

the '247 Patent, and the '159 Patent. (Batzer Decl. §§ VII.A-C.) Moreover, as thoroughly explained by Dr. Batzer, the asserted claims of each patent are invalid. (*Id.* at §§ VIII.A-D.) These substantial questions regarding infringement and invalidity of the asserted claims eliminate Plaintiffs' likelihood of success on the merits, which alone justifies denying the PI Motion.

### B.    Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm.

A preliminary injunction is "an extraordinary remedy" never awarded as of right. *Winter*, 555 U.S. at 24. To obtain that extraordinary relief, Plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief, not merely that they may suffer some business injury that can be compensated later. *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). The Patent Act does not create a categorical entitlement to an injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006). Plaintiffs' showing fails for several independent reasons.

### 1.    Plaintiffs' Delay Undercuts Any Claim of Emergency Relief.

Plaintiffs' own evidence shows that Rare Breed knew of AS Designs' accused products by August 2025. Mr. DeMonico declares that, "[b]y August 2025," Rare Breed was aware that AS Designs was offering and selling the Super Safety, ARC-Fire, and related products, and that Rare Breed's counsel sent a cease-and-desist letter dated August 9, 2025 demanding that AS Designs cease sales. (Dkt. #28-1 at ¶¶ 31-32). Mr. DeMonico further states that he personally handed that letter to Defendant Olson at a trade show, that AS Designs disputed infringement, and that AS Designs continued selling. (*Id.* at ¶¶ 33-35.)

Yet Plaintiffs did not seek a preliminary injunction until April 27, 2026—almost nine months after their asserted notice and cease-and-desist letter. That delay is incompatible with the

7

urgent, imminent, non-compensable harm required for preliminary relief. The Federal Circuit has long recognized that "delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). In *High Tech Medical*, the Federal Circuit held that, absent a good explanation, delay can "militate[] against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Id.*

Plaintiffs cannot reconcile their claimed emergency with their litigation conduct. They contend AS Designs' products threaten Rare Breed's survival, market position, pricing, goodwill, and ability to enforce its patents. But Rare Breed chose to wait months after identifying AS Designs, after sending its cease-and-desist letter, and after confirming AS Designs disputed infringement. That delay does not bar all ultimate relief, but it weighs heavily against the extraordinary interim remedy Plaintiffs seek now.

Nor can Plaintiffs excuse the delay by invoking their broader litigation campaign. Plaintiffs' own evidence says Rare Breed filed more than twenty[3] patent infringement actions after the May 2025 DOJ settlement. (Dkt. #28-1 at ¶ 17). That assertion shows Plaintiffs were capable of pursuing litigation when they chose to do so. It does not explain why AS Designs required emergency relief only after months of continued, known, and disputed sales.

**2.    Plaintiffs' Durable-Goods Theory Shows, At Most, a Damages Case.**

Plaintiffs' central irreparable-harm theory is that FRT products are durable or semi-durable goods, that each AS Designs sale displaces one Rare Breed sale, and that each displaced customer is lost for the useful life of the product. (Eichmann Decl., Dkt. #28-11 at ¶¶ 5, 10-14.) Accepting that theory for purposes of this factor does not establish irreparable harm; it identifies a finite,

---

[3] At the time of Mr. DeMonico's Declaration, that may have been accurate.

measurable lost-sales claim. Lost sales and price erosion, without more, are compensable injuries. Notably, Mr. Eichmann never actually opines that Rare Breed has lost any sale to AS Designs— he asserts only that competing sales "would be expected, as a matter of economic theory, to result in displacement of demand." (Phillips Decl. at ¶¶ 15, 56 (quoting Dkt. #28-11 at ¶11).) A theoretical expectation of displacement is the stuff of an ordinary damages model, not proof of irreparable injury.

The Federal Circuit has squarely held that "lost sales standing alone are insufficient to prove irreparable harm." *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 300 (Fed. Cir. 2009). If lost sales alone were enough, irreparable harm would exist in every manufacturer-patentee case. *Id.* at 300-01. Plaintiffs' "durable goods" argument merely repackages a lost-sales theory: a customer allegedly buys one accused product instead of one Rare Breed product. That is the classic lost-profit or reasonable-royalty scenario.

Judge Rankin rejected the same essential theory in the related *ABC IP, LLC v. Peak Tactical LLC* case. There, Plaintiffs argued that durable FRT products made each accused sale a permanently lost customer and business opportunity. The court held that "lost sales standing alone are insufficient to prove irreparable harm," and that no amount of lost revenue alone supports preliminary injunctive relief. *ABC IP, LLC v. Peak Tactical LLC*, No. 26-cv-18, Dkt. #39 at 10-11 (D. Wyo. Feb. 13, 2026), *on appeal,* No. 26-1527 (Fed. Cir.). Although *Peak Tactical* involved different accused products and patents, the irreparable-harm theory was materially similar: Plaintiffs claimed FRT sales, price pressure, market-share loss, and business-opportunity loss. The court rejected that showing. This Court should do the same.

The record here makes damages more calculable, not less. Plaintiffs identify Rare Breed's retail prices, manufacturing costs, ABC's asserted $300-per-unit royalty, Rare Breed's per-unit

9

profit, and the "combined lost profit" for each model. (Dkt. #28-1 at ¶41.) AS Designs' transaction records likewise identify units sold, prices, channels, dealers, and customers. ████████████ ██████████████████████████████████████, which permits repeat-purchase analysis rather than speculation. (Karlovic Decl. ¶11.) Plaintiffs thus have the very inputs needed to calculate money damages: accused units sold, but-for sales, applicable margins, royalties, and any proven price effect. If a customer buys a second or third AS Designs product, that sale is captured in the data and can be included in a damages model. If a customer does not buy again, Plaintiffs' claimed injury remains the first lost sale. Either way, the harm is quantifiable. (Phillips Decl. ¶¶ 15, 23-24, 31.)

Plaintiffs also lean on Mr. Luettke's position that the accused products and Rare Breed products share the same core functionality and that no non-infringing alternatives exist. (Dkt. #28-11 at ¶10 n.12; Luettke Decl., Dkt. #29-21 at ¶¶ 40-41, 58-63.) That two-supplier framing does not make damages unknowable—it makes them easier. As Mr. Phillips explains, the market Plaintiffs describe satisfies the classic *Panduit* framework for lost profits, and in a two-supplier market with no non-infringing substitutes a court may infer that the patentee would have made the infringer's sales or charged higher prices but for the infringing competition. (Phillips Decl. ¶¶ 16-20 (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989) (in a two-supplier market the *Panduit* test "is usually straightforward and dispositive"); *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1543 (Fed. Cir. 1987)).) Indeed, Plaintiffs have already supplied the inputs each *Panduit* factor requires—demand (Rare Breed's own sales and market share), absence of non-infringing substitutes (Luettke), manufacturing and marketing capacity (DeMonico's scaled production and excess inventory), and per-unit profit (Dkt. #28-1 at ¶41). (Phillips Decl. ¶¶ 19-22.) A two-supplier

10

market with no substitutes is thus the paradigm case for an adequate damages remedy, not for an injunction. The problem for Plaintiffs is not evidentiary impossibility; it is that they prefer preliminary market exclusion to proving recoverable patent damages under 35 U.S.C. § 284.

### 3.      Product Differences and Customer Choice Break Plaintiffs' Causal Chain.

Plaintiffs' displacement theory assumes the products are fungible substitutes and that price drives each purchasing decision. Their own expert undermines that assumption by describing the FRT market as a "differentiated niche market" in which product design, perceived reliability, brand identity, and channel access affect purchasing decisions. (Dkt. #28-11 at ¶¶ 6-8.) Those non-price attributes are largely unrelated to the asserted patent claims, and they matter here.

AS Designs' products offer reasons for purchase that are independent of price. Mr. Phillips details the concrete product differences: Rare Breed's FRT-15L3 is a closed, drop-in assembly, whereas the accused ARC-Fire and Super Safety kits supply only the cam, reset lever, pre-cut trigger, and (for the ARC-Fire) safety selector(s)—not the springs, hammer, disconnector, and pins—so the customer reuses existing parts and can install, service, and later upgrade the trigger of choice (for example, a higher-end Geissele or a different trigger style) without replacing the whole assembly. (Phillips Decl. ¶¶ 32-36; Karlovic Decl. ¶6.) The modularity, serviceability, mil-spec compatibility, and the option to run a trigger the shooter prefers are features AS Designs treats as core selling points, and the accused products also appeal to users who do not want the feel of Rare Breed's forced reset in ordinary semi-automatic mode. (Karlovic Decl. ¶7; Phillips Decl. ¶36.)

The differences also matter for which Rare Breed product is even the right comparator. Rare Breed's FRT-15L3—the only product on which it claims a price reduction—is a single-stage, three-position trigger, whereas the ARC-Fire is compatible with (and often sold with) two-stage

11

triggers, and AS Designs has seen growing customer demand for that two-stage option. (Phillips Decl. ¶¶ 36-37; Karlovic Decl. ¶8.) Rare Breed's own two-stage product is the FRT-15C3, not the FRT-15L3. (*See* Dkt. #28-1 at ¶ 26.) The mismatch undercuts Plaintiffs' assumption that the ARC-Fire competes head-to-head with the FRT-15L3 on price.

The ARC-Fire also is not merely a re-labeled Super Safety. The Super Safety uses a push-button mechanism, while the ARC-Fire was designed to use a rotating selector to choose firing mode, as on a standard AR-pattern rifle, and AS Designs will show it required months of independent development, hundreds of part revisions, samples in plastic and metal, additional development for a second version, and tradeoffs that delayed other products. (Karlovic Decl. ¶¶ 4-5.) Because Mr. Eichmann himself describes this as a "differentiated niche market" of "discrete choices among alternatives that are not perfectly substitutable" shaped by "non-price factors" including product design (Dkt. #28-11 at ¶¶ 6, 8), any price movement may be driven by those feature differences and user preferences rather than by the accused products' prices. (Phillips Decl. ¶¶ 36-37.) Plaintiffs cannot presume that every AS Designs buyer would have bought Rare Breed absent AS Designs, and where non-price features drive demand, the causal chain Plaintiffs need for irreparable harm is broken.

### 4.    Plaintiffs' Price-Erosion Theory Is Calculable and Not AS Designs-Specific.

Price erosion is a damages theory. The Federal Circuit recognizes that "[l]ost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1378 (Fed. Cir. 2013). The Supreme Court recognized price-erosion damages well over a century ago, and the Federal Circuit continues to award them on proper proof: "Reduction of prices, and consequent loss of profits, enforced by infringing competition, is a

12

proper ground for [an] award[] of damages." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001) (quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 551 (1886)); Phillips Decl. ¶ 31. Plaintiffs therefore cannot rely on the label "price erosion" to transform a damages claim into irreparable harm. Judge Rankin rejected a similar Rare Breed price-erosion presentation in *Peak Tactical*, explaining that Plaintiffs had not shown price erosion was non-compensable and that any proven price erosion can be addressed by applying a but-for price to units sold. *Peak Tactical*, No. 26-cv-18, Dkt. #39, at 11-13.

Here, Plaintiffs identify the alleged price change: Rare Breed reduced the FRT-15L3 price from $499 to $450 in approximately August 2025. (Dkt. #28-1 at ¶¶ 43, 57.) That is not an unknowable harm. If Plaintiffs prove that infringement caused that reduction, the alleged differential, affected units, and duration are calculable. (Phillips Decl. ¶31.) And Plaintiffs' own evidence attributes the decision broadly to "competing FRT products"—not to AS Designs. (Dkt. #28-1 at ¶57.) That testimony does not isolate AS Designs' impact or quantify any AS-specific price effect.

The record affirmatively disproves any causal link between AS Designs and the August 2025 price reduction. The composition and timing of AS Designs' sales confirm it could not have driven a price change on Rare Breed's AR-15 FRT-15L3. The bulk of AS Designs' 2025 sales by dollar value consisted of MP5-platform lower kits—a different firearm platform from the AR-15 FRT-15L3 whose price Rare Breed reduced. Because an MP5 kit sells for up to roughly $650 while a standalone Super Safety sells for approximately $100, those dollar figures substantially overstate the number of AR-15 accused units actually in the market, and AS Designs' AR-15 accused-product volume during the relevant period was limited. (Karlovic Decl. ¶14.) More decisively, AS Designs' principal AR-15 accused product, the ARC-Fire, was not even on the market when Rare

13

Breed made its pricing decision: ARC-Fire V1 pre-orders did not open until the end of August 2025. (Karlovic Decl. ¶13.) Tellingly, Mr. DeMonico attributes the price reduction in part to comparisons with "the Super Safety and ARC-Fire" (Dkt. #28-1 at ¶43), even though the ARC-Fire had not yet launched when he says the decision was made—underscoring that his causal account is reconstructed rather than reliable. Plaintiffs' own conduct likewise confirms they did not view AS Designs as a meaningful competitor then: although Plaintiffs had already sent cease-and-desist letters to and sued numerous other Super Safety sellers, they did not send AS Designs a cease-and-desist letter or sue it until later. Other Super Safety sellers—including companies that are themselves defendants in this MDL—were selling Super Safety-type products in far greater volume than AS Designs during the period of the alleged price drop. (Karlovic Decl. ¶15.) Rare Breed admits that, by the May 2025 DOJ settlement, it had identified approximately seventy companies selling allegedly infringing FRT products, most derived from publicly released Hoffman Tactical design files, with new sellers continuing to appear. (Dkt. #28-1 at ¶40.) As Mr. Phillips explains, a market-wide price response, if any, is not an AS Designs-specific irreparable harm, and the causal-nexus requirement forecloses attributing market-wide pricing pressure to this defendant. (Phillips Decl. ¶¶ 31-38); *Apple*, 678 F.3d at 1324-25.

The timing of Rare Breed's own pricing decisions independently breaks the causal chain. Rare Breed re-launched the FRT-15L3 in May 2025 at $499—and by that time, low-priced Super Safety-type products had already been available for roughly a year, including products built from design files that non-party Hoffman Tactical released publicly and for free. (Dkt. #28-1 at ¶¶ 40, 43.) If cheaper competing products were dictating Rare Breed's pricing, Rare Breed would not have selected $499 as its re-launch price months after those products had saturated the market, only to cut to $450 later. The competitive field Plaintiffs now blame for price erosion predated

14

both Rare Breed's $499 re-launch and any meaningful AS Designs presence, and AS Designs was not even among the first sellers of Super Safety-type products. (Karlovic Decl. ¶¶ 15-16.) The later reduction to $450 reflects a pre-existing, market-wide competitive landscape, not any AS Designs-specific conduct.

Plaintiffs' price-erosion narrative also fixates on the gap between the FRT-15L3 and the roughly $100 standalone Super Safety. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ (Karlovic Decl. ¶9.) The dramatic price disparity Plaintiffs invoke is therefore atypical of the actual competition between the parties' products and cannot carry a finding of AS Designs-driven price erosion.

Mr. Eichmann's fallback—that lower prices become "embedded as reference points" that retrospective compensation cannot restore—does not hold up either. First, Plaintiffs have already identified Rare Breed's pre-infringement price ($499), which resolves any uncertainty about the but-for price and makes the differential calculable. (Phillips Decl. ¶¶ 31, 38.) Second, the "embedded expectations" theory contradicts Plaintiffs' own durable-goods premise: if each accused sale "removes that customer from the addressable market for the duration of the product's useful life," then a post-judgment market would be populated largely by first-time buyers with no knowledge of any prior price anchor, who would face Rare Breed as the sole supplier. (*Id.* at ¶38.) Third, far from being unable to "restore" its pricing, a victorious Rare Breed would hold a one-supplier market and could set prices at its profit-maximizing monopoly level. (*Id.*) None of this is irreparable; it is calculable, and on Plaintiffs' own theory it resolves in their favor.

15

### 5.    Plaintiffs' Market-Share, Dealer-Lock-In, and Lead-Time Theories Are Speculative and Contradictory.

First, Plaintiffs' market-share evidence is not a reliable, AS-specific showing. Mr. DeMonico estimates that Rare Breed now holds less than 25% of the FRT market, based on his "day-to-day monitoring" of competing products online and at gun shows and the spread of "competing products like the Super Safety, ARC Fire, and other copycat FRT products." (Dkt. #28-1 at ¶55.) That is not market analysis. It does not identify total market size, AS Designs' actual share, Rare Breed's share before and after AS Designs' entry, customer diversion from AS Designs specifically, or whether other alleged infringers caused the claimed loss. Patent preliminary injunctions require a causal nexus between the alleged infringement and the asserted irreparable harm. *Apple*, 678 F.3d at 1324-25; *Metalcraft*, 848 F.3d at 1368. Moreover, Mr. DeMonico's suggestion that Rare Breed "held effectively the entire" FRT market describes the position it occupied when it first launched in 2020—not the market it re-entered after the May 2025 DOJ settlement. (Dkt. #28-1 at ¶¶ 10, 55.) By Rare Breed's own account, roughly seventy sellers of competing FRT products already populated the market by that time, most built from Hoffman Tactical's freely released design files. (*Id.* at ¶40.) Rare Breed thus re-entered a crowded field it no longer dominated, and any erosion from its 2020 peak long predated—and cannot be attributed to—AS Designs, which was not even among the first sellers of Super Safety-type products. (Karlovic Decl. ¶¶ 15-16.)

Second, Mr. Eichmann's market theory is internally inconsistent. He characterizes the market as one in which a product can displace another "over a relatively short period of time," yet he assumes that if AS Designs were later enjoined, Rare Breed could not regain customers, dealer attention, or market share. (Eichmann Decl. ¶¶ 6-8, 15-24.) Plaintiffs cannot rely on a rapidly shifting market when describing competitive harm, then insist the same market becomes

16

permanently immovable when describing monetary relief or a later injunction. Under their own characterization, removing AS Designs at the end of the case would let Rare Breed regain share "over a relatively short period of time."

Third, the "permanent customer loss" theory—that each accused sale removes a customer from Rare Breed's market forever because FRTs are durable goods—is contradicted by the actual purchasing data and is, in any event, self-defeating. As Mr. Phillips explains, if the relevant demand opportunity were truly "exhausted" by a single sale, then there would be no follow-on sales to lose beyond that one sale, and Plaintiffs' lost sales would be straightforward to identify and quantify as lost profits. (Phillips Decl. ¶¶ 15, 23.) The premise is also factually wrong: AS Designs' own sales records show tens of thousands of orders placed by a substantially smaller number of unique customers, meaning a large share of customers are in fact repeat purchasers, and customers commonly switch FRT products for reasons unrelated to price—product failures, preference in trigger feel, shape, and look, functionality differences, and spur-of-the-moment purchasing—with insignificant switching costs. (Karlovic Decl. ¶¶ 11-12; Phillips Decl. ¶24.) Any second or third sale to the same customer appears in AS Designs' sales data and is recoverable as lost profits. And because Plaintiffs seek a permanent injunction at the end of the case, even on their own theory any customers supposedly "removed" from the market would be returned to it—leaving Rare Breed, as the sole remaining supplier in the two-supplier market they posit, to capture those sales. (Phillips Decl. ¶¶ 24, 28.)

Fourth, the dealer-lock-in theory is both unsupported and beside the point. As an initial matter, Plaintiffs' own expert acknowledges that Rare Breed has no dealer network and has self-distributed directly to customers, so a theory about dealers forming sticky habits around competing products has little purchase here. (Phillips Decl. ¶¶ 27, 29.) Mr. Eichmann also makes no attempt

17

to identify or quantify any actual dealer investment in "training, compliance processes, and inventory," for either the accused products or Rare Breed's. (*Id.* at ¶27.) AS Designs will show that it does not provide dealer training beyond directing dealers to the same FAQs, videos, and materials available on its website; that compliance is straightforward because dealers are firearms businesses that follow no-ship-state restrictions; and that inventory issues resolve in the ordinary course if a dealer changes suppliers. (Karlovic Decl. ¶18.) In any event, whatever FRT-related knowledge a dealer gains is largely platform-agnostic and transferable: the same fundamentals— managing bolt bounce through buffer-weight adjustments, installing slip-trip systems, and distinguishing full-auto from semi-automatic bolt carriers—apply across FRT products, including Rare Breed's, and the no-ship-state compliance obligations overlap entirely. (*Id*. at ¶19.) Far from locking dealers to AS Designs, any such experience would equip them to sell Rare Breed's FRTs if Rare Breed prevails. Mr. Eichmann's dealer-"investment" theory thus cuts against Plaintiffs: the supposed lock-in is really transferable know-how that would benefit the eventual winner. More fundamentally, in the two-supplier market Plaintiffs posit, a post-judgment injunction removing AS Designs would leave dealers with only one FRT source—Rare Breed—so the notion that dealers would refuse to revert and instead forgo all FRT sales makes no economic sense. (Phillips Decl. ¶28.) If anything, Mr. Eichmann's concern about "uncertainty regarding product continuity" is an argument *against* an injunction, because AS Designs—not Rare Breed—is the party that would face a court-ordered product discontinuity. (*Id.* at ¶28.) Plaintiffs' East Valley example proves the opposite of irreparable harm: Mr. DeMonico states that East Valley had purchased approximately ███████ of Rare Breed triggers at retail and sought dealer status, but Rare Breed refused the dealer relationship because East Valley would not agree to stop selling products Rare Breed accused of infringing. (Dkt. #28-1 at ¶ 52.) That was Rare Breed's own business decision,

18

not an AS Designs-caused channel lock-in. And Rare Breed's decision to open a dealer program "at lower margins" does not show damage at all: a rational manufacturer adds a dealer channel precisely because broader reach and lower fulfillment costs are expected to offset the lower per-unit margin. (Phillips Decl. ¶29.)

Fifth, the lead-time theory is not an irreparable injury caused by AS Designs. Rare Breed brought its first FRT product to market at the end of 2020, years before AS Designs was formed in December 2024, and by Plaintiffs' own prior records sold ███████████ in FRTs in the two years following that launch. (Dkt. #28 at 6; Dkt. #28-1 at ¶10; Phillips Decl. ¶25 & n.29.) Rare Breed therefore already had—and realized—the first-mover opportunity it now claims AS Designs is taking away; AS Designs, formed years later, did not capture that advantage at Rare Breed's expense. (Phillips Decl. ¶25.) Any first-mover advantage reduces to lost profits in a known market, exactly what a lost-profits "market reconstruction" recreates. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); Phillips Decl. ¶¶ 16, 25. And to the extent Rare Breed lost goodwill or market position after the DOJ settlement, the record shows that much of the backlash was directed at Rare Breed's own patent-enforcement campaign and cease-and-desist strategy, not at any product confusion caused by AS Designs. (Dkt. #28-1 at ¶¶ 36-38, 46-47; Karlovic Decl. ¶17.) A self-inflicted or market-wide loss of standing is neither caused by AS Designs nor a basis for enjoining it.

### 6. <u>Plaintiffs Have Not Shown Irreparable Reputational Harm or Market Confusion</u>.

Plaintiffs' reputational evidence is speculative and does not flow from the alleged patent infringement. Mr. DeMonico's own examples include public criticism of Rare Breed's cease-and-desist letter, calls for boycotts, criticism that Rare Breed is enforcing patents against other FRT sellers, and objections to Rare Breed's litigation strategy. (Dkt. #28-1 at ¶¶ 36-38.) That is not

irreparable reputational harm caused by AS Designs' alleged infringement; it is criticism of Rare Breed's own enforcement conduct.

Plaintiffs do not show product confusion, a safety incident attributable to AS Designs, false association between AS Designs and Rare Breed, or any consumer belief that AS Designs' products come from Rare Breed or that Rare Breed's products are inferior because AS Designs sells the accused products. AS Designs sells under its own brand in a market where customers research FRT options by manufacturer, features, installation method, and price. (Karlovic Decl. ¶10.) Nor do Plaintiffs provide customer-survey evidence, dealer testimony, or other concrete proof tying reputational injury to the accused conduct. The contrast with Plaintiffs' own concurrent case against Peak Tactical (d/b/a Partisan Triggers) is telling: there, Plaintiffs pleaded false-patent-marking and false-advertising (Lanham Act) claims alleging that the defendant's marking "mislead[s] consumers into believing that the [product] possesses certain patented qualities, features, or legitimacy that it does not have." (Phillips Decl. ¶40 & n.52.) This case includes no such claims; it is grounded solely in patent infringement, and Mr. Eichmann's "uncertainty regarding product identity[ and] source" language appears to be transplanted from that different, confusion-based case. (*Id*.)

Judge Rankin rejected the same type of reputational-harm showing in *Peak Tactical*. The court held that Plaintiffs had provided evidence of negative online statements, but "no evidence of how these statements have impacted public perception of their brand" and no sufficient showing that reputational harm flowed from the alleged torts. *Peak Tactical*, No. 26-cv-18, Dkt. #39, at 15-17. The same defect is present here. Indeed, an injunction against AS Designs would do nothing to repair—and could only aggravate—harm that flows from Rare Breed's own litigation choices.

Plaintiffs cannot manufacture irreparable harm from the predictable consequences of their enforcement strategy and then attribute it to a single defendant.

### 7.   Plaintiffs' Cascading-Entry and Collectability Theories Are Speculative.

Plaintiffs contend that denying preliminary relief will embolden others to enter the market. But Rare Breed itself says it has already sued more than twenty defendants since May 2025 and had identified approximately seventy sellers by that time. (Dkt. #28-1 at ¶¶ 17, 40.) That record is inconsistent with the idea that AS Designs is uniquely signaling a low-cost path to infringement; a prospective entrant aware of Rare Breed's litigation campaign would conclude the opposite. AS Designs is not aware of any company that entered the FRT market because AS Designs sells the ARC-Fire or Super Safety; if anything, Rare Breed's litigation conduct has discouraged potential entrants. (Karlovic Decl. ¶26.) And the existence of other infringers does not make damages incalculable: in the two-supplier market Plaintiffs posit, Rare Breed would recover lost profits on all of a given infringer's diverted sales.

Plaintiffs' collectability theory fares no better. Plaintiffs cite AS Designs' December 2024 formation date and lack of public financial information, but they provide no financial records, insolvency analysis, insurance analysis, or concrete evidence that AS Designs could not satisfy a judgment—the same threadbare basis Mr. Eichmann relies on. (Phillips Decl. ¶55 (Eichmann "provides no evidence or analyses to support his assertion of collectability risk other than citing to the formation of AS Designs in December 2024").) AS Designs' actual operations refute any suggestion that it is a judgment-proof shell: it is an operating business with approximately ███ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████—with transaction, dealer, and wholesale records available in discovery. (Phillips Decl.

¶¶ 55, 59; Karlovic Decl. ¶¶ 20-21.) If Plaintiffs prove infringement and damages, they can seek money damages, enhanced damages where legally available, and appropriate post-judgment relief. If Plaintiffs believe financial information is relevant, the proper course is damages discovery, expedited accounting, or—were the Court inclined to impose any interim relief—security tailored to proven risk, not a sweeping injunction based on speculation.

Plaintiffs' collectability argument also depends on a damages figure they have inflated through related-party self-dealing. Plaintiffs' per-unit "lost profit" rests on the $300-per-unit royalty that Rare Breed purports to pay its affiliate, ABC IP, on every FRT sold—a charge equal to roughly 67% of the FRT-15L3's $450 price. (Dkt. #28-1 at ¶¶ 30, 41; Phillips Decl. ¶57.) That royalty is not the product of an arm's-length negotiation. ABC and Rare Breed share common ownership and control—the same individuals who own or control Rare Breed stand on both sides of the license, which was signed for ABC and for Rare Breed by affiliated principals. (Phillips Decl. ¶57 & n.82 (citing Complaint (Dkt. #1), *United States v. Rare Breed*, No. 1:23-cv-00369 (E.D.N.Y. Jan. 19, 2023), ¶¶ 83-84).) As Mr. Phillips explains, a 67% royalty "would be considered highly unusual and very unlikely to represent an arm's-length transaction." (Phillips Decl. ¶57.) It reflects how Plaintiffs choose to allocate revenue among their own entities, and it conveniently sets the measure of damages at a figure that exceeds what any competitor could pay.

A market-based royalty for an accessory of this kind is a small fraction of that figure. Mr. Phillips' search of the RoyaltySource and ktMINE databases identified four comparable firearm-related license agreements with a median royalty rate of 4.5% of sales, and published industry benchmarks for the most analogous categories (Consumer Goods, Retail & Leisure; and Machines and Tools) show average rates of 5.9% and third-quartile rates of 6.4% to 7.2%. (Phillips Decl. ¶58 & Ex. 3.) A reasonable royalty in the range of approximately 5.9% to 7.2% of sales—not

22

Plaintiffs' 67% intercompany figure—is what an arm's-length negotiation would yield. And AS Designs could readily pay an award in that range: ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ (Phillips Decl. ¶¶ 58-59.) Plaintiffs cannot manufacture an inability-to-pay theory by first inflating damages with an affiliate royalty no arm's-length licensee would accept and then claiming the resulting number is too large for the defendant to cover.

For all these reasons, Plaintiffs have failed to establish likely irreparable harm. That failure alone requires denial of preliminary injunctive relief.

## C.     **The Balance of Harms Favors AS Designs.**

The balance of harms independently favors denial. Plaintiffs' alleged injuries are monetary, measurable, and remediable through a damages award if Plaintiffs ultimately prevail. AS Designs, by contrast, would suffer immediate and severe injury if the Court enjoins sales of the Super Safety, ARC-Fire, MP5 lowers, slip-trip kits, and related products before any merits determination. The court in *Peak Tactical* reached the same equitable conclusion on materially similar irreparable-harm theories: because Plaintiffs had not shown irreparable harm, the extreme nature of the requested remedy shifted the balance in favor of the accused defendants. *Peak Tactical*, No. 26-cv-18, Dkt. #39, at 31-32.

An injunction would not merely preserve evidence or require an accounting. It would stop AS Designs from selling its accused product lines, strand inventory, disrupt customer relationships, impair supplier and dealer relationships, and damage AS Designs' goodwill in the firearms community. That harm cannot be undone by later telling customers, dealers, and suppliers that AS Designs was wrongfully enjoined. The injunction Plaintiffs seek would hand them the very market

exclusion they request as final relief, before they have proven infringement, validity, causation, or irreparable harm.

Plaintiffs' expert tries to tip this factor by arguing that the harm of an injunction would be "asymmetric" because Rare Breed is a "non-diversified firm" while AS Designs could simply redirect its sales to other product lines. That argument has the facts backwards. As Mr. Phillips explains, the asymmetry runs the other way: Mr. Eichmann "identifies no AS Designs products the company can rely on to 'mitigate or redirect' lost sales," and AS Designs is itself a non-diversified firm—by its own calculation, approximately ▮▮▮ of its sales are of the accused products. (Phillips Decl. ¶52; Karlovic Decl. ¶20.) In raw figures, the accused product categories account for approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. (Karlovic Decl. ¶¶ 20, 25.) Because Plaintiffs accuse the entire MP5 product family, even stripped MP5 lowers that contain no FRT component fall within the requested injunction. An injunction would not redirect AS Designs' sales; it would effectively eliminate the business. And the products AS Designs has in development are likewise lowers compatible with the accused systems that Plaintiffs would seek to enjoin.

The harm extends well beyond revenue. AS Designs currently has approximately twenty employees—more than Rare Breed's own stated headcount. (*Id.* at ¶24.) It also supports suppliers that rely on AS Designs' orders, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) A preliminary injunction would therefore harm employees, suppliers, and the commercial relationships AS Designs has built—harms that are difficult to undo if AS Designs is later found not to infringe or if the asserted patents are narrowed or invalidated. The very harms Plaintiffs' expert says favor an injunction—erosion of market share, pricing, and customer relationships that is "difficult to reverse" for a non-diversified firm—would fall on AS

24

Designs with full force, while Plaintiffs' mirror-image losses remain compensable in damages. That asymmetry runs against the injunction, not for it.

The requested injunction would also disrupt AS Designs' dealer network. Dealer and wholesale sales account for approximately ███████████████████████████████ ███████. (Karlovic Decl. ¶23.) Plaintiffs cannot rely on speculative dealer harm to Rare Breed while ignoring concrete dealer harm to AS Designs. AS Designs designed its pricing and business structure to support dealer participation. Rare Breed's own evidence, by contrast, suggests that its asserted $300-per-unit royalty to its affiliate ABC and its cost structure leave little room for dealer margins on the FRT-15L3. (Dkt. #28-1 at ¶41.) But that is a structural feature of Rare Breed's own pricing model—one driven by an intercompany royalty set between commonly controlled affiliates rather than by any arm's-length market rate (Phillips Decl. ¶57)—not a harm inflicted by AS Designs.

Plaintiffs will argue that AS Designs proceeded after a cease-and-desist letter and therefore any hardship is self-inflicted. That argument assumes the merits. The Federal Circuit and Supreme Court require equitable balancing, not a categorical rule that an accused infringer's hardship is irrelevant. *eBay*, 547 U.S. at 393-94. A cease-and-desist letter is not a judgment. AS Designs disputed infringement when Rare Breed delivered the letter and has not been found to infringe any valid patent. (Dkt. #28-1 at ¶¶ 31-35.) Nor is this a case where AS Designs copied a finished product and can walk away from sunk costs: AS Designs will show substantial independent development of the ARC-Fire, including months of work, hundreds of revisions, testing in plastic and metal, additional development of a second version, and delayed work on other products. (Karlovic Decl. ¶5.) The requested injunction would strand that investment and chill ongoing development of related products.

25

The requested injunction is also overbroad. Plaintiffs accuse AS Designs' entire MP5 product family wholesale, even though stripped MP5 lowers do not themselves contain an FRT product. (*Id*. at ¶25.) Sweeping non-FRT components into preliminary relief magnifies the harm to AS Designs without advancing any established patent right.

On the other side of the scale, Plaintiffs' asserted harm can be tracked through sales records, dealer records, pricing data, and damages discovery. AS Designs' sales are not anonymous free downloads; they are traceable commercial transactions. Plaintiffs can obtain sales quantities, revenues, margins, customer information where appropriate, and other damages information through discovery. That makes this case unlike a file-distribution case where allegedly infringing designs are released freely and downstream copying becomes impossible to trace. If Plaintiffs prevail, money damages can compensate the proven injury. The balance of harms therefore favors AS Designs.

### D.    <u>**The Public Interest Favors Denial of the Requested Injunction**</u>.

The public interest also favors denial. The public has an interest in enforcing valid patents, but that interest is not automatic and does not displace the traditional equitable test. *eBay*, 547 U.S. at 391-94. In patent cases, the public-interest inquiry focuses on whether a critical public interest would be injured by preliminary relief. *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). Where, as here, Plaintiffs have not shown irreparable harm and the accused products are sold through traceable commercial channels, the public interest does not favor preliminary market exclusion. The public also has strong interests in competition, lawful commerce, consumer choice, accurate pricing, and avoiding market exclusion based on unproven infringement allegations.

The public has a concrete countervailing interest in competition and product choice here. Plaintiffs emphasize that AS Designs sells products at lower prices, but lower prices are not a public harm unless and until Plaintiffs prove infringement and entitlement to equitable relief. AS Designs' products also offer functional and consumer-choice differences—serviceability, use of multiple trigger-component options, and compatibility with user-preferred triggers—that Rare Breed's closed, non-serviceable, drop-in unit does not. (Karlovic Decl. ¶¶ 6-9.) Enjoining differentiated products before any merits adjudication would deprive consumers of those choices based on nothing more than unproven infringement allegations. The relief Plaintiffs seek would also hand Rare Breed monopoly pricing power before any adjudication: as Mr. Phillips explains, removing the only competing supplier would let Rare Breed set prices at its profit-maximizing level—a price already inflated by the $300 intercompany royalty it charges itself rather than any arm's-length market rate. (Phillips Decl. ¶¶ 38, 57.) The public interest is not served by using a preliminary injunction to restore a monopoly and raise prices before the movant proves it is entitled to exclude anyone.

Plaintiffs' reliance on the DOJ settlement does not change the analysis. The settlement may impose obligations on Rare Breed, but it does not bind AS Designs, adjudicate AS Designs' products, establish infringement or validity, or create a public-law entitlement to preliminary patent injunctions. At most, it explains why Rare Breed may choose to enforce patents it believes are infringed. It does not relieve Rare Breed of its burden under *Winter*, *eBay*, and *Natera*.

Nor can Plaintiffs convert a private patent dispute into a safety determination. Plaintiffs themselves maintain that FRTs are lawful semi-automatic products and sell FRTs as their entire business. (Dkt. #28-1 at ¶¶ 4, 24.) They cannot claim the public is protected by FRT sales when Rare Breed makes them, but endangered by competing FRT products merely because Plaintiffs

27

allege infringement. If independent regulatory or safety issues exist, they are for the appropriate regulators, not a substitute for Plaintiffs' burden.

The *Hoffman* injunction does not compel a different result. As Judge Rankin explained in *Peak Tactical*, *Hoffman* involved the free public distribution of firearm design files, creating concerns about widespread copying, third-party manufacturing, and uncontrolled downstream infringement. *Peak Tactical*, No. 26-cv-18, Dkt. #39, at 32-34. AS Designs is not accused here of anonymously releasing free public design files for limitless downstream copying; it sells commercial products through traceable transactions. That distinction matters for both damages and the public interest: it makes damages and accounting feasible and substantially reduces any claim that the public interest requires immediate injunctive relief.

Finally, the public interest is not served by a preliminary injunction that would effectively shut down AS Designs, put employees at risk, disrupt suppliers, harm dealers, and reduce consumer choice before claim construction, merits discovery, expert discovery, or trial. Protecting patent rights is important, but so is preventing unproven patent allegations from being used to suppress competition and raise prices before the movant proves irreparable harm. Because Plaintiffs have not made that showing, the public interest favors denial.

### E.    An Injunction Would Require a Sizeable Bond.

A court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  While a PI should not be issued in this case (as explained above), a bond ensures at least some protection for AS Designs if its conduct is wrongfully enjoined.  *See Mallet & Co. v. Lacayo*, 16 F.4th 364, 390-91 (3rd Cir. 2021).  Because a party injured by the wrongful issuance of a PI has no action for damages, its only recourse is the

injunction bond. *Id*. at 391. Therefore, setting an appropriately high bond amount is critical to provide at least some relief for the harm to AS Designs from an improper PI (as discussed above), as "the consequences of wrongfully enjoining [AS Designs] could be dire if [this Court] were to significantly underestimate the economic impact of an injunction it issues." *Id*.; *see also Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) (when setting bond, "courts should err on the high side"; an error in setting the bond too high is not serious, but setting it too low produces irreparable injury). An appropriately sized bond also "serves as a deterrent to rash applications for interlocutory orders; the bond premium and the chance of liability on it causes plaintiff to think carefully beforehand." *Mallet & Co*., 16 F.4th at 391 (quotations omitted).

If the Court is inclined to enter any preliminary injunction, it should require Plaintiffs to post a bond of no less than $20,000,000 before the injunction takes effect. Plaintiffs seek to enjoin product categories that account for approximately ███████████████████████ ████████████ of the company's sales—and AS Designs has no other product line capable of meaningfully mitigating or redirecting those lost sales. (Karlovic Decl. ¶¶ 20, 25.) AS Designs' records further show an ████████████ gross margin (*id*. at ¶21), meaning the historical contribution margin at risk exceeds ████████ before accounting for the expected duration of the injunction, stranded product-development investments, tangible assets, dealer and wholesale disruption, employee and supplier harm, and loss of goodwill. Because the requested injunction would effectively eliminate AS Designs' business, and because the injunction bond may be AS Designs' only meaningful recourse if the injunction is later found wrongful, security of at least $20 million is warranted. Alternatively, the Court should require security of no less than ████████ per month for each month the injunction remains in effect, plus additional security for stranded assets and business-disruption costs.

## CONCLUSION

In light of the substantial questions regarding the asserted patents' validity and infringement, Plaintiffs are unlikely to succeed on the merits. Plaintiffs have not shown likely irreparable harm. Their alleged injuries are quantifiable through ordinary patent-damages tools; their market, dealer, lead-time, and reputational theories are speculative, internally contradictory, and not AS Designs-specific; their inability-to-pay theory rests on a damages figure inflated by an affiliate royalty no arm's-length licensee would accept, where a correct market-based royalty leaves AS Designs able to satisfy any likely judgment; and their delay defeats any claim of emergency relief. The balance of harms favors AS Designs because the requested injunction would effectively eliminate a non-diversified business, harm employees, disrupt suppliers and dealers, and sweep in products beyond any proven infringement. And the public interest favors competition and adjudication on a complete record. The motion for preliminary injunction should be denied.

## HEARING

AS Designs respectfully requests an evidentiary hearing on Plaintiffs' PI Motion. *See Heil Trailer Int'l v. Kula*, 542 F. App'x 329, 334 (5th Cir. 2013) (hearing required where facts are in dispute).

Respectfully submitted,

Dated: July 9, 2026

EMERSON, THOMSON & BENNETT, LLC
*/s/ John M. Skeriotis*
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile
*Attorneys for Defendants AS Designs, LLC, Matthew S. Karlovic, and Calvin Olson*

30

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Opposition, the supporting Karlovic Declaration, and the supporting Phillips Declaration is being served on July 9, 2026, on Plaintiffs' counsel via electronic mail:

Benjamin Christoff
christoff@fr.com

Carl E. Bruce
bruce@fr.com

Glenn D. Bellamy
gbellamy@whe-law.com

Matthew Alan Colvin
colvin@fr.com

/s/ John M. Skeriotis
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile

## LOCAL RULE CV-5(a)(7)(B) CERTIFICATION

Pursuant to L.R. CV-5(a)(7)(B), I certify that a motion to seal this Opposition, the supporting Karlovic Declaration, and the supporting Phillips Declaration has been filed (Dkt. #49).

/s/ John M. Skeriotis
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile

31