### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | 4:26-md-03176-ALM<br>MDL 3176 |
| **ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**AS DESIGNS, LLC, a North Carolina limited liability company, and MATTHEW S. KARLOVIC, an individual, and CALVIN OLSON, an individual, and JOHN DOE, an individual using the alias "s3igu2" and/or "Seagoo Threetwo,"**<br><br>    **Defendants.** | Civil Action No. 4:26-cv-00370-ALM<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF DR. JOSHUA C. HARRISON, PH.D., J.D. IN SUPPORT OF
PLAINTIFFS' REPLY IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

## I.        INTRODUCTION AND QUALIFICATIONS

1.        I, Joshua C. Harrison, submit this declaration at the request of counsel for Plaintiffs Rare Breed Triggers, LLC and ABC IP, LLC. I submit it in support of Plaintiffs' motion for a preliminary injunction against Defendant AS Designs, and in response to the Declaration of Dr. Stephen A. Batzer submitted with AS Designs' opposition to that motion.

2.        My firearms training and education includes 23 years of service in the reserve forces of the United States military, from which I was honorably discharged. That military training and experience includes service as an enlisted member of the United States Marine Corps light infantry, and as a commissioned officer in the United States Army Reserve. Throughout my military service I received periodic training and achieved proficiency with various weapons, including pistols, rifles, grenades, machine guns, mortars, artillery, supporting systems, and their safe handling and effective tactical employment. The primary duty rifles that I trained with and used throughout my military service pertained to the AR rifle subclass of semiautomatic firearms.

3.        I have more than 40 years of experience as a firearms user, owner, hobbyist, and enthusiast, during which time I routinely practiced the effective and safe operation, assembly, disassembly, and proper maintenance of a wide variety of firearms, firearms components, and accessories, and I have substantial experience as a successful competitor in shooting sports, such as in competitions sanctioned by the Practical Shooting Association of America. I am also a California licensed hunter, and have been continuously licensed to carry a concealed handgun in the State of California since 2014.

4.      I am presently certified by the National Rifle Association as a pistol instructor and as a range safety officer. I was formerly certified by the California Dept. of Justice as a firearms safety instructor. I am also a certified Glock pistol armorer.

5.      I earned the Bachelor of Science degree in mechanical engineering from the University of Southern California, graduating in 1987.  I earned Masters of Science and the Ph.D. degrees in mechanical engineering from the University of California, San Diego, graduating in 1989 and 1992, respectively.

6.      I worked as a professional mechanical engineer in industry, including salaried full-time engineering employment at IBM Corporation, Applied Magnetics Corporation, and Seagate Technology, Inc.  Those companies manufactured millions of disk drive information storage devices, and my engineering contributions were made in consideration of their practical and profitable manufacturability using the manufacturing tools and processes available at the manufacturing facilities operated by those companies.

7.      My professional engineering experience also includes full-time employment as a tenurable lecturer of mechanical engineering at the Dept. of Mechanical Engineering of the University of Queensland (an academic staff rank in Australia equivalent to Assistant Professor in the USA). There I lectured on mechanical engineering subjects, supervised postgraduate students and research, and upgraded existing laboratory facilities. I taught Mechanical Engineering courses in Engineering Dynamics, Applied Dynamics, and Elements of Machines. In connection with my work as an engineering professional, I have authored more than twenty peer-reviewed scientific publications in engineering journals or conference proceedings, and have been named as an inventor on more than ten U.S. patents.

8.    I am or have been a member of several industry and professional organizations, including the Institution of Engineers in Australia and the American Society of Mechanical Engineers.

9.    I earned the Juris Doctor degree in law from Stanford Law School in 2002, and was thereafter admitted to practice before the United States Patent & Trademark Office as a patent attorney. Throughout my 20 years of experience as a practicing patent attorney, I have routinely worked with mechanical and manufacturing engineers and other technical inventors to understand new or accused technologies and inventive mechanical devices, how those work, and how their new engineering advancements differ from the existing technical state of the art.  Such continuing engineering study and understanding is necessary for a patent attorney to communicate relevant engineering concepts and distinctions during patent litigation, or to prepare and prosecute patent applications for the inventors of new mechanical technologies.

10.    I have been retained by Plaintiffs ABC IP, LLC and Rare Breed Triggers, Inc. ("Plaintiffs") in connection with this matter. I am compensated at my ordinary hourly rate. My compensation does not depend on the outcome of this matter or on the substance of my opinions.

## II.    SCOPE OF WORK

11.    Counsel has asked me to evaluate the validity of the asserted claims of U.S. Patent Nos. 12,031,784, 12,038,247, 12,578,159, and 12,529,538 in light of the invalidity contentions set forth in Dr. Batzer's declaration and its accompanying exhibits.

12.    I have not been asked to form an opinion on infringement, and I express none. I have likewise not been asked to form an opinion on the inventorship of any asserted patent, and I express none. Where I identify a limitation that a reference does not disclose, my identification is exemplary and is not an exhaustive statement of the limitations that the reference fails to supply. I reserve the right to supplement or revise these opinions as set forth below.

HARRISON DECLARATION ON VALIDITY            3

## III.    MATERIALS DISCLOSED

13.    In forming the opinions set forth in this declaration, I have reviewed the following materials: the asserted patents and their file histories; the Declaration of Dr. Stephen A. Batzer and Exhibits 1 through 20 thereto; AS Designs' opposition to the motion for preliminary injunction; the declarations submitted in support of the motion; and each of the prior art references addressed below, namely U.S. Patent No. 10,514,223 (Rounds), U.S. Patent No. 7,398,723 (Blakley '723), U.S. Patent No. 3,045,555 (Stoner), U.S. Patent No. 9,146,067 (Stakes), U.S. Patent No. 4,023,465 (Inskip), U.S. Patent Application Publication No. 2014/0338523 (Daley), U.S. Provisional Application No. 63/377,498 (Hoffman), European Patent Application Publication No. EP 2 950 033 A1 (Ostanin) together with an English machine translation obtained from Google Patents, and U.S. Patent No. 2,539,447 (Lochhead). As to the Tommy Triggers FRT-15-3MD, I have reviewed the Complaint in *Rare Breed Triggers, LLC v. Strbac*, No. 1:22-cv-00280 (N.D. Ohio), and U.S. Provisional Application No. 63/297,884.

## IV.    RELEVANT LEGAL PRINCIPLES AND GUIDELINES

14.    I have applied the following general principles of patent law, on which I have been advised, in formulating my opinions in this report.

### A.  Legal Standard on Claim Construction

15.    I understand that, absent an explicit construction by the Court, the words of a patent claim are given the ordinary and customary meaning that a person of ordinary skill in the art would have ascribed to them at the time of the invention, read in light of the patent as a whole.

16.    I further understand that a claim term must be construed the same way for all purposes — the same understanding of a claim limitation must be applied both in comparing the claim to an accused product and in comparing the claim to the prior art.

**B.  Principles Applicable to Patent Validity**

17.    I understand that a patent is presumed valid, and that a claim can be shown invalid only by clear and convincing evidence — for example, that it lacks novelty or utility, is not adequately described or enabled, or would have been obvious in light of the prior art.

### 1.  Legal Standard for Prior Art

18.    I understand that a patent or other publication must first qualify as prior art before it can be found to invalidate a patent claim.

19.    I understand that a published U.S. or foreign patent application or patent, or another publication such as a magazine or trade-journal article, qualifies as prior art if it published or issued before the priority date.

20.    I understand that a U.S. patent application qualifies as prior art as of its U.S. filing date, even if it did not publish or issue until after the priority date.

### 2.  Legal Standard for Anticipation

21.    I understand that a claim is invalid for lack of "novelty," or "anticipation," under § 102 if a single prior art reference discloses every limitation of the claim, either expressly or inherently, within its "four corners." I understand that a claim is anticipated if the claimed invention was known or used by others in the United States, or was patented or described in a printed publication in the United States or a foreign country, before the priority date.

22.    I understand that a dependent claim incorporates all limitations of the claim or claims from which it depends, and that anticipating a dependent claim requires every one of those limitations — including the limitations of the claim it depends from — to be disclosed in a single prior art reference.

### 3.  Legal Standard for Obviousness

HARRISON DECLARATION ON VALIDITY          5

23. I understand that a claim is invalid as obvious under § 103 if the claimed subject matter as a whole would have been obvious, at the time of the invention, to a person of ordinary skill in the art, in light of the prior art. I understand that this must be shown by clear and convincing evidence.

24. I understand that the obviousness inquiry considers the scope and content of the prior art, the differences between the prior art and the claims, the level of ordinary skill in the art, and any objective indicia of nonobviousness ("secondary considerations"), which must be considered whenever present in the record.

25. I understand that a claimed invention may be found obvious if it results from: (a) combining known elements by known methods to yield a predictable result; (b) simple substitution of one known element for another to obtain a predictable result; (c) use of a known technique to improve a similar device or method in the same way; (d) applying a known technique to a known device or method ready for improvement, to yield a predictable result; (e) choosing from a finite number of identified, predictable solutions with a reasonable expectation of success (i.e., the solution was "obvious to try"); (f) known work in one field prompting variations for use in the same or a different field, where such variations were predictable; or (g) a teaching, suggestion, or motivation in the prior art to modify or combine references to arrive at the claimed invention.

26. I understand that an invention may be found obvious if the prior art suggested it to a person of ordinary skill, who would have had a reasonable expectation that it would work to accomplish its intended purpose. I understand that the party challenging validity must prove that reasonable expectation of success by clear and convincing evidence, and that an absence of evidence about the difficulty of making the combination does not, by itself, satisfy that burden.

HARRISON DECLARATION ON VALIDITY          6

27. I further understand that the obviousness analysis must avoid hindsight — the claimed invention itself cannot be used as a template for selecting and combining prior art references — must rest on articulated reasoning with a rational basis rather than conclusory assertions, and is undercut by evidence that a prior art reference teaches away from the proposed combination.

28. I further understand that a reason to combine known elements may come from a problem known in the field, an obvious use of familiar elements beyond their primary purpose, or a design need or market pressure to solve a problem — and that a predictable variation that common sense would suggest to a person of ordinary skill may be considered obvious.

29. I further understand that objective indicia of nonobviousness, or "secondary considerations" — such as long-felt need, commercial success, failure of others, copying, praise, initial skepticism, and unexpected results — must be considered when present in the record.

30. I understand that secondary-considerations evidence is entitled to weight only if the patent owner shows a nexus between that evidence and the claimed features.

31. I understand that objective indicia of nonobviousness must be weighed together with the prior art evidence, not as an afterthought, and can be sufficient to overcome a case that might otherwise appear obvious based on the prior art alone; weak or unsupported secondary-considerations evidence, however, will not overcome a strong showing of obviousness.

## V. OVERVIEW OF THE ASSERTED PATENTS

### C. DeMonico '784

#### 1. Bibliographic Information

32. U.S. Patent No. 12,031,784 B1 (the "'784 patent"), titled "Adapted Forced Reset Trigger," issued on July 9, 2024. The named inventor is Lawrence DeMonico of Austin, Texas, and the patent is assigned on its face to ABC IP, LLC of Dover, Delaware. The application that

HARRISON DECLARATION ON VALIDITY          7

matured into the '784 patent was filed November 4, 2022, as Application No. 18/052,606. The

'784 patent claims priority to U.S. Provisional Patent Application No. 63/276,090, filed

November 5, 2021.



**'784 Patent at Fig. 1**

### 2.  The State of the Art Described in the Specification

33.    The specification frames its starting point as the forced-reset semiautomatic

trigger described in U.S. Patent No. 10,514,223. (1:15–18.) The '784 patent states that the '223

patent is "incorporated herein in its entirety by this reference" and that the '223 patent's

"structure and function are fully described therein." (1:15–19.) The specification characterizes

the embodiment illustrated in the '223 patent as particularly adapted for use in an AR15-pattern

firearm. (1:19–20.)

HARRISON DECLARATION ON VALIDITY          8

34. The specification then describes the AR10 firearm pattern as similar in design, concept, and function to the AR15, but firing the larger 7.62 mm NATO (.308 Winchester) caliber cartridge, with some dimensional specifications said to be less standardized. (1:21–24.) The specification states that the larger caliber requires certain parts to be scaled differently from the AR15 pattern, resulting in a different profile of the bolt carrier body and different spacing relative to the lower receiver and trigger mechanism. (1:24–28.) In particular, the specification states that the rear or tail portion of the AR10-pattern bolt carrier is positioned vertically further from the lower receiver and trigger assembly parts, while a forward portion of the AR10-pattern bolt carrier is situated lower. (1:28–32.)

### 3. The Problem Identified in the Specification

35. The '784 patent frames the problem as the difficulty of adapting the '223 patent's forced-reset trigger to an AR10-pattern firearm. (1:33–40.) The specification states that the '223 embodiment could be installed in an AR10-pattern lower receiver—because the assembly/pivot pin locations are substantially the same—but that it would not be operable, because the upward extension of the locking member (bar) would be too short to be contacted and actuated, to release the trigger member, by the rear or tail portion of the bolt carrier as it reaches the in-battery position. (1:33–40.) The specification further states that if the upward length or height of the locking member were instead extended sufficiently to be actuated, it would then interfere with a lower surface of a forward portion of the bolt carrier as it cycles rearward, again making the device inoperable. (1:40–44.)

### 4. The Solution Described in the Specification

36. The '784 patent describes its solution, in at least one characterization, as providing a deflectable extension of the locking member that is actuated by forward movement of the bolt carrier, but that deflects or folds to avoid interfering contact with the forward portion

of the bolt carrier as the bolt carrier cycles to the rear. (1:48–52.) The specification states that the trigger member locking device has a locking member movable between a first position in which it locks the trigger member against pulling movement and a second position in which it does not restrict movement of the trigger member, the locking member being movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier. (1:53–61.) The specification states that, according to an aspect of the invention, the locking member has a body portion that is movably supported and an upward extension portion that is separately movable relative to the body portion between an extended position and a deflected position. (1:61–65.)

37.     The specification describes two example embodiments having a "one-way hinge" feature that causes the locking member to pivot in one direction when actuated by a rear portion of the bolt carrier as it returns to the in-battery position, and to give way—deflect or fold—without pivoting the remainder of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear. (1:66–2:5.)

### 5. Overview of Operation

38.     At a general level, the '784 patent describes a forced-reset trigger assembly in which, as described in the incorporated '223 patent, the locking member 12 locks the trigger member 14 and prevents it from being pulled any time the bolt carrier assembly 16 is not in the substantially in-battery position. (3:10–13.) The locking member 12 of the '784 patent additionally includes a deflectable portion that moves to allow passage of the forward portion of the bolt carrier 16 as it cycles to the rear, which the specification states can include a hinging structure. (3:24–27.)

39.     The specification describes the locking member as functioning such that force applied to the foldable extension from a rearward direction toward the front causes the entire

locking member to pivot on its pivot pin relative to the housing, releasing the trigger member, whereas rearward force applied to the foldable extension from the front toward the rear causes the foldable extension to fold on a separate pivot pin and allow the bolt carrier to pass without causing pivotal movement of the locking member body or affecting its locking of the trigger member. (3:53–60; 4:26–31.) The specification characterizes this as allowing the locking member to be of sufficient upward extension length to be engaged by the bolt carrier at the in-battery position while allowing rearward reciprocation of the bolt carrier without causing damage to the locking member or inducing an interference malfunction. (4:31–37.)

### D. Blakley '247/'159

#### 1. Bibliographic Information

40.      U.S. Patent Nos. 12,038,247 B2 (the "'247 patent") and 12,578,159 (the "'159 patent") are titled "Firearm Trigger Mechanism." The '247 patent issued on July 16, 2024. (Cover.[1]) The '159 patent issued on March 17, 2026. ('159 Cover.) The named inventor is Brian A. Blakley of Pinellas Park, Florida, and the patent is assigned on its face to ABC IP, LLC of Dover, Delaware. The '247 and '159 patents claim priority to U.S. Provisional Patent Application No. 63/374,941, filed September 8, 2022.

---

[1] The '159 patent continues from the '247 patent and shares a common specification. For brevity, citations are to the '247 patent. Each citation has an equivalent in the '159 patent.



**FIG. 1**

**'247 Patent at Fig. 1**

### 2. The State of the Art Described in the Specification

41.    The specification describes the operation of a standard semiautomatic firearm trigger as background. According to the specification, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered cartridge, and part of the propellant force is used to cycle the action—extracting and ejecting the spent cartridge and chambering a fresh one—through longitudinal reciprocation of a bolt and/or carrier that also resets the hammer or striker. (1:19–25.) The specification states that a standard semiautomatic trigger mechanism includes a disconnector that holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. (1:26–28.) The patent characterizes this arrangement as allowing the firearm to be fired only a single time when the trigger is pulled and held, because the user cannot typically release the trigger rapidly enough for the sear to re-engage before the

bolt or bolt carrier returns to its in-battery position. (1:29–33.) The patent further characterizes the disconnector as preventing the firearm from firing multiple rounds on a single trigger pull and as preventing the hammer or striker from "following" the bolt back to battery without firing a second round but leaving the hammer or striker uncocked. (1:33–37.)

42.    The specification also describes "bump firing" as a prior approach to increasing the rate of semiautomatic fire, which the patent states uses the firearm's recoil to fire shots in rapid succession by bracing the rifle with the non-trigger hand, loosening the trigger-hand grip while keeping the trigger finger stationary, and pushing the rifle forward to apply pressure to the trigger after each recoil-driven movement of the rifle. (1:40–55.)

### 3.  The Problem Identified in the Specification

43.    The '247 and '159 patents frame the underlying problem as a desire, shared among at least some shooters, to increase the rate of semiautomatic fire, while maintaining the semiautomatic action of a single shot per trigger pull. (1:29–33; 1:38–40.) Against the backdrop of the prior forced-reset and cam-based devices discussed below, the specification states broadly that "[f]urther improvement in forced reset triggers is desired." (2:14.) The specification additionally identifies a more specific shortcoming in at least one category of prior art: an inability to adapt certain forced-reset designs to an AR-pattern firearm without requiring modification not only of the fire control mechanism but also of the bolt carrier. (1:61–63.)

### 4.  Prior Attempts to Solve the Problem Described in the Specification

44.    The specification discusses, among other things, several specific prior devices that attempted to address the rate-of-fire problem. The specification treats these references in two distinct ways: it discusses certain references as background, and it expressly incorporates several references by reference "as if fully set forth in [their/its] entirety," as noted below.

45.    **Forced-reset trigger mechanisms of the Graves patents.** The specification identifies U.S. Patent Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves, which the patent characterizes as forcefully resetting the trigger through rigid mechanical contact between the trigger member and the bolt as the action cycles. (1:56–61.) The '247 patent states that adapting the Graves approach to an AR-pattern firearm would require not only a modified fire control mechanism but also a modified bolt carrier. (1:61–63.) The specification does not state that it incorporates the Graves patents by reference. (1:56–63.)

46.    **The Rounds forced-reset devices, including the '223 patent, and the '003 application**. The specification identifies U.S. Patent Nos. 10,514,223 and 11,346,627, and U.S. Patent Application Ser. No. 18/048,572, filed October 21, 2022, and states that these are "hereby incorporated by reference herein as if fully set forth in their entirety." (1:67–2:1.) The patent characterizes these devices as ones in which the hammer forces the trigger to the set position and a locking bar prevents early hammer release. (2:1–3.) The reference at U.S. Patent No. 10,514,223 is the '223 patent addressed in the companion overview, and Application Ser. No. 18/048,572 is the application that matured into the '003 patent addressed in the companion overview.

47.    **The Blakley '723 patent**. The specification identifies U.S. Patent No. 7,398,723, issued July 15, 2008, to Brian A. Blakley, and states that it is "hereby incorporated by reference herein as if fully set forth in its entirety." (2:4–7.) The patent characterizes this device as having a pivoting cam contacted by the rearwardly traveling bolt carrier such that the bottom surface of the cam presses downward on a trigger extension, forcing the rear of the trigger down and moving forward the surface of the trigger that the operator's finger engages. (2:9–13.) After

HARRISON DECLARATION ON VALIDITY          14

describing these devices, the specification states that "[f]urther improvement in forced reset triggers is desired." (2:14.)

### 5. The Solution Described in the Specification

48.    The specification describes its solution, in at least one characterization, as a semiautomatic trigger mechanism for increasing the rate of fire that can be retrofitted into popular existing firearm platforms, including AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. (2:18–23.) The specification characterizes embodiments of the invention as particularly adaptable for construction as a "drop-in" replacement trigger module requiring only the insertion of two assembly pins and the safety selector. (2:23–26.) The specification states that, advantageously, the invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions. (2:26–29.)

49.    As to the operative mechanism, the specification describes a hammer, a trigger member, a disconnector, a cam, and a three-position safety selector. (Abstract; 2:30–2:56.) The specification states that, in the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer and pivoting of the cam from a first position to a second position such that the cam lobe forces the trigger member toward the set position, but prior to reaching the set position the disconnector hook catches the hammer hook, requiring the user to manually release the trigger member before the next shot. (Abstract; 2:56–67.) The specification states that, in the forced reset semi-automatic position, the safety selector prevents the disconnector hook from catching the hammer hook, such that the cam lobe forces the trigger member to the set position and—after the bolt carrier returns and the cam pivots back to the first position—the user can pull the trigger member to fire again without manually releasing it. (Abstract; 2:67–3:10.)

HARRISON DECLARATION ON VALIDITY          15

50.     These characterizations are presented as among the features the patent attributes to its embodiments and should not be read as an exhaustive statement of the points on which the '247 patent distinguishes over the prior art.

### 6.  Overview of Operation

51.     At a general level, the specification describes a trigger mechanism for an AR-pattern firearm having a receiver with a fire control mechanism pocket and a reciprocating bolt carrier. (Abstract; 2:30–33.) The mechanism includes at least a hammer, a trigger member, a disconnector, a cam, and a three-position safety selector. (Abstract.)

52.     The hammer has a sear catch and a hook for engaging the disconnector, and is mounted to pivot on a transverse hammer axis between set and released positions, the hammer being pivoted rearward by rearward movement of the bolt carrier. (2:36–40.) The trigger member has a sear and is mounted to pivot on a transverse trigger member axis between set and released positions, the sear and sear catch being engaged in the set positions and disengaged in the released positions. (2:40–45.) The disconnector has a hook for engaging the hammer and is mounted to pivot on the transverse trigger member axis. (2:46–49.) The cam has a cam lobe and is mounted to pivot on a transverse cam axis, movable between a first position in which the cam lobe does not force the trigger member toward the set position and a second position in which it does. (2:49–53.) The safety selector pivots between safe, standard semi-automatic, and forced reset semi-automatic positions. (2:53–56.)

53.     The net effect, as the specification describes it, is a selectable mechanism: in the standard semi-automatic mode the disconnector catches the hammer and a manual trigger release is required between shots, whereas in the forced reset mode the disconnector is disabled by the safety selector, the cam lobe forces the trigger to reset, and—once the bolt carrier returns to battery and the cam pivots back to its first position—the user may fire again without first

HARRISON DECLARATION ON VALIDITY          16

manually releasing the trigger, which the patent characterizes as precluding hammer follow while permitting a higher rate of fire. (2:56–3:10; 8:43–65.)

### E. Smith '538

#### 1. Bibliographic Information

54.    U.S. Patent No. 12,529,538 (the "'538 patent") is entitled "Safety Mechanism for Firearm," and issued on January 20, 2026. The named inventor is Cameron Smith of Wabash, Indiana, and the patent is assigned on its face to ABC IP, LLC of Dover, Delaware. The application that matured into the '538 patent was filed December 4, 2024, as Application No. 18/968,984, and published on June 5, 2025 as U.S. Patent Application Publication No. 2025/0180315 A1. The '538 patent claims priority to U.S. Provisional Patent Application No. 63/605,793, filed December 4, 2023, such that the earliest filing date associated with the patent is at least December 4, 2023. The '538 patent contains 13 claims and 15 sheets of drawings. A Certificate of Correction issued March 31, 2026, correcting two typographical errors in the specification and one in claim 9.

55.    The references cited on the face of the '538 patent include U.S. Patent No. 7,398,723 to Blakley, U.S. Patent No. 12,038,247 to Blakley, U.S. Patent No. 11,724,003 to Strbac, and, among the Other Publications, a video published by Hoffman Tactical titled "Introducing the Super Safety," posted July 21, 2023. (Cover at [56].)

#### 2. The State of the Art Described in the Specification

56.    The specification initially describes some safety mechanisms conventionally used in firearms. It describes a manual safety switch, "typically located near the trigger or on the firearm's frame, which physically obstructs the fir[]ing mechanism when engaged"; trigger safety, "integrated directly into the trigger," which "requires a specific action for the trigger to move, preventing unintentional pulls"; a grip safety, which "necessitates depression by the

shooter's hand for the firearm to fire"; a drop safety or firing pin block "to prevent accidental discharges if the firearm is dropped"; and a magazine disconnect safety "that inhibits firing when the magazine is removed." (1:12–29.) The specification characterizes these mechanisms as directed to "preventing accidental discharges and ensuring overall safety." (*Id.*)

### 3. The Problem Identified in the Specification

57.     The specification states that the conventional mechanisms it describes are directed to safety alone, and characterizes its own contribution as supplying a further mode of operation "[i]n addition to the standard semi-automatic and safe modes." (Abstract.)

### 4. The Solution Described in the Specification

58.     The '538 patent describes its solution, in at least one characterization, as a safety mechanism comprising a cam selector, a lever, and a trigger, in which the cam selector replaces the standard safety selector of the firearm. (Abstract; 4:34–62.) The specification describes the cam selector as having a first end, a second end, a top side, and a bottom side, with a longitudinal slot positioned on the top side configured to receive the proximal end of the lever, and a first recess and a second recess on the bottom side. (Abstract; 4:34–62.) The specification states that the invention "provides an additional active reset mode in which the trigger is actively reset by the cam selector," in addition to standard semi-automatic and safe modes. (Abstract.)

### 5. Overview of Operation

59.     The specification describes the cam selector (100) as substantially cylindrical and as replacing the standard safety selector in the firearm, having a first end (101), a second end (102), a top side (103), and a bottom side (104). (4:34–62.) A longitudinal slot (110) on the top side receives the proximal end (201) of the lever (200), extends from the first end, and is ovular in shape with an opening (112) permitting the lever to travel through. (*Id.*) The bottom side carries a first recess (131) and a second recess (132), described as transverse recesses

HARRISON DECLARATION ON VALIDITY          18

perpendicular to the rotation axis of the cam selector, with the first recess preferably twice the length of the second. (4:63–5:20.) The bottom side further carries a safety cam profile (136) and first, second, and third detent tracks (121, 122, 123), described as transverse grooves. (*Id.*)

60.     The specification describes mode selection as accomplished by transverse movement of the cam selector, retained by a detent (400) carried in a passage in the lower receiver and urged upward against the cam selector by a spring. (5:40–6:11.) It states that pressing one side of the cam selector shifts it transversely so that the first recess registers with the first trigger tail portion (301), in which condition the mechanism operates in the semi-automatic mode, and that pressing the other side shifts it so that the safety cam profile engages the trigger tail and "prevents the trigger from being pulled regardless of what position the cam is rotated to." (*Id.*)

61.     In the active reset mode, the specification describes the returning bolt carrier as pressing against the second end (202) of the lever, rotating the lever forward. It states that the lever first pivots within the longitudinal slot "until the void is filled," after which it transfers torque to the cam selector, and that the extent of that lost motion is such that "as the bolt carrier completes its forward movement, the cam selector 100 rotates to a position where the first trigger tail portion 301 begins to slide against the cam portion 133," whereupon "the trigger bow can be pulled again by the operator." (7:1–37.)

## VI.     OPINIONS ON THE ASSERTED PRIOR ART

62.     In the sections that follow I address each reference Dr. Batzer relies upon. For each, I first set out its bibliographic information and describe the mechanism it discloses and how that mechanism operates, and I then identify exemplary limitations of the asserted claims that the reference does not disclose. Those identifications are exemplary, and are not an exhaustive statement of the limitations that each reference fails to supply. I address Dr. Batzer's

HARRISON DECLARATION ON VALIDITY            19

contentions regarding combinations of these references separately, in the section below titled "Response to Dr. Batzer's Invalidity Arguments."

### A. Rounds '223

#### 1. Bibliographic Information

63.     U.S. Patent No. 10,514,223 B1 (the "'223 patent"), titled "Firearm Trigger Mechanism," issued on December 24, 2019. The named inventor is Jeffrey Cooper Rounds of Buda, Texas, and the patent is assigned on its face to Wolf Tactical LLC, also of Buda, Texas. The application that matured into the '223 patent was filed September 27, 2018, as Application No. 16/143,624. The '223 patent claims priority to U.S. Provisional Patent Application No. 62/565,247, filed September 29, 2017, such that the earliest filing date associated with the patent is at least September 29, 2017. The patent issued with seven claims, of which at least claims 1 and 4 are independent. (6:56–7:25.)



**FIG. 1**

**'223 Patent at Fig. 1**

#### 2. Overview of Operation

64.     At a general level, the '223 patent describes a trigger mechanism for a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the sidewalls of that pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. (Abstract.) The mechanism includes at least a hammer, a trigger member, and a locking bar. (Abstract.)

65.     The hammer has a sear notch (described in the detailed description as a sear catch) and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. (Abstract.) The trigger member has a sear and is mounted in the pocket to pivot on a transverse trigger pin between set and released positions, and has a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of the bolt carrier, such that the contact forces the trigger member to the set position. (Abstract.) The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the released position; it is movable against that spring bias to a second position when contacted by the bolt carrier as the carrier reaches a substantially in-battery position, at which point the trigger member can be moved by an external force to the released position. (Abstract.)

66.     The net effect, as the specification describes it, is that the trigger is forcibly reset by the hammer during the rearward stroke of the bolt carrier, then held in that reset position by the locking bar until the bolt carrier returns substantially to battery, at which point the locking bar is displaced and the trigger may be pulled again by external force. (5:23–67; 6:1–12.) The specification states that this allows the highest possible standard rate of fire for the semiautomatic action without risk of hammer follow. (6:10–12.)

### 3.  Exemplary Elements of the '784 Patent Not Disclosed by Rounds

67.    Claim 1 of the '784 patent, its only independent claim, requires a locking member "having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position." ('784 Patent, cl. 1.) Claim 3 requires that the body portion pivot between the first and second positions, and claim 4 requires that the deflectable portion pivot relative to the body portion. (*Id.*, cls. 3, 4.) Rounds does not disclose these limitations.

68.    Rounds discloses a single, unitary locking bar (62) "carried on a frame 66 for pivotal movement on a transverse pivot pin 68." (4:61–62.) Rounds describes no portion of that locking bar as movable relative to any other portion of it. The terms "deflectable," "deflected," "body portion," and "separately movable" appear nowhere in Rounds. The only additional feature Rounds describes on the locking bar is a rearward extension (64), which Rounds describes as "a means to limit the extent to which it can pivot toward the blocking position." (5:6–9.) That is a stop constraining the movement of the locking bar, not a portion separately movable relative to it.

69.    Rounds appears among the references cited on the face of the '784 patent. ('784 Patent, Cover at [56].) The '784 patent also identifies Rounds by number in its Background, incorporates it by reference in its entirety, and states that "[i]ts structure and function are fully described therein." (1:15–20.) I understand that Rounds was therefore before the examiner during prosecution and was considered by the examiner before the '784 patent issued.

### B. Blakley '723

#### 1. Bibliographic Information

70.    U.S. Patent No. 7,398,723 B1 ("Blakley '723" or "the '723 patent") is entitled "Trigger Forward Displacement System and Method." It names Brian A. Blakley as the sole inventor and identifies no assignee on its face. It issued from Application No. 10/424,676, filed

April 25, 2003, and issued on July 15, 2008. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective filing date appears to be April 25, 2003.

### 2. Overview of Operation

71.    Blakley '723 discloses a system and method for "increasing the cyclic rate of actuating the trigger and discharging a semi-automatic firearm." (1:7–10.) Blakley '723 characterizes its approach as resetting the trigger to a forward, ready-to-fire position by use of the firearm's reciprocating member, while preserving the firearm's semi-automatic status because the firearm "only discharges one round of ammunition for each pull of the trigger." (*See generally* cols. 7–8.)

72.    Blakley '723 describes a mechanism comprising, among other things, a trigger (22) with an inner-portion groove (30) and a beveled sear portion (34); a disconnector (38) carrying a hammer hook (44); a hammer carrying a trigger sear catch (52), a disconnector hook receptacle (54), and a striking surface (56); a hammer spring (60); a "cam body subassembly" (62) made up of a cam body housing (64), a cam (66), and a cam mounting pin (68); a safety selector (82); and a "trigger extender" (90) that seats in the trigger groove (30) and presents an upper bearing surface (92) to the cam. (*See generally* cols. 5–7.)



FIG 5

**Blakley '723 at Fig. 5**

73.    According to Blakley '723, when the trigger is pulled and the hammer falls and discharges the firearm, the bolt is driven rearward; the bolt first pivots the hammer rearward to a cocked position where it engages the disconnector. (10:34–38.)



**Blakley '723 at Fig. 1**

74.    Blakley '723 then describes the reset as cam-driven: as the bolt continues rearward, it "secondly contact[s] the cam pivoting it rearward," and in rotating rearward the bottom surface of the cam (66) "pressed downward on the trigger-extension forcing the rear of the trigger down thereby moving forward the surface of the trigger that the operator's finger engages." (10:38–46.) Blakley '723 states that, "[i]n resetting the trigger the disconnector ceases to engage the hammer," and "[t]he hammer then continues to be held to the rear by the forward engagement surface of the trigger engaging the notch in the sear notch at the bottom of the hammer." (10:46–50.) Blakley '723 further describes the cam as holding the trigger "firmly down/forward potentially against the finger pressure of the operator," while the operator's finger force "is not transmitted to the bolt as an upward displacing force." (10:50–54.)



**Blakley '723 at Fig. 2**



**Blakley '723 at Fig. 3A**

75.     Blakley '723 also describes alternatives. Blakley '723 states that the cam may be pinned directly to the receiver, eliminating the cam body housing. (11:6–10.) Blakley '723 further describes that the effect "be able to be optionally selected or deselected by operating the selector-cam," and that the invention "can be effected without the provision of a selector," in which case the effect is "continually present unless the apparatus is removed from the firearm." (Blakley '723, cols. 11:11–29.) In each described configuration, Blakley '723 resets the trigger by means of the cam acting on the trigger extender. (*See generally* cols. 10–12.)

HARRISON DECLARATION ON VALIDITY          26

### 3.   Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723

76.   Claim 15 of the '247 patent recites a firearm trigger mechanism operable in two distinct modes: a standard semi-automatic mode, in which the cam is in a first position, the disconnector hook catches the hammer hook, and the user must manually release the trigger member before firing again; and a forced reset semi-automatic mode, in which the cam is in a second position and the disconnector hook is prevented from catching the hammer hook. ('247 Patent, cl. 15.) Blakley '723 does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Blakley '723 does not disclose.

**i.   A trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode.**

77.   Blakley '723 enables a single mode of operation: forced reset. Blakley's stated object is to accelerate the cyclic rate of a semi-automatic firearm by using the reciprocating member to reset the trigger, and Blakley '723 describes that effect occurring on every cycle of the bolt. (10:34–11:5.)

78.   I understand that column 11 of Blakley '723 has been considered in several forums, each of which concluded that it does not teach a third mode of operation.

79.   *Prosecution of the '247 and '159 patents.* I understand that the examiner considered and rejected this reading during prosecution of Blakley's later '247 patent, and again during prosecution of Blakley's later '159 patent. In allowing the claims of the '247 patent, the examiner expressly identified Blakley '723 as "the closest prior art" and distinguished it on the ground that it does not disclose a mechanism operable in a standard semi-automatic mode. The examiner stated:

> Blakley does not show, however, a trigger mechanism whereupon
> in a standard semi-automatic mode, said cam is in said first
> position, rearward movement of the bolt carrier causes rearward
> pivoting of said hammer such that said disconnector hook catches

said hammer hook, and thereafter the bolt carrier moves forward
into battery, at which time a user must manually release said
trigger member to free said hammer from said disconnector to
permit said hammer and trigger member to pivot to said set
positions so that the user can pull said trigger member to fire the
firearm, and whereupon in a forced reset semi-automatic mode,
said cam is in said second position, rearward movement of the bolt
carrier causes rearward pivoting of said hammer such that said
disconnector hook is prevented from catching said hammer hook,
and thereafter the bolt carrier moves forward into battery, at which
time the user can pull said trigger member to fire the firearm; and
there is no teaching in the prior art that would have motivated one
of ordinary skill in the art to modify Blakley in such a manner.

('247 File History, Notice of Allowance (May 22, 2024).) I understand the examiner reached the

same conclusion in allowing the '159 patent, where the examiner stated:

Blakley does not disclose, however, the combination of elements
wherein the trigger mechanism is operable in a first, standard semi-
automatic mode and in a second, forced reset semi-automatic
mode, whereupon in the first mode, rearward movement of the bolt
means causes rearward pivoting of the hammer such that the
disconnector hook catches the hammer hook, and thereafter the
bolt means moves forward into battery, at which time a user must
manually reduce pressure on the trigger member to free the
hammer from the disconnector to permit the hammer and trigger
member to pivot to the set positions so that the user can pull the
trigger member to fire the firearm, and whereupon in the second
mode, rearward movement of the bolt means causes rearward
pivoting of the hammer such that the disconnector hook is
prevented from holding the hammer, and thereafter the bolt means
moves forward into battery, at which time the user can pull the
trigger member to fire the firearm. Additionally, there is no
teaching in the prior art that would have motivated one of ordinary
skill in the art to modify Blakely to have such features.

('159 File History, Notice of Allowance (Feb. 9, 2026).) The examiner's determination is

consistent with my own analysis of Blakley '723, set forth below.

80.    *Eastern District of Tennessee.* I understand this contention was raised in

opposition to a motion for preliminary injunction in the Eastern District of Tennessee, where the

opposing party relied specifically on the language at column 11 of Blakley '723. *See ABC IP,*

*LLC v. Hoffman*, No. 1:25-cv-00389, Dkt. 26 at 4 n.1 (E.D. Tenn. Jan. 23, 2026); *see also id.*, Ex.

6 (charting Blakley '723 against the '247 patent). I understand the court rejected the contention and issued the preliminary injunction. *See id.*, Dkt. 46.

81.     Inter partes review proceedings. I further understand that parties adverse to the patent owner have themselves taken the position that Blakley '723 is limited to two positions. In a petition for inter partes review asserting Blakley '723 as a primary reference, the petitioner submitted the declaration of Malcolm Brown. *See* Atrius Dev. Grp. Corp. v. ABC IP LLC, IPR No. 2025-1473, Paper 1 at 14 (P.T.A.B. Aug. 29, 2025). Mr. Brown stated that Blakley '723 "appears to have a 2-position safety selector switch (i.e., safe and FRT modes) and would not have a semi-automatic mode which is standard on AR 15's and M-16's," that the column 11 passage "suggests that Blakely '723 contemplated a three-position safety selector enabling semi-automatic mode," but that "the figures and specification do not clearly support this contention." *Id.*, Paper 1004 at 48. Mr. Brown's conclusion that the figures and specification do not support a three-position reading accords with my own analysis.

82.     I further understand that institution of that inter partes review was denied on February 18, 2026, in a notice stating, as to the group of proceedings in which it appears, that "after review of the merits, the petitioner has failed to show a reasonable likelihood of prevailing with respect to at least one of the claims challenged in the petition." Notice of Decisions on Institution, Paper 20 (P.T.A.B. Feb. 18, 2026).

83.     *Mr. Blakley's own characterization.* Mr. Blakley '723 is the named inventor of both the '723 patent and the '247 patent. In the Background of the '247 patent, he described his earlier '723 patent as a device having "a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby

moving forward the surface of the trigger that an operator's finger engages." ('247 Patent, 2:04–2:13.) That description recites only the forced reset function of the cam. It attributes no mode-selection capability to the '723 patent, and it is followed by the statement that "[f]urther improvement in forced reset triggers is desired." (*Id.*, 2:14.) The '247 specification then identifies three-position operability as an advantage of the invention it claims: "Advantageously, the present invention provides a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." (*Id.*, 2:26–29.)

84.     I understand that Dr. Batzer contends the passage at column 11 is suggested to disclose a standard semi-automatic mode. Assuming that passage is read as expressing an intention to provide such a mode, in my opinion the specification of Blakley '723 does not contain an enabling disclosure of it.

85.     Dr. Batzer's own analysis is consistent with that conclusion. In the claim charts accompanying his declaration, he states, as to each independent claim reciting a standard semi-automatic mode, that "Blakley does not explicitly explain how the standard semi-automatic mode uses the various trigger mechanism components, as required in this portion of the claim, but a POSA, however, would readily know how standard semi-automatic mode operates based on Blakeley's disclosure of semi-automatic firearms." (Batzer Decl., Ex. 15 at 2, 3, 5, 7, 8, 9, 10.) I agree with Dr. Batzer's observation that Blakley '723 does not explicitly explain how the alleged semi-automatic mode would be achieved using the components of its own unique trigger mechanism.

86.     However, I disagree with Dr. Batzer that such deficiency of Blakley '723 would have been overcome by skilled artisan's general knowledge relating to then-conventional and different semi-automatic fire control mechanisms, none of which used a vertical trigger extension

HARRISON DECLARATION ON VALIDITY          30

that could be longitudinally translated into operational interference with a disconnector. I also note that the relevant inquiry is what a person of ordinary skill in the art would have understood at the time of the invention, and that Blakley '723 was filed in April 2003, roughly two decades before the priority dates of the Asserted Patents.

87.     What a person of ordinary skill in the art may know about how semi-automatic firearms operate generally is not a disclosure in Blakley '723 of how Blakley's own mechanism would operate in that mode.

88.     The passage in column 11 provides insufficient structural detail. It refers to a "selector-cam," a term appearing nowhere else in Blakley '723 and assigned no reference numeral. The passage contains no reference numerals, and the figures do not provide enabling disclosure of a semi-automatic mode of operation.

89.     In my opinion, the arrangement Blakley '723 depicts would not function as a standard semi-automatic mode. The following are exemplary reasons and are not an exhaustive account. The selector profile would not displace the trigger extender forward far enough for the cam to clear its bearing surface, and even if it did, that would carry the trigger extender into interference with the disconnector, which would render the disclosed mechanism inoperable because the disconnector must remain free to rotate rearward about the trigger pin in order for the hammer hook to pass it. Dr. Batzer does not address these shortcomings or problems with the conclusion that he draws from column 11 of Blakley '723.

> **ii.     A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.**

90.     In Blakley '723, the disconnector catches the hammer on every firing cycle. Blakley '723 describes that, after the trigger is pulled and the hammer falls, the rearward-traveling bolt "will first pivot the hammer to the cocked rearward position whereupon it will

engage the disconnector." (10:34–38.) Only later, and as a consequence of the cam having reset the trigger, does the disconnector cease to engage the hammer. (10:39–47.) Blakley '723 therefore describes a disconnector that catches the hammer hook and is subsequently released, which is the converse of the claimed arrangement in which the disconnector hook is prevented from catching the hammer hook in the first instance. Blakley '723 does not disclose any structure that prevents the disconnector hook from catching the hammer hook. Blakley's safety selector (82) is described only as a rotatable member having an outer lever and an inner tubular portion with flat recessed surfaces (88), and Blakley '723 does not describe it as interacting with the disconnector in any way. (*See generally* col. 6.)

### 4. Exemplary Elements of the '159 Patent Not Disclosed by Blakley '723

91.    The '159 patent is a continuation of the '247 patent and shares its specification. I understand the asserted claims of the '159 patent to be claims 1, 3, 6, 7, 9 through 11, and 14 through 17.

92.    Because the two patents share a specification and the asserted claims recite the same two-mode architecture, my opinions regarding Blakley '723 set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723" apply equally to each asserted claim of the '159 patent, and I incorporate them here in full.

93.    Claim 17 of the '159 patent recites two limitations not present in claim 15 of the '247 patent, which I address separately below.

### iii. A mode selector operable by the user to select between a semi-automatic mode and a forced reset mode.

94.    Claim 17 further recites a mode selector operable by the user to select between at least two modes of operation of the trigger mechanism, including a semi-automatic mode and a

forced reset mode. However, Blakley '723 does not disclose a selector that could operably select a semi-automatic mode.

95.    Blakley '723 discloses a safety selector 82, but it does not describe that selector 82 as selecting between semi-automatic and forced reset modes of operation. (6:15-20.)

96.    The passage at column 11 refers to the effect of the invention being optionally selected or deselected by operating a "selector-cam." (11:11–13.) For the reasons set out above, in my opinion Blakley '723 does not enable a mechanism in which a user-operable selector selects among safe, standard semi-automatic, and forced reset semi-automatic operation. The safety selector 82 of Blakley '723 as shown in Figs. 3 and 5 could not longitudinally translate the trigger extension sufficiently to disable the forced reset mode of operation and so could not select a semi-automatic mode.

### iv.    A difference in operation between modes determined by movable selection of the blocking means.

97.    Claim 17 further requires that the difference in operation between the modes be determined by movable selection of the blocking means, so as selectively to permit or prevent the hammer and trigger member sear engagement surfaces from engaging when the trigger member is biased by the cam. Blakley '723 discloses no structure capable of performing that function.

98.    Blakley's disconnector has no rearward tail or other surface positioned to be engaged and displaced by the safety selector or by any other user operable structure. Because Blakley's disconnector has no structure by which it can be moved at the selection of the user, Blakley '723 cannot disclose a mechanism in which the difference in operation between two modes is determined by movable selection of the blocking means. Blakley '723 describes the

disconnector as being displaced only by the hammer during the firing cycle, and describes no user-operable means of positioning it other than conventionally with the trigger.

### 1. Exemplary Elements of the '538 Patent Not Disclosed by Blakley '723

99.     The asserted claims of the '538 patent recite a cam selector having a first end, a second end, a top side, and a bottom side, a longitudinal slot positioned on the top side and configured to receive the proximal end of a lever, and a first recess and a second recess on the bottom side. The cam selector is configured to operate between a first mode in which the first trigger tail portion is movable within the first recess, a second mode in which the first trigger tail portion engages the second recess and is moved down by a cam portion of the second recess when the cam selector rotates, and a third mode in which the trigger cannot be pulled. Certain asserted claims further recite a detent movable between a first, second, and third detent track to select among the modes, and that those tracks are transverse grooves on the bottom side of the cam selector. Blakley '723 does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations that Blakley '723 does not disclose.

### v.     A cam selector.

100.     Blakley '723 describes a cam and a selector as two separate components performing two unrelated functions. Blakley's cam (66) is carried in a cam body subassembly (62) together with a cam body housing (64) and a cam mounting pin (68), and is pivoted by the rearwardly traveling bolt carrier so that it bears on the trigger extender. (5:60–6:14; 10:34–11:5.) Blakley's safety selector (82) is a separate rotatable member having an outer lever and an inner tubular portion with a plurality of flat recessed surfaces (88). (*See generally* col. 6.) Blakley '723 does not describe the safety selector as carrying a cam, and it is certainly not configured to have a cam portion of a second recess that moves a trigger tail portion down as taught by the '538 patent and required by its base claim.

HARRISON DECLARATION ON VALIDITY          34

101.    The '538 patent claims the two functions combined in a single rotary member: a cam selector whose own recesses act on the trigger tail and whose rotational position selects the mode. In my opinion Blakley '723 discloses no such member. Its cam is not a selector, and its selector does not meet the claimed limitations of the '538 cam portion.

102.    Blakley '723 likewise does not describe a longitudinal slot on the top side of any selector configured to receive the proximal end of a lever, or a detent movable among three detent tracks on the bottom side of a selector. Those structural absences follow from different intended utility. Contrary to the safety selector 82 of Blakley '723 which is rotated for selection and only by action of the user, the cam selector claimed by the '538 patent slides laterally left or right for selection (5:57-64), and is rotated only automatically (by movement of the bolt carrier), imparting that automatic rotation to move the trigger tail via action of the claimed cam potion in the second recess (7:1-8) without any concurrent change in selection.

### vi.    A cam selector operable in three modes.

103.    For the reasons set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723," in my opinion Blakley '723 does not enable a semiautomatic mode of operation, and the passage at column 11 on which Dr. Batzer relies for selectable semiautomatic mode is not supported by enabling disclosure. I incorporate those opinions here.

### C.  Stoner '555

### 2.  Bibliographic Information

104.    U.S. Patent No. 3,045,555 ("Stoner" or "the '555 patent") is entitled "Automatic Trigger Mechanism With Three Sears and a Rotatable Control Member." (Cover; 1:2–4) It names Eugene M. Stoner, of Newport Beach, California, as the inventor, and identifies Fairchild Engine and Airplane Corporation, of Hagerstown, Maryland, as assignee. (1:5–7.) It issued from

HARRISON DECLARATION ON VALIDITY          35

Application Serial No. 861,288, filed December 22, 1959, and was patented on July 24, 1962.

Stoner contains 10 claims and 2 sheets of drawings. The face of the patent reflects no claim of

priority to any earlier-filed application, so its earliest effective date appears to be the December

22, 1959 filing date. (1:8.)

### 3. Overview of Operation

105.    Stoner discloses a trigger mechanism for various guns characterized by simple

construction and a minimum number of component parts, in which a hammer, a trigger, an

intermediate sear, and an automatic sear are pivotally mounted within a receiver and are subject

to control by a single rotatable control member. (1:11–36.) Stoner characterizes the single control

member as determining, by its position, whether the gun is maintained in a safety condition, a

semi-automatic fire condition, or an automatic fire condition. (1:28–36; 5:19–22.)

106.    Stoner describes a trigger mechanism (30) comprising, among other things, a

trigger (50) pivotally mounted on a pivot pin (52) and having a forward fixed sear (60) that

retains a hammer (62) by engaging a sear abutment (64); a hammer (62) mounted on a pivot pin

(82) and biased toward firing by a torsion spring (84), the hammer further having an intermediate

sear abutment (76) and an automatic sear abutment (92); an intermediate sear (68) carrying a

hook (74) engageable with the intermediate sear abutment (76); an automatic sear (96) pivotally

mounted on a pivot pin (98), biased by a torsion spring (110), and having a head (102) with an

upper extremity (104) engageable by a shoulder (106) on the bolt carrier (42) and a lower

extremity (108) constituting a sear engageable with the automatic sear abutment (92) on the

hammer; and a common control member (120) having a control handle (122) and a control cam

(124) with a plurality of cam surfaces engageable with the trigger, the intermediate sear, and the

automatic sear. (2:43–3:30.) Stoner describes a bolt assembly (40) including a bolt carrier (42)

reciprocable between retracted and battery positions. (2:33–42.)

HARRISON DECLARATION ON VALIDITY            36



**Stoner '555 Patent at Fig. 2**

107.    Stoner describes a safety condition in which the control handle (122) is rotated so that safety cam surfaces (126) lock the trigger (50) against movement and the automatic sear (96) is held inoperative, with the fixed sear (60) engaging the sear abutment (64) to hold the hammer cocked. (3:35–63.)

108.    Stoner describes a semi-automatic condition in which the control cam (124) frees the trigger (50) and the intermediate sear (68) for movement. (3:64–4:2.) Stoner describes that, upon a trigger pull, the fixed sear (60) withdraws from the sear abutment (64) and the torsion spring (84) drives the hammer to fire; the returning bolt carrier (42) then drives the hammer down to a position in which the intermediate sear hook (74) engages the intermediate sear abutment (76) to momentarily maintain the hammer; and upon release of the trigger, the intermediate sear releases the hammer to the fixed sear (60), which re-engages the sear abutment (64) to hold the hammer cocked. (4:3–24.)

HARRISON DECLARATION ON VALIDITY              37



**Stoner '555 Patent at Fig. 5**

109.    Stoner describes an automatic condition, established by rotating the control

handle (122) to the position of FIG. 7, in which the control cam (124) permits the automatic sear

(96) to assume an operative position (its lower extremity (108) engaging the automatic sear

abutment (92) on the hammer) and a deeper portion of a cam (136) locks the intermediate sear

(68) against movement so its hook (74) cannot engage the hammer. (4:25–41.) Stoner describes

that, in this condition, rearward movement of the bolt carrier (42) drives the hammer down so

that the automatic sear (96) catches the hammer; and when the bolt carrier returns to battery, a

shoulder (106) on the bolt carrier engages the upper extremity (104) of the automatic sear head

(102) and rotates it to release the hammer to fire another round—so that, while the trigger is held

depressed, the gun continues to fire. (4:42–56.) Stoner describes that, upon release of the trigger,

the fixed sear (60) re-engages the sear abutment (64) to hold the hammer cocked. (4:57–65.)



**Stoner '555 at Fig. 7**



**Stoner '555 at Fig. 9**

**4. Exemplary Elements of the '247 Patent Not Disclosed by Stoner**

110.     Claim 15 of the '247 patent recites a firearm trigger mechanism operable in a standard semi-automatic mode and in a forced reset semi-automatic mode, in which latter mode the disconnector hook is prevented from catching the hammer hook and, after the bolt carrier moves forward into battery, the user can pull the trigger member to fire the firearm. ('247 Patent, cl. 15.) Claim 15 further recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. (*Id.*) Stoner does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Stoner does not disclose.

111.     Stoner appears among the references cited on the face of the '247 patent. ('247 Patent, Cover at [56].) I understand that references listed on the face of an issued patent were before the examiner during prosecution and were considered by the examiner before the patent issued.

### vii.     A forced reset semi-automatic mode in which the user can pull the trigger member to fire the firearm.

112.     Stoner does not disclose a forced reset semi-automatic mode. Stoner describes a single rotatable control member (120) that determines whether the trigger mechanism is maintained in a safety condition, a semi-automatic condition, or an automatic condition. (1:28–36; 5:19–22.) Stoner's third condition is automatic fire.

113.     In Stoner's automatic condition, the hammer is released to fire by the returning bolt carrier rather than by any action of the trigger. Stoner describes that when the bolt carrier (42) returns to battery, a shoulder (106) on the bolt carrier "engages the upper extremity 104 of the head 102 and rotates the head 102 clockwise about the axis of the pivot pin 98 to immediately release the hammer 62 to fire another round." (4:42–56.) Stoner states the consequence directly: "Thus, so long as the trigger 50 is maintained in depressed condition, that

HARRISON DECLARATION ON VALIDITY          40

is with the finger grip 88 thereof pulled to the rear, the gun 10 will continue to fire." (*Id.*) Stoner describes release of the trigger as what stops the firing, and describes a subsequent rearward movement of the trigger as releasing the hammer "for another burst of fire." (4:57–65.)

114.    Claim 15 is not met by fully automatic fire. In the recited forced reset semi-automatic mode, after the bolt carrier moves forward into battery, "the user can pull said trigger member to fire the firearm." The firearm fires a single round for each pull of the trigger, and the user pulls the trigger again in order to fire again. In Stoner's automatic condition the user does not pull the trigger to fire each round. The user holds the trigger to the rear and the mechanism fires the weapon repeatedly. In my opinion, automatic fire is not the forced reset semi-automatic mode that claim 15 recites.

115.    This is not disputed. Addressing the corresponding limitation of the '159 patent, which is a continuation of the '247 patent, the claim chart comparing Stoner to the asserted claims states that "Stoner discloses that trigger means 50 is operable in an automatic mode (see Figs. 7-9), but not in a forced reset semi-automatic mode." (Batzer Decl., Ex. 14 at 10.) That statement concerns the content of Stoner, and the content of Stoner does not vary depending on which patent or which claim Stoner is asserted against.

> **viii.    A cam having a cam lobe which forces the trigger member towards the set position.**

116.    Stoner discloses no cam that forces the trigger member towards the set position. The term "reset" does not appear anywhere in Stoner.

117.    Stoner's control member (120) carries a control cam (124) having a plurality of cam surfaces engageable with the trigger, the intermediate sear, and the automatic sear. (2:43–3:30.) Stoner describes only two interactions between that cam and the trigger. In the safety condition, safety cam surfaces (126) engage the upper edges of the upper portion (56) of the

trigger (50) to lock the trigger against movement. (3:35–63.) In the semi-automatic and automatic conditions, the control cam frees the trigger for movement. (3:64–4:2; 4:25–41.) Stoner describes no structure that drives or forces the trigger member toward the set position, and Stoner's trigger returns only upon release by the user.

118.    In my opinion that absence is unsurprising. The premise of Stoner's automatic condition is that the trigger remains depressed while the weapon fires, which is not compatible with forcing the trigger forward between shots.

119.    I further note that the claim chart comparing Stoner to claim 15 of the '247 patent leaves the comparison entry for this limitation blank. (Batzer Decl., Ex. 12 at 1.) No disclosure in Stoner is identified as corresponding to a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. That is consistent with my own review of Stoner, which locates no such structure in the reference.

### 5.    Exemplary Elements of the '159 Patent Not Disclosed by Stoner

120.    I understand the asserted claims of the '159 patent to be claims 1, 3, 6, 7, 9 through 11, and 14 through 17.

121.    Because the '159 patent is a continuation of the '247 patent and shares its specification, and because the asserted claims recite the same two-mode architecture, my opinions regarding Stoner set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stoner" apply equally to each asserted claim of the '159 patent, and I incorporate them here in full.

122.    Stoner also appears among the references cited on the face of the '159 patent. ('159 Patent, Cover at [56].) As with the '247 patent, I understand that Stoner was therefore before the examiner and was considered during prosecution of the '159 patent before it issued.

> ### ix. Stoner's automatic sear does not force the trigger member toward the set position.

123. In my opinion, Stoner's automatic sear (96) cannot correspond to the recited cam. Stoner describes the automatic sear as pivotally mounted on a pivot pin (98) and biased by a torsion spring (110), having a head (102) whose upper extremity (104) is engageable by a shoulder (106) on the bolt carrier (42), and a lower extremity (108) constituting a sear engageable with the automatic sear abutment (92) on the hammer. (2:43–3:30.) Stoner's automatic sear therefore acts upon the hammer, and is itself acted upon by the bolt carrier. Stoner nowhere describes the automatic sear contacting the trigger member, nowhere describes it forcing, driving, or biasing the trigger member toward the set position, and nowhere describes it as having a cam lobe.

> ### x. A forced reset semi-automatic mode.

124. Claim 17 of the '159 patent recites a forced reset mode in which the cam forcibly biases the trigger member into the set position with the hammer and trigger member sear engagement surfaces engaged, "permitting the user to immediately fire again without the user manually releasing pressure on the trigger member." ('159 Patent, cl. 17.) For the reasons set out above, Stoner discloses no such mode. Stoner's third condition is automatic fire, in which the user holds the trigger to the rear and the mechanism fires the weapon repeatedly without any further action by the user.

125. This is not disputed. Addressing this limitation, the claim chart comparing Stoner to the asserted claims of the '159 patent states that "Stoner discloses that trigger means 50 is operable in an automatic mode (see Figs. 7-9), but not in a forced reset semi-automatic mode." (Batzer Decl., Ex. 14 at 10.)

> ### xi. A difference in operation between modes determined by movable selection of the blocking means.

126.    Claim 17 further requires that the difference in operation between the modes be determined by movable selection of the blocking means, so as selectively to permit or prevent the hammer and trigger member sear engagement surfaces from engaging when the trigger member is biased by the cam. ('159 Patent, cl. 17.) The claim chart comparing Stoner to the asserted claims of the '159 patent leaves the comparison entry for this limitation blank. (Batzer Decl., Ex. 14 at 10.) No disclosure in Stoner is identified as corresponding to it, which is consistent with my own review of the reference.

### D.  Stakes '067

#### 1.  Bibliographic Information

127.    U.S. Patent No. 9,146,067 B2 ("Stakes" or "the '067 patent") is entitled "Trigger Mechanism." It names Michael A. Stakes as the sole inventor and applicant, and identifies no separate assignee on its face. It issued from Application No. 13/919,085, filed June 17, 2013, and published as U.S. Patent Application Publication No. 2014/0366418 A1 on December 18, 2014, before issuing on September 29, 2015. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective filing date appears to be June 17, 2013.

#### 2.  Overview of Operation

128.    Stakes discloses a trigger mechanism that, among other things, addresses what it characterizes as a delay in trigger-to-hammer reset that limits the speed of semi-automatic fire. (5:50–6:8.) Stakes characterizes its mechanism as a select-fire trigger mechanism allowing selection between "safe, semi-automatic, and assisted-reset semi-automatic modes of fire or operation," set by a selector (70). (6:18–20.)

129.    Stakes describes a mechanism comprising, among other things, a trigger body (23) with a trigger nose (24) and a tail (25A); a disconnector (30) having a disconnector hook (33), a disconnector lever (32), and a cam surface (35), which together with the trigger body

form a "trigger disconnector assembly" (39); a hammer (40) having a striking end (45), a striking surface (44), a hammer tail (46), and a hammer disconnect notch (47); an "assisted-reset lever" or "reset lever" (50) that is spring-biased by a reset lever spring (60); and a selector (70) carrying a cam (75) and stops (78A). (6:22–7:60.)



**Stakes '067 at Figs. 1, 3**

130.    Stakes describes a "past-cocked" position of the hammer beyond the ordinary cocked position. (5:59–6:6.) After a round is fired, Stakes describes that the rearwardly moving bolt carrier engages the hammer (40) and pivots it rearward toward the cocked position and beyond to the past-cocked position. (8:61–65.)

131.    In the *semi-automatic* mode, the selector (70) holds the reset lever (50) in an inoperative position by means of the selector cam (75) bearing on the reset lever's arm (52), so the reset lever does not act on the trigger disconnector assembly. (8:5–11, 22–60.) Stakes describes that, in this mode, the disconnector hook (33) engages the hammer disconnect notch (47) to arrest forward movement of the hammer and "prevent[] automatic fire," and that the trigger must be *released* by the user before the trigger body and trigger nose return to the set position to hold the hammer cocked in preparation for another trigger pull. (9:4–28.)



**Stakes '067 at Fig. 4**



**Stakes '067 at Figs. 6-9**

132.    In the *assisted-reset semi-automatic* mode, the selector (70) no longer holds the reset lever inoperative, and the reset lever spring (60) biases the reset lever (50) toward its operative (closed) position. (7:44–60.) The hammer disconnect notch (47) clips past the disconnector hook (33) as the hammer travels to the past-cocked position, and in the past-cocked position the disconnector hook "is positioned to engage hammer disconnect notch 47 in the engaged position of disconnector hook 33 for preventing forward movement of hammer 40," such that "[f]orward movement of hammer 40 is thus arrested by disconnector hook 33 engaging hammer disconnect notch 47." (11:55–12:23.) Stakes states that this "prevents automatic fire." (12:6.) The disconnector therefore captures the hammer after each shot.

133.    Stakes further describes that, in the assisted-reset semi-automatic mode, the user must release pressure on the trigger before the mechanism returns to its firing-ready condition. Significantly, in the *assisted-reset semi-automatic* mode, Stakes states that "[w]hen trigger 27 is released, trigger body 23 and trigger 27 pivot a trigger resetting or reset travel distance in the assisted-reset semi-automatic mode of operation from the pulled position ... to the set position." (11:55–12:23.) In each of its firing modes, Stakes describes the hammer as thereafter retained in the cocked position by the trigger nose "preparatory to firing by another trigger pull." (12:22–23.) Stakes nowhere describes firing the firearm again without the user releasing pressure on the trigger.



**Stakes '067 at Fig. 5**



**Stakes '067 at Figs. 10-14**

134.    Stakes describes the selector (70) as determining which mode is active by, among other things, the position of its cam (75) relative to the reset lever and the position of its stops relative to the tail (25A) of the trigger body. (7:61–8:5; 9:66–10:62.)



**Stakes '067 at Figs. 15-16**

135.    Stakes describes the selector (70) as carrying a stop body (78) located near, above, and opposite to a notch (25) in the tail (25A) of the trigger body (23). Stakes describes that stop body as including two stops, a stop (78A) and a stop (78B), which Stakes identifies as surfaces of the stop body oriented perpendicular to one another. (17:7–45.)

136.    Stakes describes each stop as registering with the trigger tail in one of the two firing settings. In the first position of the selector, corresponding to the semi-automatic mode of operation, stop (78A) is "registered with, meaning aligned with," the notch of the trigger tail, and with the trigger nose (24) received in the trigger notch (49) holding the hammer (40) cocked, Stakes defines a distance D1 between that stop and the notch of the trigger tail. (17:7–45.) In the second position of the selector, corresponding to the assisted-reset semi-automatic mode of operation, stop (78B) is registered with the notch of the trigger tail instead, and Stakes defines a distance D2 between that stop and the notch. (17:7–45.)

137.    Stakes describes those distances as governing how far the trigger travels. Stakes states that pulling the trigger lowers the trigger nose out of the trigger notch, releasing the

hammer, "while at the same time raising tail 25A of trigger body 23 toward stop 78A of stop body 78 of selector 70 closing distance D1," until the notch of the tail comes "into direct contact against stop 78A." Stakes describes that contact as arresting the upward movement of the tail and thereby limiting "the pivotal movement of trigger 27 and trigger body 23 past the pulled/fired position." (17:7–45.) Stakes describes the same sequence in the assisted-reset semi-automatic mode with respect to stop (78B) and distance D2. (17:7–45.) In each mode, Stakes states that "the trigger pulling and trigger reset travel distances of trigger body 23 and trigger 27 are equal." (*Id.*)

138.    Stakes states that "[d]istance D1 denoted in FIGS. 15 and 17 is greater than distance D2 denoted in FIGS. 16 and 19." (17:46–18:14.) Stakes describes the consequence as follows: "Because distance D2 is less than distance D1, the trigger pull travel distance of trigger body 23 and trigger 27 from the set position thereof to the pulled/fired position thereof in the second position of selector 70 corresponding to the assisted reset semi-automatic mode of operation ... is less than the trigger pull travel distance ... in the first position of selector 70 corresponding to the semi-automatic mode of operation ..., and the trigger reset travel distance ... in the second position of selector 70 ... is less than the trigger rest travel distance ... in first position of selector 70 ...." (17:46–18:14.)



**Stakes '067 Patent at Fig. 17**



**Stakes '067 Patent at Fig. 19**

### 3. Exemplary Elements of the '247 Patent Not Disclosed by Stakes

139.    Claim 15 of the '247 patent recites a firearm trigger mechanism operable in a standard semi-automatic mode, in which the disconnector hook catches the hammer hook and the user must manually release the trigger member to free the hammer from the disconnector, and in a forced reset semi-automatic mode, in which the disconnector hook is prevented from catching the hammer hook and the user can thereafter pull the trigger member to fire the firearm. ('247

HARRISON DECLARATION ON VALIDITY          51

Patent, cl. 15.) Claim 15 further recites a cam having a cam lobe which, in the second position of

the cam, forces the trigger member towards the set position. (*Id.*) Stakes does not disclose these

limitations. The following are exemplary and are not an exhaustive statement of the limitations

of claim 15 that Stakes does not disclose.

140.    Stakes appears among the references cited on the face of the '247 patent. ('247

Patent, Cover at [56].) I understand that references listed on the face of an issued patent were

before the examiner during prosecution and were considered by the examiner before the patent

issued.

### xii.    A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.

141.    Stakes does not disclose a forced reset mode of operation. Stakes describes a

selector (70) having three settings, which Stakes identifies as safe, semi-automatic, and assisted-

reset semi-automatic. (6:18–20.) Neither of the two firing settings is a forced reset mode.

142.    As set forth above, Stakes describes that in its assisted-reset semi-automatic mode

the disconnector hook engages the hammer disconnect notch and arrests forward movement of

the hammer after each shot, and that the user must then release pressure on the trigger before the

trigger body and trigger nose return to the set position and the disconnector hook is withdrawn to

its disengaged position. Stakes describes the hammer as thereafter held cocked "preparatory to

firing by another trigger pull."

143.    The difference between what Stakes describes and what claim 15 recites is not

one of terminology. Claim 15 recites two distinct modes. In the standard semi-automatic mode,

the disconnector hook catches the hammer hook and the user must manually release the trigger

member to free the hammer from the disconnector before the firearm can be fired again. In the

forced reset semi-automatic mode, the disconnector hook is prevented from catching the hammer

hook, and the user can pull the trigger member to fire again without that manual release. In Stakes' assisted-reset semi-automatic mode, the disconnector captures the hammer after every shot and the user must release pressure on the trigger to free it. In my opinion, that is the operation claim 15 recites for the standard semi-automatic mode, not the forced reset semi-automatic mode.

144.    Stakes' own measure of the improvement confirms this. As set forth above, Stakes defines a distance D1 between the semi-automatic stop (78A) and the trigger tail, and a shorter distance D2 between the assisted-reset stop (78B) and the trigger tail, and states that because D2 is less than D1 both the trigger pull travel distance and the trigger reset travel distance are shorter in the assisted-reset semi-automatic mode. (17:46–18:14.) What Stakes describes is therefore a shorter trigger stroke, which shortens the interval between aimed shots. It is not the elimination of the reset. Stakes states that in each mode "the trigger pulling and trigger reset travel distances of trigger body 23 and trigger 27 are equal," so the trigger travels fully back to its set position in both.

145.    Stakes explains that an advantage of the inequality between D1 and D2 is a more rapid rate of semi-automatic fire by reducing the trigger reset *distance* that must be covered by the shooter's trigger finger when the shooter resets the trigger body after every shot in the assisted-reset semi-automatic mode of operation. (17:65-18:14). Hence, the assisted-reset semi-automatic operation of Stakes is fundamentally different from the claimed forced-reset operation, in which the trigger pull distance covered by the shooter's trigger finger is *not reduced* and trigger reset (but not trigger pull) is fully automatic and *not performed by the shooter*.

> **xiii.    A cam having a cam lobe which forces the trigger member towards the set position.**

146.    Stakes does not disclose a cam. The element by which Stakes returns the trigger nose to its set position is the reset lever (50), which Stakes describes as mounted for pivotal movement at a pivot (56) between open and closed positions, having an arm (52) and an arm (53) and biased toward its operative position by a reset lever spring (60). (6:66–7:24; 7:44–60.) Stakes does not describe the reset lever as a cam, and the term "cam lobe" appears nowhere in Stakes.

147.    In my opinion the reset lever is not a cam. A cam imparts motion to another member through the contour of a working surface, so that the displacement of the driven member is determined by the shape of the cam as the cam moves through its travel. Stakes' reset lever does not work that way. It is struck by the hammer (40) and then arm (53) of reset lever (50) engages cam surface (35) of disconnector (30) which "imparts the energy from the pivoting reset lever 50 to disconnector 30." (14:22-50). Stakes reserves the term "cam" for two other structures, and the reset lever is neither of them: the cam (75) carried on the selector (70), which bears against arm (52) of the reset lever to hold it in its inoperative position, and the cam surface (35) on the disconnector lever (32), against which arm (53) of the reset lever bears. (7:61–8:5; 6:22–7:60.) In Stakes' own arrangement, the reset lever is a member that bears against a cam surface; it is not the cam.

148.    Regardless of how the reset lever is characterized, it is actuated by the hammer rather than by the bolt carrier, and contacts the disconnector. Stakes describes that the striking end (45) of the hammer (40) strikes the reset lever (50) in the past-cocked position of the hammer, pivoting the reset lever from the open position to the closed position, and contacting the disconnector. (12:24–14:64.) By contrast, the '247 patent describes its cam as contacted and

pivoted by the rearwardly moving bolt carrier, which drives the cam lobe against the trigger member. (6:41–42.)

149.    The reset lever also does not act on the trigger member. Stakes describes arm (53) of the reset lever as moving "in direct contact against cam surface 35 of disconnector lever 32 of disconnector 30 of trigger disconnector assembly 39." (12:24–43.) The reset lever acts on the disconnector, and the trigger body moves only because the trigger body and the disconnector are pivoted together as the trigger disconnector assembly (39). Claim 15 requires that the cam lobe force the trigger member towards the set position.

### 4. Exemplary Elements of the '159 Patent Not Disclosed by Stakes

150.    I understand the asserted claims of the '159 patent to be claims 1, 3, 6, 7, 9 through 11, and 14 through 17.

151.    Because the '159 patent is a continuation of the '247 patent and shares its specification, and because the asserted claims recite the same two-mode architecture, my opinions regarding Stakes set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stakes" apply equally to each asserted claim of the '159 patent, and I incorporate them here in full.

152.    Stakes also appears among the references cited on the face of the '159 patent. ('159 Patent, Cover at [56].) As with the '247 patent, I understand that Stakes was therefore before the examiner and was considered during prosecution of the '159 patent before it issued.

153.    Claim 17 of the '159 patent recites two limitations not present in claim 15 of the '247 patent, which I address separately below.

> **xiv.    A forced reset mode permitting the user to fire again without manually releasing pressure on the trigger member.**

154.    Claim 17 recites a forced reset mode in which the cam forcibly biases the trigger member into the set position with the hammer and trigger member sear engagement surfaces engaged, "permitting the user to immediately fire again without the user manually releasing pressure on the trigger member." ('159 Patent, cl. 17.) Stakes describes the opposite. As set forth above, Stakes describes that in its assisted-reset semi-automatic mode the user must release pressure on the trigger before the trigger body and trigger nose return to the set position, and describes the hammer as thereafter held cocked "preparatory to firing by another trigger pull." Stakes nowhere describes firing the firearm again without the user releasing pressure on the trigger.

> **xv.     A difference in operation between modes determined by movable selection of the blocking means.**

155.    Claim 17 further recites "a movable blocking means configured to selectively prevent the hammer sear catch surface from engaging with the sear in the set position," and requires that the difference in operation between the modes be determined by movable selection of that blocking means. ('159 Patent, cl. 17.)

156.    In Stakes, the selector (70) does not act on the disconnector (30). Stakes describes the selector as acting on the reset lever, by means of the selector cam (75) bearing against arm (52) of the reset lever to hold it in or release it from its inoperative position, and as acting on the trigger body, by means of the selector's stops (78A) relative to the tail (25A) of the trigger body. (7:61–8:5; 9:66–10:62.) Stakes describes no contact between the selector and the disconnector.

157.    Nor is the orientation of Stakes' disconnector selected by the user. The disconnector (30) is pivotally mounted together with the trigger body (23) as the trigger disconnector assembly (39) and is not moved by the selector (70).

**E.  Inskip '465**

### 5. Bibliographic Information

158.    U.S. Patent No. 4,023,465 ("Inskip" or "the '465 patent") is entitled "Firearm." It names Thomas C. Inskip, of Bethesda, Maryland, as the inventor, and identifies no assignee. It issued from Application Serial No. 555,585, filed June 27, 1975, and was patented on May 17, 1977. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective date appears to be the June 27, 1975 filing date.

### 6. Overview of Operation

159.    Inskip discloses an auto-loading firearm having a firing mechanism that selectively permits conventional semi-automatic operation or automatic operation in which bursts are fired at a rate that can be varied between one and about twelve rounds per second in response to the operator's finger pressure on the trigger, without release of the trigger. (Abstract.) Inskip characterizes the object of its invention as allowing the operator "to control the rate of fire by varying his finger pressure on the trigger during firing." (1:4–7.) Inskip describes and illustrates its mechanism in combination with a modified rifle of known design, specifically the AK-47, which Inskip characterizes as selectively operable in either a semi-automatic or a full automatic constant rate mode. (1:60–65.)

160.    Inskip characterizes the delay characteristic as achieved "by positively and rapidly kicking the trigger in a forward direction against the operator's finger pressure after each round is fired and by locking the trigger in this forward position until another round has been locked in the chamber." (2:10–28.) Inskip states that the kicking action increases the time required for the operator's finger pressure to move the trigger again to its firing position, that the delay is greater when finger pressure is reduced, and that the operator can thereby control the rate of fire with his trigger finger. (2:10–28.)

161.    Inskip describes a firing mechanism comprising, among other things, a receiver (10) in which a bolt carrier (20) is longitudinally slidable, the bolt carrier carrying a bolt (24) and a firing pin (28) and returned forward by a spiral return spring (30); a trigger (38) having ribs (44, 46) and a trigger sear (50); a secondary trigger member (56) having a sear surface (70); a hammer (72) having a hammer sear (82); a trigger disengagement arm (98) pivoted on a pin (100) and having a cam surface (102) disposed in the path of a cam surface (104) on the bolt carrier; a stiff rod (106) rigidly connected to the arm (98) and carrying at its rearward end a trigger disengagement sear (108) having a downwardly facing L-shaped sear surface (112, 114) engageable with a trigger sear pin (116); a selector lever (124) carrying a selector lug (118); and a trigger depressor plate (132) loosely carried on the front surface of the selector lug by a nut (134) and bolt (136), the plate being permitted slight vertical movement relative to the lug. (2:53–4:57.)



**Inskip '465 Patent at Fig. 1**

162.    Inskip describes the selector lever (124) as movable among three positions. In the full up position the lower surface (130) of the selector lug (118) overlies the rear portion of the trigger so that the trigger cannot be pulled, which Inskip identifies as the safety position. (4:39–47.) Inskip describes the intermediate and down positions as placing the firing mechanism in a variable rate mode and a semi-automatic mode, respectively. (4:39–5:18.) Inskip states that the trigger depressor plate (132) "is non-functional when the selector arm 124 is in either its safety position (FIG. 8) or its semi-automatic position (FIGS. 6 and 7)," and that when the arm is in the intermediate variable rate position the plate cooperates with the bolt carrier and with the trigger. (4:58–5:1.)



**Inskip '465 Patent at Fig. 8**

163.    In the variable rate mode, Inskip describes that a cam surface (142) on the bolt carrier (20) strikes and passes over the upper edge (144) of the trigger depressor plate (132), causing the plate to move downwardly against the upper surfaces of the trigger ribs (44, 46) and thereby kick the trigger (38) forward. (4:60–5:20.) Inskip further describes that the cam surface

HARRISON DECLARATION ON VALIDITY          59

(104) on the bolt carrier acts on the cam surface (102) of the trigger disengagement arm (98), rotating the arm, the rod (106), and the sear (108) so that the sear is positioned above the trigger sear pin (116). (5:1–6:48.)



Inskip '465 Patent at Fig. 4



Inskip '465 Patent at Fig. 5

164.    In the semi-automatic mode, Inskip describes that the selector lever is moved to its down position, swinging the selector lug and the trigger depressor plate to a position in which the plate cannot be engaged by the trigger. (6:51–7:68.) Inskip describes that the hammer (72)

then engages under the sear surface (70) on the secondary trigger member (56), "so that the hammer 72 is held back by the latter even if the operator's finger is not released from the trigger." (7:1–3.) Inskip states that "[t]he hammer 72 is not held back in this manner in the variable rate mode, because the trigger 38 is kicked counterclockwise soon after the hammer 72 has been rotated counterclockwise." (7:4–7.)



**Inskip '465 Patent at Figs. 6 and 7**

**7.  Exemplary Elements of the '247 Patent Not Disclosed by Inskip**

165.    Claim 15 of the '247 patent recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position, and a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook. ('247 Patent, cl. 15.) Inskip does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Inskip does not disclose.

166.    Inskip appears among the references cited on the face of the '247 patent. ('247 Patent, Cover at [56].) I understand that references listed on the face of an issued patent were before the examiner during prosecution and were considered by the examiner before the patent issued. Inskip is also cited on the face of the '784 patent, where it is designated as having been cited by the examiner. ('784 Patent, Cover at [56].)

167.    Inskip was also known to Mr. Blakley, who is the named inventor of the '247 patent. The Blakley '723 patent discusses Inskip at length and distinguishes it, stating that Inskip "appears intended to regulate the rate of fire of a machine gun by allowing the operator to control the rate of fire of the firearm by the pulling pressure on the trigger," that "[t]he exemplary embodiment of Inskip's invention uses the cycling bolt carrier of an AK47 to move the trigger of the firearm to the forward ready-to-fire position, and then locks the trigger in that position until the bolt carrier returns to battery," and that "[t]he difference between the present invention and the Inskip invention is that the Inskip mechanism used to allow the bolt carrier to force the trigger forward allows the operator's trigger finger pressure to be transmitted vertically to the bolt carrier during the entire latter portion of the bolt carrier's cycle." (Blakley '723, 9:50–10:11.) A person working in this field, with Inskip before him, did not regard Inskip as disclosing his own invention.

            **xvi.    A cam having a cam lobe which forces the trigger member towards the set position.**

168.    Inskip describes "a cam surface 142 on the bolt carrier 20" which "can strike and pass over the upper edge 144 of the plate 132, causing the plate 132 to move downwardly and thereby kick the trigger 38 slightly forward." (4:65–5:1.) Inskip describes the relationship in the same terms elsewhere, stating that "[t]he upper edge 144 of the plate 132 now lies in the path of the cam surface 142 on the bolt carrier 20 so that as the carrier 20 moves rearwardly it cams the plate 132 downwardly against the upper surfaces of the trigger ribs 44 and 46." (5:5–9.) The cam surface Inskip identifies is carried on the bolt carrier, and Inskip does not describe it as contacting the trigger at any point.

169.    The trigger depressor plate (132) is the follower member that is cammed, not the cam. In my opinion a cam is a member whose working profile determines the displacement of a driven member as the cam moves through its travel. In Inskip, that description fits the cam surface (142) on the bolt carrier, whose profile determines the downward displacement of the plate. The plate follows that profile and then bears on the upper surfaces of the trigger ribs (44, 46). The arrangement is the familiar one of a cam, a follower, and a member driven by the follower, and Inskip's own terminology assigns each part its conventional role.

170.    Claim 15 requires that the cam lobe forces the trigger member towards the set position. Defendant's expert Dr. Batzer opines that "the cam limitation is met by trigger depressor plate 132 (the cam), whose bottom surface is the cam lobe." *See* Batzer Decl., Ex. 13 at 6. I disagree with Dr. Batzer's opinion and his attempted mapping of the Inskip prior art to the claim limitations because, in Inskip, the trigger depressor plate 132 is not properly considered to be a cam but rather would be understood by a person of ordinary skill in the art to instead be a follower, and the bolt carrier surface that Inskip identifies as the cam never reaches contact with the trigger.

### xvii.    A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.

171.    In Inskip's variable rate mode, the sear surface 70 on the secondary trigger member 56, *i.e.*, Inskip's disconnector, *does* catch the hammer. Inskip states that in the semi-automatic mode the hammer's sear surface (84) "engages under the sear surface 70 on the secondary trigger member 56 so that the hammer 72 is held back by the latter even if the operator's finger is not released from the trigger," and that "[t]he hammer 72 is not held back in this manner in the variable rate mode, because the trigger 38 is kicked counterclockwise soon after the hammer 72 has been rotated counterclockwise." (6:63–7:7.) Inskip then explains what does occur in the variable rate mode: "That is, in the variable rate mode, engagement of sear surfaces 84 and 70 is momentary and the holding back of the hammer 72 is immediately transferred to sear surfaces 82 and 50." (7:7–10.)

172.    Inskip therefore describes the disconnector catching, i.e. "holding back" the hammer in the variable rate mode. What Inskip describes as differing between its two modes is the duration of the catching and the member to which the hammer is thereafter transferred, not whether the catching occurs. Figure 4, which depicts the mechanism during firing in the variable rate mode, shows the sear surface (70) on the secondary trigger member (i.e., Inskip's disconnector) catching the sear surface (84) of the hammer.

173.    Claim 15 requires that, in the forced reset semi-automatic mode, the disconnector hook be prevented from catching the hammer hook. Momentary catching is still catching. Inskip discloses no structure that prevents the sear surface on the secondary trigger member from catching the hammer in the variable rate mode, and it expressly describes that catching as occurring.

### 8.    Exemplary Elements of the '784 Patent Not Disclosed by Inskip

174.   Claim 1 of the '784 patent, its only independent claim, requires a locking member "having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position." ('784 Patent, cl. 1.) Claim 4 requires that "the locking member deflectable portion pivots relative to the body portion." (*Id.*, cl. 4.) Inskip does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations that Inskip does not disclose.

175.   Inskip appears among the references cited on the face of the '784 patent, where it is designated as having been cited by the examiner. ('784 Patent, Cover at [56].) I understand that Inskip was therefore before the examiner during prosecution and was considered by the examiner before the '784 patent issued.

### xviii.   An upwardly extending deflectable portion that is separately movable relative to the body portion.

176.   Inskip describes its spring (110) as rigidly attached to the sear (108). Inskip states that "[a] spring 110 is rigidly attached at one end to the sear 108 and extends upwardly into the path of the bolt carrier 20." (4:8–10.) Inskip does not describe that spring as movable separately from the sear and does not describe it as occupying an extended position and a deflected position.

177.   What Inskip does describe is the spring moving the sear rather than moving separately from it. Describing the rearward travel of the bolt carrier in the variable rate mode, Inskip states that "the cam surface 142 on the carrier 20 depresses and passes over the trigger disengagement spring 110 so that the trigger disengagement arm 98, its rod 106 and its sear 108 are rotated counterclockwise about the pin 100." (5:48–56.) The consequence Inskip attributes to

depressing the spring is that the arm, the rod, and the sear rotate together about the pin (100). The spring is the member through which the bolt carrier actuates the assembly.

178. Inskip describes no instance in which the spring moves and the body portion does not. In every operation Inskip describes, movement of the spring is not separate from but rather is accompanied by rotation of the arm (98), the rod (106), and the sear (108) about the pin (100). Claim 1 requires a portion that is separately movable relative to the body portion. A portion whose movement influences the movement of the body portion to which it is connected in every disclosed operation is not "separately" movable relative to it.

### xix.   A deflectable portion that pivots relative to the body portion.

179. Claim 4 requires that the deflectable portion pivot relative to the body portion. Inskip identifies the pivot in this assembly, and it is the pin (100), about which the arm (98), the rod (106), and the sear (108) rotate together. (3:66–4:8.) Inskip describes no second pivot between the spring (110) and the sear (108), and describes the connection between them as rigid. (4:8–10.)

180. In my opinion, a spring rigidly attached at one end and loaded at the other does not pivot relative to the member to which it is attached. Pivoting is rotation about an axis. A member fixed at one end and deflected under load deforms progressively along its length, with the amount of displacement varying from the fixed end to the free end. In my opinion, characterizing that deformation as pivoting would treat a member that bends and a member that is hinged as though they were the same thing, and they are not.

### F.  Tommy Triggers FRT-15-3MD

### 9.  The Asserted Materials

181. Dr. Batzer identifies "Tommy" as the Tommy Triggers FRT-15-3MD trigger assembly, which he states was sold on or before February 21, 2022. (Batzer Decl. ¶ 140.) He

relies on three materials as establishing what that assembly was: the Complaint in *Rare Breed Triggers, LLC v. Strbac*, No. 1:22-cv-00280 (N.D. Ohio), ECF No. 1 (the "Strbac Complaint"); U.S. provisional patent application no. 63/297,884, filed January 10, 2022, naming Mladen Thomas Strbac as inventor (the "'884 provisional"); and a YouTube video posted June 29, 2022 by user Bingly. (*Id.*) The claim chart addressed to claim 15 of the '247 patent cites only the Strbac Complaint. (Batzer Decl., Ex. 11.)

### 10. Overview of Operation

182.    The Strbac Complaint describes the FRT-15-3MD as an assembly accused of infringing U.S. Patent No. 10,514,223, and states that it "includes an additional feature not included in the current version of the Rare Breed FRT-15 trigger," namely that it "can operate in a 'disconnector mode,' which is much like that of a standard AR-15 trigger." (Strbac Complaint ¶ 45.) The Strbac Complaint states that the user "can switch between safe, standard semiautomatic with disconnector, and forced reset semiautomatic with locking bar modes by rotating the safety selector." (*Id.*) The Strbac Complaint identifies the internal components as "the trigger, hammer, locking bar, and springs." (*Id.* ¶ 46.)

183.    The Strbac Complaint describes the mechanism of the '223 patent, which it states the accused assembly copies, as resetting the trigger by means of the hammer. The Strbac Complaint states that the '223 patent "teaches a forcible reset of the trigger by the hammer while the bolt returns to the in-battery position," and that it "also teaches a 'locking bar' which limits movement of the trigger," which "acts to prevent the trigger from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position." (*Id.* ¶ 30.)

184.    The Strbac Complaint describes the sequence in the same terms. As the bolt carrier moves rearward it "engages with and cocks the hammer," and "the hammer forcibly resets the trigger." (*Id.* ¶ 35.) "Simultaneously, the locking bar engages with the trigger and

mechanically prevents the shooter from pulling the trigger until the locking bar is reset." (*Id.*) As the bolt carrier returns forward, it "contacts and pivots the locking bar, freeing the trigger to be pulled again by the user." (*Id.* ¶ 36.)

185.    The '884 provisional application is captioned "Improved Firearm Trigger Mechanism" and "FRT-15-3MD." Its brief description of the drawings identifies the components of the mechanism as a cassette or cartridge housing, a set screw, a guide pin, a safety spring, a safety bar, a safety bar pin, a disconnect, a hammer, a trigger, a hammer spring, a trigger spring, a disconnect spring, set screws, and a three-position safety. The '884 provisional does not show or identify a cam among the components of the mechanism.

### 11. Exemplary Elements of the '247 Patent Not Disclosed by Tommy

186.    Claim 15 of the '247 patent recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. ('247 Patent, cl. 15.) Tommy does not disclose that limitation. The following is exemplary and is not an exhaustive statement of the limitations of claim 15 that Tommy does not disclose.

> **xx.    A cam having a cam lobe which forces the trigger member towards the set position.**

187.    The materials on which Dr. Batzer relies describe two separate structures performing two separate functions, and neither is the claimed cam. The hammer resets the trigger, and the locking bar blocks it.

188.    The Strbac Complaint states that "the hammer forcibly resets the trigger." (Strbac Complaint ¶ 35.) It describes the locking bar as a member that "limits movement of the trigger" and "acts to prevent the trigger from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position." (*Id.* ¶ 30.) It describes the locking bar as engaging the trigger and "mechanically prevent[ing] the shooter from pulling the trigger," and describes

the returning bolt carrier as pivoting the locking bar so as to "free[] the trigger to be pulled again." (*Id.* ¶¶ 35, 36.) On the Strbac Complaint's own account, the locking bar restrains the trigger and releases it. It never drives the trigger toward the set position.

189.    Claim 15 requires that the cam lobe force the trigger member towards the set position. A member that holds a trigger where the hammer has already placed it, and that is then pivoted aside to permit the trigger to move, does not perform that function. In my opinion the locking bar described in the Strbac Complaint is not a cam having a cam lobe that forces the trigger member towards the set position, and neither the Strbac Complaint nor the '884 provisional describes a cam that does.

190.    Dr. Batzer recognizes this deficiency. In his summary of invalidity arguments he states that "[i]f Plaintiffs dispute that the locking bar is a 'cam' with a 'cam lobe' that 'forces' the trigger toward the set position (because the hammer, rather than the bar, performs the initial reset stroke in the Tommy design), the claim is obvious over Tommy in view of Blakley (Ground 7)." (Batzer Decl., Ex. 13 at 9.)

## G.  Daley '523

### 12. Bibliographic Information

191.    U.S. Patent Application Publication No. 2014/0338523 A1 ("Daley" or "the '523 publication") is entitled "Automatic Sear Assembly for a Rifle." It names William C. Daley, Jr., of Kingston, New Hampshire, as the inventor, and SIG SAUER, Inc., of Newington, New Hampshire, as the applicant. It published on November 20, 2014 from Application Serial No. 14/276,045, filed May 13, 2014, and claims the benefit of provisional application No. 61/824,393, filed May 17, 2013.

### 13. Overview of Operation

HARRISON DECLARATION ON VALIDITY          69

192.    Daley discloses "[a]n automatic sear assembly for providing a large-bore rifle with full-automatic firing and/or burst firing capabilities." (Abstract.) Daley describes the assembly (10) as comprising an automatic sear (100), an adjacent sear lever (200), a sear lever spring (300), and a sear spring (400). ([0035].) Daley describes the automatic sear as moving into and out of index with the hammer of the host rifle under the control of the rifle's safe/fire selector switch, and as searing with that hammer. ([0039].)

193.    Daley characterizes the object of the assembly as firing the rifle again without operating the trigger. Daley states that the assembly "can be used in a rifle, for example, to utilize the force of a moving bolt carrier during a given firing cycle to initiate a subsequent firing cycle without need to release and once again operate the trigger of the rifle." (Abstract; see also [0026].)

194.    Daley describes the sear lever (200) as providing one-way articulation between the bolt carrier and the automatic sear, such that "rotational deflection of the sear lever away from the automatic sear imparts no rotation thereto, whereas rotational deflection of the sear lever toward the automatic sear imparts rotation thereto." (Abstract.) Daley describes the sear lever as aiding "in preventing the sear from coming into direct physical contact with the bolt carrier of the rifle." ([0031]; see also [0065].)

### 14. Exemplary Elements of the '784 Patent Not Disclosed by Daley

195.    Claim 1 of the '784 patent requires "a locking member that is movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member." ('784 Patent, cl. 1.) Daley does not disclose that limitation.

196.    The subject matter of Daley was before the examiner during prosecution of the '784 patent. U.S. Patent No. 9,151,557, which issued from the application that published as the

'523 publication, appears among the references cited on the face of the '784 patent, where it is designated as having been cited by the examiner. ('784 Patent, Cover at [56].) I understand that the examiner therefore considered this disclosure before the '784 patent issued.

197.    Like Stoner, Daley's automatic sear does not act on a trigger member. It restrains the hammer. Dr. Batzer describes it the same way, stating that Daley discloses "a locking member (sear assembly 10) movable between a first position in which it locks the hammer from falling ... and a second position in which it does not restrict the hammer's movement." (Batzer Decl., Ex. 8 at 7.) Locking a hammer against falling is not locking a trigger member against pulling movement.

198.    Nor does Daley describe restraining a trigger at all. The function Daley ascribes to its assembly is to fire the rifle again "without need to release and once again operate the trigger." (Abstract.)

### H.  Hoffman '498

199.    Dr. Batzer's first ground against the '538 Patent rests on U.S. Provisional Application No. 63/377,498. I understand from counsel a provisional application is not published, and further that this provisional application was never published. I understand from counsel that a provisional's contents become publicly accessible only through the file wrapper of a later-filed application that claims its benefit and publishes or issues.

200.    I understand from counsel that no such application exists here. Its contents cannot be retrieved from Patent Center. I understand from counsel AS Designs has never produced it.

201.    Dr. Batzer does not contend otherwise. He states in a footnote that the provisional "is called 'prior art' here because it predates the priority date of the '538 Patent." Batzer Decl., Ex. 18 at 1 n.1. That is not the standard. A disclosure that predates a priority date is prior art only if it was published or otherwise available to the public, and this one was neither.

HARRISON DECLARATION ON VALIDITY                71

202.    Because the '498 provisional was not available to the public before the priority date of the '538 patent, and was not produced, I have not analyzed its disclosure against the asserted claims and express no opinion on that subject.

## I.    Lochhead '447

### 15. Bibliographic Information

203.    U.S. Patent No. 2,539,447 ("Lochhead" or "the '447 patent") is entitled "Selector for Automatic Firearms." It names John L. Lochhead of Springfield, Massachusetts, as the inventor, and issued on January 30, 1951 from Application Serial No. 41,381, filed July 29, 1948, which Lochhead identifies as a divisional of Application Serial No. 701,145, filed October 4, 1946 and thereafter abandoned. Lochhead contains 2 claims and 3 drawing figures.

### 16. Overview of Operation

204.    Lochhead discloses "a selector for selectively positioning the fire control mechanism of a firearm for semi-automatic or full-automatic fire." (1:5–8.) Lochhead identifies as a particular object the provision of a fire control mechanism "for a firearm of the type known as the U.S. carbine, cal. .30 M1, whereby either semi-automatic or full-automatic fire can be selected at will." (1:12–16.)

205.    Lochhead describes a fire control mechanism mounted in a trigger guard (4) and comprising a hammer (15) pivoted on a transverse pin (14) and having a sear notch (21) and an outwardly projecting sear lug (22); a trigger (16) pivoted on a transverse pin (33) and biased forward by a trigger spring (35); a primary sear (17); and a secondary sear (18). (1:31–2:12.)

206.    The selector Lochhead describes is a rotatable cylindrical member (48) mounted in a transverse hole (52) in the forward portion of the trigger guard and turned by a knob (50). (3:1–19.) The selector has a rectangular transverse slot (51) that cooperates with a downwardly projecting lug (46) carried on an elongated arm (45) extending forwardly from the side of the

primary sear. (Cl. 1.) A spring-biased plunger (53) retains the selector in position by engaging "one of two radially spaced holes 58 and 59 provided about the periphery of [the] cylindrical portion" of the selector. (3:20–45.)

207.    Lochhead describes two settings. For semi-automatic fire, the selector is rotated so that the bottom of the slot lies in a horizontal plane, permitting the primary sear to move forward on release of the hammer and re-engage it. (3:20–45.) For automatic fire, the selector is rotated so that the bottom of the slot is substantially vertical, whereupon "forward movement of primary sear 17 is blocked" and the sear cannot re-engage the hammer until the trigger is released. (3:46–4:2.)

### 17. Exemplary Elements of the '538 Patent Not Disclosed by Lochhead

208.    The asserted claims of the '538 patent recite a cam selector operable in three modes: a first mode in which the first trigger tail portion is movable within the first recess, a second mode in which the first trigger tail portion engages the second recess and is moved down by a cam portion of the second recess when the cam selector rotates, and a third mode in which the trigger cannot be pulled. Certain asserted claims further recite a detent movable between a first, second, and third detent track to select among those modes, and that those tracks are transverse grooves on the bottom side of the cam selector. Lochhead does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations that Lochhead does not disclose.

209.    Lochhead's selector 48 does not act on the trigger 16. Lochhead describes the transverse slot (51) in its selector as cooperating with a downwardly projecting lug (46) carried on an elongated arm (45) extending forwardly from the side of the primary sear (17). (Cl. 1; 3:1–19.) The selector's function, in the full-automatic position, is that "the bottom surface of said slot blocks the sear from moving forwardly and prevents re-engagement thereof with the hammer

until the trigger is released." (Cl. 1.) Lochhead does not describe that its selector 48 acts on the trigger 16, and describes no trigger tail portion.

210.     Lochhead describes nothing that drives the trigger toward a set position, and describes no structure that engages and moves a trigger tail downward as the selector rotates. What Lochhead's selector does is block a sear from returning, which is different from the '538 patent claims in its second mode: cam surface that moves the trigger.

211.     Lochhead also does not disclose the detent arrangement the asserted claims recite. Lochhead's detent is a spring-biased plunger engaging one of two holes spaced radially about the periphery of the cylindrical portion of the selector. (3:20–45.) That is neither three detent tracks nor tracks located on the bottom side of the selector.

### J.   Ostanin '033

#### 18. Bibliographic Information

212.     European Patent Application Publication No. EP 2 950 033 A1 ("Ostanin" or "the '033 publication") is entitled, in translation, "Handgun and Trigger Safety Therefor." It names Alexander Ostanin of Suhl, Germany, Olaf Sauer of Oberndorf, Germany, and Lutz Morgenroth of Merbelsrod, Germany, as inventors, and Merkel Jagd- und Sportwaffen GmbH of Suhl, Germany, as applicant. It published on December 2, 2015 from Application No. 15169105.2, filed May 26, 2015, and claims priority to German application DE 10 2014 107 620, filed May 30, 2014.

213.     Ostanin is written in German. I have reviewed the '033 publication together with an English machine translation of it obtained from Google Patents, and my opinions in this section are based on that translation.

#### 19. Overview of Operation

214.    Ostanin discloses a trigger safety device for a handgun, and particularly for a semi-automatic long gun. Its stated concern is the accidental discharge of a firearm, whether through handling errors, drops, or mechanical defects, and its stated object is to provide a low-cost trigger safety that can be moved to the safety position even when the weapon is uncocked and that will not cause the weapon to fire if the safety itself fails.

215.    Ostanin describes a trigger safety device (01) comprising a safety shaft (04) carrying a control cam (05), an actuating lever (10) by which the shaft is rotated, and a trigger lever (13) pivotable about a trigger axis (14). Ostanin describes the safety shaft as rotatable between two positions, which it identifies as a safety position and a firing position. In the safety position the shaft blocks the trigger lever; in the firing position it releases it.

216.    Ostanin identifies those components as known in the art. What Ostanin presents as its contribution is a spring-loaded spacer element (02), formed as a leg of a leg spring, interposed between the safety shaft and the trigger lever. Ostanin explains that in prior trigger safety devices the trigger is in direct contact with the safety shaft in the secured position, and that its spacer element instead sits between the two as a connecting element. The control cam is formed as an at least partially spiral recess in the safety shaft having two depths and two widths, and Ostanin describes the function of that spiral recess as displacing the spacer element axially, against the spring force, into and out of a blocking area.

### 20. Exemplary Elements of the '538 Patent Not Disclosed by Ostanin

217.    The asserted claims of the '538 patent recite a cam selector operable in three modes: a first mode in which the first trigger tail portion is movable within the first recess, a second mode in which the first trigger tail portion engages the second recess and is moved down by a cam portion of the second recess when the cam selector rotates, and a third mode in which

the trigger cannot be pulled. Ostanin does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations that Ostanin does not disclose.

218.    Ostanin appears to disclose two selectable modes, not three. Ostanin describes its safety shaft as rotatable between a safety position and a firing position, and identifies no other position or mode of operation. As shown in Ostanin's figures, the recesses 11 in the safety shaft 4 are not positioned to receive the central and wider breaker (disconnector) 19, and the breaker 19 does not appear to have any tail that could be affected by their rotation.

219.    Ostanin does not appear to disclose any active reset of the trigger. Ostanin does not appear to describe any structure that drives the trigger toward a set position. The purpose of the safety shaft 4 and any cams thereon appears to be to prevent the firearm from firing, not to effect an automatic reset of the trigger.

220.    Ostanin describes the spiral recess in its safety shaft as displacing the spring-loaded spacer element axially against the spring force. The spacer element then either occupies or vacates the space between the safety shaft and the trigger lever, blocking or permitting the trigger lever's pivoting movement. Ostanin does not describe the recess as bearing on a trigger tail, and does not appear to describe a structure that moves the trigger.

## VII.    RESPONSE TO DR. BATZER'S INVALIDITY ARGUMENTS

### K.  The '784 Patent

#### 21. Ground 1: Anticipation of Claims 1, 3, and 4 by Inskip, Alternatively Obviousness over Inskip Alone

221.    Dr. Batzer contends that claims 1, 3, and 4 are anticipated by Inskip. My opinions regarding Inskip, set forth above in the section titled "Exemplary Elements of the '784 Patent Not Disclosed by Inskip," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Inskip does not disclose an upwardly extending deflectable

HARRISON DECLARATION ON VALIDITY            76

portion that is separately movable relative to the body portion, as claim 1 requires, or a deflectable portion that pivots relative to the body portion, as claim 4 requires. Claim 3 depends from claim 1.

222.    I note that those limitations appear in the body of claim 1 and in claim 4, and not in the preamble. My opinions therefore do not depend on the construction of the phrase "[i]n a forced re[se]t trigger mechanism" that Dr. Batzer addresses, and they apply whether or not that preamble is limiting.

223.    Dr. Batzer contends in the alternative that claims 1, 3, and 4 would have been obvious over Inskip alone. In my opinion that contention fails for the same reasons. The limitations I have identified are absent from Inskip, and Dr. Batzer identifies nothing in Inskip that would have supplied them to a person of ordinary skill in the art.

### 22. Ground 2: Obviousness of Claims 1, 3, and 4 over Rounds in View of Daley

224.    Dr. Batzer contends that claims 1, 3, and 4 would have been obvious over Rounds in view of Daley. My opinions regarding Rounds, set forth above in the section titled "Exemplary Elements of the '784 Patent Not Disclosed by Rounds," and my opinions regarding Daley, set forth above in the section titled "Exemplary Elements of the '784 Patent Not Disclosed by Daley," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

225.    Dr. Batzer acknowledges that Rounds discloses every limitation of claim 1 except one. He states that Rounds "does not expressly describe that portion as 'deflectable' or as 'separately movable relative to the body portion,'" and that Daley "supplies precisely that feature." (Batzer Decl., Ex. 8 at 6.) The ground therefore turns on whether a person of ordinary skill would have modified Rounds' locking bar so that its upwardly extending portion moves

HARRISON DECLARATION ON VALIDITY            77

separately from its body, and on whether Daley supplies a teaching that would have led to that modification.

### xxi.   The design problem Dr. Batzer identifies does not exist in Rounds.

226.   Dr. Batzer states that "Rounds' own geometry presents the design problem Daley solves," namely that the upwardly extending portion "must extend sufficiently above the housing to be reliably engaged (and pivoted) by surface 54 of the bolt carrier tail portion 56 as the carrier moves forward ... yet must not interfere with the forward portion of the bolt carrier body 58 ... as the carrier travels rearward." (Batzer Decl., Ex. 8 at 8.)

227.   That conflict is not inherently or expressly disclosed by Rounds. Rather, it is a problem the '784 patent identifies as arising when Rounds' mechanism is installed in a different firearm platform. The '784 patent states that the embodiment illustrated in Rounds "could be installed in an AR10-pattern lower receiver ... but it would not be operable because the upward extension of the locking member (bar) would be too short to be contacted and actuated," and that "if the upward length/height of the locking member is extended sufficiently to be actuated, it would then interfere with a lower surface of a forward portion of the bolt carrier as it cycles rearward, again making the device inoperable." ('784 Patent, 1:15–20.)

228.   Rounds describes its mechanism as adapted for use in AR15-pattern firearms, and identifies no such conflict. In my opinion, a person of ordinary skill in the art reading Rounds would not necessarily have perceived the problem Dr. Batzer describes, because Rounds' geometry does not present it. The conflict arises only on the different platform the '784 patent identifies, and it is the '784 patent, not Rounds and not Daley, that identifies it.

229.   The single item Dr. Batzer offers as evidence of a constraint in Rounds does not support him. He states that the conflict is "aggravated by Rounds' rearward extension 64, which limits how far the extending portion can pivot rearward." (*Id.*) Rounds states that the rearward

extension (64) "serves as a means to limit the extent to which it can pivot toward the blocking position." (Rounds, 5:6–9.) That is a horizontal stop limiting travel of the locking bar 62 in the blocking direction, but does not identify or suggest any problem involving the height of the top of the locking bar 62 or any interference with or inability for it to reach a bottom contour of the bolt carrier.

> ### xxii. Daley's teaching is directed to holding a hammer, and its stated advantage does not apply to Rounds.

230. As set forth above, Daley discloses an automatic sear assembly whose locking member restrains the hammer, not a trigger member. In my opinion Daley therefore does not suggest a two-part trigger locking member of the kind claim 1 recites.

231. The advantage Daley states for its sear lever does not address any problem or need disclosed by Rounds. Daley states that the sear lever "aids in preventing the sear from coming into direct physical contact with the bolt carrier of the rifle," which "can help to eliminate or otherwise reduce the likelihood of causing the host rifle to bind during full-automatic and/or burst firing." ('523 publication, [0031].) Rounds locking bar is not disclosed to have any problem binding the bolt carrier, and Rounds does not describe full-automatic or burst firing.

> ### xxiii. Dr. Batzer does not explain how the modified extension would work.

232. Dr. Batzer states that the combination yields "an upwardly extending deflectable portion that moves to a deflected position when the rearward-moving bolt carrier applies force to it, and that remains in the extended position when the rear of the bolt carrier applies force in the forward direction." (Batzer Decl., Ex. 8 at 9.) He does not explain what structure would produce that behavior in Rounds.

233.    A pinned connection between the extending portion and the body, standing alone, would not. Such a connection would permit the extending portion to move in either direction, and would provide nothing to return it to its extended position after it deflects.

234.    Daley achieves the one-way behavior through structure Dr. Batzer does not carry over. Daley's sear lever (200) has its own dedicated spring, the sear lever spring (300), which is separate from the sear spring (400), and Daley describes a particular relationship between the radial lengths of the sear lever and the sear. Rounds has a single biasing spring (70), and Rounds describes that spring as acting on the locking bar as a whole: "the biasing spring 70 moves the lower end of the locking bar 62 into a second position ... in which it blocks pivotal movement of the trigger." (Rounds, 5:38–40.) Nothing in Rounds would return a separately movable extending portion to its extended position.

235.    In my opinion one of ordinary skill in the art would not be motivated to combine Rounds and Daley in the way that Dr. Batzer suggests, and to do so in a way that would result in an operable mechanism as claimed by the '784 patent would require impermissible hindsight gleaned from the '784 patent specification and drawings themselves.

236.    Claim 3 requires that the locking member body portion pivot between the first and second positions. Dr. Batzer's entire treatment of that claim is that "Daley's modification of the extending portion leaves this pivoting body architecture untouched, so claim 3 falls with claim 1." (Batzer Decl., Ex. 8 at 9.) In my opinion that assumes the claimed function rather than demonstrating it. Whether the body portion pivots as claimed depends on whether the specifics of the prior art combination cherry-picked and arranged by hindsight gleaned from the '784 disclosure itself, and Dr. Batzer does not explain why one of ordinary skill in the art would arrive at the claimed structure and claimed function otherwise.

**xxiv.    Both references were before the examiner.**

237.    As set forth above, Rounds appears among the references cited on the face of the '784 patent and is identified by number and incorporated by reference in its Background, and the subject matter of Daley appears on that face as U.S. Patent No. 9,151,557, designated as having been cited by the examiner. I understand that both were therefore before the examiner during prosecution and were considered before the '784 patent issued.

**L.  The '247 Patent**

### 23. Ground 1: Anticipation of Claim 15 by Stakes

238.    Dr. Batzer contends that claim 15 is anticipated by Stakes. My opinions regarding Stakes, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stakes," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Stakes does not disclose a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook, or a cam having a cam lobe which forces the trigger member towards the set position.

### 24. Ground 2: Anticipation of Claim 15 by Blakley '723, Alternatively Single-Reference Obviousness

239.    Dr. Batzer contends that claim 15 is anticipated by Blakley '723. My opinions regarding Blakley '723, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Blakley '723 does not provide enabling disclosure of a trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode, nor does it disclose a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.

240.     Dr. Batzer contends in the alternative that claim 15 would have been obvious over Blakley '723 alone. In my opinion that contention fails for the same reasons. Implementing the arrangement described at column 11 of Blakley '723 would have required a person of ordinary skill in the art to supply what Blakley '723 does not describe, and Dr. Batzer identifies nothing in Blakley '723 that would have supplied it.

### 25. Ground 3: Anticipation of Claim 15 by Inskip

241.     Dr. Batzer contends that claim 15 is anticipated by Inskip. My opinions regarding Inskip, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Inskip," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Inskip does not disclose a cam having a cam lobe which forces the trigger member towards the set position, or a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.

### 26. Ground 4: Anticipation of Claim 15 by Tommy

242.     Dr. Batzer contends that claim 15 is anticipated by the Tommy Triggers FRT-15-3MD. My opinions regarding Tommy, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Tommy," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion the materials Dr. Batzer relies upon do not describe a cam having a cam lobe which forces the trigger member towards the set position. They describe a hammer that resets the trigger and a locking bar that restrains it.

### 27. Ground 5: Obviousness of Claim 15 over Stoner in View of Blakley '723

243.     Dr. Batzer contends that claim 15 would have been obvious over Stoner in view of Blakley '723. My opinions regarding Stoner, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stoner," and my opinions regarding Blakley, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by

HARRISON DECLARATION ON VALIDITY          82

Blakley '723," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

### xxv. The proposed combination would not produce a mechanism operable in a standard semi-automatic mode.

244. Claim 15 requires a trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode. In my opinion the mechanism Dr. Batzer describes would not be operable in a standard semi-automatic mode, at least because nothing in either reference would disable the cam.

245. Blakley's cam is pivoted by the rearwardly traveling bolt carrier on every cycle, and Blakley '723 describes no structure by which a selector engages or disengages it. Installed in Stoner, the cam would therefore bear on the trigger extender and force the trigger toward its set position on every cycle, including in the condition Dr. Batzer identifies as the standard semi-automatic mode. The result would be a mechanism having a safe condition and a forced reset condition, not the three conditions claim 15 requires.

246. The only disclosure in either reference addressed to selectively disabling the cam is the passage at column 11 of Blakley '723. For the reasons set out above, in my opinion that passage does not contain an enabling disclosure of such an arrangement. Combination with Stoner does not correct this deficiency because Stoner does not teach or suggest compatibility with any vertical trigger extension, cam, or a semi-automatic mode that is selected by longitudinal translation of a trigger extension. There is no such compatibility and hence no motivation to combine. Dr. Batzer is counting firing modes in each prior art reference, but overlooking that the semiautomatic mode of Stoner is obtained by a specific means that is incompatible with the key components of Blakley '723.

247. Dr. Batzer acknowledges that his combination depends on that question and dismisses it. Addressing the same Stoner and Blakley '723 ground as applied to the '159 patent, he states that "[a]ny argument that Blakley '723 alone does not spell out every standard semi-automatic detail is immaterial to the Stoner/Blakley ground because Stoner expressly discloses that detail," and that "[a] POSA would have understood that when the Blakley forced-reset effect is deselected, the firearm operates in conventional semi-automatic mode using the trigger, hammer, and disconnector." (Batzer Decl., Ex. 17 at 22.) In my opinion that reasoning does not hold. Stoner describes semi-automatic operation of a mechanism that contains no cam or vertical trigger extender. Stoner therefore says nothing about how semi-automatic operation would be preserved once a cam driven by the bolt carrier has been added to it. The question of how the cam is deselected is not answered by Stoner.

> **xxvi. Dr. Batzer does not explain how Blakley's trigger extender could be installed in Stoner.**

248. Blakley '723 describes its trigger extender (90) as seated in a trigger groove (30) formed in the rear of Blakley's trigger (22). Stoner's trigger (50) has no such groove, and Dr. Batzer does not address how one would be provided.

249. Further, the rear of Stoner's trigger is occupied. Stoner's intermediate sear (68), which Dr. Batzer identifies as the claimed disconnector, is pivotally mounted on the same transverse pin (52) as the trigger, and has a rearward extremity that extends to the control cam. Stoner describes the control cam as acting directly on that rearward extremity: in the semi-automatic condition "the rearward extremity of the intermediate sear 68 is freed by rotation" of the control member, and in the automatic condition the intermediate sear "is maintained in locked condition." Blakley's trigger extender would be installed in that same region, between the trigger and the control cam. Dr. Batzer does not explain how the trigger extender could be

installed there without interfering with the rearward extremity of the intermediate sear or with the control cam's ability to act upon it, and in my opinion neither reference provides guidance on that question.

### xxvii.   The proposed modification is not the substitution of one known element for another.

250.    Dr. Batzer characterizes the combination as "the substitution of a known element for another to obtain predictable results." In my opinion it is not. Stoner's automatic sear (96) and Blakley's cam (66) perform different functions on different components. Stoner's automatic sear engages the automatic sear abutment (92) on the rearward extremity of the hammer and holds the hammer. Blakley's cam bears on the trigger extender and resets the trigger. Dr. Batzer's own description reflects the difference: he states that "Stoner lacks only the cam that forces the trigger toward its set position" and that "Stoner instead uses automatic sear 96 for its third mode." A component that holds a hammer and a component that resets a trigger are not alternatives for the same function, and exchanging one for the other is not a substitution.

### xxviii.  A person of ordinary skill would not have had a reasonable expectation of success.

251.    The combination Dr. Batzer describes requires removing one component of Stoner's mechanism, adding two components from Blakley, re-machining Stoner's trigger to receive one of them, and shortening Stoner's hammer. It also requires, among other changes, resolving the interference between the trigger extension and the disconnector, and supplying a means of disabling the cam that neither reference describes. In my opinion, a person of ordinary skill in the art presented with that number of unguided design changes, in a mechanism whose function depends on the relative timing and clearance of parts moving at high speed, would not have had a reasonable expectation that the result would work as claim 15 requires.

HARRISON DECLARATION ON VALIDITY          85

> **xxix.   Both references were before the examiner, and the combination did not emerge for decades.**

252.    Stoner and Blakley each appear among the references cited on the face of the '247 patent. ('247 Patent, Cover at [56].) The '247 patent also identifies Blakley by number in its Background. I understand that both references were therefore before the examiner during prosecution and were considered before the '247 patent issued.

253.    Stoner issued in 1962. Blakley '723 issued in 2008. I am not aware of any forced reset trigger mechanism of the kind described in the '247 patent, and in particular none commercially produced or offered for sale, that became available before Rare Breed's FRT-15 trigger was introduced in 2020, roughly fifty-eight years after Stoner and roughly twelve years after Blakley. In my opinion, if the combination Dr. Batzer describes were as straightforward as he suggests, there would be more than zero products having a longitudinally-translatable trigger extension for selective cam-driven resetting of the trigger. Presently I am aware of zero.

### 28. Ground 6: Obviousness of Claim 15 over Blakley '723 in View of Tommy

254.    Dr. Batzer contends that claim 15 would have been obvious over Blakley '723 in view of Tommy. My opinions regarding Blakley, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723," and my opinions regarding Tommy, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Tommy," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

255.    Dr. Batzer states that this ground "assumes, contrary to Ground 2, that Blakley's momentary disconnector/hammer engagement during forced reset ... does not satisfy 'prevented from catching.'" (Batzer Decl., Ex. 13 at 10.) The modification he proposes is to extend "the tail end of Blakley's disconnector within trigger groove 30," so that "Blakley's selector-cam would

then act on the disconnector tail directly rather than working against trigger-extender spring force." (*Id.* at 11.)

### xxx.    The modification depends on a structure Blakley '723 does not describe.

256.    The modification requires a selector that acts on the disconnector. Blakley '723 describes no such selector. The term "selector-cam" appears twice in Blakley, both times within the passage at column 11, and it is assigned no reference numeral and shown in no figure. The selector Blakley actually describes is the safety selector (82), which Blakley '723 describes only as a rotatable member having an outer lever and an inner tubular portion with a plurality of flat recessed surfaces (88). (*See generally* col. 6.) Blakley '723 does not describe that selector as acting upon the disconnector.

257.    In my opinion, one of ordinary skill in the art would not be motivated to make the modification required for this ground. Dr. Batzer states that his modification "eliminates ... the trigger-extension motion described at Blakley 11:11–25." The modification therefore discards the column 11 arrangement that Dr. Batzer relied upon, replacing it with a mechanism cobbled together from different references using the '247 patent as a guide..

258.    The selector component that Dr. Batzer takes from Tommy is not the selector that Blakley '723 describes, nor would it work unmodified. The passage he quotes describes "a narrow semi-circular portion of the safety selector" that "contacts the tail of the disconnector, which is sticking out of the housing." (*Id.*) Blakley's safety selector has flat recessed surfaces, is not described as having a narrow semi-circular portion, and is not described as having three positions. Adopting the arrangement Dr. Batzer describes would require modifying Blakley's selector as well, which he does not address. Moreover, the selector that Dr. Batzer takes from Tommy would not itself work with the disconnector of Blakley '723, even if that had a tail,

because the disconnector of Blakley '723 is centered laterally while the disconnector and its tail in Tommy is laterally offset. Hence, Dr. Batzer suggests a modification that would not work without modification – changing Tommy's selector lobe to be centered rather than laterally offset.

### xxxi. Blakley's disconnector has no tail, and Blakley's trigger groove is occupied.

259.    Blakley's disconnector has no rearward tail to extend. Blakley '723 describes the disconnector (38) as having "a lower attachment portion," through which a mounting pin hole (40) is provided and which has "a downwardly disposed spring recess" (42), and "an upper portion" having "a generally forwardly oriented hooked configuration with a hammer hook" (44). (5:28–34.) Blakley '723 describes no rearward portion of the disconnector at all.

260.    The location into which Dr. Batzer proposes to extend such a tail is occupied. Blakley '723 describes the inner portion of its trigger as having a seat with "two upwardly projecting side walls and a rear wall" which "form an upwardly displaced groove," and describes the trigger extender as having a lower surface with "a first external side to side first width to be received by and mated with the upward trigger groove." (5:13–27, 7:46–53.) The groove is therefore a walled seat dimensioned to receive and mate with the trigger extender.

261.    The trigger extender cannot be removed to make room. Blakley's cam acts on the stepped upper surface of the trigger extender in order to force the trigger toward the set position. Without the trigger extender, the cam would have nothing to bear upon and the forced reset operation Blakley '723 describes would not occur. Dr. Batzer does not explain how a disconnector tail could be extended into that groove alongside the trigger extender, and in my opinion one of ordinary skill in the art would not be motivated to make a modification with that unresolved interference.

#### xxxii.  The reasons Dr. Batzer gives for the modification do not withstand examination.

262.    Dr. Batzer states that the modification "eliminates Blakley's trigger-extension spring, its complex machined trigger-extension bearing surfaces, and the trigger-extension motion described at Blakley 11:11–25." (Batzer Decl., Ex. 13 at 11.) Each of those features is part of the arrangement described in the column 11 passage. In my opinion a person of ordinary skill in the art would not have been motivated to or know how to change a structure that Blakley '723 did not adequately describe or enable in the first place, where the modification would also require adding a disconnector tail that interferes with the trigger extension and would require modifying the selector whether or not taken from a different reference.

263.    Dr. Batzer further states that the modification "reduces wear on the disconnector and hammer hooks, which no longer contact at all during forced-reset cycling." (*Id.*) The absence of contact between the disconnector hook and the hammer hook during forced reset operation is the very limitation claim 15 recites. The benefit Dr. Batzer identifies is the claimed result, not a reason or way that a person of ordinary skill would have arrived at it.

264.    Finally, Dr. Batzer states that "Blakley '723 already contemplates a simplified trigger extension (Figs. 2A–2C, 3A), inviting exactly this streamlining." (*Id.*) However, Dr. Batzer does not explain how a simplified trigger extension would invite the addition of a disconnector extension that would have to interfere with it to reach the selector, or how a simplified trigger extension would invite modifying the selector of Blakley '723 to have a disconnector tail depressing lobe, or invite modifying the selector of Tommy to be laterally centered rather than laterally offset. In my opinion, the simplified trigger extension of Blakley '723 invites none of the foregoing required modifications.

#### xxxiii.  A person of ordinary skill would not have had a reasonable expectation of success.

HARRISON DECLARATION ON VALIDITY           89

265.    The modification Dr. Batzer describes requires adding a rearward tail to Blakley's disconnector, fitting that tail into a walled groove already occupied by and dimensioned for the trigger extender, modifying the safety selector to include a lobe that bears on the tail, and coordinating the timing of that lockout with the cam's action on the trigger extender. Neither reference describes any of those things. In my opinion, a person of ordinary skill in the art would not have had a reasonable expectation that the result would work as claim 15 requires, at least because the modifications appear to cause interference between the resulting subcomponents as described already herein.

### xxxiv.    Blakley and the Strbac disclosure were before the examiner.

266.    Blakley appears among the references cited on the face of the '247 patent and is identified by number in its Background. The disclosure of the Tommy Triggers FRT-15-3MD was also before the examiner: U.S. Patent No. 11,724,003 to Strbac appears among the references cited on the face of the '247 patent, and the '247 patent's Background identifies U.S. patent application Serial No. 18/048,572, filed October 21, 2022, which matured into that patent, and incorporates it by reference. ('247 Patent, Cover at [56]; 1:66–2:1.) I understand that both disclosures were therefore before the examiner during prosecution and were considered before the '247 patent issued.

### 29. Ground 7: Obviousness of Claim 15 over Tommy in View of Blakley '723

267.    Dr. Batzer contends that claim 15 would have been obvious over Tommy in view of Blakley '723. My opinions regarding Tommy and Blakley, set forth above in the sections titled "Exemplary Elements of the '247 Patent Not Disclosed by Tommy" and "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

268.     Dr. Batzer describes this ground as a fallback. He states that it "is the mirror image of Ground 6 and protects against a challenge to Tommy's 'cam' limitation," and that "[i]f Tommy's locking bar is not deemed to be a 'cam' (because Tommy uses the hammer for the reset stroke and the locking bar to hold the reset), a POSA would modify Tommy in light of Blakley to replace the rectangular locking bar with Blakley's rounded cam 66." (Batzer Decl., Ex. 13 at 11–12.)

### xxxv.   The modification requires more than exchanging a bar for a cam.

269.     Blakley's cam does not act on the trigger directly. It bears on the stepped upper surface of a trigger extender, which is seated in a groove formed by side walls and a rear wall in the inner portion of Blakley's trigger. Dr. Batzer does not address how a trigger extender and a groove to receive it would be provided in Tommy's trigger, which the materials he relies upon do not describe as having either.

270.     Blakley '723 also describes its cam as carried in a cam body subassembly (62) comprising a cam body housing (64), a cam (66), and a cam mounting pin (68), or in the alternative as requiring that the cam and the firearm receiver be "fashion[ed] ... in such a way as to allow the cam to be pinned in place directly to the receiver." (5:60–6:14; 11:6–10.) Dr. Batzer does not explain how either arrangement would be accommodated in Tommy's assembly.

271.     The modification would also reintroduce the interference I describe above in connection with Ground 6, in mirror image. Dr. Batzer's combination retains Tommy's selector-controlled disconnector lockout, which is what he says supplies the prevention of catching, and that arrangement requires a disconnector tail projecting rearward from the housing. Adding Blakley's trigger extender places a second member in that same region. Dr. Batzer does not address how both would be accommodated. One of ordinary skill in the art would not make the modification because of the apparent component interference.

HARRISON DECLARATION ON VALIDITY          91

### xxxvi. The reasons given for the modification are the claim limitation itself.

272. The reason Dr. Batzer gives for making this modification is that it supplies an element he acknowledges may be missing. He states that the ground "protects against a challenge to Tommy's 'cam' limitation," and conditions it on the possibility that "Tommy's locking bar is not deemed to be a 'cam.'" (Batzer Decl., Ex. 13 at 11–12.) In my opinion that is not a reason a person of ordinary skill in the art would have modified Tommy. It is a just a desired litigation result.

273. The remaining benefits Dr. Batzer identifies are "reduced complexity, improved reliability, reduced hammer and trigger wear, and reduced material (the trigger no longer needs the hump the hammer presses), lowering cost and weight." (*Id.*) In my opinion those are generic assertions rather than teachings drawn from either reference. Neither Tommy nor Blakley '723 identifies any deficiency in the locking bar arrangement, and neither suggests replacing it. Moreover, a modification that would create mechanical interference between a necessary component and another component from a different reference inserted in the same space is not "reduced complexity, improved reliability," or "reduced material."

### xxxvii. A person of ordinary skill would not have had a reasonable expectation of success.

274. The modification requires removing Tommy's locking bar, removing the surface of Tommy's trigger that the hammer contacts to reset it, adding Blakley's cam together with a cam body or a modified receiver, adding a trigger extender and a groove in Tommy's trigger to receive it, accommodating that extender alongside the disconnector tail, and re-timing the resulting mechanism so that the trigger is reset and then released in the proper sequence. Neither reference describes any of those steps. In my opinion a person of ordinary skill in the art would not have had a reasonable expectation that the result would work as claim 15 requires, and would

HARRISON DECLARATION ON VALIDITY          92

have had reason to expect the opposite, since the modification removes the structure that prevents the trigger from being pulled before the bolt carrier returns to battery and creates a mechanical interference between subcomponents occupying the same space.

### xxxviii.    Blakley and the Strbac disclosure were before the examiner.

275.    As set forth above in connection with Ground 6, Blakley and the disclosure of the Tommy Triggers FRT-15-3MD were each before the examiner during prosecution of the '247 patent, and I incorporate that discussion here.

### M. The '159 Patent

### 30. Ground 1: Obviousness of the Asserted Claims over Stoner in View of Blakley '723

276.    Dr. Batzer contends that the asserted claims of the '159 patent would have been obvious over Stoner in view of Blakley '723. That is the same combination he advances against claim 15 of the '247 patent as Ground 5. My opinions regarding that combination, set forth above in the section titled "Ground 5: Obviousness of Claim 15 over Stoner in View of Blakley '723," apply equally to the asserted claims of the '159 patent, and I incorporate them here.

277.    My opinions regarding Stoner and Blakley '723 individually, set forth above in the sections titled "Exemplary Elements of the '159 Patent Not Disclosed by Stoner" and "Exemplary Elements of the '159 Patent Not Disclosed by Blakley '723," also apply to this ground and I incorporate them. Those opinions include my opinions regarding the additional limitations of claim 17, which recites a mode selector operable by the user to select between a semi-automatic mode and a forced reset mode, and requires that the difference in operation between the modes be determined by movable selection of the blocking means.

### 31. Ground 2: Anticipation of the Asserted Claims by Stakes, Alternatively Obviousness

HARRISON DECLARATION ON VALIDITY          93

278.    Dr. Batzer contends that the asserted claims of the '159 patent are anticipated by, or would have been obvious over, Stakes. My opinions regarding Stakes, set forth above in the section titled "Exemplary Elements of the '159 Patent Not Disclosed by Stakes," apply to this ground, and I incorporate them here, together with the opinions incorporated by that section from my analysis of Stakes as to the '247 patent.

279.    In my opinion Stakes does not disclose the limitations identified in that section, and Dr. Batzer identifies nothing in Stakes that would have supplied them to a person of ordinary skill in the art.

### N. The '538 Patent

#### 32. Ground 1: The Hoffman Super Safety Disclosures

280.    Dr. Batzer contends that the asserted claims of the '538 patent are invalid over the public disclosure of the Hoffman Super Safety, including U.S. Provisional Application No. 63/377,498. My opinions regarding the '498 provisional, set forth above in the section titled "Hoffman '498," apply to this ground, and I incorporate them here.

#### 33. Ground 2: Improper Inventorship and Derivation

281.    Dr. Batzer contends that the '538 patent is invalid for failure to name the true inventor. He states that Mr. Hoffman conceived the claimed subject matter first, that Mr. Hoffman's prior conception is corroborated by documents and videos including the September 28, 2022 provisional application, and that Mr. Smith had access to and derived the design from Mr. Hoffman, pointing to the July 2023 publication of the design files and to purchases, advertising, and resales of Hoffman units by Mr. Smith's company. (Batzer Decl., Ex. 20 at 1.)

282.    I have not been asked to form an opinion as to the inventorship of the '538 patent, and I express no opinion on that subject.

### 34. Ground 3: Obviousness over Ostanin in View of Blakley '723 and Lochhead

283.    Dr. Batzer contends that the asserted claims of the '538 patent would have been obvious over Ostanin in view of Blakley '723 and Lochhead. My opinions regarding each of those references, set forth above in the sections titled "Exemplary Elements of the '538 Patent Not Disclosed by Ostanin," "Exemplary Elements of the '538 Patent Not Disclosed by Blakley '723," and "Exemplary Elements of the '538 Patent Not Disclosed by Lochhead," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

#### xxxix.  None of the three references discloses a selector recess that engages and moves a trigger tail.

284.    Claim 1 requires that in the second mode the first trigger tail portion engage the second recess and be moved down by a cam portion of that recess when the cam selector rotates. Dr. Batzer's own element-by-element chart identifies, for that limitation, three different structures acting on three different members. For Ostanin, he identifies the "spiral recess portion cams/displaces the spring-leg element as shaft 04 rotates." For Blakley, he identifies the "cam press[ing] downward on the trigger extension." For Lochhead, he identifies the slot surface that "controls sear lug 46 until trigger release." (Batzer Decl., Ex. 20 at 6.)

285.    None of those is the recited limitation. Ostanin's spiral recess displaces a spring leg interposed between the shaft and the trigger, and Ostanin describes that displacement as blocking or permitting the trigger's pivoting, not as moving the trigger. Blakley's cam bears on a trigger extender, but Blakley's cam is a separate pivoting member driven by the bolt carrier, not a recess in a selector. Lochhead's slot surface blocks a sear from returning forward. In my opinion, no one of the three, and no combination of them, discloses a recess in a rotary selector that engages a trigger tail and drives it down as the selector rotates.

HARRISON DECLARATION ON VALIDITY               95

> **xl.    The combination depends on the passage at column 11 of Blakley '723.**

286.    Dr. Batzer's lead reason for combining is that "Blakley '723 itself proposes the combination." (*Id.*) The support he offers is Blakley's teaching of mode selection "by operating the selector-cam" with "engagement surfaces machined into the selector-cam," at 11:11–25, together with 11:6–9. (*Id.*)

287.    That is the passage at column 11 of Blakley '723. For the reasons set forth above, in my opinion that passage does not contain an enabling disclosure. The term "selector-cam" appears twice in Blakley, both times within that passage, is assigned no reference numeral, and is shown in no figure. Blakley '723 does not depict or describe that its safety selector could disable the cam action on the trigger extension. Indeed, the drawings in Blakley '723 suggest otherwise.

288.    The second passage Dr. Batzer cites does not describe that consolidation either. Blakley '723 states there that the invention "may also be crafted by eliminating the cam body and instead fashioning the cam and firearm receiver in such a way as to allow the cam to be pinned in place directly to the receiver." (11:6–10.) That passage addresses the housing in which Blakley's cam is carried, and contemplates modifying the receiver. It does not describe combining the cam with the selector.

> **xli.    A person of ordinary skill would not have had a reasonable expectation of success.**

289.    The combination Dr. Batzer describes requires taking Blakley's separately mounted cam and merging it into a rotary selector, a consolidation Blakley '723 does not describe; machining that selector with recess sections of differing depth and width after Ostanin, whose recesses act on a spring leg rather than a trigger tail; reorienting the camming surface to bear on the rear of the trigger; adding a slot and lever coupling and a three-position detent after Lochhead, whose own third detent is "not shown"; and coordinating the resulting geometry so

that the trigger tail is driven down as the selector rotates during cycling of the action. Neither Ostanin nor Lochhead describes any structure operating during cycling of the action at all. In my opinion a person of ordinary skill in the art presented with that set of unguided changes would not have been motivated to make them nor have had a reasonable expectation that the result would work as the asserted claims require.

## VIII.   OBJECTIVE INDICIA OF NONOBVIOUSNESS

### O.  Long-Felt Need

290.    I understand that in May 1986 the Hughes Amendment closed the National Firearms Act registry to newly manufactured machine guns for civilian ownership, 18 U.S.C. § 922(o), with the result that a civilian may acquire only from a finite and diminishing number of firearms manufactured before that date. I understand that since that time civilians and manufacturers have sought to achieve comparable rates of fire on modern and commonly used platforms without the mechanism operating as a machine gun.

291.    The need addressed by the Asserted Patents is narrower than the general demand for increased rate of fire, and it remained unmet for a considerable period. Blakley '723 was filed on April 25, 2003. Mr. Blakley himself identified three-position operability as the advance of his later patent over that earlier one, stating in the Background of the '247 patent that "[f]urther improvement in forced reset triggers is desired," and in its Summary that "Advantageously, the present invention provides a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." ('247 Patent, 2:14; 2:26–29.) I am not aware of any trigger mechanism product providing safe, standard semi-automatic, and forced reset semi-automatic operation that was demonstrated or offered before January 2022, roughly nineteen years after Blakley '723 was filed.

292.    This need was reflected in the design of firing-rate-enhancing devices that did not meet it. The early to mid-2010s saw the release of binary triggers, which fire one round on pull and one round on release of the trigger; bump stocks; the Hell Fire device, which employed a spring to urge the trigger blade forward toward its reset position and which substantially increased the force required to pull the trigger; and variations of crank-operated trigger actuators. In my opinion each of those operates on a different mechanical principle from the mechanisms described in the Asserted Patents, and none provides forced reset operation in which the bolt carrier drives the trigger member to its set position. See Luettke Decl. ¶ 63.

293.    I understand that the Rare Breed FRT-15 was introduced in December 2020 and was met with immediate consumer demand. I understand that product to embody the invention of U.S. Patent No. 10,514,223 rather than the Asserted Patents, and I refer to it here as evidence of the demand for forced reset functionality rather than as evidence of the commercial success of the inventions claimed in the Asserted Patents.

## IX.    REVISION OR SUPPLEMENTATION

294.    My opinions in this Report and the bases for my opinions are based on the analysis I have conducted to date. The opinions are subject to amendment, supplementation, and change based on any opinions that the Defendants' experts may provide and information I may receive or work I may perform in the future.

## X.    CONCLUSION

295.    For the reasons discussed above, it is my opinion that the Asserted Claims of the Asserted Patents are valid.

Under penalty of perjury, I declare that the foregoing statements and facts stated herein are true and correct to the best of my knowledge and belief.

Date:  August 6, 2026

Respectfully submitted,

_____

Dr. Joshua C. Harrison