# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | 4:26-md-03176-ALM<br>MDL 3176 |
| **ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,** | Civil Action No. 4:26-cv-00370-ALM |
| **Plaintiffs,** | |
| **v.** | |
| **AS DESIGNS, LLC, a North Carolina limited liability company, and MATTHEW S. KARLOVIC, an individual, and CALVIN OLSON, an individual, and JOHN DOE, an individual using the alias "s3igu2" and/or "Seagoo Threetwo,"** | |
| **Defendants.** | |

**Reply Declaration of Richard J. Eichmann
in Support of Plaintiffs' Motion for Preliminary Injunction**



ABC IP, LLC, a Delaware limited liability company, and Rare Breed Triggers, Inc., a Texas corporation,

**Plaintiffs,**

v.

AS Designs, LLC, a North Carolina limited liability company, Matthew S. Karlovic, an individual, Calvin Olson, an individual, and John Doe, an individual using the alias "s3igu2" and/or "Seagoo Threetwo,"

**Defendants.**

Submitted by:

Richard J. Eichmann
August 6, 2026
United States District Court
Eastern District of Texas Sherman Division
In Re: Rare Breed Triggers Patent Litigation
4:26-md-03176-ALM
MDL 3176
Case No. 4:26-cv-00370-ALM

2

███████████████

## Table of Contents

I.      Qualifications, Assignment, and Summary of Reply Opinions ...........................................5

II.     The AS Designs Record Does Not Support Mr. Phillips's Conclusion That Rare Breed's Harm Is Easily and Completely Quantified...........................................................10

    A.    AS Designs' Records Establish the Scale of Its Conduct, but Do Not Measure the Full Economic Effect ...........................................................................................10

    B.    Product Differentiation Does Not Eliminate Direct Competitive Displacement.........13

    C.    AS Designs' Sales and Distribution Data and Its Own Evidence Identify Direct Competitive Interaction ...........................................................................................15

    D.    The Durable Nature of the Products Makes Diverted Transactions Non-Restorable, Even If Customers Sometimes Switch Products.......................................17

    E.    AS Designs' Dealer Activity Is Documented, but the Relevant Channel Opinion Should Be Narrowly Framed .....................................................................................18

    F.    Completed Transaction Records Do Not Identify Every Lost Opportunity or Establish the Completeness of the Remedy ...............................................................21

III.    AS Designs' Pricing Evidence Shows Direct Price Competition but Does Not Quantify AS Designs-Specific Price Erosion .....................................................................23

    A.    AS Designs Offered Lower-Priced Products and Used Rare Breed's Prices as a Competitive Reference.............................................................................................23

    B.    The Timing of Rare Breed's Historical Price Reduction Requires a Narrow AS Designs-Specific Conclusion ...................................................................................25

    C.    Historical Price Erosion and Continuing Reference-Price Effects Are Distinct.........26

    D.    A Later Injunction Would Not Necessarily Restore the Prior Price-and-Quantity Combination.............................................................................................................28

IV.     The AS Designs Financial Record Does Not Support Mr. Phillips's Opinion Concerning AS Designs' Entity-Level Ability to Pay .......................................................28

    A.    Revenue, Reported Profitability, and a Point-in-Time Cash Balance Do Not Constitute a Complete Ability-to-Pay Analysis..........................................................29

    B.    The Produced Financial Records Do Not Establish the Amount of Liquidity Available To Satisfy a Future Judgment.....................................................................30

    C.    Historical Revenue and Profit Do Not Establish That the Resulting Value Remains Within AS Designs .....................................................................................32

    D.    Mr. Phillips Evaluates Ability to Pay Only Against an Unestablished Royalty Measure...................................................................................................................33

    E.    The Present Record Establishes Material Uncertainty, Not Certain Nonpayment ......34

V.    The Additional Record Shows Material but Different Economic Effects of Granting or Denying Relief.................................................................................................35

    A.    The Relevant Economic Comparison Concerns the Character and Reversibility of the Effects...........................................................................................36

    B.    AS Designs Faces Revenue Loss and Potential Asset Impairment ............................37

    C.    The Record Supports Only a Limited Conclusion Concerning Avoidable Future Costs..................................................................................................38

    D.    The Parties' Economic Effects Differ in Timing and Potential Reversibility .............39

VI.    AS Designs' Evidence Confirms That Rare Breed's Lead-Time and Market-Position Effects Were Not Exhausted and Would Not Automatically Reverse ..............................40

    A.    Historical Success Does Not Establish That the Economic Value of Lead Time Was Exhausted.................................................................................41

    B.    AS Designs' Sales, Product Offerings, Inventory, Capacity, and Dealer Activity Increased During the Relevant Commercial Period.....................................42

    C.    Rapid Competitive Entry and Slower Recovery Are Not Economically Inconsistent ...............................................................................................45

    D.    Mr. Phillips Does Not Analyze the Timing or Extent of Any Market-Position Recovery ...........................................................................................46

VII.    Clarification Concerning Market Uncertainty, Reputation, and Third-Party Entry ..........47

VIII.    Mr. Phillips's Preliminary Reasonable-Royalty Analysis Does Not Establish the Appropriate Royalty, the Adequacy of Monetary Relief, or AS Designs' Ability to Pay.................................................................................................................49

    A.    Mr. Phillips Does Not Conduct a Complete Hypothetical-Negotiation Analysis .......49

    B.    The Four Agreements Identified by Mr. Phillips Are Not Shown To Be Economically Comparable..................................................................................50

    C.    Broad Industry Statistics Do Not Establish Where This Transaction Falls Within the Reported Distributions.................................................................52

    D.    Potential Limitations in the ABC IP–Rare Breed License Do Not Validate Mr. Phillips's Alternative Range ...................................................................53

    E.    Mr. Phillips Does Not Show That His Proposed Range Accounts for the Parties' Competitive Relationship..............................................................54

    F.    Mr. Phillips's Preliminary Range Does Not Establish AS Designs' Entity-Level Ability to Pay .................................................................................55

IX.    Conclusion .................................................................................................................56

### I.    Qualifications, Assignment, and Summary of Reply Opinions

1.    My name is Richard J. Eichmann. I am a Managing Director at Secretariat Advisors, LLC ("Secretariat"), an economic consulting firm that provides expert testimony, economic analysis, and valuation services in complex litigation. I have over 30 years of experience in economic consulting, including more than 28 years focused on litigation-related engagements. My work includes the analysis and quantification of lost profits, reasonable royalties, price erosion, business-value effects, and other forms of economic harm arising in intellectual-property and commercial disputes. I hold the Certified Valuation Analyst ("CVA") and Master Analyst in Financial Forensics ("MAFF") designations from the National Association of Certified Valuators and Analysts.[1] My qualifications are described more fully in my April 24, 2026 declaration and in my updated curriculum vitae, attached to this Reply Declaration as **Appendix 1**.[2]

2.    On April 24, 2026, I submitted the Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction (the "AS Designs Eichmann Declaration"). My assignment was to evaluate the economic characteristics of the harm associated with AS Designs, LLC's ("AS Designs") alleged manufacture, marketing, and sale of the Super Safety and ARC-Fire products and to assess whether retrospective monetary relief would provide an adequate economic remedy.

3.    Defendants subsequently submitted the Declaration of Eric J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (the "Phillips Declaration"). Mr. Phillips concludes, among other things, that Rare Breed's principal potential harm consists of lost sales in a known market; that those sales and associated profits can be "easily quantified"; that customer, dealer, market-share, and pricing effects should

---

[1]    My Certified Valuation Analyst (CVA) designation, issued by the National Association of Certified Valuators and Analysts (NACVA), was originally awarded on December 28, 2009, and most recently renewed in June 2025, with the current certification valid through June 2028 (Credential ID 991115). My Master Analyst in Financial Forensics (MAFF) in Commercial Damages designation, also issued by NACVA, was originally awarded on May 25, 2016, and most recently renewed in June 2025, with the current certification valid through June 2028 (Credential ID 703).

[2]    Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026 ("AS Designs Eichmann Declaration"), ¶¶ 1–4 and **Appendix 1**. **Appendix 1** is an updated curriculum vitae reflecting developments since the submission of the AS Designs Eichmann Declaration.

5

resolve in Rare Breed's favor following a later permanent injunction; and that a reasonable-royalty award likely would be within AS Designs' ability to pay.[3]

4.    When I submitted the AS Designs Eichmann Declaration, I had not been provided any AS Designs Bates-numbered documents or deposition testimony. My analysis at that time relied on the materials identified in **Appendix 2** to the AS Designs Eichmann Declaration, including publicly available AS Designs product listings. Mr. Phillips subsequently reviewed or relied upon AS Designs documents ASD 000001 through ASD 000049 before issuing his declaration. Mr. Phillips formed his opinions before the additional expedited discovery and Rule 30(b)(6) testimony that followed his declaration. The record now available to me includes the ASD 000001 through ASD 000049 production, later AS Designs productions, dealer-order data, additional banking records, and the Rule 30(b)(6) testimony of Matthew Karlovic concerning AS Designs' records and operations. **Appendix 2** to this Reply Declaration lists the documents and other materials made available to me after submission of the AS Designs Eichmann Declaration.[4]

5.    For purposes of this reply, I continue to assume the alleged infringement described in the record. I do not offer opinions concerning infringement, patent validity, enforceability, inventorship, ownership, willfulness, or other questions of patent law. Nor have I been asked to determine a final diversion rate, calculate lost profits or price erosion, or offer a reasonable-royalty rate.

6.    Based on the AS Designs-specific evidence now available, I conclude that it is economically likely that AS Designs displaced Rare Breed sales or other purchasing opportunities on an economically meaningful, rather than nominal, scale, although I have not calculated the final

---

[3]    Declaration of Eric J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, July 4, 2026 ("Phillips Declaration"), ¶¶ 5–10, 15–25, 27–38, 44, and 51–59.

[4]    AS Designs Eichmann Declaration, ¶ 4 and **Appendix 2** (identifying the materials considered in connection with the AS Designs Eichmann Declaration); Phillips Declaration, ¶¶ 7–10 and note 3 and Exhibit 2 (listing "AS Designs Documents From ASD 000001 To ASD 000049" among the materials reviewed or relied upon and stating that discovery had not begun and that his opinions could be modified as additional information became available); ASD 000303–000306; ASD 000307–000310; ASD 000438; Deposition of Matthew S. Karlovic, as Rule 30(b)(6) designee of AS Designs, LLC, July 30, 2026 ("Karlovic 30(b)(6) Dep."). The later-produced materials include AS Designs' May and June 2026 bank statements and dealer-order data, and the deposition testimony addresses AS Designs' sales, customers and dealers, distributions, suppliers, competitive interaction, financial capacity, facility, and equipment.

6



diversion rate or damages amount in this reply. I further conclude that retrospective monetary relief is unlikely to provide a reasonable economic equivalent for the combined customer, channel, pricing, and market-timing effects reflected in the current record. Mr. Phillips also has not established that AS Designs, at the entity level, is likely to retain sufficient assets to satisfy the judgment that may ultimately result.

7.    AS Designs' records reflect approximately ▮▮▮▮▮ in accused-product revenue, consisting of approximately ▮▮▮▮▮ in website revenue and approximately ▮▮▮▮▮ in wholesale revenue.[5] They also reflect ▮▮▮ reported accused-product units, approximately ▮▮▮▮ of which were sold in August 2025 or later, and ▮▮▮ units reported as inventory on hand. Because the reported quantities include differing products, components, kits, selectors, and configurations, the ▮▮▮-unit total is a mixed product-unit measure, not a count of completed AS Designs transactions involving products economically equivalent to complete Rare Breed triggers.[6]

8.    The record also documents activity through direct, wholesale, and dealer channels. AS Designs reported ▮▮▮ website orders associated with approximately ▮▮▮ unique email addresses, ▮ wholesale accounts purchasing outside the website channel, and ▮▮ unique customer IDs in website records assigned to the "Dealer" customer group, including ▮▮ that

---

[5]   Karlovic 30(b)(6) Dep. Ex. 6 (ASD 000046); ASD 000047; Karlovic 30(b)(6) Dep. 29:7–17, 37:9–40:23. ASD 000046 reports website revenue of ▮▮▮▮▮. The detailed dollar-value entries in ASD 000047 sum to ▮▮▮▮▮ in wholesale revenue, although the workbook's stated total is ▮▮▮▮▮, a difference of ▮▮▮▮. The difference equals the ▮▮▮ ▮▮▮ entry reflected in the detailed rows, but the workbook does not explain whether that entry was omitted from the stated total intentionally. I therefore use the sum of the detailed entries. Use of the stated workbook total instead would result in combined revenue of ▮▮▮▮▮ and would not affect my opinions.

[6]   ASD 000046; ASD 000047. ASD 000046 reports quantities sold by product by month. Accordingly, the August 2025 total includes the full month and does not separately identify transactions occurring before and after the August 9, 2025 cease-and-desist letter (see Karlovic 30(b)(6) Dep. 33:18–35:13). The reported unit and inventory quantities include differing products, components, kits, selectors, and configurations and are not treated as equivalent numbers of complete Rare Breed triggers.

appear in more than one recorded order.[7] Its dealer activity continued through July 2026, and its production identifies ARC-Fire V2 configurations beginning in April 2026.[8]

9. AS Designs' own documents and testimony confirm direct competitive interaction with Rare Breed. AS Designs personnel compared contemplated AS Designs prices with Rare Breed's prices and discussed the expected competitive effect of lower pricing. Mr. Karlovic testified that AS Designs knew Rare Breed's prices, that price affected purchaser choice, that AS Designs' products could substitute for a Rare Breed trigger, and that lower-priced competing products could take Rare Breed sales, revenue, market share, and customers.[9]

10. I have not been asked in this reply to select a final numerical diversion rate, and I express no numerical opinion on that rate. My opinions do not require resolution of that issue. The AS Designs-specific record nevertheless establishes direct competitive interaction and displacement on an economically meaningful, rather than nominal, scale. I also do not equate commercial displacement with patent-value apportionment. Product-specific differences may be relevant to translating AS Designs' mixed product-unit counts into economically comparable transactions and, where appropriate, to apportionment. Those damages issues do not eliminate the documented competitive overlap or the conclusion that AS Designs caused economically meaningful displacement.[10]

11. I also do not rely on the proposition that an AS Designs purchaser will remain permanently loyal to AS Designs. Where a purchaser would have selected Rare Breed but instead satisfied

---

[7] Karlovic Declaration, ¶ 11; ASD 000047; Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438); Karlovic 30(b)(6) Dep. 37:12–22. My analysis of the Customer ID and Customer Group Name fields in ASD 000438 identifies ▮ unique customer IDs in records assigned to the "Dealer" customer group, of which ▮ appear in more than one recorded order.

[8] ASD 000046; ASD 000438.

[9] ASD 000040–000045; ASD 000049; Karlovic 30(b)(6) Dep. 110:11–24, 114:17–117:13.

[10] ASD 000040–000045; ASD 000046; ASD 000047; ASD 000049; ASD 000438; Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026 ("AS Designs Luettke Declaration"), ¶¶ 40–41, 58–63, and 67; Karlovic 30(b)(6) Dep. 110:11–24, 114:17–117:13; Phillips Declaration, ¶¶ 20 and 32–37. The AS Designs records document the scale of its accused-product activity and its comparison of contemplated prices with Rare Breed's prices. Mr. Luettke opines that the accused products provide substantially similar forced-reset functionality and perform the same essential function as Rare Breed's FRT products. Mr. Karlovic testified that AS Designs' products could substitute for a Rare Breed trigger, that price affects purchaser choice, and that lower-priced competing products could take Rare Breed sales, revenue, market share, and customers.

8

the contemporaneous demand through an AS Designs purchase, Rare Breed lost that transaction. A possible later replacement, upgrade, or additional purchase is a separate future opportunity and does not restore the initial sale.

12. AS Designs' records identify completed transactions. They do not necessarily identify purchasers who would have selected Rare Breed but never contacted it, abandoned or delayed a purchase before becoming observable, or dealer relationships that otherwise would have formed. My opinion is not that monetary relief is inadequate merely because it cannot literally reverse history. Monetary relief may provide an adequate economic equivalent where the economically significant effects can be identified, reliably attributed, and valued. The present record does not establish that a calculation limited to identifiable unit profits, historical price differences, or a preliminary royalty range would capture the full economically significant effects documented here.

13. The additional evidence also requires narrowing certain opinions in the AS Designs Eichmann Declaration. I agree that an injunction would impose immediate economic costs on AS Designs because approximately ██ percent of its reported revenue was generated by the Accused Products. I do not assume that AS Designs could readily replace that revenue through existing unrelated product lines, and I do not offer a quantitative opinion that Rare Breed's total economic hardship exceeds AS Designs' total economic hardship. My opinion is limited to differences in the nature, timing, and potential reversibility of the parties' economic exposures.[11]

14. I likewise do not offer independent opinions that AS Designs caused source confusion, caused customers to regard Rare Breed's products as defective or unreliable, or caused any identified third party to enter the market. My principal opinions instead rest on the directly documented AS Designs-specific evidence concerning approximately ██ million in accused-product revenue, materially lower advertised prices, acknowledged substitution,

---

[11] Phillips Declaration, ¶¶ 51–53; Declaration of Matthew S. Karlovic in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, July 6, 2026 ("Karlovic Declaration"), ¶¶ 20, 25.

9

direct and intermediary distribution, completed durable-product purchases, continuing commercial expansion, and AS Designs' entity-level financial condition.

15. Mr. Phillips has established that conventional damages methodologies may be available to estimate certain identified historical losses. He has not established that the necessary diversion and allocation analysis will be straightforward, that customer, dealer, pricing, and market-position effects will reverse automatically following an injunction, that his preliminary royalty range reflects the relevant economic circumstances, or that AS Designs is likely to retain sufficient entity-level assets to satisfy the judgment ultimately entered. The additional record therefore reinforces my opinion that retrospective monetary relief would not provide an economically equivalent substitute for timely relief.

## II. The AS Designs Record Does Not Support Mr. Phillips's Conclusion That Rare Breed's Harm Is Easily and Completely Quantified

### A. AS Designs' Records Establish the Scale of Its Conduct, but Do Not Measure the Full Economic Effect

16. Mr. Phillips principally responds that Rare Breed's alleged harm consists primarily of lost sales in a known market and that those losses can be "easily quantified" through a conventional lost-profits analysis. He reasons that AS Designs' sales records identify the relevant transactions and that a market reconstruction can determine the sales and profits Rare Breed would have earned absent the alleged infringement.[12] I agree that AS Designs' records provide important information for a damages analysis. I disagree that the existence of those records establishes that the resulting analysis will be easy, complete, or economically equivalent to preventing the challenged conduct.

17. A market reconstruction does not observe the but-for market. It estimates that market by removing the challenged conduct and evaluating how purchasers, suppliers, prices, quantities, and other market participants likely would have responded. Its reliability therefore depends not merely on knowing how many units AS Designs sold, but on

---

[12] Phillips Declaration, ¶¶ 15–25 and 54. Mr. Phillips describes the use of market reconstruction and the *Panduit* framework and concludes that Rare Breed's alleged lost sales can be readily identified and quantified.

10

████████████████

determining the likely disposition of the relevant purchasing opportunities absent AS Designs.

18. AS Designs' production provides detailed evidence concerning what occurred in the actual market. Its records identify approximately ████████ in accused-product revenue, consisting of approximately ████████ in website revenue and approximately ████ ████ in wholesale revenue. Defendants identified ASD 000046 and ASD 000047 as the records responsive to Plaintiffs' requests concerning units, revenue, costs, profits, inventory, and commercial purchasers.[13] Those records establish AS Designs' completed transactions. They do not, by themselves, establish what those purchasers would have done in a market without the Accused Products.

19. AS Designs reports ████ accused-product units.[14] That figure includes differing products, components, kits, selectors, and configurations and therefore is not itself a count of completed transactions involving products economically equivalent to complete Rare Breed triggers. AS Designs' product-level schedule permits a more refined description. Of the ████ reported units, at least ████, approximately ██ percent, are identified as complete Super Safety or ARC-Fire kits, consisting of ████ Super Safety kits and ████ ARC-Fire kits.[15] The remaining ████ reported units consist of components, selectors, precut triggers, platform-extension products, and other items. This segmentation establishes both that AS Designs' reported commercial scale was not driven solely by minor replacement parts and

---

[13]  ASD 000046; ASD 000047; *Rare Breed Triggers, Inc., et al., v. AS Designs LLC, et al.*, Defendants' Objections and Supplemental Answers to Plaintiffs' First Set of Interrogatories (Nos. 1-3), July 21, 2026, at Supplemental Response to Interrogatory No. 2. Defendants identified "ASD 000046–000047" as the business records responsive to requests concerning units, revenue, costs, profit, inventory, and commercial purchasers.

[14]  ASD 000046.

[15]  ASD 000046. The 11,491 Super Safety kit total is the sum of the rows labeled Super Safety Kit–CPM-10V, Super Safety Kit–D2 Tool Steel, Super Safety Kit–4140, and Super Safety Kit–M2 Tool Steel. The 35,335 ARC-Fire kit total is the sum of the ARC-Fire V1–Ambi Kit, ARC-Fire V2 - 0-90-180 Ambi Kit, ARC-Fire V2 - 0-45-90 Ambi Kit, ARC-Fire V2 - 0-45-180 Ambi Kit, and ARC-Fire V2 - 0-90-180 Non-Ambi Kit. I excluded separately sold cams, levers, selectors, detents, precut triggers, lever blockers, slip trips, Geissele products, and the mixed "ARMP5 Lower (Stripped + Full Kits)" category because that category does not separately identify stripped lowers and complete kits. The resulting ████-unit classification is therefore conservative with respect to complete kits.

that the mixed unit total cannot be converted mechanically into an equal number of complete-trigger transactions or a single lost-profits amount.[16]

20. Mr. Phillips does not perform a product-level or transaction-level lost-profits calculation. He does not compare the parties' contemporaneous sales by month, product, platform, price, or channel; distinguish complete kits from separately sold components; calculate the profit associated with economically comparable lost sales; or test whether his proposed monetary remedy captures the customer, dealer, pricing, and market-timing effects addressed in this declaration.

21. Mr. Phillips therefore establishes that damages methodologies exist, but he does not perform the empirical work necessary to determine the scope or completeness of the resulting remedy. Characterizing the reconstruction as straightforward before undertaking those analyses assumes the conclusion he is required to support.

22. My criticism is not that Mr. Phillips was required to calculate Rare Breed's damages in his preliminary-injunction declaration. It is that he offers affirmative conclusions that the relevant harm can be "easily quantified," that customer and dealer effects will reverse after an injunction, and that AS Designs likely can satisfy the resulting award.[17] Those conclusions depend on empirical assumptions concerning product equivalence, but-for prices and quantities, channel behavior, recovery timing, and financial capacity. I do not treat Mr. Phillips's failure to perform those analyses as affirmative proof of Rare Breed's harm. Rather, the AS Designs-specific evidence described here provides the affirmative basis for my opinions, while the omitted analyses demonstrate that Mr. Phillips has not established the categorical conclusions he offers.

---

[16] ASD 000046. The ▮▮▮▮ figure is a sum of product-level unit quantities and includes complete kits and separately sold components. It is not a transaction count or a count of economically comparable complete-trigger sales.

[17] Phillips Declaration, ¶ 10.

12

## B. Product Differentiation Does Not Eliminate Direct Competitive Displacement

23. The record contains evidence of both competition and differentiation. Mr. Karlovic testified that AS Designs' products can substitute for a Rare Breed trigger, that price affects a purchaser's choice between the parties' products, and that lower-priced competing products can take Rare Breed sales, revenue, market share, and customers. Mr. Phillips, however, emphasizes differences in configuration, included components, installation requirements, modularity, trigger characteristics, price, and customer preference.[18]

24. Those propositions are not mutually exclusive. Differentiated products can compete directly for the same purchasing opportunities. Product differences may be relevant to translating mixed product-unit counts into economically comparable transactions and, where appropriate, to patent-value apportionment; they do not eliminate substitution, direct competition, or displacement.

25. Mr. Phillips also describes the relevant market as a two-supplier market based on the asserted absence of acceptable non-infringing alternatives.[19] That characterization conflates two different concepts. The absence of an acceptable lawful product offering the allegedly patented functionality is not the same as the absence of other actual sellers and accused products in the marketplace. The record identifies numerous suppliers offering forced-reset products during the relevant period.[20]

26. Those additional products may not qualify as acceptable non-infringing alternatives in a final patent-damages analysis. Their presence in the actual market does not negate the record evidence that AS Designs and Rare Breed competed directly for overlapping purchasing opportunities or that AS Designs' products could substitute for Rare Breed triggers.

---

[18] Phillips Declaration, ¶¶ 32–37; Karlovic Declaration, ¶¶ 7–8 and 12; Karlovic 30(b)(6) Dep. 110:11–24, 114:17–117:13.

[19] Phillips Declaration, ¶ 20.

[20] Phillips Declaration, ¶¶ 20–23; Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026 ("AS Designs DeMonico Declaration"), ¶¶ 36–39 and 55. The existence of additional sellers describes the actual purchasing environment and does not constitute an opinion that their products are legally acceptable non-infringing alternatives.

13

27. I have not selected a numerical diversion rate in this reply and express no numerical opinion on that rate. My opinion is that the AS Designs-specific record establishes direct competitive displacement on an economically meaningful scale. The precise damages amount is a separate issue that I have not addressed in this reply.

28. I also do not attribute all demand for the Accused Products to the allegedly patented functionality or assume that every product difference is attributable to the asserted patents. For purposes of my economic analysis, I rely on Mr. Luettke's technical opinions that the Super Safety and ARC-Fire, when assembled and used as intended, provide substantially similar forced-reset functionality to Rare Breed's FRT products and perform the same essential function for the end user.[21] I also rely on his opinion that he is not aware of alternatives providing the same combination of functionality, durability, and ease of installation without infringing the asserted claims.[22] Product-specific attributes and customer preferences may remain relevant to the calculation of damages and, where applicable, apportionment. They do not eliminate competition for purchasing opportunities involving the allegedly patented functionality.[23] My displacement opinion therefore does not equate commercial displacement with patent-value apportionment. A final damages analysis may require apportionment for nonpatented attributes, but that issue does not eliminate the competitive overlap arising from products offering the same core forced-reset function.

29. A final damages calculation may need to evaluate the parties' product characteristics, relative prices, platform compatibility, product availability, supplier capacity, and the profit associated with economically comparable transactions. Depending on the available evidence, the analysis also may require product-specific calculations and sensitivity testing.

---

[21]  AS Designs Luettke Declaration, ¶ 67.

[22]  AS Designs Luettke Declaration, ¶ 58.

[23]  AS Designs Luettke Declaration, ¶¶ 40–41, 58–63, and 67; AS Designs Eichmann Declaration, ¶ 10 and note 12; Phillips Declaration, ¶¶ 20 and 32–37. Mr. Luettke opines that the Super Safety and ARC-Fire are designed and intended to be assembled in configurations that provide the accused forced-reset functionality; that he is not aware of alternatives providing the same functionality, durability, and ease of installation without infringing the asserted claims; and that, notwithstanding differences in form factor and installation method, the accused products provide substantially similar forced-reset functionality and perform the same essential function as Rare Breed's FRT products.

14

Those damages-measurement issues are distinct from my opinion here that AS Designs caused competitive displacement on an economically meaningful scale.

30.    Mr. Phillips performs none of those product-specific calculations. His product-differentiation discussion identifies differences between the parties' products, while his two-supplier discussion treats the reconstruction as comparatively simple.[24] He does not translate the identified differences into a lost-profits amount or establish that completed-transaction profits would capture the customer, dealer, pricing, and market-timing effects addressed in this declaration.

31.    An injunction directed to AS Designs would not remove every competing seller or every lower-priced product from the market. It would, however, remove AS Designs' accused offerings from the available choice set and prevent additional AS Designs sales and dealer orders. Other sellers might remain or expand, which would affect the magnitude of any resulting benefit to Rare Breed.

### C.    AS Designs' Sales and Distribution Data and Its Own Evidence Identify Direct Competitive Interaction

32.    AS Designs' accused-product sales generated approximately ▮▮▮ ▮▮▮ in revenue and approximately ▮▮ percent of its reported total revenue.[25] Those amounts, together with the order and channel data described below, establish the scale of AS Designs' activity in the same specialized product category in which Rare Breed operates.

33.    AS Designs' reach extended through direct, wholesale, and dealer channels. The record identifies ▮▮▮ website orders associated with approximately ▮▮▮ unique customer email addresses, ▮ wholesale accounts purchasing outside the website channel, and ▮▮

---

[24]    Phillips Declaration, ¶¶ 30–37.

[25]    ASD 000046; ASD 000047; Karlovic Declaration, ¶ 20. The reported unit total includes differing products, components, kits, selectors, and configurations and is not treated as an equivalent number of complete Rare Breed trigger sales.

15

██████████████████

unique customer IDs in website records assigned to the "Dealer" customer group, including ██ that appear in more than one recorded order.[26]

34. AS Designs' own communications and testimony identify the direction of the competitive effect. Its personnel compared contemplated AS Designs prices with Rare Breed's prices and discussed the expected effect of lower pricing on Rare Breed's sales and market position.[27] Mr. Karlovic likewise testified that the products can substitute for one another and that price affects purchaser choice.[28]

35. That evidence does not, by itself, calculate the final lost-profits amount or establish that price was the only factor affecting purchaser choice. It does establish that AS Designs understood its products as competing directly with Rare Breed for the same purchasing opportunities.

36. Given AS Designs' approximately ████████ in accused-product revenue, approximately ████ unique email addresses associated with website orders, █ wholesale accounts, ██ unique customer IDs in website records assigned to the "Dealer" customer group, lower advertised prices, and its own testimony concerning substitution, it is economically likely that AS Designs displaced Rare Breed sales or other purchasing opportunities on an economically meaningful, rather than nominal, scale.[29] I have not

---

[26] Karlovic Declaration, ¶ 11; ASD 000047; Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438); Karlovic 30(b)(6) Dep. 37:12–22. My analysis of the Customer ID and Customer Group Name fields in ASD 000438 identifies ██ unique customer IDs in records assigned to the "Dealer" customer group, of which ██ appear in more than one recorded order.

[27] ASD 000040–000045.

[28] ASD 000040–000045; Karlovic 30(b)(6) Dep. 110:11–24, 114:17–117:13. The communications compare contemplated AS Designs prices with Rare Breed's prices and discuss the expected competitive effect of lower pricing.

[29] ASD 000046; ASD 000047; Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438). My analysis of the Customer ID and Customer Group Name fields in ASD 000438 identifies ██ unique customer IDs in records assigned to the "Dealer" customer group, of which ██ appear in more than one recorded order. ASD 000046 reports website revenue of ████████. The detailed dollar-value entries in ASD 000047 sum to ████████ in wholesale revenue, although the workbook's stated total is ████████, a difference of ██████. The difference equals the ████████ entry reflected in the detailed rows, but the workbook does not explain whether that entry was omitted from the stated total intentionally. I use the detailed line-item sum, resulting in combined accused-product revenue of ████████. Use of the stated workbook total instead would result in combined revenue of ████████ and would not affect my opinions.

16

converted that conclusion into a final numerical diversion rate or damages amount in this reply.

37.    I have not estimated a final diversion rate or numerical lower bound in this reply. Nevertheless, in my opinion, the scale and structure of AS Designs' activity make a merely nominal competitive effect economically unlikely. That opinion is based on the combination of approximately ▮▮▮▮▮ in accused-product revenue, approximately ▮▮▮ unique email addresses associated with website orders, ▮ wholesale accounts and ▮ customer IDs appearing in more than one website record assigned to the "Dealer" customer group, materially lower advertised prices, and AS Designs' own testimony that its products can substitute for Rare Breed's products and can take Rare Breed sales and customers. This conclusion concerns economic materiality and direction; it is not a calculation of damages.

### D.    The Durable Nature of the Products Makes Diverted Transactions Non-Restorable, Even If Customers Sometimes Switch Products

38.    Mr. Phillips argues that the durable nature of the products simplifies the damages analysis because an AS Designs sale generally represents one completed transaction whose associated lost profit can be calculated. He also relies on evidence that some purchasers may later switch products or suppliers.[30] The AS Designs Luettke Declaration confirms that the Accused Products are durable, nonconsumable mechanical components that, when properly manufactured, installed, and maintained, may function for tens of thousands of rounds and many years. Mr. Luettke further explains that an accused product can be transferred between compatible firearms and that a purchaser is unlikely to need a replacement or additional unit for the same rifle.[31] Those facts reinforce the durable nature of the purchasing opportunity; they do not establish that the purchaser's but-for choice or the applicable diversion rate is readily observable.

---

[30]    Phillips Declaration, ¶ 24 and note 28.

[31]    Phillips Declaration, ¶¶ 23–24; Karlovic Declaration, ¶ 12; AS Designs Luettke Declaration, ¶¶ 64–66. Mr. Luettke opines that the Super Safety and ARC-Fire are durable, nonconsumable mechanical components expected to function for tens of thousands of rounds and potentially for the life of the firearm; that they may be transferred between compatible firearms; and that a purchaser is unlikely to need a replacement or additional unit for the same rifle.

17

39. Where an AS Designs transaction would have been made by Rare Breed absent the alleged conduct, the transaction represents a lost Rare Breed sale. Once the purchaser acquires an AS Designs product and satisfies the contemporaneous demand associated with the relevant firearm or configuration, a later injunction does not cause the purchaser to reverse that transaction or retrospectively purchase from Rare Breed.

40. Evidence that a customer may later change triggers does not restore the initial purchasing opportunity. A possible later replacement, upgrade, or additional purchase is a separate future transaction. It does not reverse the earlier displacement or cause Rare Breed to receive the sale, revenue, customer interaction, and market presence associated with the original transaction.

41. I therefore do not rely on the proposition that an AS Designs purchaser will remain permanently loyal to AS Designs or will never purchase a Rare Breed product. The relevant economic point is transaction-specific: if the customer would have selected Rare Breed but instead satisfied the contemporaneous demand through an AS Designs purchase, Rare Breed lost that transaction regardless of whether the customer later reentered the market.

42. The expected incremental profit associated with an identifiable lost sale may be estimated. That does not establish that a per-transaction margin captures all customer-acquisition, channel, pricing, and market-timing effects associated with the completed purchase.

### E. AS Designs' Dealer Activity Is Documented, but the Relevant Channel Opinion Should Be Narrowly Framed

43. Mr. Phillips characterized AS Designs' dealer activity as an unsupported hypothetical. The post-declaration record establishes otherwise: a dealer-sales spreadsheet contains ▮ recorded website orders assigned to the "Dealer" customer group between May 23, 2025 and July 23, 2026.[32] Those records are associated with ▮ unique dealer customer IDs, of which ▮, approximately ▮ percent, appear in more than one recorded order. Of those

---

[32] Phillips Declaration, ¶ 29; Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438); Karlovic 30(b)(6) Dep. 44:15–45:2. The spreadsheet contains ▮ non-header data rows. Each row includes an Order Date, subtotal excluding tax, Refund Amount, Customer ID, Customer Group Name, and Product Details. I treat each row as one recorded website order; the file does not include a separate Order ID field.

18



customer IDs, ▮ first appear in the produced dealer-order log after August 9, 2025.[33] The recorded orders total approximately ▮▮▮ before refunds and approximately ▮▮ after recorded refunds.[34]

44. The dealer activity also continued after Plaintiffs sought preliminary relief. From April 27, 2026 through July 23, 2026, the log contains ▮ recorded orders associated with ▮ dealer customer IDs, including ▮ customer IDs whose first recorded dealer order occurred during that period.[35] Those orders reflect ▮▮▮ in subtotal before recorded refunds, ▮▮▮ in recorded refunds, and ▮▮▮ after recorded refunds.[36] I do not assume that the first appearance of a customer ID necessarily represents the creation of a new dealer relationship, that each customer ID necessarily represents a different underlying dealer, or that every recorded product is economically equivalent. The data nevertheless establish continuing dealer-channel ordering activity and the addition of customer IDs not previously appearing in the produced log during the pendency of the motion.

45. Repeat ordering is economically significant because the value of an established ordering relationship may extend beyond the margin earned on an individual transaction. Recurring purchases can generate continuing sales and access to the dealer's customer base. A damages calculation limited to completed historical orders would not necessarily capture additional opportunities associated with the continued development of that ordering relationship.

---

[33] Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438). A customer ID is classified as associated with repeat recorded ordering if it appears in more than one data row. A customer ID's first recorded dealer order is the earliest Order Date associated with that ID in the produced file. Of the ▮ unique dealer customer IDs, ▮ appear in more than one recorded order and ▮ have a first recorded order after August 9, 2025. This calculation identifies first appearance in the produced log and does not establish when the underlying dealer relationship was created or whether multiple customer IDs could relate to the same dealer.

[34] Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438). Across the ▮ recorded orders, subtotal excluding tax totals ▮▮▮, recorded refunds total ▮▮▮, and subtotal excluding tax less recorded refunds totals ▮▮▮.

[35] Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438). Using the Order Date and Customer ID fields, the produced log contains ▮ recorded orders associated with ▮ dealer customer IDs from April 27 through July 23, 2026. ▮▮▮ of those customer IDs have their earliest recorded dealer order during that period.

[36] Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438). My calculations use the Order Date, subtotal excluding tax, Refund Amount, Customer ID, and Customer Group Name fields. For April 27 through July 23, 2026, subtotal excluding tax totals ▮▮▮, recorded refunds total ▮▮▮, and net order value totals ▮▮▮. Net order value is calculated as subtotal excluding tax less recorded refunds.

19

46.    I do not rely on the proposition that ███████████ necessarily would have become a Rare Breed dealer absent AS Designs.[37] Nor do I contend that Rare Breed's lower dealer prices or dealer margins, standing alone, constitute economic injury. A dealer program may rationally exchange a lower per-unit selling price for increased volume, broader customer reach, and reduced direct fulfillment costs.[38]

47.    The narrower economic issue is whether AS Designs' dealer-designated website activity, reflected in ██ unique customer IDs, ██ of which appear in more than one recorded order, and its ██ wholesale accounts altered the timing, scale, or economics of Rare Breed's dealer development relative to the but-for market.[39] I have not quantified that effect and do not assume that every AS Designs dealer otherwise would have carried Rare Breed, that any dealer was contractually committed to AS Designs, or that simultaneous carriage was impossible.

48.    I do not offer a separate dealer-damages amount in this reply, and I do not assume that the value of every dealer relationship exceeds the profits reflected in completed orders. The relevant limitation is that completed-order records alone do not establish whether additional ordering, customer access, or channel-development opportunities would have occurred in the but-for market. Whether those effects are separately measurable and economically significant would require additional dealer-level analysis.

49.    Mr. Phillips nevertheless cannot establish that channel effects are immaterial or fully reversible without analyzing the actual dealer records. He performs no dealer-level comparison, examines no repeat-order patterns, and offers no analysis of whether or how quickly AS Designs dealers would shift their inventory, purchasing, or customer-facing activity following a later injunction.

---

[37]    Phillips Declaration, ¶ 29.

[38]    Phillips Declaration, ¶¶ 29–30; AS Designs DeMonico Declaration, ¶¶ 51–52 and 57.

[39]    ASD 000438; ASD 000047.

20

### F. Completed Transaction Records Do Not Identify Every Lost Opportunity or Establish the Completeness of the Remedy

50. AS Designs' records identify customers and dealers that completed transactions with AS Designs. Rare Breed's records identify customers and dealers that completed transactions with Rare Breed. Neither dataset necessarily identifies a purchaser who would have selected Rare Breed absent AS Designs but never contacted Rare Breed, abandoned or delayed the purchase before becoming observable, or purchased through another channel.

51. The same observability limitation applies to dealer relationships. ASD 000438 identifies website orders assigned to the "Dealer" customer group and associates those orders with customer IDs that Mr. Karlovic testified correspond to particular dealers. The produced file does not identify those dealers by name. It likewise does not identify dealers that otherwise would have contacted Rare Breed, entered Rare Breed's dealer program earlier, stocked more Rare Breed inventory, or generated additional Rare Breed sales. A commercial relationship that never formed generally produces no Rare Breed invoice, order record, or customer identifier.[40]

52. These observations do not establish that every such opportunity occurred or that each would have been material. They identify a limitation in Mr. Phillips's categorical conclusion. To support his conclusion that monetary relief will be complete, he would need to establish either that all material harm is confined to identifiable completed transactions or that any unobserved effects are economically immaterial. He does neither.

53. The continuing nature of AS Designs' activity makes that limitation more important. The production reports ███ accused-product units in inventory, including differing products, components, kits, selectors, and configurations; identifies ARC-Fire V2 offerings beginning in April 2026; and reflects continued dealer activity after Plaintiffs sought preliminary

---

[40] Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438); Karlovic 30(b)(6) Dep. 44:15–45:2, 48:4–49:5. Mr. Karlovic testified that ASD 000438 contains dealer sales included within AS Designs' website sales, that the customer IDs correspond to particular dealers, and that the records shown were dealer sales. The produced file identifies those dealer-designated transactions by customer ID rather than by dealer name.

relief.[41] The economic issue therefore is not limited to assigning damages to a fixed body of historical transactions.

54.    I agree that conventional lost-profits and price-erosion analyses may estimate certain identified historical losses if the evidence supports causation, diversion, the but-for price, and the affected sales. The existence of those methodologies does not establish that every relevant opportunity is observable, that the necessary allocations are straightforward, or that a later injunction will restore the market conditions that existed when the transactions occurred.

55.    I do not apply a standard under which monetary relief is inadequate merely because it cannot literally reverse history. Monetary relief may provide an adequate economic equivalent when the material effects can be identified, reliably attributed, and valued. My opinion is that Mr. Phillips has not shown that a calculation limited to identifiable unit profits, historical price differences, or a preliminary royalty rate would capture the economically significant customer, channel, pricing, and market-timing effects reflected in the present record.

56.    In my opinion, Mr. Phillips moves from a valid but limited premise, i.e., that certain observed losses may be estimated, to an unsupported broader conclusion that all material economic harm will be measurable and fully remedied. The AS Designs-specific record instead documents direct competition, differentiated products requiring empirical diversion analysis, other actual sellers, durable purchasing opportunities that cannot be reversed, repeat dealer activity, and continued commercial activity. Certain components of Rare Breed's harm may later be estimated, but Mr. Phillips has not shown that those components exhaust the relevant harm or that retrospective monetary relief would provide a reasonable economic equivalent for the economically significant effects reflected in the record.

---

[41]   ASD 000046; ASD 000438. The inventory quantity includes differing product types and is not treated as an equivalent number of complete Rare Breed triggers.

22

**III.    AS Designs' Pricing Evidence Shows Direct Price Competition but Does Not Quantify AS Designs-Specific Price Erosion**

57.    Mr. Phillips acknowledges that historical price erosion may be estimated through monetary damages and reasons that Rare Breed could adjust its prices after removal of the Accused Products.[42] I agree that certain historical pricing effects may be estimated if the evidence supports causation, the but-for price, and the affected sales. I disagree that Mr. Phillips has established either that AS Designs had no incremental effect on Rare Breed's pricing or that Rare Breed necessarily would return to its but-for pricing conditions following a later injunction.

**A.    AS Designs Offered Lower-Priced Products and Used Rare Breed's Prices as a Competitive Reference**

58.    The record reflects materially lower advertised prices for certain AS Designs offerings than for the cited Rare Breed products. Rare Breed advertised relevant products at prices ranging from approximately $450 to $620, depending on the model and platform, including prices of $450, $525, $615, and $620.[43] AS Designs advertised its M2 Super Safety kit at $99.99 and its ARC-Fire kit at approximately $249.99.[44] The record also documents a February 2026 transaction in which an ARC-Fire Ambi Kit sold for $249.99 and a 4140 Super Safety Kit sold for $90.00, with no separate shipping charge.[45] These products are not economically identical, and advertised or individual transaction prices do not establish average realized

---

[42]    Phillips Declaration, ¶¶ 38–44. Mr. Phillips treats historical price effects as measurable and reasons that Rare Breed could adjust its prices after removal of the Accused Products.

[43]    AS Designs DeMonico Declaration, ¶¶ 41–43.

[44]    Plaintiffs' Motion for Preliminary Injunction at 11–12; Declaration of Matthew A. Colvin in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026 ("Colvin Declaration"), Exhibits H, J, and N. The AS Designs website materials show an M2 Super Safety kit advertised at $99.99 and an ARC-Fire kit advertised at approximately $249.99.

[45]    The Cammack Declaration included in the Colvin Declaration Exhibit N documents a February 25, 2026 purchase of an ARC-Fire Trigger–Ambi Kit for $249.99 and a 4140 Super Safety Kit–Black Oxide for $90.00, with free shipping; the products were delivered on March 3, 2026. I do not treat that single transaction as an estimate of AS Designs' average realized price. It confirms that at least one completed transaction occurred at the stated product prices and without a separate shipping charge. These prices are not presented as prices for economically identical products. The offerings differ in included components, configuration, installation requirements, platform compatibility, and other attributes addressed elsewhere in this declaration.

23

prices. The observed price differences nevertheless identify price as a potentially material dimension of customer choice, together with configuration, installation, platform compatibility, trigger characteristics, brand, and other product attributes.

59.     AS Designs' internal pricing description indicates that its prices were not determined solely by applying a fixed markup to cost. The document identifies approximate cost multiples for distributor, dealer, and retail pricing, but states that those formulas were not always strictly followed when the resulting price would fall outside "what the market will pay."[46] It also states that retail prices accounted for coupon allowances of 10 to 20 percent and included free shipping.[47] The document therefore identifies perceived market willingness to pay, potential discounts, and shipping costs as considerations in AS Designs' pricing process.

60.     AS Designs' contemporaneous communications also show that Rare Breed's prices served as a competitive reference. AS Designs personnel exchanged Rare Breed product listings, discussed anticipated Rare Breed prices, and evaluated contemplated AS Designs prices relative to those amounts. In one exchange, AS Designs personnel used emphatic language to describe the anticipated competitive effect of an approximately $500 price.[48]

61.     Those communications concern particular platform-specific offerings, including the parties' MP5 or ARHK products.[49] They do not, by themselves, establish the cause of Rare Breed's earlier FRT-15L3 price reduction or quantify an AS Designs-specific pricing effect. They do establish that AS Designs monitored Rare Breed's prices and evaluated its own contemplated prices relative to Rare Breed's offerings.

---

[46]   ASD 000049.

[47]   ASD 000049. The document identifies approximate distributor, dealer, and retail pricing formulas, states that they are not always strictly observed when the result would be outside what the market will pay, and states that retail pricing accounts for coupon codes of 10 to 20 percent and free shipping. The cited materials identify Rare Breed products advertised at approximately $450, $525, $615, and $620.

[48]   ASD 000040–000045. The communications compare contemplated AS Designs prices with Rare Breed's prices and discuss expected competitive effects. They concern particular platform-specific products and are not relied upon as proof of the cause or magnitude of Rare Breed's earlier FRT-15L3 price reduction. In one exchange, an AS Designs price of approximately $500 was described as one that would "MURDER rarebreeds" (ASD 000040–000045 at -41).

[49]   ASD 000040–000045.

24

62.   Mr. Karlovic's testimony is consistent with those communications. He testified that AS Designs knew Rare Breed's prices, that price was a factor in a purchaser's choice between the parties' products, that AS Designs' products could substitute for a Rare Breed trigger, and that lower-priced competing products could take sales and customers from Rare Breed.[50]

63.   This evidence does not establish that price was the only factor affecting customer choice, that every AS Designs transaction resulted from lower pricing, or that all differences between the parties' sales were price-driven. It does establish direct competitive price awareness and an economically plausible mechanism through which AS Designs' lower-priced offerings could affect Rare Breed's price, unit volume, or both.

## B.   The Timing of Rare Breed's Historical Price Reduction Requires a Narrow AS Designs-Specific Conclusion

64.   Mr. DeMonico states that Rare Breed introduced the FRT-15L3 in approximately May 2025 at an advertised price of $499 and reduced the advertised price to $450 in approximately August 2025. He attributes that decision to customer feedback and observations that customers were comparing Rare Breed's product with materially lower-priced competing products, including the Super Safety.[51]

65.   AS Designs sales records report no ARC-Fire sales before August 2025.[52] Because Rare Breed's price reduction and AS Designs' first reported ARC-Fire sales both fall within August 2025, the monthly data do not establish whether the ARC-Fire was commercially available before the pricing decision or contributed to it. The record does establish that AS

---

[50]   Karlovic 30(b)(6) Dep. 110:11–24, 114:17–117:13.

[51]   AS Designs DeMonico Declaration, ¶¶ 41–43; Karlovic Declaration, ¶ 13; ASD 000046. Mr. DeMonico describes the introduction of the FRT-15L3 at an advertised price of $499, the approximate August 2025 reduction to $450, and the customer feedback and lower-priced competition he states informed that decision. ASD 000046 reflects the timing of AS Designs' reported Super Safety and ARC-Fire sales.

[52]   ASD 000046.

25

Designs' lower-priced Super Safety was commercially available before August 2025 and was among the lower-priced products identified by Mr. DeMonico.[53]

66. The economically supportable conclusion is not that AS Designs alone caused the entire $49 reduction.[54] Rare Breed faced multiple lower-priced sellers and products, and the pricing decision also may have reflected customer demand, launch strategy, product availability, product mix, promotions, marketing considerations, or other commercial conditions.

67. Isolating AS Designs' incremental contribution would require analysis of, among other things: the timing and quantity of AS Designs' Super Safety sales; Rare Breed's transaction prices and sales volume before and after the reduction; the prices, quantities, and availability of other competing products; changes in customer and product mix; promotional, bundling, and channel activity; and other contemporaneous conditions affecting Rare Breed's pricing.

68. Mr. Phillips does not perform that analysis. I likewise do not offer an AS Designs-specific price-erosion calculation in this reply. Mr. DeMonico's testimony and the AS Designs evidence support the existence of competitive price pressure, but they do not, without further analysis, establish what portion of the $49 reduction should be attributed specifically to AS Designs.

### C.  Historical Price Erosion and Continuing Reference-Price Effects Are Distinct

69. Historical price erosion concerns the difference, if any, between the price Rare Breed actually charged and the price it would have charged absent the challenged competition. If causation and the but-for price can be established reliably, the associated historical revenue and profit effects may be estimated.

70. A continuing reference-price effect presents a different question: whether repeated exposure to materially lower-priced alternatives affects what customers and dealers expect to pay and

---

[53] ASD 000046; AS Designs DeMonico Declaration, ¶ 43. ASD 000046 reports Super Safety sales before August 2025 and first reports ARC-Fire sales in August 2025. Because the schedule reports monthly rather than daily quantities, it does not establish the date within August 2025 on which ARC-Fire sales began or the date within August 2025 on which Rare Breed reduced the FRT-15L3 price.

[54] Phillips Declaration, ¶¶ 30–31.

26

██████████

thereby constrains Rare Breed's future pricing after those alternatives are removed. As I explained in my prior declaration, customers may evaluate a product's price relative to prices observed for alternatives rather than solely by reference to the seller's costs or preferred margin.[55]

71.    The AS Designs-specific record supplies a factual mechanism through which such an effect could occur. AS Designs advertised accused offerings at prices below Rare Breed's cited prices, developed its retail pricing with allowance for coupon discounts and free shipping, and recorded ███ website orders, █ wholesale accounts, and ██ website orders assigned to the dealer customer group. The lower-priced offerings therefore were associated with significant commercial activity rather than appearing only in isolated product listings.[56]

72.    The same evidence does not establish the magnitude or duration of any continuing reference-price effect. I have not analyzed customers' reservation prices, surveyed customer perceptions, estimated demand elasticity, or determined the amount by which AS Designs' pricing may have constrained Rare Breed after any particular date.

73.    Dealer activity may also be relevant, but the conclusion should be similarly limited. AS Designs' pricing framework separately addresses distributor, dealer, and retail prices, and its records show repeat recorded ordering associated with numerous customer IDs assigned to the "Dealer" customer group. Those facts establish that lower-priced AS Designs products were distributed through intermediary channels. They do not establish that every dealer adopted a particular price expectation, changed its Rare Breed activity, or would resist a later Rare Breed price increase.

---

[55]  AS Designs Eichmann Declaration, ¶¶ 25–29 and note 34, citing Thomas T. Nagle and Georg Müller, *The Strategy and Tactics of Pricing*, 6th ed. (Routledge 2018), at p. 19.

[56]  ASD 000049; Karlovic Declaration, ¶ 11; ASD 000047; ASD 000438. These materials identify AS Designs' pricing framework, direct website activity, wholesale activity, and dealer ordering. They do not establish the frequency or amount of actual coupon use or an average realized transaction price.

27

### D. A Later Injunction Would Not Necessarily Restore the Prior Price-and-Quantity Combination

74. Mr. Phillips reasons that removal of the Accused Products would permit Rare Breed to adjust its pricing. That is a possible outcome, but it is not a demonstrated one. A price increase may reduce quantity demanded, cause customers to defer purchases, redirect customers to other sellers or product configurations, alter dealer margins, or require additional promotions or customer education.

75. Whether Rare Breed could increase price, how quickly it could do so, and what sales volume it would retain are empirical questions. Mr. Phillips does not estimate demand elasticity, analyze realized transaction prices, determine the frequency or amount of AS Designs coupon use, evaluate customer responses to the parties' price differences, model dealer economics, or estimate the relationship between Rare Breed's price and unit volume.

76. I therefore do not conclude that all pricing effects are incapable of measurement, that AS Designs caused the entire historical $49 reduction, or that its advertised price differences translate directly into an equal amount of Rare Breed price erosion. My opinion is narrower: AS Designs' records and testimony establish direct competitive price awareness, materially lower advertised prices, and pricing practices that contemplated additional discounts and free shipping. Mr. Phillips does not analyze AS Designs' incremental contribution to Rare Breed's historical or continuing pricing constraints and does not establish that a later injunction would automatically restore Rare Breed to the price-and-quantity combination it otherwise would have achieved.

## IV. The AS Designs Financial Record Does Not Support Mr. Phillips's Opinion Concerning AS Designs' Entity-Level Ability to Pay

77. Mr. Phillips concludes that a reasonable-royalty award likely would fall within AS Designs' ability to pay. He reaches that conclusion by applying a royalty range of approximately 4.5 percent to 7.2 percent to AS Designs' accused-product sales and comparing the resulting amount with selected historical financial measures, including reported revenue, gross

margin, cash, and anticipated capital expenditures.[57] That analysis does not establish AS Designs' entity-level capacity to satisfy the judgment that may ultimately result in this matter.

78. My opinion in this section is limited to AS Designs as an entity. I have not analyzed the individual defendants' financial capacity, whether they would be legally responsible for a judgment entered against AS Designs, or whether assets held by them would be available to satisfy such a judgment. I also do not opine that AS Designs is presently insolvent or that any particular judgment necessarily will be uncollectible.

## A. Revenue, Reported Profitability, and a Point-in-Time Cash Balance Do Not Constitute a Complete Ability-to-Pay Analysis

79. ASD 000046 reports product-level "Unit Gross Profit" and "Unit Net Profit." Multiplying the reported units sold for each listed product by those product-level amounts and summing across products produces approximately ███████████ in gross profit and approximately ███████████ under the workbook's "Unit Net Profit" methodology.[58] The latter is not a reconciled net-income amount from current financial statements. For each listed product, the workbook calculates Unit Net Profit as ██ percent of Unit Gross Profit, and Mr. Karlovic testified that the ██ percent reflected an estimate intended to allow approximately ██ percent for overhead and shipping because current reporting from AS Designs' accountants was not yet available. These figures indicate substantial historical estimated profitability. They do not identify the assets retained within AS Designs, the liquidity of those assets, or the amount available when a judgment becomes due.

---

[57] Phillips Declaration, ¶¶ 57–59. Mr. Phillips applies royalty-rate indications of approximately 4.5 percent to 7.2 percent and relies on AS Designs' sales, reported cash, gross margin, and anticipated future expenditures in reaching his ability-to-pay conclusion.

[58] Karlovic 30(b)(6) Dep. Ex. 6 (ASD 000046); Karlovic 30(b)(6) Dep. 29:14–31:10, 80:10–82:17. The gross-profit amount is my calculation multiplying Number of units sold by Unit Gross Profit for each listed product and summing across products. The net-profit amount applies the same calculation using Unit Net Profit. Those calculations yield ███████████ and ███████████, respectively. For each listed product, the workbook's Unit Net Profit equals ██ percent of Unit Gross Profit. Mr. Karlovic testified that the resulting ██ percent deduction was an estimate for overhead and shipping and that current reporting from AS Designs' accountants was not yet available.

29

███████████████

80. An entity-level ability-to-pay analysis instead requires consideration of the amount and timing of the potential obligation; cash and other liquid assets; existing liabilities; working-capital and operating requirements; taxes; debt and financing commitments; expected future cash flows; the liquidity and realizable value of inventory and fixed assets; distributions or transfers outside the entity; applicable insurance; and the period over which payment would be required.

81. Mr. Phillips does not perform that analysis. He does not prepare a cash-flow projection, assess AS Designs' working-capital requirements, evaluate the liquidity of its inventory and fixed assets, analyze the company's liabilities and financing commitments, identify insurance proceeds available to satisfy an award, or consider the effect of distributions on the assets likely to remain within AS Designs when a judgment is entered. His opinion therefore is based on selected historical measures rather than a complete assessment of AS Designs' prospective capacity to pay.

82. Mr. Phillips's conclusion also is conditional on the damages measure and royalty range he selects. He does not establish that Rare Breed would be limited to a reasonable royalty, that the appropriate royalty would fall within his preliminary range, or that the relevant damages base would end with the sales reflected in the records he reviewed.

### B. The Produced Financial Records Do Not Establish the Amount of Liquidity Available To Satisfy a Future Judgment

83. AS Designs' April 30, 2026 balance sheet reports total assets of ███████████. Those reported assets consist of ███████████ in cash, ███████████ in finished-goods inventory, and ███████████ in furniture, equipment, computer equipment, and vehicles. The balance sheet reports liabilities of ███████████ and book equity of ███████████.[59]

---

[59] ASD 000002–000003. The April 30, 2026 balance sheet reports cash of ███████████, finished-goods inventory of ███████████, fixed assets of ███████████, liabilities of ███████████, and book equity of ███████████. The corresponding April 30, 2026 Truist bank statement reports an ending account balance of ███████████. I have not reconciled the approximately ██████ difference between the accounting cash balance and the bank-statement balance. (See ASD 000297–000302, at ASD 000297).

████████████████

84.   A separate asset schedule dated May 20, 2026 reports total tangible assets of ███████████, including ███████████ in property and ███████████ in machinery, in addition to vehicles, equipment, and computer equipment. The property and machinery categories are not separately reflected in the fixed-asset amounts reported on the April 30 balance sheet. The asset schedule also reports computer equipment of ███████, compared with ███████ on the April 30 balance sheet. Subsequent Truist statements report ending balances in AS Designs' checking account of ███████████ on May 29, 2026 and ███████████ on June 30, 2026.[60]

85.   The produced records are not directly reconcilable. I cannot determine from the records presently available whether the property and machinery were acquired after April 30, were subject to accounting entries not yet reflected on the April 30 balance sheet, were included elsewhere in the accounting records, or were treated differently for financial-reporting purposes. A separate financing schedule identifies a commercial mortgage associated with 330 Berry Garden Road and an SBA loan, but also includes obligations associated with individuals and other properties and does not provide a reconciled, updated AS Designs balance sheet.

86.   The composition and encumbrance of the assets also matter. Cash is immediately liquid at its stated amount. Finished-goods inventory must be sold before it produces cash. Property, machinery, vehicles, equipment, and other fixed assets may be subject to liens or financing and may not be convertible to cash at their stated cost or book amounts. Their realizable values would depend on ownership, condition, market demand, transaction costs, existing encumbrances, and the timing and circumstances of any disposition.

87.   Mr. Karlovic testified that a damages judgment entered against AS Designs would have to be paid by AS Designs, that he knew of no other likely source from which the company

---

[60]   ASD 000001; ASD 000002–000003; ASD 000036–000039; ASD 000297–000302; ASD 000303–000306; ASD 000307–000310. The May 20, 2026 asset schedule reports total tangible assets of ███████████, including property of ███████ and machinery of ███████. The separate financing schedule (*see* ASD 000036–000039) identifies, among other obligations, a commercial mortgage of ███████ associated with 330 Berry Garden Road and an SBA loan of ███████, but does not provide sufficient information to reconcile those obligations to the April 30 balance sheet or determine their complete entity-level treatment. The Truist statements report ending checking-account balances of ███████ on April 30, 2026, ███████ on May 29, 2026, and ███████ on June 30, 2026.

could satisfy such a judgment, and that AS Designs did not carry insurance applicable to a damages award in this matter.[61]

88. I do not conclude from these records that AS Designs is insolvent or necessarily will be unable to satisfy a judgment. The records report cash and noncash assets in the amounts described above. They do not, however, provide a reconciled and current statement of AS Designs' assets and liabilities or establish the net liquidity likely to remain available when a judgment becomes due. The current record therefore does not permit a reliable entity-level ability-to-pay conclusion. The reduction in the reported checking-account balance between April 30 and June 30 does not itself establish inability to pay, but it further demonstrates that a balance observed on one historical date is not a projection of the amount likely to remain when a judgment becomes due.

### C. Historical Revenue and Profit Do Not Establish That the Resulting Value Remains Within AS Designs

89. AS Designs' April 30, 2026 balance sheet reports cumulative owner distributions of ████████████[62] That cumulative amount is not directly comparable to the company's point-in-time asset balance, but it shows that AS Designs recorded ████████ in cumulative owner distributions.[63]

90. The accounting records separately report ████████ in wages expense and ████████ in payroll taxes for January through April 2026.[64] The owner-distribution balance therefore is separately recorded from ordinary wages and payroll taxes. I do not opine concerning the tax, accounting, or legal characterization of any particular payment. Economically, the records show that the ████████ owner-distribution balance was recorded separately from ordinary wages and payroll taxes.

---

[61] Karlovic 30(b)(6) Dep. 130:11–131:4, 133:18–134:3.

[62] ASD 000002–000003, at ASD 000002.

[63] ASD 000002–000003, at ASD 000002; Karlovic 30(b)(6) Dep. 40:20–41:20. Mr. Karlovic testified concerning the owner-distribution balance, the allocation between the owners, and the possible inclusion of a federal tax payment.

[64] ASD 000002–000003, at ASD 000003.

32

███████████████

91. Mr. Karlovic further testified that AS Designs did not have a strict written structure governing the amount distributed to its owners and that funds were paid to the owners and to ███████████, an entity separately owned by Mr. Olson. The produced banking records likewise reflect recurring transfers from AS Designs to its owners and separately controlled accounts.[65]

92. I draw no conclusion concerning the purpose, propriety, or legal effect of those payments. Their economic significance is narrower: historical revenue and profit do not necessarily remain within AS Designs as entity-level assets. AS Designs' ability to generate approximately ████████ in accused-product revenue therefore does not, by itself, establish the amount that will remain available to satisfy a later judgment.

93. Mr. Phillips does not analyze the owner-distribution balance, the company's distribution practices, or the relationship between historical earnings and retained liquid assets. His analysis implicitly assumes that sufficient value generated through future operations will remain within AS Designs. The present record does not establish that assumption.

### D. Mr. Phillips Evaluates Ability to Pay Only Against an Unestablished Royalty Measure

94. Applying Mr. Phillips's royalty range of 4.5 percent to 7.2 percent to approximately ██████ in accused-product revenue produces an indicated amount of approximately ███████ to ████████.[66] The lower end is approximately ██████ below AS Designs' reported June 30, 2026 checking-account balance, while the upper end is approximately ██████ above that balance. This point-in-time comparison does not establish AS Designs' ability to pay either amount when a judgment becomes due.

95. The comparison also does not address a judgment based on another damages measure. A reasonable royalty is one potential measure of patent damages. Rare Breed also claims lost profits and price-erosion damages. Mr. Phillips does not establish that Rare Breed would be

---

[65] Karlovic 30(b)(6) Dep. 42:21–43:20, 57:1–62:14, 90:15–103:12, and 134:4–135:6; Dep. Exs. 16, 18, and 20.

[66] Phillips Declaration, ¶¶ 58–59. The amounts are my calculations: approximately ████████ multiplied by 4.5 percent and 7.2 percent.



limited to his selected royalty range and does not analyze AS Designs' entity-level capacity to satisfy a lost-profits or price-erosion award.

96.    The production reports ▮▮▮▮ accused-product units in inventory, consisting of differing products, components, kits, selectors, and configurations. The dealer-order records also identify ▮▮ orders from ▮▮ dealer customer IDs between April 27 and July 23, 2026, totaling ▮▮▮▮▮▮ before recorded refunds and ▮▮▮▮▮▮ after recorded refunds.[67] These records show that AS Designs continued receiving dealer orders after Plaintiffs sought preliminary relief and that its reported inventory had not yet been reflected in completed sales. The ultimate damages period therefore may include additional transactions beyond those included in the approximately ▮▮▮▮▮▮ of historical accused-product revenue used in Mr. Phillips's calculation.

### E.    The Present Record Establishes Material Uncertainty, Not Certain Nonpayment

97.    I do not opine that AS Designs necessarily will be unable to satisfy a judgment. AS Designs may continue generating cash, may retain additional earnings, may convert inventory or other assets to cash, or may obtain financing. The present record does not permit a reliable projection of those amounts.

98.    I do conclude that Mr. Phillips has not established his affirmative opinion that AS Designs likely can satisfy a future judgment. His analysis omits the range of potential damages measures, AS Designs' working-capital and operating requirements, the liquidity of its noncash assets, the owner-distribution balance and practices, the absence of applicable insurance or an identified alternative company payment source, and the amount of assets likely to remain when a judgment becomes due.

---

[67]    ASD 000046; ASD 000438. ASD 000046 reports ▮▮▮▮ accused-product units in inventory. That quantity includes differing products, components, kits, selectors, and configurations and is not treated as an equivalent number of complete Rare Breed triggers. My analysis of ASD 000438 identifies ▮▮ dealer orders from ▮▮ customer IDs between April 27 and July 23, 2026, with net order value calculated as subtotal excluding tax less recorded refunds. For that period, subtotal excluding tax is ▮▮▮▮▮▮, recorded refunds are ▮▮▮▮▮▮, and net order value is ▮▮▮▮▮▮.

34

███████████████

99.     From an economic perspective, the practical adequacy of a monetary remedy depends not only on the nominal amount awarded but also on the expected value of recovery.[68] Based on the current AS Designs-specific record, there is material uncertainty concerning AS Designs' entity-level capacity to satisfy the judgment that may ultimately result. That uncertainty limits Mr. Phillips's conclusion that retrospective monetary relief necessarily would provide an adequate economic remedy.[69]

## V.    The Additional Record Shows Material but Different Economic Effects of Granting or Denying Relief

100.    Mr. Phillips criticizes my prior comparison of the economic effects of granting and denying preliminary relief. He relies principally on evidence that the Accused Products generated approximately ███ percent of AS Designs' reported revenue and that AS Designs has no existing product line capable of meaningfully replacing that revenue.[70] The additional record requires me to narrow, but not abandon, my prior opinion.

101.    I agree that an injunction preventing continued sales of the Accused Products would immediately affect a business in which those products generated approximately ███ percent of reported revenue. Given the reported revenue concentration, I do not rely on an assumption that AS Designs could readily replace the affected revenue through increased sales of existing unrelated products. Nor do I assume that AS Designs could maintain its current revenue, employment, production, or operating scale following an injunction.

102.    I also do not offer a quantitative opinion that the total economic hardship to Rare Breed exceeds the total economic hardship to AS Designs. The present record does not permit a

---

[68]    AS Designs Eichmann Declaration, ¶ 53.

[69]    Material uncertainty concerning AS Designs' entity-level capacity is not an opinion that nonpayment is more likely than payment. It is a limitation on Mr. Phillips's affirmative conclusion that AS Designs likely can satisfy the resulting judgment. My principal opinion concerning the inadequacy of retrospective relief does not depend on collectability. It rests independently on the displacement, observability, pricing, channel, and market-timing considerations discussed above.

[70]    Phillips Declaration, ¶¶ 51–53; Karlovic Declaration, ¶¶ 20 and 25. The Karlovic Declaration reports that approximately ███ percent of AS Designs' revenue was generated by the Accused Products and states that AS Designs has no existing product line capable of meaningfully replacing that revenue.

35

reliable comparison of every cost, lost profit, asset impairment, avoided expenditure, or future opportunity affecting each party.

103. My opinion is narrower. The parties face economic effects that differ in their nature, timing, and potential reversibility. Revenue concentration measures the magnitude of AS Designs' dependence on the Accused Products. It does not, by itself, determine how much of AS Designs' loss would consist of sunk investment, avoidable future cost, impaired assets, or forgone operating profit. Nor does it determine whether Rare Breed's lost commercialization opportunities can be recreated through a later monetary award.

### A. The Relevant Economic Comparison Concerns the Character and Reversibility of the Effects

104. In assessing the comparative economic effects, I consider several characteristics: the magnitude and expected duration of the effect; whether the affected expenditures already have been incurred; whether future expenditures can be avoided; whether assets retain alternative uses or realizable value; and whether the affected market opportunity can be recreated later.

105. Rare Breed's relevant investments include research, prototyping, testing, product development, patent development, regulatory proceedings, market creation, and organizational capacity described in the AS Designs Eichmann Declaration and the supporting factual record. Much of that investment already has been incurred and is specific to Rare Breed's FRT technology, intellectual property, brand, and commercial position.[71]

106. Expenditures already incurred cannot be avoided by changing future conduct. Economically, they are sunk.[72] Rare Breed's opportunity to earn a return on those investments also is time-dependent. Rare Breed cannot suspend the current commercial period and later recreate the

---

[71] AS Designs Eichmann Declaration, ¶¶ 46–48 and note 57; AS Designs DeMonico Declaration, ¶¶ 7–17, and 42. These materials describe Rare Breed's product-specific research, development, patent, regulatory, and market-building investments.

[72] *See*, for example, Pindyck, Robert S., "Irreversibility, Uncertainty, and Investment," *Journal of Economic Literature* 29, no. 3 (1991): 1110-1148, at 1111 ("What makes an investment expenditure a sunk cost and thus irreversible? Usually it is the fact that the capital is firm or industry specific, that is, it cannot be used productively by a different firm or in a different industry.").

████████████

same pool of uncommitted customers, product-launch conditions, dealer-development opportunities, or elapsed period in which its earlier investments could have been converted into market position.[73]

107. A later damages award may estimate portions of the economic value associated with identified lost sales or price effects. It does not permit Rare Breed to make those transactions at the time they otherwise would have occurred or to acquire the contemporaneous customer, channel, and market-development benefits associated with them.

108. This distinction does not establish that every Rare Breed effect is permanent or unmeasurable. It establishes that the economic character of Rare Breed's exposure cannot be evaluated solely by comparing current revenue dependence between the parties.

### B.  AS Designs Faces Revenue Loss and Potential Asset Impairment

109. AS Designs' records report that the Accused Products generated approximately ███ percent of its revenue.[74] Its production also identifies █████ reported accused-product units in inventory.[75] An injunction therefore could sharply reduce AS Designs' revenue and could impair the value of inventory acquired or produced for use in the affected business.

110. The reported inventory includes differing products, components, kits, selectors, and configurations. I have not performed an item-by-item analysis of the inventory's cost, lawful alternative uses, salability, or recoverable value. I therefore do not assume that all inventory would become worthless, that it could all be repurposed, or that it could be liquidated at its reported book value.

---

[73]  I do not treat Rare Breed's previously incurred expenditures themselves as incremental harm caused by denial of preliminary relief. Their economic relevance is that Rare Breed committed those resources in anticipation of earning future commercialization returns. The time-sensitive opportunity to earn those returns can be reduced by intervening competitive sales even though the original expenditures do not change.

[74]  Karlovic Declaration, ¶ 20.

[75]  ASD 000046; Karlovic Declaration, ¶¶ 20 and 25. ASD 000046 reports █████ units in inventory. The quantity includes differing products, components, kits, selectors, and configurations and is not treated as an equivalent number of complete Rare Breed triggers.

█████████████

111. AS Designs also has acquired a commercial facility and equipment that includes additive-manufacturing equipment, CNC equipment, material-handling equipment, and warehouse racking. Mr. Karlovic testified that the new facility was not yet occupied and that much of the equipment was not yet operational.[76]

112. AS Designs' April 30, 2026 balance sheet reports approximately ██████ in fixed assets and approximately ████████ in finished-goods inventory.[77] Those figures confirm that AS Designs has made real investments that may be affected by an injunction. The present record does not permit me to determine what portion of those assets is specific to the Accused Products, what portion retains lawful alternative uses, or what amount could be recovered through sale.

113. I therefore do not minimize AS Designs' economic exposure. It includes the potential loss of future operating profit, disruption of a business overwhelmingly concentrated in the Accused Products, impairment of inventory, and possible underutilization or impairment of facilities and equipment.

## C. The Record Supports Only a Limited Conclusion Concerning Avoidable Future Costs

114. The record indicates that a material portion of AS Designs' production is performed by third-party manufacturers located in the United States and Taiwan. Mr. Karlovic identified multiple outside manufacturers and testified that supplier transactions generally were conducted through purchase orders, invoices, and e-mail and that he did not believe AS Designs had written supplier agreements.[78]

---

[76] Karlovic 30(b)(6) Dep. 139:19–143:10. Mr. Karlovic testified concerning AS Designs' commercial facility, additive-manufacturing equipment, CNC equipment, material-handling equipment, and racking, and stated that the facility was not yet occupied and much of the equipment was not yet operational.

[77] ASD 000002–000003. The April 30, 2026 balance sheet reports finished-goods inventory of ████████ and fixed assets of ██████.

[78] Karlovic 30(b)(6) Dep. 77:6–80:25, 135:8–20. Mr. Karlovic identified manufacturers in the United States and Taiwan and testified concerning purchase orders, invoices, e-mail communications, and the absence of written supplier agreements to his knowledge.

38

115. That structure suggests that at least some future production purchases may be adjustable before they are ordered or incurred. For example, if AS Designs does not place a contemplated future order, it may avoid the associated purchase cost even though it also loses the expected contribution and profit from the resulting sales.

116. The record does not establish, however, that all existing commitments can be canceled or avoided. I have not reviewed every outstanding purchase order, deposit, cancellation provision, oral commitment, supplier course of dealing, minimum-purchase requirement, or work already in process. I therefore do not quantify the amount of cost AS Designs could avoid and do not assume that outstanding commitments can be terminated without economic consequence.

117. Avoidable future expenditures are economically different from historical revenue and sunk investment. Revenue is not itself a measure of irrecoverable economic loss. It includes recovery of product costs, contribution to overhead, and profit. If future sales cease, some associated variable costs may also cease, while sunk costs and impaired assets may remain.

118. The same principle applies to lawful redeployment. AS Designs' facility and equipment may retain alternative uses or resale value, but the present record is insufficient to determine those amounts. I therefore do not offer a quantitative mitigation or redeployment opinion.

### D.  The Parties' Economic Effects Differ in Timing and Potential Reversibility

119. The relevant comparison is not between harm to Rare Breed and no harm to AS Designs. Both parties face material economic consequences. AS Designs principally faces interruption of a current business highly concentrated in the Accused Products, lost expected operating profit, and possible impairment of inventory and product-related assets. Rare Breed faces continued effects on the commercialization of investments already made and on purchasing, pricing, customer, and channel opportunities arising during an elapsed market period.

120. Some of AS Designs' future expenditures may be avoided before they are incurred, while other AS Designs investments may be sunk or impaired. Some Rare Breed losses may later be estimated through damages, while other opportunities may not be fully observable or

39

recreatable. The record therefore does not support treating either party's hardship as nonexistent or readily reversible.

121. Based on the additional evidence, I narrow my prior opinion in three respects. First, I do not rely on the breadth of AS Designs' website catalog as evidence that it can readily replace accused-product revenue. Second, I do not quantify the amount AS Designs could mitigate through avoided expenditures, redeployment, asset sales, or lawful alternative products. Third, I do not opine that Rare Breed's total economic hardship exceeds AS Designs' total economic hardship.

122. I continue to conclude, however, that AS Designs' revenue concentration does not establish that the economic effects of granting and denying relief are equivalent in character or reversibility. Mr. Phillips does not compare the parties' sunk investments, quantify their avoidable and unavoidable costs, analyze the product specificity and recoverable value of their assets, or evaluate whether the relevant market opportunities can be recreated after the litigation.

123. My economic opinion is accordingly limited: an injunction would likely expose AS Designs to lost operating profit and possible impairment or underutilization of inventory, facilities, and equipment. Denial of relief would likely expose Rare Breed to continued effects on sunk, product-specific investments and time-dependent commercialization opportunities. The parties' exposures differ in their composition and timing, and the present record does not support Mr. Phillips's implication that Rare Breed's effects are fully reversible merely because some historical losses may later be estimated.

## VI. AS Designs' Evidence Confirms That Rare Breed's Lead-Time and Market-Position Effects Were Not Exhausted and Would Not Automatically Reverse

124. Mr. Phillips characterizes my discussion of lead time and persistent market-position effects as internally inconsistent. He reasons that if competing products can displace Rare Breed rapidly, Rare Breed should be able to recover rapidly after the Accused Products are removed. He also contends that Rare Breed already realized its first-mover advantage

40

through its historical sales and earlier market presence.[79] Neither conclusion follows economically.

### A. Historical Success Does Not Establish That the Economic Value of Lead Time Was Exhausted

125. Lead time is the period during which a firm can convert earlier research, development, product availability, and market creation into commercial advantages before competing offerings constrain that process. The economic benefits may include customer acquisition, sales scale, market visibility, operating experience, product development informed by customer use, and channel development.

126. Those benefits are realized over time. An earlier entrant may capture some value before competitors arrive and still lose additional value when competing products enter before the earlier entrant has fully converted its investment and market position into later sales, customers, product extensions, and distribution relationships.

127. AS Designs' own communications acknowledge Rare Breed's earlier position. In a discussion concerning the parties' MP5-platform offerings, AS Designs personnel stated that Rare Breed "beat us to it" and had a "3–4 year headstart."[80] Mr. Karlovic testified that those statements referred to Rare Breed reaching the relevant market earlier.[81] The communications therefore confirm that AS Designs itself viewed Rare Breed as having obtained a material timing advantage.

128. Mr. Karlovic also testified that resolution of Rare Breed's litigation with the federal government partially opened the relevant market, while identifying a prior court ruling as another contributing event.[82] That testimony supports the economic conclusion that the

---

[79] Phillips Declaration, ¶¶ 25–31, note 30 and 45–50. Mr. Phillips argues that Rare Breed's historical sales demonstrate that it realized its first-mover benefit and that rapid competitive displacement is inconsistent with persistent post-injunction effects.

[80] ASD 000040–000045, at -000040.

[81] ASD 000040–000045; Karlovic 30(b)(6) Dep. 111:17–112:16.

[82] Karlovic 30(b)(6) Dep. 112:17–114:8. Mr. Karlovic testified that Rare Breed's resolution of its federal litigation partially opened the market and identified a prior judicial ruling as another contributing event.

regulatory and litigation environment affected when Rare Breed could fully exploit its earlier product-development and market-building efforts.

129. Mr. Phillips cites Rare Breed's approximately ████████ in historical sales as evidence that Rare Breed already captured the value of its first-mover position.[83] Those historical sales demonstrate that Rare Breed realized some economic value from its earlier entry. They do not establish that the value of that position was exhausted.

130. Historical revenue does not determine the additional sales, customer relationships, product extensions, dealer development, operating experience, or market position Rare Breed would have achieved during the later commercial period absent AS Designs. Nor does a historical revenue amount provide an economic basis for treating the continuing value of lead time as capped or fully realized as of a particular date.

131. The relevant issue is whether AS Designs' subsequent expansion reduced Rare Breed's ability to continue converting its earlier investment and position into additional commercial benefits. The AS Designs-specific evidence supports that conclusion, although I have not quantified the magnitude of the effect at this time.

### B. AS Designs' Sales, Product Offerings, Inventory, Capacity, and Dealer Activity Increased During the Relevant Commercial Period

132. AS Designs' records reflect █████ reported accused-product units and approximately ██████████ in accused-product revenue. The reported quantity includes differing products, components, kits, selectors, and configurations and therefore is a mixed product-unit total, not a count of completed transactions involving products economically equivalent to complete Rare Breed triggers. For purposes of the lead-time analysis, the relevant features of these data are the scale and timing of AS Designs' commercial activity. I do not mechanically convert the mixed product-unit total into an equal number of complete-trigger transactions or a damages amount.

---

[83] Phillips Declaration, ¶ 25 & note 30. Mr. Phillips relies on approximately ██████ in historical Rare Breed sales in arguing that Rare Breed already captured its first-mover advantage.

42



133. Approximately ▮▮▮▮ of the reported units, roughly ▮▮ percent, are recorded in August 2025 or later. Because ASD 000046 reports quantities by month, that figure includes the entire month of August and does not separately identify transactions occurring before and after AS Designs received Rare Breed's August 9, 2025 cease-and-desist letter. Reported volume was ▮▮▮▮ units in June 2025 and ▮▮▮▮ units in July 2025, before increasing to ▮▮▮▮ units in August 2025. After lower reported volumes in September and October, monthly volume increased to ▮▮▮▮ units in November 2025 and remained above ▮▮▮▮ units in each month from November 2025 through April 2026. Average reported monthly volume during that six-month period was approximately ▮▮▮▮ units, more than five times the June–July 2025 monthly average of approximately ▮▮▮ units.[84]

134. AS Designs also continued adding accused-product offerings. ASD 000046 identifies ARC-Fire V2 configurations beginning in April 2026 and reports ▮▮▮▮ accused-product units in inventory. The inventory includes differing products, components, kits, selectors, and configurations and is not equivalent to ▮▮▮ complete Rare Breed triggers. It nevertheless represents accused-product inventory that AS Designs reported as available to support additional sales or distribution.[85]

135. AS Designs separately reported estimated monthly manufacturing capacity of approximately ▮▮▮▮ ARC-Fire V2 units, ▮▮▮▮ Super Safety units, ▮▮▮▮ ARMP5 lowers, and additional capacity for slip trips, precut triggers, and other components. The AS Designs Luettke Declaration explains that AS Designs' MP5 lowers and slip-trip components are marketed and bundled to permit the Super Safety and ARC-Fire systems to operate in firearm platforms that do not ordinarily accept AR-pattern fire-control components. Those products

---

[84] ASD 000046; Karlovic 30(b)(6) Dep. 29:6–35:13; Dep. Exs. 5–7. The monthly quantities are my calculations summing the product-level quantities reported in ASD 000046. The schedule reports ▮▮▮ units in June 2025, ▮▮▮ units in July 2025, ▮▮▮ units in August 2025, ▮▮▮ units in September 2025, ▮▮▮ units in October 2025, ▮▮▮ units in November 2025, ▮▮▮ units in December 2025, ▮▮▮ units in January 2026, ▮▮▮ units in February 2026, ▮▮▮ units in March 2026, and ▮▮▮ units in April 2026. The November 2025 through April 2026 monthly average is approximately ▮▮▮ units, compared with approximately ▮▮▮ units for June and July 2025. Because ASD 000046 reports quantities by month, the August 2025 total includes transactions occurring both before and after August 9. The reported quantities include differing products, components, kits, selectors, and configurations.

[85] ASD 000046. The production identifies ARC-Fire V2 configurations beginning in April 2026 and reports ▮▮▮ accused-product units in inventory. The inventory quantity includes differing products, components, kits, selectors, and configurations and is not treated as an equivalent number of complete Rare Breed triggers.

████████████

extend the accused forced-reset functionality to additional firearm platforms.[86] Estimated
capacity is not equivalent to actual production, sales, or demand. It does indicate that AS
Designs reported the capacity to continue supplying multiple accused-product categories and
platforms.

136.   AS Designs' activity also extended beyond direct website transactions. Its records identify
       ████ website orders associated with approximately ████ unique email addresses, █
       wholesale accounts purchasing outside the website channel, and ███ unique customer IDs in
       website records assigned to the "Dealer" customer group, including ███ that appear in more
       than one recorded order.[87] The dealer records reflect continued ordering activity through
       July 2026.[88]

137.   Taken together, the records show increased monthly unit volume, the addition of accused-
       product configurations, reported inventory and manufacturing capacity, and continuing
       direct, wholesale, and dealer activity during the relevant period. They establish that AS
       Designs' accused-product activity was ongoing and had increased during the period at issue,
       and that AS Designs continued completing transactions and receiving repeat dealer orders
       while Rare Breed competed for the same purchasing and distribution opportunities. Because
       the reported unit volume combines complete kits and components, these facts do not, by
       themselves, calculate a final lost-profits amount. That measurement limitation does not
       negate the continuing competitive displacement documented in the record.

---

[86]   ASD 000048; AS Designs Luettke Declaration, ¶¶ 42–57. AS Designs reported estimated monthly
       manufacturing capacity of approximately ████ ARC-Fire V2 units, ████ Super Safety units, ████ ARMP5
       lowers, ████ slip trips, ████ precut triggers, and ████ assorted other parts. Mr. Luettke explains that AS
       Designs' MP5 lowers and slip-trip components are marketed, configured, and bundled to permit the Super Safety
       and ARC-Fire systems to provide their forced-reset functionality in MP5-pattern and other non-AR platforms.
       The reported capacity amounts are estimates and are not equivalent to actual production or sales. ASD 000004–
       000006 separately identifies multiple additional platform-extension projects as functional, entering production,
       awaiting samples, or under development as of May 18, 2026, while also noting that one project had been
       abandoned and another continued to experience reliability issues.

[87]   Karlovic Declaration, ¶ 11; ASD 000047; Karlovic 30(b)(6) Dep. Ex. 11 (ASD 000438); Karlovic 30(b)(6) Dep.
       37:12–22. My analysis of the Customer ID and Customer Group Name fields in ASD 000438 identifies ███
       unique customer IDs in records assigned to the "Dealer" customer group, of which ███ appear in more than one
       recorded order.

[88]   ASD 000438.

44

### C. Rapid Competitive Entry and Slower Recovery Are Not Economically Inconsistent

138. There is no economic inconsistency between rapid competitive displacement and slower recovery. Entry can redirect purchases quickly when a lower-priced or differently configured alternative becomes available. Recovery may take longer because the completed purchases are not reversed and the commercial relationships formed during the intervening period do not automatically transfer to the earlier supplier.

139. The durable nature of the products reinforces that asymmetry. Where an AS Designs transaction would otherwise have been made by Rare Breed, the purchaser's contemporaneous demand for the relevant firearm or configuration has been satisfied. Removal of AS Designs later does not cause the customer to reverse the completed purchase or retrospectively purchase from Rare Breed.

140. A customer may later replace a trigger, purchase another product, or equip another firearm. That later transaction is a separate purchasing opportunity. It does not restore the initial sale or the timing, revenue, customer contact, and market presence Rare Breed would have obtained from the earlier transaction.

141. The same principle applies to dealer relationships. An injunction may prevent additional AS Designs orders, but it does not cause dealers automatically to reallocate historical purchases to Rare Breed. Nor does it establish that the dealers will immediately shift future inventory, customer attention, or ordering activity to Rare Breed.

142. AS Designs' repeat-order evidence is relevant for that reason. Records associated with many customer IDs assigned to the "Dealer" customer group reflect recurring purchasing activity with AS Designs. I do not assume that the dealers associated with those customer IDs were exclusive to AS Designs or that each otherwise would have become a Rare Breed dealer. The evidence nevertheless contradicts an assumption that all channel effects would disappear immediately when AS Designs' future sales cease.

45

### D.  Mr. Phillips Does Not Analyze the Timing or Extent of Any Market-Position Recovery

143. Mr. Phillips assumes that customers, dealers, market share, and pricing would resolve in Rare Breed's favor after a permanent injunction. He does not analyze how long that process would take, what proportion of AS Designs customers would reenter the market, whether those customers would select Rare Breed, or what costs Rare Breed would incur to acquire them after the intervening period.

144. He likewise does not analyze whether AS Designs dealers would shift to Rare Breed, the timing or extent of any such shift, the effect of existing dealer inventory, or the promotional and commercial effort required for Rare Breed to establish or expand those relationships.

145. Mr. Phillips also does not compare AS Designs' sales trajectory with Rare Breed's contemporaneous trajectory, estimate the cumulative effect of AS Designs' post-entry growth, or evaluate whether Rare Breed's future sales would return to the level and timing they would have achieved absent AS Designs.

146. A later injunction may improve Rare Breed's future competitive position by preventing additional challenged sales. It does not recreate the elapsed period during which AS Designs generated approximately ███████████ in accused-product revenue, generated website orders associated with approximately █████ unique email addresses, developed wholesale and dealer activity, added product configurations, and expanded its production capability.[89]

147. I do not opine that Rare Breed's earlier-mover advantage was eliminated entirely, that every benefit obtained by AS Designs represents a corresponding Rare Breed loss, or that Rare Breed could never recover some market position. The magnitude and duration of any recovery would require additional empirical analysis.

148. My conclusion is narrower. Rare Breed's historical sales establish that it realized some value from its earlier entry, but they do not establish that the value of its lead time was exhausted.

---

[89] ASD 000046; ASD 000047; ASD 000438; Karlovic Declaration, ¶ 11. The records reflect approximately ██████ ██████ in website revenue, approximately ████████████ in wholesale revenue, █████ website orders, approximately █████ unique customer email addresses, ██ wholesale accounts, and substantial dealer activity.

46



AS Designs' average reported monthly unit volume increased from approximately ▮▮▮ units in June and July 2025 to approximately ▮▮▮ units from November 2025 through April 2026, and its records identify additional product configurations and continuing dealer activity during that period. A later injunction would stop additional challenged activity, but it would not reverse the commercial activity that already occurred, recreate the elapsed market period, or automatically restore Rare Breed to the position and trajectory it otherwise would have achieved.

## VII.    Clarification Concerning Market Uncertainty, Reputation, and Third-Party Entry

149.    Mr. Phillips criticizes my discussion, within my April 24, 2026 declaration, concerning market uncertainty, reputational effects, and the possibility of additional competitive entry. He contends that those opinions were not tied to identified customers, dealers, or entrants and that this action concerns patent infringement rather than confusion over the source of the parties' products.[90] The additional record permits me to clarify and narrow those opinions.

150.    I do not offer an independent opinion that AS Designs caused customers to mistake an AS Designs product for a Rare Breed product, caused customers to regard Rare Breed's products as defective, unreliable, or unsafe, or caused reputational harm to an unrelated Rare Breed product line. I have not conducted a consumer survey or identified customer or dealer testimony establishing those effects.

151.    I likewise do not offer an independent opinion that AS Designs caused any identified third party to enter the market. The present record reflects multiple sellers of forced-reset products, but it does not establish that a particular seller entered because of AS Designs' conduct. I therefore do not attribute third-party entry or sales by other suppliers to AS Designs without additional evidence.

---

[90]    Phillips Declaration, ¶¶ 39–50. Mr. Phillips criticizes the AS Designs Eichmann Declaration's discussions of market uncertainty, reputational harm, and additional entry as insufficiently tied to identified customer, dealer, or entrant conduct.

152. Nor do I offer a separate quantitative opinion that litigation-related uncertainty caused an identifiable purchaser or dealer to delay, abandon, or redirect a transaction. The present record does not identify a particular customer or dealer that changed its conduct because of uncertainty concerning the continued availability of AS Designs' products. My principal opinions therefore do not depend on quantifying a separate uncertainty-related effect.

153. The post-declaration evidence establishes a narrower and directly documented point: AS Designs continued expanding its accused-product activity during the period following Rare Breed's August 9, 2025 cease-and-desist letter and during this litigation.[91] According to documents in production, AS Designs reported approximately ███ of its ███ reported accused-product units in August 2025 or later, although the August total includes transactions occurring both before and after August 9.[92] AS Designs also introduced ARC-Fire V2 configurations in April 2026, reported ███ accused-product units in inventory, and continued receiving dealer orders through July 2026.[93]

154. That documented expansion is economically relevant without relying on source confusion, reputational injury, or third-party entry. During the intervening period, AS Designs converted current demand into completed transactions, direct customers, wholesale activity, dealer-designated transactions, repeat dealer ordering, and additional product configurations. A later injunction would prevent additional challenged sales, but it would not reverse the commercial activity that already occurred or recreate the market period during which Rare Breed otherwise could have competed for those opportunities.[94]

155. My principal opinions accordingly rest on the more directly documented AS Designs-specific evidence addressed elsewhere in this declaration: approximately ███ in accused-product revenue; materially lower advertised prices and pricing practices that

---

[91] Karlovic 30(b)(6) Dep. 33:18–35:13.

[92] ASD 000046.

[93] ASD 000046; ASD 000438. ASD 000046 reports the monthly accused-product quantities, the introduction of ARC-Fire V2 configurations in April 2026, and ███ reported units in inventory. The reported quantities include differing products, components, kits, selectors, and configurations and are not treated as equivalent numbers of complete Rare Breed triggers.

[94] ASD 000047; ASD 000438.

contemplated discounts and free shipping; acknowledged substitution between the parties' products; extensive direct, wholesale, and dealer activity; durable purchasing opportunities that cannot be reversed; and material uncertainty concerning AS Designs' entity-level capacity to satisfy a future judgment. Mr. Phillips's criticisms justify narrowing the opinions identified above, but they do not establish his broader conclusion that the economically significant effects are confined to identifiable lost sales that can be sufficiently measured and compensated after trial.

**VIII. Mr. Phillips's Preliminary Reasonable-Royalty Analysis Does Not Establish the Appropriate Royalty, the Adequacy of Monetary Relief, or AS Designs' Ability to Pay**

156. Mr. Phillips proposes a potential reasonable-royalty range of 4.5 percent to 7.2 percent of accused-product sales.[95] He uses that range both to characterize a possible damages award and to support his conclusion that AS Designs likely could pay the resulting amount.[96] His analysis does not establish that the proposed range reflects the royalty the parties would have negotiated, that an award calculated using that range would address the economic effects discussed in this declaration, or that AS Designs would have the entity-level capacity to satisfy the judgment ultimately entered.

**A. Mr. Phillips Does Not Conduct a Complete Hypothetical-Negotiation Analysis**

157. A reasonable royalty estimates the compensation the parties would have negotiated for authorization to use the patented technology under the economic circumstances relevant to the assumed negotiation. From an economic perspective, the analysis ordinarily requires consideration of the licensed rights, the contribution of the patented technology to the accused products, available alternatives, the parties' competitive relationship, expected sales and profitability, exclusivity, geographic and temporal scope, commercial risk, bargaining leverage, and other consideration exchanged.

---

[95]  Phillips Declaration, ¶ 59.

[96]  Phillips Declaration, ¶¶ 56–59.

49

158. Mr. Phillips does not conduct that analysis. He does not identify the assumed negotiation date or explain what information the parties would have possessed at that time. He does not evaluate AS Designs' expected accused-product sales and profitability, the available technical and commercial alternatives, the expected life of the accused offerings, the parties' respective bargaining positions, or the effect of permitting AS Designs to compete directly with Rare Breed.

159. Instead, Mr. Phillips states that a lost-profits analysis would be premature and presents what he describes as a "potential award" derived principally from four firearm-related agreements and broad industry statistics.[97] That exercise may provide preliminary rate references for further investigation. It is not a completed valuation of the license the parties would have negotiated in this matter.

160. The current record shows that the Accused Products generated approximately ██ percent of AS Designs' reported revenue.[98] That concentration demonstrates the commercial importance of the assumed license to AS Designs' business. It does not, by itself, establish the percentage of the Accused Products' value attributable to the allegedly patented functionality or eliminate the need for appropriate apportionment. Mr. Phillips analyzes neither issue.

### B. The Four Agreements Identified by Mr. Phillips Are Not Shown To Be Economically Comparable

161. Mr. Phillips identifies four agreements with stated royalty rates of 2.5 percent, 4 percent, 5 percent, and 5 percent and calculates a median rate of 4.5 percent.[99] I have reviewed the information concerning those agreements summarized in Mr. Phillips's Exhibit 3. I have not

---

[97] Phillips Declaration, ¶ 56. Mr. Phillips states that substantial product differences make a lost-profits conclusion premature and that he therefore considers a potential reasonable-royalty award.

[98] ASD 000046; ASD 000047; Karlovic Declaration, ¶ 20. The approximately ██ percent figure concerns the proportion of AS Designs' reported revenue generated by the Accused Products. It does not constitute an apportionment of product value to the asserted patents.

[99] Phillips Declaration, ¶ 58 and Exhibit 3.

50

been provided the complete underlying agreements and therefore do not offer opinions concerning terms that are not described in his exhibit.

162. Based on Mr. Phillips's summaries, the agreements span more than three decades and involve materially different technologies and commercial arrangements. They concern, respectively, broadly described gun hardware and gun-system technology; the manufacture and sale of firearms including a 1911-style pistol; a broad package of patents, patent applications, trademarks, copyrights, and other firearm-related intangible property; and enhanced metal-matrix-composite weapon barrels.[100]

163. The summarized agreements also differ in royalty base, exclusivity, annual payment provisions, and non-royalty consideration. Some use gross sales and others net sales. Some provide exclusive rights or combine exclusive and nonexclusive rights. One includes minimum and maximum annual royalties. Another includes an upfront transfer of ███ ███████ shares of the licensee's stock.

164. Those differences matter because a stated percentage rate cannot be evaluated independently of the rights granted, the royalty base, the licensed technology, exclusivity, profitability, market structure, noncash consideration, and other economic terms. Two agreements with the same percentage rate may reflect materially different economic values when those terms differ.

165. Mr. Phillips does not compare the licensed technology in the four agreements with the asserted patents, analyze the contribution of the respective technologies to the licensed products, evaluate whether the licensors and licensees were direct competitors, or adjust for differences in exclusivity, profitability, royalty base, or other consideration. He also does not explain why the commercial circumstances of weapon barrels, a pistol business, or a broad firearm-intellectual-property portfolio provide reliable indications of the terms on which Rare Breed would authorize AS Designs to sell the Accused Products.

---

[100]   Phillips Declaration, Exhibit 3. The descriptions of the technologies, royalty bases, exclusivity provisions, annual royalty terms, and noncash consideration in this section are based on the information summarized in Mr. Phillips's exhibit.



166. Accordingly, the 4.5 percent median is a descriptive statistic derived from the four agreements Mr. Phillips selected. Without the necessary comparability analysis and adjustments, it does not establish the royalty applicable to the assumed negotiation here.

### C. Broad Industry Statistics Do Not Establish Where This Transaction Falls Within the Reported Distributions

167. Mr. Phillips also relies on RoyaltySource statistics for the categories "Consumer Goods, Retail & Leisure" and "Machines and Tools." He reports average royalty rates of approximately 5.9 percent and upper-quartile rates of approximately 7.2 percent and 6.4 percent.[101] The categories contain 403 and 166 agreements, respectively, accumulated over more than 30 years.[102]

168. Those industry summaries may provide general context, but they combine agreements involving numerous technologies, products, market structures, and economic circumstances. They do not account for the asserted technology, its contribution to AS Designs' products, the parties' direct competition, the scope of the licensed rights, or AS Designs' dependence on the Accused Products.

169. The reported maximum rates of 40 percent and 50 percent further demonstrate the breadth and heterogeneity of the underlying distributions. Selecting an average or upper quartile does not identify the appropriate rate for this transaction without explaining which characteristics place the assumed license at a particular location within the distribution.

170. Mr. Phillips provides no such analysis. His use of the broad industry statistics therefore does not independently validate either the lower or upper end of his proposed range.

---

[101]  Phillips Declaration, ¶ 58.

[102]  Phillips Declaration, ¶ 58. Mr. Phillips reports that the "Consumer Goods, Retail & Leisure" category contains 403 agreements and the "Machines and Tools" category contains 166 agreements collected over more than 30 years, with reported maximum rates of 40 percent and 50 percent.

### D. Potential Limitations in the ABC IP–Rare Breed License Do Not Validate Mr. Phillips's Alternative Range

171. Mr. Phillips questions the ███████████ royalty paid by Rare Breed to ABC IP. He relies on the relationship between the parties and the magnitude of that royalty relative to Rare Breed's selling price as reasons to question whether the arrangement provides an arm's-length indication of the royalty AS Designs would have paid. I have reviewed the October 20, 2022 Exclusive Patent License Agreement and its May 19, 2025 and January 20, 2026 addenda. The written agreement provides for a per-unit royalty on a sliding scale from ████ ████████, with the applicable rate subject to agreement between the parties. Mr. DeMonico states that the rate actually applied to Rare Breed's current products is ███████████ regardless of model.[103]

172. The royalty is one component of a broader commercial arrangement. The agreement grants Rare Breed exclusive worldwide rights to make, use, sell, offer for sale, and import forced-reset triggers and colorably equivalent products covered by the licensed patent rights. Rare Breed may sublicense those exclusive rights with notice to and approval by ABC IP. Rare Breed is solely responsible for product design, manufacture, promotion, and distribution, while ABC IP is responsible for patent prosecution and maintenance. Unless terminated earlier under its terms, the agreement continues through the expiration of the last covered patent. The addenda expand the licensed patent portfolio while leaving the agreement's other terms unchanged.

---

[103] Phillips Declaration, ¶ 57; AS Designs DeMonico Declaration, ¶¶ 5 and 30, Exhibit A, (Exclusive Patent License Agreement dated October 20, 2022, §§ I.5–I.7, II, III, VI–VIII), Exhibit B and attached Schedule A (Addendum to Exclusive Patent License Agreement dated May 19, 2025), and Exhibit C (Second Addendum to Exclusive Patent License Agreement dated January 20, 2026). The original agreement provides for a per-unit royalty on a sliding scale from ███████████, which may be set or changed within that range by agreement between ABC IP and Rare Breed. It grants Rare Breed exclusive worldwide rights to make, use, sell, offer for sale, and import covered forced-reset triggers and colorably equivalent products; permits sublicensing with notice to and approval by ABC IP; assigns product design, manufacture, promotion, and distribution responsibilities to Rare Breed; assigns patent prosecution and maintenance responsibilities to ABC IP; and generally continues through expiration of the last covered patent. The addenda expand the licensed patent portfolio while leaving the remaining terms unchanged. Mr. DeMonico states that Rare Breed currently pays ABC IP ████ for every FRT unit sold, regardless of model.

███████████████

173. Those terms are economically relevant. The stated per-unit royalty is part of an exclusive, worldwide, portfolio-wide relationship that allocates continuing commercial responsibilities, patent-related obligations, risks, and rights between the parties. It therefore cannot be evaluated solely by dividing the current ██████████ payment by Rare Breed's selling price. Nor can its economic comparability be assessed without considering the breadth and exclusivity of the licensed rights, the covered patent portfolio, the duration of the arrangement, sublicensing rights, the parties' respective responsibilities, and the other circumstances of the relationship.

174. I do not opine that the ABC IP–Rare Breed arrangement establishes the reasonable royalty that AS Designs would have paid, that the current ██████████ rate necessarily reflects a negotiation between unrelated parties, or that it should be adopted without adjustment in a damages analysis. Those considerations may affect the weight assigned to the arrangement. But identifying potential limitations in that agreement does not establish the reliability of Mr. Phillips's proposed range. A potentially imperfect existing license does not make four other unadjusted agreements or broad industry statistics economically comparable by default. Each candidate agreement must be evaluated on its own terms and circumstances.

### E. Mr. Phillips Does Not Show That His Proposed Range Accounts for the Parties' Competitive Relationship

175. A properly determined reasonable royalty may account for the parties' direct competition, the value of exclusivity, the scope of the licensed rights, and the commercial consequences of authorizing the licensee to compete. My opinion is not that a reasonable royalty categorically cannot reflect those considerations.

176. The problem is that Mr. Phillips's preliminary rate-screening exercise does not analyze them. He does not evaluate how authorization of AS Designs' sales would affect Rare Breed's sales, prices, customer acquisition, dealer development, market timing, or return on its prior investment. He does not determine what compensation Rare Breed would have required to permit a direct competitor to conduct a business in which the Accused Products generated approximately ███ percent of reported revenue.

54

177. Nor does Mr. Phillips show that his proposed range encompasses the price, customer-acquisition, channel-development, and market-timing effects addressed elsewhere in this declaration. Applying a percentage to historical sales identifies a numerical payment. It does not establish that the selected percentage reflects the full economic circumstances of the assumed authorization.

178. Accordingly, even if a complete reasonable-royalty analysis ultimately produced a calculable award, Mr. Phillips's preliminary range does not establish that the amount would provide an economically equivalent substitute for the opportunities Rare Breed would have had in a market without the challenged sales.

**F. Mr. Phillips's Preliminary Range Does Not Establish AS Designs' Entity-Level Ability to Pay**

179. Applying Mr. Phillips's proposed range of 4.5 percent to 7.2 percent to approximately ███████████ in accused-product revenue produces an indicated amount of approximately ███████████████████. That calculation is conditional on both the damages measure and royalty range he selected.

180. Mr. Phillips does not establish that Rare Breed would be limited to a reasonable royalty, that the appropriate royalty would fall within his range, or that the royalty base would end with the historical sales reflected in the records he reviewed. The production also reflects additional inventory and continuing dealer activity that may generate later transactions.

181. His ability-to-pay conclusion is therefore conditional on an unestablished damages measure and rate. As discussed in Section IV, AS Designs' entity-level capacity to satisfy a judgment depends on the amount of the obligation, the assets remaining when payment is required, the liquidity of those assets, operating requirements, distributions, and other financial circumstances. A comparison between a preliminary royalty calculation and a historical cash balance does not resolve those issues.

182. I do not opine that Mr. Phillips's proposed range necessarily is below the royalty ultimately determined. My opinion is that his preliminary references and calculations do not establish

55

that range or support his conclusions concerning the adequacy of relief or AS Designs' entity-level ability to pay.

### IX.    Conclusion

183.    Mr. Phillips concludes that Rare Breed's economic harm can be identified, quantified, and adequately compensated through a later award of lost profits or a reasonable royalty. I agree that certain identified historical losses may be estimated. I disagree that the availability of those methodologies establishes that the economically significant effects documented in the present record will be sufficiently observable, reliably attributable, and measurable to provide a reasonable economic equivalent through retrospective monetary relief.

184.    AS Designs' records document actual commercial activity at the following scale: approximately ▮▮▮▮▮ in accused-product revenue, more than ▮▮▮ website orders, approximately ▮▮▮ unique email addresses associated with website orders, ▮ wholesale accounts, and ▮ unique customer IDs in website records assigned to the "Dealer" customer group, including ▮ that appear in more than one recorded order. Those records establish the scale of AS Designs' activity in the actual market. They do not, by themselves, translate the mixed product-unit and channel data into a final lost-profits amount or capture all customer, dealer, pricing, and market-timing effects.[104]

185.    A final damages calculation may need to distinguish complete kits from separately sold components, identify economically comparable transactions, and account for product-specific prices, costs, and profits. Mr. Phillips does not perform that calculation. AS Designs' own documents and testimony nevertheless confirm the direction of the competitive relationship: its products can substitute for Rare Breed products, price affects purchaser

---

[104] ASD 000046; ASD 000047; ASD 000438; Karlovic Declaration, ¶ 11. The records reflect approximately ▮▮▮ in website revenue, approximately ▮▮▮▮▮ in wholesale revenue, ▮▮▮ website orders, approximately ▮▮▮ unique customer email addresses, ▮ wholesale accounts, and substantial dealer activity. The reported unit quantities include differing products, components, kits, selectors, and configurations and are not treated as equivalent numbers of complete Rare Breed trigger sales.

choice, and lower-priced competing products can take Rare Breed sales, customers, revenue, and market share.[105]

186. Every completed AS Designs transaction represents a historical purchase that a later injunction cannot reverse. To the extent a completed transaction otherwise would have been made by Rare Breed, it represents a lost Rare Breed sale. I have not selected a final numerical diversion rate in this reply. The possibility that a customer may later replace a product, purchase another trigger, or equip another firearm does not restore the earlier purchasing opportunity.

187. The same distinction applies to dealer and channel activity. AS Designs' dealer activity is not hypothetical. Its records identify ███ unique customer IDs in website records assigned to the "Dealer" customer group, including ███ that appear in more than one recorded order. But Mr. Phillips does not analyze whether AS Designs' activity affected the timing, scale, or economics of Rare Breed's dealer development or whether those effects would reverse promptly following an injunction.

188. AS Designs' pricing evidence likewise confirms direct competitive price pressure. AS Designs advertised certain core offerings, including Super Safety and ARC-Fire kits, at prices materially below the cited Rare Breed products, and the record documents at least one completed transaction at comparable AS Designs prices. AS Designs monitored Rare Breed's pricing and developed its own prices with reference to what the market would bear, including allowances for possible coupon discounts and free shipping. I do not attribute the entirety of Rare Breed's historical price reduction to AS Designs and do not offer an AS Designs-specific price-erosion calculation. Mr. Phillips, however, does not analyze AS Designs' incremental contribution or establish that Rare Breed would automatically return to its but-for price-and-quantity combination after a later injunction.

---

[105] ASD 000040–000045; ASD 000049; Karlovic 30(b)(6) Dep. 110:11–24, 114:17–117:13. The AS Designs communications compare contemplated AS Designs prices with Rare Breed's prices. The pricing document states that AS Designs' pricing formulas are adjusted based on what the market will bear and contemplate coupon allowances and free shipping.

189. Rare Breed's historical commercial success also does not establish that the economic value of its lead time was exhausted. AS Designs subsequently expanded its accused-product sales, direct-customer and dealer-channel activity, product configurations, inventory, and manufacturing capacity during the relevant commercial period.[106] AS Designs subsequently expanded its accused-product sales, customer base, dealer relationships, product configurations, inventory, and manufacturing capacity during the relevant commercial period. A later injunction would stop additional challenged activity, but it would not recreate that elapsed period or automatically restore Rare Breed to the trajectory it otherwise would have achieved.

190. I recognize that an injunction would impose immediate economic costs on AS Designs because approximately ▉ percent of its reported revenue was generated by the Accused Products. I do not offer a quantitative opinion that Rare Breed's total hardship exceeds AS Designs' total hardship. My opinion is limited to the different character, timing, and potential reversibility of the parties' economic exposures.

191. Mr. Phillips's preliminary reasonable-royalty analysis does not alter these conclusions. His proposed range is based on four agreements whose economic comparability he does not establish and on broad industry statistics that do not account for the specific technology, licensed rights, direct competitive relationship, or commercial circumstances of the assumed negotiation. His analysis therefore does not establish the appropriate royalty or demonstrate that his selected range captures the economic effects addressed in this declaration.

192. Nor does Mr. Phillips establish AS Designs' entity-level capacity to satisfy the judgment that may ultimately result. The produced records report approximately ▉ in total assets on the April 30 balance sheet and approximately ▉ in tangible assets on the May 20 asset schedule, but those records, the subsequent bank statements through June 30, 2026, and the financing information are not reconciled. AS Designs' reported Truist checking-account balance declined from approximately ▉ on April 30 to approximately ▉ on June 30, but the statements do not establish the reasons for that change or AS Designs' complete financial position. The records do not establish the

---

[106] ASD 000040–000045, at -000040.

58

realizable value or encumbrances of the noncash assets, AS Designs' working-capital requirements, future cash flows, or the amount likely to remain available when payment is required. I do not opine that AS Designs is insolvent or necessarily will be unable to pay a judgment. I conclude that material uncertainty remains concerning its entity-level capacity to do so.[107]

193. I have not been asked to determine a final diversion rate, calculate lost profits or price erosion, or offer an alternative reasonable-royalty rate. I also do not rely on independent opinions concerning source confusion, perceived product quality, or AS Designs' causation of third-party entry.

194. Based on the AS Designs-specific evidence now available, I conclude that AS Designs displaced Rare Breed sales or other purchasing opportunities on an economically meaningful, rather than nominal, scale, although I have not calculated the final numerical diversion rate or damages amount in this reply. Certain identified historical losses may later be estimated. The present record nevertheless supports the conclusion that retrospective monetary relief is unlikely to provide a reasonable economic equivalent for the combined effects of displaced transactions, customer and channel opportunities that may not be fully observable in completed-transaction records, continuing pricing constraints, and elapsed market timing. Mr. Phillips also has not demonstrated that AS Designs, at the entity level, is likely to retain sufficient assets to satisfy the judgment that may ultimately result. The additional record therefore reinforces my opinion in the AS Designs Eichmann Declaration that retrospective monetary relief would not provide an economically equivalent substitute for timely relief.

195. I reserve the right to supplement or revise these opinions if additional relevant documents, data, or testimony becomes available.

---

[107] ASD 000002–000003; ASD 000297–000302; ASD 000303–000306; ASD 000307–000310; Karlovic 30(b)(6) Dep. 40:20–41:20, 130:11–131:10, 133:18–134:3, and 135:23–136:2. The April 30, 2026 balance sheet reports approximately ▮▮▮▮▮ in total assets, approximately ▮▮▮▮▮ in cash, approximately ▮▮▮▮▮ in liabilities, and approximately ▮▮▮▮▮ in cumulative owner distributions. The Truist statements report ending checking-account balances of approximately ▮▮▮▮▮ on April 30, approximately ▮▮▮▮▮ on May 29, and approximately ▮▮▮▮▮ on June 30.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 6th day of August 2026.



_____

**Richard J. Eichmann**

Secretariat Advisors, LLC
135 Main Street, Suite 1850
San Francisco, CA 94105

60