# EXHIBIT 1

# EXCLUSIVE PATENT LICENSE AGREEMENT

This **EXCLUSIVE PATENT LICENSE AGREEMENT** (hereinafter, the "Agreement"), made and effective as of the 20th day of October, 2022 ("Effective Date"), by and between ABC IP, LLC (hereinafter called "Licensor"), a Delaware limited liability company having an address of 8 The Green, Suite A, Dover, Delaware 19901, and Rare Breed Triggers LLC (hereinafter called "Licensee"), a North Dakota limited liability company having an address of 3523 45th Street South, Suite 100, Fargo, North Dakota 58104. Licensor and Licensee may hereinafter collectively be referred to as the Parties.

**WHEREAS**, Licensor is the owner of all right, title, and interest in and to United States Patent Nos. 10,514,223 (Firearm Trigger Mechanism); 11,346,627 (Forced Reset Semiautomatic Trigger with Sliding Blocking Bar); and 7,398,723 (Trigger Forward Displacement System and Method);

**WHEREAS**, Licensor represents that it has filed a pending U.S. Provisional Patent Application, Serial No. 63/297,884 (hereinafter "the '884 Application") covering Three-Position Forced Reset Triggers;

**WHEREAS**, Licensor represents that it has the right to grant the herein-contained rights and license under the Licensed Patents to Licensee; and

**WHEREAS**, Licensee wishes to obtain, and Licensor is willing to grant, the herein-contained worldwide right and license respecting the Licensed Patents, and the '884 Application to replace and supersede any and all prior patent licensing agreements between the Parties.

**NOW, THEREFORE**, the Parties hereto agree as follows:

I. Definitions.

As used in this Agreement:

1) The term "Licensed Patents" shall mean United States Patent Nos. 10,514,223 ("the '223 Patent"); 11,346,627 ("the '627 Patent"); and 7,398,723 ("the '423 Patent").

2) Any patent issuing with priority claimed to the '884 Application.

3) The term "Future Patents" shall mean any United States Patent, United States patent application, foreign patent, or foreign patent application that is filed by or on behalf of ABC IP, LLC, after the Effective Date, including but not limited to any other application which has been, or which at any time while this Agreement is in effect shall be, filed as a substitute for, or a division, or a continuation relating to any firearm or firearm trigger technology. Future Patents owned by Licensor may be added under the terns of this Agreement by one or more separately executed Addendum.

4) The term "Valid Claim" shall mean:

a) In the case of an application for Letters Patent (during the time such application is pending as an application), a claim or part which shall not have been finally rejected by an unappealed or unappealable decision of the Patent Office of the country in which such application is filed; and
b) In the case of an issued and unexpired Letters Patent, a claim or part which shall not have been held invalid in an unappealed or unappealable decision of a court of competent jurisdiction.

5) The term "Forced Reset Trigger" shall mean any trigger and/or trigger device wherein the trigger is forcibly returned to the in-battery position after firing through a mechanical interaction between at least the hammer or bolt-carrier and the trigger member.

6) The term "Royalty Period" shall mean the present calendar quarter and each succeeding calendar quarter thereafter.

7) Licensor does not provide any technical data or design information with respect to the Licensed Patent or Licensed Products. Licensee is solely responsible for the design, manufacture, promotion, and distribution of the Licensed Products and Licensee has no control over the same.

II. <u>License.</u>

1) Subject to the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee the exclusive right and license to make, use, sell, offer for sale, and import for use, any Forced Reset Trigger or colorably equivalent product under the Licensed Patents and/or the '884 Application.

2) Such license shall include the right on the part of Licensee (on notice to and approval by Licensor) to sublicense the exclusive patent rights under the Licensed Patents and/or the '884 Application.

III. <u>Royalty.</u>

1) As royalty for the license hereby granted to it, Licensee shall, at the times and in the manner hereinafter set forth or otherwise mutually agreed by the Parties, pay or have paid on its behalf to Licensor a per unit fee on a sliding scale ranging from US$200.00 to $300.00 of all forced reset triggers, hereunder sold by Licensee and/or its sublicensees, the sale of which forced reset triggers is, at the time of such sale, covered by a valid claim of the Licensed Patents and/or the '884 Application. The royalty rate may be set or changed within this range from time to time, as necessary, by agreement between the Licensor and Licensee.

2) Forced Reset Triggers shall be deemed to have been sold when billed or when shipped to a wholesale or retail consumer, whichever shall first occur.

IV. Reports and payments.

1) At least quarterly and before the end of the month following the end of each calendar quarter year up to and including the calendar quarter following the termination or expiration of this Agreement, Licensee shall render or have rendered on its behalf a report to Licensor setting forth for the preceding calendar quarter:

a) the quantity of Forced Reset Triggers sold in respect of which royalty is payable hereunder,; and
b) the amount of royalty payable with respect thereto; and
c) such other information (if any) as may be necessary to show the basis on which the amount of royalty has been computed.

2) In case no payment is due hereunder for any calendar quarter year, Licensee shall so report. Royalty payable by Licensee to Licensor hereunder shall accompany each such report.

3) All amounts payable hereunder by Licensee to Licensor shall be payable in United States funds. In the event any Forced Reset Triggers shall be sold by Licensee and/or its sublicensees for funds other than United States funds, the net sales value of such forced reset triggers so sold shall first be determined in the funds of the currency for which the forced reset triggers were sold and then converted into its equivalent in United States funds at:
a) the rate applicable to the transfer of funds arising from royalty payments as established by the exchange rate for the last business day of the accounting period for which payment is thus made; or
b) if there is no applicable rate so established, then the selling rate for United States funds as published by leading commercial banks in the major city of the country of which such currency, for the last business day of such accounting period.

V. Examination of books and records.

1) Licensee shall keep, and shall cause its sublicensees to keep, full and true books of account and other records in sufficient detail so that the royalty payable to Licensor hereunder can be properly ascertained.

2) Upon no less than thirty days advance written notice, and within one year following the applicable annual sales period (the "Audit Period"), Licensor, at its expense, may appoint an independent certified public accountant to audit directly applicable sales records of Licensee at Licensee's principal place of business for the sole purpose of verifying Royalties due Licensor. An audit shall take place during regular business hours and shall not occur more than once during any twelve-month period. The certified public accountant should not be engaged in any other audit of Licensor or licensee, or on a contingency-fee basis, and must provide to Licensee a confidentiality agreement that protects Licensee's confidential information no less than the terms of this Agreement or as Licensee protects its own similar information. Licensor may audit a royalty period only once, and no audit

shall be conducted for a period spanning less than six months. A copy of any audit report shall be provided to Licensee but shall not by itself be conclusive or binding as to any reported finding.

3) In the event the audit reveals an overpayment by Licensee, the excess shall be credited to the next License Term. In the event the audit reveals underpayment of royalties, the deficiency must be paid by Licensee to Licensor within thirty days after the audit report. If the audit report reveals an underpayment by 10% or more, the cost of the audit shall be borne by Licensee.

VI. Prosecution and Maintenance of Licensed Patents. To the extent it has not done so:

1) Licensor, through its own attorneys and at its own expense and cost, shall cause to be filed and/or prosecuted any patent applications pertaining to and/or covering any and all Future Patents.

2) It shall be the obligation of Licensor to pay ongoing patent maintenance fees for the Licensed Patents as well as the '884 Application and its progeny, but in the event Licensor is unable or unwilling to pay such patent maintenance fees, Licensee may pay such patent maintenance fees, at which time any sum paid as patent maintenance fee will be offset from any owed royalty amount pursuant to Section II or IV of this Agreement.

VII. Duration and termination.

3) This Agreement shall, unless sooner terminated as hereinafter provided, remain in full force and effect until the expiration of the last of the Licensed Patents to expire or patent based on the '884 Application and its progeny, whichever occurs later.

4) In the event that one of either the Licensed Patents or patent based on the '884 Application and its progeny expires but not both, Licensee's obligation to pay a royalty to Licensor during the term of this Agreement shall terminate only with respect to that instrument which has expired.

5) Licensee may terminate this Agreement at any time upon not less than ninety (90) days' prior written notice to that effect to Licensor.

6) In the event that Licensee shall at any time fail to make payments, render reports, or otherwise abide by the conditions herein provided, Licensor shall have the right to notify Licensee of such default and that Licensor intends to terminate this Agreement unless such default is corrected within thirty (30) days.

7) Licensor, at its discretion, may terminate this Agreement in the event the ownership of Licensee changes. Licensor may terminate this Agreement in whole or with respect to one or more specific Licensed Patent(s), with or without cause, by unanimous vote of the members of Licensor who are not also members of Licensee.

8) The termination of this Agreement for any reason shall be without prejudice to Licensor's right to receive any payments accrued and unpaid at the effective date of such termination, to the provisions of Section III or VII hereof as to periods prior to termination, and to the remedy of either party hereto in respect of any previous breach of any of the covenants herein contained.

9) The termination of this Agreement for any reason shall terminate any sublicenses granted by Licensee and Licensee shall, upon termination of this Agreement, assign to Licensor all of Licensee's rights and obligations in and under such sublicenses and Licensor shall assume the same.

VIII. Enforcement. In the event any of the Licensed Patents need to be enforced against an infringer, Licensor may, but is not required to, include Licensee as a plaintiff and, if so joined, the Parties shall mutually participate in any legal action against such an infringer to resolve the dispute, whether by civil action or otherwise.

IX. Law to govern. This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to principles of conflicts of law. The Parties to this Agreement will submit all disputes arising under this Agreement to binding arbitration in Orlando, Florida, before a single arbitrator using the Commercial Rules of the American Arbitration Association ("AAA"), whether the arbitrator is independent or with another arbitration organization. The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the Parties, except that such arbitrator must be an attorney admitted to practice law in Florida. No Party to this Agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent a Party from seeking an injunction for equitable relief.

X. General.

1) All prior agreements, representations and understandings, oral or written, between the Parties and/or their representatives, if any exist, are hereby terminated, replaced, and superseded by this Agreement.

2) This Agreement shall be interpreted as if jointly written by both Parties and cannot be modified at any time except by a writing, signed by an officer of each Party.

3) The Parties acknowledge, represent and warrant that, in entering this Agreement, each Party has made an independent investigation of the facts and is not relying upon any statements or representations, other than those contained herein, made by the other Party, its agents or representatives, and that no one, including any of the Parties' agents, employees, attorneys or representatives, has made any promise, representation or warranty relating to, or offered any inducement to enter into this Agreement, except as recited herein.

4) If any part, term or provision of this Agreement is declared or determined by any court to be illegal or invalid, such illegal or invalid part, term or provision shall be deemed not a

part of this Agreement, and the validity of the remaining parts, terms, or provisions shall not be affected or impaired thereby and shall remain in full force and effect.

5) Neither party shall have the right to assign this Agreement or any rights or obligations hereunder without the consent of the other Party; provided, however, that this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of each Party, and their respective successors and assigns.

6) This agreement is for the benefit of and enforcement by only the Licensor and Licensee and does not create or provide any rights to third parties.

7) The undersigned corporate representatives represent and warrant that they have full authority to execute this Agreement on behalf of the respective corporations to bind such corporations to the terms hereof, and that all necessary action has been taken to authorize the same.

8) This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates indicated below.

**ABC IP, LLC**

By: Cole Leleux
Cole Leleux, Managing Member

Date: 10/20/2022

**RARE BREED TRIGGERS, LLC**

By: ______________________
Lawrence DeMonico, President

Date: 10-20-2022