[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM**<br>**MDL 3176**<br>[redacted] |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>AS DESIGNS, LLC, and MATTHEW S. KARLOVIC, and CALVIN OLSON, and JOHN DOE,<br>Defendants. | Civil Action No. 4:26-cv-00370-ALM |

**DECLARATION OF RICHARD J. EICHMANN IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

[redacted]

Secretariat

***Civil Action No. 4:26-cv-00370-ALM***

ABC IP, LLC and Rare Breed Triggers, Inc.,

**Plaintiffs,**

v.

AS DESIGNS, LLC, Matthew S. Karlovic, Calvin Olson, and John Doe,

**Defendants.**

Submitted by:

Richard J. Eichmann
September 2, 2026
United States District Court
Eastern District of Texas Sherman Division
In Re: Rare Breed Triggers Patent Litigation
4:26-md-03176-ALM
MDL 3176

[redacted]

**Table of Contents**

I. Qualifications, Assignment, and Scope of Opinions ... 4

II. The ARHK and the Relevant Competitive Setting ... 7

III. The FRT-RD3 Has Become Economically Important to Rare Breed ... 11

IV. The ARHK Is a Close Competitive Substitute for the FRT-RD3™ ... 15

V. The Announced ARHK Launch Creates Immediate and Concentrated Diversion Risk ... 20

VI. Durable-Goods Displacement and Lost Customer Opportunities ... 25

VII. Price Pressure and Reference-Price Effects ... 29

VIII. Loss of Lead Time and Remaining Market Exclusivity ... 33

IX. Dealer, Channel, and Product-Development Effects ... 39

X. Retrospective Monetary Relief Would Not Fully Restore the Lost Market Opportunity ... 42

XI. Conclusion ... 48

[redacted]

## I. Qualifications, Assignment, and Scope of Opinions

1. My name is Richard J. Eichmann. I am a Managing Director at Secretariat Advisors, LLC ("Secretariat"), an economic consulting firm that provides expert testimony, economic analysis, and valuation services in complex litigation. I have more than 30 years of experience in economic consulting, including more than 28 years focused on litigation-related engagements. My work includes the analysis and quantification of lost profits, reasonable royalties, price erosion, business-value effects, and other forms of economic harm arising in intellectual-property and commercial disputes. I hold the Certified Valuation Analyst ("CVA") and Master Analyst in Financial Forensics ("MAFF") designations from the National Association of Certified Valuators and Analysts. My qualifications are described more fully in my curriculum vitae and in my prior declarations in this matter.[1]

2. On April 24, 2026, I submitted the Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction (the "AS Designs Eichmann Declaration"). In that declaration, I evaluated the economic characteristics of the alleged harm associated with AS Designs, LLC's ("AS Designs") manufacture, marketing, and sale of the Super Safety and ARC-Fire products and addressed whether retrospective monetary relief would provide an adequate economic remedy.[2]

3. On August 6, 2026, I submitted a Reply Declaration in Support of Plaintiffs' Motion for Preliminary Injunction (the "AS Designs Eichmann Reply Declaration"). That declaration considered additional AS Designs–specific evidence, including sales, dealer, pricing, financial, and deposition evidence, and refined certain opinions expressed in my April 24 Declaration. Among other things, I concluded that AS Designs had displaced Rare Breed sales or other purchasing opportunities on an economically meaningful, rather than nominal, scale, while also recognizing that a final diversion rate and damages amount would require additional analysis. I further concluded that retrospective monetary relief was unlikely to

---

[1] Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, August 6, 2026 ("AS Designs Eichmann Reply Declaration"), ¶ 1 and **Appendix 1** of this declaration.

[2] Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026 ("AS Designs Eichmann Declaration"), ¶¶ 1–4.

[redacted]

provide a reasonable economic equivalent for the combined customer, channel, pricing, and market-timing effects reflected in the record.[3]

4. I have now been asked by counsel for ABC IP, LLC and Rare Breed Triggers, Inc. ("ABC" and "Rare Breed," respectively; "Plaintiffs," collectively) to evaluate the additional economic issues presented by AS Designs' announced ARHK product in connection with Plaintiffs' request for temporary injunctive relief. In particular, I have been asked to assess the economic significance of the ARHK's anticipated entry into the market for forced reset triggers designed for HK roller-delayed firearm platforms, including its competitive relationship with Rare Breed's FRT-RD3™ products, the significance of the timing and scale of the announced launch, and whether the resulting economic effects would be adequately remedied through retrospective monetary relief.

5. In performing this assignment, I rely on and incorporate, to the extent applicable, the economic principles and opinions set forth in my April 24 Declaration and August 6 Reply Declaration. I also incorporate, to the extent applicable, my prior discussion of reputational effects, subject to the limitations and clarifications stated in my August 6 Reply Declaration. I do not repeat those analyses here except where necessary to explain how the ARHK changes or sharpens the economic issues previously addressed. Where my August 6 Reply Declaration narrowed, qualified, or refined an opinion expressed in my April 24 Declaration, I apply the narrower formulation here.[4]

6. I have also reviewed the Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Temporary Restraining Order concerning the ARHK, dated September 1, 2026, and Exhibits 1 through 78 thereto. Those materials include Rare Breed and AS Designs product pages, AS Designs' public product and production announcements, manufacturer information concerning compatible firearm platforms, customer reviews, and public discussions comparing the ARHK and FRT-RD3™. A full list of the documents that I reviewed and relied upon is found in **Appendix 2**. I also analyzed Rare Breed's transaction-

[3] AS Designs Eichmann Reply Declaration, ¶¶ 2–15.

[4] AS Designs Eichmann Declaration, ¶¶ 40–45; AS Designs Eichmann Reply Declaration, ¶¶ 13–15, 46–56, 76, 97–99, 121–123, and 149–155.

[redacted]

level shipment data and prepared schedules. Those schedules trace the transaction fields, product classifications, source inputs, and calculations underlying the June 2026 sales results and May–June 2026 reported trigger-profit measure discussed below. I treat AS Designs' public statements as evidence of how it markets the ARHK and describes its intended launch; I do not treat forward-looking production statements as proof of completed inventory, actual availability, demand, or sales.[5]

7. My opinions in this declaration are economic opinions. I do not offer legal opinions and do not opine on infringement, patent validity, enforceability, inventorship, ownership, willfulness, or any other question of patent law. I also do not independently determine whether the ARHK practices any asserted patent claim. For purposes of my economic analysis, I assume the technical and infringement-related facts described by Plaintiffs' technical witnesses and counsel where those facts are relevant to the competitive issues I address.

8. I have not been asked at this stage to calculate a final lost-profits amount, determine a final numerical diversion rate, quantify price erosion attributable specifically to the ARHK, or offer a reasonable-royalty rate. Nor do I assume that every prospective ARHK purchaser otherwise would have purchased a Rare Breed product. My opinions instead concern the economic mechanisms of competitive displacement, the significance of the ARHK's entry into the relevant segment, and the extent to which retrospective monetary relief would provide an economically equivalent remedy for the effects presently supported by the record.

9. Based on the materials presently available, I conclude that the ARHK presents a materially different competitive circumstance from AS Designs' earlier MP5-related offerings because it is positioned as a factory-housing-compatible, drop-in forced reset trigger for the same roller-delayed firearm segment in which Rare Breed currently offers the FRT-RD3™. I further conclude that the ARHK's announced lower price, overlapping functionality and platform compatibility, documented customer comparisons, and planned concentrated

---

[5] Declaration of Lawrence DeMonico, September 1, 2026 ("DeMonico ARHK Declaration"), and Exhibits 1–78 thereto; Rare Breed Triggers, Inc., ShipStation transaction-level shipment data through July 22, 2026 (the "Rare Breed Transaction Data"); Eichmann Schedules.

[redacted]

launch create a direct and economically meaningful risk of diversion from Rare Breed during a limited and commercially important period. These opinions are addressed in the sections that follow.

10. I reserve the right to supplement or revise these opinions if additional relevant documents, data, testimony, or updated sales information become available.

## II. The ARHK and the Relevant Competitive Setting

11. The economic setting presented by the ARHK differs in important respects from the broader forced reset trigger market addressed in my prior declarations. The FRT-RD3™ is designed for the HK MP5, MP5K, SP5, and SP5K platforms and related clones and variants, which I refer to collectively as "MP5-family firearms." The ARHK is directed to those firearms and additional roller-delayed platforms, rather than principally to the larger installed base of AR-15-pattern firearms. I understand from Mr. DeMonico that the United States installed base of MP5-family firearms is substantially smaller than the installed base of AR-15-pattern firearms. Public manufacturer materials also provide examples of materially higher posted prices for several MP5-family hosts: HK lists an MSRP of $3,679 for the SP5; PTR lists variants of the 9CT at $1,889 and $1,989; Zenith lists the ZF-5 Essentials Package at $1,799; and Century Arms lists the AP5 at an MSRP beginning at $1,359.95.[6] By comparison, the cited AR-15-pattern examples include Ruger models with MSRPs of $699 and $749 and the Smith & Wesson M&P15 Sport III at $799.[7] These examples are not comprehensive samples, do not establish average transaction prices, and are not used to calculate an installed-base or price ratio. They are consistent with the narrower proposition that several MP5-family hosts identified in the record are materially more expensive than the cited AR-15 examples.[8]

12. That distinction matters economically because the relevant purchasing opportunities are correspondingly more limited. In a broad market with a large installed base, the introduction

6 DeMonico ARHK Declaration, Exs. 10, 11, 12, and 13.

7 DeMonico ARHK Declaration, Exs. 14 and 15.

8 DeMonico ARHK Declaration, ¶¶ 20, 25–30; DeMonico ARHK Declaration, Exs. 8, 10, 11, 12, 13, 14, and 15.

[redacted]

of a competing accessory may affect only a relatively small portion of the total pool of potential purchases at any particular time. In a narrower product segment, by contrast, each completed purchase represents a larger portion of the finite pool of available demand. As I explained in my April 24 declaration, these characteristics can magnify the economic importance of early competitive displacement because each substitution reduces the remaining pool of uncommitted demand available to the incumbent.[9]

13. Rare Breed has offered two versions of its FRT-RD3™ forced reset trigger for MP5-family firearms: the FRT-RD3™ (SEF), advertised at $615, and the FRT-RD3™ (AMBI), advertised at $620.[10] Rare Breed's product pages describe the products as three-position forced reset triggers compatible with the HK MP5, MP5K, SP5, and SP5K platforms, operating with the factory semi-automatic bolt carrier and requiring no modification to the firearm. Mr. DeMonico further states that Rare Breed designed the FRT-RD3™ as a self-contained cassette installed within the relevant trigger housing. The captured Rare Breed product pages display the products as "SOLD OUT" and "Out of stock." I therefore rely on those pages for the advertised product characteristics and prices, but not as evidence that either configuration was continuously in stock or available for immediate purchase as of the date of this declaration.[11]

14. AS Designs' earlier MP5-related configurations identified in the record differed materially from the announced ARHK configuration. AS Designs' product materials offered a replacement MP5 lower for use with its Super Safety system and a separate MP5 slip trip. Its slip-trip page states that using a Super Safety or ARC-Fire in an MP5 requires "a new lower" and an MP5 slip trip, and that the slip trip "does NOT work with stock MP5 lowers." I do not interpret these materials as establishing that no other competing configuration existed. Their economic relevance is narrower: AS Designs' own earlier identified

---

9 AS Designs Eichmann Declaration, ¶¶ 10–17.

10 DeMonico ARHK Declaration, ¶ 33.

11 DeMonico ARHK Declaration, ¶¶ 20, 29–34; DeMonico ARHK Declaration, Ex. 8 at 1, 3.

[redacted]

configuration required replacement or additional platform components that the announced ARHK is marketed as eliminating.[12]

15. The ARHK is significant because AS Designs itself markets it as a "fully self-contained drop-in cassette trigger unit" designed for HK roller-delayed platforms. AS Designs states that it installs directly into factory OEM polymer housings without modification and without additional trips, buffers, or auxiliary host components. AS Designs also advertises Safe, Semi, and "Active Reset" positions and compatibility with the MP5, MP5K, AP53, G3/91, HK21, HK31, HK11, HK32, HK33, and related clones and variants. I rely on these statements as evidence of the product characteristics AS Designs represents to prospective purchasers, not as an independent technical verification that the ARHK performs as represented in every listed host.[13]

16. The economic importance of that increased similarity is straightforward. Where two products satisfy the same core functional need, fit the same underlying firearm platform, and are offered in a similar drop-in form, the number of product attributes separating the purchasing alternatives is reduced. That does not mean the products are economically identical, nor do I assume that every prospective purchaser would view them as interchangeable. It does mean, however, that the ARHK would compete for a set of purchasing opportunities that overlaps more directly with the FRT-RD3™ than the prior AS Designs MP5 configurations that required the purchaser to replace the original housing. This is consistent with the principle stated in my August 6 declaration that product differentiation may affect the magnitude of diversion without eliminating direct competitive displacement.[14]

---

12 DeMonico ARHK Declaration, Ex. 45 at 1; Ex. 57 at 1; Ex. 58 at 1; AS Designs Eichmann Declaration, ¶ 5 & n.6; AS Designs Eichmann Reply Declaration, ¶¶ 132–137.

13 DeMonico ARHK Declaration, Ex. 18 at 1; Ex. 21 at 1; Ex. 28 at 1.

14 AS Designs Eichmann Reply Declaration, ¶¶ 23–30; Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd ed. (Reading, MA: Addison-Wesley 2000), ch. 7 (Product Differentiation and Monopolistic Competition); Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), ch. 7, "Product Differentiation: Price Competition and Non-Price Competition," Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.

[redacted]

17. The advertised pricing also creates a direct competitive dimension. AS Designs lists the ARHK at $549.99, while Rare Breed's product pages list $615 for the FRT-RD3™ (SEF) and $620 for the FRT-RD3™ (AMBI). The resulting advertised difference is approximately $65 to $70 per unit, or approximately 10 to 11 percent of the cited FRT-RD3™ prices. These are posted prices rather than verified net realized transaction prices, and price is not the only attribute affecting customer choice. Nevertheless, the combination of overlapping functionality, similar drop-in configuration, overlapping platform compatibility, and a lower advertised price provides a direct economic mechanism through which the ARHK could compete for purchasing opportunities otherwise available to the FRT-RD3™.[15]

18. The available record also contains public comments in which prospective purchasers place the ARHK and FRT-RD3™ within the same purchasing decision. One discussion is expressly titled "AS Designs ARHK vs. RB FRT-RD3," and includes a commenter stating that he was "holding out" for the ARHK. Another purchaser stated that he "couldn't wait on AS Designs anymore" and purchased the Rare Breed product when it became available. A separate commenter stated that the ability to use the anticipated AS Designs product with 5.56 and .308 rifles was "the only reason" he had not ordered a Rare Breed product. I do not treat these comments as a statistically representative sample, verified purchase records, or a basis for calculating a diversion rate. Their more limited significance is that they provide observed examples of purchasers comparing the two products and changing purchase timing based on anticipated availability or compatibility.[16]

19. Accordingly, the economic issue presented by the ARHK is not simply the addition of another forced reset product to the broader marketplace. The ARHK is an announced entrant into a narrower roller-delayed segment in which Rare Breed presently offers a differentiated factory-housing-compatible product. Based on the product characteristics, pricing, and customer comparisons presently available, I conclude that the ARHK is positioned to compete directly with the FRT-RD3™ for at least a meaningful subset of the same purchasing opportunities. The consequences of that entry are particularly important because,

---

15 DeMonico ARHK Declaration, Ex. 8 at 1, 3; Ex. 18 at 1; AS Designs Eichmann Reply Declaration, ¶¶ 58–63.

16 DeMonico ARHK Declaration, Ex. 24 at 1–2; Ex. 32 at 1; Ex. 40 at 5.

[redacted]

as discussed in the following section, the FRT-RD3™ was economically material to Rare Breed's business by June 2026.

## III. The FRT-RD3 Has Become Economically Important to Rare Breed

20. Rare Breed launched the FRT-RD3™ in late February 2026. I independently analyzed Rare Breed's transaction-level shipment data. That analysis identifies [redacted] commercial FRT-RD3™ units shipped in June 2026, consisting of [redacted] FRT-RD3-AMBI units and [redacted] FRT-RD3-SEF units.[17] June is the most recent complete month for which I have been provided product-level sales information. Because the FRT-RD3™ was commercially available for only part of February, I do not compare the [redacted] commercial units identified in the February transaction data with a complete subsequent month or use that comparison to calculate a monthly growth rate.[18]

21. Combining the FRT-RD3-AMBI and FRT-RD3-SEF configurations as a single product family, my analysis shows that the FRT-RD3™ generated [redacted] in pre-tax line revenue during June 2026. [redacted], [redacted][19] According to Mr. DeMonico, the relevant manufacturing costs are [redacted] per unit for the FRT-RD3™ (SEF) and [redacted] per unit for the FRT-RD3™ (AMBI), and the applicable royalty is [redacted] per unit.[20] Applying those inputs to the transaction-derived units and realized revenue for May and June produces a reported trigger-profit measure of [redacted] for the FRT-RD3™ and [redacted] for all included trigger families. The FRT-RD3™ therefore accounted for approximately [redacted] percent of the total reported trigger-profit measure for those included families during May and June. I independently recalculated

---

[17] Eichmann Schedules, Schedule 1.

[18] Rare Breed Transaction Data; Eichmann Schedules, Schedule 1 and Transaction Detail; DeMonico ARHK Declaration, ¶ 33. Commercial units are quantities on transaction lines with positive quantity and positive Line Revenue; the FRT-RD3™ total combines the AMBI and SEF configurations.

[19] Rare Breed Transaction Data; Eichmann Schedules, Schedule 1.

[20] DeMonico ARHK Declaration, ¶ 71 & n.2; DeMonico ARHK Declaration, Ex. 1, Exclusive Patent License Agreement, § III.1.

[redacted]

that result in Schedule 2 and reconciled the cost and royalty inputs to the amounts stated by Mr. DeMonico.[21]

22. The independently calculated June sales results and independently recalculated May–June reported trigger-profit measure provide materially more developed evidence concerning the FRT-RD3™'s economic importance than was available when I submitted my April 24 Declaration. At that time, my analysis addressed the FRT market more broadly. The current record shows that, in June 2026, Rare Breed's roller-delayed product family generated approximately [redacted] million in pre-tax line revenue and [redacted] It also accounted for [redacted] percent of the reported trigger-profit measure for May and June. The potential economic effect of ARHK entry is therefore not confined to a peripheral or experimental product line; it concerns a product family that was a substantial contributor to Rare Breed's operating results.[23]

23. These results also show why the ARHK's economic significance should be evaluated within the narrower roller-delayed segment rather than against Rare Breed's broader AR-15 business. By June 2026, the FRT-RD3™ already contributed materially to Rare Breed's current revenue and reported trigger-profit measure within a product category that constitutes Rare Breed's entire business.[24]

24. The transaction data also permit comparison of Rare Breed's stated retail prices with its observed revenue. During May and June 2026, average pre-tax line revenue per commercial unit was approximately [redacted] for the FRT-RD3-SEF and [redacted] for the FRT-RD3-

---

[21] Rare Breed Transaction Data; Eichmann Schedules, Schedule 2; DeMonico ARHK Declaration, ¶¶ 41, 71 & n.2; DeMonico ARHK Declaration, Ex. 1, Exclusive Patent License Agreement, § III.1. The transaction-level calculations reflected in the Eichmann Schedules exclude identified duplicate source observations before aggregation. The [redacted] denominator is the aggregate reported trigger-profit measure for qualifying May–June commercial transactions for the FRT-15L3, FRT-15C3, FRT-MR3, FRT-RD3-AMBI, FRT-RD3-SEF, and FRT-SG3 product families. The FRT-RD3™ numerator is [redacted]. Accordingly, [redacted] which rounds to [redacted]. DeMonico Exhibit 35 is a separately generated monthly summary; my calculations are based on the duplicate-adjusted transaction-level data described above.

[22] Eichmann Schedules, Schedule 1.

[23] Rare Breed Transaction Data; Eichmann Schedules, Schedules 1–2; see also DeMonico ARHK Declaration, ¶¶ 63, 71; AS Designs Eichmann Declaration, ¶¶ 54–57.

[24] *See* supra ¶¶ 20–22; DeMonico ARHK Declaration, ¶¶ 24, 63, 71.

[redacted]

AMBI, closely corresponding to the stated retail prices of $615 and $620, respectively.[25] Mr. DeMonico reports manufacturing costs of [redacted] for the SEF model and [redacted] for the AMBI model and a [redacted] per-unit royalty. At the stated retail prices, subtracting those reported inputs produces residual amounts of [redacted] for the SEF model and [redacted] for the AMBI model. I refer to those amounts as the "reported list-price residuals."[26]

25. The reported list-price residuals are not my final lost-profits calculation, and I do not assume that every ARHK sale will correspond one-for-one with a lost FRT-RD3™ sale. That limitation does not mean that I regard diversion as unlikely. As discussed below, the ARHK is positioned as a close competitive substitute for the FRT-RD3™ for at least a meaningful subset of purchasers, and the current record supports the conclusion that at least some ARHK sales are likely to displace purchasing opportunities otherwise available to Rare Breed. The [redacted] royalty is an expense to Rare Breed and revenue to ABC. Any later damages analysis should therefore evaluate the alleged loss to each plaintiff separately and treat the intercompany royalty consistently to avoid double counting. Using those reported inputs, an FRT-RD3™ sale produces a positive residual for Rare Breed after the identified manufacturing cost and royalty while also generating royalty revenue for ABC. The amount of any recoverable loss would depend on causation, diversion, realized price, quantity, and the complete incremental-cost evidence.[27]

26. The timing of the threatened ARHK entry remains economically relevant without assuming that FRT-RD3™ sales continued to grow after June 2026. The FRT-RD3™ remains relatively early in its commercial life, having launched only in late February 2026. As discussed in my prior declarations, early commercialization periods can be economically significant because firms may use those periods to establish customer relationships, product visibility, operating experience, and channel position that may affect subsequent sales.[28] To

---

25 Eichmann Schedules, Schedule 2; DeMonico ARHK Declaration, Ex. 8.

26 Eichmann Schedules, Schedule 2; DeMonico ARHK Declaration, ¶¶ 41, 71 & n.2; DeMonico ARHK Declaration, Ex. 1, Exclusive Patent License Agreement, § III.1.

27 *Ibid*.

28 AS Designs Eichmann Declaration, ¶¶ 14–19 and 54–57; AS Designs Eichmann Reply Declaration, ¶¶ 124–131 and 138–148.

[redacted]

the extent a purchasing opportunity is diverted during this stage, a later transaction does not necessarily provide the same timing, customer contact, or market-development opportunity.

27. As I reported in my July 31, 2026 Atrius Declaration, Rare Breed's historical transaction records provide case-specific evidence concerning the scale of commercial activity during the FRT-RD3™ launch period. During their respective first 120 days, the FRT-RD3-AMBI and FRT-RD3-SEF product families together generated approximately [redacted] in pre-tax line revenue and accounted for [redacted] commercial units. The FRT-RD3-AMBI reached [redacted] unique customers across [redacted] states, while the FRT-RD3-SEF reached [redacted] unique customers across [redacted] states.[29] Because the ARHK has not yet commercially launched, these historical results do not measure ARHK diversion or establish the sales Rare Breed would make following ARHK entry, and I do not use them as a forecast. They show that the FRT-RD3™'s early commercialization period involved substantial transaction volume, geographic reach, and customer acquisition before the anticipated ARHK launch.

28. My August 6 Reply Declaration similarly explained that historical commercial success does not establish that the economic value of lead time has been exhausted.[30] An earlier entrant can realize meaningful sales and still lose additional economic value when competition enters before the firm has fully converted its earlier position into later sales, customer relationships, product extensions, dealer development, operating experience, and market position.[31] That reasoning applies with particular force to the FRT-RD3™, which is still within the first several months of its commercial launch.

29. The most recent complete month for which I have been provided product-level monthly sales information is June 2026. Rare Breed's transaction-level shipment data extend through July

---

[29] Declaration of Richard J. Eichmann in Support of Counterclaim-Plaintiffs' Motion for Preliminary Injunction, July 31, 2026 ("Atrius Eichmann Declaration"), ¶ 38 & Schedule 1; Rare Breed Transaction Data. The FRT-RD3 analysis combines FRT-RD3-AMBI and FRT-RD3-SEF for revenue and commercial-unit totals. The calculations exclude zero-price warranty and replacement shipments, shipping charges, accessories, merchandise, donations, and other non-trigger items. Revenue is pre-tax line revenue. Unique-customer counts are reported separately by FRT-RD3 configuration using Customer ID; state counts are based on shipment destination.

[30] AS Designs Eichmann Reply Declaration, ¶ 189.

[31] AS Designs Eichmann Reply Declaration, ¶¶ 124–131.

[redacted]

22, 2026, but July represents an incomplete month, and I do not compare that partial-month activity with complete prior months.[32]

30. Based on the presently available record, I conclude that the FRT-RD3™ has become economically material to Rare Breed's current business. It generated [redacted] commercial units and [redacted] in pre-tax line revenue during June 2026, making it Rare Breed's [redacted]. For May and June combined, my independent recalculation shows that it accounted for [redacted] percent of the reported trigger-profit measure shown in Schedule 2. Those results establish that competitive entry directed specifically at the FRT-RD3™ concerns an important existing product line rather than a peripheral or experimental offering. My conclusion does not depend on any assumption concerning sales after June 2026.[33]

## IV. The ARHK Is a Close Competitive Substitute for the FRT-RD3™

31. The economic significance of the ARHK also depends on the degree to which prospective purchasers view it as an alternative to Rare Breed's FRT-RD3™. The current record supports the conclusion that the two products compete for overlapping purchasing opportunities. According to Mr. DeMonico, both are forced reset trigger products designed for HK roller-delayed firearms, both are offered in a self-contained cassette form that installs within the firearm's factory trigger housing, and both are intended to provide forced reset functionality without requiring the purchaser to replace the firearm's original external trigger housing.[34]

32. These similarities materially reduce the degree of differentiation that previously existed between the FRT-RD3™ and AS Designs' earlier MP5-related offerings. AS Designs' earlier identified configuration employed a replacement lower and separate slip-trip component, and its own slip-trip page states that the component does not work with stock MP5 lowers. By contrast, AS Designs markets the ARHK as a fully self-contained cassette

---

32 Rare Breed Transaction Data.

33 Rare Breed Transaction Data; Eichmann Schedules, Schedules 1–2; *see also* DeMonico ARHK Declaration, ¶¶ 63, 71.

34 DeMonico ARHK Declaration, ¶¶ 31, 33–35, 49–56.

[redacted]

that installs directly into factory OEM polymer housings without modifications or additional trips, buffers, or auxiliary host parts.[35]

33. Mr. DeMonico states that Rare Breed designed the FRT-RD3™ to preserve the relevant factory-housing appearance. The record contains customer reviews referring to a "factory" or "OEM" appearance and, in some instances, expressing dissatisfaction with prior configurations perceived as detracting from the MP5's appearance. AS Designs likewise emphasizes in its ARHK marketing that the product installs in factory OEM polymer housings without modification. This evidence supports the conclusion that factory-housing compatibility is a product attribute considered by at least some purchasers.[36]

34. I have not conducted a survey or other statistical study to determine the percentage of roller-delayed firearm owners for whom external appearance or factory configuration affects purchasing decisions. The reviews cited above were displayed on Rare Breed's own product website and may reflect selection, publication, or response effects. I therefore do not treat them as representative of the market or use them to quantify demand. Their limited economic significance is that they identify an attribute valued by at least some purchasers, while AS Designs' own emphasis on installation within factory OEM housings independently demonstrates that AS Designs considers the same attribute relevant to marketing the ARHK.[37]

35. The products also overlap in core functionality. AS Designs advertises the ARHK as having three selectable positions, Safe, Semi, and "Active Reset," and states that in its third position the ARC-Fire clutch is engaged for active reset. Mr. DeMonico describes Rare Breed's FRT-RD3™ as likewise operating in safe, traditional semi-automatic, and forced reset semi-automatic modes.[38] I do not independently opine on the technical operation of the ARHK or whether it practices any asserted patent claim. For purposes of my economic analysis, the

---

35 AS Designs Eichmann Declaration, ¶ 5 & n.6; AS Designs Eichmann Reply Declaration, ¶¶ 132–137; DeMonico ARHK Declaration, Ex. 18 at 1; Exs. 45, 57–58.

36 DeMonico ARHK Declaration, ¶¶ 29–31; DeMonico ARHK Declaration, Ex. 17 at 2, 5; Ex. 18 at 1; Ex. 28 at 1.

37 DeMonico ARHK Declaration, Ex. 17 at 2, 5; Ex. 18 at 1; Ex. 21 at 1; Ex. 28 at 1.

38 DeMonico ARHK Declaration, ¶¶ 22, 33, 50.

[redacted]

relevant point is that AS Designs markets the ARHK as providing the same general category of forced reset functionality sought by purchasers of the FRT-RD3™.

36. Platform compatibility further increases the overlap. Rare Breed's FRT-RD3™ models are designed for MP5-family firearms in SEF and AMBI configurations. AS Designs advertises the ARHK as compatible with the MP5, MP5K, and related variants, among other roller-delayed firearms.[39] The products therefore compete for at least a common installed base of MP5-family firearms. Broader advertised ARHK compatibility may affect the product's relative attractiveness to some customers, but it does not reduce the competitive overlap within the platforms served by both products.

37. The pricing evidence provides another dimension of direct competition. Rare Breed advertises the FRT-RD3™ (SEF) at $615 and the FRT-RD3™ (AMBI) at $620. AS Designs advertises the ARHK at $549.99 with free shipping. The resulting advertised price difference is approximately $65 to $70 per unit, or roughly 10 to 11 percent below the cited FRT-RD3™ prices.[40]

38. I do not assume that every purchaser selects between the products based primarily on price. As I explained in my August 6 Reply Declaration, differentiated products can compete directly even where purchasers consider multiple attributes, including price, configuration, installation requirements, platform compatibility, trigger characteristics, brand, and other product-specific features.[41] Product differences may affect the magnitude of diversion; they do not eliminate substitution where the products satisfy the same core need for at least some purchasers.

39. The record contains direct but anecdotal evidence that prospective customers perceive the FRT-RD3™ and ARHK as alternatives. Public discussions compare the products by name,

---

[39] DeMonico ARHK Declaration, ¶¶ 20, 25, 33, 51; DeMonico ARHK Declaration, Ex. 8 at 1, 3; Ex. 18 at 1.

[40] DeMonico ARHK Declaration, ¶¶ 56, 75; DeMonico ARHK Declaration, Ex. 8 at 1, 3; Ex. 18 at 1.

[41] AS Designs Eichmann Reply Declaration, ¶¶ 23–30, 58–63; Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd ed. (Reading, MA: Addison-Wesley, 2000), ch. 7, "Product Differentiation and Monopolistic Competition"; Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), ch. 7, "Product Differentiation: Price Competition and Non-Price Competition," Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.

[redacted]

price, factory-housing configuration, expected release timing, and cross-platform compatibility. One discussion is titled "AS Designs ARHK vs. RB FRT-RD3," while another commenter explained that broader compatibility with 5.56 and .308 rifles was the reason he had not ordered the Rare Breed product. These statements are product-specific comparisons rather than generalized discussion of forced reset triggers.[42]

40. Some comments also describe purchase timing. One commenter stated that he was "holding out" for the ARHK. Another reported that he "couldn't wait on AS Designs anymore" and purchased the Rare Breed product when it was in stock. A third stated that he could have purchased a Rare Breed trigger but instead decided to wait and spend his money with AS Designs. These examples show both possible deferral while awaiting the ARHK and a completed Rare Breed purchase when the purchaser became unwilling to continue waiting.[43]

41. I do not treat these online comments as a statistically representative sample, and I do not extrapolate a diversion percentage from them. I also have not verified the commenters' identities, firearm ownership, purchasing histories, or subsequent conduct. Certain comments express views about Rare Breed or its enforcement activities unrelated to the ARHK's price or product characteristics. I therefore do not attribute every stated decision to ARHK product competition. They nevertheless provide some direct evidence of the substitution mechanism.

42. This evidence is consistent with the economic principles discussed in my August 6 Reply Declaration. There, I explained that product differentiation does not eliminate direct competitive displacement and that the relevant question is whether products compete for overlapping purchasing opportunities.[44] Here, the record is more product-specific: the ARHK and FRT-RD3™ overlap in platform, core functionality, factory-housing-compatible

---

[42] DeMonico ARHK Declaration, Ex. 24 at 1–2; Ex. 37 at 1; Ex. 40 at 1, 5.

[43] DeMonico ARHK Declaration, Ex. 24 at 2; Ex. 32 at 1; Ex. 40 at 2.

[44] AS Designs Eichmann Reply Declaration, ¶¶ 23–30, 58–63; Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd ed. (Reading, MA: Addison-Wesley, 2000), ch. 7, "Product Differentiation and Monopolistic Competition"; Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), ch. 7, "Product Differentiation: Price Competition and Non-Price Competition," Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.

[redacted]

form, and price positioning, and prospective customers expressly compare them as alternatives.

43. AS Designs' own contemporaneous communications provide additional evidence that it viewed the ARHK and FRT-RD3™ as directly competitive products. Before Rare Breed announced the FRT-RD3™ price, AS Designs personnel discussed [redacted]. In one exchange, an AS Designs participant stated that [redacted] while also noting that [redacted]. After Rare Breed announced the FRT-RD3™ at $615 and $620, AS Designs personnel [redacted] These communications do not establish a numerical diversion rate, but they provide direct contemporaneous evidence that AS Designs itself evaluated the ARHK's pricing, compatibility, and market position relative to the FRT-RD3™ and anticipated a competitive effect on Rare Breed.

44. The broader compatibility AS Designs advertises for the ARHK may affect its attractiveness to certain purchasers. AS Designs markets the product as compatible with multiple roller-delayed hosts in addition to the MP5 and MP5K platforms.[46] I rely on those statements as evidence of how AS Designs positions the product, not as independent verification of functionality in every identified host. Broader advertised compatibility is one product attribute that may affect customer choice.

45 Deposition of Matthew S. Karlovic, as Rule 30(b)(6) designee of AS Designs, LLC, July 30, 2026 ("Karlovic 30(b)(6) Dep."), Ex. 23 ([redacted]). The communications include [redacted]. In one January 30, 2026 exchange, [redacted] in a February 24, 2026 exchange following Rare Breed's FRT-RD3™ launch, AS Designs [redacted]

46 DeMonico ARHK Declaration, ¶ 51; DeMonico ARHK Declaration, Ex. 18 at 1.

[redacted]

45. I have not determined how many prospective purchasers own multiple compatible hosts or how much weight purchasers place on broader compatibility. I therefore do not quantify any incremental diversion attributable specifically to that feature.

46. Based on the present record, I therefore conclude that the ARHK is positioned as a close competitive substitute for the FRT-RD3™ for at least a meaningful subset of purchasers. The products are not economically identical, and I do not assume one-for-one diversion. But the combination of overlapping functionality, common platform compatibility, similar drop-in factory-housing configuration, lower advertised price, and direct customer comparisons establishes a substantially stronger basis for competitive substitution than would exist for products that differed materially in their installation method, target platform, or functional use.

47. That conclusion is important to the economic analysis that follows. Where an announced entrant is positioned as a close substitute in a narrow market and prospective purchasers are already delaying or redirecting purchases in anticipation of its release, the economic effect begins before the first completed sale. The timing and concentration of AS Designs' planned ARHK launch therefore become relevant to the magnitude and reversibility of the threatened displacement.

## V. The Announced ARHK Launch Creates Immediate and Concentrated Diversion Risk

48. The timing and structure of the anticipated ARHK launch materially increase the potential economic significance of the competitive overlap described above. In a June 30, 2026 public post, AS Designs stated that the ARHK had "entered full production" and that it anticipated a "first drop of 1500 units" in approximately eight weeks, with those units ready to ship at the time of the drop.[47] A July 27 production-status update stated that parts had been finalized and that production was starting that day, that AS Designs was planning to have 1,500 units ready to ship on the drop date, and that it hoped for a late-August release.[48] An earlier June 16 product-page update separately stated that, assuming testing proceeded successfully and

---

[47] DeMonico ARHK Declaration, Ex. 41 at 1.

[48] DeMonico ARHK Declaration, Ex. 42 at 1.

[redacted]

production remained on schedule, AS Designs hoped for an early-August drop, but cautioned that "this is not a guarantee."[49] I treat these statements as evidence of AS Designs' announced production and launch intentions, not as proof that 1,500 completed units existed, that the release would occur on the announced schedule, or that the units would be sold.[50]

49. From an economic perspective, a concentrated release of that size into a relatively narrow market is materially different from gradual market entry. A staggered launch spreads competitive displacement over time and allows the incumbent to continue competing for a portion of demand as it arises. By contrast, a large single-day release permits the entrant to satisfy a substantial amount of accumulated demand almost immediately.[51] Where customers have already delayed purchases while waiting for the competing product, the initial release can convert deferred demand into completed transactions in a compressed period.

50. The public comments provide examples of demand being deferred in anticipation of the ARHK, but they do not establish the amount of accumulated demand. Certain commenters stated that they were waiting for the ARHK rather than purchasing the Rare Breed product, while another reported purchasing the FRT-RD3™ after becoming unwilling to wait longer. I do not know whether those statements resulted in completed ARHK purchases, whether the commenters would otherwise have purchased from Rare Breed, or how frequently similar conduct occurs in the broader market. I therefore do not extrapolate a diversion rate or sales quantity from the comments. Their limited relevance is that they illustrate a mechanism through which an announced future product may affect present purchase timing.[52]

---

[49] DeMonico ARHK Declaration, Ex. 18 at 1.

[50] DeMonico ARHK Declaration, Ex. 41 at 1 (June 30, 2026 post); Ex. 42 at 1 (July 27, 2026 production-status update); see also Ex. 18 at 1 (June 16, 2026 product-page update describing a planned 1,500-unit release and expressly stating that the schedule was not guaranteed).

[51] *See* W. Kip Viscusi, Joseph E. Harrington, Jr., and John M. Vernon, *Economics of Regulation and Antitrust*, 4th ed. (Cambridge, MA: The MIT Press, 2005), pp. 155–198 (addressing market structure, entry conditions, strategic competition, and preemption), Internet Archive, available at https://archive.org/details/economicsofregul0000visc_p1o1/page/n7/mode/2up, accessed September 1, 2026.

[52] DeMonico ARHK Declaration, Ex. 24 at 2; Ex. 32 at 1; Ex. 40 at 2, 5.

[redacted]

51. For scale only, AS Designs' announced 1,500-unit quantity equals approximately [redacted] percent of the [redacted] commercial FRT-RD3™ units I independently identified in Rare Breed's transaction data for June 2026, the most recent complete month for which I have been provided product-level sales information. Public comments concerning the announced ARHK launch also express an expectation that the initial 1,500-unit release may sell quickly or sell out. I do not treat those comments as a demand forecast or assume that all 1,500 units will be sold. The comparison is used to describe the potential scale and concentration of the announced launch relative to Rare Breed's recent FRT-RD3™ sales.[53]

52. The concentration of the release also affects the reversibility of the resulting harm. If a competing product is released gradually, some portion of the market remains available for the incumbent to compete for before additional units enter circulation. If 1,500 units instead enter the market in a short period and are purchased by customers who otherwise would have selected Rare Breed, those contemporaneous purchasing opportunities are exhausted once the transactions occur. A later injunction would prevent additional challenged sales, but it would not reverse completed purchases or recreate the market conditions that existed before those customers satisfied their demand.

53. This is consistent with the distinction I drew in my August 6 Reply Declaration between stopping future sales and restoring prior purchasing opportunities. There, I explained that a later injunction may improve Rare Breed's prospective position by preventing additional challenged activity, but it does not cause prior purchasers to reverse completed transactions or retrospectively purchase from Rare Breed.[54] The same principle applies here, but the announced launch structure compresses a potentially material number of those transactions into a short period.

54. The durable nature of the products reinforces this effect. As discussed in my prior declaration, a completed purchase of a durable forced reset trigger generally satisfies the customer's contemporaneous need for that firearm or configuration for a meaningful period.

---

53 Rare Breed Transaction Data; Eichmann Schedules, Schedule 1; DeMonico ARHK Declaration, ¶¶ 67–70; DeMonico ARHK Declaration, Ex. 25; Exs. 41–42. The June total combines commercial FRT-RD3-AMBI and FRT-RD3-SEF transactions and excludes zero-revenue lines.

54 AS Designs Eichmann Reply Declaration, ¶¶ 138–148.

[redacted]

A customer may later replace the product, purchase another trigger, or equip another firearm, but that later purchase constitutes a separate future opportunity. It does not restore the sale that otherwise would have occurred at the time of the initial purchase.[55]

55. The announced release is especially significant because the FRT-RD3™ remains early in its commercial development. Rare Breed launched the product in late February 2026, and, as shown in Section III, my transaction-data analysis identifies [redacted] commercial units and [redacted] in pre-tax line revenue during June 2026. The early months of a product launch can be economically important because firms use that period to establish customer relationships, product visibility, repeat-purchase opportunities, and market position. A concentrated competing launch during that period may affect not only contemporaneous transactions but also the sequence in which customers adopt products and suppliers.

56. Timing effects of this kind are economically path-dependent. The sequence of early purchases can affect subsequent market outcomes because product adoption influences familiarity, word-of-mouth, repeat purchasing, and the relative visibility of competing offerings. As I explained in my April 24 Declaration, early displacement in a differentiated niche market can affect later customer behavior and competitive positioning in ways that do not automatically reverse.[56]

57. AS Designs' public statements provide evidence of active product development and an announced intention to commercialize the ARHK. AS Designs has publicly described production activity, identified a planned first release of 1,500 units, stated that the units were intended to be ready to ship on the release date, and continued publicly promoting the product. At the same time, the announced schedule changed, the July 27 update described production as beginning that day, and AS Designs expressly stated that its anticipated release date was not guaranteed. I therefore treat the evidence as supporting an announced and

[55] AS Designs Eichmann Reply Declaration, ¶¶ 38–42, 138–140.

[56] AS Designs Eichmann Declaration, ¶¶ 7–17.

actively developed commercial product, but not as independently verifying a particular launch date, completed inventory, actual availability, demand, or sales.[57]

58. I have not reviewed or independently verified AS Designs' ARHK bills of material, supplier orders, work-in-process records, completed-unit inventory, production testing records, or customer orders. I therefore do not opine that exactly 1,500 completed units presently exist or that AS Designs will meet any announced launch date. My economic analysis uses the announced quantity only to describe the potential scale and concentration of the threatened entry. If production records, sales records, or updated public statements materially alter those facts, the corresponding analysis should be reconsidered.

59. The existing discovery nevertheless provides additional context concerning AS Designs' manufacturing scale. AS Designs reported estimated monthly manufacturing capacity of approximately [redacted] ARC-Fire V2 units, [redacted] Super Safety units, [redacted] ARMP5 lowers, [redacted] slip trips, [redacted] precut triggers, and [redacted] assorted other parts. I do not equate those capacity estimates with ARHK production, actual ARHK inventory, or demand for the ARHK. They do, however, indicate that AS Designs has reported substantial manufacturing capacity for related FRT products and platform-extension components, providing additional context for the scale of its announced 1,500-unit ARHK launch.[58]

60. Based on the currently available evidence, I conclude that the announced ARHK launch presents a risk of immediate and concentrated competitive displacement. The economic significance arises from the combination of four factors: the relatively narrow roller-delayed market, direct competitive overlap between the ARHK and FRT-RD3™, evidence that some customers are already deferring purchases while awaiting the ARHK, and AS Designs' announced plan to release 1,500 units in a concentrated initial drop.

---

[57] DeMonico ARHK Declaration, Ex. 18 at 1; Ex. 23 at 1; Ex. 41 at 1; Ex. 42 at 1.

[58] [redacted]. AS Designs reported estimated monthly manufacturing capacity of approximately [redacted] ARC-Fire V2 units, [redacted] Super Safety units, [redacted] ARMP5 lowers, [redacted] slip trips, [redacted] precut triggers, and [redacted] assorted other parts. The reported amounts are capacity estimates and are not equivalent to actual production, sales, ARHK inventory, or ARHK-specific manufacturing capacity.

[redacted]

61. Those circumstances make timing particularly important. To the extent purchasers who otherwise would have selected the FRT-RD3™ instead satisfy their demand through ARHK purchases during the initial release, the resulting transactions cannot be recreated through a later injunction. Retrospective damages may estimate the incremental profit associated with some identifiable diverted sales, but they would not cause Rare Breed to receive those transactions at the time they otherwise would have occurred or restore the associated launch-period customer and market-position opportunities.

## VI. Durable-Goods Displacement and Lost Customer Opportunities

62. The durable nature of the products at issue affects both the timing and reversibility of competitive displacement. As explained in my prior declarations, forced reset triggers are durable mechanical products rather than consumable goods purchased repeatedly at short intervals. Once a customer acquires a competing product that satisfies the customer's need for a particular firearm or configuration, that contemporaneous purchasing opportunity is generally exhausted for a meaningful period.[59]

63. In my August 6 Reply Declaration, I clarified that this principle does not depend on an assumption that a purchaser will remain permanently loyal to the competing supplier or will never purchase a Rare Breed product in the future. The relevant economic point is transaction-specific. If a customer who otherwise would have purchased a Rare Breed product instead purchases an AS Designs product and thereby satisfies the contemporaneous demand, Rare Breed loses that transaction. A later replacement, upgrade, or purchase for another firearm is a separate future opportunity and does not restore the earlier sale.[60]

64. That distinction is particularly important here because the current record contains direct examples of customers delaying or redirecting purchases between the FRT-RD3™ and the announced ARHK. Mr. DeMonico identifies prospective purchasers who state publicly that they are waiting for the ARHK rather than buying another Rare Breed trigger, as well as purchasers who ultimately bought an FRT-RD3™ because they were unwilling to continue

---

[59] AS Designs Eichmann Declaration, ¶¶ 10–17.

[60] AS Designs Eichmann Reply Declaration, ¶¶ 38–42, 138–140, and 186.

[redacted]

waiting for the ARHK's release.[61] These comments are not statistically representative of the entire market, and I do not use them to estimate a diversion rate. They nevertheless demonstrate that the products are competing for actual purchasing opportunities rather than merely occupying adjacent portions of the broader FRT market.

65. Once an ARHK purchase occurs, the effect is not reversed merely because a court later prevents AS Designs from making additional sales. The customer retains the product already purchased. To the extent that customer otherwise would have purchased an FRT-RD3™, Rare Breed cannot later recreate the original transaction at the same point in time, with the same customer, under the same competitive conditions. This is the same asymmetry I addressed in my August 6 Reply Declaration: competitive entry can redirect purchases quickly, while recovery may take longer because completed purchases are not undone when future sales cease.[62]

66. The implications extend beyond the unit margin associated with an individual sale. A completed purchase also establishes a commercial relationship between the purchaser and the supplier. The customer gains experience with that supplier's product, installation process, support, communications, and future offerings. That experience may affect subsequent purchasing decisions, recommendations to other consumers, and willingness to consider additional products from the same supplier. I do not assume that every customer relationship generates repeat sales or referrals, nor have I quantified such effects here. The economic point is that the expected value of a customer relationship may exceed the incremental profit associated with the initial transaction.

67. Rare Breed's transaction records provide direct evidence that repeat purchasing is economically relevant within the FRT-RD3™ customer base. During the respective first 120 days of the AMBI and SEF configurations, I identified [redacted] unique FRT-RD3-AMBI customers and [redacted] unique FRT-RD3-SEF customers. Because [redacted] customers purchased both configurations, the combined, deduplicated FRT-RD3™ customer cohort contains

61 DeMonico ARHK Declaration, ¶¶ 58, 62, 64.

62 AS Designs Eichmann Reply Declaration, ¶¶ 138–148.

[redacted]

[redacted] unique customers.[63] Of those customers, [redacted], or approximately [redacted] percent, had made at least one commercial Rare Breed purchase before their first FRT-RD3™ shipment. An additional [redacted], or approximately [redacted] percent, made a subsequent commercial Rare Breed purchase after their first FRT-RD3™ shipment through the July 22, 2026 data cutoff. In total, [redacted] FRT-RD3™ launch-period customers, or approximately [redacted] percent, had either prior or subsequent commercial purchasing activity with Rare Breed. I do not treat these results as a measure of customer lifetime value or assume that every purchaser will buy again. They do establish, however, that repeat purchasing and preexisting customer relationships are empirically present among FRT-RD3™ customers rather than merely hypothetical.

68. For that reason, the loss associated with a diverted transaction may include effects that are not fully observable in completed transaction records. A lost-profits analysis may identify the margin associated with an identifiable sale if the evidence supports but-for causation and diversion. It generally cannot directly observe whether the same customer would later have purchased an additional product, purchased for another firearm, upgraded to a future model, or influenced another purchaser. Those possibilities should not simply be assumed, but neither are they necessarily captured by assigning a single per-unit margin to the initial transaction.

69. The same observability limitation was central to my August 6 Reply Declaration. AS Designs' records identify customers who actually purchased from AS Designs, but they do not necessarily identify customers who otherwise would have purchased from Rare Breed

---

[63] Rare Breed Transaction Data. I identified commercial FRT-RD3-AMBI shipments during February 24 through June 23, 2026 and commercial FRT-RD3-SEF shipments during February 26 through June 25, 2026, corresponding to the respective first 120 days of each product configuration. Commercial transactions are defined as transactions with positive line revenue. Customers are identified using Customer ID and are deduplicated across the AMBI and SEF configurations. The configuration-specific counts are [redacted] unique FRT-RD3-AMBI customers and [redacted] unique FRT-RD3-SEF customers (*see* Atrius Eichmann Declaration, Schedule 1). Because [redacted] customers purchased both configurations, summing those configuration-specific counts would double-count those customers; after deduplication across configurations, the combined cohort contains [redacted] unique customers. Of those [redacted] customers, [redacted] had at least one positive-revenue Rare Breed transaction with a shipment date before their first FRT-RD3™ shipment; [redacted] had at least one positive-revenue Rare Breed transaction with a shipment date after their first FRT-RD3™ shipment and on or before July 22, 2026; and [redacted] satisfied one or both conditions. Because the source data end July 22, 2026, the subsequent-purchase percentage reflects differing and, in some cases, limited follow-up periods and should not be interpreted as a mature repeat-purchase rate.

[redacted]

and instead delayed or abandoned their purchase before ever becoming visible in Rare Breed's data. Nor do Rare Breed's own completed-order records identify transactions that never occurred.[64]

70. The ARHK record provides concrete examples of this problem. A customer who states publicly that he or she is "holding out" for the ARHK may generate no Rare Breed order record at all during the waiting period. If that customer later buys the ARHK, AS Designs' records may identify the completed transaction, but neither company's transactional records, standing alone, reveal with certainty what the customer would have purchased, when the purchase would have occurred, or whether the customer would have made subsequent Rare Breed purchases in the but-for world.

71. This does not mean that lost sales are incapable of estimation. As I stated in my August 6 Reply Declaration, conventional lost-profits methodologies may estimate identifiable historical losses where the evidence supports causation, diversion, the relevant but-for price and quantity, and the applicable incremental profit.[65] The limitation is that the existence of such methodologies does not establish that all economically significant customer-acquisition and timing effects are observable or that a damages award based solely on completed transactions provides a complete economic equivalent.

72. The narrow size of the roller-delayed segment compounds these effects. As discussed above, the relevant installed base is materially smaller than the AR-15 market. In a finite niche segment, each completed purchase removes a proportionately larger share of remaining uncommitted demand than would the same transaction in a substantially larger market. This does not establish a particular diversion rate, but it increases the economic significance of concentrated early displacement.

73. Accordingly, my opinion does not depend on an assumption of permanent customer lock-in. It rests on the narrower conclusion that a completed ARHK purchase that otherwise would have been made from Rare Breed constitutes a non-restorable historical transaction. A later

---

[64] AS Designs Eichmann Reply Declaration, ¶¶ 50–56.

[65] AS Designs Eichmann Reply Declaration, ¶¶ 54–56 and 183–194.

[redacted]

injunction can prevent additional challenged sales, but it cannot cause the customer to reverse that purchase or restore the timing, customer contact, and associated market opportunity Rare Breed would have received from the original transaction.

74. This distinction is particularly important during the FRT-RD3™'s current launch period. To the extent the ARHK converts accumulated deferred demand into completed purchases during its initial release, Rare Breed loses not only the contemporaneous unit transactions that would otherwise have occurred, but also the opportunity to acquire those customers at an early stage in the development of the roller-delayed segment. Some components of that loss may later be estimated. The timing and customer-acquisition effects, however, are not necessarily replicated by a retrospective payment after the relevant transactions and market-development period have passed.

## VII. Price Pressure and Reference-Price Effects

75. The ARHK also introduces a direct pricing dimension to the competitive relationship between AS Designs and Rare Breed in the roller-delayed segment. Rare Breed currently advertises the FRT-RD3™ (SEF) at $615 and the FRT-RD3™ (AMBI) at $620. AS Designs advertises the ARHK at $549.99 with free shipping. The resulting advertised price difference is approximately $65 to $70 per unit, or roughly 10 to 11 percent below the cited FRT-RD3™ prices.[66]

76. Price is not the only factor affecting customer choice. As discussed above, purchasers may also consider product configuration, installation method, platform compatibility, trigger characteristics, perceived quality, brand, and other attributes. Nevertheless, the present record shows that price is an economically relevant dimension of competition between the parties. In my August 6 Reply Declaration, I addressed AS Designs' materially lower advertised prices, its internal monitoring of Rare Breed's pricing, and testimony that price can affect purchaser choice between competing products.[67]

---

[66] DeMonico ARHK Declaration, ¶¶ 56, 75; DeMonico ARHK Declaration, Ex. 8 at 2, 4; Ex. 18 at 1.

[67] AS Designs Eichmann Reply Declaration, ¶¶ 58–63.

[redacted]

77. The ARHK-specific record reinforces that conclusion. Mr. DeMonico identifies prospective customers who expressly compare the ARHK and FRT-RD3™ on price, including statements that there is "no reason to spend $600 on rare breeds solution" if the customer can wait for AS Designs' lower-priced product, that the Rare Breed product is "more expensive than ASD anyway," and that customers hope AS Designs will "come[] in a little lower."[68] I do not treat those comments as statistically representative of the market, but they provide direct examples of price entering the purchase decision between the two products.

78. This pricing evidence should be distinguished from a completed price-erosion analysis. In my August 6 Reply Declaration, I explained that historical price erosion concerns the difference between the price Rare Breed actually charged and the price it would have charged absent the challenged competition. Establishing such an amount requires evidence concerning causation, but-for price, affected units, competing products, market conditions, and other factors.[69] I have not performed that calculation for the ARHK, and because the product has not yet launched, I do not opine that the ARHK has already caused a quantified reduction in the FRT-RD3™ price.

79. The economically relevant issue at this stage is prospective price pressure. A lower-priced close substitute can affect the price-and-quantity combination available to the incumbent even if the incumbent does not immediately reduce its posted price.[70] The incumbent may instead experience lower unit volume, increased customer resistance, greater demand for discounts, reduced dealer margins, or pressure to alter promotions or product positioning. The competitive effect therefore need not appear solely as an observable change in list price.

80. The existing AS Designs record provides direct evidence of that pricing strategy. AS Designs states in its produced pricing materials that its pricing formulas [redacted] and that

68 DeMonico ARHK Declaration, ¶ 76; DeMonico ARHK Declaration, Exs. 36–37, 44.

69 AS Designs Eichmann Reply Declaration, ¶¶ 64–76.

70 *See* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd ed. (Reading, MA: Addison-Wesley, 2000), ch. 7, "Product Differentiation and Monopolistic Competition"; Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), ch. 7, "Product Differentiation: Price Competition and Non-Price Competition," Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.

[redacted]

[redacted]. AS Designs' contemporaneous ARHK communications separately show its personnel [redacted].[71]

81. Mr. DeMonico further states that Rare Breed has previously reduced the FRT-15L3® price from $499 to $450 in response to customer feedback and lower-priced competing FRT offerings, including AS Designs products.[72] In my August 6 Reply Declaration, I expressly declined to attribute that entire historical reduction to AS Designs because multiple competing products and other market conditions were present.[73] That same limitation applies here: prior price pressure demonstrates that pricing competition is economically real in this market, but it does not establish the amount of any ARHK-specific future price effect.

82. Rare Breed's unit economics may also affect its ability to respond to lower pricing. The transaction data show average May–June pre-tax line revenue per commercial unit of approximately [redacted] for the FRT-RD3-SEF and [redacted] for the FRT-RD3-AMBI. Mr. DeMonico reports a [redacted] royalty payable to ABC on each unit and manufacturing costs of [redacted] for the SEF model and [redacted] for the AMBI model. Subtracting those reported inputs from the average pre-tax line revenue produces observed average residuals of approximately [redacted] and [redacted], respectively.[74]

83. Those observed average residuals are not final incremental margins or damages amounts because additional sale-dependent costs may apply. The relevant pricing relationship is nevertheless direct: holding quantity and the identified per-unit costs constant, each dollar reduction in realized selling price reduces the observed average residual by one dollar. The

---

71 Karlovic 30(b)(6) Dep. Ex. 22 ([redacted]) (describing [redacted]; Karlovic 30(b)(6) Dep. Ex. 23 [redacted]) (contemporaneous communications [redacted]).

72 DeMonico ARHK Declaration, ¶ 74.

73 AS Designs Eichmann Reply Declaration, ¶¶ 64–68.

74 Rare Breed Transaction Data; Eichmann Schedules, Schedule 2; DeMonico ARHK Declaration, ¶¶ 41, 71 & n.2; DeMonico ARHK Declaration, Ex. 1, Exclusive Patent License Agreement, § III.1.

[redacted]

actual economic effect would depend on Rare Breed's pricing response, transaction prices, quantity effects, discounts, and complete incremental-cost structure.

84. For illustration, the ARHK's advertised price of $549.99 is approximately $65 below the FRT-RD3™ SEF's stated retail price of $615 and approximately $70 below the FRT-RD3™ AMBI's stated retail price of $620. Those price differences equal approximately [redacted] percent of the SEF model's [redacted] reported list-price residual and approximately [redacted] percent of the AMBI model's [redacted] reported list-price residual.[75] I do not assume that Rare Breed would match the ARHK's price, and I do not present this arithmetic as a forecast of actual price erosion. Rather, it illustrates why a retail-price difference that is relatively modest compared with the product's total selling price can nevertheless be economically significant when measured against the substantially smaller residual remaining after the identified manufacturing cost and royalty.

85. The pricing issue also extends beyond immediate unit economics. As explained in my April 24 Declaration, repeatedly observed lower prices can become reference points against which customers evaluate future purchases.[76] In my August 6 Reply Declaration, I narrowed that opinion by explaining that the magnitude and duration of any continuing reference-price effect must be supported empirically and should not be assumed from advertised price differences alone.[77]

86. The ARHK-specific evidence nonetheless identifies a plausible mechanism for such an effect. Prospective customers are already comparing the ARHK's $549.99 advertised price with the FRT-RD3™'s $615 to $620 prices before the ARHK has launched. If those

---

[75] The percentages are calculated as follows: for the FRT-RD3™ SEF, ($615 − $549.99) ÷ [redacted] = [redacted]; for the FRT-RD3™ AMBI, ($620 − $549.99) ÷ [redacted] = [redacted]. The $615 and $620 stated retail prices are reflected in Rare Breed's product materials, and the corresponding [redacted] and [redacted] reported list-price residuals are reflected in Eichmann Schedules, Schedule 2. *See* DeMonico ARHK Declaration, ¶¶ 41, 71 & n.2; DeMonico ARHK Declaration, Ex. 1, Exclusive Patent License Agreement, § III.1; Eichmann Schedules, Schedule 2; *see* also supra ¶ 24.

[76] AS Designs Eichmann Declaration, ¶¶ 25–29; Russell S. Winer, "A Reference Price Model of Brand Choice for Frequently Purchased Products," *Journal of Consumer Research* 13, no. 2 (1986): 250–56 (developing and empirically testing a model in which consumers compare observed prices with reference or anticipated prices), available at https://pages.stern.nyu.edu/~rwiner/Reference%20price%201986%20paper.pdf, accessed August 30, 2026.

[77] AS Designs Eichmann Reply Declaration, ¶¶ 69–76.

[redacted]

comparisons become widespread after launch, they may affect customer expectations concerning what a factory-housing-compatible roller-delayed FRT should cost. That effect could manifest through lower willingness to pay, delayed purchases, increased price sensitivity, or pressure on Rare Breed to alter its future pricing.

87. I have not estimated customer demand elasticity, surveyed willingness to pay, analyzed the distribution of transaction prices or customer-level discounting, or determined the amount by which the ARHK may constrain Rare Breed's future pricing. I therefore do not quantify a prospective reference-price effect in this declaration.

88. Nor do I assume that a later injunction would necessarily return Rare Breed to the same price-and-quantity combination it would have achieved absent ARHK entry. As I explained in my August 6 Reply Declaration, whether a firm can later raise price, how quickly it can do so, and what sales volume it retains are empirical questions. A price increase following removal of a competing product may reduce quantity demanded, shift demand to other sellers, or require additional promotional or commercial effort.[78]

89. Accordingly, my opinion is limited but economically significant. The ARHK is advertised at a materially lower price than the FRT-RD3™, customers expressly compare the two products on price, and Rare Breed's per-unit economics constrain its ability to respond without affecting margin. These facts establish a direct mechanism for prospective price and volume pressure. I do not quantify that effect here, but I conclude that a later monetary award would not necessarily recreate the pricing conditions that would have existed had the ARHK not entered the market during this early stage of the FRT-RD3™'s commercial development.

**VIII. Loss of Lead Time and Remaining Market Exclusivity**

90. The ARHK also threatens a distinct economic asset addressed in my prior declarations: Rare Breed's remaining lead time in the roller-delayed segment. In my April 24 Declaration, I explained that the economic value of lead time lies in the period during which an earlier entrant can convert prior research, development, product availability, and market creation

[78] AS Designs Eichmann Reply Declaration, ¶¶ 74–76.

[redacted]

into customer relationships, operating experience, pricing expectations, and channel position before competing offerings constrain that process.[79]

91. In my August 6 Reply Declaration, I further explained that historical sales do not establish that the economic value of lead time has been exhausted. An earlier entrant may realize substantial commercial success and still lose additional value if competing products enter before the firm has fully converted its position into later sales, customer relationships, product extensions, dealer development, and market presence.[80]

92. According to Mr. DeMonico, Rare Breed commercially launched the FRT-RD3™ in February 2026 as a drop-in forced reset trigger for the relevant roller-delayed firearms. Rare Breed's transaction data and the June 2026 results discussed above establish that the product generated actual commercial sales. The captured Rare Breed product pages display the products as "SOLD OUT" and "Out of stock." I therefore do not opine that Rare Breed maintained continuous inventory or was actively accepting new orders on every date during the period addressed here. My lead-time opinion rests on Rare Breed's earlier commercial entry and observed sales through the available data cutoff, not on an assumption of uninterrupted current availability.[81]

93. That position is economically distinct from Rare Breed's present circumstances in the broader AR-15 FRT market. The record developed in this case shows that multiple competing products already exist in the AR-15 segment and that Rare Breed's earlier commercial position there has been materially eroded. By contrast, the drop-in, factory-housing-compatible roller-delayed segment remains one in which Rare Breed presently occupies the differentiated position described above.[82]

94. The ARHK is directed at that remaining position. AS Designs advertises the ARHK as a self-contained drop-in cassette that installs directly into factory OEM polymer housings

---

[79] AS Designs Eichmann Declaration, ¶¶ 18–19.

[80] AS Designs Eichmann Reply Declaration, ¶¶ 124–131.

[81] DeMonico ARHK Declaration, ¶¶ 33–35; DeMonico ARHK Declaration, Ex. 8 at 2, 4; Rare Breed Transaction Data.

[82] AS Designs Eichmann Reply Declaration, ¶¶ 132–148.

[redacted]

without modification. As discussed above, that configuration materially reduces the product-form distinction that separated Rare Breed's FRT-RD3™ from AS Designs' earlier MP5 offerings.[83]

95. The economic consequence is not merely the addition of another seller. If the ARHK enters during the FRT-RD3™'s early commercialization period, Rare Breed's window to develop the factory-housing-compatible segment without a directly comparable AS Designs product in the market ends. Once that period passes, it cannot be recreated later. A subsequent injunction may prevent additional ARHK sales, but it cannot restore the elapsed months during which Rare Breed otherwise could have continued commercializing its existing product before that close substitute entered.

96. This distinction is central to the concept of lead time. Lead time is inherently temporal. Its value derives from what a firm can accomplish before close competition arrives.[84] Once the competing entry occurs, the earlier entrant cannot later recover the lost interval by receiving a monetary payment. Damages may estimate certain foregone profits associated with identified transactions, but they do not return the firm to an earlier point in the market's development or recreate the commercial sequence that would have occurred during that period.

97. The present facts also indicate that Rare Breed realized material commercial results during the FRT-RD3™'s early launch period. As discussed in Section III, my transaction-data analysis identifies [redacted] commercial FRT-RD3™ units and [redacted] in pre-tax line revenue during June 2026. In June 2026, the FRT-RD3™ was Rare Breed's [redacted]

83 DeMonico ARHK Declaration, ¶¶ 51–58.

84 *See* Marvin B. Lieberman and David B. Montgomery, "First-Mover Advantages," *Strategic Management Journal* 9 (1988): 41–58 (surveying technological leadership, asset preemption, and buyer switching costs as potential sources of first-mover advantage), available at https://uol.de/f/2/dept/wire/fachgebiete/entrepreneur/download/Artikel_Internetoekonomie/Lieberman_First_Mover.pdf, accessed August 30, 2026; Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), pp. 314–351 (addressing sunk costs and barriers to entry, strategic business behavior, and strategic barriers to entry or mobility), Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.

[redacted]

[redacted], and it accounted for [redacted] percent of the May–June reported trigger-profit measure shown in Schedule 2.[85]

98. Those results are relevant because they demonstrate that Rare Breed's early-entry period produced actual economic benefits. The issue is not whether that earlier entry had economic value; the available record indicates that it did. The issue is whether that value had been fully realized before ARHK entry. The FRT-RD3™'s relatively short period of commercial availability, its observed sales through June 2026, and its position as the first identified commercially launched factory-housing-compatible product support the conclusion that some first-mover opportunity remained as of the available data cutoff. This conclusion does not assume that FRT-RD3™ sales increased after June 2026 or that Rare Breed maintained uninterrupted product availability. AS Designs' contemporaneous communications are consistent with that conclusion: after Rare Breed announced the FRT-RD3™, AS Designs personnel [redacted] I do not treat those statements as a quantitative measure of lead time, but they provide evidence that AS Designs recognized Rare Breed's earlier commercial position in this segment.[86]

99. Rare Breed's historical product-launch data reinforce the commercial significance of this period. As I explained in my July 31, 2026 Declaration, for example, the FRT-15L3® generated approximately [redacted] million in pre-tax line revenue and [redacted] commercial units during its first 30 days, and approximately [redacted] million and [redacted] commercial units during its first 120 days. During those first 120 days, the product also reached [redacted] unique customers across [redacted] states and Puerto Rico. Those first 120 days accounted for approximately [redacted] percent of the FRT-15L3®'s first-year commercial units and approximately [redacted] percent of its first-year revenue. I do not use those results as a forecast for the FRT-RD3™ or contend that the first 120 days represented a disproportionate share of annual sales. Rather, the data provide case-specific evidence that Rare Breed's initial

[85] Rare Breed Transaction Data; Eichmann Schedules, Schedules 1–2; *see also* DeMonico ARHK Declaration, ¶¶ 63, 71.

[86] Karlovic 30(b)(6) Dep. Ex. 23 ([redacted]).

[redacted]

commercialization periods can involve substantial sales and customer acquisition while the product's market position is still developing.[87]

100. The announced ARHK launch would introduce direct competition during that early commercialization period. Rare Breed launched the FRT-RD3™ in late February 2026, approximately six months before this declaration, and AS Designs has announced a planned first release of 1,500 ARHK units. If those units are produced, released, and sold, AS Designs would begin competing for customers during a period in which Rare Breed otherwise would have continued developing the FRT-RD3™'s position without a directly comparable AS Designs product in the market. I do not assume that all 1,500 announced units exist, will be released, will be sold, or will displace Rare Breed sales.

101. The expected economic effects of that entry may extend beyond the initial 1,500 units. Early competitive sales can influence which products customers become familiar with, which manufacturers they recommend, and which suppliers are perceived as established participants in a new segment. I do not assume that these effects necessarily produce permanent lock-in. The narrower point is that the sequence of early adoption can influence subsequent purchasing patterns and competitive positioning.

102. This is consistent with the path-dependent effects addressed in my prior declarations. In my April 24 Declaration, I explained that early competitive displacement can alter later customer behavior and market structure because initial purchasing decisions influence familiarity, expectations, and market visibility.[88] In my August 6 Reply Declaration, I clarified that rapid entry and slower recovery are not economically inconsistent because completed transactions and commercial relationships are not automatically reversed when future sales cease.[89]

---

87 Atrius Eichmann Declaration, ¶¶ 41–43 and Schedule 2. Schedule 2 reflects Rare Breed Transaction Data and reports, among other things, [redacted] commercial units and approximately [redacted] million in pre-tax line revenue during the FRT-15L3®'s first 30 days; [redacted] commercial units, approximately [redacted] million in pre-tax line revenue, and [redacted] unique customers during its first 120 days; and first-120-day activity equal to [redacted] percent of first-year commercial units and [redacted] percent of first-year revenue. *See also* Rare Breed Transaction Data.

88 AS Designs Eichmann Declaration, ¶¶ 7–17.

89 AS Designs Eichmann Reply Declaration, ¶¶ 138–148.

[redacted]

103. The current record also contains evidence that some customers are already allocating their purchasing decisions based on the expected timing of ARHK entry. As discussed above, certain prospective purchasers state that they are waiting for the ARHK rather than purchasing another FRT-RD3™, while others have purchased the FRT-RD3™ after becoming unwilling to wait longer.[90] These observations show that the timing of entry is already affecting which supplier receives certain early-period purchasing opportunities.

104. A later injunction would not reconstruct those timing effects. It would not change the supplier from which an affected customer originally purchased, restore Rare Breed's elapsed period of commercializing the FRT-RD3™ before entry of a directly comparable AS Designs product, or provide Rare Breed with the same opportunity to establish customer and market relationships before that entry occurred.

105. I therefore distinguish between historical lead-time value already realized and remaining lead-time value still at risk. Rare Breed realized some benefit from being first to market with the FRT-RD3™. That fact does not establish that the value of its earlier position was exhausted. Based on the product's late-February 2026 launch, its first-120-day commercial results, its June 2026 sales level, and the absence during that period of an identified commercially launched AS Designs product with the same factory-housing-compatible form, there remained an economically meaningful window in which additional first-mover benefits could be realized. This conclusion does not assume that sales increased after June 2026 or that Rare Breed maintained uninterrupted inventory.

106. The ARHK's entry would reduce that remaining window. I do not opine that entry necessarily would exclude Rare Breed from the market permanently or prevent Rare Breed from later recovering some market position. My conclusion is narrower: once direct competition begins in this configuration, Rare Breed permanently loses the elapsed period during which it otherwise could have continued commercializing its existing product without that close substitute in the market.

---

[90] DeMonico ARHK Declaration, ¶¶ 58, 62, 64.

[redacted]

107. Accordingly, the announced ARHK launch presents a direct risk to Rare Breed's remaining lead-time opportunity in the roller-delayed drop-in segment. Certain resulting historical lost sales may later be estimated. What cannot be recreated is the elapsed opportunity to continue commercializing the FRT-RD3™ before a directly comparable AS Designs product entered the market. That temporal loss is economically distinct from a discrete lost transaction and is one reason retrospective monetary relief may not provide an economic equivalent for all effects of ARHK entry.

## IX. Dealer, Channel, and Product-Development Effects

108. The ARHK's anticipated entry may also affect Rare Breed through dealer, channel, and product-development mechanisms that are related to, but distinct from, the direct unit-sales effects discussed above. I addressed dealer and channel effects in my prior declarations and, in my August 6 Reply Declaration, narrowed those opinions to reflect the developed AS Designs record. I do not assume that every AS Designs dealer otherwise would have carried Rare Breed, that any dealer relationship is exclusive, or that dealer activity produces a separately quantifiable damages amount without additional analysis.[91]

109. The existing AS Designs dealer record is substantial rather than hypothetical. [redacted] contains [redacted] recorded website orders assigned to the [redacted] customer group between May 23, 2025 and July 23, 2026. Those orders are associated with [redacted] unique customer IDs, of which [redacted], approximately [redacted] percent, appear in more than one recorded order. Across the [redacted] recorded orders, subtotal excluding tax totals approximately [redacted], and approximately [redacted] remains after recorded refunds.[92]

110. The dealer activity also continued during the pendency of Plaintiffs' request for preliminary relief. From April 27 through July 23, 2026, [redacted] contains [redacted] recorded orders associated with [redacted] dealer customer IDs, including [redacted] customer IDs whose earliest recorded

91 AS Designs Eichmann Reply Declaration, ¶¶ 43–49.

92 Karlovic 30(b)(6) Dep. Ex. 11 [redacted]). The spreadsheet contains [redacted] non-header data rows assigned to the [redacted] customer group. My analysis of the [redacted] field identifies [redacted] unique customer IDs, of which [redacted] appear in more than one recorded order. Across the [redacted] recorded orders, subtotal excluding tax totals [redacted], recorded refunds total [redacted], and subtotal excluding tax less recorded refunds totals [redacted]

[redacted]

dealer order in the produced log occurred during that period. Those orders reflect approximately [redacted] in subtotal before recorded refunds and approximately [redacted] after recorded refunds. I do not assume that the first appearance of a customer ID necessarily represents the creation of a new dealer relationship, that each customer ID necessarily represents a different underlying dealer, or that every recorded product is economically equivalent. The data nevertheless establish continuing dealer-channel ordering activity and repeat purchasing through AS Designs' existing distribution network.[93]

111. AS Designs also enters the ARHK launch with an established commercial footprint extending beyond the dealer activity described above. Its produced records reflect approximately [redacted] in accused-product revenue, more than [redacted] website orders associated with approximately [redacted] unique customer email addresses, and [redacted] wholesale accounts. Thus, AS Designs is not entering the roller-delayed segment as a new supplier attempting to develop a customer base and distribution network from scratch. Its existing customer and intermediary relationships provide an established commercial infrastructure through which the ARHK may be introduced. I do not assume that all existing AS Designs customers or wholesale purchasers will purchase the ARHK; the economic significance is that AS Designs begins the ARHK launch with an existing commercial base rather than de novo market entry.[94]

112. I have not been provided ARHK-specific dealer orders, wholesale commitments, preorder records, or dealer inventory allocations. I therefore do not opine that any identified AS Designs dealer has committed to stock the ARHK or that a particular dealer relationship has

---

93 Karlovic 30(b)(6) Dep. Ex. 11 ([redacted]). Using the [redacted] and [redacted] fields, the produced log contains [redacted] recorded orders associated with [redacted] dealer customer IDs from April 27 through July 23, 2026. [redacted] of those customer IDs have their earliest recorded dealer order during that period. For that period, subtotal excluding tax totals [redacted], recorded refunds total [redacted], and net order value totals [redacted].

94 Declaration of Matthew S. Karlovic in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, July 6, 2026 ("Karlovic Declaration"), ¶ 11; Karlovic 30(b)(6) Dep. Ex. 6 ([redacted]; Karlovic 30(b)(6) Dep. Ex. 11 ([redacted]). [redacted] reports approximately [redacted] in website revenue, and the Karlovic Declaration reports [redacted] website orders associated with approximately [redacted] unique customer email addresses. The detailed entries in [redacted] sum to approximately [redacted] in wholesale revenue across [redacted] wholesale accounts. Combined accused-product revenue is approximately [redacted]. [redacted] reflects the dealer-designated website activity discussed above.

[redacted]

already been diverted from Rare Breed. My opinion is narrower: AS Designs' existing distribution activity provides an established commercial channel through which the ARHK may reach customers once released.

113. This is economically relevant because dealer and intermediary relationships can affect which products customers see, compare, and purchase. As explained in my prior declaration, an established ordering relationship can create continuing access to the dealer's customer base and may support repeat transactions.[95] The significance of such relationships is not necessarily captured by the profit on a single completed order, particularly where repeated purchases or product introductions occur through the same channel.

114. The FRT-RD3™'s contribution to Rare Breed's operating results also bears on product development. Mr. DeMonico states that Rare Breed's entire business consists of forced reset triggers and related parts and that income from current products is used to support development of additional FRT products. As shown in Schedule 2, the FRT-RD3™ accounted for [redacted] percent of the reported trigger-profit measure for May and June 2026.[96]

115. To the extent ARHK entry reduces FRT-RD3™ sales or pressures its margins, it may reduce the cash contribution generated by a product that currently provides a substantial share of Rare Breed's reported trigger-profit measure. That does not establish that every dollar of reduced FRT-RD3™ profit would otherwise have been spent on research and development, nor do I assume a one-for-one relationship between current profit and future product-development spending.

116. The economically supportable conclusion is narrower. A firm that finances continuing product development from operating income has fewer internally generated resources available for that development when current product profitability declines, all else equal. Mr. DeMonico states that Rare Breed is continuing to develop additional forced reset trigger products for new platforms.[97] Accordingly, reduced contribution from a product that has

---

95 AS Designs Eichmann Reply Declaration, ¶¶ 43–48.

96 DeMonico ARHK Declaration, ¶¶ 24, 85–86; Eichmann Schedules, Schedule 2.

97 DeMonico ARHK Declaration, ¶¶ 23, 85–86.

[redacted]

become economically important to the business can affect the timing or scale of those efforts, even though the exact effect would depend on Rare Breed's cash balances, financing alternatives, development budgets, and management decisions.

117. I do not quantify a particular product-development delay or a separate damages amount associated with delayed research and development. My opinion is limited to the economic mechanism that lower operating contribution from an important product reduces the resources available for other uses unless Rare Breed replaces those funds through financing, cost reductions, lower distributions, or other sources.

118. The significance of these channel and development effects is therefore cumulative rather than standalone. Direct sales diversion reduces current transactions; lower margins may reduce the operating contribution available to support ongoing expansion; and early adoption by customers or intermediaries can affect the environment in which Rare Breed later markets both the FRT-RD3™ and related future products.

119. I do not rely on these mechanisms as independent proof that every ARHK sale will cause a dealer loss or product-development delay. Rather, they are additional ways in which direct competitive displacement can affect Rare Breed beyond the margin on an individual transaction. Whether those effects ultimately can be quantified separately would require additional dealer-level, financial, and development-budget evidence.

120. Accordingly, I conclude that the ARHK's anticipated entry may affect Rare Breed not only through direct customer substitution, but also through the timing and economics of channel development and through the contribution generated by a product that presently funds a meaningful portion of Rare Breed's business. Those effects reinforce, but do not replace, the more directly supported displacement, pricing, and lead-time mechanisms discussed above.

## X. Retrospective Monetary Relief Would Not Fully Restore the Lost Market Opportunity

121. The economic effects described above also inform whether retrospective monetary relief would provide a reasonable economic equivalent for the consequences of ARHK entry. As I explained in my prior declarations, the availability of conventional damages methodologies

[redacted]

does not necessarily mean that every economically significant effect of competitive displacement can be identified, attributed, and valued with sufficient reliability after the fact.[98]

122. I do not contend that all harm associated with the ARHK is incapable of measurement. If the evidence ultimately establishes that a particular ARHK sale otherwise would have been made by Rare Breed, the incremental profit associated with that lost FRT-RD3™ transaction may be estimated. Similarly, if sufficient evidence establishes a but-for price and affected quantity, certain historical price effects may be susceptible to analysis.[99]

123. The observable components described above do not encompass every economic mechanism identified in the present record. In addition to the incremental profit associated with an identifiable diverted transaction, the relevant mechanisms include the loss of a time-sensitive purchasing opportunity, the loss of an opportunity to acquire the customer during the FRT-RD3™'s early commercial period, potential effects on pricing conditions, and erosion of Rare Breed's remaining lead time in the factory-housing-compatible roller-delayed segment. I do not assume that each mechanism produces a separately recoverable loss or quantify each effect here. In my opinion, a calculation limited to the margin on identified diverted transactions is unlikely to provide a complete economic equivalent for the combined timing, customer-acquisition, pricing, and lead-time effects described above.[100]

124. The first limitation arises from observability. AS Designs' completed sales records, once available, may identify ARHK purchasers and transaction amounts. Those records are unlikely, by themselves, to establish which purchasers otherwise would have selected the FRT-RD3™, which would have delayed their purchase, which would have selected another product, or which would have made no purchase at all. Determining the but-for disposition of those opportunities requires reconstruction rather than direct observation.[101]

---

98 AS Designs Eichmann Reply Declaration, ¶¶ 49–56, 183–194.

99 AS Designs Eichmann Reply Declaration, ¶¶ 54–56, 69–76.

100 AS Designs Eichmann Reply Declaration, ¶¶ 49–56, 69–76, and 183–194.

101 AS Designs Eichmann Reply Declaration, ¶¶ 16–22, 50–56.

[redacted]

125. The public customer statements described by Mr. DeMonico provide direct evidence that at least some purchasers are already deciding whether and when to purchase based on the relative availability of the FRT-RD3™ and ARHK. Some state that they are waiting for the ARHK; others state that they purchased the FRT-RD3™ because they were unwilling to continue waiting.[102] Those examples strengthen the conclusion that diversion and purchase timing are real economic mechanisms, but they do not identify the full population of affected customers or provide a statistically reliable diversion rate.

126. A second limitation concerns transactions that never become observable. A prospective customer who would have purchased an FRT-RD3™ but postpones the purchase while awaiting the ARHK may leave no transaction record with either company during the period of delay. If that customer ultimately purchases an ARHK, the completed ARHK transaction may become observable, but the timing and nature of the lost Rare Breed opportunity remain counterfactual. If the customer instead makes no purchase, there may be no completed transaction from which to infer the foregone opportunity at all.

127. This is the same limitation I addressed in my August 6 Reply Declaration. Completed transaction records describe what occurred in the actual market; they do not by themselves identify every purchaser who otherwise would have selected Rare Breed, abandoned or delayed a purchase before becoming observable, or formed a commercial relationship with Rare Breed in the but-for market.[103]

128. A third limitation is temporal. The FRT-RD3™ remains in the early stages of its commercial life, and Rare Breed established the first identified commercial position in the factory-housing-compatible drop-in segment for MP5-family firearms. The economic value of that position depends in part on the period during which Rare Breed can establish customers,

---

102 DeMonico ARHK Declaration, ¶¶ 58, 62, 64.

103 AS Designs Eichmann Reply Declaration, ¶¶ 50–56.

[redacted]

sales volume, product visibility, and market position before a close substitute enters. I do not assume that Rare Breed maintained uninterrupted inventory throughout that period.[104]

129. Once the ARHK enters, that elapsed period cannot be recreated. A later damages award may compensate Rare Breed for certain lost profits associated with identified transactions, but it cannot restore additional months of operating without a directly comparable factory-housing-compatible AS Designs product in the market. Nor can it return Rare Breed to the exact sequence of customer adoption and market development that otherwise would have occurred during that period.

130. This is not a conclusion that lead time is incapable of valuation in every circumstance. Economic damages analyses may estimate the value associated with delay or lost lead time where sufficient evidence exists. The narrower point here is that a retrospective payment does not itself recreate the underlying commercial opportunity. The adequacy of such a payment therefore depends on whether the economically significant consequences of the lost period can be reliably reconstructed and valued.

131. A fourth limitation concerns pricing. As discussed in Section VII, ARHK entry introduces a lower-priced close substitute into a segment in which customers already compare the products by price. I have not calculated ARHK-specific price erosion and do not assume Rare Breed will reduce its posted prices. The economic effect could instead appear through lower volume, greater price sensitivity, increased demands for discounts, or a different future price-and-quantity combination.

132. A later injunction would not necessarily cause those conditions to reverse automatically. As I explained in my August 6 Reply Declaration, whether a supplier can restore a prior price, how quickly it can do so, and what quantity it can sell at that price are empirical questions.

[104] DeMonico ARHK Declaration, ¶¶ 33–35; DeMonico ARHK Declaration, Ex. 8 at 2, 4; Rare Breed Transaction Data; Marvin B. Lieberman and David B. Montgomery, “First-Mover Advantages,” *Strategic Management Journal* 9 (Special Issue 1988): 41–58 (discussing sources of first-mover advantage, including technological leadership, asset preemption, and buyer switching costs), available at https://uol.de/f/2/dept/wire/fachgebiete/entrepreneur/download/Artikel_Internetoekonomie/Lieberman_First_Mover.pdf, accessed August 30, 2026; Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), pp. 314–351 (addressing barriers to entry and strategic behavior in response to entry), Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.

[redacted]

Removing a competing product later does not establish that customers will return immediately to the price expectations or purchasing behavior that would have prevailed had the competing product never entered.[105]

133. A fifth limitation concerns customer acquisition. A diverted sale is not necessarily economically equivalent to the unit margin alone where the transaction would have initiated or continued a customer relationship. Rare Breed's transaction records show that repeat purchasing and preexisting customer relationships are present within the FRT-RD3™ customer population. As described in paragraph 67, [redacted] of the [redacted] identified launch-period FRT-RD3™ customers, or approximately [redacted] percent, had either prior or subsequent positive-revenue commercial activity with Rare Breed through the July 22, 2026 data cutoff. I do not treat that result as a customer-lifetime-value measure or assume that every purchaser will purchase again. It provides case-specific evidence that the customer relationship associated with an FRT-RD3™ transaction may extend beyond an isolated first purchase.[106]

134. If a customer who otherwise would have entered Rare Breed's customer base through an FRT-RD3™ purchase instead enters AS Designs' customer base through an ARHK purchase, a damages calculation based solely on the foregone margin from the first trigger would not necessarily capture subsequent differences in purchase timing, additional products, recommendations, or other customer-related opportunities. Those effects should not be assumed without evidence, but neither are they necessarily observable from the initial transaction alone.

135. The concentrated nature of the announced first release increases these measurement issues. According to Mr. DeMonico, AS Designs has publicly stated that it intends to have 1,500 units ready to ship in its initial drop.[107] If a substantial number of units are sold over a compressed period, the resulting market change may occur more quickly than would be the

---

105 AS Designs Eichmann Reply Declaration, ¶¶ 69–76; Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd ed. (Reading, MA: Addison-Wesley, 2000), ch. 7, "Product Differentiation and Monopolistic Competition."

106 Rare Breed Transaction Data; *see* supra ¶ 67 & n.63. Because the source data end July 22, 2026, subsequent-purchase observations reflect differing and, in some cases, limited follow-up periods.

107 DeMonico ARHK Declaration, ¶ 67; DeMonico ARHK Declaration, Exs. 41–42.

[redacted]

case with gradual entry. The relevant counterfactual then requires reconstructing not only which transactions Rare Breed would have obtained, but also the timing and sequence of those transactions and their effect on subsequent market development.

136. I do not assume that all 1,500 units in AS Designs' announced initial ARHK release will be completed, available for sale, or sold; that all units sold would displace Rare Breed sales; or that the announced quantity reflects final production. At the same time, public comments concerning the announced ARHK launch expressly anticipate that the initial 1,500-unit release may sell quickly or sell out. I do not treat those comments as a demand forecast, but they provide additional evidence of anticipated near-term demand. Those issues affect the magnitude of any economic harm. They do not change the underlying economic distinction between compensating for certain identifiable lost transactions and recreating the market conditions that would have existed before the competing product entered.[108]

137. In my August 6 Reply Declaration, I reviewed the AS Designs financial records then available and concluded that material uncertainty remained concerning AS Designs' entity-level capacity to satisfy a future judgment; I did not opine that AS Designs was insolvent or necessarily would be unable to pay. That uncertainty provides an additional economic consideration bearing on whether retrospective monetary relief would provide an adequate economic remedy. I do not offer a new ARHK-specific solvency or collectability opinion here, and my principal conclusions concerning the limitations of retrospective relief are independently supported by the displacement, timing, pricing, customer-acquisition, and lead-time effects described above.[109]

138. The central economic issue is that preventing a competitive event before it occurs is not always equivalent to compensating for selected consequences after it has occurred. If the ARHK enters the market, customers may make purchases, price expectations may adjust, and Rare Breed's period of commercializing the FRT-RD3™ without a directly comparable AS Designs product in the market ends. A later monetary award may compensate for

[108] *See* supra ¶¶ 48, 51, 57–59; DeMonico ARHK Declaration, ¶¶ 67–68; DeMonico ARHK Declaration, Ex. 25; Ex. 41 at 1; Ex. 42 at 1; *see also* Ex. 18 at 1.

[109] AS Designs Eichmann Reply Declaration, ¶¶ 77–99, 192–194.

[redacted]

portions of any resulting economic loss, but it cannot itself restore the market to the state that existed before those events.

139. Accordingly, based on the presently available evidence, I conclude that retrospective monetary relief is unlikely to provide a reasonable economic equivalent for the combined effects associated with ARHK entry. Certain historical losses may be measurable. The more difficult economic effects concern the lost timing of customer acquisition, the elapsed lead-time opportunity, the evolving price-and-quantity environment, and the commercial position Rare Breed otherwise would have had during the FRT-RD3™'s early market-development period.

## XI. Conclusion

140. Based on the materials presently available, the ARHK presents a materially different competitive circumstance from AS Designs' earlier MP5-related offerings. The ARHK is positioned as a factory-housing-compatible, drop-in forced reset trigger for the same roller-delayed firearm segment presently served by Rare Breed's FRT-RD3™. It overlaps with the FRT-RD3™ in core functionality, target platform, installation form, and customer use, while being advertised at a lower price. The record also contains direct examples of prospective customers comparing the two products and delaying or redirecting purchases based on the anticipated availability of the ARHK.[110]

141. The economic significance of that entry is heightened by the role the FRT-RD3™ played in Rare Breed's business as of the available data cutoff. My transaction-data analysis identifies [redacted] commercial FRT-RD3™ units and [redacted] in pre-tax line revenue during June 2026. In June 2026, the FRT-RD3™ was Rare Breed's [redacted], [redacted] of the May–June reported trigger-profit measure shown in Schedule 2.[111] The ARHK is therefore directed at a product family that was an important

[110] DeMonico ARHK Declaration, ¶¶ 51–60.

[111] Rare Breed Transaction Data; Eichmann Schedules, Schedules 1–2; see also DeMonico ARHK Declaration, ¶¶ 63, 71.

[redacted]

source of Rare Breed's revenue and operating results during the most recent complete months for which data were provided.

142. The timing and announced scale of the ARHK launch further increase the risk of competitive displacement. For scale only, the announced 1,500-unit quantity equals approximately [redacted] percent of the [redacted] commercial FRT-RD3™ units identified in Rare Breed's June 2026 transaction data. The current record also identifies customers who deferred purchases while awaiting the ARHK. I do not assume that all 1,500 announced units will be produced, available for sale, or sold, or that every ARHK sale otherwise would have been an FRT-RD3™ sale. The economic point is that a concentrated launch of the announced scale into a relatively narrow market is likely to convert at least some of the deferred demand evidenced in the record into completed competing transactions over a short period.[112]

143. The durable nature of the products makes those transactions time-sensitive. Where an ARHK purchaser otherwise would have selected Rare Breed, the contemporaneous Rare Breed transaction is lost once the customer satisfies that demand through the competing product. A later replacement, upgrade, or purchase for another firearm would be a separate future opportunity and would not restore the initial transaction. This is consistent with the economic distinction I explained in my August 6 Reply Declaration between preventing future challenged sales and restoring completed purchasing opportunities.[113]

144. The ARHK also creates a direct mechanism for prospective pricing pressure. AS Designs lists the product at $549.99. By comparison, Rare Breed's average May–June pre-tax line revenue per commercial unit was approximately [redacted] for the FRT-RD3-SEF and [redacted] for the FRT-RD3-AMBI. The ARHK's advertised price is therefore approximately $65.04 below the SEF average and $70.04 below the AMBI average. Public comments include examples of prospective purchasers comparing the products by price, although those comments are not a statistical measure of market-wide purchasing behavior.[114] I have not

[112] Eichmann Schedules, Schedule 1; DeMonico ARHK Declaration, ¶¶ 58, 62, 64, 67–70; DeMonico ARHK Declaration, Ex. 25.

[113] AS Designs Eichmann Reply Declaration, ¶¶ 38–42, 138–148, 186.

[114] Rare Breed Transaction Data; Eichmann Schedules, Schedule 2; DeMonico ARHK Declaration, ¶¶ 75–76; DeMonico ARHK Declaration, Ex. 18 at 1; Exs. 36–37, 44.

[redacted]

calculated a specific amount of ARHK-related price erosion or assumed that Rare Breed will reduce its price. The transaction and pricing evidence nevertheless establish a direct economic mechanism through which a lower-priced close substitute may affect Rare Breed through price, volume, or some combination of the two.

145. In addition, the ARHK threatens the remaining lead-time value associated with Rare Breed's current position in the factory-housing-compatible roller-delayed segment. Rare Breed has already realized economic value from being first to market with the FRT-RD3™, but that does not establish that the value of its early position has been exhausted. As I explained in my prior declarations, lead-time benefits are realized over time through customer acquisition, sales scale, market visibility, channel development, and related commercial advantages.[115]

146. Rare Breed was the first identified supplier to have commercially launched a drop-in forced reset trigger for the relevant factory-housing-compatible roller-delayed configuration. The captured product pages do not establish uninterrupted current availability, and I do not assume it. My lead-time opinion rests instead on Rare Breed's earlier entry, its observed commercial results through June 2026, and the period during which no directly comparable AS Designs product had entered the market. If the ARHK enters, that differentiated period ends. A later injunction may prevent additional ARHK sales, but it cannot recreate the elapsed commercial opportunity.[116]

147. Certain components of any resulting economic harm may later be estimated through conventional damages methodologies. I do not opine that every consequence of ARHK entry is unquantifiable. Lost profits associated with identifiable diverted transactions, and potentially certain historical pricing effects, may be estimated if the necessary evidence supports causation, diversion, but-for pricing, and the relevant incremental profit.[117]

---

115 AS Designs Eichmann Declaration, ¶¶ 18–19; AS Designs Eichmann Reply Declaration, ¶¶ 124–131.

116 DeMonico ARHK Declaration, ¶¶ 33–35; DeMonico ARHK Declaration, Ex. 8 at 1, 3; Rare Breed Transaction Data.

117 AS Designs Eichmann Reply Declaration, ¶¶ 54–56, 69–76, 183–194.

[redacted]

148. The existence of such methodologies, however, does not establish that retrospective monetary relief would provide a complete economic equivalent. Completed transaction records do not necessarily identify customers who delayed or abandoned purchases before becoming observable, the future value associated with customer acquisition, the market-position effects of losing the remaining launch-period lead time, or the price-and-quantity conditions that would have existed absent entry. These are the same types of limitations I addressed in my August 6 Reply Declaration when explaining why the ability to estimate certain historical losses does not establish that all economically significant effects are fully observable, attributable, and measurable.[118]

149. I therefore conclude that the anticipated ARHK launch creates a direct and economically meaningful risk of immediate competitive displacement to Rare Breed in the roller-delayed FRT segment. That conclusion rests on the combined evidence concerning the closeness of the products as substitutes, the current economic importance of the FRT-RD3™, the announced size and timing of the ARHK launch, documented customer purchase deferral and comparison, lower advertised pricing, and Rare Breed's still-developing position in this segment.

150. I further conclude that retrospective monetary relief would not provide a complete economic equivalent for the temporal and market-development effects described above, although it may compensate Rare Breed for certain identifiable historical losses. A later award cannot itself restore the timing of lost customer acquisitions, recreate Rare Breed's elapsed period of commercializing the FRT-RD3™ before entry of a directly comparable AS Designs product, or return the market to the customer, price, and competitive conditions that existed before ARHK entry.

151. I reserve the right to supplement or revise these opinions if additional relevant documents, data, or testimony become available.

---

[118] AS Designs Eichmann Reply Declaration, ¶¶ 49–56, 143–148, 183–194.

[redacted]

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 2nd day of September 2026.



**Richard J. Eichmann**

Secretariat Advisors, LLC
135 Main Street, Suite 1850
San Francisco, CA 94105

[redacted]

## Schedule 1

## June 2026 Commercial Units and Revenue[1]

| Product Family | Commercial Units | Pre-Tax Line Revenue | Revenue Rank |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

| FRT-RD3 Configuration | Commercial Units | Pre-Tax Line Revenue | Zero-Dollar Units Excluded |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| **Combined FRT-RD3** | [redacted] | [redacted] | [redacted] |

**Note and Source**

[1] FRT-RD3 combines the AMBI and SEF configurations because the reported claim is expressly at the product-family level. Commercial units exclude zero-dollar lines. *See* Rare Breed Transaction Data. The conclusion is independently calculated from the transaction data and does not depend on manufacturing-cost or royalty inputs.

Richard Eichmann
September 2, 2026

**Schedule 2**

**Reproduction of May–June 2026 Reported Trigger-Profit Measure[1]**

| Model-Level Calculation | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Normalized Model[2]** | **May Units** | **May Revenue** | **June Units** | **June Revenue** | **Total Units** | **Total Realized Revenue** | **Reported Mfg Cost / Unit** | **Reported Royalty / Unit** | **Reported Mfg Cost** | **Reported Royalty** | **Reported Trigger-Profit Measure** | **Share of Denominator** | **Realized Revenue / Unit** |
| FRT-15L3 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| FRT-15C3 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| FRT-MR3 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| FRT-RD3-AMBI | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| FRT-RD3-SEF | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Combined FRT-RD3** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **All Included Trigger Models** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**Notes and Source**

[1] Rare Breed Transaction Data. *See also* DeMonico ARHK Declaration, ¶ 71 and Exhibit 1 Patent License Agreement § III.1 confirm the per-unit treatment. DeMonico ARHK Declaration ¶¶ 63 and 71 reconcile to the [redacted] calculation.

[2] The FRT-SG3 produced no qualifying lines in May-June 2026.

Richard Eichmann
September 2, 2026

[redacted]

# Appendix 1

Richard Eichmann
September 2, 2026

Secretariat

**Richard J. Eichmann**, CVA, MAFF

Managing Director

135 Main Street, Ste. 1850
San Francisco, CA 94105

Mobile: +1 (510) 542-4935
email: reichmann@secretariat-intl.com

Richard Eichmann is a Managing Director specializing in economic damages, valuation, and econometric analysis in complex commercial litigation. His work spans intellectual property, trade secret misappropriation, securities, class action, and breach of contract matters. He is frequently retained to quantify lost profits, reasonable royalties, unjust enrichment, price premium, and diminution in enterprise value, and to evaluate issues of apportionment, incremental benefit, class-wide impact, and loss causation.

Mr. Eichmann's expertise includes valuation of intangible assets, financial modeling, advanced econometrics, statistical sampling, and survey design. He has substantial experience analyzing large and complex datasets and developing rigorous damages models grounded in economic theory and empirical evidence, including the evaluation of opposing regression analyses, conjoint surveys, market simulations, and valuation methodologies.

He has been designated as an expert in 86 matters and has provided deposition, arbitration, and trial testimony in federal and state courts, international tribunals, and arbitration forums. With more than 31 years of experience in economic consulting, including over 28 years devoted to litigation consulting and the valuation of intangible assets, he has worked across technology, telecommunications, automotive, financial services, energy, consumer products, and emerging technology sectors. Prior to joining Secretariat, he served as Chair of the Intellectual Property Practice and Head of the San Francisco office at a global economic consulting firm.

## EDUCATION

- M.A., Economics, University of Michigan, Ann Arbor, MI 1996
- B.A., Economics, University of Michigan, Ann Arbor, MI 1995
- B.A., Philosophy, University of Michigan, Ann Arbor, MI 1995

## CERTIFICATIONS

- Master Analyst in Financial Forensics (MAFF) - Commercial Damages, 2016
  National Association for Certified Valuators and Analysts (NACVA)
  Credential ID 703

- Certified Valuation Analyst (CVA), 2009
  National Association for Certified Valuators and Analysts (NACVA)
  Credential ID 991115

## ASSOCIATIONS

- National Association for Certified Valuators and Analysts (NACVA)

## PROFESSIONAL EXPERIENCE

- NERA Economic Consulting, Inc. (San Francisco, CA, Los Angeles, CA), Sep. 2014 – 2025
  Senior Managing Director, Chair of Intellectual Property Practice, SF Office Head

- FTI Consulting, Inc. (San Francisco, CA, Chicago, IL), Feb. 2004 – Sep. 2014
  Managing Director, Director, Manager

- Cornerstone Research (Washington, DC), Feb. 2001 – Feb. 2004
  Research Associate, Senior Analyst

- E&Y, LLC (Washington, DC), Feb. 2000 – Feb. 2001
  Senior Consultant

- KPMG, LLC (Washington, DC), Jul. 1998 – Feb. 2000
  Consultant

- J.D. Power & Associates (Detroit, MI), Jul. 1996 – Jul. 1998
  Analyst

- Northern Virginia Community College (Alexandria, VA), Sep. 1998 – May. 1999
  Adjunct Lecturer, Economics

- University of Michigan – Institute for Social Research (Ann Arbor, MI), Jul. 1993 – Jul. 1996
  Researcher

## HONORS / AWARDS

- ‘Top 25 Patent Damages Experts,” Issued by Certified Patent Valuation Analyst (CPVA) designation · September 2025

- “Top 50 Government Consultants*,”* Issued by The Consulting Group · December 2021.

- “40 Under Forty Valuation Analysts,” Issued by National Association of Certified Valuators and Analysts (NACVA) · June 2014.

## REPRESENTATIVE EXPERIENCE

### Patent and Trademark Litigation

- Patent Infringement (Chemical Mechanical Planarization (CMP) Process Slurry Technology) – Calculated patent infringement damages in the form of lost profits and reasonable royalty in the *CMC* matter.
- Patent Infringement (Cryptographic Processing Relating to Routers and Modems) – Rebutted an opposing damages expert's opinion for client *Cisco* regarding a reasonable royalty analysis that examined issues relating to the incremental benefit relating to cryptographic parallel processors.
- Patent Infringement (Standard Essential Patents Relating to DSL Technology) – Rebutted an opposing damages expert's opinion for client *2Wire* regarding FRAND reasonable royalty analysis that examined a modified top-down analysis estimating the benefits attributable to DSL SEP patents.
- Patent Infringement (Unmanned Aerial Vehicles - Drones) – Rebutted an opposing damages expert's opinion for client *Autel* regarding a lost profits and reasonable royalty analysis that examined the alleged incremental profit attributable to the benefits of patented drone technology.
- Patent Infringement (Thermal Cooling Technology) – Rebutted an opposing damages expert's opinion for client *Civiq* regarding a lost profits and reasonable royalty analysis that examined the alleged infringement of thermal cooling technology.
- Patent Infringement (Smart Phone Protective Screen Covers) – Rebutted an opposing damages expert's opinion for client *Aevoe* regarding a reasonable royalty that examined the incremental profit attributable to the benefits of patented smart phone screen protective covers.
- Patent Infringement (Smart Phone Mobile Camera Features) – Rebutted an opposing damages expert's use of survey studies as an indication of value for client *Motorola Mobility* in a patent infringement suit concerning camera and Wi Fi features. Provided testimony within a jury trial before Judge Orrick in San Francisco, California.
- Patent Infringement (Social Media) – Provided client *Facebook* with a declaration that utilized statistical analysis to examine the underlying assumptions within the model of an opposing expert in a patent infringement suit.
- Patent Infringement (Enterprise Mobility Management) – Provided client *MobileIron* with an assessment of damages incurred as a result of an alleged patent infringement pertaining to Personal Information Management security. Provided testimony within a jury trial before Judge Grewal in San Jose, California.
- Patent Infringement (Gaming) – Rebutted an opposing damages expert's calculation of reasonable royalty for client *SteelSeries* in a patent infringement suit concerning gaming mice technology. Provided testimony within a jury trial before Judge Payne in Marshall, Texas.
- Patent Infringement (Farm Equipment) – Hired as an expert to provide statistical analysis of the clinical trials run by an agricultural expert to examine the efficiency and alleged improved benefits of a mechanized corn seed planter.
- Patent Infringement (Mobile App – Video Streaming) – Provided a declaration relating to the economics of damages in support of a motion for an injunctive relief relating to patents associated with mobile streaming technology for *Eko*.
- Trademark Infringement (Hardware Trade Associations) – Assisted with the determination of potential market confusion among consumers and attendees of a national hardware trade association conference. Calculated the impact on profits for the conference, in terms of damages, given the impact.

- Trademark Infringement (Pharmaceuticals) – Rebutted an opposing expert's damages opinion relating to alleged economic damages sustained by alleged market confusion for client *Fera Pharmaceuticals*.
- Copyright Infringement (Software) – Calculated damages sustained by a software manufacturer, *Quest Software, Inc*.

## Trade Secret Misappropriation

- Misappropriation of Trade Secrets and Copyright Infringement (Database-as-a-Service Software) – Served as *Nutanix's* testifying damages expert in a JAMS arbitration involving alleged misuse of proprietary source code and confidential information to develop a competing DBaaS platform. Applied market-valuation and head-start approaches to quantify approximately $96.5 million in alleged unjust enrichment and developed an alternative hypothetical-license analysis estimating approximately $117.9 million in copyright damages
- Misappropriation of Trade Secrets (Institutional Software Trading Technology) – Served as the testifying damages expert for *BTIG* in a matter involving alleged misuse of proprietary trading technology; conducted rolling-window market-model event studies and related econometric analyses to estimate firm-specific abnormal returns and quantify approximately $332–$343 million in alleged unjust enrichment.
- Misappropriation of Trade Secrets (SaaS Healthcare Software) – Calculated lost profits and diminution value incurred and experienced by Claimant as result of subcontractor's alleged misappropriation of trade secrets relating to the SaaS healthcare software applied at the state-level to enact the ACA.
- Misappropriation of Trade Secrets (Networking and Telecommunications Market Reports) – Determined direct and consequential damages incurred by *Dell'Oro Group* as result of a breach of fiduciary duty by a former employee alleged to misappropriated trade secrets relating to the generation of standardized market reports.
- Misappropriation of Trade Secrets (Lithium Solid State Batteries) – Valuing seven trade secrets relating to lithium solid state batteries that were alleged to have been misappropriated by former employees of *Quantumscape Corporation*.
- Misappropriation of Trade Secrets (Pharmaceutical Adjudication Services) – Led team in the rebuttal of alleged lost profit and unjust enrichment claims in defense of a leading pharmaceutical adjudication service provider accused of having illegally acquired trade secrets from a former business associate.
- Misappropriation of Trade Secrets (Gene Therapy) – Rebutted an opposing expert's assessment of damages incurred by a former laboratory employee who alleged that a major academic university misappropriated his intellectual capital in the acquisition of a patented gene therapy.
- Misappropriation of Trade Secrets (Value Added Retailer) – Led team in the calculation of compensatory damages and unjust enrichment claims in defense of a value-added retailer in the Florida market accused of having illegally acquired trade secrets from a competitor.
- Misappropriation of Trade Secrets (Trading Models) – Named expert in a case that involved rebutting alleged damages sustained by an investment management company. The head of the quant group left, along with the core of his group to form a competitor investment management company. The Plaintiff alleged that when he left he took with him a proprietary trading model. Damages centered on valuing the worth and subsequent alleged diminution in value of the alleged stolen trading model.

[redacted]

## Antitrust

- Antitrust (Standard Essential Patents) – Provided consulting assistance to a confidential client regarding possible exposure to allegations on anticompetitive behavior due to its alleged failure to license patents at a fair, reasonable, and non-discriminatory (FRAND) rate that were deemed standard essential patents (SEP).
- Antitrust (Real Estate Markets) – Managed the analyses generated to rebut two expert reports that sought to calculate damages in an alleged price-fixing case. Provided statistical support in the case with regard to an examination of the validity of the plaintiff's expert's yardstick methodology.
- Antitrust (Construction Commodity) – Designed and managed statistical and econometric analyses to investigate the impact of alleged price-fixing among producers of a construction input commodity. Federal Sentencing Guideline dictated the estimation of affected commerce. A two-stage regression analysis that sought to isolate whether prices of alleged impacted months was utilized. The methodology in the case was ultimately described in an article presented at the Western Economic Association International Annual Conference in Vancouver, B.C. on July 1, 2009
- Antitrust (Energy) – Reviewed plaintiff's pricing methodology and presented an alternative mitigated price methodology to the Federal Energy Regulatory Commission (FERC) that was ultimately accepted in the matter of the California energy dispute, concerning the defense of thermal generators against the charges of price fixing and collusion.
- Antitrust (Energy) - Conducted statistical analyses of trader behavior to determine the probability of systematic gaming behavior, in the matter of FERC allegations on natural gas traders, concerning the defense of energy futures trades against the charges of price manipulation.
- Antitrust (Energy) - Managed and led programming analyses of large disparate data sets for determining liability and timing issues, in the matter of an antitrust dispute concerning allegations of collusion in the electric markets.
- Predatory Pricing Behavior (Pharmaceuticals) – Designed and managed the execution of econometric and statistical analyses of HIV pharmaceutical drugs as they pertained to alleged predatory pricing behavior of a supplier. Mr. Eichmann generated code to analyze various model specifications, correcting for first-series serial correlation that might indicate what exogenous variables influenced markets and how.

## Breach of Contract

- False Claims and Fraudulent Inducement (Pension Administration Software Implementation) – Retained as the damages expert for *The Regents of the University of California* in litigation arising from the allegedly failed implementation of its pension administration system. Developed accounting-grounded Amounts Paid, Top-Down contractual-value, and item-level À La Carte damages models, including analyses of vendor payments, contractual benchmarks, remediation expenses, and incremental internal transition costs, resulting in alternative principal-damages presentations of up to approximately $122 million.
- Breach of Contract (Semiconductors) – Quantified delay-driven lost profits and duplicative costs resulting from the alleged termination of a semiconductor fabrication agreement for *Pakal Technologies, Inc*.
- Breach of Contract (Broadband Telecommunications) – Estimated damages sustained by *Tribal Solutions* in a breach of fiduciary duty matter relating to the formation of a competitor entity by the defendants while still employed by the plaintiff.

- Breach of Contract (Non-Compete Provisions / Drayage Services) – Estimated the irreparable harm to *Roadrunner* in a breach of contract relating to non-compete provisions in a Stock Purchase Agreement.
- Breach of Contract (Winery) – Calculated damages sustained by *Close LaChance Wines* in a breach of contract allegation litigated before JAMs arbitration.
- Breach of Contract (Intellectual Property / Fraud) – Led team in the calculation of damages for a case where the plaintiff alleged that the defendant had failed to disclose a potential liability with regard to a possible infringement of intellectual property concerning soybean germ plasma prior to their merging of assets. The alleged liability materialized several years later and the plaintiff then sought indemnification under the benefit of the bargain method.
- Breach of Contract (Recreational Vehicles) – Rebutted the statistical validity of an opposing expert's inferences on the use of his survey design in a matter dealing with the impact of sales to a recreational manufacturer as a result of an alleged harm to their reputation due to an interior drywall component. Within the same, case he wrote a separate report that rebutted the statistical validity of an economic expert's damage calculation that sought to calculate the impact on sales due to an alleged reputational loss.
- Breach of Contract (Furniture) – Calculated lost profit damages alleged in a breach of contract case for *DWS International, Inc.* that involved analyzing management forecasts to estimate the fair market value of a lost opportunity as it related to the patio furniture market. Testified at trial before a jury trial in the Southern District of Ohio.
- Breach of Contract (Breast Pumps) – Calculated lost profit damages alleged in a breach of contract case for *Whittlestone, Inc.* that analyzed margin risk to estimate the fair market value of a lost opportunity as it related to the electric breast pump market.
- Breach of Contract (Agricultural Commodities) – Analyzed the short-term fixed cost structure of a slaughter house operating in a perfectly competitive environment as part of a breach of contract dispute in the agricultural commodities market.
- Breach of Contract (Telecommunications) - Managed the analytical aspects of a complex damage calculation model and prepared and presented our findings to counsel in the matter of a breach of contract dispute between two U.S. telecommunications firms.
- Breach of Contract (Auto Parts) – Calculated lost profits as a result of a breach of contract regarding easement rights and advertisement obstruction.
- Breach of Contract (Hair Coloring Products) – Calculated lost profits for client, *BehindtheChair.com* in an alleged breach of contract regarding profit distributions from a hair-coloring product business.

## Valuation Consulting and Litigation

- Settlement Valuation (Luxury Vehicle Class Action) – Conducted a valuation of a proposed settlement between the parties in the *Bullard et al. v. Jaguar Land Rover Automotive* class action matter.
- Breach of Fiduciary Duty (Visual AI Algorithm Software for Advanced Camera Systems – Smartphones, Tablets, Smart Televisions, Cars, and Robots) – Conducted a valuation utilizing the income and market approaches in a dispute between minority shareholders in a buyout under false pretenses in the *ArcSoft* dispute.
- Employee Stock Option Valuation (Retail Clothing) – Performed two business valuations for *Robert Talbott, Inc.* to estimate both the exercise current share price of a non-controlling, non-marketable privately-held high-end cloth manufacturer used to estimate the value of an alleged employee stock option held by a former CEO in dispute.

[redacted]

- Business Valuation (e-Commerce Start-Up) – Utilized ARIMA time series techniques to forecast subscription revenues of a charitable social network site, for which he calculated the fair market value of the minority interest. The income approach relied heavily on the use of historical subscription data that allowed for a range of values within a statistically confident interval.
- Business Valuation (Telecommunications) - Conducted a business valuation of an alleged lost international telecommunications opportunity that took into consideration varying capital structures within financial projections that served to rebut a plaintiff's valuation model.
- Business Valuation (Financial Services) – Assisted with the critique of a business valuation involving a minority interest of an investment management firm arising out of an employment dispute.

## Commercial Class Action Litigation

- Class Action (Copyright/DMCA) – Evaluated and developed class-wide damages methodologies in *Cook v. Meta Platforms*, a putative class of artists and small business owners alleging that Meta knowingly facilitated copyright infringement and counterfeit ad scams through its advertising platform, in violation of the Copyright Act, DMCA, and unfair competition laws.
- Class Action (Pediatric Sleep Aids) – Rebutted the proposed conjoint survey and supply side analyses of Plaintiffs in *Zarbee's*, a class of individuals alleging that they received excessive amounts of melatonin in a sleep aid product.
- Class Action (Eyeglasses) – Calculated damages sustained by a class of individuals whose eyeglasses had been sold to them with an alleged false claim of increased precision by *LensCrafters* AccuFit measurements. Utilized a conjoint analysis producing a Willingness to Pay result from a mixed logit model to run a market simulation to arrive at the premium consumers paid as a result of not knowing about the misrepresentation.
- Class Action (Automotive) – Served as damages expert in a multi-state consumer class action involving alleged design defects in GM's 8-speed Hydra-Matic transmissions (MY15–MY19). Calculated classwide economic damages under alternative benefit-of-the-bargain frameworks, including cost-of-repair and price premium methodologies. Developed retail-channel vehicle population estimates, analyzed GM sales and warranty data, and evaluated aggregate damages under varying take-rate and appeal assumptions.
- Class Action (Automotive) Served as damages expert in a four-state consumer class action involving MY19–MY22 GM trucks equipped with 8L45 and 8L90 transmissions. Utilized a conjoint-based mixed logit demand model integrated into a full market-equilibrium simulation to estimate point-of-sale overcharges. Conducted independent hedonic regression analysis of secondary-market transaction data to measure diminution in value and reconcile lifecycle pricing effects.
- Class Action (Diesel Engines) – Calculated damages sustained by a class of individuals whose Class 8 trucks had been sold to them with a manufacturer defect relating to *Paccar* MX-13 diesel engines. Utilized a hedonic regression to isolate the effect of the defect on the resale value of the vehicles.
- Class Action (All-Terrain Vehicles) – Calculated damages sustained by a class of individuals whose ATV vehicles had been sold to them with a manufacturer defect. Utilized a conjoint analysis producing a Willingness to Pay result from a mixed logit model to run a market simulation to arrive at the premium consumers paid as a result of not knowing about the defect.
- Class Action (Automotive) – Calculated damages sustained by a certified class of individuals whose vehicles had been inappropriately seized by a municipality. The task involved analyzing auction and automotive valuation data to determine both the delta and the float.

- Class Action (Automotive) – Designed and managed the execution of econometric and statistical analyses of secondary market pricing in a particular vehicle segment in defense of price impact allegations due to alleged non-disclosures by *Ford Motor Company*. We utilized econometrics to demonstrate that a recall did not, as the plaintiffs alleged, negatively impact depreciation rates of vehicles, but rather other market forces explain the sudden drop, such as rising lease terminations, market segment saturation.
- Class Action (Software Auctions) – Addressed class certification issues as they arose in matter dealing with the alleged breach of contract in the use of auctions. The matter involved analyzing the expected value of an auction.
- Class Action (Gaming) – Hired by the Indiana state lottery commission to provide consulting services in relation to a class action litigation matter, where he designed and managed the execution of an econometric model that generated expected consumer pricing behavior of a scratch-off game. The model determined the 95 percent confidence interval of sales the lottery commission could have expected to receive but for an alleged misstatement of probabilities on their website.
- Class Action (Breach of Contract / Fraud) – Led team in the calculation of damages for a case where the plaintiff alleged that the defendant willingly failed to pay royalties. The case involved a stratified statistical sampling so as to investigate the liability claims of intent as well as damage implications, if any.

## False Advertising

- False Advertising (Refresh Rates in Televisions) – Rebutted class action damages for *Vizio* in a matter involving alleged misrepresentation of refresh rates in television monitors.
- False Advertising (Enterprise Resource Planning Software Implementation) – Rebutted alleged economic damages against *Oracle* sustained by the failed Cover Oregon project due to an alleged failed ERP implementation system. (http://www.oregonlive.com/politics/index.ssf/2016/09/post_183.html)
- False Advertising (Enterprise Resource Planning Software Implementation) – Rebutted alleged economic damages sustained by a global online vehicle auction business due to an alleged failed ERP implementation system for *Sparta Consulting, Inc.*
- False Advertising (Credit Cards) – Calculated economic damages sustained by a credit card processing company, *Heartland Payment Systems, Inc.*, due to the alleged false advertising of its competitor regarding pass-through costs to merchants.
- False Advertising (Consumer Products) – Rebutted economic damages for *Philips Oral Healthcare, Inc.,* alleged to have been sustained by the class as a result of an alleged false claim regarding product quality.
- False Advertising (Trade Association) – Calculated economic damages sustained by a promoter of a trade association trade show that alleged that a competitor trade show was creating consumer confusion due to the use of their trademark infringement and false advertisement.
- False Advertising (Hand Tools) – Calculated economic damages alleged by a class as a result of false advertising, which promoted hand tools sold in the United States as "American made."
- False Advertising ('Sippy' Cups) – Calculated economic damages alleged by a competitor as a result of false advertising, which stated that certain children's 'sippy' cups held certain patents, which they did not.
- False Advertising (Beverages) – Calculated economic damages alleged by a competitor as a result of consumer confusion brought on due to false advertising, which stated that certain beverages held certain ingredients, which they did not

## Labor and Employment Litigation

- Class Action (Discrimination) – Analyzed the economics relating to the closing of certain call-centers for an airline company alleged of engaging in age discrimination. While initial analyses provided prima facie evidence of possible age discrimination when identifying the statistical differences among call-centers, further analysis indicated that regional influences were in fact greater and more prominent in influencing the company's actions.
- Class Action (Discrimination) – Generated a probit econometric model of the firm's data to model the effects of race, gender, and other attributes and their alleged effect on the probability of an employee being fired as part of an alleged employment discrimination case.
- Class Action (Discrimination) – Analyzed class certification issues as they related to an allegation that defendant chose to close an airline call-center due to the gender and age of its employees. The analysis included both an inquiry of descriptive and inferential statistics as well as cost accounting considerations
- Class Action (Discrimination) – Designed and managed statistical and econometric analyses to investigate the allegation of discriminatory behavior within a major bottling distributor.
- Class Action (Wage/Hour Dispute) – Analyzed class certification issues as they related to a wage-hour dispute of a perfume manufacturer. Conducted a stratified sampling exercise of hand-written invoices of proposed class members and examined the variability, if any, of their work experiences that would influence whether or not they were improperly classified as independent contractors.
- Class Action (Wage/Hour Dispute) – Analyzed class certification issues as they related to a wage-hour dispute of the *Skywest* airline company. Examined various influencing factors that played a role in determining the probability of an alleged class member missing his/her lunch break and how the variance revealed from the data among the influencing factors affects commonality among the alleged class members.

## Securities

- Securities Litigation (IPO) - Adapted 10b-5 securities litigation model to estimate alleged damages of IPO allocations and valuations, in the matter of a class action lawsuit against a consortium of major Wall Street underwriters.
- Breach of Contract (Hedge Funds) – Calculated damages for a case that dealt with breach of an investment contract between a seed financier and a hedge fund for *SGAM Newedge Management, Inc.* The case involved valuing a hedge fund as a proxy for alleged lost profits. Testified at a JAMS arbitration.
- Securities Fraud (Stock-Option Back Dating) – Derived statistical models to examine the frequency of stock-option back dating instances and their effect on reported earnings.
- Securities Fraud (Earnings-Smoothing) – Led a team of financial economists to investigate and isolate the prevalence and method in which earnings smoothing impacted share value.
- Mortgage-Backed Securities (Statistical Analysis) – Managed and designed econometric models tasked with analyzing loss causation as it relates to losses across tranches within securitizations.
- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Galena Street Fund v. Wells Fargo Bank, N.A.* matter.
- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Federal Housing Finance Agency v. J.P. Morgan Securities LLC et al* matter.
- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Federal Home Loan Bank of Pittsburgh v. J.P. Morgan Securities LLC et al* matter.

- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical support of a motion to deny class certification of a proposed class of investors that sought restitution from an underwriter for allegedly not having properly accounted for the risk of the underlying collateral of several securitizations.
- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical and econometric support examining the factors that influence the likelihood of loan default as it pertained to a class action that sought restitution of the alleged wrongdoings of a municipal bond insurance agency.
- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical support in examining the difference of bid and close data provided a municipal bond insurance agency.
- Securities Litigation (10b(5)) – Conducted event studies and loss causation models on a variety of 10b(5) class action case matters.
- Insider Trading – Created an econometric model to analyze the impact and materiality of alleged insider tip investigated by the SEC.

### Economic and Statistical Consulting

- Statistical (Gemology) – Designed statistical tests to examine the likelihood of collusion within international grading facilities of various gems, including diamonds.
- Economic (Automotive Markets) – Co-authored the U.S. automotive industry newsletter for J.D. Power and Associates, working directly under the senior economist in executing and managing their syndicated market forecasts and reviews.
- Econometrics (Forecasting) - Created and maintained ARIMA production and sales forecast models for the U.S. and developing markets, including Asia and Latin America.
- Forensic Investigations – Led a FCPA investigation for a U.S. petroleum company with subsidiaries in the Latin America. The case dealt with utilizing statistical techniques on a large set of general ledger transactions and a series of financial statement analyses that ultimately revealed a complex fraud where funds were being laundered via service contracts to funnel bribes.

## PUBLICATIONS

- “Making Patent Citations Count: Statistical Tools for Valuing Innovation in Litigation and Licensing,” co-authored with Adam Rhoten, 72 Loy. L. Rev. For Commentary (2026).

- “Embracing AI in Economic Testimony: Integrating Tools with Caution and Validation.” *The Value Examiner*, September/October 2025, 4–12.

- “Why Funder Forecasts Don’t Belong in Royalty Analyses,” published by *Law360* on June 24, 2025.

- “The Role of Economics on the Road to Autonomous Vehicles and Digital Mobility,” co-authored with D. Hanson, Richard Marsden, George Anstey, Grant Saggers, Garrett Glasgow, C. Phillipp Heller, Hector Lopez, Bruno Soria, and Will Taylor, published by NERA Economic Consulting, Inc., Insight in Economics™, August 17, 2021.

- “Forward Citation Analysis as a Means to Apportion Relative Value in Patent Infringement Cases,” published by the National Association for Certified Valuators and Analysts (NACVA), QuickRead on February 18, 2016.

- "An Overview of Methods for Estimating Lost Revenues in Economic Damages," published by the National Association for Certified Valuators and Analysts (NACVA), QuickRead on June 18, 2015.

- "Use of Two-Stage Linear Regression Models in Identifying the Existence and Extent of Affected Commerce in Price-Fixing Cases," co-author with M. Mercurio, working paper.

- "Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office – Extended," co-authors C. Quillen and O. Webster, *The Federal Circuit Bar Journal*, August 2002.

- "Southeast Asian Crisis: Implications in the Asian Automotive Industry," co-author R. Schnorbus, J.D. Power and Associates Syndicated Report, December 1997.

## PRESENTATIONS

- "Trade Secret Damages," presented on October 21, 2024, as a guest lecturer for the UC-Berkeley Law School for a Law course titled "Law 277.1 sec.1 - Trade Secret Law."
- "IP & Antitrust: Considerations for the High-Tech Sector," panelist, hosted by Antitrust West Coast Conference, held on November 17, 2020.
- "Lost Profits: Principles, Methods and Strategies to Prove and Defend Damages LIVE Webcast," presenter, hosted by The Knowledge Group, held on October 7, 2019.
- "Smallest Saleable Patent-Practicing Unit when Deriving FRAND in Light of Recent Federal Rulings," presenter, hosted by the Damages and Injunction Committee of the IPO, held on June 13, 2019 via a Committee hosted webinar.
- "The Concept of Apportionment in Patent Infringement Matters: Methods Considered," presented at the NACVA and CTI's 2019 Annual Consultants' Conference in Salt Lake City, UT on June 6, 2019.
- "Overview of Damages in IP Litigation Involving Standard Essential Patents (SEPs)," presented as part of the "Issues in Litigation" section of the Western Economic Association International (WEAI) Conference in Tokyo, Japan on March 22, 2019.
- "Calculating Intellectual Property Damages – How to Prepare for the 2019 Landscape," co-presenter, hosted by The Knowledge Group, held on February 13, 2019 via webinar.
- "IP and Antitrust Developments for the High Tech Sector," panelist, Antitrust West Coast 2019, held on February 12, 2019 in San Francisco, CA.
- "An Overview of Damages and the Role of the Damages Expert in Intellectual Property," instructor, Financial Valuation Seminar, hosted by the National Association of Certified Valuators and Analysts (NACVA), held on December 14, 2018 in Ft. Lauderdale, Florida, http://www.nacvanation.com/ftlauderdale/.
- "Transnational IP Litigation: Opportunities and Challenges – Focus on US IP Litigation," panelist, Berkeley-Tsinghua Annual Forum of 2018, jointly hosted by the Berkeley and Tsinghua Schools of Law, held on December 4, 2018 in Beijing, China.
- "Trade Secret Damages: Remedies for Victims of Trade Secret Violations," panelist, hosted by the Daily Journal Professional Education, held on October 30, 2018 in Palo Alto, California.
- "Factors to Consider for Injunctive Relief from an Economic Perspective: Irreparable Harm," presenter, hosted by the Damages and Injunction Committee of the IPO, held on October 11, 2018 via a Committee hosted webinar.

- "Mock International Arbitration: Toward Early Dispute Resolution of Standard Essential Patents (SEPs) in the 5G Era," presenter, hosted by the Japan Patent Office, the University of Tokyo, and the Rader Foundation, held on June 29, 2018 at the University of Tokyo, Japan.
- "Patent Infringement Damages," presented on February 1, 2018, presenter, hosted by The Knowledge Group via a webinar.
- "Trade Secret Damages from the Perspective of a Damages Expert," presented on October 18, 2017, as a guest lecturer for the UC-Davis School of Law course titled "Trade Secrets and Restrictive Covenants, Employee Mobility, Raids, and Corporate Espionage."
- "Trade Secret Damages and Remedies," co-presenter, hosted on May 19, 2017 by Bridgeport Continuing Education in San Francisco, California.
- "A Penny or a Pound: Apportioning Damages in Patent Cases," panel member hosted on May 17, 2017, by the Licensing Executive Society (LES), Silicon Valley Chapter in Palo Alto, California.
- "Raising Start-Up Capital," panel member of a webinar, hosted by Expert Webcast on January 7, 2016.
- "Patent Infringement Reasonable Royalty Damages: Apportion the Increment?," panel member hosted by the Asian Pacific American Bar Association (APABA) in Palo Alto, CA on November 23, 2015.
- "Calculation of Economic Damages in Patent Litigation Matters," at the Financial Forensics and Expert Witness Conference, hosted by the National Association for Certified Valuators and Analysts (NACVA) in Houston, TX on October 19, 2015.
- "Ease of Enforcement and Magnitude of Damages Awards as Determinative Factors in Establishing the Market Value of a Patent: Trends in IP Damages Awards," at the Tenth Annual Conference on Best Practices in Patent Monetization, hosted by Law Seminars International in San Francisco, CA on March 26, 2015.
- "Supreme Court Takes a Middle Path in Reaffirming Fraud on the Market Theory," presented via Thomson Reuters as a national webinar on September 3, 2014 and currently available online via West LegalEdCenter.
- "Statistical and Technological-Based Fact-Gathering in Wage-and-Hour Cases," at the Annual Wage & Hour Conference presented via Bridgeport Continuing Education in San Francisco, CA on October 10, 2013.
- "Business Damages Analysis & Modeling: Litigating and Proving Damages," presented via Bridgeport Continuing Education in San Francisco, CA on May 10, 2013.
- "New Disclosure Rules and What They Mean For ERISA Class Certification," panel speaker for FTI Consulting ERISA Fiduciary Litigation and Compliance Breakfast Series 2012 in Chicago, IL on April 24, 2012.
- "Understanding and Proving Damages: Business Damages Analysis and Modeling," presented via Bridgeport Continuing Education in San Francisco, CA on April 12, 2012.
- "Litigating a Trade Secret Case: Economic Damage Considerations," presented via Bridgeport Continuing Education in San Francisco, CA on December 9, 2010.
- "Financial Forecasting," presented within the Mergers and Acquisitions section of the American Institute of Certified Public Accountants (AICPA) meeting held in San Francisco, CA on August 4, 2010.
- "Application of Multivariate Regression Analysis in Identifying Economic Damages," white paper presented under the "Law and Crime" section of the Western Economic Association International Annual Conference in Portland, Oregon on July 1, 2010.

- "The Use of Regression Analysis as a Means to Better Forecast Sales When Using the DCF Method," presented within the Business Valuation section of the National Association of Certified Valuators and Analysts (NACVA) and Institute of Business Appraisers (IBA), 2010 Annual Consultants' Conference, held in Miami, Florida, on June 4, 2010, now available online as a webinar (https://www.nacva.com/store_product.asp?prodid=120).
- "Hand Rule as a Basis for Calculating Punitive Damages" paper originally presented at the Southern Economic Association Conference in Washington, DC on November 19, 2005 and again at the Annual Meeting of the World Institute for Research and Publication (WIRP) – Law on May 16, 2010.
- "Use of Two-Stage Linear Regression Models in Identifying the Existence and Extent of Affected Commerce in Price-Fixing Cases," paper co-presented with M. Mercurio under the "Commercial Damages and Antitrust Litigation" section of the Western Economic Association International Annual Conference in Vancouver, B.C. on July 1, 2009.
- "An Economic Analysis of Punitive Damages" co-presented with Andrew Frey of Mayer, Brown, Rowe & Maw LLP and Office of General Counsel of Ford Motor Company at a conference titled "Managing Risks in High Stakes Litigation" in Chicago, IL on December 2, 2004

## EXPERT DESIGNATIONS, REPORTS, AND TESTIMONY

89 TOTAL: 49 PLAINTIFFS (55%) & 40 DEFENDANTS (45%)
124 REPORTS FILED | 58 DEPOSITIONS | 7 ARBITRATION TESTIMONIES | 7 TRIAL TESTIMONIES

1. <u>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA</u> V. LINEA SOLUTIONS, INC., SAGITEC SOLUTIONS, LLC, ET AL., SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ALAMEDA, CASE NO. 23CV056879, EXPERT REPORT FILED AUGUST 14, 2026. (HON. SOMNATH RAJ CHATTERJEE)

2. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND <u>RARE BREED TRIGGERS, INC.</u> V. CLOAK INDUSTRIES, INC., ET AL.*, CASE NO. 4:26-CV-00608-ALM; PEAK TACTICAL, LLC, ET AL., CASE NO. 4:26-CV-00698-ALM; AND OPTICS PLANET, INC., CASE NO. 4:26-CV-00521-ALM, DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER FILED AUGUST 7, 2026. (HON. AMOS L. MAZZANT, III)

3. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND <u>RARE BREED TRIGGERS, INC.</u> V. ATRIUS DEVELOPMENT GROUP CORPORATION, ET AL.,* CASE NO. 4:26-MD-03176-ALM MDL 3176, DECLARATION FILED JULY 31, 2026. (HON. AMOS L. MAZZANT III).

4. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND <u>RARE BREED TRIGGERS, INC.</u> V. AR-TT, LLC ET AL.,* CASE NO. 4:26-MD-

03176-ALM MDL 3176, DECLARATION FILED MAY 28, 2026, JULY 1, 2026. (HON. AMOS L. MAZZANT III).

5. *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. AS DESIGNS, LLC, ET AL.,* UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF NORTH CAROLINA, CASE NO. 1:25-CV-1192, EXPERT REPORT FILED APRIL 24, 2026, REPLY REPORT FILED AUGUST 6, 2026. (HON. WILLIAM LINDSAY OSTEEN, JR.).

6. *ERIC OLSON ET AL. V. WORLD FINANCIAL GROUP AGENCY, LLC ET AL.,* JUDICIAL ARBITRATION AND MEDIATION SERVICES, JAMS REF. NO. 5110000677, EXPERT REPORT FILED APRIL 17, 2026, REBUTTAL REPORT FILED MAY 8, 2026, DEPOSITION TESTIMONY GIVEN AUGUST 10, 2026.

7. *HELMS ET AL. V. GENERAL MOTORS LLC,* UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:22-CV-10783-MAG-KGA, EXPERT REPORT FILED FEBRUARY 20, 2026. (HON. MARK A. GOLDSMITH).

8. *LARGAN PRECISION CO., LTD. V. MOTOROLA MOBILITY LLC*, IN THE HIGH COURT OF DELHI AT NEW DELHI, (ORDINARY ORIGINAL COMMERCIAL JURISDICTION), CS (COMM) NO. 795 OF 2022 AND CS (COMM) NO. 3 OF 2024, EVIDENCE BY WAY OF AFFIDAVIT (EWA) FILED ON JANUARY 31, 2026, DEPOSITION TESTIMONY GIVEN APRIL 13, 2026, APRIL 15, 2026, APRIL 17, 2026, APRIL 20, 2026, AND APRIL 22, 2026.

9. *PAKAL TECHNOLOGIES, INC. V. ROBERT BOSCH SEMICONDUCTORS, LLC ET AL.*, SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO, CASE NO. CGC-23-61129, EXPERT REPORT FILED ON JANUARY 23, 2026, DEPOSITION TESTIMONY GIVEN JANUARY 26, 2026.

10. *NUTANIX, INC. V. BALA KUCHIBHOTLA, KAMALDEEP KHANUJA, BAKUL BANTHIA, AND TESSELL, INC.*, JUDICIAL ARBITRATION AND MEDIATION SERVICES, JAMS REF. NO. 5110000487, EXPERT REPORT FILED ON OCTOBER 24, 2025, REPLY TO REBUTTAL REPORT FILED JANUARY 16, 2026, DEPOSITION TESTIMONY GIVEN FEBRUARY 17, 2026, ARBITRATION TESTIMONY GIVEN JULY 21, 2026.

11. *JENNIFER L. COOK D/B/A JK COOK, JL COOK SCULPTOR AND SNAKEARTS.COM ET AL. V. META PLATFORMS, INC. F/K/A FACEBOOK, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:22-CV-02485-JCS, DECLARATION FILED ON SEPTEMBER 17, 2025, DEPOSITION TESTIMONY GIVEN OCTOBER 30, 2025, REPLY DECLARATION FILED ON JANUARY 27, 2026. (HON. JOSEPH C. SPERO AND HON. YVONNE GONZALEZ ROGERS)

12. *BTIG, LLC V. STONEX FINANCIAL, INC. AND STONEX GROUP, INC.*, FINRA ARBITRATION, REF. NO. 1210040786, REPORT FILED ON AUGUST 18, 2025, DECLARATION FILED ON SEPTEMBER

2, 2025, ARBITRATION TESTIMONY GIVEN ON DECEMBER 9, 2025, REBUTTAL ARBITRATION TESTIMONY GIVEN ON JANUARY 14, 2026.

13. *J. BULLARD ET AL. V. JAGUAR LAND ROVER AUTOMOTIVE, ET AL.*, U.S. DISTRICT COURT, DISTRICT OF NEW JERSEY, CASE NO. 2:20-CV-14464-JMV-JBC, REPORT FILED ON MAY 28, 2025 (HON. JOHN MICHAEL VAZQUEZ)

14. *LARGAN PRECISION CO., LTD. V. MOTOROLA MOBILITY LLC*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:21-CV-09138-JSW, REPORT FILED ON MAY 16, 2025, SUPPLEMENTAL REPORT FILED ON JUNE 13, 2025, REBUTTAL REPORT FILED JUNE 13, 2025, DEPOSITION TESTIMONY GIVEN JULY 9, 2025, DEPOSITION TESTIMONY GIVEN OCTOBER 8, 2025. (HON. JEFFREY S. WHITE)

15. *(CONFIDENTIAL) V. (CONFIDENTIAL)* – RELATING TO SAAS HEALTHCARE EXCHANGES, CPR INSTITUTE FOR DISPUTE RESOLUTION, CASE NO. G-24-7-NA, DECLARATION FILED ON JANUARY 17, 2025.

16. *LOPEZ ET AL. V. ZARBEE'S, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:22-CV-04465-CRB, DECLARATION FILED ON SEPTEMBER 27, 2024. (HON. CHARLES R. BREYER)

17. *STARR ET AL. V. VSL PHARMACEUTICALS, INC. ET AL.*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND, CASE NO. 8:19-CV-02173-TDC, EXPERT REPORT FILED ON JUNE 3, 2024, DEPOSITION TESTIMONY GIVEN JULY 15, 2024, REPLY REPORT FILED ON NOVEMBER 20,2024. (HON. LYDIA K. GRIGGSBY) (VSL PROBIOTIC BUYERS WIN CLASS CERT. IN RICO CASE - LAW360)

18. *TRIBAL SOLUTIONS GROUP, LLC ET AL. V. VALANDRA ET AL.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, NORTHERN DIVISION, CASE NO. 3:23-CV-00010-CWR-LGI, EXPERT REPORT FILED ON APRIL 5, 2024, SUPPLEMENTAL REBUTTAL REPORT FILED ON JULY 18, 2024, AND ON AUGUST 30, 2024, DEPOSITION TESTIMONY GIVEN AUGUST 28, 2024. (HON. CARLTON W. REEVES)

19. *ABERIN ET AL. V. AMERICAN HONDA MOTOR CO., INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:16-CV-04384-JST, EXPERT REPORT FILED ON APRIL 1, 2024. (HON. JON S. TIGAR)

20. *CMC MATERIALS, INC. V. DUPONT DE NEMOURS, INC. ET AL.*, U.S. DISTRICT COURT, DISTRICT OF DELAWARE, CASE NO. 1:20-CV-00738-MN, EXPERT REPORT FILED ON MARCH 27, 2024,

REBUTTAL REPORT FILED ON MAY 10, 2024, DEPOSITION TESTIMONY GIVEN MAY 30, 2024. (HON. JENNIFER L. HALL)

21. *MARC CHAN ET AL. V. ARCSOFT INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION, CASE NO. 4:19-CV-05836 JSW, EXPERT REPORT FILED APRIL 27, 2023, DEPOSITION TESTIMONY GIVEN JULY 21, 2023, TRIAL TESTIMONY GIVEN JANUARY 31, 2024. (HON. LAUREL BEELER)

22. *EDIBLE IP, LLC ET AL. V. 1-800-FLOWERS.COM, INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, CASE NO. 20-CV-02405-VMC, EXPERT REPORT FILED ON FEBRUARY 17, 2023, DEPOSITION GIVEN MAY 11, 2023. (HON. OMAR A. WILLIAMS)

23. *TECSEC, INCORPORATED V. INTERNATIONAL BUSINESS MACHINES CORPORATION, SAS INSTITUTE, INC., SAP AMERICA, INC., SAP AG, CISCO SYSTEMS, INC., ORACLE AMERICA, INC. (F/K/A SUN MICROSYSTEMS, INC.), SYBASE, INC., SOFTWARE AG, ADOBE SYSTEMS, INC., EBAY, INC., PAYPAL, INC. AND ORACLE CORPORATION*, U.S. DISTRICT COURT, EASTERN DISTRICT OF VIRGINIA, CASE NO. 1:10-CV-00115 LMB-TCB, EXPERT REPORT FILED AUGUST 17, 2020, DEPOSITION TESTIMONY GIVEN ON SEPTEMBER 15, 2020 (HON. LIAM O'GRADY), AMENDED EXPERT REPORT FILED MARCH 31, 2023, (HON. PATRICIA TOLLIVER GILES)

24. *LUMASENSE TECHNOLOGIES, INC. V. ADVANCED ENGINEERING SERVICES*, LLC, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:20-CV-07905, EXPERT REPORT FILED ON SEPTEMBER 14, 2022. (HON. WILLIAM H. ORRICK)

25. *NETGEAR, INC. V. ASUSTEK COMPUTER, INC. AND ASUS COMPUTER INTERNATIONAL, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:21-CV-08993, EXPERT REPORT FILED ON AUGUST 12, 2022. (HON. CHARLES R. BREYER)

26. *TARGA MANAGEMENT HOLDINGS, LLC, TARGA PARENT HOLDINGS, LLC, TARGA BUYER, LLC, THE CHUDY GROUP, LLC (D/B/A/ TCGRX) AND PARATA SYSTEMS, LLC V. DUANE S. CHUDY, DEAN A. CHUDY, JONATHAN F. CHUDY, GOLF GIFTS & GALLERY, INC., JAMES T. SPERNOW, MATTHEW E. NOFFSINGER, AND THE JFC GROUP (D/B/A TRUPAKRX)*, STATE OF WISCONSIN CIRCUIT COURT, MILWAUKEE COUNTY, CASE NO. 2021CV000938, EXPERT REPORT FILED ON JUNE 14, 2022, DEPOSITION TESTIMONY GIVEN SEPTEMBER 14, 2022. (HON. LAURA GRAMLING PEREZ)

27. *SPEERLY ET AL., V. GENERAL MOTORS, LLC*, U.S. DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:19-CV-11044-DML-DRG, EXPERT REPORT FILED ON OCTOBER 9, 2021, DEPOSITION TESTIMONY GIVEN DECEMBER 3, 2021, EXPERT REPORT FILED ON FEBRUARY 20, 2026. (HON. DAVID M. LAWSON)

28. *ROBERT PONZIO ET AL. V. MERCEDES-BENZ USA, LLC AND DAIMLER AG*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, CASE NO. 1:18-CV-03984-

MHC, DECLARATION FILED ON JANUARY 27, 2021 AND ON JULY 21, 2021. (HON. JOSEPH H. RODRIGUEZ)

29. *EXPRESS LIEN, INC. V. HANDLE, INC. ET AL.*, U.S. DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, CASE NO. 2:19-CV-10156-SSV-MBN, EXPERT REPORT FILED ON MARCH 10, 2021, DEPOSITION TESTIMONY GIVEN APRIL 30, 2021. (HON. JANE T. MILAZZO).

30. *RINGCENTRAL, INC. V. NEXTIVA, INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:19-CV-02626-NMC, EXPERT REPORT FILED ON JANUARY 19, 2021, REBUTTAL REPORT FILED ON FEBRUARY 24, 2021, DEPOSITION TESTIMONY GIVEN ON MARCH 12, 2021. (HON. NATHANAEL M. COUSINS)

31. *JBF INTERLUDE 2009 LTD – ISRAEL (COLLECTIVELY, "EKO") V. QUIBI HOLDINGS, INC.*, U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION, CIVIL ACTION NO. 2:20-CV-2299, DECLARATION FILED ON APRIL 1, 2020, REPLY DECLARATION FILED ON APRIL 21, 2020, DECLARATION FILED ON OCTOBER 27, 2020, DEPOSITION TESTIMONY GIVEN ON DECEMBER 8, 2020. (HON. JOHN A. KRONSTADT)

32. *APARTMENT OWNERS ASSOCIATION OF CALIFORNIA, INC. ET AL. V. CITY OF LOS ANGELES ET AL.*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, CONSOLIDATED CASE NO. BC709658, EXPERT REPORT FILED OCTOBER 21, 2020, DEPOSITION TESTIMONY GIVEN ON NOVEMBER 23, 2020 (HON. MAREN E. NELSON)

33. *SZ DJI TECHNOLOGY CO., LTD. AND DJI EUROPE B.V. V. AUTEL ROBOTICS USA, LLC AND AUTEL AERIAL TECHNOLOGY CO. LTD.*, U.S. DISTRICT COURT, DISTRICT OF DELAWARE, CIVIL ACTION NO. 1:16-CV-00706-LPS-CJB, EXPERT REPORT FILED ON JANUARY 19, 2018, SUPPLEMENTAL REPORT FILED ON MARCH 7, 2018, REBUTTAL REPORT FILED ON JANUARY 23, 2020, DEPOSITION TESTIMONY GIVEN ON FEBRUARY 11, 2020, SUPPLEMENTAL REBUTTAL REPORT FILED ON JUNE 22, 2020, DEPOSITION TESTIMONY GIVEN ON JULY 6, 2020. (HON. LEONARD P. STARK)

34. *ARIZA ET AL. V. LUXOTTICA RETAIL NORTH AMERICA, D/B/A, LENSCRAFTERS*, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK, BROOKLYN DIVISION, CASE NO. 1:17-CV-05216-PKC-RLM, EXPERT REPORT FILED ON SEPTEMBER 10, 2019, REBUTTAL REPORT FILED ON NOVEMBER 13, 2019, DEPOSITION TESTIMONY GIVEN ON DECEMBER 10, 2019, DECLARATION FILED ON FEBRUARY 18, 2020. (HON. PAMELA K. CHEN)

35. *QUEST SOFTWARE, INC. V. NIKE, INC.*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON, PORTLAND DIVISION, CASE NO. 3:18-CV-00721, EXPERT REPORT FILED ON JULY 19, 2019. (HON. KARIN J. IMMERGUT)

36. *JRV, LLC ET AL. V. WINERY EXCHANGE, INC.*, JAMS ARBITRATION – SAN FRANCISCO RESOLUTION CENTER, REFERENCE NUMBER 1100090897, EXPERT REPORT FILED ON MAY 15, 2019, REBUTTAL REPORT FILED ON MAY 25, 2019, DEPOSITION TESTIMONY GIVEN ON

MAY 28, 2019, ARBITRATION TESTIMONY GIVEN ON JUNE 20, 2019. (MS. ZELA “ZEE” G. CLAIBORNE, ESQ.)

37. *BK TRUCKING CO. ET AL. V. PACCAR, INC. ET AL.*, UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY, CASE NO. 1:15-CV-02282-JPS-AMD, EXPERT REPORT FILED ON JANUARY 14, 2019, SUPPLEMENTAL REPORT FILED ON APRIL 12, 2019, REBUTTAL REPORT FILED ON JUNE 7, 2019, DEPOSITION TESTIMONY GIVEN ON JUNE 19, 2019. (HON. JEROME B. SIMANDLE)

38. *ROADRUNNER INTERMODAL SERVICES, LLC V. T.G.S. TRANSPORTATION, INC.*, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA, CASE NO. 1:17-CV-01056-DAD-BAM, DECLARATION FILED ON OCTOBER 24, 2017, EXPERT REPORT FILED ON MARCH 11, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 4, 2019, SUPPLEMENTAL REPORT FILED ON APRIL 12, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 23, 2019. (HON. DALE A. DROZD)

39. *MANUFACTURING RESOURCES INTERNATIONAL, INC. V. CIVIQ SMARTSCAPES, LLC ET AL.*, UNITED STATES DISTRICT COURT, DISTRICT OF DELAWARE, CASE NO. 1:17-CV-00269-RGA, EXPERT REPORT FILED ON FEBRUARY 19, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 2, 2019. (HON. RICHARD G. ANDREWS)

40. *MICREL, LLC V. RAY ZINN*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SAN MATEO, CASE NO. 538785, EXPERT REPORT FILED ON MARCH 23, 2017, DEPOSITION TESTIMONY GIVEN ON APRIL 26, 2017, TRIAL TESTIMONY GIVEN ON JANUARY 10, 2019. (HON. RICHARD H. DUBOIS)

41. *JOHANNESSOHN ET AL. V. POLARIS INDUSTRIES, INC.*, UNITED STATES DISTRICT COURT, DISTRICT OF MONTANA, CASE NO. 0:16-CV-03348-PJS-LIB, EXPERT REPORT FILED ON NOVEMBER 16, 2018, DEPOSITION TESTIMONY GIVEN ON JANUARY 17, 2019, EXPERT REPORT FILED ON MARCH 21, 2019. (HON. NANCY BRASEL) – OPPOSING EXPERT WAS NOBEL PRIZE WINNER DANIEL MACFADDEN.

42. *TQ DELTA, LLC V. 2WIRE, INC.*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, CASE NO. 13-CV-1835-RGA, EXPERT REPORT FILED ON NOVEMBER 9, 2018, EXPERT REPORT FILED ON NOVEMBER 29, 2018, DEPOSITION TESTIMONY GIVEN ON DECEMBER 17, 2018, EXPERT REPORT FILED ON DECEMBER 28, 2018, DEPOSITION TESTIMONY GIVEN ON JANUARY 29, 2019. (HON. RICHARD G. ANDREWS)

43. *DELL’ORO GROUP, INC. V. 650 GROUP, LLC ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:17-CV-00750-JD, EXPERT REPORT FILED ON AUGUST 7, 2018, DECLARATION FILED ON SEPTEMBER 10, 2018, AND SUPPLEMENTAL EXPERT REPORT FILED ON SEPTEMBER 20, 2018. (HON. JAMES DONATO)

44. *COPART, INC. V. SPARTA CONSULTING*, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA, CASE NO. 2:14-CV-0046-KJM-CKD, AFFIRMATIVE EXPERT REPORT REGARDING

COUNTER-CLAIMS, MAY 31, 2016, REBUTTAL REPORT REGARDING CONTRACT CLAIMS FILED ON NOVEMBER 24, 2016, REBUTTAL REPORT REGARDING TRADE SECRET CLAIMS FILED ON DECEMBER 16, 2016, DEPOSITION TESTIMONY GIVEN ON JANUARY 17, 2017, TRIAL TESTIMONY GIVEN ON MAY 16, 2018. (HON. KIMBERLY J. MUELLER)

45. *CAMSOFT DATA SYSTEMS, INC. V. SOUTHERN ELECTRONICS SUPPLY, INC.*, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, CASE NO. 3:09-CV-01047, EXPERT REPORT FILED APRIL 14, 2018. (HON. JANICE CLARK)

46. *QUANTUMSCAPE CORPORATION V. Z. CHEN & K. KERMAN*, JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC., REFERENCE NUMBER 1100088671, DEPOSITION TESTIMONY GIVEN APRIL 10, 2018.

47. *THE PARALLAX GROUP INTERNATIONAL, LLC V. INCSTORES, LLC*, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, THE SOUTHERN DISTRICT, CASE NO. 8:16-CV-929-AG-DFM, EXPERT REPORT FILED ON AUGUST 3, 2017, DEPOSITION TESTIMONY GIVEN ON MARCH 20, 2018. (HON. ANDREW J. GUILFORD)

48. *POLYGROUP LIMITED (MCO), (PETITIONER) V. WILLIS ELECTRIC COMPANY, LIMITED (PATENT OWNER)*, UNITED STATES PATENT AND TRADEMARK OFFICE BEFORE THE PATENT TRIAL AND APPEAL BOARD, CASE NOS. IPR2016-01610; -01612, DECLARATION FILED ON AUGUST 23, 2017, DEPOSITION TESTIMONY GIVEN ON SEPTEMBER 26, 2017, AND, SUPPLEMENTAL DECLARATION FILED ON NOVEMBER 13, 2017, AND ON DECEMBER 8, 2017.

49. *EVOLVED WIRELESS, LLC V. LENOVO GROUP, LTD., LENOVO (UNITED STATES) INC., AND MOTOROLA MOBILITY LLC*, U.S. DISTRICT COURT DISTRICT OF DELAWARE, CASE NO. 1:15-CV-00544-SLR, EXPERT REPORT FILED ON JULY 17, 2017, DEPOSITION TESTIMONY GIVEN ON AUGUST 15, 2017. (HON. SUE LEWIS ROBINSON)

50. *THE REGENTS OF THE UNIVERSITY OF CALIFORNIA V. ST. JUDE MEDICAL, INC.*, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION, CASE NO. 4:16-CV-06210-YGR. (HON. YVONNE GONZALEZ ROGERS)

51. *BEHINDTHECHAIR.COM V. D. CHRISTAL; OLAPLEX, LLC; LIQWD, INC.*, SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, LASC CASE NO. BC 569584, EXPERT REPORT FILED

APRIL 6, 2017, DEPOSITION TESTIMONY GIVEN ON APRIL 13, 2017. (HON. DEBRE K. WEINTRAUB)

52. *ROBERT LARSEN ET AL. V. VIZIO, INC.*, UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION, CASE NO. 8:14-CV-01865-CJC-JCG, EXPERT REPORT COMPLETED MARCH 27, 2017. (HON. CORMAC J. CARNEY)

53. *JOANNA C. SULLIVAN V. STEPHEN A. FINN*, UNITED STATES DISTRICT COURT, CALIFORNIA NORTHERN DISTRICT, CASE NO. 3:16:CV-01948-WHO, EXPERT REPORT FILED ON MARCH 1, 2017. (HON. WILLIAM H. ORRICK)

54. *IMPROVED SEARCH, LLC V. AOL, INC.*, IN THE UNITED STATES DISTRICT FOR THE DISTRICT OF DELAWARE, CASE NO. 12-262 (SLR) (SRF). (HON. LEONARD P. STARK)

55. *SAN FRANCISCO NEWS PAPER COMPANY LLC V. HEARST CORPORATION ET AL.*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE CITY AND COUNTY OF SAN FRANCISCO, CASE NO. CGC-13-532369, EXPERT REPORT FILED ON NOVEMBER 10, 2016; DEPOSITION TESTIMONY GIVEN ON DECEMBER 9, 2016; SUPPLEMENTAL REPORT FILED ON APRIL 24, 2017; AND, DEPOSITION TESTIMONY GIVEN ON MAY 23, 2017. (HON. CURTIS E. KARNOW)

56. *REILY FOODS COMPANY, INC. V. SCHIFF FOOD PRODUCTS COMPANY, INC. ET AL.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, CIVIL ACTION NO. 16-01505, EXPERT REPORT FILED ON DECEMBER 6, 2016, MEDIATION DECEMBER 7 – 8, 2016. (HON. JANE TRICHE MILAZZO)

57. *RECOVERY VILLAGE AT UMATILLA, L.L.C. V. HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC. ET AL.*, IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA, COMPLEX LITIGATION UNIT, CASE NO. CACE 15-014725(07), EXPERT REPORT FILED ON DECEMBER 16, 2016.

58. *FATPIPE, INC. V. TALARI NETWORKS, INC.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, TYLER DIVISION, CASE NO. 6:15-CV-00458-RWS. (HON. ROBERT W. SCHROEDER, III)

59. *STATE OF OREGON, THE OREGON HEALTH AUTHORITY, AND THE OREGON DEPARTMENT OF HUMAN SERVICES; THE OREGON HEALTH INSURANCE EXCHANGE CORPORATION, DBA COVER OREGON V. ORACLE AMERICA, INC. ET AL.*, IN THE CIRCUIT COURT OF THE STATE

OF OREGON, FOR THE COUNTY OF MARION, NO. 14 C 20043. CASE SETTLED ON SEPTEMBER 15, 2015. (HON. ANNA J. BROWN).

60. *CLOS LACHANCE WINES, INC. V. A.V. BRANDS, INC.*, JAMS ARBITRATION, EXPERT REPORT AND DEPOSITION TESTIMONY FILED AND GIVEN ON FEBRUARY 19, 2016, ARBITRATION TESTIMONY GIVEN ON MARCH 8, 2016.

61. *RACING OPTICS, INC. V. AEVOE CORPORATION*, U.S. DISTRICT COURT FOR THE DISTRICT OF NEVADA, CIVIL ACTION NO. 2:15-CV-01774-JCM-VCF. (HON. ROBERT C. JONES)

62. *FERRING B.V. V. FERA PHARMACEUTICALS, LLC, PERRIGO COMPANY, PERRIGO COMPANY PLC, PERRIGO COMPANY OF TENNESSEE, AND PERRIGO NEW YORK, INC.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK, CIVIL ACTION NO. 2:13-CV-04640, EXPERT REPORT FILED ON DECEMBER 11, 2015. (HON. SANDRA J. FEUERSTEIN)

63. *HEARTLAND PAYMENT SYSTEMS, INC. V. MERCURY PAYMENT SYSTEMS*, LLC, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:14-CV-00437-JCS. (HON. JOSEPH C. SPERO)

64. *EMBLAZE LTD. V. MICROSOFT CORPORATION*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:12-CV-5422 JST. (HON. YVONNE GONZALEZ ROGERS)

65. *FORMFACTOR, INC. V. MARTEK, INC.*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:14-CV-01122, EXPERT REPORT FILED ON MAY 1, 2015. (HON. JAMES DONATO)

66. *BETTER MOUSE COMPANY, LLC V. STEELSERIES APS; AND STEELSERIES NORTH AMERICA CORP.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION, CASE NO. 2:14-CV-198, EXPERT REPORT FILED ON SEPTEMBER 24, 2015, TRIAL TESTIMONY GIVEN ON JANUARY 13, 2016. (HON. ROY S. PAYNE)

67. *INTERSTATE FIRE & CASUALTY COMPANY AND FIREMEN'S FUND INSURANCE COMPANY V. APARTMENT MANAGEMENT CONSULTANTS, LLC, SUNRIDGE PARTNERS, LLC, AND AMBER NICOLE LOMPE*, U.S. DISTRICT COURT FOR THE DISTRICT OF WYOMING, CIVIL ACTION NO. 13-CV-278 J, EXPERT REPORT FILED ON MARCH 18, 2015, DEPOSITION TESTIMONY, JUNE 8, 2015, AND SUPPLEMENTAL EXPERT REPORT, AUGUST 13, 2015. (HON. ALAN B. JOHNSON)

68. *GOOD TECHNOLOGY CORPORATION AND GOOD TECHNOLOGY SOFTWARE, INC. V. MOBILEIRON, INC.,* U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION CASE NO. 12-05826-EDL, EXPERT REPORT FILED ON JANUARY 9, 2015

AND FEBRUARY 13, 2015; AND, TRIAL TESTIMONY GIVEN ON JULY 28, 2015. (HON. PAUL SINGH GREWAL)

69. *FUJIFILM CORPORATION V. MOTOROLA MOBILITY LLC*, UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION CASE NO. C 12-03587 RS, EXPERT REPORT FILED ON OCTOBER 31, 2014 AND JANUARY 15, 2015; DEPOSITION TESTIMONY GIVEN ON NOVEMBER 18, 2014; AND, JANUARY 26, 2015; AND, TRIAL TESTIMONY GIVEN ON APRIL 28, 2015. (HON. WILLIAM H. ORRICK)

70. *COE ET AL. V. PHILIPS ORAL HEALTHCARE, INC.*, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON MASTER DOCKET NO. 2:13-CV-00518-MJP. (HON. MARSHA J. PECHMAN)

71. *VENTURE CORPORATION LTD AND VENTURE DESIGN SERVICES, INC. V. JAMES BARRETT*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA CASE NO. CV-13-03384-PSG (ADR), EXPERT REPORT FILED ON OCTOBER 6, 2014. (HON. PAUL SINGH GREWAL)

72. *M. VILLANUEVA ET AL. V. FIDELITY NATIONAL TITLE COMPANY, ET AL.*, SANTA CLARA COUNTY SUPERIOR COURT CASE NO. 1-10-CV-173356, EXPERT REPORT FILED ON MARCH 20, 2014, DEPOSITION TESTIMONY GIVEN ON MARCH 21, 2014; AND, TRIAL TESTIMONY GIVEN ON MAY 15, 2014. (HON. PETER H. KIRWAN)

73. *FEDERAL HOUSING FINANCE AGENCY, ETC. V. JPMORGAN CHASE ET AL.*, U.S. DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK CASE NO. 11 CIV. 6188(DLC). (HON. DENISE COTE)

74. *KB HOMES V. K&L GATES, LLP (AKA KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP) ET AL*, LOS ANGELES COUNTY SUPERIOR COURT CASE NO. BC484090, REBUTTAL

DECLARATION FILED ON MAY 5, 2014, EXPERT REPORT FILED ON JANUARY 17, 2014, AND DEPOSITION TESTIMONY GIVEN ON JANUARY 23, 2014. (HON. WILLIAM F. HIGHBERGER)

75. *GALENA STREET FUND, L.P. V. WELLS FARGO BANK, N.A.*, U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO CASE NO. 1:12-CV-00587-MSK, EXPERT REPORT FILED ON MAY 2, 2014. (HON. MICHAEL J. WANTANABE)

76. *HYPHENATED SYSTEMS, LLC V. BRUKER NANO, INC. ET AL*, SANTA ANA COUNTY SUPERIOR COURT, UNLIMITED JURISDICTION CASE NO. 1-11-CV212650, EXPERT REPORT AND DEPOSITION TESTIMONY FILED AND GIVEN ON OCTOBER 22, 2013.

77. *HENRY A., ET AL. V. MICHAEL WILLDEN, ET AL*, U.S. DISTRICT COURT, DISTRICT OF NEVADA CASE NO. 2:10-CV-00528- RCJ-PAL. (HON. ROBERT C. JONES)

78. *UTHE TECHNOLOGY CORPORATION V. AETRIUM, INC., HENRY ALLEN, ET AL*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION CASE NO. 3:95-CV-02377-WHA, EXPERT REPORT FILED ON JUNE 14, 2013, AND DEPOSITION TESTIMONY GIVEN ON JUNE 19, 2013. (HON. WILLIAM ALSUP)

79. *RICHARD COHEN V. ROBERT TALBOTT, INC.,* AMERICAN ARBITRATION ASSOCIATION CASE NO. 74 116 170 11 DECR.

80. *WIRELESS INK CORPORATION V. FACEBOOK, INC., GOOGLE, INC., YOUTUBE, INC., YOUTUBE LLC, AND MYSPACE, INC.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK CASE NO. 10-CV-1841 AND 11.CV-1751, DECLARATION ON AUGUST 6, 2012. (HON. P. KEVIN CASTEL)

81. *ALLIED FELLOWSHIP SERVICE V. RMD SERVICES I, LLC ET AL.*, ALAMEDA COUNTY SUPERIOR COURT CASE NO. RG09488702. (HON. P. KEVIN CASTEL)

82. *WHITTLESTONE, INC. V. HANDI-CRAFT COMPANY*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION CASE NO. 08-04193 SBA, EXPERT REPORT FILED ON MAY 14, 2012, AND DEPOSITION TESTIMONY GIVEN ON JUNE 14, 2012. (HON. JACQUELINE SCOTT CORLEY)

83. *C. SCLIMENTI V. THE LELAND STANFORD JUNIOR UNIVERSITY ET AL.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 08-CV-01730-W-BLM, EXPERT REPORT FILED

[redacted]

ON FEBRUARY 1, 2011, AND DEPOSITION TESTIMONY GIVEN ON MAY 6, 2011. (HON. ANTHONY J. BATTAGLIA)

84. *CARDSTORE.COM, INC. F/K/A INK2 CORPORATION V. MIMEO.COM, INC.*, JAMS ARBITRATION, EXPERT REPORT COMPLETED ON DECEMBER 21, 2010 (SETTLED DATE OF FILING).

85. *DWS INTERNATIONAL, INC. DBA MARBLE DIMENSIONS WORLDWIDE V. MEIXIA ARTS AND HANDCRAFTS CO. LTD., HOME CASUAL, LLC, ET AL*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF OHIO, CASE NO. 3:09CV458, EXPERT REPORT FILED ON AUGUST 16, 2010, DEPOSITION TESTIMONY GIVEN ON JANUARY 21, 2011 AND, TRIAL TESTIMONY GIVEN ON JUNE 24, 2011. (HON. THOMAS M. ROSE)

86. *LBV ASSET MANAGEMENT LLP ET AL. V. SGAM NEWEDGE MANAGEMENT, INC. ET AL*, JAMS ARBITRATION, EXPERT REPORT FILED ON APRIL 28, 2010, SUPPLEMENTAL EXPERT REPORT FILED ON JUNE 2, 2010, AND ARBITRATION TESTIMONY GIVEN ON JUNE 10, 2010.

87. *CELSO ROBLEDO ET AL. V. CITY OF CHICAGO ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION CASE NO. 05 C 0335, EXPERT REPORT FILED ON NOVEMBER 21, 2008. (HON. ELAINE E. BUCKLO)

88. *COACHMEN INDUSTRIES ET AL. V. CRANE COMPOSITES, INC. F/K/A KEMLITE*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF INDIANA CASE NO. 3:06-CV-0160-CAN, EXPERT REPORT FILED ON JULY 1, 2007 AND SEPARATE EXPERT REPORT FILED ON JUNE 21, 2007 AND JULY 1, 2007. (HON. CHRISTOPHER A. NEUCHTERLEIN)

89. *TIFFANY BLACKWELL ET AL. V. SKYWEST AIRLINES, INC.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 06CV0307, EXPERT REPORT FILED ON JUNE 25, 2007. (HON. DANA M. SABRAW)

[redacted]

# Appendix 2

Richard Eichmann
September 2, 2026

# Materials Relied Upon

**Declarations and Expert Reports**

- Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026, and Appendices.
- Declaration of Matthew S. Karlovic in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, July 6, 2026.
- Declaration of Richard J. Eichmann in Support of Counterclaim-Plaintiffs' Motion for Preliminary Injunction, July 31, 2026, and Schedules.
- Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, August 6, 2026, and Appendices.
- Declaration of Lawrence DeMonico, September 2, 2026, and Exhibits 1–78.

**Deposition**

- Deposition of Matthew S. Karlovic, as Rule 30(b)(6) designee of AS Designs, LLC, July 30, 2026, and Exhibits.

**Legal Filing**

- *ABC IP, LLC et al. v. AS Designs, LLC et al.*, Plaintiffs' Motion for Temporary Restraining Order, September 2, 2026.

**Literature**

- Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd ed. (Reading, MA: Addison-Wesley, 2000), ch. 7, "Product Differentiation and Monopolistic Competition."
- Marvin B. Lieberman and David B. Montgomery, "First-Mover Advantages," *Strategic Management Journal* 9 (1988): 41–58, available at https://uol.de/f/2/dept/wire/fachgebiete/entrepreneur/download/Artikel_Internetoekonomie/Lieberman_First_Mover.pdf, accessed August 30, 2026.
- Jean Tirole, *The Theory of Industrial Organization* (Cambridge, MA: The MIT Press, 1988), pp. 209–302, 314–351, Internet Archive, available at https://archive.org/details/theoryofindustri00jean, accessed September 1, 2026.
- W. Kip Viscusi, Joseph E. Harrington, Jr. and John M. Vernon, *Economics of Regulation and Antitrust*, 4th ed. (Cambridge, MA: The MIT Press, 2005), Internet Archive, available at https://archive.org/details/economicsofregul0000visc_p1o1/page/n7/mode/2up, accessed September 1, 2026.
- Russell S. Winer, "A Reference Price Model of Brand Choice for Frequently Purchased Products," *Journal of Consumer Research* 13, no. 2 (1986): 250–56, available at https://pages.stern.nyu.edu/~rwiner/Reference%20price%201986%20paper.pdf, accessed August 30, 2026.

**Sales Data**

- Rare Breed Transaction Data.
- [redacted]ions.
- [redacted]
- [redacted]
- [redacted].
- [redacted]
- [redacted]