[redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: RARE BREED TRIGGERS PATENT LITIGATION | CASE NO. 4:26-md-03176-ALM |
| RARE BREED TRIGGERS, INC. et al.,<br>Plaintiffs,<br>vs.<br>AS DESIGNS, LLC et al.,<br>Defendants. | (CASE NO. 4:26-cv-00370-ALM)<br>CHIEF JUDGE AMOS L. MAZZANT |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iv

I. BACKGROUND ........ 1

II. APPLICABLE LAW ........ 2

III. DISCUSSION ........ 3

A. Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits ........ 3

B. Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm ........ 7

1. Plaintiffs' Delay Refutes Any Claim of Emergency ........ 8

2. Plaintiffs' own Economist Concedes that the Claimed Harm can Be Measured. ........ 9

3. Plaintiffs [redacted] and Price Infringement in Dollars ........ 11

4. ARHK Demand Is Driven by Features and Sentiments Unrelated to the Asserted Patents ........ 11

5. The Record Does Not Show Likely Diversion of Plaintiffs' Sales ........ 13

6. The Claimed Price, Lead-Time, and Reputational Harms Are Speculative or Not Caused by the ARHK ........ 14

7. Any Damages Attributable to the ARHK are Collectible ........ 16

C. The Balance of Harms Favors AS Designs ........ 17

1. A Restraint Would Impose Immediate Harm on AS Designs. ........ 17

2. Plaintiffs' "Delayed Launch" Argument Contradicts their own Theory of Harm. ........ 18

3. AS Designs' Hardship Is Not "Self-Inflicted." ........ 18

4. Plaintiffs' Side of the Scale Is Light ........ 19

D. The Public Interest Favors Denial of the Requested Injunction ........ 20

E. A TRO Would Require a Sizeable Bond ........ 22

**Page**

IV. CONCLUSION.....23

V. HEARING.....24

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Alpek Polyester, S.A. v. Polymetrix AG*,
No. 2021-1706, 2021 WL 5974163 (Fed. Cir. Dec. 16, 2021) .......... 5

*Apple Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) .......... 7, 8, 12

*Apple Inc. v. Samsung Elecs. Co.*,
735 F.3d 1352 (Fed. Cir. 2013) .......... 3

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015) .......... 10

*Big Tyme Invs., L.L.C. v. Edwards*,
985 F.3d 456 (5th Cir. 2021) .......... 3

*Bio-Rad Labs. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) .......... 10

*BlephEx, LLC v. Myco Indus.*,
24 F.4th 1391 (Fed. Cir. 2022) .......... 3

*Clark v. Prichard*,
812 F.2d 991 (5th Cir. 1987) .......... 2

*Commil USA, LLC v. Cisco Sys.*,
575 U.S. 632 (2015) .......... 5

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) .......... 4, 5

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*,
246 F.3d 1336 (Fed. Cir. 2001) .......... 10

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013) .......... 10

*Duncan Parking Techs. v. IPS Grp.*,
914 F.3d 1347 (Fed. Cir. 2019) .......... 4

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 8

**Page(s)**

*Flores v. Sanders*,
No. 6:21cv145, 2022 WL 18276842 (E.D. Tex. May 12, 2022) ........................................4

*Heil Trailer Int'l v. Kula*,
542 F. App'x 329 (5th Cir. 2013) ........................................................................................24

*High Tech Med. Instrumentation, Inc. v. New Image Indus.*,
49 F.3d 1551 (Fed. Cir. 1995)..............................................................................................8

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ..............................................................................................16

*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988)..........................................................................................21

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990)............................................................................................10

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ..............................................................................................17

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
656 F. App'x 504 (Fed. Cir. 2016) .......................................................................................5

*Mallet & Co. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) .........................................................................................22, 23

*Mead Johnson & Co. v. Abbott Labs.*,
201 F.3d 883 (7th Cir. 2000) .......................................................................................22, 23

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017)............................................................................................3

*Mitek Sys. v. United Servs. Auto. Ass'n*,
139 F.4th 1340 (Fed. Cir. 2025) ...........................................................................................5

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
106 F.4th 1369 (Fed. Cir. 2024) ...........................................................................................7

*Novartis Pharms. Corp. v. Eon Labs Mfg.*,
363 F.3d 1306 (Fed. Cir. 2004)............................................................................................5

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
843 F.3d 1315 (Fed. Cir. 2016)............................................................................................5

**Page(s)**

*Richert v. Calderin*,
No. 24-cv-21901-ALTMAN, 2025 WL 263454 (S.D. Fla. Jan. 22, 2025) ..........................6

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)..........................................................................................10

*Spath v. Hayes Wheels Int'l-Ind., Inc.*,
211 F.3d 392 (7th Cir. 2000) ..............................................................................................6

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989)..........................................................................................10

*T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*,
821 F.2d 646 (Fed. Cir. 1987)............................................................................................11

*Tek Global, S.R.L. v. Sealant Sys. Int'l*,
920 F.3d 777 (Fed. Cir. 2019)..............................................................................................4

*Tinnus Enter. v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017)..........................................................................................2, 3

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986)........................................................................................18, 19

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008).........................................................................................................3, 7, 14

**STATUTES**

35 U.S.C. § 271 .................................................................................................................4, 5

**RULES**

Fed. R. Civ. P. 65 ......................................................................................................22, 23, 24

## I. BACKGROUND[1]

In January of this year, Defendant AS Designs, LLC ("AS Designs") publicly announced a new forced reset trigger ("FRT") product – the ARHK. (*See* Dkt. #75-29 and #75-33.) The ARHK is a fully self-contained drop-in FRT that is compatible with multiple firearms platforms. (Karlovic Decl. ¶5.) The ARHK is designed for the MP5 family and also for 5.56- and 7.62-caliber roller-delayed rifles, including the AP53, G3/91, HK11, HK21, HK32, and HK33. (*Id*. at ¶¶ 5, 7.) The FRT-RD3, a competing product of Plaintiff Rare Breed Triggers, Inc. ("Rare Breed"), launched in February 2026 and fits only the 9mm MP5 family. (Dkt. #74-2 at ¶¶ 20, 25, 33; Karlovic Decl. ¶3.) AS Designs has listed the ARHK at $549.99; the FRT-RD3 sells for $615 and $620. (Dkt. #74-2 at ¶ 56.)

In the words of Plaintiffs Rare Breed and ABC IP, LLC ("ABC"), AS Designs further announced the ARHK on its Instagram page in early February and "posted full specifications on Instagram on April 4, 2026." (Dkt. #74-2 at ¶54.) Yet Plaintiffs did *nothing* about this for months. Even when they previously moved for a preliminary injunction ("PI") against AS Designs' other products (like the Super Safety and the ARC-Fire) on April 27, 2026, that motion made no mention of the ARHK (which had already been publicly discussed for several months). (*See* Dkt. #28.)

Finally, on September 2, 2026, Plaintiffs moved for a temporary restraining order ("TRO") against the ARHK based on alleged infringement of several asserted patents: U.S. Patent 12,031,784 ("'784 Patent," Dkt. #75-3), U.S. Patent 12,038,247 ("'247 Patent," Dkt. #75-1), U.S. Patent 12,578,159 ("'159 Patent," Dkt. #75-2), and U.S. Patent 12,636,403 ("'403 Patent," Dkt.

[1] This Opposition is accompanied by the supporting declarations of Matthew Karlovic ("Karlovic Decl."), Eric Phillips ("Phillips Decl."), and Sergey Vernyuk ("Vernyuk Decl."). Exhibit 1 of the Vernyuk Declaration is referred to as the "DeMonico Dep." All docket citations are to this case, unless otherwise indicated (e.g., n.4 and n.7 below).

#75-4). ("TRO Mot.," Dkt. #74.[2]) They filed the TRO Motion despite the fact that no complaint (operative or pending) even mentions the ARHK. Furthermore, despite Plaintiffs' claims that the ARHK's full specifications are publicly available, the TRO Motion includes no comparison of the asserted patent claims with the ARHK.

Because the ARHK is not the subject of any claim against Defendants, preliminary injunctive relief cannot be granted regarding it. And Plaintiffs' lack of a term-by-term comparison of the asserted patent claims against the ARHK means the TRO Motion cannot show a likelihood of success on the merits. Plaintiffs' likelihood of success is further reduced in light of the substantial questions regarding the validity of the asserted patents (as further explained below). And Plaintiffs' delay in seeking the TRO belies any claims of irreparable harm due to the ARHK. For these reasons and others discussed in this Opposition, Defendants respectfully submit that the TRO Motion should be denied.

## II. <u>APPLICABLE LAW</u>

A request for preliminary injunctive relief is generally governed by regional circuit law, though the Federal Circuit has itself built a body of precedent applying the general considerations to patent cases and gives dominant effect to that precedent insofar as it reflects considerations specific to patent issues. *Tinnus Enter. v. Telebrands Corp.*, 846 F.3d 1190, 1202-03 (Fed. Cir. 2017). The prerequisites for granting a TRO are the same as for a preliminary injunction. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). They are: (1) likelihood of success on the merits, (2) irreparable harm in the absence of the injunctive relief, (3) the balance of hardships tipping in the movant's favor, and (4) the injunction is in the public interest. *Tinnus Enter.*, 846 F.3d at 1202;

[2] The TRO Motion was supported, *inter alia*, by a declaration from Rare Breed's president, Lawrence DeMonico (Dkt. #74-2), and one from Plaintiffs' damages expert, Dr. Eichmann (Dkt. #74-1).

*Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021) (movant must "clearly carr[y] the burden of persuasion on all four requirements"). Preliminary injunctive relief "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

On likelihood of success, the patentee must show that it will likely prove infringement and that it will likely withstand any challenges to the validity of the patent. An accused infringer need only demonstrate a substantial question of validity or infringement to defeat a likelihood of success on the merits. *Tinnus Enter.*, 846 F.3d at 1202. Unlike proving invalidity at trial, an accused infringer "need not, to defeat a preliminary injunction [or TRO], prove invalidity by clear and convincing evidence . . . ." *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022); *see also Tinnus Enter.*, 846 F.3d at 1205 (the burden to show a substantial question of invalidity at the PI/TRO stage is lower than what is required to prove invalidity at trial).

The patentee must also establish that it is likely to suffer irreparable harm (absent the injunction) and that there is a causal nexus between the alleged harm and the alleged infringement. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017)*; see also Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (the causal-nexus requirement distinguishes between irreparable harm caused by infringement and irreparable harm caused by otherwise lawful competition). On the balance of hardships, a court weighs the harm to the movant if the injunction is not granted against the harm to the non-movant if the injunction is granted. *Metalcraft*, 848 F.3d at 1369.

## III. DISCUSSION

### A. Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits.

As an initial matter, the complaint that was operative when the TRO Motion was filed does

not even mention the ARHK – it could not since it was filed on December 30, 2025, before the ARHK was announced. (*See* Dkt. #4.) The recently allowed complaint does not mention the ARHK either. (*See* Dkt. #39 and #82.) A request for preliminary injunctive relief "must be based on allegations related to the claims in the complaint." *Flores v. Sanders*, No. 6:21cv145, 2022 WL 18276842, at *2 (E.D. Tex. May 12, 2022). So without even a pending pleading on the ARHK – much less an entered one – this TRO Motion should be denied.

To the extent Plaintiffs will claim that the ARHK was somehow presciently included in their complaints (entered or pending) by virtue of the ARC-Fire, it is not clear from those complaints what specific causes of action Plaintiffs are actually asserting against what products. The prior complaint includes two counts of indirect infringement and two counts of direct infringement. (*See* Dkt. #4 at 12-48.) But the current proposed complaint scraps that approach, replacing it with five counts, each of which asserts direct, induced, "and/or" contributory infringement of one of five patents. (*See* Dkt. #39 at 13-99.) Furthermore, those counts (which are asserted against several different products) assert infringement "literally and/or under the doctrine of equivalents." (*See id.*)

Proving direct infringement (under 35 U.S.C. §271(a)) requires a patentee to establish that one or more patent claims read on the accused product literally or under the doctrine of equivalents (i.e., that the product embodies each claim limitation literally or its equivalent). *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005); *Tek Global, S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 784 (Fed. Cir. 2019). That analysis entails two steps: (1) determining the meaning and scope of the asserted claims (i.e., claim construction), and (2) comparing the construed claims to the accused products. *Duncan Parking Techs. v. IPS Grp.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).

Proving induced infringement (under §271(b)) requires a patentee to establish that (1) a third party directly infringed the asserted claims (i.e., underlying direct infringement), (2) the defendant induced those infringing acts (i.e., causation), and (3) the defendant knew the acts it induced constituted infringement (i.e., intent). *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 843 F.3d 1315, 1332 (Fed. Cir. 2016); *Alpek Polyester, S.A. v. Polymetrix AG*, No. 2021-1706, 2021 WL 5974163, at *8 (Fed. Cir. Dec. 16, 2021). The second step requires the inducer to take an affirmative act to encourage infringement. *Power Integrations*, 843 F.3d at 1332.

The Federal Circuit has discussed contributory infringement (under §271(c)) using several different formulations. Synthesizing them, the required elements are: (1) an act of direct infringement, (2) the defendant knew that the combination for which its component was especially made was both patented and infringing (i.e., knowledge of the patent and knowledge of infringement), (3) the defendant's component is not a staple article of commerce suitable for substantial non-infringing uses, and (4) the component is a material part of the patented invention. *Cross Med.*, 424 F.3d at 1312; *Mitek Sys. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1351 (Fed. Cir. 2025); *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522 (Fed. Cir. 2016); *see also Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 639 (2015). "[T]here can be no inducement or contributory infringement absent an underlying direct infringement." *Novartis Pharms. Corp. v. Eon Labs Mfg.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004). If a defendant reasonably believes that he does not infringe (e.g., by reading the claims differently from the plaintiff), that defendant is not liable for indirect infringement, even if his reading is ultimately wrong. *See Koninklijke Philips*, 656 F. App'x at 523 (citing *Commil*, 575 U.S. at 642).

The TRO Motion dedicates just a few pages to the likelihood-of-success factor, to discuss the applicable legal standards, claim construction, infringement of four patents, and the patents' validity. (*See* Dkt. #74 at 16-20). To say that the discussion is sparse is a severe understatement; the TRO Motion does not even go through each element of each asserted claim and compare it against the accused product (as required to show direct infringement). The conclusory and undeveloped nature of the infringement arguments alone justifies denying the TRO Motion. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).

Instead, the TRO Motion offloads the discussion to *exhibits* of several Luettke Declarations that were filed with *other* motions on *other* products. (*See* Dkt. #74 at 17-18.) Plaintiffs did not include (in the TRO Motion or any supporting expert declaration) any technical discussion of the ARHK (e.g., its components and construction, and how it works) because they do not know such details (since the ARHK has not been released yet). That is why they asked for such information so they could use it in the TRO Motion. (*See* Dkt. #74 at 3, 9; Dkt. #75-5.) They did not obtain that information yet filed their TRO Motion anyway. But without such information, Plaintiffs cannot possibly show that the ARHK (for which they included no technical discussion) likely meets each and every element of each of the roughly two dozen asserted claims and thus likely infringes the four asserted patents – which is what Plaintiffs must do to obtain a TRO.

Additionally, Plaintiffs' effective incorporation by reference (of multiple prior Luettke Declarations) is a transparent attempt to circumvent this District's page limits. *See Richert v. Calderin*, No. 24-cv-21901-ALTMAN, 2025 WL 263454, at *1 (S.D. Fla. Jan. 22, 2025). Plaintiffs requested leave to increase their TRO Motion from 15 pages to 30. (*See* Dkt. #72.) But incorporating *three* Luettke declarations (Luettke I Decl., Luettke Reply Decl., and Luettke II Decl.) and their seven exhibits results in a whopping 269 pages (!) added to the TRO Motion's

already increased 30 pages.[3] Plaintiffs neither requested nor received permission for such an increase. If the Court does not deny the TRO Motion for its failure to show – within the motion itself – likelihood of success on the merits, then Defendants' non-infringement and invalidity response must also largely rely on their expert's declarations.

And for the detailed reasons explained in the previously filed declarations of Dr. Stephen A. Batzer, the accused products do not infringe the asserted claims of the '784 Patent, the '247 Patent, the '159 Patent, and the '403 Patent. (Dkt. #51 at 33-34 (§VII.A-C); Dkt. #51-3 at 5-8; Dkt. #51-4 at 5-8; Dkt. #51-5 at 24-45; *Z3* Dkt.[4] #72 at 44 (§VII.D); *Z3* Dkt. #72-6 at 18-33.) Moreover, as thoroughly explained by Dr. Batzer, the asserted claims of each patent are invalid. (Dkt. #51 at 34-41 (§VIII); Dkt. #51-6 to #51-20; *Z3* Dkt. #72 at 52-53 (§VIII.E); *Z3* Dkt. #72-22 to #72-25.) These substantial questions regarding infringement and invalidity of the asserted claims eliminate Plaintiffs' likelihood of success on the merits, which alone justifies denying the TRO Motion.

**B. <u>Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm</u>.**

A preliminary injunction is "an extraordinary remedy" never awarded as of right. *Winter*, 555 U.S. at 24. To obtain that extraordinary relief, Plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief, not merely that they may suffer some business injury that can be compensated later. *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). "Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy

---

[3] The Court increased the page limit for both the TRO Motion and this Opposition to 30 pages. (Dkt. #78.)

[4] *Z3* Dkt. refers to the docket of *ABC IP, LLC v. Z3 Prods.*, 4:26-cv-00367-ALM (E.D. Tex.), a companion case in this MDL.

that product for reasons other than the patented feature." *Apple*, 678 F.3d at 1324. The Patent Act does not create a categorical entitlement to an injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006). Plaintiffs' showing fails for several independent reasons. Their own conduct shows no emergency. Their own economist concedes that the harm they fear can be measured. ABC has licensed the very patents it says cannot be compensated in money, and Plaintiffs have told the market what they believe each infringing unit is worth in dollars. And their own evidence shows that ARHK demand is driven by features and sentiments that have nothing to do with the asserted patents.

### 1. Plaintiffs' Delay Refutes Any Claim of Emergency.

Delay in seeking relief "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *High Tech Med. Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Plaintiffs' timeline speaks for itself:

| Date | Event | Record |
|---|---|---|
| Jan. 2026 | AS Designs announces the ARHK at SHOT Show | TRO Mot. 9 |
| Feb. 5, 2026 | ARHK announced on Instagram (4,500+ likes) | Dkt. #74-2 at ¶54 |
| Apr. 4, 2026 | Full ARHK specifications posted | Dkt. #74-2 at ¶54 |
| Apr. 27, 2026 | Plaintiffs move for a preliminary injunction against AS Designs' other products, but not the ARHK | Dkt. #28 |
| July 1, 2026 | AS Designs announces "full production" and upcoming 1,500-unit first drop | Dkt. #74-2 at ¶67 |
| July 7, 2026 | Plaintiffs capture the ARHK page, with its $549.99 price | Dkt. #75-25 |
| Sep. 2, 2026 | Plaintiffs file this TRO Motion | TRO Mot. |

Plaintiffs thus knew of the ARHK for roughly seven months, and knew its price, design concept, and description for months, before seeking emergency relief. Plaintiffs chose to litigate a PI motion against AS Designs' other products without including the ARHK. They then waited several more months after the production announcement, and filed only after the "late August" launch window they now call imminent had passed. (Dkt. #74 at 1-2; Dkt. #74-2 at ¶67.)

Plaintiffs' footnote on delay measures promptness from the filing of their complaints across their various cases. (Dkt. #74 at 20 n.6.) That is the wrong measure. In the first place, the ARHK is *not* in any *AS Designs* complaint at all, as explained above. More importantly, the question is how long Plaintiffs waited after learning of the product they seek to enjoin. On that question, Plaintiffs offer no explanation at all. Their resource constraints did not prevent them from filing "more than 125" infringement actions and nine other motions for preliminary relief, including a separate PI motion against the Defendants during the same period. (Dkt. #74 at 13-14.)

**2. Plaintiffs' own Economist Concedes that the Claimed Harm can Be Measured.**

Plaintiffs' damages expert does not support the TRO Motion's central premise. Dr. Eichmann states that he has not calculated a lost-profits amount, a diversion rate, or ARHK-specific price erosion. (Dkt. #74-1 at ¶8.) He does not assume one-for-one diversion. (*Id*. at ¶46.) He does not assume that the announced 1,500 units "exist, will be released, will be sold, or will displace Rare Breed sales." (*Id*. at ¶100.)

Most importantly, he disclaims the conclusion the motion needs. He "do[es] not contend that all harm associated with the ARHK is incapable of measurement," and he agrees that "the incremental profit associated with [a] lost FRT-RD3™ transaction may be estimated." (*Id*. at ¶122.) He does not "opine that every consequence of ARHK entry is unquantifiable," and agrees

that lost profits on diverted transactions and historical pricing effects "may be estimated." (*Id*. at ¶147.)

Plaintiffs' theory of the market makes that measurement easier, not harder. Plaintiffs insist that the ARHK would create a "two-competitor market." (Dkt. #74 at 21.) In a two-supplier market, the *Panduit* lost-profits test "is usually straightforward and dispositive." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). Every ARHK sale would be recorded in AS Designs' own transaction data, with its date, price, and customer. (*See* Phillips Decl. at ¶¶ 32-33, 35.) Plaintiffs' repeat-purchase effects are measurable too: Plaintiffs already track more than [redacted] repeat customers, and Dr. Eichmann himself computed the share of FRT-RD3 launch customers with other Rare Breed purchases. (Dkt. #74-2 at ¶66; Dkt. #74-1 at ¶67; Phillips Decl. at ¶¶ 34-37.) Any timing effect can be addressed with prejudgment interest. (Phillips Decl. at ¶39.) Price erosion, if it ever occurs, is a standard component of lost-profits damages. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*, 246 F.3d 1336, 1357 (Fed. Cir. 2001).

What remains of Dr. Eichmann's opinion is that a damages award would not be a "complete economic equivalent" because it cannot literally recreate the past. (Dkt. #74-1 at ¶¶ 148, 150.) That is true of every damages award in every case. If it were enough, irreparable harm would be established whenever a competitor enters the market, and *Illinois Tool Works* would mean nothing. *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).[5]

[5] Several of Plaintiffs' principal authorities were decided after infringement had been adjudicated, when the question was a permanent injunction. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1145 (Fed. Cir. 2011); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1339 (Fed. Cir. 2013); *Bio-Rad Labs. v. 10X Genomics Inc.*, 967 F.3d 1353, 1360 (Fed. Cir. 2020); *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 637 (Fed. Cir. 2015). The cases are less helpful about whether an unreleased product may be restrained before any adjudication.

### 3. Plaintiffs [redacted] and Price Infringement in Dollars.

Plaintiffs concede that a patentee's willingness to license its patents weighs against irreparable harm, and represent that Rare Breed "has not licensed its patents to third parties." (Dkt. #74 at 20 n.6.) [redacted] (DeMonico Dep. 77:7-25.[6]) *See T.J. Smith & Nephew Ltd. v. Consol. Med. Equip.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (patentee's licensing of its patent weighs against irreparable harm).

Plaintiffs have also put a price on the accused conduct. DeMonico testified that Plaintiffs' position is that [redacted] (DeMonico Dep. 122:9-15.) [redacted] (*Id.* at 122:25-123:8.) [redacted] (*Id.* at 85:17-88:2.) Patentees that have [redacted], have [redacted], and have a [redacted] for the defendants in front of the Court cannot credibly claim that money is no remedy.

### 4. ARHK Demand Is Driven by Features and Sentiments Unrelated to the Asserted Patents.

Plaintiffs cannot show a causal nexus because their own evidence shows that ARHK buyers want the product for reasons other than the patented features.

**Platform compatibility**. The FRT-RD3 fits only the 9mm MP5 family. (Karlovic Decl. ¶¶ 3, 7; Dkt. #74-2 at ¶56.) The ARHK is designed for 5.56- and 7.62-caliber roller-delayed rifles as well: the AP53, G3/91, HK11, HK21, HK32, and HK33. (Karlovic Decl. ¶¶ 5, 7.) A large share of

[6] Plaintiffs' counsel [redacted] during the deposition. (*Id.* at 236:16-237:3.)

the customer interest AS Designs has received concerns those rifles, and AS Designs expects a substantial portion of ARHK sales to come from platforms where Plaintiffs sell nothing. (*Id*. at ¶10.) Much of the ARHK's development work went to those platforms. (*Id*. at ¶11.) Plaintiffs' own evidence confirms this. They quote a customer who will wait for the ARHK because "RB's doesn't" work across calibers and "[m]y 53 is patiently standing by." (Dkt. #74-2 at ¶57.) The internal message Plaintiffs feature most prominently ties the ARHK's competitive edge to the fact that it "works in more then just 9mm" [*sic*]. (Dkt. #74-9 at ASD000041.) Dr. Eichmann agrees that broader compatibility "may affect customer choice" but does not quantify its effect. (Dkt. #74-1 at ¶44.) A sale to an HK91 or HK33 owner is not a sale Plaintiffs could ever have made.

**Trigger feel**. The ARHK is a single-stage trigger; the FRT-RD3 is two-stage. (Karlovic Decl. ¶¶ 3, 8; Dkt. #74-2 at ¶56.) AS Designs designed the single-stage pull because it more closely matches the OEM feel that many owners of these platforms prefer. (Karlovic Decl. ¶8.) Plaintiffs do not contend that their patents claim a single-stage pull.

**Hostility toward Plaintiffs**. Much of the "diversion" evidence Plaintiffs cite is not about the ARHK's features at all. It is about Plaintiffs. The comments Plaintiffs quote include "Holding out for ASD. I can't support the ATF's lapdog" and "I will gladly pay 2-3 times for a competitor's MP5 FRT before I give them a dime." (Dkt. #74-2 at ¶¶ 64, 100.) Plaintiffs attribute this hostility to their own enforcement campaign and their settlement with the DOJ, which long predate the ARHK. (*Id*. at ¶¶ 47, 95-98.) Rare Breed's President concedes that such a customer "is not a customer Rare Breed can win back with pricing, quality, or time." (*Id*. at ¶100.) Those customers would not buy the FRT-RD3 whether or not the ARHK exists. Their purchases are, by definition, sales lost "for reasons other than the patented feature." *Apple*, 678 F.3d at 1324.

### 5. The Record Does Not Show Likely Diversion of Plaintiffs' Sales.

**The "two-product market" is a construct**. Plaintiffs' exclusivity claim depends on defining the market as drop-in cassettes that fit inside the factory housing. (Dkt. #74 at 20-21.) But Plaintiffs admit that other forced-reset options for these firearms exist and compete with the FRT-RD3, including AS Designs' own replacement lowers and slip trips and third-party setups. (Dkt. #74-2 at ¶¶ 30, 34, 81.) Dr. Eichmann expressly declines to treat the record as showing that no other competing configuration exists. (Dkt. #74-1 at ¶14.) And the ARHK itself is not a perfect substitute even for buyers focused on appearance: its selectors have exposed screws that the OEM parts and the FRT-RD3 lack. (Karlovic Decl. ¶12.)

**Seven months of ARHK promotion did not slow the FRT-RD3**. Plaintiffs claim that customers are already deferring purchases to wait for the ARHK. (Dkt. #74 at 20.) Yet during the very months the ARHK was being promoted, FRT-RD3 sales [redacted]e. (Dkt. #74-2 at ¶63.) Plaintiffs' own exhibits show supposedly "waiting" customers buying the FRT-RD3 anyway: "Just couldn't wait on AS Designs anymore"; "a bird in the hand." (*Id*. at ¶62.)

**Rare Breed often has no inventory to divert**. Rare Breed's product pages repeatedly show the FRT-RD3 as "SOLD OUT" or "Out of stock." (Dkt. #74-1 at ¶13; Phillips Decl. ¶24 (archived captures throughout 2026).) In June 2026 Rare Breed was limiting purchases to one per customer per day. (Phillips Decl. ¶24.) Rare Breed [redacted]. (DeMonico Dep. 43:1-11.) A sale Rare Breed could not have filled is not a sale the ARHK takes from it, and some of the "purchasing delay" Plaintiffs attribute to the ARHK is more plausibly explained by their own supply limits. (Phillips Decl. ¶25.)

**The anecdotes cannot carry the burden**. Plaintiffs' diversion evidence consists of anonymous forum posts. Their own expert declines to treat them as "a statistically representative sample" or to derive a diversion rate from them. (Dkt. #74-1 at ¶41.) He does not know "whether those statements resulted in completed ARHK purchases" or "whether the commenters would otherwise have purchased from Rare Breed." (*Id.* at ¶50.) DeMonico himself could not say how [redacted] (DeMonico Dep. 200:24-204:25, 210:21-211:12.) Evidence their own expert will not rely on cannot make harm "likely." *Winter*, 555 U.S. at 22.

### 6. The Claimed Price, Lead-Time, and Reputational Harms Are Speculative or Not Caused by the ARHK.

**Price erosion**. Plaintiffs have known about ARHK's price since at least early July. (*See* Dkt. #75-25; *see also* Vernyuk Decl. Ex. 2 (April 2026 capture of ARHK webpage showing $549.99 price).) Plaintiffs have not lowered the FRT-RD3's price, maintain a no-discount policy, and offer no evidence they plan to change either. (Dkt. #74-2 at ¶73.) Their expert has "not calculated ARHK-specific price erosion and do[es] not assume Rare Breed will reduce its posted prices." (Dkt. #74-1 at ¶131; *see id.* at ¶78.)

The motion's claim that the FRT-RD3 generates "roughly [redacted]%" of Rare Breed's profit is an artifact of accounting between the two Plaintiffs, not a measure of harm. (*See* Dkt. #74 at 1.) Rare Breed computes its "profit" after paying a flat $[redacted] per-unit royalty to its co-Plaintiff ABC. (Dkt. #74-2 at ¶71.) The two Plaintiffs are related parties. [redacted]. (DeMonico Dep. 49:9-50:21.) DeMonico [redacted],

[redacted]. (*Id*. at 94:3-96:3.) [redacted] of the FRT-15L3's retail price. (*Id*. at 92:19-25, 97:20-98:16.) [redacted]. (*Id*. at 99:1-7, 100:20-101:19, 105:4-106:13.) The license itself permits a sliding scale from $200 to $300, which [redacted]. (*Id*. at 117:8-118:14, 120:19-121:4.) The royalty is money moving between affiliated companies and [redacted]. (*Id*. at 51:6-9, 115:24-116:1; Phillips Decl. ¶49.) Measured by Plaintiffs' combined per-unit profit, which DeMonico himself identifies as the relevant loss, the picture changes. (*See* Dkt. #74-2 at ¶¶ 71-72.) At Plaintiffs' own list-price figures, the [redacted] FRT-15L3 units sold in June generated about $[redacted] in combined profit ([redacted]). The [redacted] FRT-RD3 units generated no more than about $[redacted] ([redacted]). (*Id*. at ¶¶ 63, 71.) The ARHK's $65–$70 price difference is about [redacted]% of that combined profit, not the [redacted]% Dr. Eichmann reports. (Phillips Decl. ¶47; *cf*. Dkt. #74-1 at ¶84.)

**Lead time**. Plaintiffs have had the FRT-RD3 on the market, without a drop-in competitor, for seven months. The motion itself quotes AS Designs acknowledging Plaintiffs' "3-4 year headstart." (Dkt. #74 at 12.) Dr. Eichmann does not opine that the ARHK "would exclude Rare Breed from the market permanently or prevent Rare Breed from later recovering some market position," and does not assume any "permanent lock-in." (Dkt. #74-1 at ¶¶ 101, 106.) A temporary competitive disadvantage that the patentee can later recover from is the kind of harm damages are designed to address. (Phillips Decl. ¶55.)

**Reputation**. The reputational harm Plaintiffs describe – boycotts, the "Rare Greed" epithet, and public criticism of their lawsuits – arises from Plaintiffs' own enforcement campaign

and their DOJ settlement. (Dkt. #74-2 at ¶¶ 47, 95-101.) DeMonico testified that the community was "wildly supportive" of Rare Breed through the DOJ fight and "by and large" happy with the settlement, and that the hostility followed Plaintiffs' decision to enforce their patents. (DeMonico Dep. 230:17-231:13, 233:19-234:1.) Asked whether there would be any negative publicity had Plaintiffs never sued anyone, he answered, "I guess we'll never know." (*Id*. at 236:2-5.) None of it is caused by the ARHK's use of any claimed feature, and a TRO against the ARHK would not reverse any of it. The few comments Plaintiffs cite about confusion over who "innovated" or whether the ARHK is "licensed" do not show patent harm either. (*See* Dkt. #74-2 at ¶¶ 91-92.) The products are visibly different, and the FRT-RD3 is engraved with Rare Breed's name. (Dkt. #74 at 11; *see also* Karlovic Decl. ¶ 12.)

**Other entrants**. Plaintiffs predict that without a TRO, other infringers will "overrun" the HK market as they did the AR-15 market. (Dkt. #74 at 25.) But by Plaintiffs' own account, the AR-15 market filled with competitors during years when Plaintiffs were allegedly barred from enforcing their patents at all. (Dkt. #74-2 at ¶13.) Plaintiffs now have more than 125 pending actions and the full range of remedies. (Dkt. #74 at 13.) Speculation about unnamed future entrants is not irreparable harm caused by these Defendants. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

**7. Any Damages Attributable to the ARHK are Collectible.**

Plaintiffs' claim that AS Designs is "[w]orth [a]bout $[redacted] [b]ut [c]ould [a]lready [o]we [m]ore [t]han $[redacted]" is not about the ARHK. (*See* Dkt. #74 at 25.) The $[redacted] figure concerns the ARC-Fire and Super Safety, the subject of Plaintiffs' separate pending PI motion. (*See id*. at 26-27.) It also appears to assume that every buyer of a $130–$250 ARC-Fire would otherwise have paid $450 for a Rare Breed trigger. That is the one-for-one diversion

assumption Plaintiffs' own expert refuses to make. (Dkt. #74-1 at ¶46.) And Dr. Eichmann offers no "new ARHK-specific solvency or collectability opinion." (*Id.* at ¶137.) In his prior declaration, he found only "material uncertainty" and "did not opine that AS Designs was insolvent or necessarily would be unable to pay." (*Id.*)

Per Plaintiffs' own brief, AS Designs is an operating, profitable company with net equity of about $[redacted] against liabilities of about $[redacted]. (Dkt. #74 at 26; *see also* Dkt. #50 at 21-23 (addressing similar collectability argument in opposition to Plaintiffs' PI Motion).) Plaintiffs' authority involved nothing like this. *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011), concerned a receivership over proceeds of a Ponzi scheme. *See id.* at 589, 597.

The ARHK itself adds to, rather than depletes, the fund from which any judgment would be paid. AS Designs expects a gross margin of about [redacted]% on the ARHK. (Karlovic Decl. ¶15.) Enjoining its launch would remove the very revenue Plaintiffs say they fear they cannot collect. And every ARHK sale during any restraint period would be recorded, identifying each buyer and host firearm.

### C. <u>The Balance of Harms Favors AS Designs</u>.

On this record, the comparison is lopsided. AS Designs faces a concrete, quantified loss. Plaintiffs face, at most, a modest and measurable one. The balance of harms favors denial.

#### 1. A Restraint Would Impose Immediate Harm on AS Designs.

AS Designs has spent months developing and promoting the ARHK. (Karlovic Decl. ¶¶ 5, 11; Dkt. #74-2 at ¶54.) Based on customer interest, AS Designs could sell as many as [redacted] units in the first month of release, at a price of about $520 to $550 and a gross margin of about [redacted]%. (Karlovic Decl. ¶¶ 14-15.) A TRO during that period would put up to about $[redacted] in profit at risk. (*Id.* at ¶15.)

The restraint Plaintiffs seek is also far broader than any harm they claim. It would bar ARHK sales to owners of 5.56 and 7.62 rifles – the AP53, G3/91, HK11, HK21, HK32, and HK33 – for which Plaintiffs sell no product at all. (Karlovic Decl. ¶¶ 7, 10.) AS Designs expects a substantial portion of ARHK sales to go to those platforms. (*Id*. at ¶10.) Enjoining those sales would protect no Plaintiff sale. It would simply keep a product from customers that Plaintiffs cannot serve.

**2. Plaintiffs' "Delayed Launch" Argument Contradicts their own Theory of Harm.**

Plaintiffs say the TRO would cost AS Designs nothing but "a delayed launch," because its inventory "keeps its value." (Dkt. #74 at 28-29.) That argument cannot be squared with the rest of the motion. Plaintiffs' entire irreparable-harm theory is that launch timing matters: that early sales, early customer relationships, and early market position cannot be restored later. (Dkt. #74 at 22; Dkt. #74-1 at ¶¶ 73-74, 106.) If that were true for Plaintiffs, it would be equally true for AS Designs. Plaintiffs cannot claim that a competitor's launch-period sales are irreplaceable when they are the ones losing them, but costless to delay when they are the ones asking for the delay.

The cases Plaintiffs cite for enjoining a pre-launch product do not change the analysis. (*See* Dkt. #74 at 28-29.) Every preliminary injunction against a new product "preserves the status quo" in the sense that it keeps a competitor out of the market. That characterization would favor the patentee in every case. It cannot substitute for a showing that the equities actually favor restraint on this record.

**3. AS Designs' Hardship Is Not "Self-Inflicted."**

Plaintiffs argue that AS Designs' hardship deserves no weight because AS Designs proceeded "with full knowledge of Rare Breed's patents." (Dkt. #74 at 28-29.) But the principle they invoke applies to "a product *found* to infringe." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d

995, 1003 n.12 (Fed. Cir. 1986) (emphasis added). The ARHK has not been found to infringe anything. Plaintiffs have never charted the ARHK against any claim. They rely instead on charts of a different product, prepared for a different motion that the Court has not decided. (Dkt. #74 at 17-18.) As explained in §III.A above, AS Designs disputes both infringement and validity. Many competitors in a patent-dense market operate with knowledge of their rivals' patents. That knowledge does not convert a good-faith dispute into a forfeiture of equitable consideration.

The internal messages Plaintiffs quote do not change this. (*See* Dkt. #74 at 11-12.) They are informal speculation, from January 2026, about what Plaintiffs might charge for a product whose price they had not yet announced. (*See* Dkt. #74-9 at ASD000041-42.) Pricing a product to compete with a rival is not misconduct; it is competition. The $[redacted] figure discussed in those messages is not the ARHK's price. And the same messages identify the ARHK's broader platform compatibility – an attribute Plaintiffs' product lacks – as its competitive advantage. (*Id.* at ASD000041.)

**4. Plaintiffs' Side of the Scale Is Light.**

On the other side, Plaintiffs' claimed harm is modest, uncertain, and compensable. *See* §III.B, supra. Their own expert will not estimate a diversion rate or assume that the announced units will sell or displace Rare Breed sales. (Dkt. #74-1 at ¶¶ 8, 46, 100.) DeMonico agreed that Rare Breed will [redacted]. (DeMonico Dep. 227:7-9.) The FRT-RD3 is frequently sold out, so a restraint would not transfer those sales to Plaintiffs; buyers would simply go without. (*See* Phillips Decl. ¶24.) And the portion of the ARHK market that could overlap with Plaintiffs is limited to MP5-family owners who want a drop-in cassette and would buy from Plaintiffs – a group that excludes the many buyers who, by Plaintiffs' own

account, will not buy from Rare Breed at any price. (Dkt. #74-2 at ¶100.) The balance of hardships therefore weighs against a restraint.

### D. <u>The Public Interest Favors Denial of the Requested Injunction</u>.

Plaintiffs' single-paragraph discussion of the public-interest factor is limited to the U.S. Department of Justice's Statement of Interest[7] and the fact that Rare Breed practices the asserted patents. (Dkt. #74 at 29.) In §I.A, the DOJ Statement reviews some of the patents asserted in this MDL. In §II, the DOJ Statement sets forth generic patent and injunction principles. In §I.B, the DOJ Statement quotes the statute on machineguns and notes the court split over whether FRTs are machineguns; it also notes a settlement between the DOJ and Rare Breed in their litigations on that question. Lastly, §III sets for the DOJ's actual statement of interest. The Statement notes (pointing to the machinegun statutes) that "[t]he ATF has an interest in limiting the sale and distribution of FRTs," while also conceding that there is a split whether FRTs *are*, in fact, machineguns.[8] (*Id*. at 4, 6.) If not, the ATF has no lawful interest in limiting FRTs.

The DOJ Statement then notes that, as part of settlement, "Rare Breed agreed not to design forced reset triggers for handguns. . ." (defined as "a firearm whose magazine loads into the trigger-hand grip") and notes that other manufacturers may not be bound by such limitations. (DOJ Statement at 6-7; *see also* Dkt. #75-11 at ¶¶ 7-8.) But the TRO Motion nowhere states that the ARHK is a handgun FRT, so that argument does not apply. (*See* Dkt. #75-17 to #75-20 (showing examples of firearms for which the ARHK is designed, none of which qualifies as a handgun).)

---

[7] "DOJ Statement," filed as Dkt. #44 in *In re Rare Breed Triggers Patent Litig*., No. 4:26-md-03176-ALM (E.D. Tex.).

[8] The settlement between the DOJ and Rare Breed simply resolved the *litigations*, not the underlying question of whether FRTs are machineguns.

The DOJ Statement also states that the settlement obligates Rare Breed to engage in patent enforcement. But the actual Settlement Agreement mentions *only* U.S. Patent 10,514,223 (the "'223 Patent"), even though the '784 Patent and the '247 Patent had also issued by then (as had several of the '403 Patent's parents). (*See* Dkt. #75-11 at ¶9.) And while Rare Breed has asserted the '223 Patent in several other cases in this MDL, it has not done so against AS Designs, so that aspect of the DOJ Statement is inapplicable here.

The DOJ Statement states that the ATF "has a strong interest in promoting the safe use of firearms by the public, and in this particular case, in discouraging unregulated manufacture of forced reset triggers that allegedly infringe Rare Breed's patents." (DOJ Statement at 1.) But it is unclear, from either the DOJ Statement or the actual Settlement Agreement, *how* the ATF is regulating *Rare Breed's* FRTs. The only limitation disclosed therein is the prohibition against handgun FRTs, which does not apply here (as explained above), thus rendering that interest inapplicable here. Ultimately, the DOJ "do[es] not take a position on any of the other factors for granting a preliminary injunction or on the ultimate question of whether the court should exercise its discretion to issue a preliminary injunction." (DOJ Statement at 1.) And with the other concerns specified therein being inapplicable here, the DOJ Statement does not help Plaintiffs on this factor.

In patent cases, the public-interest inquiry focuses on whether a critical public interest would be injured by granting preliminary relief. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). Where, as here, Plaintiffs have not shown irreparable harm and the accused products are sold through traceable commercial channels, the public interest does not favor preliminary market exclusion. The public also has strong interests in competition, lawful

commerce, consumer choice, accurate pricing, and avoiding market exclusion based on unproven infringement allegations.

Plaintiffs emphasize that AS Designs would sell the ARHK at slightly lower prices than Rare Breed's FRT-RD3; but lower prices are a public benefit, not public harm. AS Designs' ARHK also offers functional and consumer-choice differences – compatibility with a wider range of firearms and a certain trigger feel – that Rare Breed's unit does not. (Karlovic Decl. ¶¶ 6-13.) Enjoining differentiated products before any merits adjudication would deprive consumers of those choices based on nothing more than unproven infringement allegations. The relief Plaintiffs seek would also hand Rare Breed monopoly pricing power before any adjudication: removing the only drop-in competitor would let Rare Breed set prices at its profit-maximizing level. The public interest is not served by using a TRO to maintain a monopoly with raised prices before the movant proves it is entitled to exclude anyone. Thus, the public interest favors denial of the TRO Motion.

**E. <u>A TRO Would Require a Sizeable Bond.</u>**

A court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While a TRO should not be issued in this case (as explained above), a bond ensures at least some protection for AS Designs if its conduct is wrongfully enjoined. *See Mallet & Co. v. Lacayo*, 16 F.4th 364, 390-91 (3d Cir. 2021). Because a party injured by the wrongful issuance of a TRO has no action for damages, its only recourse is the bond. *Id*. at 391. Therefore, setting an appropriately high bond amount is critical to provide at least some relief for the harm to AS Designs from an improper TRO (as discussed above), as "the consequences of wrongfully enjoining [AS Designs] could be dire if [this Court] were to significantly underestimate the economic impact of an injunction it issues." *Id*.; *see also Mead*

*Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) (when setting bond, "courts should err on the high side"; an error in setting the bond too high is not serious, but setting it too low produces irreparable injury). An appropriately sized bond also "serves as a deterrent to rash applications for interlocutory orders; the bond premium and the chance of liability on it causes plaintiff to think carefully beforehand." *Mallet & Co.*, 16 F.4th at 391 (quotations omitted).

If the Court is inclined to enter any TRO, it should require Plaintiffs to post a bond of no less than $[redacted] before the TRO takes effect. If issued, a TRO could last up to 28 days. *See* Fed. R. Civ. P. 65(b)(2). AS Designs anticipates selling up to [redacted] units during its first month. (Karlovic Decl. ¶14.) Priced at $520-$550, with a [redacted]% expected gross profit margin, AS Designs risks losing $[redacted] of profit if the TRO were granted, not even considering other aspects such as dealer and wholesale disruption, employee and supplier harm, and loss of goodwill. (*See id*. at ¶15.) Because the bond may be AS Designs' only meaningful recourse if the TRO is later found wrongful, security of at least $[redacted] is warranted.

## IV. CONCLUSION

Plaintiffs ask the Court to restrain a product that appears in no complaint, that they have never inspected, and that they have never charted against a single claim. They waited seven months after the ARHK was announced, and until after the launch window they now call imminent, to seek "emergency" relief. Their own economist concedes that any harm can be measured; their own witness testified that they have licensed the asserted patents and have a per-unit settlement price in mind for every defendant; and their own evidence shows that customers want the ARHK for platforms, features, and reasons that have nothing to do with the asserted claims. On the other side of the scale, a restraint would cost AS Designs up to $[redacted] in first-month profit and would bar sales to owners of 5.56- and 7.62-caliber rifles for which Plaintiffs sell no product at all.

Plaintiffs have not clearly carried their burden on any of the four factors, let alone all of them. Defendants respectfully request that the Court deny the TRO Motion. If the Court is nonetheless inclined to enter any restraint, Defendants request that (1) it be conditioned on Plaintiffs first posting security of no less than $[redacted] under Rule 65(c); and (2) it be limited to the period permitted by Rule 65(b)(2), rather than the open-ended restraint "until a preliminary injunction can be briefed and entered" that Plaintiffs request (Dkt. #74 at 30).

## V. <u>HEARING</u>

AS Designs respectfully requests an evidentiary hearing on Plaintiffs' TRO Motion. *See Heil Trailer Int'l v. Kula*, 542 F. App'x 329, 334 (5th Cir. 2013) (hearing required where facts are in dispute).

Respectfully submitted,

Dated: September 28, 2026

EMERSON, THOMSON & BENNETT, LLC
*/s/ Sergey Vernyuk*
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile
*Attorneys for Defendants AS Designs, LLC, Matthew S. Karlovic, and Calvin Olson*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this Opposition, the supporting Karlovic Declaration, the supporting Phillips Declaration, and the supporting Vernyuk Declaration with exhibits is being served on September 28, 2026, on Plaintiffs' counsel via electronic mail:

Benjamin Christoff
christoff@fr.com

Carl E. Bruce
bruce@fr.com

Glenn D. Bellamy
gbellamy@whe-law.com

Matthew Alan Colvin
colvin@fr.com

Melissa R. Smith
melissa@gillamsmithlaw.com

*/s/ Sergey Vernyuk*
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile

**LOCAL RULE CV-5(a)(7)(B) CERTIFICATION**

Pursuant to L.R. CV-5(a)(7)(B), I certify that a motion to seal this Opposition, the supporting Karlovic Declaration, the supporting Phillips Declaration, and the transcript of the DeMonico Deposition has been filed.

*/s/ Sergey Vernyuk*
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile