[redacted]

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| In Re: Rare Breed Triggers Patent Litigation | 4:26-md-03176-ALM<br>MDL 3176 |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AS DESIGNS, LLC, *et al.*,<br><br>Defendants. | Civil Action No. 4:26-cv-00370-ALM |

**REBUTTAL DECLARATION OF ERIC J. PHILLIPS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

## Table of Contents


1. Qualifications .... 3
2. Assignment .... 3
3. Summary of Conclusions .... 5
4. Eichmann's Opinions on Adequacy of Monetary Damages .... 6
   - 4.1. FRT-RD3's Economic Relevance to Rare Breed (Section III) .... 6
   - 4.2. ARHK as a Competitive Substitute for FRT-RD3 (Section IV) .... 7
   - 4.3. Diversion Risk Due to Announced ARHK Launch (Section V) .... 10
   - 4.4. Displacement and Lost Customer Opportunities (Section VI) .... 11
   - 4.5. Price Pressure and Reference-Price Effects (Section VII) .... 14
   - 4.6. Loss of Lead Time and Remaining Market Exclusivity (Section VIII) .... 17
   - 4.7. Dealer, Channel, and Product-Development Effects (Section IX) .... 18
   - 4.8. Retrospective Monetary Relief (Section X) .... 20

I, ERIC J. PHILLIPS, declare as follows:

## 1. Qualifications

1. I am President of VLF Consulting, Inc. ("VLF"), a business advisory firm that addresses accounting, financial, economic, and marketing issues in complex commercial disputes, frequently involving intellectual property, and in other valuation matters. During my 26 years specializing in intellectual property damages and valuation, I have assessed damages across a wide range of industries and valued patents, trademarks, copyrights, trade secrets, and know-how in bankruptcy proceedings, licensing negotiations and transactions, and joint ventures. I am also certified in business valuation and have provided business-valuation services.

2. I am a Certified Valuation Analyst (CVA) and a Master Analyst in Financial Forensics (MAFF) through the National Association of Certified Valuators and Analysts (NACVA). I am also a member of the Licensing Executives Society (LES). My curriculum vitae, including a listing of my prior testimony and publications, is attached hereto as Exhibit 1.

3. VLF is being compensated for my time on this matter at my current hourly rate. VLF's compensation is not dependent on any outcomes in this litigation.

## 2. Assignment

4. VLF was retained in this matter by Emerson, Thomson & Bennett, LLC, counsel for defendants AS Designs, LLC ("AS Designs"), Matthew S. Karlovic (an individual), Calvin Olson (an individual), and John Doe (an individual using the alias "s3igu2"), (collectively, "Defendants") in a suit brought by Rare Breed Triggers, Inc., ("Rare Breed") and ABC IP, LLC ("ABC IP"), (collectively, "Plaintiffs"), related to asserted infringement of several patents.

5. On July 4, 2026, I submitted the Declaration of Eric J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("AS Designs Phillips Declaration"). That declaration responded to the Declaration of Richard J. Eichmann dated April 24, 2026,[1] regarding irreparable harm and adequacy of monetary damages with respect to the ARC-Fire and Super Safety products sold by AS Designs.

[1] Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026 ("AS Designs Eichmann Declaration").

6. On September 2, 2026, Plaintiffs submitted a declaration of Richard J. Eichmann in support of their request for a temporary restraining order against AS Designs' anticipated release of its ARHK product into the market for forced reset triggers for HK roller-delayed firearm platforms ("ARHK Eichmann Declaration"). Eichmann's assignment was to evaluate the economic issues surrounding the anticipated ARHK product and to assess "whether the resulting economic effects would be adequately remedied through retrospective monetary relief."[2] VLF has been asked to review and assess the ARHK Eichmann Declaration and to provide my independent opinion as to the adequacy of monetary damages, assuming infringement of the patents-in-suit.[3]

7. In developing the opinions reflected in this report, I relied upon various filings in this case, publicly available information, applicable legal and accounting principles, and my professional experience. A listing of documents reviewed or relied upon to date in connection with this report is attached as Exhibit 2 or referenced in the text and footnotes of this report.

8. I may be asked to testify at a deposition and/or hearing regarding these and related matters between the parties.[4] In connection with any such hearing testimony, I may prepare demonstrative exhibits and identify documents and testimony in this matter that may assist with my testimony. I have not yet prepared and/or identified such exhibits.

9. For the limited purposes of this declaration, I accept as assumptions most of the characterizations put forth in the ARHK Eichmann Declaration regarding the products, companies, and market. My assumptions are not intended to reflect agreement or endorsement of those characterizations, and I may later rebut aspects of those assumptions if appropriate, as documents, testimony, and other information are identified in the discovery process.

10. Regarding the products and market for AS Designs' ARHK, the ARHK Eichmann Declaration asserts the following:

a. The ARHK is positioned as a factory-housing-compatible drop-in (cassette style) forced reset trigger for the same segment in which Rare Breed currently sells its FRT-RD3 (¶¶9, 15, 140).

---

[2] Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Temporary Restraining Order, September 2, 2026 ("ARHK Eichmann Declaration"), ¶4.

[3] I do not opine on the infringement or the validity of the patents-in-suit, or their inventorship and ownership, nor am I offering any legal opinions.

[4] I may also be asked to eventually provide opinions as to damages suffered by Plaintiffs related to the alleged infringement of the patents-in-suit. Because only limited discovery has taken place, I reserve the right to modify opinions expressed herein based upon documents, testimony, and other information identified in the discovery process.

b. After the FRT-RD3's introduction by Rare Breed in February 2026, it has become an important source of revenues and profits during recent months (¶¶20, 30, 141).

c. The ARHK is expected to be priced $65 to $70 per unit less than Rare Breed's FRT-RD3 (¶17). Anecdotal internet postings suggest that the ARHK may be impacting timing of purchases by some prospective customers (¶18).

11. Eichmann concludes with the following:

a. ARHK's announced lower price, overlapping functionality and platform compatibility, documented customer comparisons, and planned concentrated launch create an "economically meaningful risk" of diverted sales from Rare Breed during a "limited and commercially important period" (¶9).

b. Although a damages award could quantify lost profits from diverted sales and historical pricing effects, "the existence of such methodologies [] does not establish that retrospective monetary relief would provide a complete economic equivalent" (¶¶147-148). This is because: (¶150)

> "A later award cannot itself restore the timing of lost customer acquisitions, recreate Rare Breed's elapsed period of commercializing the FRT-RD3 before entry of [ARHK], or return the market to the customer, price, and competitive conditions that existed before ARHK entry."

### 3. Summary of Conclusions

12. The ARHK Eichmann Declaration identifies several hypothetical reasons that a later damages award may not adequately compensate Rare Breed, but the primary threat is that of lost sales in a known market (¶9, summarizing conclusions. See also Eichmann Sections IV and V). Based upon Eichmann's and DeMonico's assertions that Rare Breed is the sole participant in the market and that AS Designs' entry would create a two-supplier market, a conventional damages analysis and market reconstruction would adequately assess damages.

13. Other alleged harms—loss of market share / position, price erosion, follow-on sales to the same customer, and delayed purchases—also are quantifiable using conventional damages methods. The remaining alleged harms—a possible inability to raise prices after a post-litigation injunction, loss of dealer relationships, and effects on the timing or scale of product development—depend on unsupported chains of hypotheticals rather than evidence of actual or imminent harm.

## 4. Eichmann's Opinions on Adequacy of Monetary Damages

### 4.1. FRT-RD3's Economic Relevance to Rare Breed (Section III)

14. After concluding that the FRT-RD3 is highly profitable and a strong contributor to Rare Breed's profits, Eichmann asserts that the timing of the ARHK entry is "economically relevant" because "early commercialization periods **can be** economically significant because firms **may use** those periods to establish customer relationships, product visibility, operating experience, and channel position that **may affect** subsequent sales" (¶26, emphasis added). This assertion is vague as to any actual benefits enjoyed by Rare Breed during its period of exclusivity, and is also speculative as to any actual and particular harm that would result from ARHK's introduction.

15. Eichmann later identifies ways a non-specific "firm" might seek to benefit from its lead time – by converting "its earlier position into later sales, customer relationships, product extensions, dealer development, operating experience, and market position" (¶28). Yet these points fare no better, and remain vague as to actual benefits and speculative as to actual and particular harm from an ARHK introduction:

| Suggested Ongoing Benefit From Lead Time | Shortcomings |
|---|---|
| Later sales. | To the extent Rare Breed loses sales, even to repeat buyers, those sales would be expected to be included in a damages computation. |
| Customer relationships. | Vague, non-specific. If this refers to repeat buyers, again, such sales would be included in a damages computation. |
| Product extensions. | Eichmann identifies no Rare Breed product extensions related to the relevant products, nor am I aware of any. If this refers to FRTs for other firearms platforms, Eichmann provides no evidence that sales of FRT-RD3 (MP5/SP5 platform) increase sales of unrelated-platform FRTs (e.g. FRT-15L3 for the AR15 platform). |
| Dealer development. | Limited, if any, relevance; Eichmann has acknowledged that Rare Breed has no dealer network.[5] |

[5] AS Designs Eichmann Declaration 4/24/26, ¶20 at footnote 28.

| | |
|---|---|
| Operating experience. | Vague, non-specific. Rare Breed has been accumulating operating experience from all its products, including the FRT-RD3, and would continue gaining operating experience with respect to FRT-RD3 regardless of the introduction of the ARHK. |
| Market position. | Vague, non-specific. If this refers to the level of sales, then a damages award would be expected to compensate for lost sales / pricing where appropriate. |

**Figure 1. Summary of Eichmann's suggested benefits of "lead time."**

### 4.2. ARHK as a Competitive Substitute for FRT-RD3 (Section IV)

16. Eichmann concludes that "the ARHK is positioned as a close competitive substitute for the FRT-RD3 for at least a meaningful subset of purchasers" (¶46) and that ARHK's "economic effect begins before the first completed sale" since "prospective purchasers are already delaying or redirecting purchases" (¶47). Although Eichmann's conclusions regarding competition are not adequately supported, accepting them for purposes of this analysis does not establish that the resulting harm is unquantifiable. Whether and to what extent the ARHK would divert or delay sales are factual questions relevant to the amount of damages, not proof that monetary damages would be inadequate.

**1. Extent of Competition is Not Identified.**

17. In support of the conclusion that "the ARHK is positioned as a close competitive substitute for the FRT-RD3 for at least a meaningful subset of purchasers" (¶46), Eichmann relies upon overlapping MP5/MP5K compatibility, functional similarities, and also upon anecdotal internet posts repeatedly:

a. Product reviews posted to Rare Breed's own website suggesting the importance of installing in factory OEM polymer housings without modification. Yet Eichmann disclaims their usefulness due to possible "selection, publication, or response effects," and states "I therefore do not treat them as representative of the market or use them to quantify demand" (¶¶33-34).

b. Discussions on reddit.com and ar15.com with anecdotal comments regarding product similarities and differences between the FRT-RD3 and upcoming ARHK (¶39). Eichmann disclaims these, too, stating "I do not treat these online comments as a statistically representative sample, and I do not extrapolate a diversion percentage from them" (¶41).

18. After disclaiming the representativeness and quantitative significance of the anecdotal sources, Eichmann nevertheless concludes that "the ARHK is positioned as a close competitive substitute for the FRT-RD3 for at least a meaningful subset of purchasers" (¶46). He also states that the products are not economically identical and that he does not assume one-for-one diversion.[6] Yet he does not define the "meaningful subset" or estimate the corresponding diversion rate. The phrase could encompass a wide range of purchasers; for example, even 5% to 10% might be described as meaningful. Without identifying the subset or estimating diversion, the conclusion does not establish the expected magnitude of competition between the products.

19. This "close competitive substitute" premise underlies virtually all of Eichmann's opinions concerning the inadequacy of monetary damages.[7] Despite that prominent position, the scope limitation of "at least a meaningful subset of customers" offers no sense of the magnitude of the expected competition (diversion rate) between the products, and thus does not adequately support the resulting opinions.

**2. Product Differences are Significant.**

20. The ARHK Eichmann Declaration correctly identifies some relevant differences between the ARHK and Rare Breed's FRT-RD3 products (¶15), and acknowledges that the product differences impact the diversion rate.[8] These differences include:

a. Whereas the FRT-RD3 is compatible only with MP5/MP5K/SP5/SP5K,[9] the ARHK will be compatible with multiple roller-delayed hosts. These platforms include: MP5/MP5K (9mm), AP53 (5.56 cal), G3/91 (7.62 cal), HK21 (7.62 cal), HK11 (7.62 cal), HK32 (7.62 cal), HK33 (5.56 cal) clones and other variants.[10]

[6] ARHK Eichmann Declaration 9/2/26, ¶46. See also ¶38 ("Product differences may affect the magnitude of diversion") and ¶44 ("Broader advertised compatibility is one product attribute that may affect customer choice.")

[7] See, e.g., Section V (concentrated diversion risk) at ¶60; Section VI (lost customer opportunities) at ¶74; Section VII (price erosion) at ¶79; Section VIII (lost market exclusivity time) at ¶94; Section IX (product development funding) at ¶118.

[8] ARHK Eichmann Declaration 9/2/26, ¶¶44-45, explaining that certain purchasers may be attracted to the ARHK's compatibility with multiple roller-delayed hosts beyond the MP5/MP5K, unlike Rare Breed's FRT-RD3. But he "[does] not quantify any incremental diversion attributable specifically to that feature."

[9] ARHK DeMonico Declaration 9/1/26, ¶56, Ex. 8. Note that the FRT-RD3 is offered in two configurations for this one product family— "SEF" intended for non-ambidextrous HK SEF grip frames, and "AMBI" with an ambidextrous selector (safety levers on both left and right side). Eichmann notes the caliber compatibility differences at ¶39.

[10] ARHK DeMonico Declaration 9/1/26, Ex. 18. See also ARHK Eichmann Declaration 9/2/26, ¶44. See also ARHK Karlovic Declaration 9/27/26, ¶7.

b. Whereas the FRT-RD3 includes a 2-stage trigger, the ARHK includes a single-stage trigger.[11]

c. The ARHK has a fully disengaged Semi position unlike Rare Breed's FRT-RD3.[12]

21. The ARHK Karlovic Declaration states that each identified product difference appeals to customer preferences that differ from those of buyers of Rare Breed's FRT-RD3.[13] The ARHK's compatibility with 7.62/5.56-caliber platforms addresses a segment that the MP5-compatible FRT-RD3 cannot serve. Karlovic also states that the ARHK's single-stage trigger and fully disengaged Semi position appeal to customers who would otherwise have significantly less interest in the FRT-RD3. According to Karlovic, these distinctions are relevant to a significant pool of potential customers and reduce direct competition with Rare Breed.[14] Although Eichmann acknowledges the differences, his "close competitive substitute" conclusion does not fully account for their effect on the scope of direct competition and the diversion rate.

**3. The "Economic Effect Begins Before the First Completed Sale" is Speculative.**

22. Eichmann concludes the analysis of competition with an assertion that ARHK's "economic effect begins before the first completed sale," based on the assertion that "prospective purchasers are already delaying or redirecting purchases in anticipation of its release" (¶47).

23. But the evidence of deferral is limited to just two or three of the same anecdotal internet posts that Eichmann himself acknowledges are not statistically representative.[15] Eichmann points to no evidence of the scale of deferral, the number of customers affected, or the duration of the delay.

**4. The ARHK is Not Yet Available, and the FRT-RD3 is Often "SOLD OUT."**

24. Eichmann correctly notes that the Rare Breed FRT-RD3 web pages referred to by the ARHK DeMonico Declaration state that the FRT-RD3 was "SOLD OUT." As such, Eichmann

[11] ARHK DeMonico Declaration 9/1/26, ¶56, Ex. 8 (FRT-RD3), Ex. 24 (reddit posts).

[12] ARHK DeMonico Declaration 9/1/26, ¶65, Ex. 18 (ARHK web page, stating "Semi mode is fully disengaged with no active reset, giving you a standard trigger pull in the second position.").

[13] ARHK Karlovic Declaration 9/27/26, ¶¶7-10.

[14] ARHK Karlovic Declaration 9/27/26, ¶13.

[15] ARHK Eichmann Declaration 9/2/26, ¶¶40 (identifying two comments about waiting for ARHK and one about waiting but then buying from Rare Breed anyway. See ARHK DeMonico Declaration 9/1/26, Ex. 24 at 2; Ex. 32 at 1; Ex. 40 at 2), ¶41 ("I do not treat these online comments as a statistically representative sample," and "I have not verified the commentor's identities, firearm ownership, purchasing histories, or subsequent conduct.").

does not rely on those documents as "evidence that either configuration was continuously in stock or available for immediate purchase as of the date of this declaration."[16] A review of all of the available pages saved from Rare Breed's website at archive.org since the product's February 2026 introduction indicates repeated "SOLD OUT" periods:[17]

| Date | FRT-RD3 Ambi/SEF Status |
|---|---|
| 2/20/26 | SOLD OUT |
| 3/02/26 | SOLD OUT |
| 5/17/26 | SOLD OUT |
| 6/22/26 | Available; limited to 1 per customer per day |
| 8/23/26 | Available |
| ca. 9/01/26 | SOLD OUT |

**Figure 2. Status of FRT-RD3 from all available archived pages.**

25. The frequency of out-of-stock periods shown in the available archived pages has two implications. First, some observed purchasing delay may reflect limited availability of the FRT-RD3 rather than anticipation of the ARHK. Second, when Rare Breed's FRT-RD3 is out of stock, there is no inventory from which to divert, undermining the implications of Eichmann's "close competitive substitute" conclusions.

### 4.3. <u>Diversion Risk Due to Announced ARHK Launch (Section V)</u>

26. Eichmann asserts that "the announced ARHK launch presents a risk of immediate and concentrated competitive displacement" due to the "direct competitive overlap" and because the anticipated 1,500-unit release equates to [redacted]% of Rare Breed's June 2026 sales (¶¶60, 51).

**1. The "[redacted]%" Comparison is Economically Misleading.**

27. Eichmann states that "AS Designs' announced 1,500-unit quantity equals approximately [redacted] percent of the [redacted] commercial FRT-RD3 units I independently identified in Rare Breed's transaction data for June 2026" (¶51). That comparison does not measure likely

[16] ARHK Eichmann Declaration 9/2/26, ¶13, citing ARHK DeMonico Declaration 9/1/26, Ex. 8.
[17] This list includes all available archived web pages for https://rarebreedtriggers.com/product-category/triggers/ at https://web.archive.org for 2/20/26, 3/2/26, 5/17/26, 6/22/26, and 8/23/26. "Ca. 9/1/26" availability per ARHK DeMonico Declaration 9/1/26, Ex. 8.

diversion. The numerator is an announced quantity (¶58), while the denominator is one month of completed FRT-RD3 sales. Second, the ARHK also addresses platforms beyond the FRT-RD3's HK MP5/SP5-family platforms, including AP53, G3/91, HK21, HK11, HK32, HK33, and related clones and variants, so ARHK sales would not necessarily come from the FRT-RD3's addressable segment. Finally, Eichmann states that he does "not assume that all 1,500 units will be sold" (¶51) and does "not assume one-for-one diversion" (¶46). The [redacted]% comparison therefore describes relative quantities, not the percentage of FRT-RD3 sales likely to be diverted.

**2. The "Accumulated Demand" Is Speculative.**

28. Eichmann asserts that "a large single-day release permits the entrant to satisfy a substantial amount of accumulated demand almost immediately" (¶49). But the evidence of "accumulated demand" is limited to two or three anonymous online comments,[18] which Eichmann himself acknowledges are "not a statistically representative sample" (¶¶40-41, 64) and from which he "do[es] not know whether those statements resulted in completed ARHK purchases, whether the commenters would otherwise have purchased from Rare Breed, or how frequently similar conduct occurs in the broader market" (¶50). A "concentrated diversion risk" cannot be established from a few unverified anonymous comments.

**4.4. <u>Displacement and Lost Customer Opportunities (Section VI)</u>**

29. Eichmann here asserts that a future ARHK sale at Rare Breed's expense "constitutes a non-restorable historical transaction" and a later injunction "cannot cause the customer to reverse that purchase or restore the timing, customer contact, and associated market opportunity Rare Breed would have received from the original transaction" (¶73). Eichmann further asserts that "[t]he timing and customer-acquisition effects, however, are not necessarily replicated" by a later damages award (¶74). Although the alleged harm is not defined precisely, it appears to consist of two components: (a) delayed purchases of either the FRT-RD3 or ARHK; and (b) Rare Breed's lost follow-on sales to customers who would have purchased an FRT-RD3 but instead purchase (in the future) an ARHK.

[18] ARHK Eichmann Declaration 9/2/26, ¶¶50 (citing apparently 3 instances of deferring a Rare Breed purchase), ¶40 (citing 3 instances of deferring a Rare Breed purchase, but one instance resulted in an eventual Rare Breed purchase).

**1. Damages Are Not Intended to Literally Recreate the Past.**

30. Eichmann states that if Rare Breed loses a sale to the ARHK, it "cannot later recreate the original transaction at the same point in time, with the same customer, under the same competitive conditions" (¶65) and that such a sale is a "non-restorable historical transaction" (¶73). As such, a later injunction "cannot cause the customer to reverse that purchase or restore the timing, customer contact, and associated market opportunity Rare Breed would have received from the original transaction" (¶73).

31. This is true in a literal sense, but literal restoration of the past is not the function of a damages award. A damages analysis instead reconstructs the market that likely would have existed but for the assumed infringement and measures the resulting economic loss. As I previously explained, "damages experts reconstruct the market to show, hypothetically, likely outcomes with infringement factored out of the economic picture," and "the Federal Circuit has affirmed lost profit awards based on a wide variety of reconstruction theories where the patentee has presented reliable economic evidence of 'but for' causation."[19] Eichmann's observation that a later award "cannot recreate" the past is therefore beside the point.

32. Eichmann makes a similar assertion of problematic uncertainty in reconstructing the but-for world: (¶70)

> "If [an otherwise Rare Breed] customer later buys the ARHK, AS Designs' records may identify the completed transaction, but neither company's transactional records, standing alone, **reveal with certainty** what the customer would have purchased, when the purchase would have occurred, or whether the customer would have made subsequent Rare Breed purchases in the but-for world." (emphasis added)

33. Absolute certainty is not required to determine damages adequately, nor must a damages analysis literally recreate the past. The three identified uncertainties–what the customer would have purchased, purchase timing, and follow-on sales to the same customer—can be evaluated using transaction data, economically grounded assumptions, and conventional damages methods, as explained below. Moreover, these same uncertainties also weigh *against* a TRO or injunction, since a TRO/injunction that removes AS Designs from the market would create these uncertainties about how the market should have evolved.

[19] AS Designs Phillips Declaration 7/4/26, ¶16, citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001)).

**2. The Repeat-Purchasing Percentages Support Quantifiability, Not Unquantifiability.**

34. Eichmann presents the calculation that [redacted]% of FRT-RD3 launch-period customers "had either prior or subsequent commercial purchasing activity with Rare Breed" (¶67). But this statistic supports the opposite conclusion from the one Eichmann draws. If a customer made a prior or subsequent purchase, that purchase is a concrete, identifiable transaction in Rare Breed's records. It is not an unobservable "customer relationship" effect. It is a sale that can be counted and whose profit can be calculated.

35. If sales of ARHK similarly lead to repeat / follow-on sales to AS Designs, those sales would be included in AS Designs' sales data and therefore the damages calculations.

**3. Follow-On Sales Are Not an Unquantifiable Special Form of Damages.**

36. Eichmann states that "a lost-profits analysis may identify the margin associated with an identifiable sale" but "generally cannot directly observe whether the same customer would later have purchased an additional product, purchased for another firearm, upgraded to a future model, or influenced another purchaser" (¶68). He further states that these possibilities "should not simply be assumed, but neither are they necessarily captured by assigning a single per-unit margin to the initial transaction" (¶68).

37. Eichmann's assertion does not establish that follow-on sales fall outside a lost-profits analysis. Follow-on sales are additional alleged lost sales; they may be included when supported by evidence of causation and a reliable estimate of the sales and associated profits. See AS Designs Phillips Declaration 7/4/26 ¶¶15–23 (describing the *Panduit* framework and market reconstruction). Eichmann identifies potential follow-on effects, but he does not explain why those effects cannot be estimated using transaction histories or other reliable economic evidence.

**4. No Evidence of "Economically Significant Customer-Acquisition and Timing Effects"**

38. Eichmann concludes that lost profits methodologies "do[] not establish that all economically significant customer-acquisition and timing effects are observable or that a damages award based solely on completed transactions provides a complete economic equivalent" (¶71). But Eichmann provides no evidence of the magnitude of these "customer-acquisition and timing effects," no explanation as to how the magnitude qualifies them as "economically significant," and no explanation as to why they cannot be accounted for in a conventional damages analysis.

39. The asserted "customer-acquisition" effects appear to refer principally to follow-on sales, which may be included in a damages analysis when supported by evidence.[20] The asserted "timing effects" appear to refer to delays in Rare Breed's actual or but-for sales. Such effects can be evaluated by identifying the affected sales, estimating the period of delay, and applying an appropriate discount or prejudgment-interest methodology to reflect the time value of money. Eichmann does not explain why those conventional tools would be inadequate here.

40. Eichmann also suggests that damages could fail to account for customers who otherwise would have purchased from Rare Breed but "abandoned their purchase," and purchase *nothing* instead (¶¶69, 126). Here, Eichmann identifies no evidence that expectations of ARHK has caused or will cause prospective customers to purchase *nothing* (neither the FRT-RD3 nor ARHK). Second, Eichmann offers no guidance on the expected magnitude of such an effect. Third, assuming, *arguendo*, that certain Rare Breed would-be customers do indeed choose nothing because of ARHK, such an effect could be accounted for in a market reconstruction analysis, such as using surveys, benchmarks, site activity / conversion analysis, or waitlists.

### 4.5. <u>Price Pressure and Reference-Price Effects (Section VII)</u>

41. In Section VII, Eichmann concludes with a "limited" opinion (¶89) that ARHK's anticipated 10% to 11% lower price compared to Rare Breed's FRT-RD3 **could** result – **if** price comparisons become widespread after launch—in delayed sales and price erosion to Rare Breed (¶87), and a later monetary award "would not necessarily recreate the pricing conditions that would have existed" but for ARHK's market entry (¶89).

#### 1. The "Prospective Price Pressure" Is Speculative and Unsupported by Evidence.

42. Eichmann acknowledges upfront that the "issue at this stage is **prospective** price pressure" (¶79, emphasis added). Eichmann then asserts that a "lower-priced close substitute can affect the price-and-quantity combination available to the incumbent even if the incumbent does not immediately reduce its posted price," and that "the incumbent may instead experience lower unit volume, increased customer resistance, greater demand for discounts, reduced dealer margins, or pressure to alter promotions or product positioning" (¶79; also at ¶86).

[20] See also Eichmann's own calculation of follow-on sales percentages with respect to Rare Breed (¶67).

43. This is a list of hypotheticals. Eichmann cites no evidence that Rare Breed has lowered, or plans to lower, the FRT-RD3 price. He cites no evidence of "increased customer resistance," "greater demand for discounts," or "reduced dealer margins"[21] in the roller-delayed segment. He cites no legal authority establishing that generalized, unidentified "price pressure" constitutes irreparable harm or that such effects cannot be accounted for in a damages computation. Insofar as the "price pressure" Eichmann describes does in fact result in lower unit volumes, reduced prices, or reduced margins, those are precisely the harms that are compensable through a conventional price-erosion or lost-profits analysis. As I previously explained, "any economic harm resulting from price erosion can be awarded as monetary damages."[22]

44. Eichmann later restates the point, stating: (¶87)

> "If those comparisons [of prices by prospective customers] become widespread after launch, they may affect customer expectations concerning what a factory-housing-compatible roller-delayed FRT should cost. That effect could manifest through lower willingness to pay, delayed purchases, increased price sensitivity, or pressure on Rare Breed to alter its future pricing."

45. This is speculation layered upon speculation. The sentence contains three successive hedges: "if" the comparisons become widespread, they "may affect" expectations, and the effect "could manifest" in one of four generalized ways. And again, Eichmann cites no evidence showing those four suggested outcomes.

**2. The [redacted]% and [redacted]% Calculations Are Economically Misleading.**

46. Eichmann attempts to show that the price difference between the anticipated ARHK and Rare Breed's FRT-RD3 is more substantial than the actual 10% to 11% by measuring the $65 to $70 difference against Rare Breed's *profit level*[23] instead of price. This price difference accordingly amounts to [redacted]% to [redacted]% of Rare Breed's profits, indicating that, actually, 10% to 11% price difference is not "modest" but instead "economically significant" (¶84).

---

[21] Eichmann's "reduced dealer margins" assertion appears to have limited, if any, relevance since Eichmann has: (1) previously acknowledged that Rare Breed has no dealer network or program (AS Designs Eichmann Declaration 4/24/26, ¶20 at footnote 28); and (2) has not identified any Rare Breed dealers in such a program.

[22] AS Designs Phillips Declaration 7/4/26, ¶31, citing the Federal Circuit's observation in *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001), that "[r]eduction of prices, and consequent loss of profits, enforced by infringing competition, is a proper ground for awarding of damages."

[23] Eichmann refers to Rare Breed's profits as "list-price residual," while DeMonico refers to this amount (price less manufacturing cost and ABC's royalty) as "Rare Breed's Profit." See ARHK DeMonico Declaration 9/1/26, ¶71.

47. This calculation is not meaningful for the purpose Eichmann assigns it. Eichmann calculates this profit ("residual") by deducting manufacturing costs and the $[redacted] per-unit "royalty" paid to ABC IP. But ABC is a named plaintiff and would thus be expected to seek its losses as well. Both Eichmann and DeMonico indeed assert that ABC's losses should be included in a damages assessment.[24] Accordingly, DeMonico calculates and presents ABC's and Rare Breed's "Combined Profit" as the relevant measure of Plaintiffs' losses, not simply Rare Breed's profits. Measured against Plaintiffs' combined profit, the $65 to $70 difference equals approximately [redacted]% to [redacted]%, rather than [redacted]% to [redacted]% of Rare Breed's "residual."[25] Eichmann's suggestion that the price difference amounts to [redacted]% to [redacted]% of profits thereby misrepresents and overstates the "economic significance" of the price difference.

48. At any rate, the 10% to 11% price difference is the appropriate indicator of *potential* pricing harm based on current and anticipated pricing. Alternative calculations such as that proposed by Eichmann require speculative leaps about Rare Breed's future pricing response, causation, and measure of profits.

49. Further, gauging the price difference against Rare Breed's profits, net of the $[redacted] royalty to ABC, is inappropriate because, as I previously explained,[26] the $[redacted] per-unit payment does not appear to be the result of an arms-length transaction, and therefore does not properly reflect Rare Breed costs. Recent deposition testimony by the two signers of the agreement that specifies $[redacted] per unit (i.e., DeMonico and Leleux) confirms that the transaction was not arms length.[27] Yet Eichmann without basis accepts and endorses the $[redacted] per unit "royalty," resulting in an inappropriate calculation and unreliable result.

---

[24] ARHK Eichmann Declaration 9/2/26, ¶25 ("The $[redacted] royalty is an expense to Rare Breed and revenue to ABC. Any later damages analysis should therefore evaluate the alleged loss to each plaintiff separately and treat the intercompany royalty consistently to avoid double counting.") See also ARHK DeMonico Declaration 9/1/26, ¶72 ("every sale lost to an infringing product is a concrete, per-unit loss to both Plaintiffs: ABC loses its $[redacted] royalty, and Rare Breed loses its per-unit profit.")

[25] Calculation: $65 ÷ $[redacted] profit = [redacted]% for SEF. $70 ÷ $[redacted] = [redacted]% for AMBI.

[26] AS Designs Phillips Declaration 7/4/26, ¶57 and footnote 82.

[27] For example, DeMonico is [redacted]. DeMonico dep. tr. 9/16/26 pp. 115-6. Both DeMonico and Leleux are [redacted] (dep. tr. 9/16/26 pp. 50-1), and Leleux [redacted] – see DeMonico dep. tr. p. 23) and his [redacted] (Cole Leleux dep. tr. 9/17/26, draft pp. 37, 41-42, 221-3).

**3. The Suggested Post-Litigation Damage is Speculation.**

50. In the case of Plaintiffs' success and a post-litigation injunction against AS Designs, Eichmann addresses Rare Breed's hypothetical pricing recovery, stating that "whether a firm can later raise price, how quickly it can do so, and what sales volume it retains are empirical questions" (¶88). He then concludes that "a later monetary award would not necessarily recreate the pricing conditions that would have existed had the ARHK not entered the market" (¶89).

51. This proposed post-litigation harm depends on a series of unsupported hypotheticals: that Rare Breed would reduce FRT-RD3 prices because of ARHK entry; that a post-litigation injunction would issue; that Rare Breed thereafter would be unable to restore its price or would require significant time to do so; and that the resulting loss would not be captured in a damages award. Eichmann identifies no evidence supporting those assumptions. His description of pricing recovery as an "empirical" question indicates that the issue can be investigated using market evidence, but it does not by itself establish either the existence or the amount of any post-litigation harm.

**4.6. <u>Loss of Lead Time and Remaining Market Exclusivity (Section VIII)</u>**

52. The Eichmann Declaration states that an ARHK introduction would result in Rare Breed's losing: (a) its period of exclusivity in selling the FRT-RD3 in this segment (¶106), and (b) its "opportunity to establish customer and market relationships" (¶104) that "can influence subsequent purchasing patterns and competitive positioning" (¶101).

**1. No Concrete Damages Are Tied to The Loss of Market Exclusivity.**

53. Here, Eichmann identifies no concrete damages. Eichmann does not state what specific sales, customers, dealer relationships, or customer perceptions (¶101) Rare Breed would have accomplished during the foregone market exclusivity period and what Rare Breed would lose due to an ARHK entry.

54. Eichmann states that "Early competitive sales can influence which products customers become familiar with, which manufacturers they recommend, and which suppliers are perceived as established participants in a new segment" (¶101). Eichmann adds that "the sequence of early adoption can influence subsequent purchasing patterns and competitive positioning" (¶101). These are general economic observations, not identifications of specific harm to Plaintiffs.

**2. Eichmann's Own Disclaimers Undermine the "Irreparable" Character of the Harm.**

55. Eichmann acknowledges that he does "not assume that all 1,500 announced units exist, will be released, will be sold, or will displace Rare Breed sales" (¶100). He further states that he does "not opine that entry necessarily would exclude Rare Breed from the market permanently or prevent Rare Breed from later recovering some market position" (¶106). If Rare Breed can "later recover some market position," the alleged lead-time harm is not irreparable; it is a temporary competitive disadvantage that can be addressed through conventional damages. Further, Eichmann posits a two-supplier market, the FRT-RD3 and ARHK,[28] and offers no explanation as to why Rare Breed would not be expected to later recover its *full* market position promptly. As I explained previously,[29] courts have ruled that in such a two-supplier market as posited by Eichmann and DeMonico, "one may infer that the patentee would have made the infringer's sales or charged higher prices but for the infringing competition."[30] I also explained: "If AS Designs were removed from the market through an end-of-litigation injunction, Rare Breed would more likely, under [Eichmann's] characterization, be expected to gain share 'over a relatively short period of time.' "[31]

**4.7. <u>Dealer, Channel, and Product-Development Effects (Section IX)</u>**

56. In this section, Eichmann asserts that AS Designs has an "established commercial footprint" and infrastructure "through which the ARHK may reach customers once released" (¶¶111, 112). Turning to Rare Breed's product development, Eichmann states that **if** the ARHK entry reduces FRT-RD3 sales or profit margins, "it **may reduce** the cash contribution generated" by the FRT-RD3 (¶115), which "**can affect** the timing or scale of" development efforts (¶116).

**1. The "Established Commercial Infrastructure" Is Not an Opinion of Harm.**

57. Eichmann states that AS Designs' "existing customer and intermediary relationships provide an established commercial infrastructure through which the ARHK may be introduced" (¶111). This is a description of AS Designs' commercial scale, not an opinion of harm

[28] ARHK Eichmann Declaration 9/2/26, ¶¶93-95. See also ARHK DeMonico Declaration 9/1/26, ¶81 ("Rare Breed still holds the exclusivity" in the FRT-RD3's segment, and the ARHK will cause "loss of exclusivity.")

[29] AS Designs Phillips Declaration 7/4/26, ¶¶20.

[30] *Amstar Corp. v. Envirotech Corp.,* 823 F. 2d 1538, 1543 (Fed. Cir. 1987). See also *State Industries, Inc. v. Mor-Flo Industries, Inc*., 883 F. 2d 1573, 1578 (Fed. Cir. 1989), ruling that in a two-supplier market, "the Panduit test is usually straightforward and dispositive."

[31] AS Designs Phillips Declaration 7/4/26, ¶¶24.

to Rare Breed. If AS Designs' size and reach generate additional sales, those sales are identified in its records and accounted for in a conventional damages calculation.[32]

58. Eichmann's "opinion" is also limited to merely showing AS Designs dealer-ordering activity and repeat purchasing. No dealer has been identified as diverted from Rare Breed or committed to the ARHK at Rare Breed's expense.

59. The "established commercial infrastructure" characterization is also at odds with Eichmann's own ability-to-pay position. Eichmann's opening declaration cited AS Designs' recent formation and lack of publicly-available financial information to suggest an inability to pay a judgment.[33] Yet here Eichmann points to AS Designs' [redacted] in revenue, more than [redacted] orders, and [redacted] customers as evidence of AS Designs' "established commercial footprint" (¶111). It is unclear how to reconcile these positions.

**2. The Product-Development Argument Is Speculative.**

60. Regarding Rare Breed's product development efforts, Eichmann states that "reduced contribution from a product that has become economically important to the business can affect the timing or scale of those efforts, even though the exact effect would depend on Rare Breed's cash balances, financing alternatives, development budgets, and management decisions (¶116). Yet Eichmann identifies no evidence that any of Rare Breed's development efforts have been or will be impacted by the ARHK. Eichmann does not identify a specific product, development milestone, budget, or timeline that has been or will be affected.

61. The list of caveats—cash balances, financing alternatives, development budgets, management decisions—effectively concede that the effect is unknown and speculative. With so many unknowns, this amounts to a hypothesis, not an opinion.

62. Furthermore, the FRT-RD3's profits of $[redacted] to $[redacted] are substantial.[34] The assumption that a reduction in FRT-RD3 sales would materially impair Rare Breed's ability to fund product development is not supported by quantitative analysis (or the record, as noted above).

[32] See AS Designs Phillips Declaration 7/4/26, ¶15 (lost profits from lost sales is commonly calculated), ¶24 ("any additional Accused Product sales by AS Designs to a particular customer due to such stickiness would be included in its sales data and thereby included in a damages calculation, making such harm compensable.")

[33] AS Designs Eichmann Declaration 4/24/26, ¶53. The Eichmann Reply 8/6/26 asserts "there is material uncertainty" about its "capacity to satisfy the judgment" (¶99).

[34] ARHK DeMonico Declaration 9/1/26, ¶71 (Combined Profit of $[redacted] to $[redacted] for the FRT-RD3).

63. Ultimately, this section rests on a chain of hypotheticals. The argument proceeds as follows: future ARHK sales may reduce FRT-RD3 sales (¶115); that may reduce margins (¶118); that may reduce available funds (¶116); that may affect product development (¶116); subject to several managerial caveats (¶116). Each link is conditional. No link is supported by evidence of actual harm. Yet even assuming *arguendo* each hypothetical outcome, delayed profits of Rare Breed due to delayed development programs can be accounted for in a damages computation when supported by reliable evidence—as noted previously, the cost/value of delayed/accelerated cash flows is commonly included in financial and damages calculations.

### 4.8. <u>Retrospective Monetary Relief (Section X)</u>

64. Section X repeats the principal "limitations" of damages awards as identified in Sections III through IX and concludes that "retrospective monetary relief is unlikely to provide a reasonable economic equivalent for the combined effects associated with ARHK entry" (¶139). The five stated limitations do not provide an independent basis for that conclusion; each corresponds to an issue addressed above and is either quantifiable through conventional damages methods or unsupported by evidence of actual harm:

| Asserted "Limitation" of Monetary Relief | Discussed Above in: |
|---|---|
| 1. Damages analysis requires a but-for market reconstruction instead of direct observation (¶124). | Section 4.4.1 |
| 2. Some customers may delay/cancel purchases or purchase ARHK (¶¶125-126). | Section 4.2.3;<br>Section 4.4.4 |
| 3. Lost lead time; damages does not recreate the commercial opportunity (¶¶128-130). | Section 4.6 |
| 4. Continued pricing harm after an end-of-litigation injunction (¶¶131-132). | Section 4.5.3 |
| 5. Customer relationships result in repeat purchases (¶¶133-134). | Section 4.1;<br>Section 4.4.2;<br>Section 4.4.3 |

**Figure 3. Eichmann's asserted "limitation" on monetary relief.**

65. Eichmann has not estimated the magnitude of any of these effects, identified any specific customers or dealer affected, or demonstrated that any of these effects cannot be accounted for in a conventional damages analysis.

**1. Inability to Pay Assertions are Not Supported.**

66. Lastly, Eichmann repeats the conclusion from his August 6 Reply Declaration that "**material uncertainty** remained concerning AS Designs' entity-level capacity to satisfy a future judgment; I did not opine that AS Designs was insolvent or necessarily would be unable to pay" (¶137, emphasis added). Eichmann offers no "new ARHK-specific solvency or collectability opinion here" and adds that his prior conclusions on "material uncertainty" are "independently supported by the displacement, timing, pricing, customer-acquisition, and lead-time effects described above" (¶137).

67. Yet Eichmann offers no explanation as to how these ARHK-specific analyses independently support that conclusion. In fact, some Eichmann assertions suggest otherwise. First, Eichmann identifies no evidence demonstrating actual Rare Breed pricing harm, such as a price reduction, on its FRT-RD3 product. Further, Eichmann's identified ARHK-to-Rare Breed price difference of $65 to $70 (¶17) is lower than the price difference identified previously for the ARC-Fire and Super Safety ($200 to $360).[35] The lower price differential suggests significantly less potential per unit price erosion, *cet. par*. Second, Eichmann's characterization of a "substantially smaller" overall market size for MP5-related firearms would suggest a lower impact of a damages award specific to the ARHK.[36] Third, the significantly greater anticipated price of the ARHK ($550; ¶17) over the ARC-Fire and Super Safety ($250 and $90, respectively[37]) would likely result in greater generated profits per unit from which to pay an award of damages, *cet. par*.

[35] AS Designs Eichmann Declaration 4/24/26, ¶¶5, 25 indicates FRT-15L3 price of $450, and accused product prices of $90 (Super Safety) to $250 (ARC-Fire). Price differences then amount to $200 to $360 per unit.

[36] ARHK Eichmann Declaration 9/2/26, ¶11. Eichmann identifies 1,500 anticipated ARHK units, as compared to "more than [redacted] website orders" for AS Designs' other products (¶111).

[37] AS Designs Eichmann Declaration 4/24/26, ¶5.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: Sep. 28, 2026

Eric J. Phillips

Exhibit 1

VLF CONSULTING
VALUATION • LITIGATION • FINANCIAL

**Chicago Area Office**
1945 Hitchcock Ave
Downers Grove, IL 60515
(312) 489-2483 direct
(773) 354-4644 mobile
ephillips@vlfconsulting.com

**Certifications**

Certified Valuation Analyst

Master Analyst in Financial Forensics

**Professional Affiliations**

National Association of Certified Valuators and Analysts

Licensing Executives Society

**Education**

Master of Business Administration (with honors), Kelley School of Business at Indiana University

Bachelor of Science, Mechanical Engineering (with Distinction), The Ohio State University

# Eric J. Phillips MBA, CVA, MAFF

President

## Biography

Eric Phillips is President of VLF Consulting. Mr. Phillips has twenty-six years of experience in providing valuation and litigation advisory services to attorneys and corporate clients across a broad range of industries. With a focus on intellectual property litigation and valuation, Mr. Phillips has extensive experience in the valuation of patents, trademarks, copyrights, software, trade secrets, and know-how in such contexts as infringement litigation, bankruptcy proceedings, false marking, licensing negotiations and transactions, and joint ventures. His experience includes providing testimony in federal court proceedings regarding intellectual property damages. He has broad experience in damages – lost profits, reasonable royalties, past and future price erosion, convoyed sales, and prejudgment interest. He has also conducted flexible damages/valuation modeling, including probability trees, sensitivity analyses, and Monte Carlo analysis. As a Certified Valuation Analyst, he has also assisted clients with business valuation needs.

Mr. Phillips is a Certified Valuation Analyst (CVA) and a Master Analyst in Financial Forensics (MAFF) through the National Association of Certified Valuators and Analysts (NACVA). He is also a member of the Licensing Executives Society (LES).

## Professional Experience

- VLF Consulting, President, 2011 to present.
- FTI Consulting, Senior Director, 2009 to 2011.
- Charles River Associates (formerly InteCap), Principal, 2000 to 2009.
- Tadano Faun GmbH Mobile Cranes, Nuremberg, Germany, summer intern, 1999.
- Siemens Energy & Automation, Product Engineer, Development, 1995 to 1998.

## Industry Experience Examples

- Surgical products
- Pharmaceutical
- Measurement tools
- Construction products
- Medical testing products
- Semiconductors
- Computer hardware
- Computer software
- Consumer electronics
- Sports equipment
- Financial derivatives trading systems
- Non-profit organizations
- Automotive products
- Aviation
- Agricultural chemicals
- Biotech research tools
- Telecommunications equipment
- Wireless networking systems
- Petroleum refining
- Manufacturing

## Illustrative Intellectual Property Project Experience

- Assisted a sporting goods manufacturer defending itself in litigation involving several patents. In this make-or-break case between the two leading manufacturers of high-end products, Mr. Phillips rebutted a sweeping damages claim by the Plaintiff. Through complex analyses of the relevant products and their next-best alternatives, Mr. Phillips successfully narrowed the scope of the purported patented benefits, undermining Plaintiff's position on the importance of the patents, thereby leading to a highly favorable settlement.

- At a patent trial involving the two leading makers of toddler feeding products, Mr. Phillips presented a broad array of damages, including profit disgorgement, lost profits, reasonable royalties, and pre-issuance reasonable royalties. Mr. Phillips's testimony achieved a complete damages victory for plaintiff, as the jury awarded all damages amounts exactly as presented.
- Engaged in multiple patent infringement disputes related to blood sampling devices for glucose monitoring, Mr. Phillips determined both lost profits and reasonable royalty damages in suits brought by a leading U.S. device manufacturer and designer.
- Supported a Tier 1 automotive supplier that had supplied electronic control modules to an auto manufacturer and had become embroiled in ensuing litigation due to its indemnifying the auto maker. Assistance included a thorough review of both plaintiff's and defendant's expert reports and a detailed analysis of 10+ years of Daubert rulings by the sitting judge in Texas. The results were successfully used to revise expert strategy and in indemnification negotiations.
- In a complex patent litigation case involving multiple patents and method and system claims related to auto-leveling systems for recreational vehicles, Mr. Phillips demonstrated the errors in plaintiff's lost profits claim and provided a reliable reasonable royalty approach that considered multiple types of value indicators.
- Determined the appropriate reasonable royalty damages for a worldwide leading tax stamp provider in a patent infringement case related to cigarette tax stamping technology. Mr. Phillips testified regarding numerous errors by Plaintiff's damages expert, opined on the appropriate royalties, and assisted the client in preparing a vigorous *Daubert* motion against the opposing expert regarding Entire Market Value Rule issues and other errors.
- Assisted a worldwide leader in heavy-haul over-the-road trailer systems who was accused of patent infringement regarding their dual-lane modular trailers. His particular expertise related to the Entire Market Value Rule was key in successfully limiting the scope of royalty damages, leading to a favorable settlement.
- In a highly complex dispute involving multiple plaintiffs, patents, and hammer mill technologies, Mr. Phillips determined lost profits, price erosion, and reasonable royalty damages for each plaintiff. Claims in the multiple lawsuits included patent infringement and false marking. Mr. Phillips' adroitness at navigating the complex legal and *Daubert* issues surrounding lost profits and price erosion led to rigorous and unassailable opinions and testimony.
- Assisted a German surgical products manufacturer in valuing its numerous trademarks used by international licensees. Mr. Phillips developed a multi-pronged valuation approach to arrive at an appropriate range of royalties that would adequately compensate the trademark owner for the use by the licensees. His opinions played a key role in negotiations and related litigation among the various international entities.
- Assisted a distributor of imported goods by valuing its proprietary enterprise management software system, a cloud-based system including both front-office and back-office applications. VLF's efforts supported the owners' strategic shift towards enhancement and commercialization of the software platform.
- Directed efforts to identify and quantify lost profits and reasonable royalty damages for dozens of clients, such as: a manufacturer of spinal implant products, a foreign maker of hard disk drives, a leading domestic computer maker, a worldwide supplier of airbag systems, and makers of branded pharmaceutical products.

### Presentations and Articles

- "A Comprehensive Guide on Apportioning Patent Damages: Tips and Strategies Explored," (co-presenter), live webcast, *The Knowledge Group*, November 2019.
- "Responding To Fed. Circ.'s Latest Patent Damages Test," E. Phillips and A. Parikh, *Law360.com*, August 2018.
- "Recent Rulings on the Entire Market Value Rule and Impacts on Patent Litigation and Valuation," E. Phillips and D. Boag, *Les Nouvelles* (journal of the Licensing Executives Society), March 2013.
- "Patent Damages Overview and Update on Current Issues," presented by E. Phillips and D. Haas, May 2011.
- "Apportionment Issues in IP Damages Cases," presented by E. Phillips and D. Haas, April 2011.
- "Judicial Impact on Patent Value," presented by E. Phillips and B. Burton, March 2011.
- "Intellectual Property," presented by E. Phillips, D. Haas, and S. Weingust to the China Appraisal Society, July 28, 2010.
- "Economic and Damages Issues in Pharma / ANDA Litigation," presented by E. Phillips and D. Haas, August 2009.
- "Using Monte Carlo Methods for Technology Valuation, Pricing, & Dealmaking," R. Razgaitis and E. Phillips. Presented by Mr. Phillips to AICPA/ASA National Valuation Conference, November 10, 2008.

### Prior Testimony (Client is Underlined)

- *Munchkin, Inc., v. TOMY International, Inc.*, Northern District of Illinois, Case No. 1:18-cv-6337, Dec 2021 (deposition) and Sep 2025 (trial).
- *Ravin Crossbows, LLC v. Hunter's Mfg Co., Inc. d/b/a TenPoint Crossbow Techs*, Northern District of Ohio, Eastern Division, Case No. 5:23-cv-00598, Oct 2024.
- *Spectrum Dynamics Medical Limited v. General Electric Co., et al*., Southern District of New York, Case No.: 18-cv-11386, Oct 2023 and Sep 2021.
- *C&M Oilfield Rentals, LLC v. Apollo Lighting Solutions, et al.*, Western District of Texas, Waco Division, Civil Action No. 6:21-cv-00544, Jul 2022.
- *Days Corporation v. Lippert Components, Inc., and Innovative Design Solutions, Inc.*, Northern District of Indiana, Civil Action No. 3:17-cv-00208, Sep 2020.
- *Water Technology, LLC v. Kokido Development Ltd and Menard Inc.,* Eastern District of Missouri, Case No. 4:17-cv-01906, Sep 2019.
- *Bakko Bros., Inc. and Genesis III, Inc. v. Jacobs Corp.,* Southern District of Iowa, Central Division, Civil Case No. 4:14-cv-00015, May 2017.
- *Tax-Right, LLC v. SICPA Product Security LLC*, Eastern District of Virginia, Civil Action No.: 3:12-CV-657-REP, Aug 2013.

**Exhibit 2**
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

**Documents Reviewed or Relied Upon**

**AS Designs Documents**

| From | To |
|---|---|
| ASD 000001 | ASD 000049 |
| ASD 000438 | ASD 000438 |

**Legal Filings**

- 2025-12-30 Amended Complaint, *Rare Breed and ABC IP v. AS Designs,* MDNC-1-25-cv-01192-4
- 2026-04-27 Plaintiffs' Motion for Preliminary Injunction
  - 2026-04-24 Declaration of Richard J. Eichmann in Support of Motion for Preliminary Injunction
  - 2026-04-24 Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction
  - 2026-04-24 Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction
    - Exhibits A to I
- 2026-07-06 Declaration of Matthew S. Karlovic in Support of Defendants' Opp. to Pltfs' Mot. For Prelim. Injunction
- 2026-08-06 Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction
- 2026-09-02 Plaintiffs' Motion for Temporary Restraining Order (re. ARHK)
  - 2026-09-02 Declaration of Matthew A. Colvin in Support of Pltfs' Mot. for Temp. Restraining Order (re. ARHK)
    - Exhibits 1 to 13
  - 2026-09-01 Declaration of Lawrence DeMonico (re. ARHK)
    - Exhibits 1 to 78
  - 2026-09-02 Declaration of Richard J. Eichmann in Support of Pltfs' Mot. For Temp. Restraining Order (re. ARHK)
- 2026-09-27 Declaration of Matthew S. Karlovic (in Support of Defendants' Opp. to Pltfs' Mot. For TRO re. ARHK)

**Depositions**

- Deposition of Matthew S. Karlovic (AS Designs), 7/30/26, Personal
- Deposition of Matthew S. Karlovic (AS Designs), 7/30/26, 30(b)(6)
- Deposition of Lawrence DeMonico (Rare Breed), 9/16/26
- Deposition of Cole Leleux (ABC IP), 9/17/26

**Other / Public Domain Information**

- 2026-01-07 (*Rare Breed v. Hoffman, et al.* ) Plaintiffs' Motion for Preliminary Injunction
- 2026-01-23 (*Rare Breed v. Hoffman, et al.* ) Response to Plaintiffs' Motion for Preliminary Injunction
  Declaration of Timothy Hoffman in Support of Defendant's Response
  Letter to Hoffman re. notice of patent infringement
  Settlement Agreement, 5/13/25 between U.S. and Rare Breed, et al.
- 2026-02-11 (*Rare Breed v. Hoffman, et al.* ) Order granting preliminary injuction
- 2026-01-15 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Complaint for Patent Infringement, False Patent Marking, and False Advertising
- 2026-01-16 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Plaintiffs' Motion for TRO and Prelim. Injunction
  Declaration of Samir P. Warty, Ph.D. in Support of Plaintiffs' Motion for TRO and Preliminary Injunction
- 2026-01-30 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Def's Resp. in Opp. to Pltfs' Mot. for TRO and PI
  Declaration of Scott W. Cragun
  Rebuttal Declaration of John Nixon
  Declaration of Michael Stakes
  Declaration of Ben Woods, incl. 2023-09-05 (*U.S. v. Rare Breed et al* .) Order of Preliminary Injunction

**Exhibit 2**
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

**Documents Reviewed or Relied Upon**

- 2026-02-13 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Order Denying Pltfs' Motion for TRO and PI
- 2026-05-14 (*Atrius Dvp. Group v. Rare Breet et al.* ) First Amended Complaint for Declaratory Judgment
- Fannon, Nancy J., *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys* , 2011 ed.
- Dunn, Robert L., *Recovery of Damages For Lost Profits* , 6th Ed. Vol. 1, Vol. 2, 2022 Supplement
- “Understanding Distribution Channels in Business: How They Function,” at https://www.investopedia.com/terms/d/distribution-channel.asp
- “The Pros and Cons of Direct and Indirect Product Distribution,” Business Development Bank of Canada, at https://www.bdc.ca/en/articles-tools/marketing-sales-export/marketing/how-bring-new-product-market
- Andjelkovic, A. and Marija Radosavljevic, “The Length of the Distribution Channel as a Factor of its Efficiency,” Strategic Management, Vol. 25 (2020), No. 2, pp. 9-17.
- RoyaltySource and ktMINE royalty rate databases
- “Royalty Rate Industry Summary Report 2025,” published by IPSCIO / RoyaltySource, 2026
- https://activesafetydesigns.com/
- https://rarebreedtriggers.com/
- https://archive.org/