[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM**<br>**MDL 3176**<br>[redacted] |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>AS DESIGNS, LLC, and MATTHEW S. KARLOVIC, and CALVIN OLSON, and JOHN DOE,<br>Defendants. | Civil Action No. 4:26-cv-00370-ALM |

**REPLY DECLARATION OF RICHARD J. EICHMANN IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

[redacted]

Secretariat

***Civil Action No. 4:26-cv-00370-ALM***

ABC IP, LLC and Rare Breed Triggers, Inc.,
**Plaintiffs,**
v.
AS DESIGNS, LLC, Matthew S. Karlovic, Calvin Olson, and John Doe,

**Defendants.**

Submitted by:

Richard J. Eichmann
October 13, 2026
United States District Court
Eastern District of Texas Sherman Division
In Re: Rare Breed Triggers Patent Litigation
4:26-md-03176-ALM
MDL 3176

[redacted]

## Table of Contents


I. Qualifications and Scope of Reply ........ 4

II. Summary of Opinions ........ 6

III. Competitive Overlap and the Evidence of Customer Choice ........ 9

IV. Launch Scale, Supply, and Timing ........ 12

V. Financial Significance and the Proper Accounting Measures ........ 15

VI. Customer History and the Inference It Supports ........ 18

VII. What Monetary Analysis Can Address and What Remains Unresolved ........ 22

VIII. Licensing Evidence and the Scope of the Counterfactual ........ 25

IX. AS Designs Projected Launch Loss ........ 28

X. Other Asserted Effects and Conclusion ........ 29

[redacted]

## I. Qualifications and Scope of Reply

1. My name is Richard J. Eichmann. I am a Managing Director at Secretariat Advisors, LLC ("Secretariat"). I have more than 30 years of experience in economic consulting, including more than 28 years focused on litigation-related engagements. My work includes the analysis of lost profits, reasonable royalties, price erosion, business value, and other economic harm in intellectual-property and commercial disputes. I hold the Certified Valuation Analyst and Master Analyst in Financial Forensics designations. My qualifications and curriculum vitae were provided with my prior declarations and are incorporated here by reference.[1]

2. I submit this reply concerning AS Designs, LLC's ("AS Designs") ARHK product at the request of counsel for ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("Rare Breed"; collectively, "Plaintiffs"). I respond to the economic opinions and arguments in Eric J. Phillips's September 28, 2026 rebuttal declaration, Matthew S. Karlovic's September 27, 2026 declaration, and Defendants' opposition.[2] This reply supplements my September Declaration and the relevant analyses in my April 24 and August 6, 2026 declarations.[3]

3. My opinions concern economics. For purposes of this analysis, I assume infringement by AS Designs and rely on Plaintiffs' technical witnesses and counsel for the relevant technical and patent-related premises. I do not independently determine infringement, validity, or the legal requirements for temporary injunctive relief. [4]

4. I considered the materials identified in **Appendix 2R** and cited below, including the declarations, submitted deposition excerpts, contemporaneous communications, product materials, Rare Breed's transaction data, my September schedules, [redacted]

---

[1] Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Temporary Restraining Order, September 2, 2026 ("Eichmann September Declaration"), ¶ 1; **Appendix 1R**. The schedules accompanying that declaration are referred to as the "Eichmann September Schedules."

[2] Rebuttal Declaration of Eric J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, September 28, 2026 ("Phillips Declaration"); Declaration of Matthew S. Karlovic, September 27, 2026 ("Karlovic Declaration"); Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, September 28, 2026 ("Defendants' Opposition to TRO").

[3] Declaration of Richard J. Eichmann in Support of Motion for Preliminary Injunction, April 24, 2026; Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, August 6, 2026 ("Eichmann August Reply").

[4] Eichmann September Declaration, ¶¶ 7–8; Phillips Declaration, ¶ 6 and n.3.

[redacted]

[redacted], and [redacted].[5] The records include transactions through September 30, 2026, together with stock-history, order-fulfillment, and price-tier information. The accompanying **Supplemental Schedules R1–R5**, including the R2A common-period analysis, present the supporting calculations and source detail. **R1** reconciles the financial measures; **R2** examines customer purchasing history; and **R3** presents the pricing comparisons and launch-forecast calculations. **R2A** examines subsequent customer purchases over common observation periods using transactions through September 30, 2026.[6] **R4** identifies the Nexus agreements' relevant terms and economic implications. **R5** and its companion schedules (R5.1, R5.2, and R5.3) present the shipment, stock, fulfillment, and price-tier evidence.[7]

5. My assignment is to assess the competitive effects of anticipated ARHK entry and the extent to which monetary relief could compensate for those effects. I do not present a final damages

---

5 *See* "AWP - Rare Breed FRT Sales Data 2020-2026.xlsx," Methodology and Transactions worksheets ("Transaction Workbook"); Eichmann September Schedules; and "AWP - Rare Breed FRT Sales Data 2020-2026 thru 2026-09-30 (Transactions Only).csv" ("September Transaction Extract"), together with its companion transaction and full workbooks. For analyses using the September Transaction Extract, string whitespace is normalized and [redacted] exact duplicate rows are removed from [redacted] source transaction rows, retaining [redacted] rows.

[redacted]

6 *See* **Supplemental Schedule R2A,** *including* **R2A Common Periods ("CP"), CP.1 - CP.4**, and the supporting customer ("Customer Detail") and transaction ("Transaction") detail work tabs. Customer identifiers, qualifying transactions, and date conventions are discussed in Section VI.

7 *See* "FRT-RD3 Stock History (WooCommerce) Feb-Sep 2026.xlsx," "FRT-RD3 Order Records Feb-Sep 2026 (ShipStation extract).xlsx," and "Rare Breed Sales by Channel (ShipStation Ship Date Basis) May2025-Sep2026.xlsx," including their source and methodology worksheets; **Supplemental Schedule R5, R5.1 - R5.3**. The transaction analysis covers shipments through September 30, 2026. The open-order records identify orders placed by September 30 that remained unshipped as of October 5, 2026. The transaction records contain no actual ARHK transactions. Price tiers are inferred classifications, not verified purchaser identities or distribution channels.

[redacted]

calculation. In forming my opinions, I distinguish observed facts, forecasts attributed to their sources, and economic inferences.[8]

## II. Summary of Opinions

6. The proposed ARHK launch presents a material competitive risk to Rare Breed's acquisition of FRT-RD3 customers during the product's early commercialization. The products serve overlapping MP5-family applications, and AS Designs' contemporaneous communications expressly considered Rare Breed's anticipated price and competitive position.[9] Mr. Karlovic's forecast of up to [redacted] first-month ARHK sales indicates the substantial commercial scale AS Designs anticipates.[10] The concern therefore rests on identified competitive overlap, deliberate consideration of Rare Breed's market position, and a potentially substantial launch directed in part to the same customer demand.[11]

7. Rare Breed's purchasing records demonstrate why the customer opportunity at risk extends beyond the initial sale. **Supplemental Schedule R2A** follows all [redacted] launch customers over common observation periods; within 90 days of their initial qualifying RD3 shipment, [redacted] customers ([redacted]) placed qualifying later trigger orders.[12] Those fulfilled orders provide concrete evidence that a customer relationship can involve purchases beyond the initial sale. AS Designs' transaction records would show its own sales, not the initial and causally related later purchases Rare Breed would otherwise have obtained. Nor would

[8] Eichmann September Declaration, ¶¶ 6–8, 41, 46, 51, and 58; **Supplemental Schedules R2, R2A CP, and R3**.

[9] Eichmann September Declaration, ¶¶ 31–47 and 48–60; Eichmann September Schedules, **Schedule 1**; ASD 000040–000045.

[10] Karlovic Declaration, ¶ 14.

[11] Karlovic Declaration, ¶¶ 14–15; **Supplemental Schedule R3, R3.1, R3.2**. The forecast describes anticipated launch scale, not a measured diversion rate.

[12] **Supplemental Schedule R2A CP**; **Supplemental Schedule R2A CP.1**.

[redacted]

recovery of a later market share establish recovery of earlier lost profits. Mr. Phillips's arguments therefore do not resolve the customer-acquisition and timing effects at issue.[13]

8. The FRT-RD3's commercial importance persists whether Rare Breed is examined separately or Plaintiffs are considered together. **Supplemental Schedule R1** deducts the scheduled royalty as a cost in Rare Breed's separate-company calculation and eliminates that payment as an internal transfer in the combined-plaintiff calculation. Both perspectives support the product's economic significance. The distinction concerns how the returns are allocated between Plaintiffs; the product's importance does not depend on counting an intercompany payment as a cost to Plaintiffs collectively.[14]

9. Rare Breed's operating dealer network gives the distribution concern a concrete commercial foundation. [redacted][15] [redacted].[16] Mr. DeMonico's account of East Valley Tactical also identifies an actual obstacle to developing a dealer relationship: the prospective dealer's continued sale of products Rare Breed identified as infringing.[17] Together, this evidence establishes identifiable distribution relationships, channel prices, and business opportunities relevant to evaluating the effects of ARHK entry.[18]

---

[13] Phillips Declaration, ¶¶ 12–13, 30–40, 55, and 64–65; DeMonico Declaration, ¶ 66; **Supplemental Schedules R2 and R2A CP**; Eichmann September Declaration, ¶¶ 122–139 and 147–150. **Supplemental Schedule R2A CP** documents qualifying later purchases. Estimating lost follow-on profits requires identifying later purchases Rare Breed would have received absent diversion of the initial customer acquisition and applying appropriate margins, observation periods, and recapture. Customer definitions and the common-period methodology are discussed in Section VI.

[14] **Supplemental Schedule R1** and the financial reconciliation discussed below. The separate-company and combined-plaintiff residuals are alternative accounting perspectives and are not added together. Neither residual is presented as net income or a final incremental-profit or damages calculation.

[15] DeMonico Deposition, 65:20–66:8.

[16] Davidson Reseller Agreement, §§ 2.1, 3.2, 4.2, and Exhibit C.

[17] DeMonico Declaration, ¶¶ 83–84.

[18] DeMonico Deposition, 65:20–66:8; Davidson Reseller Agreement, §§ 2.1, 3.2, 4.2, and Exhibit C; DeMonico Declaration, ¶¶ 83–84; The approximately [redacted] figure is Mr. DeMonico's estimate for Rare Breed's business as of September 16, 2026, not a count of dealers shown to have purchased the FRT-RD3. The East

[redacted]

10. Neither the [redacted] nor the [redacted] provide a stand-alone measure of ARHK-related economic loss. [redacted] That structure generates product revenue for Rare Breed; it does not establish a price for authorizing an independent supplier to manufacture a competing ARHK product. A valid economic comparison must account for the complete transaction and the competitive circumstances it addresses.[20]

11. Mr. Karlovic's [redacted] forecast does not establish the economic loss attributable to a temporary restraint. The figure projects gross profit from assumed launch sales without determining which purchases would be permanently forgone and which would occur later.[21] Measuring the effect of a restraint requires evidence of launch readiness, the timing of demand, subsequent sales and recapture, and incremental costs incurred or avoided. Delayed receipts and permanently lost sales have different economic consequences. A first-month gross-profit forecast does not resolve that distinction or establish the amount of loss a temporary restraint would cause.[22]

12. I conclude that anticipated ARHK entry presents a material risk to Rare Breed's customer acquisition and associated profit opportunities during the FRT-RD3's early commercialization. The overlapping applications, competitive communications, anticipated launch scale, and observed later purchasing identify a specific commercial opportunity at risk.

---

Valley Tactical account concerns an earlier dispute involving products including ARC-Fire; it illustrates a distribution mechanism and is not treated as a completed ARHK-caused loss.

[19] [redacted], and Exhibit D §§ 2–3, ABCRBT-MDL-0004737 – 0004772, at - 0004738, -0004742, -0004744, -0004753, and -0004770; [redacted], ABCRBT-MDL-0004711- 0004736, at - 0004716–0004717; Supplemental Schedule R4 and the licensing discussion below.

[20] [redacted], and Exhibits A–C; DeMonico Deposition, 85:17–86:7. These agreements document negotiated terms for authorized commercialization. Their economic relevance depends on the rights, obligations, and retained controls accompanying the stated payments.

[21] Karlovic Declaration, ¶¶ 14–15; **Supplemental Schedule R3**.

[22] **Supplemental Schedule R3**; Phillips Declaration, ¶¶ 30–40 and 63.

[redacted]

Entry during this period can alter when customers purchase, which supplier establishes the relationship, and the opportunity for later business. A count of ARHK transactions does not capture that sequence, and a later recovery of market share does not restore it. The record therefore identifies economically consequential changes in customer acquisition, purchasing sequence, and competitive position that are not resolved by counting completed sales or assuming later market-share recovery. Mr. Phillips has not demonstrated how his proposed reconstruction methods would capture those combined effects.[23]

## III. Competitive Overlap and the Evidence of Customer Choice

13. The evidence supports direct competition between the ARHK and Rare Breed's FRT-RD3 for purchasers seeking a self-contained, three-position trigger for MP5-family firearms. Both products are marketed for that use.[24] The comparison also distinguishes these trigger products from the H&K SP5/SP5-L replacement lower that AS Designs separately advertised with a full-kit choice of Super Safety or ARC-Fire V2 components.[25] ARHK's compatibility with additional platforms expands its potential customer base; it does not eliminate competition for customers whose needs either product can satisfy. The relevant economic question is whether a purchaser would select the FRT-RD3 absent the ARHK, not whether the products have identical features or serve identical customer populations.

14. The contemporaneous communications give that competitive overlap concrete commercial significance. In the January 30, 2026 discussion reproduced at ASD 000041, [redacted]"[26] When asked about that statement, Mr. Karlovic testified that pricing at [redacted]

[23] Eichmann September Declaration, ¶¶ 61–77, 123, and 137–150; Phillips Declaration, ¶¶ 30–40 and 50–67; **Supplemental Schedules R1–R5,** including R2A. The supporting discussions below address customer acquisition, timing, pricing, supply, and dealer relationships.

[24] DeMonico Declaration, ¶¶ 49–58 and Exhibits 8 and 18; Karlovic Declaration, ¶¶ 3, 5, and 7; Phillips Declaration, ¶¶ 19–21.

[25] Colvin Declaration filed April 27, 2026, Exhibit K, Dkt. 29-11, ECF pp. 2–3, PageID 308–309. Product characteristics are described as reported in these sources. Exhibit K documents an advertised replacement-lower configuration; it does not establish current availability or noninfringing status.

[26] ASD 000040–000045, at -000041.

[redacted]

[redacted][27] The surrounding discussion also addressed [redacted]. Read together, the communications and testimony support the inference that price and compatibility were being evaluated as advantages in competing against Rare Breed. Broader compatibility was part of the competitive comparison, not a reason to disregard it.

15. Subsequent communications reinforce that interpretation. [redacted].[28] On February 24, participants discussed [redacted][29] Other comments included [redacted]"[30] These exchanges connect pricing and launch timing to an identified competing product. They support the conclusion that Rare Breed's offering was a relevant competitive benchmark for ARHK.

16. Mr. Karlovic's discussion of product differences does not rebut that evidence. Some differences may place particular purchases outside the competitive overlap, while others may influence which product a customer selects within it. For example, compatibility with a platform the FRT-RD3 cannot serve addresses a different use. By contrast, a preferred trigger feel or semi-automatic setting could make ARHK more attractive to an MP5 purchaser who otherwise would have selected the FRT-RD3. The existence of those features therefore does not, by itself, establish reduced diversion. Mr. Karlovic refers to a "large portion" of customers providing feedback and an expected "substantial portion" of sales into other platforms, but provides neither the underlying customer counts nor a quantified allocation of anticipated

---

[27] Deposition of Matthew S. Karlovic, as Rule 30(b)(6) designee of AS Designs, LLC, July 30, 2026 ("Karlovic 30(b)(6) Dep."), Ex. 23 (ASD 000040–000045); *See also* Eichmann September Declaration, ¶ 43 n.45. The quoted chat message is attributed to the displayed handle. Mr. Karlovic's testimony is separately reported at 114:17–115:1; *See also* 114:10–16 and 115:15–116:14 for context. At 116:3–5 he [redacted]

[28] ASD 000040–000045, at -000042.

[29] ASD 000040–000045, at -000043.

[30] ASD 000040–000045, at -000040. The asserted head-start period is the participant's characterization.

[redacted]

sales.[31] His descriptions offer no numerical basis for determining how much ARHK demand falls outside the overlap or how purchasers within it would choose between the products.

17. That distinction is particularly important for customers who own more than one compatible firearm. A purchaser's interest in ARHK's broader compatibility does not establish that the purchaser would have rejected the FRT-RD3 absent ARHK. An owner of both an MP5 and another compatible platform may value that flexibility while still considering the FRT-RD3 for the MP5. Diversion turns on what the purchaser would have bought absent ARHK, including whether the purchaser would instead select Rare Breed, buy both products, or make no Rare Breed purchase.[32] These distinctions identify the customer choices a diversion analysis must examine. They do not support excluding customers from the competitive overlap merely because they value a feature unique to ARHK.

18. The online discussions provide additional evidence that the products enter the same purchase decisions. The cited examples include commenters considering whether to wait for ARHK and one reporting that he purchased a Rare Breed product after waiting.[33] Those statements corroborate comparison shopping and expressed purchase deferral. I consider these examples together with the products' overlapping applications and contemporaneous pricing communications as evidence of competitive overlap; they do not supply a population-wide diversion percentage.

19. The same attention to customer choice is necessary when evaluating Mr. Phillips's expectation that Rare Breed would promptly recover its full market position following a later injunction.[34] Identifying two principal products does not establish that every purchaser chooses between them on a one-for-one basis, or that removing one product later recreates the purchase opportunities that existed before its entry. Purchasers may postpone a purchase, decline to

[31] Karlovic Declaration, ¶¶ 7–13, particularly ¶ 10; Phillips Declaration, ¶¶ 20–21.

[32] DeMonico Declaration, ¶¶ 55–66; Karlovic Declaration, ¶¶ 7–13; Eichmann September Declaration, ¶¶ 39–46. The purchaser examples illustrate the economic distinctions relevant to diversion; they are not estimates of segment size.

[33] DeMonico Declaration, ¶¶ 58 and 62 and Exhibits 24 at 2, 32 at 1, and 40 at 2; Eichmann September Declaration, ¶¶ 40–41 and 50; Phillips Declaration, ¶¶ 17–18 and 22–23. Page references are to the exhibit pages.

[34] Phillips Declaration, ¶¶ 12 and 53–55; Eichmann September Declaration, ¶¶ 13–19, 44–46, and 93–106; DeMonico Declaration, Exhibits 57–58.

[redacted]

purchase, select another configuration, or already have satisfied the need that originally brought them to the market. Mr. Phillips's recovery inference therefore requires evidence about subsequent purchasing behavior; it does not follow from the number of principal suppliers alone. Even a recovery in Rare Breed's share of future purchases would not establish that it had recovered the customers, sales, or profits lost during the intervening period.

## IV. Launch Scale, Supply, and Timing

20. The announced scale of ARHK's launch is economically significant when compared with Rare Breed's observed sales activity. My September Declaration compared the publicly announced 1,500-unit release with the [redacted] commercial FRT-RD3 units Rare Breed shipped in June 2026, a quantity equivalent to [redacted] of those monthly shipments.[35] That comparison places the proposed launch in commercial context. Mr. Phillips's observation that the percentage does not measure diversion does not undermine its value for that purpose. My September Declaration expressly distinguished the announced quantity from actual sell-through and did not assume that each ARHK sale would displace a Rare Breed sale.[36] The comparison demonstrates the commercial scale of the proposed release relative to Rare Breed's recent shipments.

21. Mr. Karlovic's subsequent forecast of [redacted] ARHK sales in the first month reinforces the significance of the proposed entry. This is AS Designs' own assessment of its commercial prospects, not a sales projection I have attributed to it.[37] The earlier 1,500-unit release announcement and the first-month forecast describe different quantities and time horizons and should be evaluated separately. Both nevertheless bear on the scale and timing of the competitive threat. In my opinion, AS Designs' expectation of selling that many units within

---

35 Eichmann September Declaration, ¶¶ 46, 48–51, and 58; Eichmann September Schedules, **Schedule 1**. The June quantity comprises [redacted] commercial units and excludes zero-revenue units under the schedule's stated methodology.

36 Eichmann September Declaration, ¶¶ 46, 48–51, and 58; Phillips Declaration, ¶¶ 26–28; **Supplemental Schedule R3**.

37 Karlovic Declaration, ¶ 14; DeMonico Declaration, ¶¶ 67–70 and Exhibits 41–42; Eichmann September Declaration, ¶¶ 48–60. The release quantity and first-month forecast cover different time horizons and are not added together.

[redacted]

one month supports concern about the concentration of customer-acquisition opportunities during the launch period.

22. Production announcements and forecasts identify the potential scale of entry; release timing, saleable inventory, orders, platform mix, and fulfillment determine how those plans translate into competitive sales.[38] My analysis evaluates that prospective competitive exposure using the announced quantities together with evidence of launch readiness and fulfillment.

23. Mr. Phillips's reliance on displayed stockouts does not resolve Rare Breed's ability to supply the purchases at issue. The client stock-history reconstruction identifies repeated FRT-RD3 replenishments and sell-outs, supporting an assessment of supply over time.[39] The relevant question is whether and when Rare Breed would have supplied a customer's purchase absent ARHK entry. A customer who otherwise would have waited for Rare Breed's next replenishment could instead purchase ARHK, displacing a sale Rare Breed would have fulfilled later. A snapshot showing no immediately available inventory does not address that possibility. The reconstruction's last recorded sell-outs occurred in July. Mr. Phillips labels the DeMonico Exhibit 8 product page approximately September 1, but the declaration's exhibit index identifies May 19, 2026 as its capture date. Mr. Phillips's own Figure 2 shows the FRT-RD3 available on August 23, 2026. The page therefore is not evidence of a September stockout. Accordingly, I do not infer uninterrupted availability or include demand Rare Breed could not have served. Neither the webpage nor the reconstruction supports treating every observed stockout as eliminating the risk of diversion.

---

38 DeMonico Declaration, Exhibits 41–42; Karlovic Declaration, ¶¶ 5 and 14–15; Eichmann September Declaration, ¶¶ 6 and 57–59.

39 Phillips Declaration, ¶¶ 24–25 and Figure 2; Eichmann September Declaration, ¶¶ 13 and 57–59; "FRT-RD3 Stock History (WooCommerce) Feb-Sep 2026.xlsx," Restocks and Sell-outs, Stock Notes Read, and Source worksheets; Supplemental Schedule R5. [redacted]

[redacted]

24. Rare Breed's manufacturing arrangement and actual fulfillment records provide additional evidence relevant to supply. Mr. DeMonico testified that [redacted] That operating arrangement does not establish an inability to fulfill customer purchases. Among the [redacted] shipped FRT-RD3 records in the order extract, the median order-to-shipment interval is [redacted][40] These results provide concrete evidence of fulfillment times for recorded shipments, although they do not measure waiting before an order could be placed or unused production capacity. The separate open-order extract identifies [redacted] placed by September 30 and still unshipped at the October 5 pull; it is not a complete September 30 backlog. A reliable lost-sales analysis must therefore evaluate the timing of the purchases Rare Breed would have received against available inventory, production and fulfillment capacity, and lead times. The fulfillment records inform that inquiry more directly than isolated website captures.

25. Launch timing matters because the opportunity to acquire a customer can precede, and be affected by, the opportunity to make later sales. Commercial FRT-RD3 shipments began in February 2026, placing the proposed ARHK entry within the product's early commercialization period.[41] A purchaser who acquires a durable trigger can satisfy the immediate need for that installation, reducing the opportunity for Rare Breed to make that same initial sale later. Subsequent purchases remain possible, as the repeat-purchase evidence discussed below demonstrates. But the possibility of a later purchase does not establish recapture of the initial opportunity. Where ARHK captures a purchase that Rare Breed otherwise would have supplied, a later injunction does not itself restore that sale, its timing, or the associated opportunity to establish the customer relationship.

---

40 DeMonico Deposition, 43:1–11; "FRT-RD3 Order Records Feb-Sep 2026 (ShipStation extract).xlsx," Sources, RD3 Orders Shipped, and RD3 Orders Open at 9-30 worksheets; Supplemental Schedule R5. The [redacted] are shipped records, not distinct orders, customers, or units. The open-order list comprises four awaiting-shipment orders for [redacted] and [redacted] on-hold orders for [redacted]. Reasons for holds are not recorded, and the list omits orders shipped between September 30 and the October 5 pull. Neither extract independently establishes spare capacity or a supply shortage.

41 Transaction Workbook and Supplemental Schedule R2 (first qualifying commercial shipments: February 24, 2026 for AMBI and February 26, 2026 for SEF); DeMonico Declaration, ¶ 66; Eichmann September Declaration, ¶¶ 61–77 and 93–106.

[redacted]

## V. Financial Significance and the Proper Accounting Measures

26. The FRT-RD3's economic importance does not depend on choosing one of the two accounting perspectives challenged by Mr. Phillips. Schedule R1 presents both. In May and June 2026, the two FRT-RD3 configurations generated [redacted] of commercial revenue from [redacted] units. Using the manufacturing costs and [redacted] assumption in the September schedules, they contributed [redacted] to Rare Breed's reported residual after those two deductions. That equals [redacted] corresponding residual for the five trigger product lines in that schedule.[42]

| May–June 2026 measure | FRT-RD3 | Five product lines | FRT-RD3 share |
|---|---|---|---|
| Commercial revenue | [redacted] | [redacted] | [redacted] |
| RBT residual after manufacturing and [redacted] | [redacted] | [redacted] | [redacted] |
| Combined residual before other costs | [redacted] | [redacted] | [redacted] |

Source: **Supplemental Schedule R1**. The two residual measures are alternatives and must not be added.

27. [redacted]. The FRT-RD3 share on that basis is [redacted]. The [redacted] and [redacted] figures answer different accounting questions. Presenting both measures identifies the allocation of returns between Plaintiffs and confirms the product's substantial contribution under either measure.[43]

28. [redacted]. Mr. DeMonico states that [redacted]. [redacted]. I use [redacted] because it is [redacted] and the input used in the September

[42] Eichmann September Schedules, **Schedule 2**, reconciled in **Supplemental Schedule R1**; DeMonico Declaration, ¶¶ 71–72. "Reported residual" describes this revenue-less-manufacturing-cost-less-royalty calculation. It is not net income, a verified incremental-profit measure, or a percentage of all profits earned by either plaintiff.

[43] **Supplemental Schedule R1**. The combined calculation eliminates the scheduled [redacted] transfer but does not establish that every dollar received by ABC is free of external obligations. [redacted] *See* DeMonico Deposition, 99–106 [redacted]. The financial shares in this paragraph remain May–June measures.

[redacted]

schedules. That is a factual basis for the company-level measure challenged by Mr. Phillips. The combined-plaintiff calculation separately eliminates that [redacted].[44]

29. The unit-price comparisons should likewise retain their denominators. At list prices of $615 for SEF and $620 for AMBI, the specified manufacturing costs of [redacted] and [redacted] produce [redacted] and [redacted] before the [redacted] and other relevant costs. After the scheduled [redacted], the Rare Breed residuals are [redacted] and [redacted]. Both sets of figures are relevant to understanding the company and the combined Plaintiffs; neither is, by itself, a final lost-profit rate.[45]

30. The price difference and its potential effect on profit are different economic measures. At the earlier advertised ARHK price of $549.99, the gaps against Rare Breed's SEF and AMBI list prices are $65.01 and $70.01, respectively, or 10.57% and 11.29%. Those percentages describe the price difference facing purchasers. If Rare Breed matched that price while quantities, manufacturing costs, and the scheduled royalty remained unchanged, the same dollar reductions would absorb [redacted] and [redacted] of Rare Breed's separate-company residuals, or [redacted] of the combined-plaintiff residuals before other costs. These conditional calculations explain the margin implications of a price response. They do not predict that Rare Breed will match ARHK's price. The separate-company and combined calculations must remain clearly distinguished, but expressing the gap as a percentage of selling price does not answer the separate question of its effect on profit.[46]

---

44 DeMonico Declaration, ¶ 71 and Exhibit 1, § III.1 (printed p.2), as amended by Exhibits 2–3; DeMonico Deposition, 94:3–96:3 and 117:8–118:14; Phillips Declaration, ¶¶ 46–49; **Supplemental Schedule R1**. The reported applied payment and its company-level consequences are distinct from the elimination of an internal transfer on consolidation. [redacted] See also "AWP - Rare Breed FRT Sales Data 2020-2026 thru 2026-09-30.xlsx," Cost Inputs and Methodology worksheets. The original [redacted] assumption is retained in Schedule R1.

45 DeMonico Declaration, ¶¶ 71–72; Eichmann September Declaration, ¶¶ 78–89; **Supplemental Schedule R3**; **Supplemental Schedule R3.1**. The list-price illustration is distinct from the realized revenue-per-unit calculations for May–June in **Supplemental Schedule R1**.

46 DeMonico Declaration, Exhibit 18; Phillips Declaration, ¶¶ 46–49; **Supplemental Schedule R3; Supplemental Schedule R3.1**. Exact comparisons use $549.99; the September discussion rounded the dollar gaps to $65 and $70. The illustration holds quantity, manufacturing cost, royalty treatment, and other conditions constant solely to isolate the price difference.

[redacted]

31. Mr. Karlovic's $520-to-$550 expected range would imply a $65-to-$95 gap against SEF and a $70-to-$100 gap against AMBI. **Supplemental Schedule R3 and Supplemental Schedule R3.1** present the resulting sensitivities under the stated price and cost assumptions. Maintaining a posted price can coexist with lower volume. Determining the actual price and quantity effects requires evidence of customer response and the other differences described above.[47]

32. The announced lower ARHK price poses a direct competitive threat to Rare Breed's sales and margins. Maintaining its posted price would not eliminate the harm if purchasers instead select ARHK. The contemporaneous communications show that AS Designs considered precisely that competitive effect. In the present record, the economic concern is the price-and-volume position Rare Breed could maintain absent ARHK entry, not merely whether its posted price changes.[48]

33. The [redacted] supplies a [redacted] benchmark for interpreting those price differences. Exhibit C [redacted], compared with stated retail prices of $620 and $615. Exhibit B sets the corresponding [redacted], but § 3.5 expressly permits the reseller to choose its actual selling price. The agreement therefore distinguishes what Rare Breed receives from a dealer, what the dealer advertises, and what an end user ultimately pays. These are different economic measures. The [redacted] reduce Rare Breed's revenue per unit by [redacted] relative to the stated retail prices, but do not by themselves measure lost incremental profit: a channel comparison must also account for selling and fulfillment costs, the royalty actually applied, and any additional volume obtained through dealers. Mr. DeMonico's testimony that dealer sales compress margins and can require a lower internal royalty reinforces the need for that channel-specific treatment. Neither the listed retail

---

[47] Karlovic Declaration, ¶ 15; Phillips Declaration, ¶¶ 41–49; **Supplemental Schedule R3**; **Supplemental Schedule R3.1**.

[48] ASD 000041–000044; DeMonico Declaration, ¶ 73; Phillips Declaration, ¶¶ 41–51; Eichmann September Declaration, ¶¶ 78–89 and 131–132.

[redacted]

residuals nor the scheduled [redacted] should be mechanically applied to every discounted dealer transaction.[49]

## VI. Customer History and the Inference It Supports

34. Supplemental Schedule R2 reconciles the previously reported customer-history figures. Supplemental Schedule R2A provides the common-period, trigger-only analysis emphasized in this reply. Using the July 22, 2026 cutoff, R2 distinguishes activity before and after the launch purchase and identifies [redacted] unique customers purchasing an FRT-RD3 during the first 120 calendar days beginning with each configuration's first qualifying commercial shipment. Of those customers, [redacted] had qualifying prior activity, [redacted] had qualifying subsequent activity, and [redacted] were in both groups. The number with either prior or subsequent activity is therefore [redacted]. The groups are not additive without subtracting the overlap.[50]

| Launch customer history | Customers | Share of 6,264 |
|---|---|---|
| Prior activity | [redacted] | [redacted] |
| Subsequent activity | [redacted] | [redacted] |
| Both prior and subsequent | [redacted] | [redacted] |
| Either prior or subsequent | [redacted] | [redacted] |

Source: **Supplemental Schedule R2**. Prior and subsequent groups overlap. Activity includes non-trigger transactions.

35. The [redacted] customers with subsequent activity equal [redacted] of the cohort. This historical count differs from R2A's [redacted] qualifying customers within 90 days: R2 uses the July cutoff and broader transaction categories, while R2A uses the September cutoff, trigger-only transactions, and the later-order rules described below. There are [redacted] subsequent-only customers, [redacted]

---

49 [redacted] Exhibit C specifies [redacted] for AMBI and [redacted] for SEF. The agreement documents this counterparty's terms; it does not independently identify the purchasers in the price-tier extract or establish realized retail selling prices. DeMonico April Declaration, ¶¶ 51 and 57; DeMonico Declaration, ¶¶ 83 and 110. Those statements concern the broader product line and competitive conditions described by Mr. DeMonico, not measured ARHK-caused price erosion.

50 Transaction Workbook; Eichmann September Declaration, ¶ 67; Eichmann September Declaration work product, "2. In-Draft Calculations.do;" **Supplemental Schedule R2**. The 120-day periods are February 24–June 23 for AMBI and February 26–June 25 for SEF, inclusive. Customers appearing in both configurations are counted once in the customer total.

[redacted]

prior-only customers, and [redacted] with neither kind of activity in the observed records. The word "additional" in the earlier description of the subsequent group should not be read to exclude overlap with the prior group. Schedule R2 makes that overlap explicit. Historical purchases before the launch are evidence of an existing customer relationship, not future sales caused by acquisition of the FRT-RD3.[51]

36. The historical counts include positive-quantity, positive-revenue activity across all recorded categories, including donations, accessories, and shipping charges or protection. Prior and subsequent activity is classified by shipment date; activity on the initial shipment date is excluded. Follow-up ends July 22, giving later launch purchasers shorter observation periods. R2A addresses those differences through trigger-only transactions and equal observation periods using the September 30 cutoff.[52]

37. To test whether the result merely reflects non-trigger activity, Schedule R2 separately restricts prior and subsequent transactions to the disclosed trigger product families while retaining the same launch cohort. On that basis, [redacted] customers had prior trigger purchases and [redacted] had subsequent trigger purchases; [redacted] had both, producing [redacted] with either. Thus, [redacted] of the launch cohort had an observed subsequent trigger purchase. Substantial later purchasing remains evident when the analysis is limited to triggers.[53]

38. **Supplemental Schedule R2A** examines subsequent purchasing over common observation periods. The September 30 cutoff permits a full 30, 60, and 90 days of observation for every member of the original [redacted]-customer launch cohort. A qualifying later purchase is a positive-quantity, positive-revenue trigger line on a distinct order dated strictly after the customer's first qualifying RD3 shipment and shipped within the stated period. An order placed on or before the initial shipment date is excluded even if it has a different order number or ships later. Later

---

[51] Eichmann September Declaration, ¶ 67; **Supplemental** Schedules R2 and R2A. The identities are [redacted].

[52] Transaction Workbook; Eichmann September Declaration work product, "2. In-Draft Calculations.do;" **Supplemental Schedule R2** and its methodology notes. The supplemental positive-quantity, positive-revenue filter reproduces the broad counts reported using the supplied program's nonzero-revenue filter.

[53] **Supplemental Schedule R2** and Customer Detail worksheet. The trigger-family definition is disclosed in the workbook. The calculation uses the same shipment-date boundaries and July 22 cutoff. **Supplemental Schedule R2A** separately addresses unequal observation periods and the distinction between a later shipment and a new order placed after the initial shipment; it supplements rather than replaces this historical reconciliation.

[redacted]

fulfillment of the initial order is also excluded. These rules distinguish a later purchasing decision from a later shipment. The launch windows, customer population, and trigger-family definition remain unchanged. The earlier July-cutoff results are retained as historical comparisons, and the September Transaction Extract reproduces their common-period customer counts when restricted to that cutoff.[54]

39. Subsequent trigger ordering remains evident when all launch customers receive the same observation period. Within 60 days, [redacted] customers, or [redacted], placed a qualifying later trigger order. This includes [redacted] customers without earlier recorded paid activity, or [redacted], and [redacted] customers with earlier paid activity, or [redacted]. The results establish later ordering in both groups and provide a concrete basis for examining follow-on purchasing opportunities.[55]

40. The 90-day product check confirms that the later orders include both additional RD3 purchases and other trigger products. Of the [redacted] launch customers, [redacted] subsequently purchased an RD3, [redacted] purchased another included trigger family, and [redacted] did both, leaving [redacted] distinct customers. The qualifying lines contain [redacted] trigger units and [redacted] of positive-line revenue. Restricting the later qualifying lines to prices at or above 90% of the applicable list price leaves [redacted] qualifying customers, or [redacted]. Thus, the observed later-purchase rate is not driven by lower-priced lines. The unit of analysis is the recorded customer identifier; website ordering and retail pricing do not establish individual end-user status. Mr. DeMonico's account of East Valley Tactical purchasing Rare Breed triggers at retail before seeking dealer

---

54 September Transaction Extract; **Supplemental Schedule R2A** and its customer, transaction, and historical-comparison detail. The original launch windows are February 24–June 23 for AMBI and February 26–June 25 for SEF, inclusive. Day one is the day after the first qualifying launch shipment, and the last day of each follow-up period is included. A qualifying later line must have an order date strictly after the date of that initial shipment, no later than its own shipment date, and a distinct Order ID from the initial qualifying RD3 order or orders. A different Order ID does not override the date requirement; orders placed on or before the initial shipment date are excluded. Paid means positive quantity and positive line revenue. The original disclosed trigger families are retained; adding the newly recorded FRT-AP3 family does not add any qualifying customer at 30, 60, or 90 days. These are observations of fulfilled orders and do not capture unshipped or cancelled demand.

55 **Supplemental Schedule R2A**, September 30 cutoff, 60-day results: [redacted]. The prior-activity groups are disjoint and sum to the original cohort. Prior activity retains the historical positive-quantity, positive-revenue definition across recorded categories and shipment dates before the initial qualifying launch shipment. The source methodology bases customer identifiers on normalized email, with name and ZIP used when email is absent. **Absence of earlier recorded activity does not establish that a purchaser was a first-time individual customer**.

[redacted]

status illustrates the distinction. Intermediary and individual-owner purchasing must be distinguished when evaluating the associated profit opportunities.[56,57]

41. Holding all [redacted] launch customers fixed, the qualifying later-purchase count rises from [redacted] within 30 days ([redacted]) to [redacted] within 60 days ([redacted]) and [redacted] within 90 days [redacted]). These are observations of one complete cohort, so the increase does not reflect changing eligibility denominators. I also examine the timing choice. Holding the same customer population fixed, measuring from the order date associated with the initial qualifying RD3 shipment, and counting distinct later trigger orders placed within the stated period and fulfilled by September 30 yields [redacted] customers at 60 days ([redacted]) and [redacted] at 90 days [redacted]). The similar results show that the descriptive finding is not confined to the shipment-based timing rule.[58]

42. Supplemental Schedule R2A establishes why customer acquisition matters beyond the first sale. It observes the entire [redacted]-customer launch cohort for equal periods and documents substantial later trigger purchasing: [redacted] within 60 days and [redacted] within 90 days. The result is not an artifact of shorter observation periods for later launch customers or the inclusion of non-trigger transactions. These fulfilled purchases show that the commercial opportunity associated with an RD3 customer can extend to additional RD3 units and other trigger products. A calculation confined to the margin on the initial diverted sale does not address

---

56 DeMonico April Declaration, ¶ 52; DeMonico Declaration, ¶ 84; DeMonico Deposition, 65:20–66:8; Supplemental Schedule R2A. Mr. DeMonico reports that East Valley Tactical purchased at retail before seeking dealer status. This example does not identify East Valley Tactical within the launch cohort; it shows why price and website coding alone do not verify end-user status.

57 **Supplemental Schedule R2A**, September 30 cutoff, 90-day product check and supporting transaction detail. The customer identity is [redacted]. Positive-line, pre-tax revenue is not net of negative adjustments or post-shipment refunds; the source methodology states that post-shipment refunds and freight/processing costs are not captured. No incremental-profit margin is applied. The price-tier source also confirms that website ordering and inferred dealer pricing can coexist; see Supplemental Schedule R5 and Section V above. The retail-price sensitivity excludes later lines below 90% of applicable list price while retaining all [redacted] launch customers; it yields [redacted] units, and [redacted] of positive-line revenue. This is a price-based sensitivity, not a verified end-user classification.

58 **Supplemental Schedule R2A**, September 30 cutoff, common-period results and order-date sensitivity. The sensitivity holds the original shipment-defined cohort fixed; it does not reconstruct an order-defined launch population or include cancelled and unfulfilled orders. It changes both the starting date to the earliest order date associated with the initial qualifying RD3 shipment and the follow-up event to a later order placed within the horizon, provided that it was fulfilled by September 30. It is therefore a timing sensitivity, not an otherwise identical shipment-window calculation. AP3 inclusion leaves qualifying customer counts unchanged under the primary rule.

[redacted]

those associated opportunities. R2A supplies evidence for evaluating them; it does not apply an automatic customer-value multiplier.[59]

43. AS Designs' follow-on sales records do not measure the follow-on profits Rare Breed would otherwise have earned. In paragraph 35, Mr. Phillips reasons that follow-on sales to AS Designs would appear in its records and therefore enter the damages calculation. But the two companies' purchasing patterns need not be the same. An AS Designs customer's later purchase of a product Rare Breed does not offer is not automatically a lost Rare Breed sale. Conversely, the absence of a later AS Designs purchase does not establish that the customer would have made no later Rare Breed purchase. The causation question raised by Mr. Phillips in paragraph 37 is whether diversion of the initial customer acquisition would cause Rare Breed to lose later purchases it otherwise would have received. Answering that question requires evidence appropriate to Rare Breed's products and customers. Counting AS Designs' recorded transactions does not perform that analysis.[60]

## VII. What Monetary Analysis Can Address and What Remains Unresolved

44. Mr. Phillips's identification of conventional valuation methods does not establish that monetary relief would adequately address the combined effects at issue. In addition to transaction data, he identifies surveys, benchmarks, site-activity and conversion analysis, and waitlists. He does not apply those methods to the proposed ARHK entry or show how they would capture the customer relationships, purchasing sequence, pricing conditions, and remaining lead-time opportunities Rare Breed would have developed absent entry.[61]

45. The relevant question is whether the proposed reconstruction would reliably measure those combined economic consequences. An initial purchase may satisfy an installation need and

---

[59] **Supplemental Schedules R2 and R2A**, including the retained July-cutoff comparison; Phillips Declaration, ¶¶ 34–39; Eichmann September Declaration, ¶¶ 67–71 and 133–134. The September extract reproduces the July-cutoff common-period customer counts. The July-cutoff 60- and 90-day rates were [redacted] and [redacted] based on [redacted] and [redacted] eligible earlier launch customers, respectively. The full-cohort results are the primary descriptive findings because all [redacted] launch customers receive the same observation period. The different rates reflect inclusion of later launch customers, not deletion of previously observed qualifying customers.

[60] Phillips Declaration, ¶¶ 34–37, especially ¶ 35; Eichmann September Declaration, ¶¶ 68–71. Historical later purchasing provides evidence of the opportunity at risk; quantifying lost follow-on profits requires identifying later purchases Rare Breed would have received absent diversion of the initial customer acquisition.

[61] Phillips Declaration, ¶¶ 30–40, 43, and 64–65; Eichmann September Declaration, ¶¶ 122–123 and 147.

[redacted]

begin a customer relationship that later market-share recovery does not, by itself, restore. The observed rate of later Rare Breed purchasing does not itself establish the purchasing path of customers who would select ARHK. A reconstruction must determine which initial and later Rare Breed purchases would be lost, when they would occur, and whether later sales replace them. Mr. Phillips does not explain how the methods he identifies would resolve those questions for the overlapping customers and launch conditions at issue.[62]

46. The record identifies a specific opportunity at risk. Rare Breed had begun selling the FRT-RD3 and shipped [redacted] commercial units in June. It then faced an announced, lower-priced product serving some of the same applications. AS Designs' internal communications [redacted]. Together, these facts identify a concrete threat to initial sales and the opportunity to develop continuing customer relationships during a commercially important period.[63]

47. AS Designs' sales records would show what its customers bought, not what Rare Breed would have sold absent ARHK entry. They would not reveal, by themselves, when those customers would have purchased from Rare Breed, the products they would have selected, or the later business associated with those relationships. Rare Breed's own purchasing histories and fulfillment records bear directly on those questions. Using those histories requires a supported connection between the observed customers' purchasing behavior and the behavior of customers whose initial purchase ARHK would divert. Mr. Phillips's proposal to include AS Designs' recorded repeat transactions does not establish that connection or reconstruct the lost Rare Breed purchasing sequence.[64]

48. Deferral and abandonment create an additional gap in transaction records. A customer who postpones a Rare Breed purchase while awaiting ARHK may leave no completed sale with

---

[62] Eichmann September Declaration, ¶¶ 65, 70, 73–74, 123, and 150; Phillips Declaration, ¶¶ 29–40; Supplemental Schedule R2A and the customer and timing definitions in Section VI.

[63] Eichmann September Schedules, **Schedule 1**; ASD 000040–000044; **Supplemental Schedule R2**; Karlovic Declaration, ¶¶ 5–15.

[64] Phillips Declaration, ¶¶ 21, 25, 27, 34–40, and 53–55; **Supplemental Schedules R1**, R2, R2A, and R5. The customer and fulfillment analyses address Rare Breed's observed purchasing histories and ability to serve demand over time.

[redacted]

either supplier during the delay. If the customer ultimately buys ARHK, that record still does not reveal when Rare Breed otherwise would have made the sale. If the customer makes no purchase, there may be no transaction to count. Separately, an overlapping buyer who acquires ARHK may satisfy an installation need and reduce Rare Breed's opportunity to obtain the initial sale and associated later business. For the website and waitlist approaches Mr. Phillips identifies, the task is to distinguish ARHK-related deferral from stockouts, ordinary browsing, and other reasons for not purchasing, and to determine the resulting Rare Breed sales and profits. He identifies possible information sources without performing that analysis.[65]

49. Interest and discounting adjust the timing of an estimated cash flow; they do not identify the underlying lost business. They cannot supply the missing determination of which customers Rare Breed would have acquired, what those customers would have purchased, or how entry altered the sequence of later purchases. Thus, the availability of a timing adjustment does not answer whether the commercially significant effects have been captured in the first place.[66]

50. Mr. Phillips's paragraph 55 moves from my acknowledgment that Rare Breed could recover some market position to an expectation that it would promptly recover its full position. Those are different propositions. Market share measures a seller's percentage of purchases during a particular period; it does not measure the profits lost before that period or establish the volume of demand that remains. Rare Breed could regain its earlier market share while serving different customers or a smaller volume of purchases than it would have served absent ARHK entry. Recapture depends on the amount and timing of replacement or additional purchases, evaluated against the purchases Rare Breed otherwise would have received. Its mere possibility does not establish that recovery. A return to an earlier market share therefore does not establish recovery of the earlier customer opportunities or their associated profits.[67]

---

[65] Phillips Declaration, ¶¶ 25 and 40, pp. 10 and 14; DeMonico Declaration, ¶ 66; Eichmann September Declaration, ¶¶ 69–71 and 125–126; **Supplemental Schedule R2**.

[66] Phillips Declaration, ¶¶ 39 and 63; Karlovic Declaration, ¶¶ 14–15. The distinction is between estimating the underlying economic loss and adjusting for the timing of its cash flows.

[67] Phillips Declaration, ¶¶ 52–55; DeMonico Declaration, ¶ 66; Eichmann September Declaration, ¶¶ 93–106. This analysis does not assume that ARHK purchasers are permanently excluded from future Rare Breed purchases. Supported recapture would reduce the estimated loss. Economic recovery through later sales must be distinguished from compensation for profits that remain lost.

[redacted]

51. The difficulty is that ARHK entry can change the customer relationships and sequence of purchases that generate Rare Breed's profits. The overlapping applications, competitive communications, and anticipated launch scale identify that threat during the FRT-RD3's early commercialization. Supplemental Schedule R2A documents qualifying later trigger orders from [redacted] of all [redacted] launch customers within a common 90-day period, demonstrating that the commercial opportunity can extend beyond the initial sale. AS Designs' sales records do not themselves identify the Rare Breed purchasing sequence that would have occurred, and later market share does not measure the intervening lost profits. Mr. Phillips identifies additional reconstruction methods without applying them to those customer-acquisition, timing, pricing, and lead-time consequences. His analysis therefore does not establish that the proposed methods would provide a complete economic measure of the combined effects documented here.[68]

## VIII. Licensing Evidence and the Scope of the Counterfactual

52. The licensing and settlement evidence must be evaluated according to the transactions it describes. Mr. DeMonico discussed a co-branded arrangement for the [redacted]. A settlement payment requires examination of the claims, periods, and rights it resolves. [redacted] These transactions show why licensing, settlement, and resale evidence cannot be reduced to an interchangeable per-unit rate.[69]

---

[68] ASD 000040–000044; DeMonico Declaration, ¶ 66; Karlovic Declaration, ¶¶ 5–15; **Supplemental Schedules R2**, R2A, and R5; Phillips Declaration, ¶¶ 30–40 and 52–55; Eichmann September Declaration, ¶¶ 122–139 and 147–150. The customer analysis uses Rare Breed's observed shipments through September 30, 2026 and the order-date and common-period definitions in Section VI.

[69] DeMonico Deposition, 77:7–25 (Nexus and Springfield Kuna), 82:8–83:24, 85:17–86:20, 87–88 (settlements and resale), and 122:25–123:8 (sublicensing). [redacted] The commercial agreements are not treated as complete records of the separate settlements described in the testimony.

[redacted]

53. Mr. DeMonico specifically explained that [redacted] Economically, this arrangement routes product revenue through Rare Breed while retaining contractual control over distribution and product presentation. It does not establish that Rare Breed would accept the same return from an independent competitor supplying its own product.[70]

54. A license in one setting does not, by itself, price the consequences of an unrestricted competing launch in another. Relevant economic distinctions include the covered platform and technology, sales channels, branding, competitive overlap, exclusivity, term, volume, and the business rights retained by each party. [redacted].[71]

55. [redacted]

---

[70] DeMonico Deposition, 83:1–15 and 85:17–86:7; Davidson Reseller Agreement, §§ 1.14–1.15, 2.1.1–2.1.3, 3.2, 3.5, 4.2, and 5.2, and Exhibits A–C (PDF pp. 2–3 and 8–11). Exhibit A selects brick-and-mortar sales for standalone retail triggers and "No Restrictions" for triggers pre-installed in firearms, subject to the agreement's territorial restrictions; the standalone online-sales and gun-show boxes are not selected. These channel selections describe contractual authorization, not measured sales by channel.

[71] DeMonico Deposition, 77:7–25 and 122:25–123:8; Eichmann September Declaration, ¶¶ 7–8. Manufacturing Agreement, recitals and §§ 1.9, 1.22, 2.1, 3.2, 6.1, and 6.14, ABCRBT-MDL-0004737–0004738, 0004740, 0004742, 0004744, 0004747–0004748, and 0004753. The [redacted]

[redacted]

[redacted] My economic inference is that these provisions can help preserve Rare Breed's connection with licensed-product purchasers and its control over how the product is presented and supplied. Those rights form part of the commercial arrangement accompanying the [redacted] and must be considered when comparing that payment with the consequences of independent ARHK entry.[72]

56. The fee also forms part of a broader exchange. [redacted] These noncash rights, services, and risks must be considered when comparing the [redacted] with another transaction. The payment is not an isolated patent-royalty observation or a measure of Rare Breed's net incremental profit.[73]

57. [redacted] Those provisions do not establish that the [redacted] measures the harm from an independent competing ARHK launch.[74]

58. [redacted]

---

72 [redacted]; Exhibit C, ABCRBT-MDL-0004769; Exhibit D §§ 1–4, ABCRBT-MDL-0004770–0004771. The distinction is a contractual allocation of control, not a measured estimate of customer retention or follow-on profit.

73 [redacted]

74 [redacted]

[redacted]

[redacted]

These contractual limits further distinguish the [redacted] arrangement from independent ARHK entry and form part of the exchange accompanying the [redacted].[75]

59. The [redacted] and [redacted] agreements document commercial structures materially different from independent ARHK entry, with distinct sources of receipts: [redacted] Neither arrangement establishes that the scheduled [redacted], or a reseller purchase price fully values the acquisition, timing, and competitive effects addressed here.[76]

## IX. AS Designs Projected Launch Loss

60. Mr. Karlovic's [redacted] forecast estimates gross profit from assumed launch sales, not the loss caused by a temporary restraint. At [redacted] units, a [redacted] gross margin and selling prices of $520 to $550 imply gross profit of [redacted]. His stated figure falls within that range, but the arithmetic does not connect the projected profit to the effect of a restraint. That requires distinguishing purchases permanently forgone from purchases occurring later and accounting for the associated costs, timing, and subsequent recovery.[77]

61. The forecast uses a top-end quantity of up to [redacted] units and a full-month horizon. Mr. Karlovic also describes potential restraint periods of 14 or 28 days. The declaration does not provide a day-by-day release plan, confirmed orders, a platform allocation, or a calculation connecting either stated restraint period to permanently forgone units. A straight-line daily allocation

75 [redacted]

76 DeMonico Deposition, 94:3–96:3 and 117:8–118:14; Eichmann September Declaration, ¶¶ 7–8; Phillips Declaration, ¶ 6 and n.3. [redacted], a negotiated external license, a reseller purchase, and a settlement are different economic observations and should not be treated as interchangeable rates. [redacted]; DeMonico Deposition, 85:17–86:7.

77 Karlovic Declaration, ¶¶ 14–15; **Supplemental Schedule R3**; **Supplemental Schedule R3.1**. The calculation uses Mr. Karlovic's stated quantity, price, and gross-margin assumptions.

[redacted]

would itself be an assumption because launch sales may be concentrated. I therefore do not substitute a mechanical prorating calculation for the missing timing evidence.[78]

62. Gross margin also does not necessarily equal incremental profit lost from delay. The calculation should identify which production, selling, fulfillment, and other costs would be incurred or avoided; whether inventory can be sold after the restraint; whether buyers wait or purchase elsewhere; and whether any carrying, cancellation, or financing costs arise. Units sold later create a different economic loss from units never sold. Already-incurred costs and incremental future costs likewise require different treatment. None of these distinctions is resolved by multiplying forecast sales by a gross-margin percentage.[79]

63. Mr. Karlovic's projection may indicate the commercial stakes of the proposed launch, but the supplied calculation does not establish [redacted] of unrecoverable injury from a temporary restraint.[80]

## X. Other Asserted Effects and Conclusion

64. Mr. Phillips's reliance on an earlier statement that Rare Breed had no dealer network omits the evidence of its operating dealer program. Mr. DeMonico testified on September 16, 2026 that Rare Breed sold through dealers, that the program opened in approximately January or February 2026, and that it included approximately [redacted] dealers nationwide. The [redacted]. Dealer relationships and the opportunity to develop them are therefore concrete features of Rare Breed's business relevant to evaluating ARHK entry.[81]

---

[78] Karlovic Declaration, ¶¶ 14–15.

[79] Karlovic Declaration, ¶¶ 14–15; Phillips Declaration, ¶¶ 30–40 and 63 (market reconstruction and timing methods).

[80] Karlovic Declaration, ¶¶ 14–15; Phillips Declaration, ¶¶ 27–40; **Supplemental Schedule R3**; **Supplemental Schedule R3.1**.

[81] Phillips Declaration, ¶ 15 and n.5; DeMonico Deposition, 65:20–66:8; [redacted]. Mr. DeMonico estimated the dealer-program start as January or February 2026 and the dealer count as approximately [redacted] across the United States. The count concerns Rare Breed's dealer network as a whole; Exhibit C separately establishes that the Davidson agreement includes both FRT-RD3 configurations.

[redacted]

65. [redacted] This evidence connects competing products to an identified obstacle to developing a dealer relationship. It supports consideration of that mechanism for ARHK where the products compete, without relabeling the earlier ARC-Fire-related dispute as an ARHK loss.[82]

66. The economic concern extends to the terms and timing of distribution, as well as whether a dealer relationship is ultimately formed. Mr. DeMonico attributes an earlier-than-planned expansion into dealer sales to competing products and describes the associated lower pricing and margin pressure. AS Designs' own dealer network provides a route through which ARHK could reach overlapping purchasers. Together, the testimony and contract identify a channel mechanism that a count of ARHK transactions alone would not resolve: which sales Rare Breed otherwise would have made directly or through dealers, at what prices and costs, and through which customer relationships. Estimating an ARHK-related loss through that mechanism requires evidence connecting the proposed entry to those choices; the broader channel evidence supplies commercial context rather than a measured ARHK loss.[83]

67. Mr. Phillips also misreads the relationship between my collection discussion and competitive opinions. Paragraph 137 of my September Declaration did not say that displacement, timing, or price effects prove AS Designs lacks the ability to pay. It recalled the financial uncertainty

---

[82] DeMonico April Declaration, ¶ 52 (approximately [redacted] in prior retail purchases); DeMonico Declaration, ¶ 84 (more than [redacted] in prior retail purchases and refusal to stop selling identified products including ARC-Fire); [redacted] The two purchase figures are successive descriptions of the same relationship and are not added together. The example concerns a prospective dealer relationship and broader accused-product competition, not an established dealer shown to have switched to ARHK.

[83] DeMonico Declaration, ¶¶ 83–84 and 110; DeMonico Deposition, 216:15–24; Eichmann September Declaration, ¶¶ 108–120; Phillips Declaration, ¶¶ 56–59. Mr. DeMonico described AS Designs as a manufacturer with a dealer network but did not provide a definitive sales number in the cited testimony. The economic inference concerns distribution reach and channel choice, not the legal scope of an injunction or a measured ARHK dealer-diversion rate.

[redacted]

discussed in my August Reply and explained that the competitive reasons for my remedy assessment were independent of collection risk. I maintain that distinction. Historical gross revenue and commercial reach are different from cash or assets available to satisfy a future judgment; neither establishes the other.[84]

68. The ARHK's higher expected selling price likewise does not establish collectability. Collectability depends on realized volume, incremental costs, retained earnings, distributions, assets, liabilities, and the size and timing of a judgment. A smaller addressable segment or smaller price gap may affect a supported damages calculation but does not itself determine the resources available to pay it.[85]

69. The evidence identifies commercially meaningful competition for Rare Breed's customers during the FRT-RD3's early commercialization. The products serve overlapping applications, AS Designs expressly considered Rare Breed's pricing and head start, and its own forecast anticipates substantial first-month sales. Rare Breed's records establish the commercial opportunities exposed to that entry: a product making a substantial economic contribution, fulfilled later trigger orders from [redacted] of all [redacted] launch customers within 90 days, and an operating dealer channel with specified prices and conduct requirements. The replenishment and fulfillment records further show why the opportunity to serve those customers must be assessed over time. Together, this evidence supports a threat to initial sales and the development of customer and distribution relationships, not merely a comparison of two unit prices.[86]

70. I therefore conclude that proposed ARHK entry presents a material risk to Rare Breed's customer acquisition and associated profit opportunities. Those effects involve which customers Rare Breed acquires, when purchases occur, the opportunity for later business, and the prices and channels through which it serves demand. Mr. Phillips has not shown how his

---

84 Eichmann September Declaration, ¶ 137; Eichmann August Reply, ¶¶ 77–99, particularly ¶ 99; Phillips Declaration, ¶¶ 59 and 66–67.

85 Phillips Declaration, ¶ 67; Karlovic Declaration, ¶¶ 14–15; Eichmann August Reply, ¶¶ 77–99.

86 ASD 000040–000045; Karlovic Declaration, ¶¶ 5–15; **Supplemental Schedules R1–R5;** Eichmann September Declaration, ¶¶ 31–77, as clarified above. DeMonico Deposition, 65:20–66:8; DeMonico Declaration, ¶¶ 83–84; [redacted], and Exhibit C. *See also* **Supplemental Schedule R2A**, September 30 cutoff, 90-day results, and its order-date and shipment-date definitions.

proposed methods would reconstruct those combined consequences; his reliance on recorded transactions and later market share does not establish recovery of the lost opportunities or profits. The [redacted] [redacted] do not supply a substitute measure: [redacted], [redacted] Mr. Karlovic's first-month gross-profit forecast likewise does not establish the loss caused by a temporary restraint because it does not distinguish postponed sales from permanently forgone sales. The record supports the competitive threat and the commercial importance of the opportunities at risk; the opposing analyses do not establish that those combined consequences would be fully captured or recovered.

71. I reserve the right to supplement or revise these opinions if additional relevant evidence becomes available.

[redacted]

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 13, 2026

**Richard J. Eichmann**

Secretariat Advisors, LLC

135 Main Street, Suite 1850

San Francisco, CA 94105

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Appendix 1

Richard Eichmann
October 13, 2026

Secretariat

**Richard J. Eichmann**, CVA, MAFF

Managing Director

135 Main Street, Ste. 1850
San Francisco, CA 94105

Mobile: +1 (510) 542-4935
email: reichmann@secretariat-intl.com

Richard Eichmann is a Managing Director specializing in economic damages, valuation, and econometric analysis in complex commercial litigation. His work spans intellectual property, trade secret misappropriation, securities, class action, and breach of contract matters. He is frequently retained to quantify lost profits, reasonable royalties, unjust enrichment, price premium, and diminution in enterprise value, and to evaluate issues of apportionment, incremental benefit, class-wide impact, and loss causation.

Mr. Eichmann's expertise includes valuation of intangible assets, financial modeling, advanced econometrics, statistical sampling, and survey design. He has substantial experience analyzing large and complex datasets and developing rigorous damages models grounded in economic theory and empirical evidence, including the evaluation of opposing regression analyses, conjoint surveys, market simulations, and valuation methodologies.

He has been designated as an expert in 86 matters and has provided deposition, arbitration, and trial testimony in federal and state courts, international tribunals, and arbitration forums. With more than 31 years of experience in economic consulting, including over 28 years devoted to litigation consulting and the valuation of intangible assets, he has worked across technology, telecommunications, automotive, financial services, energy, consumer products, and emerging technology sectors. Prior to joining Secretariat, he served as Chair of the Intellectual Property Practice and Head of the San Francisco office at a global economic consulting firm.

## EDUCATION

- M.A., Economics, University of Michigan, Ann Arbor, MI 1996
- B.A., Economics, University of Michigan, Ann Arbor, MI 1995
- B.A., Philosophy, University of Michigan, Ann Arbor, MI 1995

## CERTIFICATIONS

- Master Analyst in Financial Forensics (MAFF) - Commercial Damages, 2016
  National Association for Certified Valuators and Analysts (NACVA)
  Credential ID 703

- Certified Valuation Analyst (CVA), 2009
  National Association for Certified Valuators and Analysts (NACVA)
  Credential ID 991115

## ASSOCIATIONS

- National Association for Certified Valuators and Analysts (NACVA)

## PROFESSIONAL EXPERIENCE

- NERA Economic Consulting, Inc. (San Francisco, CA, Los Angeles, CA), Sep. 2014 – 2025
  Senior Managing Director, Chair of Intellectual Property Practice, SF Office Head
- FTI Consulting, Inc. (San Francisco, CA, Chicago, IL), Feb. 2004 – Sep. 2014
  Managing Director, Director, Manager
- Cornerstone Research (Washington, DC), Feb. 2001 – Feb. 2004
  Research Associate, Senior Analyst
- E&Y, LLC (Washington, DC), Feb. 2000 – Feb. 2001
  Senior Consultant
- KPMG, LLC (Washington, DC), Jul. 1998 – Feb. 2000
  Consultant
- J.D. Power & Associates (Detroit, MI), Jul. 1996 – Jul. 1998
  Analyst
- Northern Virginia Community College (Alexandria, VA), Sep. 1998 – May. 1999
  Adjunct Lecturer, Economics
- University of Michigan – Institute for Social Research (Ann Arbor, MI), Jul. 1993 – Jul. 1996
  Researcher

## HONORS / AWARDS

- ‘Top 25 Patent Damages Experts,” Issued by Certified Patent Valuation Analyst (CPVA) designation · September 2025
- “Top 50 Government Consultants*,”* Issued by The Consulting Group · December 2021.
- “40 Under Forty Valuation Analysts,” Issued by National Association of Certified Valuators and Analysts (NACVA) · June 2014.

## REPRESENTATIVE EXPERIENCE

### Patent and Trademark Litigation

- Patent Infringement (Chemical Mechanical Planarization (CMP) Process Slurry Technology) – Calculated patent infringement damages in the form of lost profits and reasonable royalty in the *CMC* matter.
- Patent Infringement (Cryptographic Processing Relating to Routers and Modems) – Rebutted an opposing damages expert's opinion for client *Cisco* regarding a reasonable royalty analysis that examined issues relating to the incremental benefit relating to cryptographic parallel processors.
- Patent Infringement (Standard Essential Patents Relating to DSL Technology) – Rebutted an opposing damages expert's opinion for client *2Wire* regarding FRAND reasonable royalty analysis that examined a modified top-down analysis estimating the benefits attributable to DSL SEP patents.
- Patent Infringement (Unmanned Aerial Vehicles - Drones) – Rebutted an opposing damages expert's opinion for client *Autel* regarding a lost profits and reasonable royalty analysis that examined the alleged incremental profit attributable to the benefits of patented drone technology.
- Patent Infringement (Thermal Cooling Technology) – Rebutted an opposing damages expert's opinion for client *Civiq* regarding a lost profits and reasonable royalty analysis that examined the alleged infringement of thermal cooling technology.
- Patent Infringement (Smart Phone Protective Screen Covers) – Rebutted an opposing damages expert's opinion for client *Aevoe* regarding a reasonable royalty that examined the incremental profit attributable to the benefits of patented smart phone screen protective covers.
- Patent Infringement (Smart Phone Mobile Camera Features) – Rebutted an opposing damages expert's use of survey studies as an indication of value for client *Motorola Mobility* in a patent infringement suit concerning camera and Wi Fi features. Provided testimony within a jury trial before Judge Orrick in San Francisco, California.
- Patent Infringement (Social Media) – Provided client *Facebook* with a declaration that utilized statistical analysis to examine the underlying assumptions within the model of an opposing expert in a patent infringement suit.
- Patent Infringement (Enterprise Mobility Management) – Provided client *MobileIron* with an assessment of damages incurred as a result of an alleged patent infringement pertaining to Personal Information Management security. Provided testimony within a jury trial before Judge Grewal in San Jose, California.
- Patent Infringement (Gaming) – Rebutted an opposing damages expert's calculation of reasonable royalty for client *SteelSeries* in a patent infringement suit concerning gaming mice technology. Provided testimony within a jury trial before Judge Payne in Marshall, Texas.
- Patent Infringement (Farm Equipment) – Hired as an expert to provide statistical analysis of the clinical trials run by an agricultural expert to examine the efficiency and alleged improved benefits of a mechanized corn seed planter.
- Patent Infringement (Mobile App – Video Streaming) – Provided a declaration relating to the economics of damages in support of a motion for an injunctive relief relating to patents associated with mobile streaming technology for *Eko*.
- Trademark Infringement (Hardware Trade Associations) – Assisted with the determination of potential market confusion among consumers and attendees of a national hardware trade association conference. Calculated the impact on profits for the conference, in terms of damages, given the impact.

- Trademark Infringement (Pharmaceuticals) – Rebutted an opposing expert's damages opinion relating to alleged economic damages sustained by alleged market confusion for client *Fera Pharmaceuticals*.
- Copyright Infringement (Software) – Calculated damages sustained by a software manufacturer, *Quest Software, Inc*.

## Trade Secret Misappropriation

- Misappropriation of Trade Secrets and Copyright Infringement (Database-as-a-Service Software) – Served as *Nutanix's* testifying damages expert in a JAMS arbitration involving alleged misuse of proprietary source code and confidential information to develop a competing DBaaS platform. Applied market-valuation and head-start approaches to quantify approximately $96.5 million in alleged unjust enrichment and developed an alternative hypothetical-license analysis estimating approximately $117.9 million in copyright damages
- Misappropriation of Trade Secrets (Institutional Software Trading Technology) – Served as the testifying damages expert for *BTIG* in a matter involving alleged misuse of proprietary trading technology; conducted rolling-window market-model event studies and related econometric analyses to estimate firm-specific abnormal returns and quantify approximately $332–$343 million in alleged unjust enrichment.
- Misappropriation of Trade Secrets (SaaS Healthcare Software) – Calculated lost profits and diminution value incurred and experienced by Claimant as result of subcontractor's alleged misappropriation of trade secrets relating to the SaaS healthcare software applied at the state-level to enact the ACA.
- Misappropriation of Trade Secrets (Networking and Telecommunications Market Reports) – Determined direct and consequential damages incurred by *Dell'Oro Group* as result of a breach of fiduciary duty by a former employee alleged to misappropriated trade secrets relating to the generation of standardized market reports.
- Misappropriation of Trade Secrets (Lithium Solid State Batteries) – Valuing seven trade secrets relating to lithium solid state batteries that were alleged to have been misappropriated by former employees of *Quantumscape Corporation*.
- Misappropriation of Trade Secrets (Pharmaceutical Adjudication Services) – Led team in the rebuttal of alleged lost profit and unjust enrichment claims in defense of a leading pharmaceutical adjudication service provider accused of having illegally acquired trade secrets from a former business associate.
- Misappropriation of Trade Secrets (Gene Therapy) – Rebutted an opposing expert's assessment of damages incurred by a former laboratory employee who alleged that a major academic university misappropriated his intellectual capital in the acquisition of a patented gene therapy.
- Misappropriation of Trade Secrets (Value Added Retailer) – Led team in the calculation of compensatory damages and unjust enrichment claims in defense of a value-added retailer in the Florida market accused of having illegally acquired trade secrets from a competitor.
- Misappropriation of Trade Secrets (Trading Models) – Named expert in a case that involved rebutting alleged damages sustained by an investment management company. The head of the quant group left, along with the core of his group to form a competitor investment management company. The Plaintiff alleged that when he left he took with him a proprietary trading model. Damages centered on valuing the worth and subsequent alleged diminution in value of the alleged stolen trading model.

## Antitrust

- Antitrust (Standard Essential Patents) – Provided consulting assistance to a confidential client regarding possible exposure to allegations on anticompetitive behavior due to its alleged failure to license patents at a fair, reasonable, and non-discriminatory (FRAND) rate that were deemed standard essential patents (SEP).
- Antitrust (Real Estate Markets) – Managed the analyses generated to rebut two expert reports that sought to calculate damages in an alleged price-fixing case. Provided statistical support in the case with regard to an examination of the validity of the plaintiff's expert's yardstick methodology.
- Antitrust (Construction Commodity) – Designed and managed statistical and econometric analyses to investigate the impact of alleged price-fixing among producers of a construction input commodity. Federal Sentencing Guideline dictated the estimation of affected commerce. A two-stage regression analysis that sought to isolate whether prices of alleged impacted months was utilized. The methodology in the case was ultimately described in an article presented at the Western Economic Association International Annual Conference in Vancouver, B.C. on July 1, 2009
- Antitrust (Energy) – Reviewed plaintiff's pricing methodology and presented an alternative mitigated price methodology to the Federal Energy Regulatory Commission (FERC) that was ultimately accepted in the matter of the California energy dispute, concerning the defense of thermal generators against the charges of price fixing and collusion.
- Antitrust (Energy) - Conducted statistical analyses of trader behavior to determine the probability of systematic gaming behavior, in the matter of FERC allegations on natural gas traders, concerning the defense of energy futures trades against the charges of price manipulation.
- Antitrust (Energy) - Managed and led programming analyses of large disparate data sets for determining liability and timing issues, in the matter of an antitrust dispute concerning allegations of collusion in the electric markets.
- Predatory Pricing Behavior (Pharmaceuticals) – Designed and managed the execution of econometric and statistical analyses of HIV pharmaceutical drugs as they pertained to alleged predatory pricing behavior of a supplier. Mr. Eichmann generated code to analyze various model specifications, correcting for first-series serial correlation that might indicate what exogenous variables influenced markets and how.

## Breach of Contract

- Breach of Contract, False Claims, and Fraud (Pension Administration Software) – Served as the testifying damages expert for *The Regents of the University of California* in litigation concerning the implementation and support of its pension administration system. Developed alternative damages models evaluating vendor payments, contractual cost benchmarks, remediation expenses, and incremental costs of transitioning system operations in-house. Prepared expert and rebuttal reports and provided deposition testimony.
- Breach of Contract (Semiconductors) – Quantified delay-driven lost profits and duplicative costs resulting from the alleged termination of a semiconductor fabrication agreement for *Pakal Technologies, Inc*.
- Breach of Contract (Broadband Telecommunications) – Estimated damages sustained by *Tribal Solutions* in a breach of fiduciary duty matter relating to the formation of a competitor entity by the defendants while still employed by the plaintiff.

- Breach of Contract (Non-Compete Provisions / Drayage Services) – Estimated the irreparable harm to *Roadrunner* in a breach of contract relating to non-compete provisions in a Stock Purchase Agreement.
- Breach of Contract (Winery) – Calculated damages sustained by *Close LaChance Wines* in a breach of contract allegation litigated before JAMs arbitration.
- Breach of Contract (Intellectual Property / Fraud) – Led team in the calculation of damages for a case where the plaintiff alleged that the defendant had failed to disclose a potential liability with regard to a possible infringement of intellectual property concerning soybean germ plasma prior to their merging of assets. The alleged liability materialized several years later and the plaintiff then sought indemnification under the benefit of the bargain method.
- Breach of Contract (Recreational Vehicles) – Rebutted the statistical validity of an opposing expert's inferences on the use of his survey design in a matter dealing with the impact of sales to a recreational manufacturer as a result of an alleged harm to their reputation due to an interior drywall component. Within the same, case he wrote a separate report that rebutted the statistical validity of an economic expert's damage calculation that sought to calculate the impact on sales due to an alleged reputational loss.
- Breach of Contract (Furniture) – Calculated lost profit damages alleged in a breach of contract case for *DWS International, Inc.* that involved analyzing management forecasts to estimate the fair market value of a lost opportunity as it related to the patio furniture market. Testified at trial before a jury trial in the Southern District of Ohio.
- Breach of Contract (Breast Pumps) – Calculated lost profit damages alleged in a breach of contract case for *Whittlestone, Inc.* that analyzed margin risk to estimate the fair market value of a lost opportunity as it related to the electric breast pump market.
- Breach of Contract (Agricultural Commodities) – Analyzed the short-term fixed cost structure of a slaughter house operating in a perfectly competitive environment as part of a breach of contract dispute in the agricultural commodities market.
- Breach of Contract (Telecommunications) - Managed the analytical aspects of a complex damage calculation model and prepared and presented our findings to counsel in the matter of a breach of contract dispute between two U.S. telecommunications firms.
- Breach of Contract (Auto Parts) – Calculated lost profits as a result of a breach of contract regarding easement rights and advertisement obstruction.
- Breach of Contract (Hair Coloring Products) – Calculated lost profits for client, *BehindtheChair.com* in an alleged breach of contract regarding profit distributions from a hair-coloring product business.

## Valuation Consulting and Litigation

- Settlement Valuation (Luxury Vehicle Class Action) – Conducted a valuation of a proposed settlement between the parties in the *Bullard et al. v. Jaguar Land Rover Automotive* class action matter.
- Breach of Fiduciary Duty (Visual AI Algorithm Software for Advanced Camera Systems – Smartphones, Tablets, Smart Televisions, Cars, and Robots) – Conducted a valuation utilizing the income and market approaches in a dispute between minority shareholders in a buyout under false pretenses in the *ArcSoft* dispute.
- Employee Stock Option Valuation (Retail Clothing) – Performed two business valuations for *Robert Talbott, Inc.* to estimate both the exercise current share price of a non-controlling, non-marketable privately-held high-end cloth manufacturer used to estimate the value of an alleged employee stock option held by a former CEO in dispute.

- Business Valuation (e-Commerce Start-Up) – Utilized ARIMA time series techniques to forecast subscription revenues of a charitable social network site, for which he calculated the fair market value of the minority interest. The income approach relied heavily on the use of historical subscription data that allowed for a range of values within a statistically confident interval.
- Business Valuation (Telecommunications) - Conducted a business valuation of an alleged lost international telecommunications opportunity that took into consideration varying capital structures within financial projections that served to rebut a plaintiff's valuation model.
- Business Valuation (Financial Services) – Assisted with the critique of a business valuation involving a minority interest of an investment management firm arising out of an employment dispute.

## Commercial Class Action Litigation

- Class Action (Copyright/DMCA) – Evaluated and developed class-wide damages methodologies in *Cook v. Meta Platforms*, a putative class of artists and small business owners alleging that Meta knowingly facilitated copyright infringement and counterfeit ad scams through its advertising platform, in violation of the Copyright Act, DMCA, and unfair competition laws.
- Class Action (Pediatric Sleep Aids) – Rebutted the proposed conjoint survey and supply side analyses of Plaintiffs in *Zarbee's*, a class of individuals alleging that they received excessive amounts of melatonin in a sleep aid product.
- Class Action (Eyeglasses) – Calculated damages sustained by a class of individuals whose eyeglasses had been sold to them with an alleged false claim of increased precision by *LensCrafters* AccuFit measurements. Utilized a conjoint analysis producing a Willingness to Pay result from a mixed logit model to run a market simulation to arrive at the premium consumers paid as a result of not knowing about the misrepresentation.
- Class Action (Automotive) – Served as damages expert in a multi-state consumer class action involving alleged design defects in GM's 8-speed Hydra-Matic transmissions (MY15–MY19). Calculated classwide economic damages under alternative benefit-of-the-bargain frameworks, including cost-of-repair and price premium methodologies. Developed retail-channel vehicle population estimates, analyzed GM sales and warranty data, and evaluated aggregate damages under varying take-rate and appeal assumptions.
- Class Action (Automotive) Served as damages expert in a four-state consumer class action involving MY19–MY22 GM trucks equipped with 8L45 and 8L90 transmissions. Utilized a conjoint-based mixed logit demand model integrated into a full market-equilibrium simulation to estimate point-of-sale overcharges. Conducted independent hedonic regression analysis of secondary-market transaction data to measure diminution in value and reconcile lifecycle pricing effects.
- Class Action (Diesel Engines) – Calculated damages sustained by a class of individuals whose Class 8 trucks had been sold to them with a manufacturer defect relating to *Paccar* MX-13 diesel engines. Utilized a hedonic regression to isolate the effect of the defect on the resale value of the vehicles.
- Class Action (All-Terrain Vehicles) – Calculated damages sustained by a class of individuals whose ATV vehicles had been sold to them with a manufacturer defect. Utilized a conjoint analysis producing a Willingness to Pay result from a mixed logit model to run a market simulation to arrive at the premium consumers paid as a result of not knowing about the defect.
- Class Action (Automotive) – Calculated damages sustained by a certified class of individuals whose vehicles had been inappropriately seized by a municipality. The task involved analyzing auction and automotive valuation data to determine both the delta and the float.

- Class Action (Automotive) – Designed and managed the execution of econometric and statistical analyses of secondary market pricing in a particular vehicle segment in defense of price impact allegations due to alleged non-disclosures by *Ford Motor Company*. We utilized econometrics to demonstrate that a recall did not, as the plaintiffs alleged, negatively impact depreciation rates of vehicles, but rather other market forces explain the sudden drop, such as rising lease terminations, market segment saturation.
- Class Action (Software Auctions) – Addressed class certification issues as they arose in matter dealing with the alleged breach of contract in the use of auctions. The matter involved analyzing the expected value of an auction.
- Class Action (Gaming) – Hired by the Indiana state lottery commission to provide consulting services in relation to a class action litigation matter, where he designed and managed the execution of an econometric model that generated expected consumer pricing behavior of a scratch-off game. The model determined the 95 percent confidence interval of sales the lottery commission could have expected to receive but for an alleged misstatement of probabilities on their website.
- Class Action (Breach of Contract / Fraud) – Led team in the calculation of damages for a case where the plaintiff alleged that the defendant willingly failed to pay royalties. The case involved a stratified statistical sampling so as to investigate the liability claims of intent as well as damage implications, if any.

## False Advertising

- False Advertising (Refresh Rates in Televisions) – Rebutted class action damages for *Vizio* in a matter involving alleged misrepresentation of refresh rates in television monitors.
- False Advertising (Enterprise Resource Planning Software Implementation) – Rebutted alleged economic damages against *Oracle* sustained by the failed Cover Oregon project due to an alleged failed ERP implementation system. (http://www.oregonlive.com/politics/index.ssf/2016/09/post_183.html)
- False Advertising (Enterprise Resource Planning Software Implementation) – Rebutted alleged economic damages sustained by a global online vehicle auction business due to an alleged failed ERP implementation system for *Sparta Consulting, Inc.*
- False Advertising (Credit Cards) – Calculated economic damages sustained by a credit card processing company, *Heartland Payment Systems, Inc.*, due to the alleged false advertising of its competitor regarding pass-through costs to merchants.
- False Advertising (Consumer Products) – Rebutted economic damages for *Philips Oral Healthcare, Inc.,* alleged to have been sustained by the class as a result of an alleged false claim regarding product quality.
- False Advertising (Trade Association) – Calculated economic damages sustained by a promoter of a trade association trade show that alleged that a competitor trade show was creating consumer confusion due to the use of their trademark infringement and false advertisement.
- False Advertising (Hand Tools) – Calculated economic damages alleged by a class as a result of false advertising, which promoted hand tools sold in the United States as “American made.”
- False Advertising (‘Sippy’ Cups) – Calculated economic damages alleged by a competitor as a result of false advertising, which stated that certain children’s ‘sippy’ cups held certain patents, which they did not.
- False Advertising (Beverages) – Calculated economic damages alleged by a competitor as a result of consumer confusion brought on due to false advertising, which stated that certain beverages held certain ingredients, which they did not

## Labor and Employment Litigation

- Class Action (Discrimination) – Analyzed the economics relating to the closing of certain call-centers for an airline company alleged of engaging in age discrimination. While initial analyses provided prima facie evidence of possible age discrimination when identifying the statistical differences among call-centers, further analysis indicated that regional influences were in fact greater and more prominent in influencing the company's actions.
- Class Action (Discrimination) – Generated a probit econometric model of the firm's data to model the effects of race, gender, and other attributes and their alleged effect on the probability of an employee being fired as part of an alleged employment discrimination case.
- Class Action (Discrimination) – Analyzed class certification issues as they related to an allegation that defendant chose to close an airline call-center due to the gender and age of its employees. The analysis included both an inquiry of descriptive and inferential statistics as well as cost accounting considerations
- Class Action (Discrimination) – Designed and managed statistical and econometric analyses to investigate the allegation of discriminatory behavior within a major bottling distributor.
- Class Action (Wage/Hour Dispute) – Analyzed class certification issues as they related to a wage-hour dispute of a perfume manufacturer. Conducted a stratified sampling exercise of hand-written invoices of proposed class members and examined the variability, if any, of their work experiences that would influence whether or not they were improperly classified as independent contractors.
- Class Action (Wage/Hour Dispute) – Analyzed class certification issues as they related to a wage-hour dispute of the *Skywest* airline company. Examined various influencing factors that played a role in determining the probability of an alleged class member missing his/her lunch break and how the variance revealed from the data among the influencing factors affects commonality among the alleged class members.

## Securities

- Securities Litigation (IPO) - Adapted 10b-5 securities litigation model to estimate alleged damages of IPO allocations and valuations, in the matter of a class action lawsuit against a consortium of major Wall Street underwriters.
- Breach of Contract (Hedge Funds) – Calculated damages for a case that dealt with breach of an investment contract between a seed financier and a hedge fund for *SGAM Newedge Management, Inc.* The case involved valuing a hedge fund as a proxy for alleged lost profits. Testified at a JAMS arbitration.
- Securities Fraud (Stock-Option Back Dating) – Derived statistical models to examine the frequency of stock-option back dating instances and their effect on reported earnings.
- Securities Fraud (Earnings-Smoothing) – Led a team of financial economists to investigate and isolate the prevalence and method in which earnings smoothing impacted share value.
- Mortgage-Backed Securities (Statistical Analysis) – Managed and designed econometric models tasked with analyzing loss causation as it relates to losses across tranches within securitizations.
- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Galena Street Fund v. Wells Fargo Bank, N.A.* matter.
- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Federal Housing Finance Agency v. J.P. Morgan Securities LLC et al* matter.
- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Federal Home Loan Bank of Pittsburgh v. J.P. Morgan Securities LLC et al* matter.

- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical support of a motion to deny class certification of a proposed class of investors that sought restitution from an underwriter for allegedly not having properly accounted for the risk of the underlying collateral of several securitizations.
- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical and econometric support examining the factors that influence the likelihood of loan default as it pertained to a class action that sought restitution of the alleged wrongdoings of a municipal bond insurance agency.
- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical support in examining the difference of bid and close data provided a municipal bond insurance agency.
- Securities Litigation (10b(5)) – Conducted event studies and loss causation models on a variety of 10b(5) class action case matters.
- Insider Trading – Created an econometric model to analyze the impact and materiality of alleged insider tip investigated by the SEC.

### Economic and Statistical Consulting

- Statistical (Gemology) – Designed statistical tests to examine the likelihood of collusion within international grading facilities of various gems, including diamonds.
- Economic (Automotive Markets) – Co-authored the U.S. automotive industry newsletter for J.D. Power and Associates, working directly under the senior economist in executing and managing their syndicated market forecasts and reviews.
- Econometrics (Forecasting) - Created and maintained ARIMA production and sales forecast models for the U.S. and developing markets, including Asia and Latin America.
- Forensic Investigations – Led a FCPA investigation for a U.S. petroleum company with subsidiaries in the Latin America. The case dealt with utilizing statistical techniques on a large set of general ledger transactions and a series of financial statement analyses that ultimately revealed a complex fraud where funds were being laundered via service contracts to funnel bribes.

## PUBLICATIONS

- "Making Patent Citations Count: Statistical Tools for Valuing Innovation in Litigation and Licensing," co-authored with Adam Rhoten, 72 Loy. L. Rev. For Commentary (2026).

- "Embracing AI in Economic Testimony: Integrating Tools with Caution and Validation." *The Value Examiner*, September/October 2025, 4–12.

- "Why Funder Forecasts Don't Belong in Royalty Analyses," published by *Law360* on June 24, 2025.

- "The Role of Economics on the Road to Autonomous Vehicles and Digital Mobility," co-authored with D. Hanson, Richard Marsden, George Anstey, Grant Saggers, Garrett Glasgow, C. Phillipp Heller, Hector Lopez, Bruno Soria, and Will Taylor, published by NERA Economic Consulting, Inc., Insight in Economics™, August 17, 2021.

- "Forward Citation Analysis as a Means to Apportion Relative Value in Patent Infringement Cases," published by the National Association for Certified Valuators and Analysts (NACVA), QuickRead on February 18, 2016.

- "An Overview of Methods for Estimating Lost Revenues in Economic Damages," published by the National Association for Certified Valuators and Analysts (NACVA), QuickRead on June 18, 2015.

- "Use of Two-Stage Linear Regression Models in Identifying the Existence and Extent of Affected Commerce in Price-Fixing Cases," co-author with M. Mercurio, working paper.

- "Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office – Extended," co-authors C. Quillen and O. Webster, *The Federal Circuit Bar Journal*, August 2002.

- "Southeast Asian Crisis: Implications in the Asian Automotive Industry," co-author R. Schnorbus, J.D. Power and Associates Syndicated Report, December 1997.

## PRESENTATIONS

- "Trade Secret Damages," presented on October 21, 2024, as a guest lecturer for the UC-Berkeley Law School for a Law course titled "Law 277.1 sec.1 - Trade Secret Law."
- "IP & Antitrust: Considerations for the High-Tech Sector," panelist, hosted by Antitrust West Coast Conference, held on November 17, 2020.
- "Lost Profits: Principles, Methods and Strategies to Prove and Defend Damages LIVE Webcast," presenter, hosted by The Knowledge Group, held on October 7, 2019.
- "Smallest Saleable Patent-Practicing Unit when Deriving FRAND in Light of Recent Federal Rulings," presenter, hosted by the Damages and Injunction Committee of the IPO, held on June 13, 2019 via a Committee hosted webinar.
- "The Concept of Apportionment in Patent Infringement Matters: Methods Considered," presented at the NACVA and CTI's 2019 Annual Consultants' Conference in Salt Lake City, UT on June 6, 2019.
- "Overview of Damages in IP Litigation Involving Standard Essential Patents (SEPs)," presented as part of the "Issues in Litigation" section of the Western Economic Association International (WEAI) Conference in Tokyo, Japan on March 22, 2019.
- "Calculating Intellectual Property Damages – How to Prepare for the 2019 Landscape," co-presenter, hosted by The Knowledge Group, held on February 13, 2019 via webinar.
- "IP and Antitrust Developments for the High Tech Sector," panelist, Antitrust West Coast 2019, held on February 12, 2019 in San Francisco, CA.
- "An Overview of Damages and the Role of the Damages Expert in Intellectual Property," instructor, Financial Valuation Seminar, hosted by the National Association of Certified Valuators and Analysts (NACVA), held on December 14, 2018 in Ft. Lauderdale, Florida, http://www.nacvanation.com/ftlauderdale/.
- "Transnational IP Litigation: Opportunities and Challenges – Focus on US IP Litigation," panelist, Berkeley-Tsinghua Annual Forum of 2018, jointly hosted by the Berkeley and Tsinghua Schools of Law, held on December 4, 2018 in Beijing, China.
- "Trade Secret Damages: Remedies for Victims of Trade Secret Violations," panelist, hosted by the Daily Journal Professional Education, held on October 30, 2018 in Palo Alto, California.
- "Factors to Consider for Injunctive Relief from an Economic Perspective: Irreparable Harm," presenter, hosted by the Damages and Injunction Committee of the IPO, held on October 11, 2018 via a Committee hosted webinar.

- "Mock International Arbitration: Toward Early Dispute Resolution of Standard Essential Patents (SEPs) in the 5G Era," presenter, hosted by the Japan Patent Office, the University of Tokyo, and the Rader Foundation, held on June 29, 2018 at the University of Tokyo, Japan.
- "Patent Infringement Damages," presented on February 1, 2018, presenter, hosted by The Knowledge Group via a webinar.
- "Trade Secret Damages from the Perspective of a Damages Expert," presented on October 18, 2017, as a guest lecturer for the UC-Davis School of Law course titled "Trade Secrets and Restrictive Covenants, Employee Mobility, Raids, and Corporate Espionage."
- "Trade Secret Damages and Remedies," co-presenter, hosted on May 19, 2017 by Bridgeport Continuing Education in San Francisco, California.
- "A Penny or a Pound: Apportioning Damages in Patent Cases," panel member hosted on May 17, 2017, by the Licensing Executive Society (LES), Silicon Valley Chapter in Palo Alto, California.
- "Raising Start-Up Capital," panel member of a webinar, hosted by Expert Webcast on January 7, 2016.
- "Patent Infringement Reasonable Royalty Damages: Apportion the Increment?," panel member hosted by the Asian Pacific American Bar Association (APABA) in Palo Alto, CA on November 23, 2015.
- "Calculation of Economic Damages in Patent Litigation Matters," at the Financial Forensics and Expert Witness Conference, hosted by the National Association for Certified Valuators and Analysts (NACVA) in Houston, TX on October 19, 2015.
- "Ease of Enforcement and Magnitude of Damages Awards as Determinative Factors in Establishing the Market Value of a Patent: Trends in IP Damages Awards," at the Tenth Annual Conference on Best Practices in Patent Monetization, hosted by Law Seminars International in San Francisco, CA on March 26, 2015.
- "Supreme Court Takes a Middle Path in Reaffirming Fraud on the Market Theory," presented via Thomson Reuters as a national webinar on September 3, 2014 and currently available online via West LegalEdCenter.
- "Statistical and Technological-Based Fact-Gathering in Wage-and-Hour Cases," at the Annual Wage & Hour Conference presented via Bridgeport Continuing Education in San Francisco, CA on October 10, 2013.
- "Business Damages Analysis & Modeling: Litigating and Proving Damages," presented via Bridgeport Continuing Education in San Francisco, CA on May 10, 2013.
- "New Disclosure Rules and What They Mean For ERISA Class Certification," panel speaker for FTI Consulting ERISA Fiduciary Litigation and Compliance Breakfast Series 2012 in Chicago, IL on April 24, 2012.
- "Understanding and Proving Damages: Business Damages Analysis and Modeling," presented via Bridgeport Continuing Education in San Francisco, CA on April 12, 2012.
- "Litigating a Trade Secret Case: Economic Damage Considerations," presented via Bridgeport Continuing Education in San Francisco, CA on December 9, 2010.
- "Financial Forecasting," presented within the Mergers and Acquisitions section of the American Institute of Certified Public Accountants (AICPA) meeting held in San Francisco, CA on August 4, 2010.
- "Application of Multivariate Regression Analysis in Identifying Economic Damages," white paper presented under the "Law and Crime" section of the Western Economic Association International Annual Conference in Portland, Oregon on July 1, 2010.

- "The Use of Regression Analysis as a Means to Better Forecast Sales When Using the DCF Method," presented within the Business Valuation section of the National Association of Certified Valuators and Analysts (NACVA) and Institute of Business Appraisers (IBA), 2010 Annual Consultants' Conference, held in Miami, Florida, on June 4, 2010, now available online as a webinar (https://www.nacva.com/store_product.asp?prodid=120).
- "Hand Rule as a Basis for Calculating Punitive Damages" paper originally presented at the Southern Economic Association Conference in Washington, DC on November 19, 2005 and again at the Annual Meeting of the World Institute for Research and Publication (WIRP) – Law on May 16, 2010.
- "Use of Two-Stage Linear Regression Models in Identifying the Existence and Extent of Affected Commerce in Price-Fixing Cases," paper co-presented with M. Mercurio under the "Commercial Damages and Antitrust Litigation" section of the Western Economic Association International Annual Conference in Vancouver, B.C. on July 1, 2009.
- "An Economic Analysis of Punitive Damages" co-presented with Andrew Frey of Mayer, Brown, Rowe & Maw LLP and Office of General Counsel of Ford Motor Company at a conference titled "Managing Risks in High Stakes Litigation" in Chicago, IL on December 2, 2004

## EXPERT DESIGNATIONS, REPORTS, AND TESTIMONY

91 TOTAL: 51 PLAINTIFFS (56%) & 40 DEFENDANTS (44%)
127 REPORTS FILED | 60 DEPOSITIONS | 8 ARBITRATION TESTIMONIES | 7 TRIAL TESTIMONIES

1. NICBYTE LLC, ET. AL. V. COMMUNITY WEST BANK ET. AL., SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF FRESNO, CASE NO. 24CECG01486, EXPERT REPORT FILED SEPTEMBER 22, 2026, DEPOSITION TESTIMONY GIVEN SEPTEMBER 25, 2026. (HON. KRISTI CULVER KAPETAN)

2. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA V. LINEA SOLUTIONS, INC., SAGITEC SOLUTIONS, LLC, ET AL., SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ALAMEDA, CASE NO. 23CV056879, EXPERT REPORT FILED AUGUST 14, 2026, REBUTTAL REPORT SEPTEMBER 14, 2026, DEPOSITION TESTIMONY GIVEN OCTOBER 2, 2026. (HON. SOMNATH RAJ CHATTERJEE)

3. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. CLOAK INDUSTRIES, INC., ET AL.*, CASE NO. 4:26-CV-00608-ALM; PEAK TACTICAL, LLC, ET AL., CASE NO. 4:26-CV-00698-ALM; AND OPTICS PLANET, INC., CASE NO. 4:26-CV-00521-ALM, DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER FILED AUGUST 7, 2026. (HON. AMOS L. MAZZANT, III)

4. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. ATRIUS DEVELOPMENT GROUP*

*CORPORATION, ET AL.,* CASE NO. 4:26-MD-03176-ALM MDL 3176, DECLARATION FILED JULY 31, 2026. (HON. AMOS L. MAZZANT III).

5. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. AR-TT, LLC ET AL.,* CASE NO. 4:26-MD-03176-ALM MDL 3176, DECLARATION FILED MAY 28, 2026, JULY 1, 2026. (HON. AMOS L. MAZZANT III).

6. IN RE: RARE BREED TRIGGERS PATENT LITIGATION, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION, MDL NO. 4:26-MD-03176-ALM, INCLUDING *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. AS DESIGNS, LLC, ET AL.*, CASE NO. 4:26-CV-00370-ALM, DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER FILED SEPTEMBER 2, 2026. (HON. AMOS L. MAZZANT, III)

7. *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. AS DESIGNS, LLC, ET AL.,* UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF NORTH CAROLINA, CASE NO. 1:25-CV-1192, EXPERT REPORT FILED APRIL 24, 2026, REPLY REPORT FILED AUGUST 6, 2026. (HON. WILLIAM LINDSAY OSTEEN, JR.).

8. *ERIC OLSON ET AL. V. WORLD FINANCIAL GROUP AGENCY, LLC ET AL.,* JUDICIAL ARBITRATION AND MEDIATION SERVICES, JAMS REF. NO. 5110000677, EXPERT REPORT FILED APRIL 17, 2026, REBUTTAL REPORT FILED MAY 8, 2026, DEPOSITION TESTIMONY GIVEN AUGUST 10, 2026, ARBITRATION TESTIMONY GIVEN SEPTEMBER 18, 2026.

9. *HELMS ET AL. V. GENERAL MOTORS LLC,* UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:22-CV-10783-MAG-KGA, EXPERT REPORT FILED FEBRUARY 20, 2026. (HON. MARK A. GOLDSMITH).

10. *LARGAN PRECISION CO., LTD. V. MOTOROLA MOBILITY LLC*, IN THE HIGH COURT OF DELHI AT NEW DELHI, (ORDINARY ORIGINAL COMMERCIAL JURISDICTION), CS (COMM) NO. 795 OF 2022 AND CS (COMM) NO. 3 OF 2024, EVIDENCE BY WAY OF AFFIDAVIT (EWA) FILED ON JANUARY 31, 2026, DEPOSITION TESTIMONY GIVEN APRIL 13, 2026, APRIL 15, 2026, APRIL 17, 2026, APRIL 20, 2026, AND APRIL 22, 2026.

11. *PAKAL TECHNOLOGIES, INC. V. ROBERT BOSCH SEMICONDUCTORS, LLC ET AL.*, SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO, CASE NO. CGC-23-61129, EXPERT REPORT FILED ON JANUARY 23, 2026, DEPOSITION TESTIMONY GIVEN JANUARY 26, 2026.

12. *NUTANIX, INC. V. BALA KUCHIBHOTLA, KAMALDEEP KHANUJA, BAKUL BANTHIA, AND TESSELL, INC.*, JUDICIAL ARBITRATION AND MEDIATION SERVICES, JAMS REF. NO. 5110000487, EXPERT REPORT FILED ON OCTOBER 24, 2025, REPLY TO REBUTTAL REPORT

FILED JANUARY 16, 2026, DEPOSITION TESTIMONY GIVEN FEBRUARY 17, 2026, ARBITRATION TESTIMONY GIVEN JULY 21, 2026.

13. *JENNIFER L. COOK D/B/A JK COOK, JL COOK SCULPTOR AND SNAKEARTS.COM ET AL. V. META PLATFORMS, INC. F/K/A FACEBOOK, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:22-CV-02485-JCS, DECLARATION FILED ON SEPTEMBER 17, 2025, DEPOSITION TESTIMONY GIVEN OCTOBER 30, 2025, REPLY DECLARATION FILED ON JANUARY 27, 2026. (HON. JOSEPH C. SPERO AND HON. YVONNE GONZALEZ ROGERS)

14. *BTIG, LLC V. STONEX FINANCIAL, INC. AND STONEX GROUP, INC.*, FINRA ARBITRATION, REF. NO. 1210040786, REPORT FILED ON AUGUST 18, 2025, DECLARATION FILED ON SEPTEMBER 2, 2025, ARBITRATION TESTIMONY GIVEN ON DECEMBER 9, 2025, REBUTTAL ARBITRATION TESTIMONY GIVEN ON JANUARY 14, 2026.

15. *J. BULLARD ET AL. V. JAGUAR LAND ROVER AUTOMOTIVE, ET AL.*, U.S. DISTRICT COURT, DISTRICT OF NEW JERSEY, CASE NO. 2:20-CV-14464-JMV-JBC, REPORT FILED ON MAY 28, 2025 (HON. JOHN MICHAEL VAZQUEZ)

16. *LARGAN PRECISION CO., LTD. V. MOTOROLA MOBILITY LLC*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:21-CV-09138-JSW, REPORT FILED ON MAY 16, 2025, SUPPLEMENTAL REPORT FILED ON JUNE 13, 2025, REBUTTAL REPORT FILED JUNE 13, 2025, DEPOSITION TESTIMONY GIVEN JULY 9, 2025, DEPOSITION TESTIMONY GIVEN OCTOBER 8, 2025. (HON. JEFFREY S. WHITE)

17. *(CONFIDENTIAL) V. (CONFIDENTIAL)* – RELATING TO SAAS HEALTHCARE EXCHANGES, CPR INSTITUTE FOR DISPUTE RESOLUTION, CASE NO. G-24-7-NA, DECLARATION FILED ON JANUARY 17, 2025.

18. *LOPEZ ET AL. V. ZARBEE'S, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:22-CV-04465-CRB, DECLARATION FILED ON SEPTEMBER 27, 2024. (HON. CHARLES R. BREYER)

19. *STARR ET AL. V. VSL PHARMACEUTICALS, INC. ET AL.*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND, CASE NO. 8:19-CV-02173-TDC, EXPERT REPORT FILED ON JUNE 3, 2024, DEPOSITION TESTIMONY GIVEN JULY 15, 2024, REPLY REPORT FILED ON NOVEMBER 20,2024. (HON. LYDIA K. GRIGGSBY) (VSL PROBIOTIC BUYERS WIN CLASS CERT. IN RICO CASE - LAW360)

20. *TRIBAL SOLUTIONS GROUP, LLC ET AL. V. VALANDRA ET AL.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, NORTHERN DIVISION, CASE NO. 3:23-CV-00010-CWR-LGI, EXPERT REPORT FILED ON APRIL 5, 2024, SUPPLEMENTAL REBUTTAL REPORT FILED ON

JULY 18, 2024, AND ON AUGUST 30, 2024, DEPOSITION TESTIMONY GIVEN AUGUST 28, 2024. (HON. CARLTON W. REEVES)

21. *ABERIN ET AL. V. AMERICAN HONDA MOTOR CO., INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:16-CV-04384-JST, EXPERT REPORT FILED ON APRIL 1, 2024. (HON. JON S. TIGAR)

22. *CMC MATERIALS, INC. V. DUPONT DE NEMOURS, INC. ET AL.*, U.S. DISTRICT COURT, DISTRICT OF DELAWARE, CASE NO. 1:20-CV-00738-MN, EXPERT REPORT FILED ON MARCH 27, 2024, REBUTTAL REPORT FILED ON MAY 10, 2024, DEPOSITION TESTIMONY GIVEN MAY 30, 2024. (HON. JENNIFER L. HALL)

23. *MARC CHAN ET AL. V. ARCSOFT INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION, CASE NO. 4:19-CV-05836 JSW, EXPERT REPORT FILED APRIL 27, 2023, DEPOSITION TESTIMONY GIVEN JULY 21, 2023, TRIAL TESTIMONY GIVEN JANUARY 31, 2024. (HON. LAUREL BEELER)

24. *EDIBLE IP, LLC ET AL. V. 1-800-FLOWERS.COM, INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, CASE NO. 20-CV-02405-VMC, EXPERT REPORT FILED ON FEBRUARY 17, 2023, DEPOSITION GIVEN MAY 11, 2023. (HON. OMAR A. WILLIAMS)

25. *TECSEC, INCORPORATED V. INTERNATIONAL BUSINESS MACHINES CORPORATION, SAS INSTITUTE, INC., SAP AMERICA, INC., SAP AG, CISCO SYSTEMS, INC., ORACLE AMERICA, INC. (F/K/A SUN MICROSYSTEMS, INC.), SYBASE, INC., SOFTWARE AG, ADOBE SYSTEMS, INC., EBAY, INC., PAYPAL, INC. AND ORACLE CORPORATION*, U.S. DISTRICT COURT, EASTERN DISTRICT OF VIRGINIA, CASE NO. 1:10-CV-00115 LMB-TCB, EXPERT REPORT FILED AUGUST 17, 2020, DEPOSITION TESTIMONY GIVEN ON SEPTEMBER 15, 2020 (HON. LIAM O'GRADY), AMENDED EXPERT REPORT FILED MARCH 31, 2023, (HON. PATRICIA TOLLIVER GILES)

26. *LUMASENSE TECHNOLOGIES, INC. V. ADVANCED ENGINEERING SERVICES*, LLC, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:20-CV-07905, EXPERT REPORT FILED ON SEPTEMBER 14, 2022. (HON. WILLIAM H. ORRICK)

27. *NETGEAR, INC. V. ASUSTEK COMPUTER, INC. AND ASUS COMPUTER INTERNATIONAL, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:21-CV-08993, EXPERT REPORT FILED ON AUGUST 12, 2022. (HON. CHARLES R. BREYER)

28. *TARGA MANAGEMENT HOLDINGS, LLC, TARGA PARENT HOLDINGS, LLC, TARGA BUYER, LLC, THE CHUDY GROUP, LLC (D/B/A/ TCGRX) AND PARATA SYSTEMS, LLC V. DUANE S. CHUDY, DEAN A. CHUDY, JONATHAN F. CHUDY, GOLF GIFTS & GALLERY, INC., JAMES T. SPERNOW, MATTHEW E. NOFFSINGER, AND THE JFC GROUP (D/B/A TRUPAKRX)*, STATE OF WISCONSIN CIRCUIT COURT, MILWAUKEE COUNTY, CASE NO. 2021CV000938, EXPERT REPORT FILED ON

JUNE 14, 2022, DEPOSITION TESTIMONY GIVEN SEPTEMBER 14, 2022. (HON. LAURA GRAMLING PEREZ)

29. *SPEERLY ET AL., V. GENERAL MOTORS, LLC*, U.S. DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:19-CV-11044-DML-DRG, EXPERT REPORT FILED ON OCTOBER 9, 2021, DEPOSITION TESTIMONY GIVEN DECEMBER 3, 2021, EXPERT REPORT FILED ON FEBRUARY 20, 2026. (HON. DAVID M. LAWSON)

30. *ROBERT PONZIO ET AL. V. MERCEDES-BENZ USA, LLC AND DAIMLER AG*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, CASE NO. 1:18-CV-03984-MHC, DECLARATION FILED ON JANUARY 27, 2021 AND ON JULY 21, 2021. (HON. JOSEPH H. RODRIGUEZ)

31. *EXPRESS LIEN, INC. V. HANDLE, INC. ET AL.*, U.S. DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, CASE NO. 2:19-CV-10156-SSV-MBN, EXPERT REPORT FILED ON MARCH 10, 2021, DEPOSITION TESTIMONY GIVEN APRIL 30, 2021. (HON. JANE T. MILAZZO).

32. *RINGCENTRAL, INC. V. NEXTIVA, INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:19-CV-02626-NMC, EXPERT REPORT FILED ON JANUARY 19, 2021, REBUTTAL REPORT FILED ON FEBRUARY 24, 2021, DEPOSITION TESTIMONY GIVEN ON MARCH 12, 2021. (HON. NATHANAEL M. COUSINS)

33. *JBF INTERLUDE 2009 LTD – ISRAEL (COLLECTIVELY, "EKO") V. QUIBI HOLDINGS, INC.*, U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION, CIVIL ACTION NO. 2:20-CV-2299, DECLARATION FILED ON APRIL 1, 2020, REPLY DECLARATION FILED ON APRIL 21, 2020, DECLARATION FILED ON OCTOBER 27, 2020, DEPOSITION TESTIMONY GIVEN ON DECEMBER 8, 2020. (HON. JOHN A. KRONSTADT)

34. *APARTMENT OWNERS ASSOCIATION OF CALIFORNIA, INC. ET AL. V. CITY OF LOS ANGELES ET AL.*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, CONSOLIDATED CASE NO. BC709658, EXPERT REPORT FILED OCTOBER 21, 2020, DEPOSITION TESTIMONY GIVEN ON NOVEMBER 23, 2020 (HON. MAREN E. NELSON)

35. *SZ DJI TECHNOLOGY CO., LTD. AND DJI EUROPE B.V. V. AUTEL ROBOTICS USA, LLC AND AUTEL AERIAL TECHNOLOGY CO. LTD.*, U.S. DISTRICT COURT, DISTRICT OF DELAWARE, CIVIL ACTION NO. 1:16-CV-00706-LPS-CJB, EXPERT REPORT FILED ON JANUARY 19, 2018, SUPPLEMENTAL REPORT FILED ON MARCH 7, 2018, REBUTTAL REPORT FILED ON JANUARY 23, 2020, DEPOSITION TESTIMONY GIVEN ON FEBRUARY 11, 2020, SUPPLEMENTAL REBUTTAL REPORT FILED ON JUNE 22, 2020, DEPOSITION TESTIMONY GIVEN ON JULY 6, 2020. (HON. LEONARD P. STARK)

36. *ARIZA ET AL. V. LUXOTTICA RETAIL NORTH AMERICA, D/B/A, LENSCRAFTERS*, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK, BROOKLYN DIVISION, CASE NO. 1:17-CV-05216-PKC-RLM, EXPERT REPORT FILED ON SEPTEMBER 10, 2019, REBUTTAL

REPORT FILED ON NOVEMBER 13, 2019, DEPOSITION TESTIMONY GIVEN ON DECEMBER 10, 2019, DECLARATION FILED ON FEBRUARY 18, 2020. (HON. PAMELA K. CHEN)

37. *QUEST SOFTWARE, INC. V. NIKE, INC.*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON, PORTLAND DIVISION, CASE NO. 3:18-CV-00721, EXPERT REPORT FILED ON JULY 19, 2019. (HON. KARIN J. IMMERGUT)

38. *JRV, LLC ET AL. V. WINERY EXCHANGE, INC.*, JAMS ARBITRATION – SAN FRANCISCO RESOLUTION CENTER, REFERENCE NUMBER 1100090897, EXPERT REPORT FILED ON MAY 15, 2019, REBUTTAL REPORT FILED ON MAY 25, 2019, DEPOSITION TESTIMONY GIVEN ON MAY 28, 2019, ARBITRATION TESTIMONY GIVEN ON JUNE 20, 2019. (MS. ZELA “ZEE” G. CLAIBORNE, ESQ.)

39. *BK TRUCKING CO. ET AL. V. PACCAR, INC. ET AL.*, UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY, CASE NO. 1:15-CV-02282-JPS-AMD, EXPERT REPORT FILED ON JANUARY 14, 2019, SUPPLEMENTAL REPORT FILED ON APRIL 12, 2019, REBUTTAL REPORT FILED ON JUNE 7, 2019, DEPOSITION TESTIMONY GIVEN ON JUNE 19, 2019. (HON. JEROME B. SIMANDLE)

40. *ROADRUNNER INTERMODAL SERVICES, LLC V. T.G.S. TRANSPORTATION, INC.*, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA, CASE NO. 1:17-CV-01056-DAD-BAM, DECLARATION FILED ON OCTOBER 24, 2017, EXPERT REPORT FILED ON MARCH 11, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 4, 2019, SUPPLEMENTAL REPORT FILED ON APRIL 12, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 23, 2019. (HON. DALE A. DROZD)

41. *MANUFACTURING RESOURCES INTERNATIONAL, INC. V. CIVIQ SMARTSCAPES, LLC ET AL.*, UNITED STATES DISTRICT COURT, DISTRICT OF DELAWARE, CASE NO. 1:17-CV-00269-RGA, EXPERT REPORT FILED ON FEBRUARY 19, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 2, 2019. (HON. RICHARD G. ANDREWS)

42. *MICREL, LLC V. RAY ZINN*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SAN MATEO, CASE NO. 538785, EXPERT REPORT FILED ON MARCH 23, 2017, DEPOSITION TESTIMONY GIVEN ON APRIL 26, 2017, TRIAL TESTIMONY GIVEN ON JANUARY 10, 2019. (HON. RICHARD H. DUBOIS)

43. *JOHANNESSOHN ET AL. V. POLARIS INDUSTRIES, INC.*, UNITED STATES DISTRICT COURT, DISTRICT OF MONTANA, CASE NO. 0:16-CV-03348-PJS-LIB, EXPERT REPORT FILED ON NOVEMBER 16, 2018, DEPOSITION TESTIMONY GIVEN ON JANUARY 17, 2019, EXPERT REPORT FILED ON MARCH 21, 2019. (HON. NANCY BRASEL) – OPPOSING EXPERT WAS NOBEL PRIZE WINNER DANIEL MACFADDEN.

44. *TQ DELTA, LLC V. 2WIRE, INC.*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, CASE NO. 13-CV-1835-RGA, EXPERT REPORT FILED ON NOVEMBER 9, 2018, EXPERT REPORT FILED ON NOVEMBER 29, 2018, DEPOSITION TESTIMONY GIVEN ON

DECEMBER 17, 2018, EXPERT REPORT FILED ON DECEMBER 28, 2018, DEPOSITION TESTIMONY GIVEN ON JANUARY 29, 2019. (HON. RICHARD G. ANDREWS)

45. *DELL'ORO GROUP, INC. V. 650 GROUP, LLC ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:17-CV-00750-JD, EXPERT REPORT FILED ON AUGUST 7, 2018, DECLARATION FILED ON SEPTEMBER 10, 2018, AND SUPPLEMENTAL EXPERT REPORT FILED ON SEPTEMBER 20, 2018. (HON. JAMES DONATO)

46. *COPART, INC. V. SPARTA CONSULTING*, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA, CASE NO. 2:14-CV-0046-KJM-CKD, AFFIRMATIVE EXPERT REPORT REGARDING COUNTER-CLAIMS, MAY 31, 2016, REBUTTAL REPORT REGARDING CONTRACT CLAIMS FILED ON NOVEMBER 24, 2016, REBUTTAL REPORT REGARDING TRADE SECRET CLAIMS FILED ON DECEMBER 16, 2016, DEPOSITION TESTIMONY GIVEN ON JANUARY 17, 2017, TRIAL TESTIMONY GIVEN ON MAY 16, 2018. (HON. KIMBERLY J. MUELLER)

47. *CAMSOFT DATA SYSTEMS, INC. V. SOUTHERN ELECTRONICS SUPPLY, INC.*, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, CASE NO. 3:09-CV-01047, EXPERT REPORT FILED APRIL 14, 2018. (HON. JANICE CLARK)

48. *QUANTUMSCAPE CORPORATION V. Z. CHEN & K. KERMAN*, JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC., REFERENCE NUMBER 1100088671, DEPOSITION TESTIMONY GIVEN APRIL 10, 2018.

49. *THE PARALLAX GROUP INTERNATIONAL, LLC V. INCSTORES, LLC*, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, THE SOUTHERN DISTRICT, CASE NO. 8:16-CV-929-AG-DFM, EXPERT REPORT FILED ON AUGUST 3, 2017, DEPOSITION TESTIMONY GIVEN ON MARCH 20, 2018. (HON. ANDREW J. GUILFORD)

50. *POLYGROUP LIMITED (MCO), (PETITIONER) V. WILLIS ELECTRIC COMPANY, LIMITED (PATENT OWNER)*, UNITED STATES PATENT AND TRADEMARK OFFICE BEFORE THE PATENT TRIAL AND APPEAL BOARD, CASE NOS. IPR2016-01610; -01612, DECLARATION FILED ON AUGUST 23, 2017, DEPOSITION TESTIMONY GIVEN ON SEPTEMBER 26, 2017, AND, SUPPLEMENTAL DECLARATION FILED ON NOVEMBER 13, 2017, AND ON DECEMBER 8, 2017.

51. *EVOLVED WIRELESS, LLC V. LENOVO GROUP, LTD., LENOVO (UNITED STATES) INC., AND MOTOROLA MOBILITY LLC*, U.S. DISTRICT COURT DISTRICT OF DELAWARE, CASE NO. 1:15-

CV-00544-SLR, EXPERT REPORT FILED ON JULY 17, 2017, DEPOSITION TESTIMONY GIVEN ON AUGUST 15, 2017. (HON. SUE LEWIS ROBINSON)

52. *THE REGENTS OF THE UNIVERSITY OF CALIFORNIA V. ST. JUDE MEDICAL, INC.*, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION, CASE NO. 4:16-CV-06210-YGR. (HON. YVONNE GONZALEZ ROGERS)

53. *BEHINDTHECHAIR.COM V. D. CHRISTAL; OLAPLEX, LLC; LIQWD, INC.*, SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, LASC CASE NO. BC 569584, EXPERT REPORT FILED APRIL 6, 2017, DEPOSITION TESTIMONY GIVEN ON APRIL 13, 2017. (HON. DEBRE K. WEINTRAUB)

54. *ROBERT LARSEN ET AL. V. VIZIO, INC.*, UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION, CASE NO. 8:14-CV-01865-CJC-JCG, EXPERT REPORT COMPLETED MARCH 27, 2017. (HON. CORMAC J. CARNEY)

55. *JOANNA C. SULLIVAN V. STEPHEN A. FINN*, UNITED STATES DISTRICT COURT, CALIFORNIA NORTHERN DISTRICT, CASE NO. 3:16:CV-01948-WHO, EXPERT REPORT FILED ON MARCH 1, 2017. (HON. WILLIAM H. ORRICK)

56. *IMPROVED SEARCH, LLC V. AOL, INC.*, IN THE UNITED STATES DISTRICT FOR THE DISTRICT OF DELAWARE, CASE NO. 12-262 (SLR) (SRF). (HON. LEONARD P. STARK)

57. *SAN FRANCISCO NEWS PAPER COMPANY LLC V. HEARST CORPORATION ET AL.*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE CITY AND COUNTY OF SAN FRANCISCO, CASE NO. CGC-13-532369, EXPERT REPORT FILED ON NOVEMBER 10, 2016; DEPOSITION TESTIMONY GIVEN ON DECEMBER 9, 2016; SUPPLEMENTAL REPORT FILED ON APRIL 24, 2017; AND, DEPOSITION TESTIMONY GIVEN ON MAY 23, 2017. (HON. CURTIS E. KARNOW)

58. *REILY FOODS COMPANY, INC. V. SCHIFF FOOD PRODUCTS COMPANY, INC. ET AL.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, CIVIL ACTION NO. 16-01505, EXPERT REPORT FILED ON DECEMBER 6, 2016, MEDIATION DECEMBER 7 – 8, 2016. (HON. JANE TRICHE MILAZZO)

59. *RECOVERY VILLAGE AT UMATILLA, L.L.C. V. HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC. ET AL.*, IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR

BROWARD COUNTY, FLORIDA, COMPLEX LITIGATION UNIT, CASE NO. CACE 15-014725(07), EXPERT REPORT FILED ON DECEMBER 16, 2016.

60. *FATPIPE, INC. V. TALARI NETWORKS, INC.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, TYLER DIVISION, CASE NO. 6:15-CV-00458-RWS. (HON. ROBERT W. SCHROEDER, III)

61. *STATE OF OREGON, THE OREGON HEALTH AUTHORITY, AND THE OREGON DEPARTMENT OF HUMAN SERVICES; THE OREGON HEALTH INSURANCE EXCHANGE CORPORATION, DBA COVER OREGON V. ORACLE AMERICA, INC. ET AL.*, IN THE CIRCUIT COURT OF THE STATE OF OREGON, FOR THE COUNTY OF MARION, NO. 14 C 20043. CASE SETTLED ON SEPTEMBER 15, 2015. (HON. ANNA J. BROWN).

62. *CLOS LACHANCE WINES, INC. V. A.V. BRANDS, INC.*, JAMS ARBITRATION, EXPERT REPORT AND DEPOSITION TESTIMONY FILED AND GIVEN ON FEBRUARY 19, 2016, ARBITRATION TESTIMONY GIVEN ON MARCH 8, 2016.

63. *RACING OPTICS, INC. V. AEVOE CORPORATION*, U.S. DISTRICT COURT FOR THE DISTRICT OF NEVADA, CIVIL ACTION NO. 2:15-CV-01774-JCM-VCF. (HON. ROBERT C. JONES)

64. *FERRING B.V. V. FERA PHARMACEUTICALS, LLC, PERRIGO COMPANY, PERRIGO COMPANY PLC, PERRIGO COMPANY OF TENNESSEE, AND PERRIGO NEW YORK, INC.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK, CIVIL ACTION NO. 2:13-CV-04640, EXPERT REPORT FILED ON DECEMBER 11, 2015. (HON. SANDRA J. FEUERSTEIN)

65. *HEARTLAND PAYMENT SYSTEMS, INC. V. MERCURY PAYMENT SYSTEMS*, LLC, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:14-CV-00437-JCS. (HON. JOSEPH C. SPERO)

66. *EMBLAZE LTD. V. MICROSOFT CORPORATION*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:12-CV-5422 JST. (HON. YVONNE GONZALEZ ROGERS)

67. *FORMFACTOR, INC. V. MARTEK, INC.*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:14-CV-01122, EXPERT REPORT FILED ON MAY 1, 2015. (HON. JAMES DONATO)

68. *BETTER MOUSE COMPANY, LLC V. STEELSERIES APS; AND STEELSERIES NORTH AMERICA CORP.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION,

CASE NO. 2:14-CV-198, EXPERT REPORT FILED ON SEPTEMBER 24, 2015, TRIAL TESTIMONY GIVEN ON JANUARY 13, 2016. (HON. ROY S. PAYNE)

69. *INTERSTATE FIRE & CASUALTY COMPANY AND FIREMEN'S FUND INSURANCE COMPANY V. APARTMENT MANAGEMENT CONSULTANTS, LLC, SUNRIDGE PARTNERS, LLC, AND AMBER NICOLE LOMPE*, U.S. DISTRICT COURT FOR THE DISTRICT OF WYOMING, CIVIL ACTION NO. 13-CV-278 J, EXPERT REPORT FILED ON MARCH 18, 2015, DEPOSITION TESTIMONY, JUNE 8, 2015, AND SUPPLEMENTAL EXPERT REPORT, AUGUST 13, 2015. (HON. ALAN B. JOHNSON)

70. *GOOD TECHNOLOGY CORPORATION AND GOOD TECHNOLOGY SOFTWARE, INC. V. MOBILEIRON, INC.,* U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION CASE NO. 12-05826-EDL, EXPERT REPORT FILED ON JANUARY 9, 2015 AND FEBRUARY 13, 2015; AND, TRIAL TESTIMONY GIVEN ON JULY 28, 2015. (HON. PAUL SINGH GREWAL)

71. *FUJIFILM CORPORATION V. MOTOROLA MOBILITY LLC*, UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION CASE NO. C 12-03587 RS, EXPERT REPORT FILED ON OCTOBER 31, 2014 AND JANUARY 15, 2015; DEPOSITION TESTIMONY GIVEN ON NOVEMBER 18, 2014; AND, JANUARY 26, 2015; AND, TRIAL TESTIMONY GIVEN ON APRIL 28, 2015. (HON. WILLIAM H. ORRICK)

72. *COE ET AL. V. PHILIPS ORAL HEALTHCARE, INC.*, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON MASTER DOCKET NO. 2:13-CV-00518-MJP. (HON. MARSHA J. PECHMAN)

73. *VENTURE CORPORATION LTD AND VENTURE DESIGN SERVICES, INC. V. JAMES BARRETT*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA CASE NO. CV-13-03384-PSG (ADR), EXPERT REPORT FILED ON OCTOBER 6, 2014. (HON. PAUL SINGH GREWAL)

74. *M. VILLANUEVA ET AL. V. FIDELITY NATIONAL TITLE COMPANY, ET AL.*, SANTA CLARA COUNTY SUPERIOR COURT CASE NO. 1-10-CV-173356, EXPERT REPORT FILED ON MARCH 20, 2014, DEPOSITION TESTIMONY GIVEN ON MARCH 21, 2014; AND, TRIAL TESTIMONY GIVEN ON MAY 15, 2014. (HON. PETER H. KIRWAN)

75. *FEDERAL HOUSING FINANCE AGENCY, ETC. V. JPMORGAN CHASE ET AL.*, U.S. DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK CASE NO. 11 CIV. 6188(DLC). (HON. DENISE COTE)

76. *KB HOMES V. K&L GATES, LLP (AKA KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP) ET AL*, LOS ANGELES COUNTY SUPERIOR COURT CASE NO. BC484090, REBUTTAL

DECLARATION FILED ON MAY 5, 2014, EXPERT REPORT FILED ON JANUARY 17, 2014, AND DEPOSITION TESTIMONY GIVEN ON JANUARY 23, 2014. (HON. WILLIAM F. HIGHBERGER)

77. *GALENA STREET FUND, L.P. V. WELLS FARGO BANK, N.A.*, U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO CASE NO. 1:12-CV-00587-MSK, EXPERT REPORT FILED ON MAY 2, 2014. (HON. MICHAEL J. WANTANABE)

78. *HYPHENATED SYSTEMS, LLC V. BRUKER NANO, INC. ET AL*, SANTA ANA COUNTY SUPERIOR COURT, UNLIMITED JURISDICTION CASE NO. 1-11-CV212650, EXPERT REPORT AND DEPOSITION TESTIMONY FILED AND GIVEN ON OCTOBER 22, 2013.

79. *HENRY A., ET AL. V. MICHAEL WILLDEN, ET AL*, U.S. DISTRICT COURT, DISTRICT OF NEVADA CASE NO. 2:10-CV-00528- RCJ-PAL. (HON. ROBERT C. JONES)

80. *UTHE TECHNOLOGY CORPORATION V. AETRIUM, INC., HENRY ALLEN, ET AL*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION CASE NO. 3:95-CV-02377-WHA, EXPERT REPORT FILED ON JUNE 14, 2013, AND DEPOSITION TESTIMONY GIVEN ON JUNE 19, 2013. (HON. WILLIAM ALSUP)

81. *RICHARD COHEN V. ROBERT TALBOTT, INC.*, AMERICAN ARBITRATION ASSOCIATION CASE NO. 74 116 170 11 DECR.

82. *WIRELESS INK CORPORATION V. FACEBOOK, INC., GOOGLE, INC., YOUTUBE, INC., YOUTUBE LLC, AND MYSPACE, INC.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK CASE NO. 10-CV-1841 AND 11.CV-1751, DECLARATION ON AUGUST 6, 2012. (HON. P. KEVIN CASTEL)

83. *ALLIED FELLOWSHIP SERVICE V. RMD SERVICES I, LLC ET AL.*, ALAMEDA COUNTY SUPERIOR COURT CASE NO. RG09488702. (HON. P. KEVIN CASTEL)

84. *WHITTLESTONE, INC. V. HANDI-CRAFT COMPANY*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION CASE NO. 08-04193 SBA, EXPERT REPORT FILED ON MAY 14, 2012, AND DEPOSITION TESTIMONY GIVEN ON JUNE 14, 2012. (HON. JACQUELINE SCOTT CORLEY)

85. *C. SCLIMENTI V. THE LELAND STANFORD JUNIOR UNIVERSITY ET AL.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 08-CV-01730-W-BLM, EXPERT REPORT FILED

ON FEBRUARY 1, 2011, AND DEPOSITION TESTIMONY GIVEN ON MAY 6, 2011. (HON. ANTHONY J. BATTAGLIA)

86. *CARDSTORE.COM, INC. F/K/A INK2 CORPORATION V. MIMEO.COM, INC.*, JAMS ARBITRATION, EXPERT REPORT COMPLETED ON DECEMBER 21, 2010 (SETTLED DATE OF FILING).

87. *DWS INTERNATIONAL, INC. DBA MARBLE DIMENSIONS WORLDWIDE V. MEIXIA ARTS AND HANDCRAFTS CO. LTD., HOME CASUAL, LLC, ET AL*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF OHIO, CASE NO. 3:09CV458, EXPERT REPORT FILED ON AUGUST 16, 2010, DEPOSITION TESTIMONY GIVEN ON JANUARY 21, 2011 AND, TRIAL TESTIMONY GIVEN ON JUNE 24, 2011. (HON. THOMAS M. ROSE)

88. *LBV ASSET MANAGEMENT LLP ET AL. V. SGAM NEWEDGE MANAGEMENT, INC. ET AL*, JAMS ARBITRATION, EXPERT REPORT FILED ON APRIL 28, 2010, SUPPLEMENTAL EXPERT REPORT FILED ON JUNE 2, 2010, AND ARBITRATION TESTIMONY GIVEN ON JUNE 10, 2010.

89. *CELSO ROBLEDO ET AL. V. CITY OF CHICAGO ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION CASE NO. 05 C 0335, EXPERT REPORT FILED ON NOVEMBER 21, 2008. (HON. ELAINE E. BUCKLO)

90. *COACHMEN INDUSTRIES ET AL. V. CRANE COMPOSITES, INC. F/K/A KEMLITE*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF INDIANA CASE NO. 3:06-CV-0160-CAN, EXPERT REPORT FILED ON JULY 1, 2007 AND SEPARATE EXPERT REPORT FILED ON JUNE 21, 2007 AND JULY 1, 2007. (HON. CHRISTOPHER A. NEUCHTERLEIN)

91. *TIFFANY BLACKWELL ET AL. V. SKYWEST AIRLINES, INC.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 06CV0307, EXPERT REPORT FILED ON JUNE 25, 2007. (HON. DANA M. SABRAW)

[redacted]

# Appendix 2

Richard Eichmann
October 13, 2026

[redacted]

# Materials Relied Upon

**Declarations and Expert Reports**

- Declaration of Richard J. Eichmann in Support of Motion for Preliminary Injunction, April 24, 2026, and appendices.
- Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026, and exhibits.
- Declaration of Matthew A. Colvin, April 27, 2026, and exhibits.
- Colvin Declaration filed April 27, 2026, and exhibits.
- Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, August 6, 2026, and appendices.
- Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Temporary Restraining Order, September 1, 2026, and exhibits.
- Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Temporary Restraining Order, September 2, 2026, and appendices.
- Declaration of Matthew S. Karlovic, September 27, 2026.
- Rebuttal Declaration of Eric J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, September 28, 2026.

**Depositions**

- Deposition of Matthew S. Karlovic, as Rule 30(b)(6) designee of AS Designs, LLC, July 30, 2026, and Exhibits.
- Deposition of Lawrence DeMonico, September 16, 2026.

**Legal Filing**

- Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, September 28, 2026.

**Agreements**

- [redacted]
- [redacted]
- [redacted]

**Sales Data**

- AWP - Rare Breed FRT Sales Data 2020-2026.xlsx.
- AWP - Rare Breed FRT Sales Data 2020-2026 thru 2026-09-30 (Transactions Only).csv.
- FRT-RD3 Stock History (WooCommerce) Feb-Sep 2026.xlsx.
- FRT-RD3 Order Records Feb-Sep 2026 (ShipStation extract).xlsx.
- Rare Breed Sales by Channel (ShipStation Ship Date Basis) May2025-Sep2026.xlsx.

**Bates**

- ASD 000040–000045.