[redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: RARE BREED TRIGGERS PATENT LITIGATION | CASE NO. 4:26-md-03176-ALM |
| RARE BREED TRIGGERS, INC. et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>AS DESIGNS, LLC et al.,<br><br>Defendants. | (CASE NO. 4:26-cv-00370-ALM)<br><br>CHIEF JUDGE AMOS L. MAZZANT |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION AGAINST THE ARHK**

[redacted]

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iv

I. BACKGROUND ..... 1

II. APPLICABLE LAW ..... 2

III. DISCUSSION ..... 3

A. Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits ..... 3

B. Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm ..... 9

1. Plaintiffs' Delay Refutes Any Claim of Emergency ..... 10

2. Plaintiffs' own Economist Concedes that the Claimed Harm can Be Measured. ..... 12

3. Plaintiffs License their Patents and Price Infringement in Dollars ..... 13

4. ARHK Demand Is Driven by Features and Sentiments Unrelated to the Asserted Patents ..... 14

5. The Record Does Not Show Likely Diversion of Plaintiffs' Sales ..... 15

6. The Claimed Price, Lead-Time, and Reputational Harms Are Speculative or Not Caused by the ARHK ..... 16

7. Any Damages Attributable to the ARHK are Collectible ..... 19

C. The Balance of Harms Favors AS Designs ..... 20

1. A Restraint Would Impose Immediate Harm on AS Designs. ..... 20

2. Plaintiffs' "Delayed Launch" Argument Contradicts their own Theory of Harm. ..... 21

3. AS Designs' Hardship Is Not "Self-Inflicted." ..... 21

4. Plaintiffs' Side of the Scale Is Light ..... 22

D. The Public Interest Favors Denial of the Requested Injunction ..... 23

E. A TRO or PI Would Require a Sizeable Bond ..... 25

[redacted]

**Page**

IV. CONCLUSION ....................................................................................................26

[redacted]

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*ABC IP, LLC v. Peak Tactical, LLC*,
No. 26-CV-18-R, 2026 WL 940599 (D. Wyo. Mar. 11, 2026) ....................4

*Alpek Polyester, S.A. v. Polymetrix AG*,
No. 2021-1706, 2021 WL 5974163 (Fed. Cir. Dec. 16, 2021)....................6

*Apple Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012)....................9, 15

*Apple Inc. v. Samsung Elecs. Co.*,
735 F.3d 1352 (Fed. Cir. 2013)....................3

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015)....................13

*Big Tyme Invs., L.L.C. v. Edwards*,
985 F.3d 456 (5th Cir. 2021) ....................2

*Bio-Rad Labs. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020)....................13

*BlephEx, LLC v. Myco Indus.*,
24 F.4th 1391 (Fed. Cir. 2022) ....................3

*Clark v. Prichard*,
812 F.2d 991 (5th Cir. 1987) ....................2

*Commil USA, LLC v. Cisco Sys.*,
575 U.S. 632 (2015)....................6

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005)....................5, 6

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*,
246 F.3d 1336 (Fed. Cir. 2001)....................13

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)....................13

*Duncan Parking Techs. v. IPS Grp.*,
914 F.3d 1347 (Fed. Cir. 2019)....................5

[redacted]

**Page(s)**

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................10

*High Tech Med. Instrumentation, Inc. v. New Image Indus.*,
49 F.3d 1551 (Fed. Cir. 1995)....................10

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985)....................19

*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988)....................24

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990)....................13

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011)....................20

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
656 F. App'x 504 (Fed. Cir. 2016)....................6

*Mallet & Co. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021)....................25, 26

*Mead Johnson & Co. v. Abbott Labs.*,
201 F.3d 883 (7th Cir. 2000)....................25

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017)....................3

*Mitek Sys. v. United Servs. Auto. Ass'n*,
139 F.4th 1340 (Fed. Cir. 2025)....................6

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
106 F.4th 1369 (Fed. Cir. 2024)....................9

*Novartis Pharms. Corp. v. Eon Labs Mfg.*,
363 F.3d 1306 (Fed. Cir. 2004)....................6

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
843 F.3d 1315 (Fed. Cir. 2016)....................6

*Richert v. Calderin*,
No. 24-cv-21901-ALTMAN, 2025 WL 263454 (S.D. Fla. Jan. 22, 2025)....................8

[redacted]

**Page(s)**

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)....13

*Spath v. Hayes Wheels Int'l-Ind., Inc.*,
211 F.3d 392 (7th Cir. 2000)....7

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989)....12

*T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*,
821 F.2d 646 (Fed. Cir. 1987)....13

*Tek Global, S.R.L. v. Sealant Sys. Int'l*,
920 F.3d 777 (Fed. Cir. 2019)....5

*Tinnus Enter. v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017)....2, 3

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986)....21, 22

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008)....2, 3, 9, 16

**STATUTES**

35 U.S.C. § 112....7

35 U.S.C. § 271....5, 6

**RULES**

Fed. R. Civ. P. 65....25, 26, 27

Local Rule CV-7....2, 8

Local Patent Rule 4-1....7

Local Patent Rule 4-2....7

[redacted]

# I. BACKGROUND

In January of this year, Defendant AS Designs, LLC ("AS Designs") publicly announced a new forced reset trigger ("FRT") product – the ARHK. (*See* Dkt. #75-29 and #75-33.[1]) The ARHK is a fully self-contained drop-in FRT that is compatible with multiple firearms platforms. (Dkt. #88-1 at ¶5.) The ARHK is designed for the MP5 family and also for 5.56- and 7.62-caliber roller-delayed rifles, including the AP53, G3/91, HK11, HK21, HK32, and HK33. (*Id.* at ¶¶ 5, 7.) The FRT-RD3, a competing product of Plaintiff Rare Breed Triggers, Inc. ("Rare Breed"), launched in February 2026 and fits only the 9mm MP5 family. (Dkt. #74-2 at ¶¶ 20, 25, 33; Dkt. #88-1 at ¶3.) AS Designs has listed the ARHK at $549.99; the FRT-RD3 sells for $615 and $620. (Dkt. #74-2 at ¶ 56.)

In the words of Plaintiffs Rare Breed and ABC IP, LLC ("ABC"), AS Designs further announced the ARHK on its Instagram page in early February and "posted full specifications on Instagram on April 4, 2026." (Dkt. #74-2 at ¶54.) Yet Plaintiffs did *nothing* about this for months. Even when they previously moved for a preliminary injunction ("PI") against AS Designs' other products (like the Super Safety and the ARC-Fire) on April 27, 2026, that motion made no mention of the ARHK (which had already been publicly discussed for several months). (*See* Dkt. #28.)

Finally, on September 2, 2026, Plaintiffs moved for a temporary restraining order ("TRO") against the ARHK based on alleged infringement of several asserted patents: U.S. Patent 12,031,784 ("'784 Patent," Dkt. #75-3), U.S. Patent 12,038,247 ("'247 Patent," Dkt. #75-1), U.S. Patent 12,578,159 ("'159 Patent," Dkt. #75-2), and U.S. Patent 12,636,403 ("'403 Patent," Dkt. #75-4). ("TRO Mot.," Dkt. #74.) Despite Plaintiffs' claims that the ARHK's full specifications are publicly available, the TRO Motion included no comparison of the asserted patent claims with

[1] All docket citations are to this case, unless otherwise indicated.

[redacted]

the ARHK. "Plaintiffs have failed to carry their burden of showing a substantial likelihood of success on the merits," so the Court denied their TRO Motion. (Dkt. #113 at 6.)

Undeterred, Plaintiffs filed another, serial TRO motion a week later, seeking another bite at the apple. ("Renewed Mot.," Dkt. #117.) But even if that procedural impropriety were set aside, Plaintiffs are unable to clearly establish a likelihood of showing infringement, and there are substantial questions regarding the validity of the asserted claims. Furthermore, Plaintiffs' delay in seeking the original TRO belies any claims of irreparable harm due to the ARHK. For these reasons and others discussed in this Opposition, Defendants respectfully submit that the Renewed Motion should be denied.[2]

## II. <u>APPLICABLE LAW</u>

A request for preliminary injunctive relief is generally governed by regional circuit law, though the Federal Circuit has itself built a body of precedent applying the general considerations to patent cases and gives dominant effect to that precedent insofar as it reflects considerations specific to patent issues. *Tinnus Enter. v. Telebrands Corp.*, 846 F.3d 1190, 1202-03 (Fed. Cir. 2017). The prerequisites for granting a TRO are the same as for a preliminary injunction. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). They are: (1) likelihood of success on the merits, (2) irreparable harm in the absence of the injunctive relief, (3) the balance of hardships tipping in the movant's favor, and (4) the injunction is in the public interest. *Tinnus Enter.*, 846 F.3d at 1202; *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021) (movant must "clearly carr[y] the burden of persuasion on all four requirements"). Preliminary injunctive relief "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S.

[2] The original TRO Motion was 30 pages long. The Renewed Motion is 39 pages long (not including the 5-page supplement Plaintiffs filed earlier this week, Dkt. #120). Despite a motion almost triple the size of the default page limits (*see* Local Rule CV-7(a)(2)), Defendants received just over a week to respond (*see* Dkt. #121; Local Rule CV-7(e) (providing for 14 days by default)).

[redacted]

7, 24 (2008).

On likelihood of success, the patentee must show that it will likely prove infringement and that it will likely withstand any challenges to the validity of the patent. An accused infringer need only demonstrate a substantial question of validity or infringement to defeat a likelihood of success on the merits. *Tinnus Enter.*, 846 F.3d at 1202. Unlike proving invalidity at trial, an accused infringer "need not, to defeat a preliminary injunction [or TRO], prove invalidity by clear and convincing evidence . . . ." *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022); *see also Tinnus Enter.*, 846 F.3d at 1205 (the burden to show a substantial question of invalidity at the PI/TRO stage is lower than what is required to prove invalidity at trial).

The patentee must also establish that it is likely to suffer irreparable harm (absent the injunction) and that there is a causal nexus between the alleged harm and the alleged infringement. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017)*; see also Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (the causal-nexus requirement distinguishes between irreparable harm caused by infringement and irreparable harm caused by otherwise lawful competition). On the balance of hardships, a court weighs the harm to the movant if the injunction is not granted against the harm to the non-movant if the injunction is granted. *Metalcraft*, 848 F.3d at 1369.

## III. DISCUSSION

### A. Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits.

As an initial matter, Plaintiffs already took their shot at a TRO against the ARHK – and the shot missed because they "failed to carry their burden of showing a substantial likelihood of success on the merits." (Dkt. #113 at 6.) Plaintiffs now regroup and want to take another shot through their Renewed Motion after addressing what was previously missing. Assuming,

[redacted]

*arguendo*, the Renewed Motion rectifies the deficiency on the likelihood-of-success factor but is nevertheless denied for failure to establish irreparable harm, would Plaintiffs file yet another "renewed" TRO motion trying to fix those deficiencies? Such serial attempts are improper because they can go on indefinitely with no end in sight, all the while harassing Defendants and continually imposing on the Court.

Indeed, Plaintiffs already tried such a tack in another case within this MDL: they moved for a TRO and PI against Peak Tactical, LLC and lost. After they lost, they moved "for expedited discovery intending to gather relevant evidence to renew their PI request." *ABC IP, LLC v. Peak Tactical, LLC*, No. 26-CV-18-R, 2026 WL 940599, at *1 (D. Wyo. Mar. 11, 2026). That court denied the request for the discovery and for reconsideration of the TRO/PI denial. *Id.* In response to Plaintiffs' complaints that they were not able to present the necessary evidence with their original motion, the court pointed out that Plaintiffs were responsible for the timing of their motion. *Id.* at *4. The same applies here. Plaintiffs filed their TRO Motion without having an ARHK unit and thus failed to show a likelihood of success on the merits. When that motion was denied, they then allegedly obtained the unit and filed the Renewed Motion. Paraphrasing the *Peak* court, if Plaintiffs needed the ARHK unit to support their TRO Motion, they "should have waited to file that motion until after" they obtained the necessary information. *Id.* While this Court stated that the denial of the TRO Motion was "without prejudice" (Dkt. #113 at 6), the parties did not develop that point, which therefore is dicta.

Additionally, while Plaintiffs acknowledge that "the ARHK has not been released," they claim to have "received an ARHK from someone who obtained it from AS Designs." (Dkt. #117 at 14.) The Colvin Declaration cited for support simply states that Mr. Colvin "received an ARHK from someone who obtained it from AS Designs" and states that he sent it back "to the person who

[redacted]

sent it to" him. (Dkt. #118 at ¶¶ 5, 7.) Neither the Renewed Motion nor the Colvin Declaration discloses *who* sent the unit to Mr. Colvin, nor *how* that person obtained the unit from AS Designs, given that it has not been released. Furthermore, it is unclear how Mr. Colvin can have personal, first-hand knowledge that this person obtained the unit from AS Designs. (*See* Dkt. #118 at ¶2.) This raises authenticity and hearsay issues at minimum. Plaintiffs' "Supplemental Evidence" (submitted earlier this week) includes social media posts that say that AS Designs loaned a handful of prototype ARHK units to content creators and seems to implicitly admit the identity of the unnamed person who obtained the ARHK and sent it to Mr. Colvin. (*See* Dkt. #120.) If the intent of the "Supplemental Evidence" is to address the authenticity issue, then simply stating the facts (rather than implying them in a roundabout way) would be more appropriate, and a declaration from the unnamed person would further remove the authenticity and hearsay issues. If that is not the intent, then it is unclear why the "Supplemental Evidence" was submitted.

Turning to the merits, proving direct infringement (under 35 U.S.C. §271(a)) requires a patentee to establish that one or more patent claims read on the accused product literally or under the doctrine of equivalents (i.e., that the product embodies each claim limitation literally or its equivalent). *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005); *Tek Global, S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 784 (Fed. Cir. 2019). That analysis entails two steps: (1) determining the meaning and scope of the asserted claims (i.e., claim construction), and (2) comparing the construed claims to the accused products. *Duncan Parking Techs. v. IPS Grp.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).

Proving induced infringement (under §271(b)) requires a patentee to establish that (1) a third party directly infringed the asserted claims (i.e., underlying direct infringement), (2) the defendant induced those infringing acts (i.e., causation), and (3) the defendant knew the acts it

[redacted]

induced constituted infringement (i.e., intent). *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 843 F.3d 1315, 1332 (Fed. Cir. 2016); *Alpek Polyester, S.A. v. Polymetrix AG*, No. 2021-1706, 2021 WL 5974163, at *8 (Fed. Cir. Dec. 16, 2021). The second step requires the inducer to take an affirmative act to encourage infringement. *Power Integrations*, 843 F.3d at 1332.

The Federal Circuit has discussed contributory infringement (under §271(c)) using several different formulations. Synthesizing them, the required elements are: (1) an act of direct infringement, (2) the defendant knew that the combination for which its component was especially made was both patented and infringing (i.e., knowledge of the patent and knowledge of infringement), (3) the defendant's component is not a staple article of commerce suitable for substantial non-infringing uses, and (4) the component is a material part of the patented invention. *Cross Med.*, 424 F.3d at 1312; *Mitek Sys. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1351 (Fed. Cir. 2025); *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522 (Fed. Cir. 2016); *see also Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 639 (2015). "[T]here can be no inducement or contributory infringement absent an underlying direct infringement." *Novartis Pharms. Corp. v. Eon Labs Mfg.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004). If a defendant reasonably believes that he does not infringe (e.g., by reading the claims differently from the plaintiff), that defendant is not liable for indirect infringement, even if his reading is ultimately wrong. *See Koninklijke Philips*, 656 F. App'x at 523 (citing *Commil*, 575 U.S. at 642).

The Renewed Motion includes a section on the likelihood-of-success factor. (*See* Dkt. #117 at 16-23). That section generically discusses the legal standards for infringement and claim construction. But it does not actually go through the asserted claims and construe any limitations. Instead, it merely waves a hand and argues they all should carry their plain meaning. (*Id.* at 17.)

[redacted]

That is simply impossible. For example, various claims contain means-plus-function limitations that are governed by 35 U.S.C. §112(f): claim 14 of the '403 Patent and claims 1, 6, 10, 14-16 of the '159 Patent (bolt means); claim 17 of the '159 Patent (movable blocking means); claim 1 of the '784 Patent, claims 14, 17, 32 of the '403 Patent (locking member). Such terms do not have a "plain and ordinary meaning" in the field and must be construed. *See* P.R. 4-1(a), 4-2(a) (requiring construction of §112(f) terms). In light of Defendants' prior Opposition (Dkt. #50) to Plaintiffs' earlier PI Motion, and the supporting declaration of Defendants' expert responding to Plaintiffs' infringement allegations on a claim-by-claim basis (Dkt. #51 to #51-20), Plaintiffs know full-well that the parties do not ascribe the same meaning to all the claim terms. Yet Plaintiffs do not even acknowledge the claim construction disputes, much less wrestle with them.

As for infringement, the Renewed Motion does not go through each element of each asserted claim and compare it against the accused product (as required to show direct infringement). Instead, it argues about similarities between the ARHK and the ARC-Fire. (Dkt. #117 at 18-19.) But that is not how one shows infringement.

When the Renewed Motion finally gets to the actual asserted patents, rather than quoting the actual asserted claims, the Motion merely summarizes just one claim from each patent, conclusorily states that "[t]he ARHK has each element," and points to the exhibits of the supporting Luettke Declaration. (*See id.* at 19-21.) Needless to say, summarizing a patent claim and asserting that a product is "close enough" is not how infringement analyses are performed. The conclusory and undeveloped nature of the infringement arguments alone justifies denying the Renewed Motion. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).

And Plaintiffs' effective incorporation by reference of the Luettke Declaration and its exhibits (Dkt. #117-1 to #117-5) is a transparent attempt to circumvent this District's page limits.

[redacted]

*See Richert v. Calderin*, No. 24-cv-21901-ALTMAN, 2025 WL 263454, at *1 (S.D. Fla. Jan. 22, 2025). Plaintiffs requested leave to increase their Renewed Motion from 15 pages to 40. (*See* Dkt. #116.) But incorporating the Luettke Declaration and its four exhibits results in a whopping 219 pages (!) added to the Renewed Motion's already increased 40 pages.[3] Plaintiffs neither requested nor received permission for such an increase.

In their Reply in support of the original TRO Motion, Plaintiffs argued that such incorporation by reference did not evade this District's page limits because those limits "exclude attachments." (Dkt. #109 at 3 (citing to Local Rule CV-7(a)(2)).) That is a frivolous argument. By that logic, a party can simply place unlimited arguments in a document (however long), title it "attachment" or "exhibit," and submit it with its brief, fully expecting all of them to be considered. That would make a mockery of this District's page limits. The issue is not that the Luettke Declaration and its exhibits are long. The problem is that without incorporating them into the Renewed Motion, Plaintiffs cannot even hope to show a likelihood of success on the merits. If the Court does not deny the Renewed Motion for its failure to show – within the motion itself – likelihood of success on the merits, then Defendants' non-infringement and invalidity response must also largely rely on their expert's declarations.

And for the detailed reasons explained in the accompanying declaration of Dr. Stephen A. Batzer (Batzer Decl. §VII and Exhibits 3-6), the ARHK does not infringe the asserted claims of the '784 Patent, the '247 Patent, the '159 Patent, and the '403 Patent. Moreover, as thoroughly explained by Dr. Batzer (Batzer Decl. §VIII), the asserted claims of each patent are invalid. (*See also* Dkt. #51 at 34-41 (§VIII); Dkt. #51-6 to #51-20; *ABC IP, LLC v. Z3 Prods.*, No. 4:26-cv-

[3] The Court increased the page limit for both the Renewed Motion and this Opposition to 40 pages. (Dkt. #123.)

[redacted]

00367-ALM (E.D. Tex.), Dkt. #72 at 52-53 (§VIII.E) and Dkt. #72-22 to 72-25.) Furthermore, other defendants in this MDL have likewise submitted expert declarations that the asserted patents are invalid. (*E.g.*, *ABC IP, LLC v. Mister Guns, LLC*, No. 2:26-cv-00056-ALM (E.D. Tex.), Dkt. #71-7 to #71-11 (Declaration of Ryan D. Cook, MS, PE).) These substantial questions regarding infringement and invalidity of the asserted claims eliminate Plaintiffs' likelihood of success on the merits, which alone justifies denying the Renewed Motion.

Plaintiffs point to the Harrison Declaration submitted with their Reply to the separate PI Motion. (*See* Dkt. #117 at 22-23.) They focus on a single point: whether the prior art Blakley reference (U.S. Patent 7,398,723) discloses a trigger that can be switched between forced-reset and standard semi-automatic mode. (*Id.*) But that is hardly the only invalidity challenge against the asserted patents. And even if it were, whether Blakley does or does not disclose that feature involves dueling experts[4] and thus raises a substantial question of invalidity, which is sufficient to defeat Plaintiffs' showing on this factor.

**B. <u>Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm</u>.**

A preliminary injunction is "an extraordinary remedy" never awarded as of right. *Winter*, 555 U.S. at 24. To obtain that extraordinary relief, Plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief, not merely that they may suffer some business injury that can be compensated later. *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). "Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple*, 678 F.3d at 1324. The Patent Act

[4] Plaintiffs' reference to "unrebutted testimony" from the hearing in *Hoffman Tactical* (Dkt. #117 at 23) is unclear in its applicability here, since Defendants *have* submitted testimony on this very point. What did not happen in that case has no bearing on what did happen here.

[redacted]

does not create a categorical entitlement to an injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006). Plaintiffs' showing fails for several independent reasons. Their own conduct shows no emergency. Their own economist concedes that the harm they fear can be measured. ABC has licensed the very patents it says cannot be compensated in money, and Plaintiffs have told the market what they believe each infringing unit is worth in dollars. And their own evidence shows that ARHK demand is driven by features and sentiments that have nothing to do with the asserted patents.

**1. Plaintiffs' Delay Refutes Any Claim of Emergency.**

Delay in seeking relief "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *High Tech Med. Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Plaintiffs' timeline speaks for itself:

| Date | Event | Record |
|---|---|---|
| Jan. 2026 | AS Designs announces the ARHK at SHOT Show | Dkt. #74 at 9 |
| Feb. 5, 2026 | ARHK announced on Instagram (4,500+ likes) | Dkt. #74-2 at ¶54 |
| Apr. 4, 2026 | Full ARHK specifications posted | Dkt. #74-2 at ¶54 |
| Apr. 27, 2026 | Plaintiffs move for a preliminary injunction against AS Designs' other products, but not the ARHK | Dkt. #28 |
| July 1, 2026 | AS Designs announces "full production" and upcoming 1,500-unit first drop | Dkt. #74-2 at ¶67 |
| July 7, 2026 | Plaintiffs capture the ARHK page, with its $549.99 price | Dkt. #75-25 |
| Sep. 2, 2026 | Plaintiffs file the original TRO Motion | Dkt. #74 |

Plaintiffs thus knew of the ARHK for roughly seven months, and knew its price, design concept, and description for months, before seeking emergency relief. Plaintiffs chose to litigate a

[redacted]

PI motion against AS Designs' other products without including the ARHK. They then waited several more months after the production announcement, and filed only after the "late August" launch window they now call imminent had passed. (Dkt. #74 at 1-2; Dkt. #74-2 at ¶67.)

Plaintiffs' prior footnote on delay measured promptness from the filing of their complaints across their various cases. (Dkt. #74 at 20 n.6.) That is the wrong measure. In the first place, the ARHK is *not* in any *AS Designs* complaint at all, as previously explained. (*See* Dkt. #88 at 3-4.) More importantly, the question is how long Plaintiffs waited after learning of the product they seek to enjoin. On that question, Plaintiffs offer no explanation at all. Their resource constraints did not prevent them from filing "more than 125" infringement actions and nine other motions for preliminary relief, including a separate PI motion against the Defendants during the same period. (Dkt. #74 at 12-13.)

Plaintiffs argue that they could sit back and wait until the harm became "concrete," which they claim occurred on July 1, 2026. (Dkt. #117 at 32-33.) However, one of the harms they claim is irreparable is the fact that customers are waiting for the ARHK instead of purchasing Rare Breed's FRT-RD3. (*Id*. at 24.) Yet looking through the exhibits Plaintiffs submitted in support of that argument, some stated their intent to wait as early as March 4, 2026 – four *months* before Plaintiffs' claimed "concrete" date, and half a year before Plaintiffs filed the TRO Motion. (*See* Dkt. #76 at PageID #3314; Dkt. #76-1 at PageID #3318.) Plaintiffs cannot have it both ways – they cannot argue that there was no concrete harm to justify moving for injunctive relief while simultaneously arguing that there was irreparable harm.

Plaintiffs now try to shift the focus to how quickly they filed the Renewed Motion. (Dkt. #117 at 15.) But those remedial efforts do nothing to change the fact that Plaintiffs knew of the

[redacted]

upcoming ARHK and did nothing for *months*, which undermines their claim of the alleged harm being irreparable.

### 2. Plaintiffs' own Economist Concedes that the Claimed Harm can Be Measured.

Plaintiffs' damages expert does not support the Renewed Motion's central premise. Dr. Eichmann states that he has not calculated a lost-profits amount, a diversion rate, or ARHK-specific price erosion. (Dkt. #74-1 at ¶8.) He does not assume one-for-one diversion. (*Id*. at ¶46.) He does not assume that the announced 1,500 units "exist, will be released, will be sold, or will displace Rare Breed sales." (*Id*. at ¶100.)

Most importantly, he disclaims the conclusion the motion needs. He "do[es] not contend that all harm associated with the ARHK is incapable of measurement," and he agrees that "the incremental profit associated with [a] lost FRT-RD3™ transaction may be estimated." (*Id*. at ¶122.) He does not "opine that every consequence of ARHK entry is unquantifiable," and agrees that lost profits on diverted transactions and historical pricing effects "may be estimated." (*Id*. at ¶147.)

Plaintiffs' theory of the market makes that measurement easier, not harder. Plaintiffs insist that the ARHK would create a "two-competitor market." (Dkt. #117 at 25.) In a two-supplier market, the *Panduit* lost-profits test "is usually straightforward and dispositive." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). Every ARHK sale would be recorded in AS Designs' own transaction data, with its date, price, and customer. (*See* Dkt. #88-2 at ¶¶ 32-33, 35.) Plaintiffs' repeat-purchase effects are measurable too: Plaintiffs already track more than [redacted] repeat customers, and Dr. Eichmann himself computed the share of FRT-RD3 launch customers with other Rare Breed purchases. (Dkt. #74-2 at ¶66; Dkt. #74-1 at ¶67; Dkt. #88-2 at ¶¶ 34-37.) Any timing effect can be addressed with prejudgment interest. (Dkt. #88-2 at

[redacted]

¶39.) Price erosion, if it ever occurs, is a standard component of lost-profits damages. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*, 246 F.3d 1336, 1357 (Fed. Cir. 2001).

What remains of Dr. Eichmann's opinion is that a damages award would not be a "complete economic equivalent" because it cannot literally recreate the past. (Dkt. #74-1 at ¶¶ 148, 150.) That is true of every damages award in every case. If it were enough, irreparable harm would be established whenever a competitor enters the market, and *Illinois Tool Works* would mean nothing. *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).

Several of Plaintiffs' principal authorities were decided after infringement had been adjudicated, when the question was a permanent injunction. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1145 (Fed. Cir. 2011); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1339 (Fed. Cir. 2013); *Bio-Rad Labs. v. 10X Genomics Inc.*, 967 F.3d 1353, 1360 (Fed. Cir. 2020); *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 637 (Fed. Cir. 2015). The cases are less helpful about whether an unreleased product may be restrained before any adjudication.

**3. Plaintiffs License their Patents and Price Infringement in Dollars.**

Plaintiffs concede that a patentee's willingness to license its patents weighs against irreparable harm. (Dkt. #74 at 20 n.6.) [redacted] (Dkt. #88-4 at 77:7-25.) *See T.J. Smith & Nephew Ltd. v. Consol. Med. Equip.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (patentee's licensing of its patent weighs against irreparable harm).

Plaintiffs have also put a price on the accused conduct. DeMonico testified that Plaintiffs' position is that [redacted] (Dkt. #88-4 at 122:9-15.) [redacted] (*Id.* at 122:25-123:8.) [redacted]

[redacted] (*Id.* at 85:17-88:2.) Patentees that have licensed their technology, [redacted] for the defendants in front of the Court cannot credibly claim that money is no remedy.

**4. ARHK Demand Is Driven by Features and Sentiments Unrelated to the Asserted Patents.**

Plaintiffs cannot show a causal nexus because their own evidence shows that ARHK buyers want the product for reasons other than the patented features.

**Platform compatibility**. The FRT-RD3 fits only the 9mm MP5 family. (Dkt. #88-1 at ¶¶ 3, 7; Dkt. #74-2 at ¶56.) The ARHK is designed for 5.56- and 7.62-caliber roller-delayed rifles as well: the AP53, G3/91, HK11, HK21, HK32, and HK33. (Dkt. #88-1 at ¶¶ 5, 7.) A large share of the customer interest AS Designs has received concerns those rifles, and AS Designs expects a substantial portion of ARHK sales to come from platforms where Plaintiffs sell nothing. (*Id.* at ¶10.) Much of the ARHK's development work went to those platforms. (*Id.* at ¶11.) Plaintiffs' own evidence confirms this. They quote a customer who will wait for the ARHK because "RB's doesn't" work across calibers and "[m]y 53 is patiently standing by." (Dkt. #74-2 at ¶57.) The internal message Plaintiffs feature most prominently ties the ARHK's competitive edge to the fact that it "works in more then just 9mm" [*sic*]. (Dkt. #74-9 at ASD000041.) Dr. Eichmann agrees that broader compatibility "may affect customer choice" but does not quantify its effect. (Dkt. #74-1 at ¶44.) A sale to an HK91 or HK33 owner is not a sale Plaintiffs could ever have made.

**Trigger feel**. The ARHK is a single-stage trigger; the FRT-RD3 is two-stage. (Dkt. #88-1 at ¶¶ 3, 8; Dkt. #74-2 at ¶56.) AS Designs designed the single-stage pull because it more closely matches the OEM feel that many owners of these platforms prefer. (Dkt. #88-1 at ¶8.) Plaintiffs do not contend that their patents claim a single-stage pull.

[redacted]

**Hostility toward Plaintiffs**. Much of the "diversion" evidence Plaintiffs cite is not about the ARHK's features at all. It is about Plaintiffs. The comments Plaintiffs quote include "Holding out for ASD. I can't support the ATF's lapdog" and "I will gladly pay 2-3 times for a competitor's MP5 FRT before I give them a dime." (Dkt. #74-2 at ¶¶ 64, 100.) Plaintiffs attribute this hostility to their own enforcement campaign and their settlement with the DOJ, which long predate the ARHK. (*Id.* at ¶¶ 47, 95-98.) Rare Breed's President concedes that such a customer "is not a customer Rare Breed can win back with pricing, quality, or time." (*Id.* at ¶100.) Those customers would not buy the FRT-RD3 whether or not the ARHK exists. Their purchases are, by definition, sales lost "for reasons other than the patented feature." *Apple*, 678 F.3d at 1324.

**5. The Record Does Not Show Likely Diversion of Plaintiffs' Sales.**

**The "two-product market" is a construct**. Plaintiffs' exclusivity claim depends on defining the market as drop-in cassettes that fit inside the factory housing. (Dkt. #117 at 25.) But Plaintiffs admit that other forced-reset options for these firearms exist and compete with the FRT-RD3, including AS Designs' own replacement lowers and slip trips and third-party setups. (Dkt. #74-2 at ¶¶ 30, 34, 81.) Thus, Plaintiffs' claims that their FRT-RD3 is the only FRT for HK-pattern firearms is simply untrue. Dr. Eichmann expressly declines to treat the record as showing that no other competing configuration exists. (Dkt. #74-1 at ¶14.) And the ARHK itself is not a perfect substitute even for buyers focused on appearance: its selectors have exposed screws that the OEM parts and the FRT-RD3 lack. (Dkt. #88-1 at ¶12.)

**Seven months of ARHK promotion did not slow the FRT-RD3**. Plaintiffs claim that customers are already deferring purchases to wait for the ARHK. (Dkt. #117 at 24.) Yet during the very months the ARHK was being promoted, FRT-RD3 sales [redacted]

[redacted]. (Dkt. #74-2 at ¶63; Dkt. #117 at 27.) Plaintiffs' own exhibits show supposedly "waiting" customers buying the FRT-RD3 anyway: "Just couldn't wait on AS Designs anymore"; "a bird in the hand." (*Id*. at ¶62.)

**Rare Breed often has no inventory to divert**. Rare Breed's product pages repeatedly show the FRT-RD3 as "SOLD OUT" or "Out of stock." (Dkt. #74-1 at ¶13; Dkt. #88-2 at ¶24 (archived captures throughout 2026).) In June 2026 Rare Breed was limiting purchases to one per customer per day. (Dkt. #88-2 at ¶24.) Rare Breed [redacted] (Dkt. #88-4 at 43:1-11.) A sale Rare Breed could not have filled is not a sale the ARHK takes from it, and some of the "purchasing delay" Plaintiffs attribute to the ARHK is more plausibly explained by their own supply limits. (Dkt. #88-2 at ¶25.)

**The anecdotes cannot carry the burden**. Plaintiffs' diversion evidence consists of anonymous forum posts. Their own expert declines to treat them as "a statistically representative sample" or to derive a diversion rate from them. (Dkt. #74-1 at ¶41.) He does not know "whether those statements resulted in completed ARHK purchases" or "whether the commenters would otherwise have purchased from Rare Breed." (*Id*. at ¶50.) DeMonico himself could not say how [redacted] (Dkt. #88-4 at 200:24-204:25, 210:21-211:12.) Evidence their own expert will not rely on cannot make harm "likely." *Winter*, 555 U.S. at 22.

#### 6. The Claimed Price, Lead-Time, and Reputational Harms Are Speculative or Not Caused by the ARHK.

**Price erosion**. Plaintiffs have known about ARHK's price since at least early July. (*See* Dkt. #75-25; *see also* Dkt. #95-5 (April 2026 capture of ARHK webpage showing $549.99

[redacted] price[5]).) Plaintiffs have not lowered the FRT-RD3's price, maintain a no-discount policy, and offer no evidence they plan to change either. (Dkt. #74-2 at ¶73.) Their expert has "not calculated ARHK-specific price erosion and do[es] not assume Rare Breed will reduce its posted prices." (Dkt. #74-1 at ¶131; *see id.* at ¶78.)

The motion's claim that the FRT-RD3 generates "roughly [redacted]%" of Rare Breed's profit is an artifact of accounting between the two Plaintiffs, not a measure of harm. (*See* Dkt. #117 at 37.) Rare Breed computes its "profit" after paying a flat $[redacted] per-unit royalty to its co-Plaintiff ABC. (Dkt. #74-2 at ¶71.) The two Plaintiffs are related parties. [redacted]. (Dkt. #88-4 at 49:9-50:21.) DeMonico [redacted]. (*Id.* at 94:3-96:3.) [redacted] of the FRT-15L3's retail price. (*Id.* at 92:19-25, 97:20-98:16.) [redacted]. (*Id.* at 99:1-7, 100:20-101:19, 105:4-106:13.) The license itself permits a sliding scale from $200 to $300, which [redacted]. (*Id.* at 117:8-118:14, 120:19-121:4.) The royalty is money moving between affiliated companies and [redacted]. (*Id.* at 51:6-9, 115:24-116:1; Dkt. #88-2 at ¶49.) Measured by Plaintiffs' combined per-unit profit, which DeMonico himself identifies as the relevant loss, the picture changes. (*See* Dkt. #74-2 at ¶¶ 71-72.) At Plaintiffs' own list-price

---

[5] The Renewed Motion repeats several times that AS Designs "has since cut the price to $519.99." (Dkt. #117 at 2, 10-11, 24.) First, Defendants' Opposition to the original TRO Motion noted that the ARHK's price ranged from $520 to $550, so this is hardly off-the-presses new. (*See* Dkt. #88 at 17, 23.) Second, this is not a "cut" in price. Rather, as can be surmised from the exhibit Plaintiffs submitted on this point, the lower price is for an ARHK without an ejector lever (so that customers can use their own), while the higher price includes an ejector lever. (*See* Dkt. #118-1.)

[redacted]

figures, the [redacted] FRT-15L3 units sold in June generated about $[redacted] in combined profit ([redacted]). The [redacted] FRT-RD3 units generated no more than about $[redacted] ([redacted]). (*Id*. at ¶¶ 63, 71.) The ARHK's $65–$70 price difference is about [redacted]% of that combined profit, not the [redacted]% Dr. Eichmann reports. (Dkt. #88-2 at ¶47; *cf*. Dkt. #74-1 at ¶84.)

**Lead time**. Plaintiffs have had the FRT-RD3 on the market, without a drop-in competitor, for nine months.[6] The motion itself quotes AS Designs acknowledging Plaintiffs' "3-4 year headstart." (Dkt. #117 at 11.) Dr. Eichmann does not opine that the ARHK "would exclude Rare Breed from the market permanently or prevent Rare Breed from later recovering some market position," and does not assume any "permanent lock-in." (Dkt. #74-1 at ¶¶ 101, 106.) A temporary competitive disadvantage that the patentee can later recover from is the kind of harm damages are designed to address. (Dkt. #88-2 at ¶55.)

**Reputation**. The reputational harm Plaintiffs describe – boycotts, the "Rare Greed" epithet, and public criticism of their lawsuits – arises from Plaintiffs' own enforcement campaign and their DOJ settlement. (Dkt. #74-2 at ¶¶ 47, 95-101.) DeMonico testified that the community was "wildly supportive" of Rare Breed through the DOJ fight and "by and large" happy with the settlement, and that the hostility followed Plaintiffs' decision to enforce their patents. (Dkt. #88-4 at 230:17-231:13, 233:19-234:1.) Asked whether there would be any negative publicity had Plaintiffs never sued anyone, he answered, "I guess we'll never know." (*Id*. at 236:2-5.)

Plaintiffs' "Supplemental Evidence" further illustrates how Plaintiffs are damaging their own reputation in the community. According to the submitted social media posts, Plaintiffs induced a content creator, who received a prototype ARHK under obligations of confidentiality,

[6] Even though the FRT-RD3 has been on the market for *nine months* by now, Plaintiffs still refer to it as being in its "launch window" and "opening months." (Dkt. #117 at 16, 26, 35.) But such labels hardly apply to such a long lapse of time since February 2026.

[redacted]

to breach those obligations and send that ARHK to Plaintiffs' counsel so that it could be used against AS Designs in litigation. (*See* Dkt. #120 at 2.) Unsurprisingly, such breach of trust and "betrayal," which Plaintiffs induced, does not endear Plaintiffs to the community. (*See* Dkt. #120-2 and 120-3.) But none of it is caused by the ARHK's use of any claimed feature, and a TRO against the ARHK would not reverse any of it.

The few comments Plaintiffs cite about confusion over who "innovated" or whether the ARHK is "licensed" do not show patent harm either. (*See* Dkt. #74-2 at ¶¶ 91-92.) The products are visibly different, and the FRT-RD3 is engraved with Rare Breed's name. (Dkt. #117 at 10; *see also* Dkt. #88-1 at ¶ 12.)

**Other entrants**. Plaintiffs predict that without a TRO, other infringers will "overrun" the HK market as they did the AR-15 market. (Dkt. #117 at 30.) But by Plaintiffs' own account, the AR-15 market filled with competitors during years when Plaintiffs were allegedly barred from enforcing their patents at all. (Dkt. #74-2 at ¶13.) Plaintiffs now have more than 125 pending actions and the full range of remedies. (Dkt. #117 at 12.) Speculation about unnamed future entrants is not irreparable harm caused by these Defendants. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

**7. Any Damages Attributable to the ARHK are Collectible.**

Plaintiffs' original TRO Motion claimed that AS Designs is "[w]orth [a]bout $[redacted] [b]ut [c]ould [a]lready [o]we [m]ore [t]han $[redacted]" is not about the ARHK. (*See* Dkt. #74 at 25.) Plantiffs have since reduced the "more than $[redacted]" down to "[n]early $[redacted]." (Dkt. #117 at 30.) That figure concerns the ARC-Fire and Super Safety, the subject of Plaintiffs' separate pending PI motion. (*See id.* at 31.) It also appears to assume that every buyer of a $130–$250 ARC-Fire would otherwise have paid $450 for a Rare Breed trigger. That is the one-for-one

[redacted]

diversion assumption Plaintiffs' own expert refuses to make. (Dkt. #74-1 at ¶46.) And Dr. Eichmann offers no "new ARHK-specific solvency or collectability opinion." (*Id.* at ¶137.) In his prior declaration, he found only "material uncertainty" and "did not opine that AS Designs was insolvent or necessarily would be unable to pay." (*Id.*)

Per Plaintiffs' own brief, AS Designs is an operating, profitable company with net equity of about $[redacted] against liabilities of about $[redacted]. (Dkt. #117 at 31; *see also* Dkt. #50 at 21-23 (addressing similar collectability argument in opposition to Plaintiffs' PI Motion).) Plaintiffs' authority involved nothing like this. *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011), concerned a receivership over proceeds of a Ponzi scheme. *See id.* at 589, 597.

The ARHK itself adds to, rather than depletes, the fund from which any judgment would be paid. AS Designs expects a gross margin of about [redacted]% on the ARHK. (Dkt. #88-1 at ¶15.) Enjoining its launch would remove the very revenue Plaintiffs say they fear they cannot collect. And every ARHK sale during any restraint period would be recorded, identifying each buyer and host firearm.

### C. <u>The Balance of Harms Favors AS Designs</u>.

On this record, the comparison is lopsided. AS Designs faces a concrete, quantified loss. Plaintiffs face, at most, a modest and measurable one. The balance of harms favors denial.

#### 1. A Restraint Would Impose Immediate Harm on AS Designs.

AS Designs has spent months developing and promoting the ARHK. (Dkt. #88-1 at ¶¶ 5, 11; Dkt. #74-2 at ¶54.) Based on customer interest, AS Designs could sell as many as [redacted] units in the first month of release, at a price of about $520 to $550 and a gross margin of about [redacted]%. (Dkt. #88-1 at ¶¶ 14-15.) A TRO during that period would put up to about $[redacted] in profit at risk. (*Id.* at ¶15.)

[redacted]

The restraint Plaintiffs seek is also far broader than any harm they claim. It would bar ARHK sales to owners of 5.56 and 7.62 rifles – the AP53, G3/91, HK11, HK21, HK32, and HK33 – for which Plaintiffs sell no product at all. (Dkt. #88-1 at ¶¶ 7, 10.) AS Designs expects a substantial portion of ARHK sales to go to those platforms. (*Id.* at ¶10.) Enjoining those sales would protect no Plaintiff sale. It would simply keep a product from customers that Plaintiffs cannot serve.

**2. Plaintiffs' "Delayed Launch" Argument Contradicts their own Theory of Harm.**

Plaintiffs say the TRO would cost AS Designs nothing but "a delayed launch," because its inventory "keeps its value." (Dkt. #117 at 35-36.) That argument cannot be squared with the rest of the motion. Plaintiffs' entire irreparable-harm theory is that launch timing matters: that early sales, early customer relationships, and early market position cannot be restored later. (Dkt. #117 at 26; Dkt. #74-1 at ¶¶ 73-74, 106.) If that were true for Plaintiffs, it would be equally true for AS Designs. Plaintiffs cannot claim that a competitor's launch-period sales are irreplaceable when they are the ones losing them, but costless to delay when they are the ones asking for the delay.

The cases Plaintiffs cite for enjoining a pre-launch product do not change the analysis. (*See* Dkt. #117 at 35-36.) Every preliminary injunction against a new product "preserves the status quo" in the sense that it keeps a competitor out of the market. That characterization would favor the patentee in every case. It cannot substitute for a showing that the equities actually favor restraint on this record.

**3. AS Designs' Hardship Is Not "Self-Inflicted."**

Plaintiffs argue that AS Designs' hardship deserves no weight because AS Designs proceeded "with full knowledge of Rare Breed's patents." (Dkt. #117 at 16, 35-36.) But the principle they invoke applies to "a product *found* to infringe." *Windsurfing Int'l, Inc. v. AMF, Inc.*,

[redacted]

782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) (emphasis added). The ARHK has not been found to infringe anything. As explained in §III.A above, AS Designs disputes both infringement and validity. Plaintiffs' argument here simply begs the question. Many competitors in a patent-dense market operate with knowledge of their rivals' patents. That knowledge does not convert a good-faith dispute into a forfeiture of equitable consideration.

The internal messages Plaintiffs quote do not change this. (*See* Dkt. #117 at 10-11.) They are informal speculation, from January 2026, about what Plaintiffs might charge for a product whose price they had not yet announced. (*See* Dkt. #74-9 at ASD000041-42.) Pricing a product to compete with a rival is not misconduct; it is competition. The $[redacted] figure discussed in those messages is not the ARHK's price. And the same messages identify the ARHK's broader platform compatibility – an attribute Plaintiffs' product lacks – as its competitive advantage. (*Id.* at ASD000041.)

**4. Plaintiffs' Side of the Scale Is Light.**

On the other side, Plaintiffs' claimed harm is modest, uncertain, and compensable. *See* §III.B, supra. Their own expert will not estimate a diversion rate or assume that the announced units will sell or displace Rare Breed sales. (Dkt. #74-1 at ¶¶ 8, 46, 100.) DeMonico agreed that Rare Breed will [redacted]. (Dkt. #88-4 at 227:7-9.) The FRT-RD3 is frequently sold out, so a restraint would not transfer those sales to Plaintiffs; buyers would simply go without. (*See* Dkt. #88-2 at ¶24.) And the portion of the ARHK market that could overlap with Plaintiffs is limited to MP5-family owners who want a drop-in cassette and would buy from Plaintiffs – a group that excludes the many buyers who, by Plaintiffs' own account, will not buy from Rare Breed at any price. (Dkt. #74-2 at ¶100.) The balance of hardships therefore weighs against a restraint.

[redacted]

**D. The Public Interest Favors Denial of the Requested Injunction.**

Plaintiffs' single-page discussion of the public-interest factor is limited to the U.S. Department of Justice's Statement of Interest[7] and the fact that Rare Breed practices the asserted patents. (Dkt. #117 at 37-38.) In §I.A, the DOJ Statement reviews some of the patents asserted in this MDL. In §II, the DOJ Statement sets forth generic patent and injunction principles. In §I.B, the DOJ Statement quotes the statute on machineguns and notes the court split over whether FRTs are machineguns; it also notes a settlement between the DOJ and Rare Breed in their litigations on that question. Lastly, §III sets for the DOJ's actual statement of interest. The Statement notes (pointing to the machinegun statutes) that "[t]he ATF has an interest in limiting the sale and distribution of FRTs," while also conceding that there is a split whether FRTs *are*, in fact, machineguns.[8] (*Id*. at 4, 6.) If they are not, the ATF has no lawful interest in limiting FRTs.

The DOJ Statement then notes that, as part of settlement, "Rare Breed agreed not to design forced reset triggers for handguns. . ." (defined as "a firearm whose magazine loads into the trigger-hand grip") and notes that other manufacturers may not be bound by such limitations. (DOJ Statement at 6-7; *see also* Dkt. #75-11 at ¶¶ 7-8.) But the Renewed Motion nowhere states that the ARHK is a handgun FRT, so that argument does not apply. (*See* Dkt. #75-17 to #75-20 (showing examples of firearms for which the ARHK is designed, none of which qualifies as a handgun).)

The DOJ Statement also states that the settlement obligates Rare Breed to engage in patent enforcement. But the actual Settlement Agreement mentions *only* U.S. Patent 10,514,223 (the

---

[7] "DOJ Statement," filed as Dkt. #44 in *In re Rare Breed Triggers Patent Litig*., No. 4:26-md-03176-ALM (E.D. Tex.).

[8] The settlement between the DOJ and Rare Breed simply resolved the *litigations*, not the underlying question of whether FRTs are machineguns.

[redacted]

"'223 Patent"), even though the '784 Patent and the '247 Patent had also issued by then (as had several of the '403 Patent's parents). (*See* Dkt. #75-11 at ¶9.) And while Rare Breed has asserted the '223 Patent in several other cases in this MDL, it has not done so against AS Designs, so that aspect of the DOJ Statement is inapplicable here.

The DOJ Statement states that the ATF "has a strong interest in promoting the safe use of firearms by the public, and in this particular case, in discouraging unregulated manufacture of forced reset triggers that allegedly infringe Rare Breed's patents." (DOJ Statement at 1.) But it is unclear, from either the DOJ Statement or the actual Settlement Agreement, *how* the ATF is regulating or limiting *Rare Breed's* FRTs. The only limitation disclosed therein is the prohibition against handgun FRTs, which does not apply here (as explained above), thus rendering that interest inapplicable here. Ultimately, the DOJ "do[es] not take a position on any of the other factors for granting a preliminary injunction or on the ultimate question of whether the court should exercise its discretion to issue a preliminary injunction." (DOJ Statement at 1.) And with the other concerns specified therein being inapplicable here, the DOJ Statement does not help Plaintiffs on this factor.

In patent cases, the public-interest inquiry focuses on whether a critical public interest would be injured by granting preliminary relief. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). Where, as here, Plaintiffs have not shown irreparable harm and the accused products are sold through traceable commercial channels, the public interest does not favor preliminary market exclusion. The public also has strong interests in competition, lawful commerce, consumer choice, accurate pricing, and avoiding market exclusion based on unproven infringement allegations.

[redacted]

Plaintiffs emphasize that AS Designs would sell the ARHK at slightly lower prices than Rare Breed's FRT-RD3; but lower prices are a public benefit, not public harm. AS Designs' ARHK also offers functional and consumer-choice differences – compatibility with a wider range of firearms and a certain trigger feel – that Rare Breed's unit does not. (Dkt. #88-1 at ¶¶ 6-13.) Enjoining differentiated products before any merits adjudication would deprive consumers of those choices based on nothing more than unproven infringement allegations. The relief Plaintiffs seek would also hand Rare Breed monopoly pricing power before any adjudication: removing the only drop-in competitor would let Rare Breed set prices at its profit-maximizing level. The public interest is not served by using a TRO to maintain a monopoly with raised prices before the movant proves it is entitled to exclude anyone. Thus, the public interest favors denial of the Renewed Motion.

**E. <u>A TRO or PI Would Require a Sizeable Bond.</u>**

A court may issue a TRO or PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While a TRO or PI should not be issued in this case (as explained above), a bond ensures at least some protection for AS Designs if its conduct is wrongfully enjoined. *See Mallet & Co. v. Lacayo*, 16 F.4th 364, 390-91 (3d Cir. 2021). Because a party injured by the wrongful issuance of a TRO or PI has no action for damages, its only recourse is the bond. *Id.* at 391. Therefore, setting an appropriately high bond amount is critical to provide at least some relief for the harm to AS Designs from an improper TRO or PI (as discussed above), as "the consequences of wrongfully enjoining [AS Designs] could be dire if [this Court] were to significantly underestimate the economic impact of an injunction it issues." *Id.*; *see also Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) (when setting

[redacted]

bond, "courts should err on the high side"; an error in setting the bond too high is not serious, but setting it too low produces irreparable injury). An appropriately sized bond also "serves as a deterrent to rash applications for interlocutory orders; the bond premium and the chance of liability on it causes plaintiff to think carefully beforehand." *Mallet & Co.*, 16 F.4th at 391 (quotations omitted).

If the Court is inclined to enter any TRO, it should require Plaintiffs to post a bond of no less than $[redacted] before the TRO takes effect. If issued, a TRO could last up to 28 days. *See* Fed. R. Civ. P. 65(b)(2). AS Designs anticipates selling up to [redacted] units during its first month. (Dkt. #88-1 at ¶14.) Priced at $520-$550, with a [redacted]% expected gross profit margin, AS Designs risks losing $[redacted] of profit if the TRO were granted, not even considering other aspects such as dealer and wholesale disruption, employee and supplier harm, and loss of goodwill. (*See id.* at ¶15.) Because the bond may be AS Designs' only meaningful recourse if the TRO is later found wrongful, security of at least $[redacted] is warranted.[9]

## IV. CONCLUSION

Plaintiffs waited seven months after the ARHK was announced, and until after the launch window they now call imminent, to seek "emergency" relief. But their asserted patents have serious invalidity issues and do not clearly encompass the ARHK anyway. Their own economist concedes that any harm can be measured; their own witness testified that they have licensed the asserted patents and have a per-unit settlement price in mind for every defendant; and their own evidence shows that customers want the ARHK for platforms, features, and reasons that have nothing to do with the asserted claims. On the other side of the scale, a restraint would cost AS

---

[9] If the Court is inclined to enter a preliminary injunction, the bond should be increased.

[redacted]

Designs up to $[redacted] in first-month profit and would bar sales to owners of 5.56- and 7.62-caliber rifles for which Plaintiffs sell no product at all.

Plaintiffs have not clearly carried their burden on any of the four factors, let alone all of them. Defendants respectfully request that the Court deny the Renewed Motion. If the Court is nonetheless inclined to enter any restraint, Defendants request that (1) it be conditioned on Plaintiffs first posting security of no less than $[redacted] under Rule 65(c); and (2) it be limited to the period permitted by Rule 65(b)(2), rather than being open-ended until a preliminary injunction hearing can be held (Dkt. #117 at 2).

Respectfully submitted,

Dated: November 5, 2026

EMERSON, THOMSON & BENNETT, LLC
*/s/ Sergey Vernyuk*
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile
*Attorneys for Defendants AS Designs, LLC, Matthew S. Karlovic, and Calvin Olson*

[redacted]

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Opposition is being served on November 5, 2026, on Plaintiffs' counsel via electronic mail:

Benjamin Christoff
christoff@fr.com

Carl E. Bruce
bruce@fr.com

Glenn D. Bellamy
gbellamy@whe-law.com

Matthew Alan Colvin
colvin@fr.com

Melissa R. Smith
melissa@gillamsmithlaw.com

*/s/ Sergey Vernyuk*
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile

## LOCAL RULE CV-5(a)(7)(B) CERTIFICATION

Pursuant to L.R. CV-5(a)(7)(B), I certify the Court has granted authorization to seal the information contained in this document by entry of the Protective Order in *In re Rare Breed Triggers Patent Litig.*, No. 4:26-md-03176-ALM, Dkt. #90 (§XIV).

*/s/ Sergey Vernyuk*
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile