**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | 4:26-md-03176-ALM<br>MDL 3176 |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AS DESIGNS, LLC, MATTHEW S. KARLOVIC, CALVIN OLSON and JOHN DOE, an individual using the alias "s3igu2" and/or "Seagoo Threetwo,"<br><br>Defendants. | Civil Action No. 4:26-cv-00370-ALM<br>**JURY TRIAL DEMANDED** |

**DECLARATION OF DR. JOSHUA C. HARRISON, PH.D., J.D. REGARDING PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST THE ARHK**

## I. INTRODUCTION AND QUALIFICATIONS

1. I, Joshua C. Harrison, submit this declaration at the request of counsel for Plaintiffs Rare Breed Triggers, Inc. and ABC IP, LLC. I submit it to clarify certain factual questions relevant to Plaintiffs' reply in support of their Motion for Temporary Restraining Order and Preliminary Injunction Against the ARHK, and in response to the Declaration of Dr. Stephen A. Batzer dated November 4, 2026 (the "Batzer ARHK Declaration"), submitted with Defendants' opposition to that motion.

2. My firearms training and education include 23 years of service in the reserve forces of the United States military, from which I was honorably discharged. That military training and experience includes service as an enlisted member of the United States Marine Corps light infantry, and as a commissioned officer in the United States Army Reserve. Throughout my military service I received periodic training and achieved proficiency with various weapons, including pistols, rifles, grenades, machine guns, mortars, artillery, supporting systems, and their safe handling and effective tactical employment. The primary duty rifles that I trained with and used throughout my military service pertained to the AR rifle subclass of semiautomatic firearms.

3. I have more than 40 years of experience as a firearms user, owner, hobbyist, and enthusiast, during which time I routinely practiced the effective and safe operation, assembly, disassembly, and proper maintenance of a wide variety of firearms, firearms components, and accessories, and I have substantial experience as a successful competitor in shooting sports, such as in competitions sanctioned by the Practical Shooting Association of America. I am also a California licensed hunter, and have been continuously licensed to carry a concealed handgun in the State of California since 2014.

4. I am presently certified by the National Rifle Association as a pistol instructor and as a range safety officer. I was formerly certified by the California Dept. of Justice as a firearms safety instructor. I am also a certified Glock pistol armorer.

5. I earned the Bachelor of Science degree in mechanical engineering from the University of Southern California, graduating in 1987. I earned Masters of Science and the Ph.D. degrees in mechanical engineering from the University of California, San Diego, graduating in 1989 and 1992, respectively.

6. I worked as a professional mechanical engineer in industry, including salaried full-time engineering employment at IBM Corporation, Applied Magnetics Corporation, and Seagate Technology, Inc. Those companies manufactured millions of disk drive information storage devices, and my engineering contributions were made in consideration of their practical and profitable manufacturability using the manufacturing tools and processes available at the manufacturing facilities operated by those companies.

7. My professional engineering experience also includes full-time employment as a tenurable lecturer of mechanical engineering at the Dept. of Mechanical Engineering of the University of Queensland (an academic staff rank in Australia equivalent to Assistant Professor in the USA). There I lectured on mechanical engineering subjects, supervised postgraduate students and research, and upgraded existing laboratory facilities. I taught Mechanical Engineering courses in Engineering Dynamics, Applied Dynamics, and Elements of Machines. In connection with my work as an engineering professional, I have authored more than twenty peer-reviewed scientific publications in engineering journals or conference proceedings, and have been named as an inventor on more than ten U.S. patents.

8. I am or have been a member of several industry and professional organizations, including the Institution of Engineers in Australia and the American Society of Mechanical Engineers.

9. I earned the Juris Doctor degree in law from Stanford Law School in 2002, and was thereafter admitted to practice before the United States Patent & Trademark Office as a patent attorney. Throughout my 20 years of experience as a practicing patent attorney, I have routinely worked with mechanical and manufacturing engineers and other technical inventors to understand new or accused technologies and inventive mechanical devices, how those work, and how their new engineering advancements differ from the existing technical state of the art. Such continuing engineering study and understanding is necessary for a patent attorney to communicate relevant engineering concepts and distinctions during patent litigation, or to prepare and prosecute patent applications for the inventors of new mechanical technologies.

10. I have been retained by Plaintiffs ABC IP, LLC and Rare Breed Triggers, Inc. (“Plaintiffs”) in connection with this matter. I am compensated at my ordinary hourly rate. My compensation does not depend on the outcome of this matter or on the substance of my opinions.

## II. SCOPE OF WORK

11. Counsel has asked me to evaluate the validity of the asserted claims of U.S. Patent Nos. 12,031,784, 12,038,247, 12,578,159, and 12,636,403 in light of the invalidity contentions set forth in the Batzer ARHK Declaration and in the earlier declarations and exhibits that it incorporates by reference. I understand from counsel that the asserted claims are claims 1 and 4 of the ’784 patent, claim 15 of the ’247 patent, claims 1, 3, 6, 7, 9 through 11, and 14 through 17 of the ’159 patent, and claims 14, 15, 17, 29, 30, 32, 38, and 39 of the ’403 patent.

12. I previously submitted a declaration in this action dated August 6, 2026 (Dkt. 64), responding to Dr. Batzer’s declaration of July 9, 2026 (Dkt. 51), in connection with Plaintiffs’

motion for a preliminary injunction against other AS Designs products. That declaration addressed the '784, '247, and '159 patents, as well as U.S. Patent No. 12,529,538, which I understand is not asserted against the ARHK. This declaration restates the opinions from my August 6, 2026 declaration that address the '784, '247, and '159 patents, and adds my opinions regarding the '403 patent, which was not at issue in my earlier declaration.

13. I have not been asked to form an opinion on infringement, and I express none. I have likewise not been asked to form an opinion on the inventorship of any asserted patent, and I express none. Where I identify a limitation that a reference does not disclose, my identification is exemplary and is not an exhaustive statement of the limitations that the reference fails to supply. I reserve the right to supplement or revise these opinions as set forth below.

## III. MATERIALS DISCLOSED

14. In forming the opinions set forth in this declaration, I have reviewed the following materials: the asserted patents and their file histories, including the Certificate of Correction for the '403 patent issued August 18, 2026; the Batzer ARHK Declaration; Dr. Batzer's declaration of July 9, 2026 (Dkt. 51) and Exhibits 1 through 20 thereto (cited herein as "Batzer Decl."); Sections V.E and VIII of, and Exhibits 22 through 25 to, Dr. Batzer's declaration executed August 17, 2026 and filed in *ABC IP, LLC v. Z3 Prods.*, No. 4:26-cv-00367-ALM (E.D. Tex.), Dkt. 72 (the "Consolidated Batzer Declaration"); Defendants' opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction Against the ARHK; that motion and the declarations submitted in support of it; and each of the prior art references addressed below, namely U.S. Patent No. 10,514,223 (Rounds), U.S. Patent No. 7,398,723 (Blakley '723), U.S. Patent No. 3,045,555 (Stoner), U.S. Patent No. 9,146,067 (Stakes), U.S. Patent No. 4,023,465 (Inskip), U.S. Patent Application Publication No. 2014/0338523 (Daley), U.S. Patent No. 10,337,818 (Sampson), and U.S. Patent No. 9,952,013 (Fellows). As to the Tommy Triggers

FRT-15-3MD, I have reviewed the Complaint in *Rare Breed Triggers, LLC v. Strbac*, No. 1:22-cv-00280 (N.D. Ohio), and U.S. Provisional Application No. 63/297,884.

## IV. RELEVANT LEGAL PRINCIPLES AND GUIDELINES

15. I have applied the following general principles of patent law, on which I have been advised, in formulating my opinions in this declaration.

### A. Legal Standard on Claim Construction

16. I understand that, absent an explicit construction by the Court, the words of a patent claim are given the ordinary and customary meaning that a person of ordinary skill in the art would have ascribed to them at the time of the invention, read in light of the patent as a whole.

17. I further understand that a claim term must be construed the same way for all purposes — the same understanding of a claim limitation must be applied both in comparing the claim to an accused product and in comparing the claim to the prior art.

### B. Principles Applicable to Patent Validity

18. I understand that a patent is presumed valid, and that a claim can be shown invalid only by clear and convincing evidence — for example, that it lacks novelty or utility, is not adequately described or enabled, or would have been obvious in light of the prior art.

#### 1. Legal Standard for Prior Art

19. I understand that a patent or other publication must first qualify as prior art before it can be found to invalidate a patent claim.

20. I understand that a published U.S. or foreign patent application or patent, or another publication such as a magazine or trade-journal article, qualifies as prior art if it published or issued before the priority date.

21. I understand that a U.S. patent application qualifies as prior art as of its U.S. filing date, even if it did not publish or issue until after the priority date.

### 2. Legal Standard for Anticipation

22. I understand that a claim is invalid for lack of "novelty," or "anticipation," under § 102 if a single prior art reference discloses every limitation of the claim, either expressly or inherently, within its "four corners." I understand that a claim is anticipated if the claimed invention was known or used by others in the United States, or was patented or described in a printed publication in the United States or a foreign country, before the priority date.

23. I understand that a dependent claim incorporates all limitations of the claim or claims from which it depends, and that anticipating a dependent claim requires every one of those limitations — including the limitations of the claim it depends from — to be disclosed in a single prior art reference.

### 3. Legal Standard for Obviousness

24. I understand that a claim is invalid as obvious under § 103 if the claimed subject matter as a whole would have been obvious, at the time of the invention, to a person of ordinary skill in the art, in light of the prior art. I understand that this must be shown by clear and convincing evidence.

25. I understand that the obviousness inquiry considers the scope and content of the prior art, the differences between the prior art and the claims, the level of ordinary skill in the art, and any objective indicia of nonobviousness ("secondary considerations").

26. I understand that a claimed invention may be found obvious if it results from: (a) combining known elements by known methods to yield a predictable result; (b) simple substitution of one known element for another to obtain a predictable result; (c) use of a known technique to improve a similar device or method in the same way; (d) applying a known

technique to a known device or method ready for improvement, to yield a predictable result; (e) choosing from a finite number of identified, predictable solutions with a reasonable expectation of success (i.e., the solution was "obvious to try"); (f) known work in one field prompting variations for use in the same or a different field, where such variations were predictable; or (g) a teaching, suggestion, or motivation in the prior art to modify or combine references to arrive at the claimed invention.

27. I understand that an invention may be found obvious if the prior art suggested it to a person of ordinary skill, who would have had a reasonable expectation that it would work to accomplish its intended purpose. I understand that the party challenging validity must prove that reasonable expectation of success by clear and convincing evidence, and that an absence of evidence about the difficulty of making the combination does not, by itself, satisfy that burden.

28. I further understand that the obviousness analysis must avoid hindsight — the claimed invention itself cannot be used as a template for selecting and combining prior art references — must rest on articulated reasoning with a rational basis rather than conclusory assertions, and is undercut by evidence that a prior art reference teaches away from the proposed combination.

29. I further understand that a reason to combine known elements may come from a problem known in the field, an obvious use of familiar elements beyond their primary purpose, or a design need or market pressure to solve a problem — and that a predictable variation that common sense would suggest to a person of ordinary skill may be considered obvious.

30. I further understand that objective indicia of nonobviousness, or "secondary considerations" — such as long-felt need, commercial success, failure of others, copying, praise, initial skepticism, and unexpected results — must be considered when present in the record.

31. I understand that secondary-considerations evidence is entitled to weight only if the patent owner shows a nexus between that evidence and the claimed features.

32. I understand that objective indicia of nonobviousness must be weighed together with the prior art evidence, not as an afterthought, and can be sufficient to overcome a case that might otherwise appear obvious based on the prior art alone. However, I also understand that weak or unsupported secondary-considerations evidence will not overcome a strong showing of obviousness.

## V. OVERVIEW OF THE ASSERTED PATENTS

### A. DeMonico ’784

#### 1. Bibliographic Information

33. U.S. Patent No. 12,031,784 B1 (the “’784 patent”), titled “Adapted Forced Reset Trigger,” issued on July 9, 2024. The named inventor is Lawrence DeMonico of Austin, Texas, and the patent is assigned on its face to ABC IP, LLC of Dover, Delaware. The application that matured into the ’784 patent was filed November 4, 2022, as Application No. 18/052,606. The ’784 patent claims priority to U.S. Provisional Patent Application No. 63/276,090, filed November 5, 2021.




**’784 Patent at Fig. 1**

### 2. The State of the Art Described in the Specification

34. The specification frames its starting point as the forced reset semiautomatic trigger described in U.S. Patent No. 10,514,223. (1:15–18.) The ’784 patent states that the ’223 patent is “incorporated herein in its entirety by this reference” and that the ’223 patent’s “structure and function are fully described therein.” (1:15–19.) The specification characterizes the embodiment illustrated in the ’223 patent as particularly adapted for use in an AR15-pattern firearm. (1:19–20.)

35. The specification then describes the AR10 firearm pattern as similar in design, concept, and function to the AR15, but firing the larger 7.62 mm NATO (.308 Winchester) caliber cartridge, with some dimensional specifications said to be less standardized. (1:21–24.)

The specification states that the larger caliber requires certain parts to be scaled differently from the AR15 pattern, resulting in a different profile of the bolt carrier body and different spacing relative to the lower receiver and trigger mechanism. (1:24–28.) In particular, the specification states that the rear or tail portion of the AR10-pattern bolt carrier is positioned vertically further from the lower receiver and trigger assembly parts, while a forward portion of the AR10-pattern bolt carrier is situated lower. (1:28–32.)

### 3. The Problem Identified in the Specification

36. The ’784 patent addresses the difficulty of adapting the ’223 patent’s forced reset trigger to an AR10-pattern firearm. (1:33–40.) The specification states that the ’223 embodiment could be installed in an AR10-pattern lower receiver—because the assembly/pivot pin locations are substantially the same—but that it would not be operable, because the upward extension of the locking member (bar) would be too short to be contacted and actuated, to release the trigger member, by the rear or tail portion of the bolt carrier as it reaches the in-battery position. (1:33–40.) The specification further states that if the upward length or height of the locking member were instead extended sufficiently to be actuated, it would then interfere with a lower surface of a forward portion of the bolt carrier as it cycles rearward, again making the device inoperable. (1:40–44.)

### 4. The Solution Described in the Specification

37. The ’784 patent describes a solution, in at least one characterization, as providing a deflectable extension of the locking member that is actuated by forward movement of the bolt carrier, but that deflects or folds to avoid interfering contact with the forward portion of the bolt carrier as the bolt carrier cycles to the rear. (1:48–52.) The specification states that the trigger member locking device has a locking member movable between a first position in which it locks the trigger member against pulling movement and a second position in which it does not restrict

movement of the trigger member, the locking member being movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier. (1:53–61.) The specification states that, according to an aspect of the invention, the locking member has a body portion that is movably supported and an upward extension portion that is separately movable relative to the body portion between an extended position and a deflected position. (1:61–65.)

38. The specification describes two example embodiments having a "one-way hinge" feature that causes the locking member to pivot in one direction when actuated by a rear portion of the bolt carrier as it returns to the in-battery position, and to give way—deflect or fold—without pivoting the remainder of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear. (1:66–2:5.)

**5. Overview of Operation**

39. At a general level, the '784 patent describes a forced reset trigger assembly in which, as described in the incorporated '223 patent, the locking member 12 locks the trigger member 14 and prevents it from being pulled any time the bolt carrier assembly 16 is not in the substantially in-battery position. (3:10–13.) The locking member 12 of the '784 patent additionally includes a deflectable portion that moves to allow passage of the forward portion of the bolt carrier 16 as it cycles to the rear, which the specification states can include a hinging structure. (3:24–27.)

40. The specification describes the locking member as functioning such that force applied to the foldable extension from a rearward direction toward the front causes the entire locking member to pivot on its pivot pin relative to the housing, releasing the trigger member, whereas rearward force applied to the foldable extension from the front toward the rear causes the foldable extension to fold on a separate pivot pin and allow the bolt carrier to pass without

causing pivotal movement of the locking member body or affecting its locking of the trigger member. (3:53–60; 4:26–31.) The specification characterizes this as allowing the locking member to be of sufficient upward extension length to be engaged by the bolt carrier at the in-battery position while allowing rearward reciprocation of the bolt carrier without causing damage to the locking member or inducing an interference malfunction. (4:31–37.)

### B. Blakley ’247/’159

#### 1. Bibliographic Information

41. U.S. Patent Nos. 12,038,247 B2 (the “’247 patent”) and 12,578,159 (the “’159 patent”) are titled “Firearm Trigger Mechanism.” The ’247 patent issued on July 16, 2024. (Cover.[1]) The ’159 patent issued on March 17, 2026. (’159 Cover.) The named inventor is Brian A. Blakley of Pinellas Park, Florida, and the patent is assigned on its face to ABC IP, LLC of Dover, Delaware. The ’247 and ’159 patents claim priority to U.S. Provisional Patent Application No. 63/374,941, filed September 8, 2022.

[1] The ’159 patent continues from the ’247 patent and shares a common specification. For brevity, citations are to the ’247 patent. Each citation has an equivalent in the ’159 patent.




FIG. 1

**’247 Patent at Fig. 1**

### 2. The State of the Art Described in the Specification

42. The specification describes the operation of a conventional semiautomatic firearm trigger as background. According to the specification, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered cartridge, and part of the propellant force is used to cycle the action—extracting and ejecting the spent cartridge and chambering a fresh one—through longitudinal reciprocation of a bolt and/or carrier that also resets the hammer or striker. (1:19–25.) The specification describes the conventional semiautomatic trigger mechanism as including a disconnector that holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. (1:26–28.) The patent characterizes this arrangement as allowing the firearm to be fired only a single time when the trigger is pulled and held, because the user cannot typically release the trigger rapidly enough for the sear to re-engage before the

bolt or bolt carrier returns to its in-battery position. (1:29–33.) The patent further characterizes the disconnector as preventing the hammer or striker from "following" the bolt back to battery without firing a second round but leaving the hammer or striker uncocked. (1:33–37.)

43. The specification also describes "bump firing" as a prior approach to increasing the rate of semiautomatic fire, which the patent states uses the firearm's recoil to fire shots in rapid succession by bracing the rifle with the non-trigger hand, loosening the trigger-hand grip while keeping the trigger finger stationary, and pushing the rifle forward to apply pressure to the trigger after each recoil-driven movement of the rifle. (1:40–55.)

### 3. The Problem Identified in the Specification

44. The '247 and '159 patents describe a desire, shared among at least some shooters, to increase the rate of semiautomatic fire, while maintaining the semiautomatic action of a single shot per trigger pull. (1:29–33; 1:38–40.) Against the backdrop of the prior forced reset and cam-based devices discussed below, the specification states broadly that "[f]urther improvement in forced reset triggers is desired." (2:14.) The specification additionally identifies a more specific shortcoming in at least one category of prior art: an inability to adapt certain forced reset designs to an AR-pattern firearm without requiring modification not only of the fire control mechanism but also of the bolt carrier. (1:61–63.)

### 4. Prior Attempts to Solve the Problem Described in the Specification

45. The specification discusses, among other things, several specific prior devices that attempted to address the rate-of-fire problem. The specification treats these references in two distinct ways: it discusses certain references as background, and it expressly incorporates several references by reference "as if fully set forth in [their/its] entirety," as noted below.

46. **Forced reset trigger mechanisms of the Graves patents.** The specification identifies U.S. Patent Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves,

which the patent characterizes as forcefully resetting the trigger through rigid mechanical contact between the trigger member and the bolt as the action cycles. (1:56–61.) The ’247 patent states that adapting the Graves approach to an AR-pattern firearm would require not only a modified fire control mechanism but also a modified bolt carrier. (1:61–63.) The specification does not state that it incorporates the Graves patents by reference. (1:56–63.)

47. **The Rounds forced reset devices, including the ’223 patent, and the ’003 application**. The specification identifies U.S. Patent Nos. 10,514,223 and 11,346,627, and U.S. Patent Application Ser. No. 18/048,572, filed October 21, 2022, and states that these are “hereby incorporated by reference herein as if fully set forth in their entirety.” (1:67–2:1.) The patent characterizes these devices as ones in which the hammer forces the trigger to the set position and a locking bar prevents early hammer release. (2:1–3.) The reference at U.S. Patent No. 10,514,223 is the ’223 patent addressed in the companion overview, and Application Ser. No. 18/048,572 is the application that matured into the ’003 patent addressed in the companion overview.

48. **The Blakley ’723 patent**. The specification identifies U.S. Patent No. 7,398,723, issued July 15, 2008, to Brian A. Blakley, and states that it is “hereby incorporated by reference herein as if fully set forth in its entirety.” (2:4–7.) The patent characterizes that device as having a pivoting cam contacted by the rearwardly traveling bolt carrier such that the bottom surface of the cam presses downward on a trigger extension, forcing the rear of the trigger down and moving forward the surface of the trigger that the operator’s finger engages. (2:9–13.) After describing these devices, the specification states that “[f]urther improvement in forced reset triggers is desired.” (2:14.)

### 5. The Solution Described in the Specification

49. The specification describes its solution, in at least one characterization, as a semiautomatic trigger mechanism for increasing the rate of fire that can be retrofitted into popular existing firearm platforms, including AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. (2:18–23.) The specification characterizes embodiments of the invention as particularly adaptable for construction as a “drop-in” replacement trigger module requiring only the insertion of two assembly pins and the safety selector. (2:23–26.) The specification states that, advantageously, the invention provides a “three position” trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions. (2:26–29.)

50. As to the operative mechanism, the specification describes a hammer, a trigger member, a disconnector, a cam, and a three-position safety selector. (Abstract; 2:30–2:56.) The specification states that, in the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer and pivoting of the cam from a first position to a second position such that the cam lobe forces the trigger member toward the set position, but prior to reaching the set position the disconnector hook catches the hammer hook, requiring the user to manually release the trigger member before the next shot. (Abstract; 2:56–67.) The specification states that, in the forced reset semi-automatic position, the safety selector prevents the disconnector hook from catching the hammer hook, such that the cam lobe forces the trigger member to the set position and—after the bolt carrier returns and the cam pivots back to the first position—the user can pull the trigger member to fire again without manually releasing it. (Abstract; 2:67–3:10.)

51. These characterizations are presented as among the features the patent attributes to its embodiments and should not be read as an exhaustive statement of the points on which the '247 patent distinguishes over the prior art.

**6. Overview of Operation**

52. At a general level, the specification describes a trigger mechanism for an AR-pattern firearm having a receiver with a fire control mechanism pocket and a reciprocating bolt carrier. (Abstract; 2:30–33.) The mechanism includes at least a hammer, a trigger member, a disconnector, a cam, and a three-position safety selector. (Abstract.)

53. The hammer has a sear catch and a hook for engaging the disconnector, and is mounted to pivot on a transverse hammer axis between set and released positions, the hammer being pivoted rearward by rearward movement of the bolt carrier. (2:36–40.) The trigger member has a sear and is mounted to pivot on a transverse trigger member axis between set and released positions, the sear and sear catch being engaged in the set positions and disengaged in the released positions. (2:40–45.) The disconnector has a hook for engaging the hammer and is mounted to pivot on the transverse trigger member axis. (2:46–49.) The cam has a cam lobe and is mounted to pivot on a transverse cam axis, movable between a first position in which the cam lobe does not force the trigger member toward the set position and a second position in which it does. (2:49–53.) The safety selector pivots between safe, standard semi-automatic, and forced reset semi-automatic positions. (2:53–56.)

54. The net effect, as the specification describes it, is a selectable mechanism: in the standard semi-automatic mode the disconnector catches the hammer and a manual trigger release is required between shots, whereas in the forced reset mode the disconnector is disabled by the safety selector, the cam lobe forces the trigger to reset, and—once the bolt carrier returns to battery and the cam pivots back to its first position—the user may fire again without first

manually releasing the trigger, which the patent characterizes as precluding hammer follow while permitting a higher rate of semi-automatic fire. (2:56–3:10; 8:43–65.)

### C. Strbac '403

#### 1. Bibliographic Information

55. U.S. Patent No. 12,636,403 (the "'403 patent") is entitled "Firearm Trigger Mechanism" and issued on May 26, 2026. (Cover.) The named inventor is Mladen Thomas Strbac of Cleveland, Ohio, and the patent is assigned on its face to ABC IP, LLC of Dover, Delaware. (Cover.) The '403 Patent claims priority to U.S. Provisional Patent Application No. 63/297,884, filed January 10, 2022, such that the earliest filing date associated with the patent is at least January 10, 2022. (Cover; 1:5–14.)




FIG. 1

**'403 Patent at Fig. 1**

#### 2. The State of the Art Described in the Specification

56. The specification describes the operation of a conventional semiautomatic firearm trigger as background. According to the '403 Patent, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered cartridge, and part of the propellant force is used to cycle the action—extracting and ejecting the spent cartridge and chambering a fresh one—through longitudinal reciprocation of a bolt and/or carrier that also resets the hammer or striker. (1:25–31.) The specification describes that the conventional semiautomatic trigger mechanism includes a disconnector that holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. (1:32–34.) The patent characterizes this arrangement as allowing the firearm to be fired only a single time when the trigger is pulled and held, because the user cannot typically release the trigger rapidly enough for the sear to re-engage before the bolt or bolt carrier returns to its in-battery position. (1:35–39.) The patent further characterizes the disconnector as preventing the hammer or striker from "following" the bolt back to battery without firing a second round but leaving the hammer or striker uncocked. (1:39–43.)

57. The specification also describes "bump firing" as a prior approach to increasing the rate of semiautomatic fire, which the patent states uses the firearm's recoil to fire shots in rapid succession by bracing the rifle, loosening the trigger-hand grip while keeping the trigger finger stationary, and pushing the rifle forward to apply pressure to the trigger. (1:48–61.)

**3. The Problem Identified in the Specification**

58. The '403 Patent describes a desire, shared among at least some shooters, to increase the rate of semiautomatic fire, while the disconnector-based design of a standard trigger inherently limits that rate to a single shot per trigger pull. (1:39–46.) Against the backdrop of the prior forced reset and cam-based devices discussed below, the specification states broadly that "[f]urther improvement in forced reset triggers is desired." (2:27.) The specification additionally

identifies a more specific shortcoming in at least one category of prior art: an inability to adapt certain forced reset designs to an AR-pattern firearm without requiring modification not only of the fire control mechanism but also of the bolt carrier. (1:67–2:2.)

**4. Prior Attempts to Solve the Problem Described in the Specification**

59. The specification discusses, among other things, several specific prior devices that attempted to address the rate-of-fire problem. The '403 Patent treats these references in two distinct ways: it discusses certain references as background, and it expressly incorporates three references by reference "as if fully set forth in [their/its] entirety," as noted below.

60. Forced reset trigger mechanisms of the Graves patents. The specification identifies U.S. Patent Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves, which the patent characterizes as forcefully resetting the trigger through rigid mechanical contact between the trigger member and the bolt as the action cycles. (1:62–67.) The specification states that adapting the Graves approach to an AR-pattern firearm would require not only a modified fire control mechanism but also a modified bolt carrier. (1:67–2:2.)

61. The Rounds patents, including the '223 patent. The specification identifies U.S. Patent Nos. 10,514,223 and 11,346,627, and states that these are "hereby incorporated by reference herein as if fully set forth in their entirety." (2:3–6.) The specification characterizes these as devices in which the hammer forces the trigger to the set position and a locking bar prevents early hammer release. (2:6–2:8.) The reference at U.S. Patent No. 10,514,223 is the same '223 patent addressed elsewhere in this declaration.

62. The Blakley '723 patent. The specification identifies U.S. Patent No. 7,398,723, issued to Brian A. Blakley, and states that it is "hereby incorporated by reference herein as if fully set forth in its entirety." (2:9–12.) The patent characterizes this device as having a pivoting cam contacted by the rearwardly traveling bolt carrier such that the bottom surface of the cam

presses downward on a trigger extension, forcing the rear of the trigger down and moving forward the surface of the trigger that the operator's finger engages. (2:12–18.)

63. The Blakley '941 provisional application. The specification identifies U.S. Provisional Patent Application No. 63/374,941, filed September 8, 2022, also invented by Brian A. Blakley, and states that it is "hereby incorporated by reference herein as if fully set forth in its entirety." (2:18–23.) The patent characterizes this device as a pivoting-cam arrangement that incorporates a three-position safety selector and associated structure to provide safe, standard semi-automatic, and forced reset semi-automatic modes. (2:23–26.) After describing these devices, the specification states that "[f]urther improvement in forced reset triggers is desired." (2:27.)

### 5. The Solution Described in the Specification

64. The '403 Patent describes a solution, in at least one characterization, as a semiautomatic trigger mechanism for increasing the rate of fire that can be retrofitted into popular existing firearm platforms, including AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. (2:31–36.) The specification characterizes the invention as particularly adaptable for construction as a "drop-in" replacement trigger module requiring only the insertion of two assembly pins and the safety selector. (2:36–39.) The specification states that, advantageously, the invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions. (2:39–42.)

65. As to the operative mechanism, the specification describes a hammer, a trigger member, a disconnector, a locking member, and a three-position safety selector. (Abstract.) The specification states that, in the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time the user must manually release the trigger member to free the

hammer from the disconnector before the hammer and trigger member can pivot to the set positions for the next shot. (Abstract; 3:10–17.) The specification states that, in the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer that forces the trigger member to the set position, the safety selector prevents the disconnector hook from catching the hammer hook, and thereafter—once the bolt carrier reaches the substantially in-battery position—the user can pull the trigger member to fire again without manually releasing it. (Abstract; 3:17–25.)

**6. Overview of Operation**

66. At a general level, the ’403 Patent describes a trigger mechanism for an AR-pattern firearm having a receiver with a fire control mechanism pocket and a reciprocating bolt carrier. (Abstract; 7:49–51.) The mechanism includes at least a hammer, a trigger member, a disconnector, a locking member, and a three-position safety selector. (Abstract.)

67. The hammer has a sear catch and a hook for engaging the disconnector, and is mounted to pivot on a transverse hammer pivot axis between set and released positions, the hammer being pivoted rearward by rearward movement of the bolt carrier. (Abstract.) The trigger member has a sear and is mounted to pivot on a transverse trigger member pivot axis between set and released positions, with a surface positioned to be contacted by the hammer during rearward pivoting so as to force the trigger member to the set position; the sear and sear catch are engaged in the set positions and disengaged in the released positions. (Abstract.) The disconnector has a hook for engaging the hammer and is mounted to pivot on the transverse trigger member pivot axis. (Abstract.) The locking member is mounted to pivot on a transverse locking member pivot axis and is movable between a first position blocking the trigger member from the released position and a second position permitting it; the locking member is spring biased toward the first position and moved against that bias to the second position by contact from the bolt carrier as the

carrier nears in-battery position. (Abstract.) The safety selector pivots between safe, standard semi-automatic, and forced reset semi-automatic positions. (Abstract.)

68. The net effect, as the specification describes it, is a selectable mechanism: in the standard semi-automatic mode the disconnector catches the hammer and a manual trigger release is required between shots, whereas in the forced reset mode the disconnector is disabled, the hammer forces the trigger to reset, and the locking member holds the trigger until the bolt returns substantially to battery—thereby precluding "hammer follow" while permitting a higher rate of semi-automatic fire. (Abstract; 10:32–47.)

## VI. OPINIONS ON THE ASSERTED PRIOR ART

69. In the sections that follow I address each reference Dr. Batzer relies upon. For each, I first set out its bibliographic information and describe the mechanism it discloses and how that mechanism operates, and I then identify exemplary limitations of the asserted claims that the reference does not disclose. Those identifications are exemplary, and are not an exhaustive statement of the limitations that each reference fails to supply. I address Dr. Batzer's contentions regarding combinations of these references separately, in the section below titled "Response to Dr. Batzer's Invalidity Arguments."

### A. Rounds '223

#### 1. Bibliographic Information

70. U.S. Patent No. 10,514,223 B1 (the "'223 patent"), titled "Firearm Trigger Mechanism," issued on December 24, 2019. The named inventor is Jeffrey Cooper Rounds of Buda, Texas, and the patent is assigned on its face to Wolf Tactical LLC, also of Buda, Texas. The application that matured into the '223 patent was filed September 27, 2018, as Application No. 16/143,624. The '223 patent claims priority to U.S. Provisional Patent Application No. 62/565,247, filed September 29, 2017, such that the earliest filing date associated with the patent

is at least September 29, 2017. The patent issued with seven claims, of which at least claims 1 and 4 are independent. (6:56–7:25.)




FIG. 1

**’223 Patent at Fig. 1**

**2. Overview of Operation**

71. At a general level, the ’223 patent describes a trigger mechanism for a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the sidewalls of that pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. (Abstract.) The mechanism includes at least a hammer, a trigger member, and a locking bar. (Abstract.)

72. The hammer has a sear notch (described in the detailed description as a sear catch) and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. (Abstract.) The trigger member has a sear and is mounted in the pocket to pivot on a transverse trigger pin between set and released positions, and has a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of

the bolt carrier, such that the contact forces the trigger member to the set position. (Abstract.) The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the released position; it is movable against that spring bias to a second position when contacted by the bolt carrier as the carrier reaches a substantially in-battery position, at which point the trigger member can be moved by an external force to the released position. (Abstract.)

73. The net effect, as the specification describes it, is that the trigger is forcibly reset by the hammer during the rearward stroke of the bolt carrier, then held in that reset position by the locking bar until the bolt carrier returns substantially to battery, at which point the locking bar is displaced and the trigger may be pulled again by external force. (5:23–67; 6:1–12.) The specification states that this allows the highest possible standard rate of fire for the semiautomatic action without risk of hammer follow. (6:10–12.)

### 3. Exemplary Elements of the ’784 Patent Not Disclosed by Rounds

74. Claim 1 of the ’784 patent, its only independent claim, requires a locking member “having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position.” (’784 Patent, cl. 1.) Claim 3 requires that the body portion pivot between the first and second positions, and claim 4 requires that the deflectable portion pivot relative to the body portion. (*Id.*, cls. 3, 4.) Rounds does not disclose these limitations.

75. Rounds discloses a single, unitary locking bar (62) “carried on a frame 66 for pivotal movement on a transverse pivot pin 68.” (4:61–62.) Rounds describes no portion of that locking bar as movable relative to any other portion of it. The terms “deflectable,” “deflected,” “body portion,” and “separately movable” appear nowhere in Rounds. The only additional feature Rounds describes on the locking bar is a rearward extension (64), which Rounds

describes as “a means to limit the extent to which it can pivot toward the blocking position.” (5:6–9.) That is a stop constraining the movement of the locking bar, not a portion separately movable relative to it.

76. Rounds appears among the references cited on the face of the ’784 patent. (’784 Patent, Cover at [56].) The ’784 patent also identifies Rounds by number in its Background, incorporates it by reference in its entirety, and states that “[i]ts structure and function are fully described therein.” (1:15–20.) I understand that Rounds was therefore before the examiner during prosecution and was considered by the examiner before the ’784 patent issued.

**4. Exemplary Elements of the ’403 Patent Not Taught by Rounds**

77. Each of the asserted claims of the ’403 patent requires a disconnector. (’403 Patent, cls. 14, 17, 32, 38, 39, and cls. 15, 29, and 30 by dependency.) Each asserted claim also requires a standard semi-automatic mode of operation distinct from the forced reset semi-automatic mode, and claims 15, 29, 32, 38, and 39 require in addition a safety selector by which the two are selected. (*Id.*, cls. 14, 15, 17, 29, 32, 38, 39.) Rounds does not teach these limitations.

78. The Rounds invention pointedly does not include a disconnector. The trigger module Rounds describes comprises a housing 12, a hammer 18, a modified trigger member 26, a locking bar 62 carried on a frame 66 for pivotal movement on a transverse pivot pin 68, and a biasing spring 70. (4:61–5:9.) No disconnector is among them. The word “disconnector” appears in Rounds only twice, and in both instances Rounds uses it to describe the conventional mechanism from which its own design departs, stating that a standard semiautomatic trigger mechanism “includes a disconnector, which holds the hammer or striker in a cocked position.” (1:25–36.)

79. Dr. Batzer states that “Rounds discloses that an AR-pattern fire control group includes a disconnector,” citing 1:25–36 and 1:50–2:10, and that “Rounds implicitly discloses a

disconnector interaction (the hammer is held in the set position by sear engagement).” (Consolidated Batzer Decl., Ex. 23 at 1–2; Ex. 24 at 1.) The first passage he cites is the Background description of a conventional trigger mechanism. The second, at 1:50–2:10, describes bump-fire devices and pull/release trigger mechanisms, and does not mention a disconnector. Dr. Batzer appears to identify “sear engagement” as a “disconnector interaction,” but in the context of Rounds “sear engagement” is the engagement between the sear catch (46) of the hammer and the sear (48) of the trigger member, by which the trigger sear holds the hammer in the set position. (4:25–27.) No disconnector is involved in that engagement.

80. Rounds also expressly describes how its forced reset structure is installed. The contact surfaces upon which the hammer bears “may be integral to a specially formed trigger body or may be a separate insert (shown) that is made to closely fit and mate with a standard AR-pattern trigger member, held in place by the trigger pin 36, with no lost motion between the parts.” (Rounds, 4:7–11.) In a standard AR-pattern fire control group, the trigger pin is the pin upon which the disconnector pivots, and the disconnector occupies the space within the trigger member that Rounds describes its insert as occupying. In my opinion, a person of ordinary skill in the art following Rounds would understand that Rounds expressly teaches removing the disconnector when installing the insert. Rounds’ own mechanism confirms that understanding: it contains no disconnector.

81. Rounds does not teach a standard semi-automatic mode of operation, or a selector position corresponding to one. The safety selector in Rounds is the ordinary AR-pattern component, which Rounds states may be standard “(MIL-SPEC) in all respects.” (4:58–60.) That selector has two positions, safe and fire. Rounds describes the operation of its mechanism only in the fire position, and the operation it describes is forced reset operation: the hammer forces the

trigger member to its reset position during the rearward stroke of the bolt carrier, the locking bar holds it there, and the trigger may be pulled again once the carrier returns substantially to battery. Rounds nowhere describes a mode in which the user must release the trigger before the firearm can be fired again.

82. A person of ordinary skill in the art would recognize that Rounds expressly teaches substituting forced reset operation for standard semi-automatic operation rather than adding forced reset operation to it. The insert Rounds describes has no hook and does not move relative to the trigger member, and so cannot hold the hammer while the user maintains rearward pressure on the trigger.

83. Rounds appears among the references cited on the face of the ’403 patent. (’403 Patent, Cover at [56].) The ’403 patent also identifies Rounds by number in its Background, incorporates it by reference in its entirety, and characterizes it as a device in which “the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.” (*Id.*, 2:3–8.) I understand that Rounds was therefore before the examiner during prosecution and was considered by the examiner before the ’403 patent issued.

### B. Blakley ’723

#### 1. Bibliographic Information

84. U.S. Patent No. 7,398,723 B1 (“Blakley ’723” or “the ’723 patent”) is entitled “Trigger Forward Displacement System and Method.” It names Brian A. Blakley as the sole inventor and identifies no assignee on its face. It issued from Application No. 10/424,676, filed April 25, 2003, and issued on July 15, 2008. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective filing date appears to be April 25, 2003.

#### 2. Overview of Operation

85. Blakley ’723 discloses a system and method for “increasing the cyclic rate of actuating the trigger and discharging a semi-automatic firearm.” (1:7–10.) Blakley ’723 characterizes its approach as resetting the trigger to a forward, ready-to-fire position by use of the firearm’s reciprocating member, while preserving the firearm’s semi-automatic status because the firearm “only discharges one round of ammunition for each pull of the trigger.” (*See generally* cols. 7–8.)

86. Blakley ’723 describes a mechanism comprising, among other things, a trigger (22) with an inner-portion groove (30) and a beveled sear portion (34); a disconnector (38) carrying a hammer hook (44); a hammer carrying a trigger sear catch (52), a disconnector hook receptacle (54), and a striking surface (56); a hammer spring (60); a “cam body subassembly” (62) made up of a cam body housing (64), a cam (66), and a cam mounting pin (68); a safety selector (82); and a “trigger extender” (90) that seats in the trigger groove (30) and presents an upper bearing surface (92) to the cam. (*See generally* cols. 5–7.)




FIG 5

**Blakley '723 at Fig. 5**

87. According to Blakley '723, when the trigger is pulled and the hammer falls and discharges the firearm, the bolt is driven rearward; the bolt first pivots the hammer rearward to a cocked position where it engages the disconnector. (10:34–38.)




**Blakley '723 at Fig. 1**

88. Blakley '723 then describes the reset as cam-driven: as the bolt continues rearward, it "secondly contact[s] the cam pivoting it rearward," and in rotating rearward the bottom surface of the cam (66) "pressed downward on the trigger-extension forcing the rear of the trigger down thereby moving forward the surface of the trigger that the operator's finger engages." (10:38–46.) Blakley '723 states that, "[i]n resetting the trigger the disconnector ceases to engage the hammer," and "[t]he hammer then continues to be held to the rear by the forward engagement surface of the trigger engaging the notch in the sear notch at the bottom of the hammer." (10:46–50.) Blakley '723 further describes the cam as holding the trigger "firmly down/forward potentially against the finger pressure of the operator," while the operator's finger force "is not transmitted to the bolt as an upward displacing force." (10:50–54.)




**Blakley ’723 at Fig. 2**

FIG 3A




**Blakley ’723 at Fig. 3A**

89. Blakley ’723 also describes alternatives. Blakley ’723 states that the cam may be pinned directly to the receiver, eliminating the cam body housing. (11:6–10.) Blakley ’723 further describes that the effect “be able to be optionally selected or deselected by operating the selector-cam,” and that the invention “can be effected without the provision of a selector,” in which case the effect is “continually present unless the apparatus is removed from the firearm.” (Blakley ’723, cols. 11:11–29.) In each described configuration, Blakley ’723 resets the trigger by means of the cam acting on the trigger extender. (*See generally* cols. 10–12.)

### 3. Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723

90. Claim 15 of the '247 patent recites a firearm trigger mechanism operable in two distinct modes: a standard semi-automatic mode, in which the cam is in a first position, the disconnector hook catches the hammer hook, and the user must manually release the trigger member before firing again; and a forced reset semi-automatic mode, in which the cam is in a second position and the disconnector hook is prevented from catching the hammer hook. ('247 Patent, cl. 15.) Blakley '723 does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Blakley '723 does not disclose.

#### i. A trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode.

91. Blakley '723 enables a single mode of operation: forced reset. Blakley's stated object is to accelerate the cyclic rate of a semi-automatic firearm by using the reciprocating member to reset the trigger, and Blakley '723 describes that effect occurring on every cycle of the bolt. (10:34–11:5.)

92. I understand that column 11 of Blakley '723 has been considered in several forums, each of which concluded that it does not teach a third mode of operation.

93. *Prosecution of the '247 and '159 patents.* I understand that the examiner considered and rejected this reading during prosecution of Blakley's later '247 patent, and again during prosecution of Blakley's later '159 patent. In allowing the claims of the '247 patent, the examiner expressly identified Blakley '723 as "the closest prior art" and distinguished it on the ground that it does not disclose a mechanism operable in a standard semi-automatic mode. The examiner stated:

> Blakley does not show, however, a trigger mechanism whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches

> said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm; and there is no teaching in the prior art that would have motivated one of ordinary skill in the art to modify Blakley in such a manner.

('247 File History, Notice of Allowance (May 22, 2024).) I understand the examiner reached the same conclusion in allowing the '159 patent, where the examiner stated:

> Blakley does not disclose, however, the combination of elements wherein the trigger mechanism is operable in a first, standard semi-automatic mode and in a second, forced reset semi-automatic mode, whereupon in the first mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm, and whereupon in the second mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger member to fire the firearm. Additionally, there is no teaching in the prior art that would have motivated one of ordinary skill in the art to modify Blakely to have such features.

('159 File History, Notice of Allowance (Feb. 9, 2026).) The examiner's determination is consistent with my own analysis of Blakley '723, set forth below.

94. *Eastern District of Tennessee.* I understand this contention was raised in opposition to a motion for preliminary injunction in the Eastern District of Tennessee, where the opposing party relied specifically on the language at column 11 of Blakley '723. *See ABC IP,*

*LLC v. Hoffman*, No. 1:25-cv-00389, Dkt. 26 at 4 n.1 (E.D. Tenn. Jan. 23, 2026); *see also id.*, Ex. 6 (charting Blakley '723 against the '247 patent). I understand the court rejected the contention and issued the preliminary injunction. *See id.*, Dkt. 46.

95. Inter partes review proceedings. I further understand that parties adverse to the patent owner have themselves taken the position that Blakley '723 is limited to two positions. In a petition for inter partes review asserting Blakley '723 as a primary reference, the petitioner submitted the declaration of Malcolm Brown. *See* Atrius Dev. Grp. Corp. v. ABC IP LLC, IPR No. 2025-1473, Paper 1 at 14 (P.T.A.B. Aug. 29, 2025). Mr. Brown stated that Blakley '723 "appears to have a 2-position safety selector switch (i.e., safe and FRT modes) and would not have a semi-automatic mode which is standard on AR 15's and M-16's," that the column 11 passage "suggests that Blakely '723 contemplated a three-position safety selector enabling semi-automatic mode," but that "the figures and specification do not clearly support this contention." *Id.*, Paper 1004 at 48. Mr. Brown's conclusion that the figures and specification do not support a three-position reading accords with my own analysis.

96. I further understand that institution of that inter partes review was denied on February 18, 2026, in a notice stating, as to the group of proceedings in which it appears, that "after review of the merits, the petitioner has failed to show a reasonable likelihood of prevailing with respect to at least one of the claims challenged in the petition." Notice of Decisions on Institution, Paper 20 (P.T.A.B. Feb. 18, 2026).

97. *Mr. Blakley's own characterization.* Mr. Blakley '723 is the named inventor of both the '723 patent and the '247 patent. In the Background of the '247 patent, he described his earlier '723 patent as a device having "a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam

presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages." ('247 Patent, 2:04–2:13.) That description recites only the forced reset function of the cam. It attributes no mode-selection capability to the '723 patent, and it is followed by the statement that "[f]urther improvement in forced reset triggers is desired." (*Id.*, 2:14.) The '247 specification then identifies three-position operability as an advantage of the invention it claims: "Advantageously, the present invention provides a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." (*Id.*, 2:26–29.)

98. I understand that Dr. Batzer contends the passage at column 11 is suggested to disclose a standard semi-automatic mode. Assuming that passage is read as expressing an intention to provide such a mode, in my opinion the specification of Blakley '723 does not contain an enabling disclosure of it.

99. Dr. Batzer's own analysis is consistent with that conclusion. In the claim charts accompanying his declaration, he states, as to each independent claim reciting a standard semi-automatic mode, that "Blakley does not explicitly explain how the standard semi-automatic mode uses the various trigger mechanism components, as required in this portion of the claim, but a POSA, however, would readily know how standard semi-automatic mode operates based on Blakeley's disclosure of semi-automatic firearms." (Batzer Decl., Ex. 15 at 2, 3, 5, 7, 8, 9, 10.) I agree with Dr. Batzer's observation that Blakley '723 does not explicitly explain how the alleged semi-automatic mode would be achieved using the components of its own unique trigger mechanism.

100. However, I disagree with Dr. Batzer that such deficiency of Blakley '723 would have been overcome by skilled artisan's general knowledge relating to then-conventional and

different semi-automatic fire control mechanisms, none of which used a vertical trigger extension that could be longitudinally translated into operational interference with a disconnector. The relevant inquiry is what a person of ordinary skill in the art would have understood at the time of the invention, and Blakley ’723 was filed in April 2003, roughly two decades before the priority dates of the Asserted Patents.

101. Moreover, what a person of ordinary skill in the art may know about how semi-automatic firearms operate generally is not a disclosure in Blakley ’723 of how Blakley’s own mechanism would operate in that mode.

102. The passage in column 11 provides insufficient structural detail. It refers to a “selector-cam,” a term appearing nowhere else in Blakley ’723 and assigned no reference numeral. The passage contains no reference numerals, and the figures do not provide enabling disclosure of a semi-automatic mode of operation.

103. In my opinion, the arrangement Blakley ’723 depicts would not function as a standard semi-automatic mode. For example, the selector profile would not displace the trigger extender forward far enough for the cam to clear its bearing surface, and even if it did, that would carry the trigger extender into interference with the disconnector, which would render the disclosed mechanism inoperable because the disconnector must remain free to rotate rearward about the trigger pin in order for the hammer hook to pass it. Dr. Batzer does not address these problems with the conclusion that he draws from column 11 of Blakley ’723.

**ii. A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.**

104. In Blakley ’723, the disconnector catches the hammer on every firing cycle. Blakley ’723 describes that, after the trigger is pulled and the hammer falls, the rearward-traveling bolt “will first pivot the hammer to the cocked rearward position whereupon it will

engage the disconnector." (10:34–38.) Only later, and as a consequence of the cam having reset the trigger, does the disconnector cease to engage the hammer. (10:39–47.) Blakley '723 therefore describes a disconnector that catches the hammer hook and is subsequently released, which is different from the claimed arrangement in which the disconnector hook is prevented from catching the hammer hook in the first instance. Blakley '723 does not disclose any structure that prevents the disconnector hook from catching the hammer hook. Blakley's safety selector (82) is described only as a rotatable member having an outer lever and an inner tubular portion with flat recessed surfaces (88), and Blakley '723 does not describe it as interacting with the disconnector in any way. (*See generally* col. 6.)

#### 4. Exemplary Elements of the '159 Patent Not Disclosed by Blakley '723

105. The '159 patent is a continuation of the '247 patent and shares its specification. I understand the asserted claims of the '159 patent to be claims 1, 3, 6, 7, 9 through 11, and 14 through 17.

106. Because the two patents share a common specification, and the asserted claims of both patents require the same alternative trigger reset modes (*i.e.*, a forced reset mode, versus a reset mode requiring that user manually release pressure on the trigger) depending on whether the disconnector is allowed or prevented from catching the hammer, my opinions regarding Blakley '723 set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723" apply equally to each asserted claim of the '159 patent. I incorporate them here in full.

107. Claim 17 of the '159 patent recites two limitations not present in claim 15 of the '247 patent, which I address separately below.

##### i. A mode selector operable by the user to select between a semi-automatic mode and a forced reset mode.

108. Claim 17 further recites a mode selector operable by the user to select between at least two semi-automatic modes of operation of the trigger mechanism, including a "forced reset mode," and a "semi-automatic mode" requiring that the user manually release pressure on the trigger. However, Blakley '723 does not disclose a selector that could operably select the latter mode.

109. Blakley '723 discloses a safety selector 82, but it does not describe that selector 82 as selecting between semi-automatic and forced reset modes of operation. (6:15-20.)

110. The passage at column 11 refers to the effect of the invention being optionally selected or deselected by operating a "selector-cam." (11:11–13.) For the reasons set out above, in my opinion Blakley '723 does not enable a mechanism in which a user-operable selector selects among safe, conventional semi-automatic, and forced reset semi-automatic operation. The safety selector 82 of Blakley '723 as shown in Figs. 3 and 5 could not longitudinally translate the trigger extension sufficiently to disable the forced reset mode of operation and so could not select a conventional semi-automatic mode.

**ii. A difference in operation between modes determined by movable selection of the blocking means.**

111. Claim 17 further requires that the difference in operation between the modes be determined by movable selection of the blocking means, so as selectively to permit or prevent the hammer and trigger member sear engagement surfaces from engaging when the trigger member is biased by the cam. Blakley '723 discloses no structure capable of performing that function.

112. Blakley's disconnector has no rearward tail or other surface positioned to be engaged and displaced by the safety selector or by any other user operable structure. Because Blakley's disconnector has no structure by which it can be moved at the selection of the user,

Blakley ’723 cannot disclose a mechanism in which the difference in operation between two modes is determined by movable selection of the blocking means. Blakley ’723 describes the disconnector as being displaced only by the hammer during the firing cycle, and describes no user-operable means of positioning it other than conventionally with the trigger.

### 5. Exemplary Elements of the ’403 Patent Not Disclosed by Blakley ’723

113. Each asserted claim of the ’403 patent requires a trigger mechanism operable in a standard semi-automatic mode, or a safety selector movable to a standard semi-automatic position, in which, after the action cycles, rearward pressure on the trigger member must be reduced before the trigger member can be actuated to fire again. (’403 Patent, cls. 14, 17, 32, 38, 39.) Claims 15, 29, 32, 38, and 39 further recite a safety selector that selects between that standard semi-automatic mode and a forced reset semi-automatic mode. (*Id.*, cls. 15, 29, 30, 32, 38, 39.) Claims 14 and 17, and the claims that depend from them, also require that in the forced reset semi-automatic mode the disconnector hook be prevented from holding the hammer hook. (*Id.*, cls. 14, 17.) Blakley ’723 does not disclose these limitations.

#### i. A standard semi-automatic mode.

114. For the reasons set forth above in the subsection titled “A trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode,” in my opinion Blakley ’723 does not provide an enabling disclosure of a standard semi-automatic mode of operation of its mechanism, and I incorporate those opinions here. Those reasons apply equally to the standard semi-automatic mode recited in each asserted claim of the ’403 patent.

115. Dr. Batzer’s analysis of the ’403 patent adds an inherency contention. He states that, when Blakley’s trigger-forward-displacement effect is deselected, “the disclosed mechanism necessarily leaves the hammer held by the disconnector until trigger pressure is reduced,” and that “[t]he remaining disclosed fire-control components then operate in their ordinary semi-

automatic sequence." (Consolidated Batzer Decl., Ex. 25 at 1, 3.) Blakley '723 does not describe the operation of its mechanism in any deselected condition. Its only description of deselection is the passage at column 11, which describes "configuring the trigger extension to be able to move forward and rearward within/upon the rear of the trigger by means of a spring bias that competes with engagement surfaces machined into the selector-cam." (11:11–16.) Whether a mechanism configured in that way would hold the hammer with the disconnector and release it only when trigger pressure is reduced depends on structure Blakley '723 does not describe, including how far the trigger extension moves, where it comes to rest relative to the disconnector, and how the selector-cam holds it there. As explained above and as drawn by Blakley '723, in my opinion moving the trigger extender forward far enough for the cam to clear its bearing surface would carry it into an inoperable interference with the disconnector. The result Dr. Batzer describes therefore does not necessarily follow from what Blakley '723 discloses.

**ii. A safety selector that selects between the standard semi-automatic mode and the forced reset semi-automatic mode.**

116. Dr. Batzer states that Blakley '723 "expressly states that its forced reset effect may be optionally selected or deselected by operating a safety selector 82, which configures the movable trigger extension 90 so that cam contact either occurs or is prevented," citing 6:15–32 and 11:11–25. (Consolidated Batzer Decl., Ex. 22 at 4, 7, 8, 11, 13; *see also id.*, Ex. 25 at 6.) On the contrary, Blakley '723 does not state that. The passage at column 11 attributes the selecting and deselecting to a "selector-cam," a term that appears nowhere else in Blakley '723 and is assigned no reference numeral. (11:11–16.) Blakley's description of its safety selector (82) states only that the selector has an outer portion comprising a downwardly displaced lever and an inner portion having a generally solid tubular configuration with a plurality of flat recessed surfaces (88), and that the selector is rotatable when in place in the receiver. (6:15–21.) Blakley '723 does

not describe the safety selector (82) as engaging, moving, or configuring the trigger extender (90).

117. The remaining lines Dr. Batzer cites, at 6:22–32, describe the configuration of the trigger extender (90) and its stepped upper surface. Like the passage at column 11, they do not identify the safety selector (82) as the structure that moves the trigger extender, and they do not describe how the trigger extender would be moved sufficiently, how sufficient movement could be operable in view of apparent interference with the disconnector, or how the moved trigger extender would be retained there or released therefrom. For the reasons set forth above in the section titled "Exemplary Elements of the '159 Patent Not Disclosed by Blakley '723," in my opinion Blakley '723 does not disclose a user-operable selector that selects between a standard semi-automatic mode and a forced reset semi-automatic mode, and I incorporate those opinions here.

**iii. A forced reset semi-automatic mode in which the disconnector hook is prevented from holding the hammer hook.**

118. Claims 14 and 17 of the '403 patent, and claims 15, 29, and 30, which depend from them, require that, in the forced reset semi-automatic mode, "the disconnector hook is prevented from holding the hammer hook." ('403 Patent, cls. 14, 17.) Blakley '723 does not disclose that limitation. For the reasons set forth above in the subsection titled "A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook," in Blakley '723 the disconnector catches the hammer on every firing cycle, and I incorporate those opinions here.

119. A disconnector that catches the hammer hook holds it for as long as the two remain engaged. Blakley '723 describes that, after the trigger is pulled and the hammer falls, the rearward-traveling bolt "will first pivot the hammer to the cocked rearward position whereupon

it will engage the disconnector." (10:34–38.) The hammer is released from the disconnector only later, after the bolt has contacted and pivoted the cam and the cam has reset the trigger: "[i]n resetting the trigger the disconnector ceases to engage the hammer." (10:38–47.) A disconnector that ceases to engage the hammer is one that was holding it. Blakley '723 therefore describes a disconnector that holds the hammer hook, at least momentarily, on every cycle before releasing it, rather than a disconnector hook that is prevented from holding the hammer hook.

120. Dr. Batzer's own descriptions are consistent with that reading. He states that "on rearward bolt travel the hammer initially engages the disconnector," and that the disconnector "ceases to engage the hammer" only as the cam forces the trigger to its set position. (Consolidated Batzer Decl., Ex. 25 at 3, 5.) In his earlier declaration, he described the same event as "Blakley's momentary disconnector/hammer engagement during forced reset." (Batzer Decl., Ex. 13 at 10.) Dr. Batzer characterizes Blakley '723 as disclosing "non-retention by the disconnector during the reset." (Consolidated Batzer Decl., Ex. 25 at 5.) But the reset to which he refers is the event that releases a hammer the disconnector has already caught and held, and releasing the hammer after it has been held does not mean the disconnector was prevented from holding it.

121. Blakley '723 also discloses no structure that prevents its disconnector hook from holding the hammer hook. As set forth above, Blakley's safety selector (82) is described only as a rotatable member having an outer lever and an inner tubular portion with flat recessed surfaces (88), and Blakley '723 does not describe it as interacting with the disconnector in any way. (6:15–21.) Moreover, the Blakley '723 drawings suggest that it would be impractical to modify the disconnector 38 to extend a tail rearwardly towards the safety selector 82, due to apparent interference with the trigger extender 90.

## C. Stoner '555

### 1. Bibliographic Information

122. U.S. Patent No. 3,045,555 ("Stoner" or "the '555 patent") is entitled "Automatic Trigger Mechanism with Three Sears and a Rotatable Control Member." (Cover; 1:2–4) It names Eugene M. Stoner, of Newport Beach, California, as the inventor, and identifies Fairchild Engine and Airplane Corporation, of Hagerstown, Maryland, as assignee. (1:5–7.) It issued from Application Serial No. 861,288, filed December 22, 1959, and was patented on July 24, 1962. Stoner contains 10 claims and 2 sheets of drawings. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective date appears to be the December 22, 1959 filing date. (1:8.)

### 2. Overview of Operation

123. Stoner discloses a trigger mechanism for various guns characterized by simple construction and a minimum number of component parts, in which a hammer, a trigger, an intermediate sear, and an automatic sear are pivotally mounted within a receiver and are subject to control by a single rotatable control member. (1:11–36.) Stoner characterizes the single control member as determining, by its position, whether the gun is maintained in a safety condition, a semi-automatic fire condition, or an automatic fire condition. (1:28–36; 5:19–22.)

124. Stoner describes a trigger mechanism (30) comprising, among other things, a trigger (50) pivotally mounted on a pivot pin (52) and having a forward fixed sear (60) that retains a hammer (62) by engaging a sear abutment (64); a hammer (62) mounted on a pivot pin (82) and biased toward firing by a torsion spring (84), the hammer further having an intermediate sear abutment (76) and an automatic sear abutment (92); an intermediate sear (68) carrying a hook (74) engageable with the intermediate sear abutment (76); an automatic sear (96) pivotally mounted on a pivot pin (98), biased by a torsion spring (110), and having a head (102) with an

upper extremity (104) engageable by a shoulder (106) on the bolt carrier (42) and a lower extremity (108) constituting a sear engageable with the automatic sear abutment (92) on the hammer; and a common control member (120) having a control handle (122) and a control cam (124) with a plurality of cam surfaces engageable with the trigger, the intermediate sear, and the automatic sear. (2:43–3:30.) Stoner describes a bolt assembly (40) including a bolt carrier (42) reciprocable between retracted and battery positions. (2:33–42.)

FIG. 2.




**Stoner '555 Patent at Fig. 2**

125. Stoner describes a safety condition in which the control handle (122) is rotated so that safety cam surfaces (126) lock the trigger (50) against movement and the automatic sear (96) is held inoperative, with the fixed sear (60) engaging the sear abutment (64) to hold the hammer cocked. (3:35–63.)

126. Stoner describes a semi-automatic condition in which the control cam (124) frees the trigger (50) and the intermediate sear (68) for movement. (3:64–4:2.) Stoner describes that, upon a trigger pull, the fixed sear (60) withdraws from the sear abutment (64) and the torsion spring (84) drives the hammer to fire; the returning bolt carrier (42) then drives the hammer down to a position in which the intermediate sear hook (74) engages the intermediate sear

abutment (76) to momentarily maintain the hammer; and upon release of the trigger, the intermediate sear releases the hammer to the fixed sear (60), which re-engages the sear abutment (64) to hold the hammer cocked. (4:3–24.)

FIG. 5.




**Stoner '555 Patent at Fig. 5**

127. Stoner describes an automatic condition, established by rotating the control handle (122) to the position of FIG. 7, in which the control cam (124) permits the automatic sear (96) to assume an operative position (its lower extremity (108) engaging the automatic sear abutment (92) on the hammer) and a deeper portion of a cam (136) (as shown in FIG. 8) locks the intermediate sear (68) against movement so its hook (74) cannot engage the hammer. (4:25–41.) Stoner describes that, in this condition, rearward movement of the bolt carrier (42) drives the hammer down so that the automatic sear (96) catches the hammer; and when the bolt carrier returns to battery, a shoulder (106) on the bolt carrier engages the upper extremity (104) of the automatic sear head (102) and rotates it to release the hammer to fire another round—so that, while the trigger is held depressed, the gun continues to fire. (4:42–56.) Stoner describes that, upon release of the trigger, the fixed sear (60) re-engages the sear abutment (64) to hold the hammer cocked. (4:57–65.)




**Stoner '555 at Fig. 7**




**Stoner '555 at Fig. 9**

### 3. Exemplary Elements of the '247 Patent Not Disclosed by Stoner

128. Claim 15 of the ’247 patent recites a firearm trigger mechanism operable in a standard semi-automatic mode and in a forced reset semi-automatic mode, in which latter mode the disconnector hook is prevented from catching the hammer hook and, after the bolt carrier moves forward into battery, the user can pull the trigger member to fire the firearm. (’247 Patent, cl. 15.) Claim 15 further recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. (*Id.*) Stoner does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Stoner does not disclose.

129. Stoner appears among the references cited on the face of the ’247 patent. (’247 Patent, Cover at [56].) I understand that references listed on the face of an issued patent were before the examiner during prosecution and were considered by the examiner before the patent issued.

**i. A forced reset semi-automatic mode in which the user can pull the trigger member to fire the firearm.**

130. Stoner does not disclose a forced reset semi-automatic mode. Stoner describes a single rotatable control member (120) that determines whether the trigger mechanism is maintained in a safety condition, a semi-automatic condition, or an automatic condition. (1:28–36; 5:19–22.) Stoner’s third condition is automatic fire.

131. In Stoner’s automatic condition, the hammer is released to fire by the returning bolt carrier rather than by any action of the trigger. Stoner describes that when the bolt carrier (42) returns to battery, a shoulder (106) on the bolt carrier “engages the upper extremity 104 of the head 102 and rotates the head 102 clockwise about the axis of the pivot pin 98 to immediately release the hammer 62 to fire another round.” (4:42–56.) Stoner states the consequence directly: “Thus, so long as the trigger 50 is maintained in depressed condition, that

is with the finger grip 88 thereof pulled to the rear, the gun 10 will continue to fire." (*Id.*) Stoner describes release of the trigger as what stops the firing, and describes a subsequent rearward movement of the trigger as releasing the hammer "for another burst of fire." (4:57–65.)

132. Claim 15 is not met by fully automatic fire. In the recited forced reset semi-automatic mode, after the bolt carrier moves forward into battery, "the user can pull said trigger member to fire the firearm." The firearm fires a single round for each pull of the trigger, and the user pulls the trigger again in order to fire again. In Stoner's automatic condition the user does not pull the trigger to fire each round. The user holds the trigger to the rear and the mechanism fires the weapon repeatedly. In my opinion, automatic fire is not the forced reset semi-automatic mode that claim 15 recites.

133. This is not disputed. Addressing the corresponding limitation of the '159 patent, which is a continuation of the '247 patent, the claim chart comparing Stoner to the asserted claims states that "Stoner discloses that trigger means 50 is operable in an automatic mode (see Figs. 7-9), but not in a forced reset semi-automatic mode." (Batzer Decl., Ex. 14 at 10.) That statement concerns the content of Stoner, and the content of Stoner does not vary depending on which patent or which claim Stoner is asserted against.

**ii. A cam having a cam lobe which forces the trigger member towards the set position.**

134. Stoner discloses no cam that forces the trigger member towards the set position.

135. Stoner's control member (120) carries a control cam (124) having a plurality of cam surfaces engageable with the trigger, the intermediate sear, and the automatic sear. (2:43–3:30.) Stoner describes only two interactions between that cam and the trigger. In the safety condition, safety cam surfaces (126) engage the upper edges of the upper portion (56) of the trigger (50) to lock the trigger against movement. (3:35–63.) In the semi-automatic and

automatic conditions, the control cam frees the trigger for movement. (3:64–4:2; 4:25–41.) Stoner describes no structure that drives or forces the trigger member toward the set position, and Stoner's trigger returns only upon release by the user.

136. In my opinion that absence is unsurprising. The premise of Stoner's automatic condition is that the trigger remains depressed while the weapon fires, which is not compatible with forcing the trigger forward between shots.

137. I further note that the claim chart comparing Stoner to claim 15 of the '247 patent leaves the comparison entry for this limitation blank. (Batzer Decl., Ex. 12 at 1.) No disclosure in Stoner is identified as corresponding to a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. That is consistent with my own review and understanding of Stoner; there is no such structure in the reference.

**4. Exemplary Elements of the '159 Patent Not Disclosed by Stoner**

138. I understand the asserted claims of the '159 patent to be claims 1, 3, 6, 7, 9 through 11, and 14 through 17.

139. Because the '159 patent is a continuation of the '247 patent and shares its specification, and because the asserted claims recite the same two-mode architecture, my opinions regarding Stoner set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stoner" apply equally to each asserted claim of the '159 patent, and I incorporate them here in full.

140. Stoner also appears among the references cited on the face of the '159 patent. ('159 Patent, Cover at [56].) As with the '247 patent, I understand that Stoner was therefore before the examiner and was considered during prosecution of the '159 patent before it issued.

**i. Stoner's automatic sear does not force the trigger member toward the set position.**

141. In my opinion, Stoner's automatic sear (96) cannot correspond to the recited cam. Stoner describes the automatic sear as pivotally mounted on a pivot pin (98) and biased by a torsion spring (110), having a head (102) whose upper extremity (104) is engageable by a shoulder (106) on the bolt carrier (42), and a lower extremity (108) constituting a sear engageable with the automatic sear abutment (92) on the hammer. (2:43–3:30.) Stoner's automatic sear therefore acts upon the hammer, and is itself acted upon by the bolt carrier. Stoner nowhere describes the automatic sear contacting the trigger member, nowhere describes it forcing, driving, or biasing the trigger member toward the set position, and nowhere describes it as having a cam lobe.

**ii. A forced reset semi-automatic mode.**

142. Claim 17 of the '159 patent recites a forced reset mode in which the cam forcibly biases the trigger member into the set position with the hammer and trigger member sear engagement surfaces engaged, "permitting the user to immediately fire again without the user manually releasing pressure on the trigger member." ('159 Patent, cl. 17.) For the reasons set out above, Stoner discloses no such mode. Stoner's third condition is automatic fire, in which the user holds the trigger to the rear and the mechanism fires the weapon repeatedly without any further action by the user. (4:42–56.)

143. This is not disputed. Addressing this limitation, the claim chart comparing Stoner to the asserted claims of the '159 patent states that "Stoner discloses that trigger means 50 is operable in an automatic mode (see Figs. 7-9), but not in a forced reset semi-automatic mode." (Batzer Decl., Ex. 14 at 10.) In my opinion, forcing the trigger forward between shots would be both unnecessary and disadvantageous to Stoner's intended automatic firing mode.

**5. Exemplary Elements of the '403 Patent Not Disclosed by Stoner**

144. I understand the asserted claims of the ’403 patent to be claims 14, 15, 17, 29, 30, 32, 38, and 39. Those claims require, among other things, a trigger member that is forced to the set position as a result of cycling of the action; a locking member that mechanically blocks the trigger member from moving from the set position to the released position and that is moved between its blocking and non-blocking positions by the cycling action itself; and a safety selector offering a forced reset semi-automatic position. (’403 Patent, cls. 14, 15, 17, 29, 30, 32, 38, 39.) Stoner does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations that Stoner does not disclose.

**i. A trigger member that is forced to the set position by cycling of the action.**

145. Claims 14, 17, and 32 each require that the trigger member be forced to the set position in response to cycling of the action, and claim 39 requires that in the forced reset semi-automatic position the trigger member “is forced to move to a full reset position against rearward pressure on the trigger member.” (’403 Patent, cls. 14, 17, 32, 39.) Stoner discloses no structure that forces, drives, or otherwise returns the trigger member to the set position. Claim 38 likewise requires a safety selector movable into a forced reset semi-automatic position. (*Id.*, cl. 38.) A person of ordinary skill in the art would understand forced reset operation to be a mode of semi-automatic operation in which cycling of the action forces the trigger member to the set position. Because Stoner discloses no structure that returns the trigger member to the set position, Stoner does not disclose forcing the trigger member to that position against rearward pressure.

146. Stoner’s control member (120) carries a control cam (124) having a plurality of cam surfaces engageable with the trigger, the intermediate sear, and the automatic sear. (2:43–3:30.) Stoner describes only two interactions between that cam and the trigger. In the safety condition, safety cam surfaces (126) engage the upper edges of the upper portion (56) of the trigger (50) to lock it against movement. (3:35–63.) In the semi-automatic and automatic

conditions, the control cam frees the trigger for movement. (3:64–4:2; 4:25–41.) Stoner's trigger returns forward only when the user releases it; the trigger reset is not forced by cycling of the bolt carrier.

147. The premise of Stoner's automatic condition is that the trigger remains depressed while the weapon fires. (4:42–56.) Forcing the trigger forward between shots would be both unnecessary and disadvantageous to Stoner's intended automatic firing mode. Claim 32 requires that in the forced reset semi-automatic mode the trigger member be actuable "without reducing pressure on the trigger member," and claim 39 requires that the trigger member be forced forward "against rearward pressure on the trigger member." ('403 Patent, cls. 32, 39.) By contrast, Stoner describes the trigger as remaining where the user holds it.

**ii. A locking member that mechanically blocks the trigger member and is moved by the cycling action.**

148. Claims 14, 17, and 32 each require a locking member that mechanically blocks the trigger member from moving from the set position to the released position when in a first or block position, that does not block it when in a second or non-block position, and that is moved into the non-blocking position by forward movement of the bolt means or forward motion of the cyclic semi-automatic action. ('403 Patent, cls. 14, 17, 32; see also cls. 15, 29, 30 by dependency.) Stoner does not disclose such a member.

149. The only structure Stoner describes as restraining the trigger is the safety cam surfaces (126) of the control cam (124), which engage the upper edges of the upper portion (56) of the trigger (50) to lock it and prevent rearward rotation of the finger grip (88). (3:35–63.) Those surfaces are formed on the common control member (120) and are brought into and out of engagement by the user's rotation of the control handle (122), not by any movement of the bolt carrier. (2:43–3:30; 3:35–63.) Stoner describes no structure that is moved into a blocking

position during the rearward stroke of the bolt carrier and out of it as the carrier returns to battery.

150. Claim 30 requires in addition a safety selector that is separate from the locking member. ('403 Patent, cl. 30.) In Stoner, the safety cam surfaces (126) are formed on the common control member (120), which is the same component the user rotates to select among Stoner's three conditions. (2:43–3:30; 3:35–63.)

**iii. A safety selector having a forced reset semi-automatic position.**

151. Claims 15, 29, 32, 38, and 39 each require a safety selector that selects between at least a standard semi-automatic mode or position and a forced reset semi-automatic mode or position. ('403 Patent, cls. 15, 29, 32, 38, 39.) Stoner describes a single rotatable control member (120) that determines whether the gun is maintained in a safety condition, a semi-automatic fire condition, or an automatic fire condition. (1:28–36; 5:19–22.) Stoner's third condition is automatic fire.

152. In Stoner's automatic condition the hammer is released to fire by the returning bolt carrier rather than by any action of the trigger. (4:42–56.) Stoner describes release of the trigger as what stops the firing. (4:57–65.) Stoner describes no selector position in which the trigger member is forcibly reset and the user actuates the trigger to fire each round.

153. Dr. Batzer relies on Stoner's automatic condition as teaching "preventing disconnector hook 74 from holding hammer hook 76 and timing renewed firing to the bolt carrier's return to battery." (Consolidated Batzer Decl., Ex. 25 at 10.) What Stoner times to the bolt carrier's return to battery is the release of the hammer by the bolt carrier itself, through the engagement of a shoulder (106) on the bolt carrier with the head of the automatic sear (96). (4:42–56.) Stoner's automatic condition is therefore automatic fire, in which the user does not actuate the trigger to fire each round, rather than the forced reset semi-automatic operation the

asserted claims recite, in which the user actuates the trigger member to fire again. Dr. Batzer has acknowledged as much: "Stoner discloses that trigger means 50 is operable in an automatic mode (see Figs. 7-9), but not in a forced reset semi-automatic mode." (Batzer Decl., Ex. 14 at 10.)

154. Stoner appears among the references cited on the face of the '403 patent. ('403 Patent, Cover at [56].) I understand that Stoner was therefore before the examiner during prosecution and was considered by the examiner before the '403 patent issued.

**D. Stakes '067**

**1. Bibliographic Information**

155. U.S. Patent No. 9,146,067 B2 ("Stakes" or "the '067 patent") is entitled "Trigger Mechanism." It names Michael A. Stakes as the sole inventor and applicant, and identifies no separate assignee on its face. It issued from Application No. 13/919,085, filed June 17, 2013, and published as U.S. Patent Application Publication No. 2014/0366418 A1 on December 18, 2014, before issuing on September 29, 2015. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective filing date appears to be June 17, 2013.

**2. Overview of Operation**

156. Stakes discloses a trigger mechanism that, among other things, addresses what it characterizes as a delay in trigger-to-hammer reset that limits the speed of semi-automatic fire. (5:50–6:8.) Stakes characterizes its mechanism as a select-fire trigger mechanism allowing selection between "safe, semi-automatic, and assisted-reset semi-automatic modes of fire or operation," set by a selector (70). (6:18–20.)

157. Stakes describes a mechanism comprising, among other things, a trigger body (23) with a trigger nose (24) and a tail (25A); a disconnector (30) having a disconnector hook (33), a disconnector lever (32), and a cam surface (35), which together with the trigger body form a "trigger disconnector assembly" (39); a hammer (40) having a striking end (45), a striking

surface (44), a hammer tail (46), and a hammer disconnect notch (47); an “assisted-reset lever” or “reset lever” (50) that is spring-biased by a reset lever spring (60); and a selector (70) carrying a cam (75) and stops (78A). (6:22–7:60.)







**Stakes ’067 at Figs. 1, 3**

158. Stakes describes a “past-cocked” position of the hammer beyond the ordinary cocked position. (5:59–6:6.) After a round is fired, Stakes describes that the rearwardly moving bolt carrier engages the hammer (40) and pivots it rearward toward the cocked position and beyond to the past-cocked position. (8:61–65.)

159. In the *semi-automatic* mode, the selector (70) holds the reset lever (50) in an inoperative position by means of the selector cam (75) bearing on the reset lever’s arm (52), so the reset lever does not act on the trigger disconnector assembly. (8:5–11, 22–60.) Stakes describes that, in this mode, the disconnector hook (33) engages the hammer disconnect notch (47) to arrest forward movement of the hammer and “prevent[] automatic fire,” and that the trigger must be *released* by the user before the trigger body and trigger nose return to the set position to hold the hammer cocked in preparation for another trigger pull. (9:4–28.)



FIG. 4

**Stakes ’067 at Fig. 4**



FIG. 6



FIG. 7



FIG. 8



FIG. 9

**Stakes ’067 at Figs. 6-9**

160. In the *assisted-reset semi-automatic* mode, the selector (70) no longer holds the reset lever inoperative, and the reset lever spring (60) biases the reset lever (50) toward its operative (closed) position. (7:44–60.) The hammer disconnect notch (47) clips past the disconnector hook (33) as the hammer travels to the past-cocked position, and in the past-cocked position the disconnector hook "is positioned to engage hammer disconnect notch 47 in the engaged position of disconnector hook 33 for preventing forward movement of hammer 40," such that "[f]orward movement of hammer 40 is thus arrested by disconnector hook 33 engaging hammer disconnect notch 47." (11:55–12:23.) Stakes states that this "prevents automatic fire." (12:6.) The disconnector therefore captures the hammer after each shot.

161. Stakes further describes that, in the assisted-reset semi-automatic mode, the user must release pressure on the trigger before the mechanism returns to its firing-ready condition. Significantly, in the *assisted-reset semi-automatic* mode, Stakes states that "[w]hen trigger 27 is released, trigger body 23 and trigger 27 pivot a trigger resetting or reset travel distance in the assisted-reset semi-automatic mode of operation from the pulled position ... to the set position." (11:55–12:23.) In each of its firing modes, Stakes describes the hammer as thereafter retained in the cocked position by the trigger nose "preparatory to firing by another trigger pull." (12:22–23.) Stakes nowhere describes firing the firearm again without the user releasing pressure on the trigger.



FIG. 5

**Stakes '067 at Fig. 5**



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14

**Stakes '067 at Figs. 10-14**

162. Stakes describes the selector (70) as determining which mode is active by, among other things, the position of its cam (75) relative to the reset lever and the position of its stops relative to the tail (25A) of the trigger body. (7:61–8:5; 9:66–10:62.)




**Stakes '067 at Figs. 15-16**

163. Stakes describes the selector (70) as carrying a stop body (78) located near, above, and opposite to a notch (25) in the tail (25A) of the trigger body (23). Stakes describes that stop body as including two stops, a stop (78A) and a stop (78B), which Stakes identifies as surfaces of the stop body oriented perpendicular to one another. (17:7–45.)

164. Stakes describes each stop as registering with the trigger tail in one of the two firing settings. In the first position of the selector, corresponding to the semi-automatic mode of operation, stop (78A) is "registered with, meaning aligned with," the notch of the trigger tail, and with the trigger nose (24) received in the trigger notch (49) holding the hammer (40) cocked, Stakes defines a distance D1 between that stop and the notch of the trigger tail. (17:7–45.) In the second position of the selector, corresponding to the assisted-reset semi-automatic mode of operation, stop (78B) is registered with the notch of the trigger tail instead, and Stakes defines a distance D2 between that stop and the notch. (17:7–45.)

165. Stakes describes those distances as governing how far the trigger travels. Stakes states that pulling the trigger lowers the trigger nose out of the trigger notch, releasing the

hammer, "while at the same time raising tail 25A of trigger body 23 toward stop 78A of stop body 78 of selector 70 closing distance D1," until the notch of the tail comes "into direct contact against stop 78A." Stakes describes that contact as arresting the upward movement of the tail and thereby limiting "the pivotal movement of trigger 27 and trigger body 23 past the pulled/fired position." (17:7–45.) Stakes describes the same sequence in the assisted-reset semi-automatic mode with respect to stop (78B) and distance D2. (17:7–45.) In each mode, Stakes states that "the trigger pulling and trigger reset travel distances of trigger body 23 and trigger 27 are equal." (*Id.*)

166. Stakes states that "[d]istance D1 denoted in FIGS. 15 and 17 is greater than distance D2 denoted in FIGS. 16 and 19." (17:46–18:14.) Stakes describes the consequence as follows: "Because distance D2 is less than distance D1, the trigger pull travel distance of trigger body 23 and trigger 27 from the set position thereof to the pulled/fired position thereof in the second position of selector 70 corresponding to the assisted reset semi-automatic mode of operation ... is less than the trigger pull travel distance ... in the first position of selector 70 corresponding to the semi-automatic mode of operation ..., and the trigger reset travel distance ... in the second position of selector 70 ... is less than the trigger rest travel distance ... in first position of selector 70 ...." (17:46–18:14.)




**Stakes '067 Patent at Fig. 17**




**Stakes '067 Patent at Fig. 19**

### 3. Exemplary Elements of the '247 Patent Not Disclosed by Stakes

167. Claim 15 of the '247 patent recites a firearm trigger mechanism operable in a standard semi-automatic mode, in which the disconnector hook catches the hammer hook and the user must manually release the trigger member to free the hammer from the disconnector, and in a forced reset semi-automatic mode, in which the disconnector hook is prevented from catching the hammer hook and the user can thereafter pull the trigger member to fire the firearm. ('247

Patent, cl. 15.) Claim 15 further recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. (*Id.*) Stakes does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Stakes does not disclose.

168. Stakes appears among the references cited on the face of the ’247 patent. (’247 Patent, Cover at [56].) I understand that references listed on the face of an issued patent were before the examiner during prosecution and were considered by the examiner before the patent issued.

**i. A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.**

169. Stakes does not disclose a forced reset mode of operation. Stakes describes a selector (70) having three settings, which Stakes identifies as safe, semi-automatic, and assisted-reset semi-automatic. (6:18–20.) Neither of the two firing settings is a forced reset mode.

170. As set forth above, Stakes describes that in its assisted-reset semi-automatic mode the disconnector hook engages the hammer disconnect notch and arrests forward movement of the hammer after each shot, and that the user must then release pressure on the trigger before the trigger body and trigger nose return to the set position and the disconnector hook is withdrawn to its disengaged position. Stakes describes the hammer as thereafter held cocked “preparatory to firing by another trigger pull.”

171. The difference between what Stakes describes and what claim 15 recites is not one of terminology. Claim 15 recites two distinct modes. In the standard semi-automatic mode, the disconnector hook catches the hammer hook and the user must manually release the trigger member to free the hammer from the disconnector before the firearm can be fired again. In the forced reset semi-automatic mode, the disconnector hook is prevented from catching the hammer

hook, and the user can pull the trigger member to fire again without that manual release. In Stakes' assisted-reset semi-automatic mode, the disconnector captures the hammer after every shot and the user must release pressure on the trigger to free it. In my opinion, that is the operation claim 15 recites for the standard semi-automatic mode, not the forced reset semi-automatic mode.

172. Stakes' own measure of the improvement confirms this. As set forth above, Stakes defines a distance D1 between the semi-automatic stop (78A) and the trigger tail, and a shorter distance D2 between the assisted-reset stop (78B) and the trigger tail, and states that because D2 is less than D1 both the trigger pull travel distance and the trigger reset travel distance are shorter in the assisted-reset semi-automatic mode. (17:46–18:14.) What Stakes describes is therefore a shorter trigger stroke, which shortens the interval between aimed shots. It is not the elimination of the reset. Stakes states that in each mode "the trigger pulling and trigger reset travel distances of trigger body 23 and trigger 27 are equal," so the trigger travels fully back to its set position in both.

173. Stakes explains that an advantage of the inequality between D1 and D2 is a more rapid rate of semi-automatic fire by reducing the trigger reset *distance* that must be covered by the shooter's trigger finger when the shooter resets the trigger body after every shot in the assisted-reset semi-automatic mode of operation. (17:65-18:14). Hence, the assisted-reset semi-automatic operation of Stakes is fundamentally different from the claimed forced reset operation, in which the trigger pull distance covered by the shooter's trigger finger is *not reduced* and trigger reset (but not trigger pull) is fully automatic and *not performed by the shooter*.

**ii. A cam having a cam lobe which forces the trigger member towards the set position.**

174. Stakes does not disclose a cam. The element by which Stakes returns the trigger nose to its set position is the reset lever (50), which Stakes describes as mounted for pivotal movement at a pivot (56) between open and closed positions, having an arm (52) and an arm (53) and biased toward its operative position by a reset lever spring (60). (6:66–7:24; 7:44–60.) Stakes does not describe the reset lever as a cam, and the term "cam lobe" appears nowhere in Stakes.

175. In my opinion the reset lever is not a cam. A cam imparts motion to another member through the contour of a working surface, so that the displacement of the driven member is determined by the shape of the cam as the cam moves through its travel. Stakes' reset lever does not work that way. It is struck by the hammer (40) and then arm (53) of reset lever (50) engages cam surface (35) of disconnector (30) which "imparts the energy from the pivoting reset lever 50 to disconnector 30." (14:22-50). Stakes reserves the term "cam" for two other structures, and the reset lever is neither of them: the cam (75) carried on the selector (70), which bears against arm (52) of the reset lever to hold it in its inoperative position, and the cam surface (35) on the disconnector lever (32), against which arm (53) of the reset lever bears. (7:61–8:5; 6:22–7:60.) In Stakes' own arrangement, the reset lever is a member that bears against a cam surface; it is not the cam.

176. Regardless of how the reset lever is characterized, it is actuated by the hammer rather than by the bolt carrier, and contacts the disconnector. Stakes describes that the striking end (45) of the hammer (40) strikes the reset lever (50) in the past-cocked position of the hammer, pivoting the reset lever from the open position to the closed position, and contacting the disconnector. (12:24–14:64.) By contrast, the '247 patent describes its cam as contacted and

pivoted by the rearwardly moving bolt carrier, which drives the cam lobe against the trigger member. (6:41–42.)

177. The reset lever also does not act on the trigger member. Stakes describes arm (53) of the reset lever as moving "in direct contact against cam surface 35 of disconnector lever 32 of disconnector 30 of trigger disconnector assembly 39." (12:24–43.) The reset lever acts on the disconnector, and the trigger body moves only because the trigger body and the disconnector are pivoted together as the trigger disconnector assembly (39). Claim 15 requires that the cam lobe force the trigger member towards the set position.

### 4. Exemplary Elements of the '159 Patent Not Disclosed by Stakes

178. I understand the asserted claims of the '159 patent to be claims 1, 3, 6, 7, 9 through 11, and 14 through 17.

179. Because the '159 patent is a continuation of the '247 patent and shares its specification, and because the asserted claims recite the same two-mode architecture, my opinions regarding Stakes set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stakes" apply equally to each asserted claim of the '159 patent, and I incorporate them here in full.

180. Stakes also appears among the references cited on the face of the '159 patent. ('159 Patent, Cover at [56].) As with the '247 patent, I understand that Stakes was therefore before the examiner and was considered during prosecution of the '159 patent before it issued.

181. Claim 17 of the '159 patent recites two limitations not present in claim 15 of the '247 patent, which I address separately below.

#### i. A forced reset mode permitting the user to fire again without manually releasing pressure on the trigger member.

182. Claim 17 recites a forced reset mode in which the cam forcibly biases the trigger member into the set position with the hammer and trigger member sear engagement surfaces engaged, "permitting the user to immediately fire again without the user manually releasing pressure on the trigger member." ('159 Patent, cl. 17.) Stakes describes the opposite. As set forth above, Stakes describes that in its assisted-reset semi-automatic mode the user must release pressure on the trigger before the trigger body and trigger nose return to the set position, and describes the hammer as thereafter held cocked "preparatory to firing by another trigger pull." Stakes nowhere describes firing the firearm again without the user releasing pressure on the trigger.

**ii. A difference in operation between modes determined by movable selection of the blocking means.**

183. Claim 17 further recites "a movable blocking means configured to selectively prevent the hammer sear catch surface from engaging with the sear in the set position," and requires that the difference in operation between the modes be determined by movable selection of that blocking means. ('159 Patent, cl. 17.)

184. In Stakes, the selector (70) does not act on the disconnector (30). Stakes describes the selector as acting on the reset lever, by means of the selector cam (75) bearing against arm (52) of the reset lever to hold it in or release it from its inoperative position, and as acting on the trigger body, by means of the selector's stops (78A) relative to the tail (25A) of the trigger body. (7:61–8:5; 9:66–10:62.) Stakes describes no contact between the selector and the disconnector.

185. Nor is the orientation of Stakes' disconnector selected by the user. The disconnector (30) is pivotally mounted together with the trigger body (23) as the trigger disconnector assembly (39) and is not moved by the selector (70).

**E. Inskip '465**

### 1. Bibliographic Information

186. U.S. Patent No. 4,023,465 ("Inskip" or "the '465 patent") is entitled "Firearm." It names Thomas C. Inskip, of Bethesda, Maryland, as the inventor, and identifies no assignee. It issued from Application Serial No. 555,585, filed June 27, 1975, and was patented on May 17, 1977. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective date appears to be the June 27, 1975 filing date.

### 2. Overview of Operation

187. Inskip discloses an auto-loading firearm having a firing mechanism that selectively permits conventional semi-automatic operation or automatic operation in which bursts are fired at a rate that can be varied between one and about twelve rounds per second in response to the operator's finger pressure on the trigger, without release of the trigger. (Abstract.) Inskip characterizes the object of its invention as allowing the operator "to control the rate of fire by varying his finger pressure on the trigger during firing." (1:4–7.) Inskip describes and illustrates its mechanism in combination with a modified rifle of known design, specifically the AK-47, which Inskip characterizes as selectively operable in either a semi-automatic or a full automatic constant rate mode. (1:60–65.)

188. Inskip characterizes the delay characteristic as achieved "by positively and rapidly kicking the trigger in a forward direction against the operator's finger pressure after each round is fired and by locking the trigger in this forward position until another round has been locked in the chamber." (2:10–28.) Inskip states that the kicking action increases the time required for the operator's finger pressure to move the trigger again to its firing position, that the delay is greater when finger pressure is reduced, and that the operator can thereby control the rate of fire with his trigger finger. (2:10–28.)

189. Inskip describes a firing mechanism comprising, among other things, a receiver (10) in which a bolt carrier (20) is longitudinally slidable, the bolt carrier carrying a bolt (24) and a firing pin (28) and returned forward by a spiral return spring (30); a trigger (38) having ribs (44, 46) and a trigger sear (50); a secondary trigger member (56) having a sear surface (70); a hammer (72) having a hammer sear (82); a trigger disengagement arm (98) pivoted on a pin (100) and having a cam surface (102) disposed in the path of a cam surface (104) on the bolt carrier; a stiff rod (106) rigidly connected to the arm (98) and carrying at its rearward end a trigger disengagement sear (108) having a downwardly facing L-shaped sear surface (112, 114) engageable with a trigger sear pin (116); a selector lever (124) carrying a selector lug (118); and a trigger depressor plate (132) loosely carried on the front surface of the selector lug by a nut (134) and bolt (136), the plate being permitted slight vertical movement relative to the lug. (2:53–4:57.)




**Inskip '465 Patent at Fig. 1**

190. Inskip describes the selector lever (124) as movable among three positions. In the full up position the lower surface (130) of the selector lug (118) overlies the rear portion of the trigger so that the trigger cannot be pulled, which Inskip identifies as the safety position. (4:39–47.) Inskip describes the intermediate and down positions as placing the firing mechanism in a variable rate mode and a semi-automatic mode, respectively. (4:39–5:18.) Inskip states that the trigger depressor plate (132) "is non-functional when the selector arm 124 is in either its safety position (FIG. 8) or its semi-automatic position (FIGS. 6 and 7)," and that when the arm is in the intermediate variable rate position the plate cooperates with the bolt carrier and with the trigger. (4:58–5:1.)




**Inskip '465 Patent at Fig. 8**

191. In the variable rate mode, Inskip describes that a cam surface (142) on the bolt carrier (20) strikes and passes over the upper edge (144) of the trigger depressor plate (132), causing the plate to move downwardly against the upper surfaces of the trigger ribs (44, 46) and thereby kick the trigger (38) forward. (4:60–5:20.) Inskip further describes that the cam surface

(104) on the bolt carrier acts on the cam surface (102) of the trigger disengagement arm (98), rotating the arm, the rod (106), and the sear (108) so that the sear is positioned above the trigger sear pin (116). (5:1–6:48.)

Fig. 4.




**Inskip '465 Patent at Fig. 4**

Fig. 5.




**Inskip '465 Patent at Fig. 5**

192. In the semi-automatic mode, Inskip describes that the selector lever is moved to its down position, swinging the selector lug and the trigger depressor plate to a position in which the plate cannot be engaged by the trigger. (6:51–7:68.) Inskip describes that the hammer (72)

then engages under the sear surface (70) on the secondary trigger member (56), "so that the hammer 72 is held back by the latter even if the operator's finger is not released from the trigger." (7:1–3.) Inskip states that "[t]he hammer 72 is not held back in this manner in the variable rate mode, because the trigger 38 is kicked counterclockwise soon after the hammer 72 has been rotated counterclockwise." (7:4–7.)







**Inskip '465 Patent at Figs. 6 and 7**

### 3. Exemplary Elements of the '247 Patent Not Disclosed by Inskip

193. Claim 15 of the ’247 patent recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position, and a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook. (’247 Patent, cl. 15.) Inskip does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations of claim 15 that Inskip does not disclose.

194. Inskip appears among the references cited on the face of the ’247 patent. (’247 Patent, Cover at [56].) I understand that references listed on the face of an issued patent were before the examiner during prosecution and were considered by the examiner before the patent issued. Inskip is also cited on the face of the ’784 patent, where it is designated as having been cited by the examiner. (’784 Patent, Cover at [56].)

195. Inskip was also known to Mr. Blakley, who is the named inventor of the ’247 patent. The Blakley ’723 patent discusses Inskip at length and distinguishes it, stating that Inskip “appears intended to regulate the rate of fire of a machine gun by allowing the operator to control the rate of fire of the firearm by the pulling pressure on the trigger,” that “[t]he exemplary embodiment of Inskip’s invention uses the cycling bolt carrier of an AK47 to move the trigger of the firearm to the forward ready-to-fire position, and then locks the trigger in that position until the bolt carrier returns to battery,” and that “[t]he difference between the present invention and the Inskip invention is that the Inskip mechanism used to allow the bolt carrier to force the trigger forward allows the operator’s trigger finger pressure to be transmitted vertically to the bolt carrier during the entire latter portion of the bolt carrier’s cycle.” (Blakley ’723, 9:50–10:11.) A person working in this field, with Inskip before him, did not regard Inskip as disclosing his own invention.

**i. A cam having a cam lobe which forces the trigger member towards the set position.**

196. Inskip describes "a cam surface 142 on the bolt carrier 20" which "can strike and pass over the upper edge 144 of the plate 132, causing the plate 132 to move downwardly and thereby kick the trigger 38 slightly forward." (4:65–5:1.) Inskip describes the relationship in the same terms elsewhere, stating that "[t]he upper edge 144 of the plate 132 now lies in the path of the cam surface 142 on the bolt carrier 20 so that as the carrier 20 moves rearwardly it cams the plate 132 downwardly against the upper surfaces of the trigger ribs 44 and 46." (5:5–9.) The cam surface Inskip identifies is carried on the bolt carrier, and Inskip does not describe it as contacting the trigger at any point.

197. The trigger depressor plate (132) is the follower member that is cammed, not the cam. In my opinion a cam is a member whose working profile determines the displacement of a driven member as the cam moves through its travel. In Inskip, that description fits the cam surface (142) on the bolt carrier, whose profile determines the downward displacement of the plate. The plate follows that profile and then bears on the upper surfaces of the trigger ribs (44, 46). The arrangement is the familiar one of a cam, a follower, and a member driven by the follower, and Inskip's own terminology assigns each part its conventional role.

198. Claim 15 requires that the cam lobe forces the trigger member towards the set position. Defendant's expert Dr. Batzer opines that "the cam limitation is met by trigger depressor plate 132 (the cam), whose bottom surface is the cam lobe." *See* Batzer Decl., Ex. 13 at 6. I disagree with Dr. Batzer's opinion and his attempted mapping of the Inskip prior art to the claim limitations because, in Inskip, the trigger depressor plate 132 is not properly considered to be a cam but rather would be understood by a person of ordinary skill in the art to instead be a follower, and the bolt carrier surface that Inskip identifies as the cam never reaches contact with the trigger.

**ii. A forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.**

199. In Inskip's variable rate mode, the sear surface 70 on the secondary trigger member 56, *i.e.*, Inskip's disconnector, *does* catch the hammer. Inskip states that in the semi-automatic mode the hammer's sear surface (84) "engages under the sear surface 70 on the secondary trigger member 56 so that the hammer 72 is held back by the latter even if the operator's finger is not released from the trigger," and that "[t]he hammer 72 is not held back in this manner in the variable rate mode, because the trigger 38 is kicked counterclockwise soon after the hammer 72 has been rotated counterclockwise." (6:63–7:7.) Inskip then explains what does occur in the variable rate mode: "That is, in the variable rate mode, engagement of sear surfaces 84 and 70 is momentary and the holding back of the hammer 72 is immediately transferred to sear surfaces 82 and 50." (7:7–10.)

200. Inskip therefore describes the disconnector catching, i.e. "holding back" the hammer in the variable rate mode. What Inskip describes as differing between its two modes is the duration of the catching and the member to which the hammer is thereafter transferred, not whether the catching occurs. Figure 4, which depicts the mechanism during firing in the variable rate mode, shows the sear surface (70) on the secondary trigger member (i.e., Inskip's disconnector) catching the sear surface (84) of the hammer.

201. Claim 15 requires that, in the forced reset semi-automatic mode, the disconnector hook be prevented from catching the hammer hook. Momentary catching is still catching. Inskip discloses no structure that prevents the sear surface on the secondary trigger member from catching the hammer in the variable rate mode, and it expressly describes that catching as occurring.

**4. Exemplary Elements of the '784 Patent Not Disclosed by Inskip**

202. Claim 1 of the ’784 patent, its only independent claim, requires a locking member “having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position.” (’784 Patent, cl. 1.) Claim 4 requires that “the locking member deflectable portion pivots relative to the body portion.” (*Id.*, cl. 4.) Inskip does not disclose these limitations. The following are exemplary and are not an exhaustive statement of the limitations that Inskip does not disclose.

203. Inskip appears among the references cited on the face of the ’784 patent, where it is designated as having been cited by the examiner. (’784 Patent, Cover at [56].) I understand that Inskip was therefore before the examiner during prosecution and was considered by the examiner before the ’784 patent issued.

**i. An upwardly extending deflectable portion that is separately movable relative to the body portion.**

204. Inskip describes its spring (110) as rigidly attached to the sear (108). Inskip states that “[a] spring 110 is rigidly attached at one end to the sear 108 and extends upwardly into the path of the bolt carrier 20.” (4:8–10.) Inskip does not describe that spring as movable separately from the sear and does not describe it as occupying an extended position and a deflected position.

205. What Inskip does describe is the spring moving the sear rather than moving separately from it. Describing the rearward travel of the bolt carrier in the variable rate mode, Inskip states that “the cam surface 142 on the carrier 20 depresses and passes over the trigger disengagement spring 110 so that the trigger disengagement arm 98, its rod 106 and its sear 108 are rotated counterclockwise about the pin 100.” (5:48–56.) The consequence Inskip attributes to

depressing the spring is that the arm, the rod, and the sear rotate together about the pin (100). The spring is the member through which the bolt carrier actuates the assembly.

206. Inskip describes no instance in which the spring moves and the body portion does not. In every operation Inskip describes, movement of the spring is not separate from but rather is accompanied by rotation of the arm (98), the rod (106), and the sear (108) about the pin (100). Claim 1 requires a portion that is separately movable relative to the body portion. A portion whose movement influences the movement of the body portion to which it is connected in every disclosed operation is not "separately" movable relative to it.

**ii. A deflectable portion that pivots relative to the body portion.**

207. Claim 4 requires that the deflectable portion pivot relative to the body portion. Inskip identifies the pivot in this assembly, and it is the pin (100), about which the arm (98), the rod (106), and the sear (108) rotate together. (3:66–4:8.) Inskip describes no second pivot between the spring (110) and the sear (108), and describes the connection between them as rigid. (4:8–10.)

208. In my opinion, a spring rigidly attached at one end and loaded at the other does not pivot relative to the member to which it is attached. Pivoting is rotation about an axis. A member fixed at one end and deflected under load deforms progressively along its length, with the amount of displacement varying from the fixed end to the free end. In my opinion, characterizing that deformation as pivoting would treat a member that bends and a member that is hinged as though they were the same thing, and they are not.

## F. Tommy Triggers FRT-15-3MD

### 1. The Asserted Materials

209. Dr. Batzer identifies "Tommy" as the Tommy Triggers FRT-15-3MD trigger assembly, which he states was sold on or before February 21, 2022. (Batzer Decl. ¶ 140.) He

relies on three materials as establishing what that assembly was: the Complaint in *Rare Breed Triggers, LLC v. Strbac*, No. 1:22-cv-00280 (N.D. Ohio), ECF No. 1 (the "Strbac Complaint"); U.S. provisional patent application no. 63/297,884, filed January 10, 2022, naming Mladen Thomas Strbac as inventor (the "'884 provisional"); and a YouTube video posted June 29, 2022 by user Bingly. (*Id.*) The claim chart addressed to claim 15 of the '247 patent cites only the Strbac Complaint. (Batzer Decl., Ex. 11.)

**2. Overview of Operation**

210. The Strbac Complaint describes the FRT-15-3MD as an assembly accused of infringing U.S. Patent No. 10,514,223, and states that it "includes an additional feature not included in the current version of the Rare Breed FRT-15 trigger," namely that it "can operate in a 'disconnector mode,' which is much like that of a standard AR-15 trigger." (Strbac Complaint ¶ 45.) The Strbac Complaint states that the user "can switch between safe, standard semiautomatic with disconnector, and forced reset semiautomatic with locking bar modes by rotating the safety selector." (*Id.*) The Strbac Complaint identifies the internal components as "the trigger, hammer, locking bar, and springs." (*Id.* ¶ 46.)

211. The Strbac Complaint describes the mechanism of the '223 patent, which it states the accused assembly copies, as resetting the trigger by means of the hammer. The Strbac Complaint states that the '223 patent "teaches a forcible reset of the trigger by the hammer while the bolt returns to the in-battery position," and that it "also teaches a 'locking bar' which limits movement of the trigger," which "acts to prevent the trigger from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position." (*Id.* ¶ 30.)

212. The Strbac Complaint describes the sequence in the same terms. As the bolt carrier moves rearward it "engages with and cocks the hammer," and "the hammer forcibly resets the trigger." (*Id.* ¶ 35.) "Simultaneously, the locking bar engages with the trigger and

mechanically prevents the shooter from pulling the trigger until the locking bar is reset." (*Id.*) As the bolt carrier returns forward, it "contacts and pivots the locking bar, freeing the trigger to be pulled again by the user." (*Id.* ¶ 36.)

213. The '884 provisional application is captioned "Improved Firearm Trigger Mechanism" and "FRT-15-3MD." Its brief description of the drawings identifies the components of the mechanism as a cassette or cartridge housing, a set screw, a guide pin, a safety spring, a safety bar, a safety bar pin, a disconnect, a hammer, a trigger, a hammer spring, a trigger spring, a disconnect spring, set screws, and a three-position safety. The '884 provisional does not show or identify a cam among the components of the mechanism.

### 3. Exemplary Elements of the '247 Patent Not Disclosed by Tommy

214. Claim 15 of the '247 patent recites a cam having a cam lobe which, in the second position of the cam, forces the trigger member towards the set position. ('247 Patent, cl. 15.) Tommy does not disclose that limitation. The following is exemplary and is not an exhaustive statement of the limitations of claim 15 that Tommy does not disclose.

#### i. A cam having a cam lobe which forces the trigger member towards the set position.

215. The materials on which Dr. Batzer relies describe two separate structures performing two separate functions, and neither is the claimed cam. The hammer resets the trigger, and the locking bar blocks it.

216. The Strbac Complaint states that "the hammer forcibly resets the trigger." (Strbac Complaint ¶ 35.) It describes the locking bar as a member that "limits movement of the trigger" and "acts to prevent the trigger from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position." (*Id.* ¶ 30.) It describes the locking bar as engaging the trigger and "mechanically prevent[ing] the shooter from pulling the trigger," and describes

the returning bolt carrier as pivoting the locking bar so as to "free[] the trigger to be pulled again." (*Id.* ¶¶ 35, 36.) On the Strbac Complaint's own account, the locking bar restrains the trigger and releases it. It never drives the trigger toward the set position.

217. Claim 15 requires that the cam lobe force the trigger member towards the set position. A member that holds a trigger where the hammer has already placed it, and that is then pivoted aside to permit the trigger to move, does not perform that function. In my opinion the locking bar described in the Strbac Complaint is not a cam having a cam lobe that forces the trigger member towards the set position, and neither the Strbac Complaint nor the '884 provisional describes a cam that does.

218. Dr. Batzer recognizes this deficiency. In his summary of invalidity arguments he states that "[i]f Plaintiffs dispute that the locking bar is a 'cam' with a 'cam lobe' that 'forces' the trigger toward the set position (because the hammer, rather than the bar, performs the initial reset stroke in the Tommy design), the claim is obvious over Tommy in view of Blakley (Ground 7)." (Batzer Decl., Ex. 13 at 9.)

### G. Daley '523

#### 1. Bibliographic Information

219. U.S. Patent Application Publication No. 2014/0338523 A1 ("Daley" or "the '523 publication") is entitled "Automatic Sear Assembly for a Rifle." It names William C. Daley, Jr., of Kingston, New Hampshire, as the inventor, and SIG SAUER, Inc., of Newington, New Hampshire, as the applicant. It published on November 20, 2014 from Application Serial No. 14/276,045, filed May 13, 2014, and claims the benefit of provisional application No. 61/824,393, filed May 17, 2013.

#### 2. Overview of Operation

220. Daley discloses "[a]n automatic sear assembly for providing a large-bore rifle with full-automatic firing and/or burst firing capabilities." (Abstract.) Daley describes the assembly (10) as comprising an automatic sear (100), an adjacent sear lever (200), a sear lever spring (300), and a sear spring (400). ([0035].) Daley describes the automatic sear as moving into and out of index with the hammer of the host rifle under the control of the rifle's safe/fire selector switch, and as searing with that hammer. ([0039].)

221. Daley characterizes the object of the assembly as firing the rifle again without operating the trigger. Daley states that the assembly "can be used in a rifle, for example, to utilize the force of a moving bolt carrier during a given firing cycle to initiate a subsequent firing cycle without need to release and once again operate the trigger of the rifle." (Abstract; see also [0026].)

222. Daley describes the sear lever (200) as providing one-way articulation between the bolt carrier and the automatic sear, such that "rotational deflection of the sear lever away from the automatic sear imparts no rotation thereto, whereas rotational deflection of the sear lever toward the automatic sear imparts rotation thereto." (Abstract.) Daley describes the sear lever as aiding "in preventing the sear from coming into direct physical contact with the bolt carrier of the rifle." ([0031]; see also [0065].)

### 3. Exemplary Elements of the '784 Patent Not Disclosed by Daley

223. Claim 1 of the '784 patent requires "a locking member that is movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member." ('784 Patent, cl. 1.) Daley does not disclose that limitation.

224. The subject matter of Daley was before the examiner during prosecution of the '784 patent. U.S. Patent No. 9,151,557, which issued from the application that published as the

’523 publication, appears among the references cited on the face of the ’784 patent, where it is designated as having been cited by the examiner. (’784 Patent, Cover at [56].) I understand that the examiner therefore considered this disclosure before the ’784 patent issued.

225. Like Stoner, Daley’s automatic sear does not act on a trigger member. It restrains the hammer. Dr. Batzer describes it the same way, stating that Daley discloses “a locking member (sear assembly 10) movable between a first position in which it locks the hammer from falling ... and a second position in which it does not restrict the hammer’s movement.” (Batzer Decl., Ex. 8 at 7.) Locking a hammer against falling is not locking a trigger member against pulling movement.

226. Nor does Daley describe restraining a trigger at all. The function Daley ascribes to its assembly is to fire the rifle again “without need to release and once again operate the trigger.” (Abstract.)

### H. Sampson ’818

#### 1. Bibliographic Information

227. U.S. Patent No. 10,337,818 B1 (“Sampson” or “the ’818 patent”) is entitled “AK-47 Trigger Assembly.” It names John Burton Sampson, Jr., of Chandler, Arizona, as the inventor and applicant, and identifies no separate assignee on its face. It issued from Application No. 15/904,518, filed February 26, 2018, and was patented on July 2, 2019. The face of the patent reflects no claim of priority to any earlier-filed application, so its earliest effective filing date appears to be February 26, 2018.

#### 2. Overview of Operation

228. Sampson states that it relates to “trigger assemblies for AK-47 firearms.” (1:5–7.) Sampson observes that some prior devices for increasing the firing rate of semi-automatic firearms “alter the firing rate without allowing the alteration to be selected or de-selected,” and

states its object as providing “a trigger assembly having a selectable double fire mode.” (1:31–40.) Sampson describes its “double fire mode” as one “wherein a round is fired upon trigger pull and another round is fired upon releasing the trigger.” (5:29–34.)

229. Sampson describes a trigger assembly (20) comprising a trigger (22) having a sear (28) at its forward portion; a disconnector (23) having a hook portion (34), pivotally mounted on the trigger pin (30) adjacent the trigger; a secondary disconnector (24) pivotally mounted on the rearward portion (32) of the trigger by a pin (43); and a selector bar (25) pivotally coupled to the receiver. (2:59–3:36.) Sampson describes the assembly as a conventional trigger group modified by the incorporation of the secondary disconnector, identifies the trigger group modified in its preferred embodiment as the Tapco G2 trigger group, and states that the modification can be made to other trigger groups used on AK-style firearm platforms. (3:41–51.)

230. Sampson describes the selector bar (25) as movable among three positions: “a back position, placing firearm 10 into a semi-automatic fire mode, a middle position placing firearm 10 in a double fire mode, and a front position, placing firearm 10 in a safe mode.” (3:35–40.) The front position of the selector bar for safe mode is shown in Sampson Fig. 2.

231. In the semi-automatic mode shown in Figs. 3-6, Sampson describes that the selector bar is moved to the back position, forcing the secondary disconnector to its non-limiting position, in which it “does not engage disconnector 23 and allows disconnector 23 to operate in a conventional manner.” (3:62–4:3.) When a round is fired, the bolt carrier pushes the hammer rearward “until it engages and is caught by hook portion 34 of disconnector 23 as shown in FIG. 5.” (4:7–12.) When the trigger is released, the disconnector releases the hammer, which “is then caught and held by sear 28 of trigger 22, completing the firing cycle.” (4:16–20.)




FIG. 5




FIG. 6

**Sampson '818 at Figs. 5-6**

232. In the double fire mode shown in Figs. 7-12, Sampson describes that the selector bar is moved to the middle position, releasing the secondary disconnector to pivot to its limiting position, in which it rides against the back of the disconnector and limits the disconnector to a limited-forward position. (4:28–35; 4:49–52.) Sampson states that the secondary disconnector thereby prevents the disconnector "from moving as far forward as it normally would but still allowing it to capture hammer 18." (4:52–58.) Because the limited-forward position widens the gap between the disconnector hook and the sear, when the trigger is released "hammer 18 has enough room to slip past sear 28 and ignite a round." (4:59–67.)




FIG. 9




FIG. 10

**Sampson '818 at Figs. 9-10**

233. In each of its firing modes, Sampson therefore describes the disconnector catching and holding the hammer after the action cycles while the trigger remains pulled. What the selector bar changes is what happens when the user releases the trigger: in the semi-automatic mode, the hammer is transferred to the sear; in the double fire mode, the hammer slips past the sear and fires a second round. (4:7–27; 4:52–5:3.)

**3. Exemplary Elements of the '403 Patent Not Disclosed by Sampson**

234. Each asserted claim of the '403 patent recites a forced reset semi-automatic mode or position, and claims 14 and 17 further require that, in the forced reset semi-automatic mode,

the disconnector hook be prevented from holding the hammer hook. ('403 Patent, cls. 14, 15, 17, 29, 30, 32, 38, 39.) Sampson does not disclose these limitations.

**i. A forced reset semi-automatic mode.**

235. Sampson does not disclose a forced reset mode of operation. Sampson's three selector positions are safe, semi-automatic, and double fire. (3:35–40; 5:29–34.) Sampson describes no structure that forces the trigger toward its set position as the action cycles. Sampson's trigger is biased toward its engaged position by a spring, and returns to that position when the user releases it. (3:4–7; 4:16–20.) Sampson's double fire mode is a pull-and-release mode in which releasing the trigger fires a second round. (4:59–5:3; 5:29–34.) It is not a mode in which the trigger is forced to its set position against the user's finger pressure, and it is not a mode in which the user can fire again without reducing pressure on the trigger.

**ii. A mode in which the disconnector hook is prevented from holding the hammer hook.**

236. Sampson describes no position of its selector bar in which the disconnector is prevented from holding the hammer. In the semi-automatic mode, the hammer "engages and is caught by hook portion 34 of disconnector 23." (4:7–12.) In the double fire mode, the limiting position of the secondary disconnector restricts the forward travel of the disconnector "but still allow[s] it to capture hammer 18." (4:52–58.)

237. Dr. Batzer's contrary contention rests on a reversal of Sampson's modes. He states that Sampson's middle position is a "standard semi-automatic" position, and that in Sampson's back position the selector bar "retains secondary disconnector 24 in a non-limiting position, allowing primary disconnector 23 to move fully forward so that hook 34 does not hold the hammer after cycling." (Consolidated Batzer Decl., Ex. 25 at 12–14; *see also id.*, Ex. 23 at 1–3.) Sampson states the opposite on both points. Sampson identifies the back position as the position

"placing firearm 10 into a semi-automatic fire mode," and the middle position as the position "placing firearm 10 in a double fire mode." (3:35–40.) And in the back position the disconnector does hold the hammer after cycling: the passage Dr. Batzer cites describes the hammer being "caught by hook portion 34 of disconnector 23 as shown in FIG. 5," and held there until the user releases the trigger. (3:62–4:20.)

238. The middle position that Dr. Batzer calls "standard semi-automatic" is Sampson's double fire mode. Dr. Batzer describes it as a position in which the hammer is held by the disconnector and "manual trigger release [is] required." (Consolidated Batzer Decl., Ex. 23 at 2; *see also id.*, Ex. 25 at 13–14.) In that position, releasing the trigger does not return the hammer to the sear; it fires the firearm. (4:59–5:3.) A mode in which releasing the trigger discharges a round is not the standard semi-automatic mode the asserted claims recite, in which reducing pressure on the trigger member frees the hammer from the disconnector to permit the hammer and the trigger member to pivot to their set positions so that the user can pull the trigger member to fire again. ('403 Patent, cl. 14.)

**I. Fellows '013**

**1. Bibliographic Information**

239. U.S. Patent No. 9,952,013 B2 ("Fellows" or "the '013 patent") is entitled "Trigger Group for Semi-Automatic Firearms." It names Ryan Paul Fellows, of San Jose, California, and Jay Leonard Jacobson, of Minden, Nevada, as inventors, identifies California Business Environments, Inc. as the applicant, and identifies Franklin Armory Holdings, Inc., of Minden, Nevada, as assignee. It issued on April 24, 2018 from Application No. 15/339,982, filed November 1, 2016, which published as U.S. Patent Application Publication No. 2017/0122686 A1 on May 4, 2017. Fellows claims the benefit of U.S. Provisional Patent Application No.

62/250,337, filed November 3, 2015, which Fellows identifies as entitled "BINARY FIRING SYSTEM™ (aka BFS™)." (1:7–11.)

**2. Overview of Operation**

240. Fellows discloses a trigger group for semi-automatic firearms that provides a "binary" mode of fire. Fellows explains that the National Firearms Act, as interpreted by the Bureau of Alcohol, Tobacco, Firearms and Explosives, treats the pull of a trigger and the release of a trigger as separate functions, so that "a firearm that fires a shot upon the pull of a trigger and fires a second shot upon the release of the trigger may not be a machine gun." (1:31–39.) Fellows identifies as an existing approach the Hawbaker trigger system, which provides "one mode for normal semi-automatic operation and another mode that fires by pulling the trigger and fires a second round upon trigger release," and identifies as its own improvements a single selector placed outside the trigger guard and the ability to place the firearm in safe mode even after the trigger has been pulled in the binary mode. (1:40–2:8.)

241. Fellows describes a trigger group (10) comprising a hammer (12), a backup disconnector (26), a binary disconnector (38), a semi-automatic disconnector (50), a trigger (62), and a safety selector assembly (74). (3:53–58.) Fellows states that "[t]he binary disconnector, semi-automatic disconnector, backup disconnector, and sear all act as retention facilities each operable to selectively restrain the hammer in the cocked position." (4:40–43.) Fellows describes the safety selector as providing three distinct modes, "safe mode, semi-automatic mode, and binary mode," and as carrying cam lobe profiles that interact with rearward extensions of the trigger and of each of the three disconnectors to regulate their movement. (4:45–5:3.) The safe mode is depicted in Fig. 3 of Fellows, the semi-automatic mode shown in Figs. 4-6, and the binary mode shown in Figs. 8-12.

242. In the semi-automatic mode, Fellows describes that, after a round is fired, the bolt carrier group pushes the hammer back into the cocked position, and "[t]he notch 22 of the hammer has latched onto the hook 60 of the semi-automatic disconnector 50," an engagement that "prevents the hammer from rotating forward again even though the trigger 62 remains pulled." (5:62–6:6.) When the trigger is released, the semi-automatic disconnector releases the hammer, and the sear on the trigger catches the hammer, "which prevents the hammer from rotating forward until the trigger is pulled again." (6:9–17.)




**Fellows '013 at Fig. 6**

243. In the binary mode, Fellows describes that the safety selector disables the semi-automatic disconnector and enables the binary disconnector. (6:42–61; 8:27–41.) After a round is

fired, "the hook 48 on the binary disconnector engages with the notch 22 on the hammer," an engagement that "prevents the hammer from rotating forward again even though the trigger 62 remains pulled." (8:2–14.) When the trigger is released, the binary disconnector releases the hammer, but the sear "is not positioned to catch the notch 24 in the hammer 12," so that "the hammer rotates forward again upon release of the trigger, discharging a second round." (8:17–26.) Fellows also describes a backup disconnector that catches the hammer in a particular trigger position in which neither the sear nor the binary disconnector can catch it, stating that "it is essential for safety to prevent the hammer from falling forward unintentionally to strike the firing pin." (7:6–25.)

FIG. 11




**Fellows '013 at Fig. 11**

244. In each of its firing modes, Fellows therefore describes a disconnector retaining the hammer after the action cycles while the trigger remains pulled, and the user releasing the trigger before the firearm can be fired by another pull. (9:37–61.) In the semi-automatic mode, release of the trigger transfers the hammer to the sear; in the binary mode, release of the trigger fires a second round. Fellows describes no structure that forces the trigger forward.

**3. Exemplary Elements of the ’403 Patent Not Disclosed by Fellows**

245. Claims 38 and 39 of the ’403 patent each recite “[a] forced reset trigger mechanism” having a safety selector “movable between a standard semi-automatic position and a forced reset semi-automatic position.” Claim 39 further requires that, in the forced reset semi-automatic position, “the trigger member is forced to move to a full reset position against rearward pressure on the trigger member and the rearward pressure on the trigger member does not need to be reduced to actuate the trigger to fire the firearm.” (’403 Patent, cls. 38, 39.) Fellows does not disclose these limitations.

**i. A safety selector having a forced reset semi-automatic position.**

246. Fellows does not disclose forced reset operation in any mode. Fellows’ selector positions are safe, semi-automatic, and binary. (4:45–49.) In neither firing mode does any structure force the trigger toward its forward position against the user’s finger pressure, and in neither firing mode can the user fire again by maintaining pressure on the trigger. In both, a disconnector retains the hammer while the trigger remains pulled, and the user must release the trigger. (5:62–6:17; 8:1–26.)

247. Dr. Batzer’s claim chart states that “Fellows discloses a forced reset function achieved in second selector position,” citing Fellows’ Abstract. (Consolidated Batzer Decl., Ex. 24 at 1, 2.) I disagree with Dr. Batzer’s understanding of Fellows’ Abstract quoted above, and I disagree that Fellows discloses a forced reset function in any of its selector positions, as “forced

reset" would be understood by one of ordinary skill in the art in the context of the '403 patent specification and claims. On the contrary, Fellows' Abstract describes the second selector position as enabling "discharge of the firearm in response to movement of the trigger to the forward position after movement to the rearward position and . . . an additional discharge of the firearm upon release of the trigger to the forward position." (Abstract.) That passage describes the binary mode, in which releasing the trigger fires a second round, rather than forced reset operation.

## VII. RESPONSE TO DR. BATZER'S INVALIDITY ARGUMENTS

### A. Dr. Batzer's November 4, 2026 Declaration

248. The Batzer ARHK Declaration contains no new invalidity analysis. Its section addressing invalidity consists of three paragraphs, in which Dr. Batzer states that, "[a]s further explained in §VIII of my prior Consolidated Declaration, it is my opinion that the asserted patent claims are invalid," notes that other defendants in this multidistrict litigation have submitted their own expert declarations, and reserves the right to amend or supplement his opinions. (Batzer ARHK Decl. ¶¶ 41–43.) He likewise incorporates the legal standards and the descriptions of the asserted patents from that declaration. (*Id.* ¶¶ 17, 22.)

249. In the sections below addressing the '784, '247, and '159 patents, which restate the opinions in my August 6, 2026 declaration, citations to "Batzer Decl." refer to Dr. Batzer's July 9, 2026 declaration and use the exhibit numbering of that declaration. In the section addressing the '403 patent, citations to "Consolidated Batzer Decl." refer to the Consolidated Batzer Declaration and its Exhibits 22 through 25.

250. Dr. Batzer also refers to the June 26, 2026 declaration of Ryan D. Cook, submitted by other defendants in this multidistrict litigation. (Batzer ARHK Decl. ¶ 42; *see ABC IP, LLC v. Mister Guns, LLC*, No. 2:26-cv-00056-ALM (E.D. Tex.), Dkt. 71-7 to 71-11.) Dr.

Batzer does not adopt, describe, or rely on any particular opinion in that declaration. I understand that the deadline to respond to Mr. Cook's declaration has not yet passed. I will respond to Mr. Cook's declaration by that deadline, and I incorporate that forthcoming response by reference here.

251. In his technology overview, Dr. Batzer lists several patents and the Tommy Triggers FRT-15-3MD as examples of forced reset designs, and states that such designs were known as early as 1934, citing U.S. Patent Nos. 2,056,975 and 2,139,691. (Batzer ARHK Decl. ¶ 21.) Dr. Batzer does not rely on any of those items in any ground of invalidity he advances against the '403 patent. The Michal patents (U.S. Patent Nos. 2,056,975 and 2,139,691), the Graves patents, Rounds, and Blakley '723 each appear among the references cited on the face of the '403 patent. ('403 Patent, Cover at [56].)

**B. The '784 Patent**

**1. Ground 1: Anticipation of Claims 1, 3, and 4 by Inskip, Alternatively Obviousness over Inskip Alone**

252. Dr. Batzer contends that claims 1, 3, and 4 are anticipated by Inskip. My opinions regarding Inskip, set forth above in the section titled "Exemplary Elements of the '784 Patent Not Disclosed by Inskip," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Inskip does not disclose an upwardly extending deflectable portion that is separately movable relative to the body portion, as claim 1 requires, or a deflectable portion that pivots relative to the body portion, as claim 4 requires. Claim 3 depends from claim 1.

253. I note that those limitations appear in the body of claim 1 and in claim 4, and not in the preamble. My opinions therefore do not depend on the construction of the phrase "[i]n a

forced re[se]t trigger mechanism" that Dr. Batzer addresses, and they apply whether or not that preamble is limiting.

254. Dr. Batzer contends in the alternative that claims 1, 3, and 4 would have been obvious over Inskip alone. In my opinion that contention fails for the same reasons. The limitations I have identified are absent from Inskip, and Dr. Batzer identifies nothing in Inskip that would have supplied them to a person of ordinary skill in the art.

#### 2. Ground 2: Obviousness of Claims 1, 3, and 4 over Rounds in View of Daley

255. Dr. Batzer contends that claims 1, 3, and 4 would have been obvious over Rounds in view of Daley. My opinions regarding Rounds, set forth above in the section titled "Exemplary Elements of the '784 Patent Not Disclosed by Rounds," and my opinions regarding Daley, set forth above in the section titled "Exemplary Elements of the '784 Patent Not Disclosed by Daley," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

256. Dr. Batzer acknowledges that Rounds discloses every limitation of claim 1 except one. He states that Rounds "does not expressly describe that portion as 'deflectable' or as 'separately movable relative to the body portion,'" and that Daley "supplies precisely that feature." (Batzer Decl., Ex. 8 at 6.) The ground therefore turns on whether a person of ordinary skill would have modified Rounds' locking bar so that its upwardly extending portion moves separately from its body, and on whether Daley supplies a teaching that would have led to that modification.

##### i. The design problem Dr. Batzer identifies does not exist in Rounds.

257. Dr. Batzer states that "Rounds' own geometry presents the design problem Daley solves," namely that the upwardly extending portion "must extend sufficiently above the housing

to be reliably engaged (and pivoted) by surface 54 of the bolt carrier tail portion 56 as the carrier moves forward ... yet must not interfere with the forward portion of the bolt carrier body 58 ... as the carrier travels rearward." (Batzer Decl., Ex. 8 at 8.)

258. That conflict is not inherently or expressly disclosed by Rounds. Rather, it is a problem the '784 patent identifies as arising when Rounds' mechanism is installed in a different firearm platform. The '784 patent states that the embodiment illustrated in Rounds "could be installed in an AR10-pattern lower receiver ... but it would not be operable because the upward extension of the locking member (bar) would be too short to be contacted and actuated," and that "if the upward length/height of the locking member is extended sufficiently to be actuated, it would then interfere with a lower surface of a forward portion of the bolt carrier as it cycles rearward, again making the device inoperable." ('784 Patent, 1:15–20.)

259. Rounds describes its mechanism as adapted for use in AR15-pattern firearms, and identifies no such conflict. In my opinion, a person of ordinary skill in the art reading Rounds would not necessarily have perceived the problem Dr. Batzer describes, because Rounds' geometry does not present it. The conflict arises only on the different platform the '784 patent identifies, and it is the '784 patent, not Rounds and not Daley, that identifies it.

260. The single item Dr. Batzer offers as evidence of a constraint in Rounds does not support him. He states that the conflict is "aggravated by Rounds' rearward extension 64, which limits how far the extending portion can pivot rearward." (*Id.*) Rounds states that the rearward extension (64) "serves as a means to limit the extent to which it can pivot toward the blocking position." (Rounds, 5:6–9.) That is a horizontal stop limiting travel of the locking bar 62 in the blocking direction, but does not identify or suggest any problem involving the height of the top

of the locking bar 62 or any interference with or inability for it to reach a bottom contour of the bolt carrier.

**ii. Daley's teaching is directed to holding a hammer, and its stated advantage does not apply to Rounds.**

261. As set forth above, Daley discloses an automatic sear assembly whose locking member restrains the hammer, not a trigger member. In my opinion Daley therefore does not suggest a two-part trigger locking member of the kind claim 1 recites.

262. The advantage Daley states for its sear lever does not address any problem or need disclosed by Rounds. Daley states that the sear lever "aids in preventing the sear from coming into direct physical contact with the bolt carrier of the rifle," which "can help to eliminate or otherwise reduce the likelihood of causing the host rifle to bind during full-automatic and/or burst firing." ('523 publication, [0031].) Rounds locking bar is not disclosed to have any problem binding the bolt carrier, and Rounds does not describe full-automatic or burst firing.

**iii. Dr. Batzer does not explain how the modified extension would work.**

263. Dr. Batzer states that the combination yields "an upwardly extending deflectable portion that moves to a deflected position when the rearward-moving bolt carrier applies force to it, and that remains in the extended position when the rear of the bolt carrier applies force in the forward direction." (Batzer Decl., Ex. 8 at 9.) He does not explain what structure would produce that behavior in Rounds.

264. A pinned connection between the extending portion and the body, standing alone, would not. Such a connection would permit the extending portion to move in either direction, and would provide nothing to return it to its extended position after it deflects.

265. Daley achieves the one-way behavior through structure Dr. Batzer does not carry over. Daley's sear lever (200) has its own dedicated spring, the sear lever spring (300), which is separate from the sear spring (400), and Daley describes a particular relationship between the radial lengths of the sear lever and the sear. Rounds has a single biasing spring (70), and Rounds describes that spring as acting on the locking bar as a whole: "the biasing spring 70 moves the lower end of the locking bar 62 into a second position ... in which it blocks pivotal movement of the trigger." (Rounds, 5:38–40.) Nothing in Rounds would return a separately movable extending portion to its extended position.

266. In my opinion one of ordinary skill in the art would not be motivated to combine Rounds and Daley in the way that Dr. Batzer suggests, and to do so in a way that would result in an operable mechanism as claimed by the '784 patent would require impermissible hindsight gleaned from the '784 patent specification and drawings themselves.

267. Claim 3 requires that the locking member body portion pivot between the first and second positions. Dr. Batzer's entire treatment of that claim is that "Daley's modification of the extending portion leaves this pivoting body architecture untouched, so claim 3 falls with claim 1." (Batzer Decl., Ex. 8 at 9.) In my opinion that assumes the claimed function rather than demonstrating it. Whether the body portion pivots as claimed depends on whether the specifics of the prior art combination cherry-picked and arranged by hindsight gleaned from the '784 disclosure itself, and Dr. Batzer does not explain why one of ordinary skill in the art would arrive at the claimed structure and claimed function otherwise.

**iv. Both references were before the examiner.**

268. As set forth above, Rounds appears among the references cited on the face of the '784 patent and is identified by number and incorporated by reference in its Background, and the subject matter of Daley appears on that face as U.S. Patent No. 9,151,557, designated as having

been cited by the examiner. I understand that both were therefore before the examiner during prosecution and were considered before the ’784 patent issued.

### C. The ’247 Patent

#### 1. Ground 1: Anticipation of Claim 15 by Stakes

269. Dr. Batzer contends that claim 15 is anticipated by Stakes. My opinions regarding Stakes, set forth above in the section titled “Exemplary Elements of the ’247 Patent Not Disclosed by Stakes,” apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Stakes does not disclose a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook, or a cam having a cam lobe which forces the trigger member towards the set position.

#### 2. Ground 2: Anticipation of Claim 15 by Blakley ’723, Alternatively Single-Reference Obviousness

270. Dr. Batzer contends that claim 15 is anticipated by Blakley ’723. My opinions regarding Blakley ’723, set forth above in the section titled “Exemplary Elements of the ’247 Patent Not Disclosed by Blakley ’723,” apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Blakley ’723 does not provide enabling disclosure of a trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode, nor does it disclose a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.

271. Dr. Batzer contends in the alternative that claim 15 would have been obvious over Blakley ’723 alone. In my opinion that contention fails for the same reasons. Implementing the arrangement described at column 11 of Blakley ’723 would have required a person of ordinary skill in the art to speculatively create the missing structures that Blakley ’723 does not describe,

without adequate information in the reference to do so definitely, reliably, consistently, or with a reasonable expectation of success.

### 3. Ground 3: Anticipation of Claim 15 by Inskip

272. Dr. Batzer contends that claim 15 is anticipated by Inskip. My opinions regarding Inskip, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Inskip," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Inskip does not disclose a cam having a cam lobe which forces the trigger member towards the set position, or a forced reset semi-automatic mode in which the disconnector hook is prevented from catching the hammer hook.

### 4. Ground 4: Anticipation of Claim 15 by Tommy

273. Dr. Batzer contends that claim 15 is anticipated by the Tommy Triggers FRT-15-3MD. My opinions regarding Tommy, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Tommy," apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion the materials Dr. Batzer relies upon do not describe a cam having a cam lobe which forces the trigger member towards the set position. They describe a hammer that resets the trigger and a locking bar that restrains it.

### 5. Ground 5: Obviousness of Claim 15 over Stoner in View of Blakley '723

274. Dr. Batzer contends that claim 15 would have been obvious over Stoner in view of Blakley '723. My opinions regarding Stoner, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Stoner," and my opinions regarding Blakley, set forth above in the section titled "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

### i. The proposed combination would not produce a mechanism operable in a standard semi-automatic mode.

275. Claim 15 requires a trigger mechanism operable in both a standard semi-automatic mode and a forced reset semi-automatic mode. In my opinion the mechanism Dr. Batzer describes would not be operable in a standard semi-automatic mode, at least because nothing in either reference would disable the cam.

276. Blakley's cam is pivoted by the rearwardly traveling bolt carrier on every cycle, and Blakley '723 describes no structure by which a selector engages or disengages it. Installed in Stoner, the cam would therefore bear on the trigger extender and force the trigger toward its set position on every cycle, including in the condition Dr. Batzer identifies as the standard semi-automatic mode. The result would be a mechanism having a safe condition and a forced reset condition, not the three conditions claim 15 requires.

277. The only disclosure in either reference addressed to selectively disabling the cam is the passage at column 11 of Blakley '723. For the reasons set out above, in my opinion that passage does not contain an enabling disclosure of such an arrangement. Combination with Stoner does not correct this deficiency because Stoner does not teach or suggest compatibility with any vertical trigger extension, cam, or a semi-automatic mode that is selected by longitudinal translation of a trigger extension. There is no such compatibility and hence no motivation to combine. Dr. Batzer is counting firing modes in each prior art reference, but overlooking that the semiautomatic mode of Stoner is obtained by a specific means that is incompatible with the key components of Blakley '723.

278. Dr. Batzer acknowledges that his combination depends on that question and dismisses it. Addressing the same Stoner and Blakley '723 ground as applied to the '159 patent, he states that "[a]ny argument that Blakley '723 alone does not spell out every standard semi-

automatic detail is immaterial to the Stoner/Blakley ground because Stoner expressly discloses that detail," and that "[a] POSA would have understood that when the Blakley forced reset effect is deselected, the firearm operates in conventional semi-automatic mode using the trigger, hammer, and disconnector." (Batzer Decl., Ex. 17 at 22.) In my opinion that reasoning does not hold. Stoner describes semi-automatic operation of a mechanism that contains no cam or vertical trigger extender. Stoner therefore says nothing about how semi-automatic operation would be preserved once a cam driven by the bolt carrier has been added to it. The question of how the cam is deselected is not answered by Stoner.

**ii. Dr. Batzer does not explain how Blakley's trigger extender could be installed in Stoner.**

279. Blakley '723 describes its trigger extender (90) as seated in a trigger groove (30) formed in the rear of Blakley's trigger (22). Stoner's trigger (50) has no such groove, and Dr. Batzer does not address how one would be provided.

280. Further, the rear of Stoner's trigger is occupied. Stoner's intermediate sear (68), which Dr. Batzer identifies as the claimed disconnector, is pivotally mounted on the same transverse pin (52) as the trigger, and has a rearward extremity that extends to the control cam. Stoner describes the control cam as acting directly on that rearward extremity: in the semi-automatic condition "the rearward extremity of the intermediate sear 68 is freed by rotation" of the control member, and in the automatic condition the intermediate sear "is maintained in locked condition." Blakley's trigger extender would be installed in that same region, between the trigger and the control cam. Dr. Batzer does not explain how the trigger extender could be installed there without interfering with the rearward extremity of the intermediate sear or with the control cam's ability to act upon it, and in my opinion neither reference provides guidance on that question.

**iii. The proposed modification is not the substitution of one known element for another.**

281. Dr. Batzer characterizes the combination as "the substitution of a known element for another to obtain predictable results." In my opinion it is not. Stoner's automatic sear (96) and Blakley's cam (66) perform different functions on different components. Stoner's automatic sear engages the automatic sear abutment (92) on the rearward extremity of the hammer and holds the hammer. Blakley's cam bears on the trigger extender and resets the trigger. Dr. Batzer's own description reflects the difference: he states that "Stoner lacks only the cam that forces the trigger toward its set position" and that "Stoner instead uses automatic sear 96 for its third mode." A component that holds a hammer and a component that resets a trigger are not alternatives for the same function, and exchanging one for the other is not a substitution.

**iv. A person of ordinary skill would not have had a reasonable expectation of success.**

282. The combination Dr. Batzer describes requires removing one component of Stoner's mechanism, adding two components from Blakley, re-machining Stoner's trigger to receive one of them, and shortening Stoner's hammer. It also requires, among other changes, resolving the interference between the trigger extension and the disconnector, and supplying a means of disabling the cam that neither reference describes. In my opinion, a person of ordinary skill in the art presented with that number of unguided design changes, in a mechanism whose function depends on the relative timing and clearance of parts moving at high speed, would not have had a reasonable expectation that the result would work as claim 15 requires.

**v. Both references were before the examiner, and the combination did not emerge for decades.**

283. Stoner and Blakley each appear among the references cited on the face of the '247 patent. ('247 Patent, Cover at [56].) The '247 patent also identifies Blakley by number in its

Background. I understand that both references were therefore before the examiner during prosecution and were considered before the ’247 patent issued.

284. Stoner issued in 1962. Blakley ’723 issued in 2008. I am not aware of any forced reset trigger mechanism of the kind described in the ’247 patent, and in particular none commercially produced or offered for sale, that became available before Rare Breed’s FRT-15 trigger was introduced in 2020, roughly fifty-eight years after Stoner and roughly twelve years after Blakley. In my opinion, if the combination Dr. Batzer describes were as straightforward as he suggests, there would be more than zero products having a longitudinally-translatable trigger extension for selective cam-driven resetting of the trigger. Presently I am aware of zero.

### 6. Ground 6: Obviousness of Claim 15 over Blakley ’723 in View of Tommy

285. Dr. Batzer contends that claim 15 would have been obvious over Blakley ’723 in view of Tommy. My opinions regarding Blakley, set forth above in the section titled “Exemplary Elements of the ’247 Patent Not Disclosed by Blakley ’723,” and my opinions regarding Tommy, set forth above in the section titled “Exemplary Elements of the ’247 Patent Not Disclosed by Tommy,” apply to this ground, and I incorporate them here. I address the proposed combination separately below.

286. Dr. Batzer states that this ground “assumes, contrary to Ground 2, that Blakley’s momentary disconnector/hammer engagement during forced reset ... does not satisfy ‘prevented from catching.’” (Batzer Decl., Ex. 13 at 10.) The modification he proposes is to extend “the tail end of Blakley’s disconnector within trigger groove 30,” so that “Blakley’s selector-cam would then act on the disconnector tail directly rather than working against trigger-extender spring force.” (*Id.* at 11.)

#### i. The modification depends on a structure Blakley ’723 does not describe.

287. The modification requires a selector that acts on the disconnector. Blakley ’723 describes no such selector. The term “selector-cam” appears twice in Blakley, both times within the passage at column 11, and it is assigned no reference numeral and shown in no figure. The selector Blakley actually describes is the safety selector (82), which Blakley ’723 describes only as a rotatable member having an outer lever and an inner tubular portion with a plurality of flat recessed surfaces (88). (*See generally* col. 6.) Blakley ’723 does not describe that selector as acting upon the disconnector.

288. In my opinion, one of ordinary skill in the art would not be motivated to make the modification required for this ground. Dr. Batzer states that his modification “eliminates ... the trigger-extension motion described at Blakley 11:11–25.” The modification therefore discards the column 11 arrangement that Dr. Batzer relied upon, replacing it with a mechanism cobbled together from different references using the ’247 patent as a guide.

289. The selector component that Dr. Batzer takes from Tommy is not the selector that Blakley ’723 describes, nor would it work unmodified. The passage he quotes describes “a narrow semi-circular portion of the safety selector” that “contacts the tail of the disconnector, which is sticking out of the housing.” (*Id.*) Blakley’s safety selector has flat recessed surfaces, is not described as having a narrow semi-circular portion, and is not described as having three positions. Adopting the arrangement Dr. Batzer describes would require modifying Blakley’s selector as well, which he does not address. Moreover, the selector that Dr. Batzer takes from Tommy would not itself work with the disconnector of Blakley ’723, even if that had a tail, because the disconnector of Blakley ’723 is centered laterally while the disconnector and its tail in Tommy is laterally offset. Hence, Dr. Batzer suggests a modification that would not work

without modification – changing Tommy's selector lobe to be centered rather than laterally offset.

**ii. Blakley's disconnector has no tail, and Blakley's trigger groove is occupied.**

290. Blakley's disconnector has no rearward tail to extend. Blakley '723 describes the disconnector (38) as having "a lower attachment portion," through which a mounting pin hole (40) is provided and which has "a downwardly disposed spring recess" (42), and "an upper portion" having "a generally forwardly oriented hooked configuration with a hammer hook" (44). (5:28–34.) Blakley '723 describes no rearward portion of the disconnector at all.

291. The location into which Dr. Batzer proposes to extend such a tail is occupied. Blakley '723 describes the inner portion of its trigger as having a seat with "two upwardly projecting side walls and a rear wall" which "form an upwardly displaced groove," and describes the trigger extender as having a lower surface with "a first external side to side first width to be received by and mated with the upward trigger groove." (5:13–27, 7:46–53.) The groove is therefore a walled seat dimensioned to receive and mate with the trigger extender.

292. The trigger extender cannot be removed to make room. Blakley's cam acts on the stepped upper surface of the trigger extender in order to force the trigger toward the set position. Without the trigger extender, the cam would have nothing to bear upon and the forced reset operation Blakley '723 describes would not occur. Dr. Batzer does not explain how a disconnector tail could be extended into that groove alongside the trigger extender, and in my opinion one of ordinary skill in the art would not be motivated to make a modification with that unresolved interference.

**iii. The reasons Dr. Batzer gives for the modification do not withstand examination.**

293. Dr. Batzer states that the modification "eliminates Blakley's trigger-extension spring, its complex machined trigger-extension bearing surfaces, and the trigger-extension

motion described at Blakley 11:11–25." (Batzer Decl., Ex. 13 at 11.) Each of those features is part of the arrangement described in the column 11 passage. In my opinion a person of ordinary skill in the art would not have been motivated to or know how to change a structure that Blakley '723 did not adequately describe or enable in the first place, where the modification would also require adding a disconnector tail that interferes with the trigger extension and would require modifying the selector whether or not taken from a different reference.

294. Dr. Batzer further states that the modification "reduces wear on the disconnector and hammer hooks, which no longer contact at all during forced reset cycling." (*Id.*) The absence of contact between the disconnector hook and the hammer hook during forced reset operation is the very limitation claim 15 recites. The benefit Dr. Batzer identifies is the claimed result, not a reason or way that a person of ordinary skill would have arrived at it.

295. Finally, Dr. Batzer states that "Blakley '723 already contemplates a simplified trigger extension (Figs. 2A–2C, 3A), inviting exactly this streamlining." (*Id.*) However, Dr. Batzer does not explain how a simplified trigger extension would invite the addition of a disconnector extension that would have to interfere with it to reach the selector, or how a simplified trigger extension would invite modifying the selector of Blakley '723 to have a disconnector tail depressing lobe, or invite modifying the selector of Tommy to be laterally centered rather than laterally offset. In my opinion, the simplified trigger extension of Blakley '723 invites none of the foregoing required modifications.

**iv. A person of ordinary skill would not have had a reasonable expectation of success.**

296. The modification Dr. Batzer describes requires adding a rearward tail to Blakley's disconnector, fitting that tail into a walled groove already occupied by and dimensioned for the trigger extender, modifying the safety selector to include a lobe that bears on the tail, and

coordinating the timing of that lockout with the cam's action on the trigger extender. Neither reference describes any of those things. In my opinion, a person of ordinary skill in the art would not have had a reasonable expectation that the result would work as claim 15 requires, at least because the modifications appear to cause interference between the resulting subcomponents as described already herein.

**v. Blakley and the Strbac disclosure were before the examiner.**

297. Blakley appears among the references cited on the face of the '247 patent and is identified by number in its Background. The disclosure of the Tommy Triggers FRT-15-3MD was also before the examiner: U.S. Patent No. 11,724,003 to Strbac appears among the references cited on the face of the '247 patent, and the '247 patent's Background identifies U.S. patent application Serial No. 18/048,572, filed October 21, 2022, which matured into that patent, and incorporates it by reference. ('247 Patent, Cover at [56]; 1:66–2:1.) I understand that both disclosures were therefore before the examiner during prosecution and were considered before the '247 patent issued.

**7. Ground 7: Obviousness of Claim 15 over Tommy in View of Blakley '723**

298. Dr. Batzer contends that claim 15 would have been obvious over Tommy in view of Blakley '723. My opinions regarding Tommy and Blakley, set forth above in the sections titled "Exemplary Elements of the '247 Patent Not Disclosed by Tommy" and "Exemplary Elements of the '247 Patent Not Disclosed by Blakley '723," apply to this ground, and I incorporate them here. I address the proposed combination separately below.

299. Dr. Batzer describes this ground as a fallback. He states that it "is the mirror image of Ground 6 and protects against a challenge to Tommy's 'cam' limitation," and that "[i]f Tommy's locking bar is not deemed to be a 'cam' (because Tommy uses the hammer for the reset stroke and the locking bar to hold the reset), a POSA would modify Tommy in light of Blakley to

replace the rectangular locking bar with Blakley's rounded cam 66." (Batzer Decl., Ex. 13 at 11–12.)

**i. The modification requires more than exchanging a bar for a cam.**

300. Blakley's cam does not act on the trigger directly. It bears on the stepped upper surface of a trigger extender, which is seated in a groove formed by side walls and a rear wall in the inner portion of Blakley's trigger. Dr. Batzer does not address how a trigger extender and a groove to receive it would be provided in Tommy's trigger, which the materials he relies upon do not describe as having either.

301. Blakley '723 also describes its cam as carried in a cam body subassembly (62) comprising a cam body housing (64), a cam (66), and a cam mounting pin (68), or in the alternative as requiring that the cam and the firearm receiver be "fashion[ed] ... in such a way as to allow the cam to be pinned in place directly to the receiver." (5:60–6:14; 11:6–10.) Dr. Batzer does not explain how either arrangement would be accommodated in Tommy's assembly.

302. The modification would also reintroduce the interference I describe above in connection with Ground 6, in mirror image. Dr. Batzer's combination retains Tommy's selector-controlled disconnector lockout, which is what he says supplies the prevention of catching, and that arrangement requires a disconnector tail projecting rearward from the housing. Adding Blakley's trigger extender places a second member in that same region. Dr. Batzer does not address how both would be accommodated. One of ordinary skill in the art would not make the modification because of the apparent component interference.

**ii. The reasons given for the modification are the claim limitation itself.**

303. The reason Dr. Batzer gives for making this modification is that it supplies an element he acknowledges may be missing. He states that the ground "protects against a challenge to Tommy's 'cam' limitation," and conditions it on the possibility that "Tommy's locking bar is

not deemed to be a 'cam.'" (Batzer Decl., Ex. 13 at 11–12.) In my opinion that is not a reason a person of ordinary skill in the art would have modified Tommy. It is rather a desired litigation result.

304. The remaining benefits Dr. Batzer identifies are "reduced complexity, improved reliability, reduced hammer and trigger wear, and reduced material (the trigger no longer needs the hump the hammer presses), lowering cost and weight." (*Id.*) In my opinion those are generic assertions rather than teachings drawn from either reference. Neither Tommy nor Blakley '723 identifies any deficiency in the locking bar arrangement, and neither suggests replacing it. Moreover, a modification that would create mechanical interference between a necessary component and another component from a different reference inserted in the same space is not "reduced complexity, improved reliability," or "reduced material."

**iii. A person of ordinary skill would not have had a reasonable expectation of success.**

305. The modification requires removing Tommy's locking bar, removing the surface of Tommy's trigger that the hammer contacts to reset it, adding Blakley's cam together with a cam body or a modified receiver, adding a trigger extender and a groove in Tommy's trigger to receive it, accommodating that extender alongside the disconnector tail, and re-timing the resulting mechanism so that the trigger is reset and then released in the proper sequence. Neither reference describes any of those steps. In my opinion a person of ordinary skill in the art would not have had a reasonable expectation that the result would work as claim 15 requires, and would have had reason to expect the opposite, since the modification removes the structure that prevents the trigger from being pulled before the bolt carrier returns to battery and creates a mechanical interference between subcomponents occupying the same space.

**iv. Blakley and the Strbac disclosure were before the examiner.**

306. As set forth above in connection with Ground 6, Blakley and the disclosure of the Tommy Triggers FRT-15-3MD were each before the examiner during prosecution of the '247 patent, and I incorporate that discussion here.

**D. The '159 Patent**

**1. Ground 1: Obviousness of the Asserted Claims over Stoner in View of Blakley '723**

307. Dr. Batzer contends that the asserted claims of the '159 patent would have been obvious over Stoner in view of Blakley '723. That is the same combination he advances against claim 15 of the '247 patent as Ground 5. My opinions regarding that combination, set forth above in the section titled "Ground 5: Obviousness of Claim 15 over Stoner in View of Blakley '723," apply equally to the asserted claims of the '159 patent, and I incorporate them here.

308. My opinions regarding Stoner and Blakley '723 individually, set forth above in the sections titled "Exemplary Elements of the '159 Patent Not Disclosed by Stoner" and "Exemplary Elements of the '159 Patent Not Disclosed by Blakley '723," also apply to this ground and I incorporate them. Those opinions include my opinions regarding the additional limitations of claim 17, which recites a mode selector operable by the user to select between a semi-automatic mode and a forced reset mode, and requires that the difference in operation between the modes be determined by movable selection of the blocking means.

**2. Ground 2: Anticipation of the Asserted Claims by Stakes, Alternatively Obviousness**

309. Dr. Batzer contends that the asserted claims of the '159 patent are anticipated by, or would have been obvious over, Stakes. My opinions regarding Stakes, set forth above in the section titled "Exemplary Elements of the '159 Patent Not Disclosed by Stakes," apply to this ground, and I incorporate them here, together with the opinions incorporated by that section from my analysis of Stakes as to the '247 patent.

310. In my opinion Stakes does not disclose the limitations identified in that section, and Dr. Batzer identifies nothing in Stakes that would have supplied them to a person of ordinary skill in the art.

### E. The ’403 Patent

311. Dr. Batzer advances four grounds against the asserted claims of the ’403 patent: anticipation by Blakley ’723 or, alternatively, obviousness over Blakley ’723 alone (Ground 1); obviousness over Blakley ’723 in view of Stoner (Ground 2); obviousness of claims 14, 15, 17, 29, 30, and 32 over Rounds in view of Sampson (Ground 3); and obviousness of claims 38 and 39 over Rounds in view of Fellows (Ground 4). (Consolidated Batzer Decl. ¶¶ 191–98; Ex. 25 at 1–2.)

#### 1. Ground 1: Anticipation by Blakley ’723, Alternatively Obviousness over Blakley ’723 Alone

312. Dr. Batzer contends that claims 14, 15, 17, 29, 30, 32, 38, and 39 are anticipated by Blakley ’723. My opinions regarding Blakley ’723, set forth above in the section titled “Exemplary Elements of the ’403 Patent Not Disclosed by Blakley ’723,” apply to this ground, and I incorporate them here. For the reasons set forth in that section, in my opinion Blakley ’723 does not provide an enabling disclosure of a standard semi-automatic mode of operation of its mechanism or of a safety selector that selects between a standard semi-automatic mode and a forced reset semi-automatic mode, and it does not disclose a forced reset semi-automatic mode in which the disconnector hook is prevented from holding the hammer hook. Each asserted claim of the ’403 patent requires the first of those limitations; claims 15, 29, 32, 38, and 39 also require the second; and claims 14, 15, 17, 29, and 30 also require the third.

313. This ground rests on the same passage at column 11 of Blakley ’723 that Dr. Batzer relies upon against the ’247 and ’159 patents. As I explain above, that passage has been

considered by the examiners of the ’247 and ’159 patents, in the Eastern District of Tennessee, and in an inter partes review proceeding, and none of those forums concluded that it discloses a selectable standard semi-automatic mode. The ’403 patent’s own Background describes Blakley ’723 as a device in which a pivoting cam contacted by the rearwardly traveling bolt carrier forces the trigger forward, and attributes no mode-selection capability to it. (’403 Patent, 2:9–18.)

314. Dr. Batzer contends in the alternative that the asserted claims would have been obvious over Blakley ’723 alone, stating that “[i]f there is any doubt that Blakley discloses conventional semi-automatic operation, it would at minimum have been obvious from Blakley alone.” (Consolidated Batzer Decl., Ex. 25 at 3–4.) He does not explain what modification of Blakley ’723 a person of ordinary skill in the art would have made, how that person would have made it, or why that person would have expected it to work. In my opinion that contention fails for the same reasons as his anticipation contention. Implementing the arrangement described at column 11 would have required a person of ordinary skill in the art to speculatively create the structure Blakley ’723 does not describe, including the “selector-cam,” the means of moving and retaining the trigger extender, and a way of moving the trigger extender without carrying it into interference with the disconnector. Dr. Batzer identifies nothing in Blakley ’723 that would have adequately guided such speculation towards a definite result with a reasonable likelihood of success.

**i. Blakley ’723 was before the examiner.**

315. Blakley ’723 appears among the references cited on the face of the ’403 patent, and the ’403 patent identifies Blakley ’723 by number in its Background and incorporates it by reference in its entirety. (’403 Patent, Cover at [56]; 2:9–13.) I understand that Blakley ’723 was therefore before the examiner during prosecution and was considered by the examiner before the ’403 patent issued.

### 2. Ground 2: Obviousness over Blakley ’723 in View of Stoner

316. Dr. Batzer contends that the asserted claims would have been obvious over Blakley ’723 in view of Stoner. My opinions regarding Blakley ’723 and Stoner, set forth above in the sections titled “Exemplary Elements of the ’403 Patent Not Disclosed by Blakley ’723” and “Exemplary Elements of the ’403 Patent Not Disclosed by Stoner,” apply to this ground, and I incorporate them here. Dr. Batzer advances the same two references in combination against claim 15 of the ’247 patent and against the ’159 patent, and my opinions regarding that combination, set forth above in the section titled “Ground 5: Obviousness of Claim 15 over Stoner in View of Blakley ’723,” apply equally here. I address the additional points Dr. Batzer makes as to the ’403 patent below.

#### i. The combination would not produce a mechanism operable in a standard semi-automatic mode.

317. Dr. Batzer states that Stoner “independently discloses the conventional semi-automatic disconnector sequence and a concrete multi-position selector architecture, eliminating any dispute over Ground 1,” and that a person of ordinary skill in the art “would have used Stoner’s established selector architecture to implement Blakley’s disclosed select/deselect function.” (Consolidated Batzer Decl., Ex. 25 at 1, 9.) That a conventional semi-automatic sequence existed has never been in dispute. The question is how a standard semi-automatic mode would be obtained in a mechanism in which Blakley’s cam is pivoted by the rearwardly traveling bolt carrier and forces the trigger forward on every cycle, and Stoner does not answer it. Stoner’s control cam (124) engages the trigger, the intermediate sear, and the automatic sear. (Stoner, 2:43–3:30.) Stoner describes no cam driven by the bolt carrier, no trigger extender, and no structure by which a selector could move a trigger extender out of the path of such a cam. The

only disclosure in either reference addressed to disabling Blakley's cam is the passage at column 11 of Blakley '723, which, for the reasons set out above, is not an enabling disclosure.

318. Blakley '723 states that "[i]n resetting the trigger the disconnector ceases to engage the hammer." (Blakley '723, 10:46–47.) As long as Blakley's cam continues to reset the trigger on every cycle, therefore, Blakley's disconnector releases the hammer on every cycle, and the user is not required to reduce pressure on the trigger before firing again. One of ordinary skill in the art would have no expectation that Stoner's selector could prevent Blakley's cam from doing so in any selector position, including the position Dr. Batzer identifies as the standard semi-automatic position. In my opinion the result of the modification would not be a mechanism selectable between a standard semi-automatic mode and a forced reset semi-automatic mode, as each asserted claim of the '403 patent requires.

**ii. Dr. Batzer's reliance on Stoner's automatic condition.**

319. Dr. Batzer also relies on Stoner's automatic condition, stating that "[i]n the proposed combination, Stoner's selector teachings control which operating relationship applies." (Consolidated Batzer Decl., Ex. 25 at 10.) As set forth above, Stoner's automatic condition is automatic fire, in which the returning bolt carrier releases the hammer through the automatic sear without any actuation of the trigger by the user. (Stoner, 4:42–56.) Blakley '723 identifies as an object of its invention increasing the cyclic firing rate "without causing the firearm to fall into the legal definition of a machine gun," and emphasizes that its mechanism preserves semi-automatic status because "the firearm only discharges one round of ammunition for each pull of the trigger." (Blakley '723, 10:30–33; 8:24–26.) In my opinion, a person of ordinary skill in the art beginning with Blakley '723 would not have been motivated to combine Stoner's automatic-fire teachings with in Blakley's mechanism. Those teachings are directed to the result Blakley '723 states that its invention avoids.

320. Dr. Batzer does not explain how the proposed combination would provide a forced reset semi-automatic mode in which the disconnector hook is prevented from holding the hammer hook, as claims 14, 15, 17, 29, and 30 require. In Blakley's forced reset sequence, the disconnector catches and holds the hammer before the cam resets the trigger. (Blakley '723, 10:34–47.) The only teaching Dr. Batzer identifies for keeping a disconnector from holding the hammer is Stoner's automatic condition, in which Stoner locks its intermediate sear against movement while its automatic sear holds the hammer for release by the bolt carrier. (Stoner, 4:25–56.) Beyond stating that Stoner's selector teachings would control which operating relationship applies, Dr. Batzer does not explain specifically how the combination would result in a structure that selectively prevents Blakley's disconnector from holding the hammer hook. (Consolidated Batzer Decl., Ex. 25 at 10.)

**iii. The motivation Dr. Batzer identifies does not explain the combination.**

321. Dr. Batzer states that "Blakley invites selectable operation by stating that its trigger-forward-displacement effect may be selected or deselected," and that Stoner supplies "a known implementation of that very control concept: a single rotatable control member with multiple cam surfaces that establishes the desired operating or non-operating condition." (Consolidated Batzer Decl., Ex. 25 at 10.) The arrangement the column 11 passage describes is moving the trigger extension forward or rearward within the rear of the trigger, against a spring bias, so that a lower part of its bearing surface lies beneath the cam. (Blakley '723, 11:11–25.) Stoner's control cam does nothing of the kind; it locks or frees the trigger, the intermediate sear, and the automatic sear. (Stoner, 3:35–4:41.) In my opinion a reason to want a selectable mechanism is not a reason to select these two references, and Dr. Batzer does not explain how a person of ordinary skill in the art would use Stoner's control cam to move Blakley's trigger

extender, or how the result would provide the standard semi-automatic mode the asserted claims require.

322. For the reasons set forth above in connection with Ground 5 against the '247 patent, in my opinion a person of ordinary skill in the art would not have had a reasonable expectation that the proposed combination would work as the asserted claims of the '403 patent require.

**iv. Both references were before the examiner.**

323. Blakley '723 and Stoner each appear among the references cited on the face of the '403 patent, and the '403 patent identifies Blakley '723 by number in its Background and incorporates it by reference. ('403 Patent, Cover at [56]; 2:9–13.) I understand that both references were therefore before the examiner during prosecution and were considered by the examiner before the '403 patent issued.

**3. Ground 3: Obviousness of Claims 14, 15, 17, 29, 30, and 32 over Rounds in View of Sampson**

324. Dr. Batzer contends that claims 14, 15, 17, 29, 30, and 32 would have been obvious over Rounds in view of Sampson. My opinions regarding Rounds and Sampson, set forth above in the sections titled "Exemplary Elements of the '403 Patent Not Disclosed by Rounds" and "Exemplary Elements of the '403 Patent Not Disclosed by Sampson," apply to this ground, and I incorporate them here. Dr. Batzer describes the combination as one that "combines Rounds' forced reset mechanism with Sampson's selector-controlled disconnector architecture to make that mechanism switchable between standard semi-automatic and forced reset operation." (Consolidated Batzer Decl., Ex. 25 at 13.) I address the proposed combination below.

**i. The combination rests on a reversal of Sampson's modes.**

325. Dr. Batzer's combination assigns the standard semi-automatic mode to Sampson's middle selector position, and the non-catching disconnector of the forced reset mode to Sampson's back selector position. (Consolidated Batzer Decl., Ex. 25 at 13–14; Ex. 23 at 2–3.) As set forth above, Sampson's back position is its semi-automatic mode, in which the disconnector catches and holds the hammer, and its middle position is its double fire mode, in which the disconnector also captures the hammer and releasing the trigger fires a second round. (Sampson, 3:35–40; 3:62–5:3.) Sampson therefore does not supply what Dr. Batzer takes from it. It discloses no selector position in which the disconnector hook is prevented from holding the hammer, which claims 14, 15, 17, 29, and 30 require. The selectable mode it does disclose, beyond conventional semi-automatic fire, is a pull-and-release mode that none of the asserted claims recites.

**ii. Rounds has no disconnector for Sampson's selector to control.**

326. Dr. Batzer's combination also depends on a disconnector in Rounds. He states that "Rounds describes the AR-pattern fire-control group as including a disconnector," and that "[t]he mechanism in Rounds inherently prevents the disconnector from holding the hammer in its operating mode." (Consolidated Batzer Decl., Ex. 25 at 13; Ex. 23 at 3.) As set forth above, Rounds expressly teaches replacing the disconnector with an insert that cannot perform a disconnector function. Therefore, applying Rounds as Rounds describes would not supply a disconnector for Sampson's selector to control.

327. For the reasons set forth above, in my opinion a person of ordinary skill in the art following Rounds would understand that Rounds expressly teaches removing the disconnector when installing the insert, and Rounds' safety selector is a standard selector having a safe position and a fire position. The natural result of applying Rounds is a mechanism having a safe position and a forced reset position, and no standard semi-automatic mode.

**iii. Dr. Batzer does not explain how the combined mechanism would provide the claimed modes.**

328. To arrive at the asserted claims, the combined mechanism would need a disconnector that holds the hammer, requiring the user to reduce trigger pressure, when the selector is in one position, and a disconnector that is prevented from holding the hammer when the selector is in another position, all while Rounds' hammer forces the trigger member to its set position and Rounds' locking bar blocks and releases it on every cycle. Neither reference describes such a mechanism. Rounds has no disconnector and no selectable modes. Sampson's selector bar acts on a secondary disconnector that limits the forward travel of the disconnector, and in every position in which the firearm can be fired, Sampson's disconnector captures the hammer. (Sampson, 4:7–12; 4:52–58.) Dr. Batzer does not identify which of Sampson's components would be added to Rounds, where they would be mounted, or how a selector position would be obtained in which the disconnector is prevented from holding the hammer.

329. The two references also locate their structures in the same region of the trigger. Sampson's secondary disconnector is pivotally mounted on the rearward portion (32) of Sampson's trigger, and its selector bar acts on the rearward portion of the trigger and on a rearwardly extending contact member of the secondary disconnector. (Sampson, 3:22–40; 3:52–4:1; 5:8–13.) Rounds' trigger member carries at its rear the upwardly extended contact surfaces (30, 32) that interact with the hammer and with the locking bar. (Rounds, 4:1–7.) Dr. Batzer does not address how both would be accommodated at the rear of a single trigger member. Sampson's assembly is also a modification of an AK-pattern trigger group, while Rounds is a drop-in module for an AR-pattern fire control mechanism pocket. (Sampson, 2:44–45; 3:41–51; Rounds, 2:30–38.) Dr. Batzer does not address that difference either.

**iv. The motivation Dr. Batzer identifies is generic, and Rounds points away from Sampson's selectable feature.**

330. Dr. Batzer states that a person of ordinary skill in the art would have been motivated to combine Rounds and Sampson "because both address fire-control improvements for semi-automatic firearms and alter trigger/reset behavior to permit faster follow-up operation," and because the two mechanisms "are mechanically independent and present no identified technical barrier to integration." (Consolidated Batzer Decl., Ex. 25 at 14.) In my opinion those statements would describe nearly any two references in this field, and they do not explain why a person of ordinary skill in the art would have selected these two references or combined them in the manner the claims recite. The absence of an identified barrier is not a reason to combine, and for the reasons above, Dr. Batzer has not shown that there is none.

331. Sampson's selector is structured to provide a selectable double fire mode, in which a round is fired on the pull of the trigger and another on its release. (Sampson, 1:39–40; 5:29–34.) Rounds identifies pull/release trigger mechanisms, together with bump-fire devices, as prior approaches to increasing the rate of semi-automatic fire, and states that "[t]he above-described devices either require practice to use reliably, are complex, and/or are expensive to manufacture and install." (Rounds, 1:37–2:14.) In my opinion, a person of ordinary skill in the art beginning with Rounds would not have looked to a selector whose purpose is to add a pull/release mode as the means of adding a standard semi-automatic mode to Rounds' forced reset mechanism.

**v. A person of ordinary skill would not have had a reasonable expectation of success.**

332. The combination Dr. Batzer describes requires adding to Rounds' trigger member a disconnector that Rounds' own installation displaces; adding Sampson's secondary disconnector and selector bar; adapting components designed for an AK-pattern trigger group to an AR-pattern drop-in module; accommodating those components alongside Rounds' contact

surfaces and locking bar; and then supplying a selector position in which the disconnector is prevented from holding the hammer, which neither reference describes. In my opinion, a person of ordinary skill in the art presented with that set of unguided changes, in a mechanism whose function depends on the relative timing and clearance of parts moving at high speed, would not have had a reasonable expectation that the result would work as claims 14, 15, 17, 29, 30, and 32 require.

**vi. Rounds was before the examiner.**

333. As set forth above, Rounds appears among the references cited on the face of the ’403 patent and is incorporated by reference in its Background. (’403 Patent, Cover at [56]; 2:3–8.) I understand that Rounds was therefore before the examiner during prosecution and was considered by the examiner before the ’403 patent issued.

**4. Ground 4: Obviousness of Claims 38 and 39 over Rounds in View of Fellows**

334. Dr. Batzer contends that claims 38 and 39 would have been obvious over Rounds in view of Fellows. My opinions regarding Rounds and Fellows, set forth above in the sections titled “Exemplary Elements of the ’403 Patent Not Disclosed by Rounds” and “Exemplary Elements of the ’403 Patent Not Disclosed by Fellows,” apply to this ground, and I incorporate them here. I address the proposed combination below.

**i. Dr. Batzer’s chart relies on a mischaracterization of Fellows.**

335. Dr. Batzer’s claim chart for this ground mischaracterizes Fellows as disclosing forced reset operation in its second selector position. (Consolidated Batzer Decl., Ex. 24 at 1, 2.) However, Fellows’ second position is actually a binary position, which is not forced reset operation, and apparently understood that when he proposed “[s]ubstituting Rounds’ forced reset operating mode for Fellows’ alternate/binary mode.” (*Id.*, Ex. 25 at 16, 18.)

### ii. Fellows' binary mode and Rounds' forced reset operation are not interchangeable.

336. Dr. Batzer states that the substitution "would preserve Fellows' known selector function while using Rounds' mechanism according to its established function." (Consolidated Batzer Decl., Ex. 25 at 18.) In my opinion the two are not modes that can be exchanged within a selector. Fellows' binary mode is produced by its selector's cam lobes acting on the trigger and on its semi-automatic, binary, and backup disconnectors, which determine which retention facility holds the hammer and what happens when the user releases the trigger. (Fellows, 4:45–5:3; 6:42–61; 8:27–41.) Rounds' forced reset operation is produced by mechanical contact between the hammer and a contact surface of the trigger member, and by a locking bar actuated by the bolt carrier, neither of which is controlled by a selector and both of which operate on every cycle. (Rounds, 5:23–6:12.) Fellows' selector has no cam lobe that acts on any structure corresponding to Rounds' contact surface or locking bar, and Rounds has no disconnectors for Fellows' cam lobes to act upon.

337. Fellows does describe its selector disabling one disconnector: in the binary mode, a cam lobe moves the semi-automatic disconnector so that it is unable to interface with the hammer. (Fellows, 8:27–41.) But Fellows does so only to enable another disconnector, the binary disconnector, which then holds the hammer while the trigger remains pulled. (*Id.*, 8:1–14.) Fellows describes no firing position in which the hammer is free of every disconnector while the trigger remains pulled. Fellows' modes each presuppose that the trigger remains pulled while a disconnector holds the hammer after the action cycles. Forced reset operation presupposes the opposite: that the cycling of the action drives the trigger member forward to its full reset position, against the user's finger pressure, so that the user can fire again without reducing that pressure. ('403 Patent, cl. 39.) Dr. Batzer does not explain how a selector designed for the former

would be adapted to control the latter, and the proposed combination does not suggest an operable adaptation to one of ordinary skill in the art.

338. Dr. Batzer also does not explain how one of ordinary skill in the art would know without impermissible hindsight which of Fellows' three disconnectors would be retained, removed, or modified to arrive at the claimed structure; how Fellows' selector would cause Rounds' forced reset operation to occur in one position but not the other; or how, in the standard semi-automatic position, a disconnector would hold the hammer until the user reduces pressure while Rounds' hammer forces the trigger member forward on every cycle. Fellows also states that "it is essential for safety to prevent the hammer from falling forward unintentionally to strike the firing pin," and provides its backup disconnector for that purpose. (Fellows, 7:13–25.) Dr. Batzer does not explain whether that structure would be retained, or how it would interact with Rounds' mechanism.

**iii. Rounds points away from binary trigger mechanisms.**

339. Fellows is a binary trigger mechanism, as its Abstract and its priority application confirm. (Fellows, Abstract; 1:7–11.) Rounds identifies pull/release trigger mechanisms as a prior approach to increasing the rate of semi-automatic fire, and states that the devices it describes "either require practice to use reliably, are complex, and/or are expensive to manufacture and install." (Rounds, 2:1–14.) In my opinion, a person of ordinary skill in the art beginning with Rounds would not have looked to a binary trigger mechanism with three disconnectors and a selector carrying five cam lobe profiles as the means of adding a standard semi-automatic mode to Rounds' forced reset mechanism, and Dr. Batzer identifies no reason, apart from the claimed result, that such a person would have done so.

**iv. A person of ordinary skill would not have had a reasonable expectation of success.**

340. The combination Dr. Batzer describes requires removing Fellows' binary mode; retaining or discarding an unidentified subset of Fellows' three disconnectors and five cam lobe profiles; adding a disconnector to Rounds' trigger member in the space Rounds' insert occupies; and supplying a selector position in which no disconnector holds the hammer while Rounds' hammer forces the trigger forward, together with a selector position in which a disconnector holds the hammer notwithstanding that forcing. Neither reference describes any of those steps. In my opinion a person of ordinary skill in the art would not have had a reasonable expectation that the result would work as claims 38 and 39 require.

**v. Rounds was before the examiner.**

341. As set forth above, Rounds appears among the references cited on the face of the '403 patent and is incorporated by reference in its Background. I understand that Rounds was therefore before the examiner during prosecution and was considered by the examiner before the '403 patent issued. Fellows itself does not appear among the references cited on the face of the '403 patent. The face of the '403 patent does list a September 2015 article titled "Franklin Armory Releases 'Binary Firing System,'" along with several patents and publications naming Fellows as an inventor, and Fellows is assigned to Franklin Armory Holdings, Inc. and claims the benefit of a provisional application entitled "BINARY FIRING SYSTEM™ (aka BFS™)." ('403 Patent, Cover at [56]; Fellows, Cover; 1:7–11.)

## VIII. OBJECTIVE INDICIA OF NONOBVIOUSNESS

### A. Long-Felt Need

342. I understand that in May 1986 the Hughes Amendment closed the National Firearms Act registry to newly manufactured machine guns for civilian ownership, 18 U.S.C. § 922(o), with the result that a civilian may acquire only from a finite and diminishing number of firearms manufactured before that date. I understand that since that time civilians and

manufacturers have sought to achieve comparable rates of fire on modern and commonly used platforms without the mechanism operating as a machine gun.

343. The need addressed by the Asserted Patents is narrower than the general demand for increased rate of fire, and it remained unmet for a considerable period. Blakley ’723 was filed on April 25, 2003. Mr. Blakley himself identified three-position operability as the advance of his later patent over that earlier one, stating in the Background of the ’247 patent that “[f]urther improvement in forced reset triggers is desired,” and in its Summary that “Advantageously, the present invention provides a ‘three position’ trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.” (’247 Patent, 2:14; 2:26–29.) I am not aware of any trigger mechanism product providing safe, standard semi-automatic, and forced reset semi-automatic operation that was demonstrated or offered before January 2022, roughly nineteen years after Blakley ’723 was filed.

344. This need was reflected in the design of firing-rate-enhancing devices that did not meet it. The early to mid-2010s saw the release of binary triggers, which fire one round on pull and one round on release of the trigger; bump stocks; the Hell Fire device, which employed a spring to urge the trigger blade forward toward its reset position and which substantially increased the force required to pull the trigger; and variations of crank-operated trigger actuators. In my opinion each of those operates on a different mechanical principle from the mechanisms described in the Asserted Patents, and none provides forced reset operation in which the bolt carrier drives the trigger member to its set position. See Luettke Decl. ¶ 63.

345. The references Dr. Batzer cites against the ’403 patent illustrate the point. In the years immediately preceding January 2022, the selectable trigger mechanisms he identifies, Fellows (issued 2018) and Sampson (issued 2019), provided a pull-and-release mode in addition

to semi-automatic fire, and the forced reset mechanism he identifies, Rounds (issued 2019), provided no standard semi-automatic mode and no selector with which to choose one. None of them provided safe, standard semi-automatic, and forced reset semi-automatic operation in a single mechanism, which the '403 patent identifies as an advantage of its invention. ('403 Patent, 2:39–42.)

346. I understand that the Rare Breed FRT-15 was introduced in December 2020 and was met with immediate consumer demand. I understand that product to embody the invention of U.S. Patent No. 10,514,223 rather than the Asserted Patents, and I refer to it here as evidence of the demand for forced reset functionality rather than as evidence of the commercial success of the inventions claimed in the Asserted Patents.

## IX. REVISION OR SUPPLEMENTATION

347. My opinions in this declaration and the bases for my opinions are based on the analysis I have conducted to date. The opinions are subject to amendment, supplementation, and change based on any opinions that the Defendants' experts may provide and information I may receive or work I may perform in the future.

## X. CONCLUSION

348. For the reasons discussed above, it is my opinion that the Asserted Claims of the Asserted Patents are valid.

Under penalty of perjury, I declare that the foregoing statements and facts stated herein are true and correct to the best of my knowledge and belief.

Date: November 12, 2026

Respectfully submitted,

Dr. Joshua C. Harrison