# EXHIBIT E

# Claim Chart for U.S. Patent No. 12,636,403: Batzer Noninfringement Positions and Luettke Reply

## Super Safety

### Claim 14

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 14[pre]. A trigger mechanism for a firearm operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising: | The Consolidated Motion for Preliminary Injunction ("Consolidated Motion," ECF No. 7, §II.C.2.c) and the supporting Luettke Declaration (ECF No. 8, §IV.A) generically refer to the Super Safety, without distinguishing among Defendants (e.g., which Defendant sells which exact components in its Super Safety kit), even though the Luettke Declaration acknowledges that there are many Super Safety variants offered by the different Defendants. Thus, this response will focus on the base components of the Super Safety. The Super Safety is not a complete firearm trigger mechanism, as it consists only of a lever, a cam, and a detent, omitting other required components, as noted below. See also Luettke Decl. ¶17. Similarly, these components individually are also not a firearm trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the Super Safety is sold as a kit of purpose-designed components, including a pre-cut trigger, cam, reset lever, centering block, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the Super Safety as sold by AS Designs. Contrary to Batzer's description of those base components, AS Designs' Super Safety kit includes a pre-cut trigger.<br><br>As assembled, the mechanism is operable in both a standard semi-automatic mode and a forced reset semi-automatic mode. Batzer does not dispute that; he acknowledges that the Super Safety cam slides to select between standard semi-automatic and forced reset modes (element 32[d]). |
| 14[a]. a hammer having a hammer sear catch and a hammer hook and adapted to pivot on a transverse hammer pivot axis between a set position and a released position, the hammer adapted to be pivoted rearward by rearward movement of a bolt means; | The Super Safety does not include a hammer or a bolt means. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 14[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer sear catch and a hammer hook, pivots on a transverse hammer pivot axis between set and released positions, and is pivoted rearward by rearward movement of the bolt carrier. Batzer does not dispute that. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | A POSITA would understand "bolt means" to connote structure. It names a physical component that is standard and well understood in the firearms art, the reciprocating bolt or bolt carrier, and the '403 Patent uses the term consistently with that ordinary meaning. Batzer himself identifies that structure as the bolt carrier assembly 92. |
| 14[b]. a trigger member having a trigger member sear and adapted to move between a set position and a released position, the trigger member being forced to the set position as a result of cycling action of the bolt means, such that the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member; | "Bolt means" is a means-plus-function limitation governed by §112(f) and is thus limited to the corresponding structure disclosed in the specification and its equivalents. The Super Safety does not include a trigger, a bolt means, or a hammer. Furthermore, a firearm's trigger requires more than just cycling action of the bolt means to be forced to the set position (i.e., a standard semi-automatic firearm includes cycling action of the bolt means, but its trigger is not forced to the set position thereby). The patent specification discloses that, only if the firearm is set to the forced-reset position, rearward travel of the bolt carrier assembly 92 forces the hammer 36 to press down on a hump 58 of the trigger member 38, forcing it to rotate counter-clockwise, and allows the spring-biased locking member 72 to pivot counter-clockwise so that it locks and keeps the trigger member 38 in the set position. 10:1-44, Figs. 9A-D. In a firearm with a Super Safety, the bolt carrier does not force the hammer to press down on a hump of a trigger to force the trigger to rotate to the set position, nor does the Super Safety include a spring-biased locking member that pivots to lock the trigger member in the set position once it has been re-set by the hammer. | A POSITA would understand "bolt means" to connote structure. It names a physical component that is standard and well understood in the firearms art, the reciprocating bolt or bolt carrier, and the '403 Patent uses the term consistently with that ordinary meaning. Batzer himself identifies that structure as the bolt carrier assembly 92.<br><br>Batzer's argument that the Super Safety does not include a trigger is incorrect as to AS Designs' Super Safety, which includes a pre-cut trigger, and his remaining missing-components argument is addressed at element 14[pre].<br><br>Batzer's remaining argument adds requirements the claim does not contain. The claim requires that the trigger member be forced to the set position "as a result of cycling action of the bolt means." It does not specify the mechanism through which the cycling action does so, and it does not require that the hammer press on a hump of the trigger member or that a spring-biased locking member pivot to hold it. Those are features of one disclosed embodiment. In the Super Safety, as assembled and used as intended in its forced reset mode, the rearward-moving bolt carrier drives the reset lever, the reset lever rotates the cam, and the cam lobe forces the trigger member to the set position. The trigger member is therefore forced to the set position by the cycling action, which is what the claim recites. |
| 14[c]. wherein the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released | Since the Super Safety does not include a hammer (with a sear catch) or a trigger member (with a sear), the Super Safety's missing trigger sear is not in engagement with the missing hammer's sear catch in the set positions nor out of engagement in the released positions. | Batzer's only argument is that the kit as shipped omits the hammer and the trigger member, but AS Designs' Super Safety kit includes a pre-cut trigger. As addressed at element 14[pre], my analysis is directed to the assembled mechanism. In that mechanism, the trigger member sear engages the hammer sear catch in the set positions of the hammer and trigger member and is out of engagement in the released positions. Batzer does not dispute that operation. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| position of the trigger member, | | |
| 14[d]. a disconnector having a disconnector hook for engaging the hammer hook and adapted to pivot on a transverse disconnector pivot axis; and | The Super Safety does not include a disconnector or a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 14[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook for engaging the hammer hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 14[e]. a locking member adapted to be movably mounted, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position and adapted to be moved to the second position by forward movement of the bolt means, | "Locking member" is a means-plus-function limitation governed by §112(f), as it uses a nonce word (member) prefixed by a function (locking) and does not have a plain and ordinary meaning connoting specific structure to a skilled artisan. Thus, this limitation is limited to the corresponding structure disclosed in the specification and equivalents. See Figs. 1-9D, 8:33-49, 9:2-16, 10:14-44, Abstract. Furthermore, the specification explains that the "first position" is one where the locking member does not block the trigger member from moving upwards, while the "second position" is one where the locking member does block the trigger member from moving upwards (i.e., being pulled to by the user and moving to the released position); this is opposite to the "first position" and "second position" recited in this claim limitation, which renders it unclear and indefinite. The Super Safety does not include a trigger, a bolt means, or such a locking member that pivots around a pin going through an opening in the locking member, that is contacted by the bolt carrier assembly to rotate only in the clockwise direction but that is not contacted by the bolt carrier assembly to rotate counter-clockwise (which rotation can occur only due to spring bias), and that has a notch to receive a corner of a trigger member (extending upwards from its middle section, not from the trigger tail) and to prevent it from further clockwise rotation until the locking member is pivoted clockwise to release the trigger corner. Also, the specification and this claim limitation disclose that the locking member is cycled between its blocking and non-blocking positions each time the bolt carrier action cycles, regardless of the mode the firearm is set to. In contrast, the | I understand from counsel that absence of the word "means" creates a rebuttable presumption that § 112(f) does not apply, and that the presumption is overcome only if a POSITA would read the term as a nonce word rather than as connoting structure. A POSITA would understand "locking member" to connote structure. The term names a physical component in the firearms trigger art, as reflected in the '403 Patent itself and in the '223 Patent, which use "locking member" and "locking bar" as component names, and as reflected in Batzer's own use of "cam," "lever," and "detent bar" to identify parts. The claim itself recites the member's structure and structural relationships: it is movably mounted, it moves between a position in which it mechanically blocks the trigger member from moving to the released position and a position in which it does not, and it is moved by the cycling action. A POSITA would understand that recitation to describe a physical part, not a functional placeholder.<br><br>The Super Safety's locking member is its cam, as identified in my prior chart (Luettke II Decl. Ex. L). As assembled and used as intended in forced reset mode, the cam is movably mounted and rotates between a first position, in which the cam lobe mechanically blocks the trigger member from moving to the released position, and a second position, in which it does not. As the bolt carrier returns forward, it moves the reset lever, and the engaged reset lever rotates the cam to the second position. The cam is therefore adapted to be moved to the second position by forward movement of the bolt means. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | Super Safety cycles between a blocking and non-blocking position only if the firearm is in forced-reset mode. The Luettke Declaration, Ex. L, views the "cam lobes" as being the locking member. But these lobes bear no resemblance to the locking member disclosed in the patent, as discussed in the preceding paragraph. Furthermore, Ex. L shows two arrows pointing to the cam lobes: one to the lobe that interfaces with the trigger tail in forced-reset mode, and another lobe that interfaces with the trigger tail in safe mode. But in safe mode, the cam (and thus the lobe) remains in a fixed position and does not move between a first and second position; and in safe mode, the cam lobe always blocks the trigger tail. (While not indicated in the Luettke Declaration, the converse is true for standard semi-auto mode: the cam pivots, but the cam lobe does not block the trigger tail in any pivoting position.) The Super Safety cam itself is not contacted by the bolt carrier to either rotate or move axially among the three modes. The Super Safety lever does not do anything to the trigger – it does not even contact the trigger. | Batzer's argument about the order of the "first" and "second" positions does not create any uncertainty about what the claim requires. The claim defines each position by what the locking member does there: in the "first position" it "mechanically blocks the trigger member from moving to the released position," and in the "second position" it "does not mechanically block the trigger member." A POSITA would apply those claim-defined positions, and the Super Safety cam occupies each of them. That the specification labels the corresponding positions of the disclosed embodiment differently does not change the definitions the claim itself supplies.<br><br>Batzer's requirements of a pivot pin passing through an opening in the locking member, rotation in only one direction by contact with the bolt carrier, return by spring bias, and a notch that receives a corner of the trigger member are features of one disclosed embodiment, not requirements of the claim.<br><br>His argument that the disclosed locking member cycles in every mode adds a further requirement the claim does not contain. This limitation recites how the locking member moves as the action cycles; it does not require that it do so in the standard semi-automatic mode. Claim 14 separately recites each mode, and element 14[g] recites the forced reset operation. As assembled and used as intended in forced reset mode, the Super Safety cam cycles between the blocking and non-blocking positions on every cycle of the action.<br><br>That the bolt carrier contacts the reset lever rather than the cam does not matter. The claim requires that the locking member be "adapted to be moved" to the second position "by forward movement of the bolt means," not that the bolt means directly contact the locking member. Here, the bolt carrier moves the reset lever, and the engaged reset lever carries the cam with it. Likewise, it is the cam lobe that blocks the trigger member; that the reset lever does not itself contact the trigger is irrelevant.<br><br>Batzer's observations about safe mode and standard semi-automatic mode also do not bear on this limitation. My analysis is directed to forced reset mode, in which the cam rotates between the recited positions. That a different portion |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | of the cam also blocks the trigger in safe mode, and that the standard-fire groove relieves the cam lobe in standard semi-automatic mode, does not change how the cam operates in forced reset mode. Nor does it matter that the bolt carrier does not move the cam axially among the three modes. The user slides the cam to select a mode; the claim does not require that the bolt carrier do so. |
| 14[f]. wherein in the standard semi-automatic mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook holds the hammer hook, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and the trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm again; and | The Super Safety does not include a bolt means, a hammer, a disconnector, or a trigger member. If the Super Safety is installed in a firearm that includes the missing components and set to standard semi-automatic mode, rearward movement of a bolt carrier assembly may cause rearward pivoting of the hammer such that a disconnector hook may hold the hammer hook (depending on the configuration and operation of the missing components). While the bolt carrier assembly remains rearwards, reducing pressure on the trigger will not free the hammer from the disconnector and would not permit the hammer and trigger to pivot to the set positions because the hammer would still be pressed downwards by the bolt carrier assembly. When the bolt carrier assembly thereafter moves forward into battery, the firearm user would normally need to manually release the trigger to free the hammer from the disconnector to permit the hammer and trigger to pivot to their set positions so the user can pull the trigger to fire the firearm. | Batzer's missing-components argument is addressed at element 14[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the Super Safety installed and set to standard semi-automatic mode, rearward movement of the bolt carrier pivots the hammer rearward, the disconnector hook holds the hammer hook, and the user must manually release the trigger to free the hammer from the disconnector so that the hammer and trigger member pivot to their set positions and the user can fire again.<br><br>His remaining point, that reducing pressure on the trigger while the bolt carrier is still rearward would not free the hammer, adds a requirement the claim does not contain. The claim does not require that the user be able to free the hammer at any particular instant during the cycle. It recites that, once the disconnector hook holds the hammer hook, the user must manually reduce pressure on the trigger member to free the hammer before firing again. Batzer agrees that is what the user must do. |
| 14[g]. wherein in the forced reset semi-automatic mode, rearward movement of the bolt means causes the trigger member to be forced to the set position, and the disconnector hook is prevented from holding the hammer hook, and thereafter when the bolt means reaches a substantially in-battery position or an in-battery position the user can | The Super Safety does not include a bolt means, a hammer, a disconnector, or a trigger member. If the Super Safety is installed in a firearm that includes the missing components and set to forced-reset mode, rearward movement of a bolt carrier assembly does not alone cause the trigger member to be forced to the set position. Since "bolt means" is a means-plus-function limitation that is limited to the corresponding structure disclosed in the specification and equivalents thereof, the patent specification discloses that (if the firearm is set to the forced-reset position) rearward travel of the bolt carrier assembly 92 forces the hammer 36 to press down on a hump 58 of the trigger member 38, forcing it to rotate counter-clockwise to the set position, and allows the spring- | Batzer's missing-components argument is addressed at element 14[pre], and his "bolt means" argument and his argument about how the trigger member is forced to the set position are addressed at element 14[b].<br><br>Batzer concedes that in forced reset mode, continued rearward movement of the bolt carrier causes the reset lever to rotate the cam, which forces the trigger member to the set position, and that when the bolt carrier moves forward into battery, it causes the reset lever to rotate the cam, unblocking the trigger and allowing the user to fire again.<br><br>Batzer's remaining argument rests on an incorrect factual premise. In the Super Safety, as assembled and used as |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| actuate the trigger member to fire the firearm again. | biased locking member 72 to pivot counter-clockwise so that it locks and keeps the trigger member 38 in the set position. 10:1-44, Figs. 9A-D. In a firearm with a Super Safety set to forced-reset mode, the bolt carrier does not force the hammer to press down on a hump of a trigger to force the trigger to rotate to the set position, nor does the Super Safety include a spring-biased locking member that pivots (upon release from contact with the bolt carrier assembly) to lock the trigger member in the set position once it has been re-set by the hammer. Furthermore, if a firearm with a Super Safety is set to forced-reset mode, the disconnector hook is not prevented from catching and holding the hammer hook as the bolt carrier assembly moves rearwards; indeed, depending on the configuration and operation of the missing components, the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook. Continued rearward movement of the bolt carrier would cause the lever to rotate the cam, which forces the trigger member to the set position, which would also cause the disconnector to release the hammer hook. When the bolt carrier thereafter moves forward into battery, it causes the lever to rotate the cam, unblocking the trigger and allowing the firearm user to pull the trigger to fire the firearm again. | intended, the disconnector hook never catches or holds the hammer hook in forced reset mode. As the bolt carrier travels rearward, it pivots the hammer rearward past the disconnector hook and continues to drive the hammer to a past-cocked position, in which the hammer hook is not in contact with the disconnector. Near the end of its rearward travel, with the hammer still past cocked, the bolt carrier drives the reset lever rearward, rotating the engaged cam, which forces the trigger member to its set position and moves the disconnector out of the path of the hammer hook. As the bolt carrier then moves forward, the hammer pivots forward, passes the disconnector, which has been moved out of its path, and is held by the trigger member sear. At no point in that sequence does the disconnector hook catch or hold the hammer hook. That is what this limitation recites: in forced reset mode, the disconnector hook "is prevented from holding the hammer hook." Batzer's contrary statement that "the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook" does not describe how the Super Safety operates. |

**Claim 15**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| 15[pre]. The trigger mechanism of claim 14, | See claim 14 above. | See claim 14 above. |
| 15[a]. further comprising a safety selector, movement of which selects between at least standard semi-automatic mode and forced reset semi-automatic mode. | This claim (including its reliance on claim 14) recites (and the specification shows) discrete components that comprise the trigger mechanism, which presumptively means that they are distinct components (rather than one and the same structure). Thus, e.g., the recited safety selector and the locking member cannot be met by the same component. The Super Safety cam acts as a safety selector, and sliding the cam along its axis of rotation selects between at least standard semi-automatic mode and forced-reset mode. However, the Luettke Declaration, Ex. L, views the cam as meeting the locking member limitation, so the cam cannot also meet the safety | Batzer concedes that the Super Safety cam "acts as a safety selector, and sliding the cam along its axis of rotation selects between at least standard semi-automatic mode and forced-reset mode." That is what this limitation requires. The claim does not require that the safety selector rotate; sliding is movement. That the safety selector of the disclosed embodiment pivots is a feature of one embodiment, not a requirement of the claim.<br>Batzer's argument that the safety selector and the locking member must be different components adds a requirement this claim does not contain. I understand from counsel that when |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | selector limitation. Furthermore, the specification discloses that the claimed safety selector pivots/rotates to select a mode; in contrast, the Super Safety cam slides along its axis to select a mode. | one claim expressly recites a limitation and another does not, the other claim is presumed not to include it. Claim 30 expressly recites "a safety selector that is separate from the locking member." Claim 15 does not. In the Super Safety, the user slides the cam to select the mode, and the bolt carrier, through the reset lever, rotates the cam so that its lobe blocks and unblocks the trigger member. |

**Claim 17**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 17[pre]. A trigger mechanism for a semi-automatic firearm, comprising: | The Consolidated Motion and the supporting Luettke Declaration generically refer to the Super Safety, without distinguishing among Defendants (e.g., which Defendant sells which exact components in its Super Safety kit), even though the Luettke Declaration acknowledges that there are many Super Safety variants offered by the different Defendants. Thus, this response will focus on the base components of the Super Safety. The Super Safety is not a complete firearm trigger mechanism, as it consists only of a lever, a cam, and a detent, omitting other required components, as noted below. Similarly, these components individually are also not a firearm trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the Super Safety is sold as a kit of purpose-designed components, including a pre-cut trigger, cam, reset lever, centering block, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the Super Safety as sold by AS Designs. Contrary to Batzer's description of those base components, AS Designs' Super Safety kit includes a pre-cut trigger. |
| 17[a]. a hammer comprising a hammer hook; | The Super Safety does not include a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 17[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer hook. Batzer does not dispute that. |
| 17[b]. a disconnector comprising a disconnector | The Super Safety does not include a disconnector or a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 17[pre], my analysis is directed to the assembled mechanism. In that mechanism, the |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| hook for holding the hammer hook; | | disconnector of the AR-15 pattern fire control group has a disconnector hook for holding the hammer hook. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 17[c]. a trigger member, wherein the trigger member can be forced into a trigger set position responsive to rearward motion of a cyclic semi-automatic action of the semi-automatic firearm; and | This limitation appears to include a typographical error, but the request for certificate of correction refers to a different claim location for such a correction. Thus, it is unclear whether the "forced into a trigger set position" limitation is optional, mandatory, or a capability. Regardless, the Super Safety does not include a trigger member. | AS Designs' Super Safety includes a pre-cut trigger, which is the trigger member. The language Batzer identifies was corrected by a Certificate of Correction signed August 18, 2026, which changes "wherein the trigger member can be is" at column 14, line 53 to "wherein the trigger member can be." As corrected, the limitation recites that the trigger member "can be forced into a trigger set position responsive to rearward motion of a cyclic semi-automatic action." The Super Safety's trigger member can be. As assembled and used as intended in forced reset mode, the rearward-moving bolt carrier drives the reset lever, the reset lever rotates the cam, and the cam lobe forces the trigger member to the set position. |
| 17[d]. a locking member configured to move between a block position and a non-block position, wherein the block position mechanically blocks the trigger member from moving from the trigger set position to a trigger released position, wherein the non-block position permits the trigger member to be moved from the trigger set position to the trigger released position, wherein the locking member is moved into the block position during rearward motion of the cyclic semi-automatic action and moved into the non-block position during forward motion of the cyclic semi-automatic action, and wherein: | "Locking member" is a means-plus-function limitation governed by §112(f), as it uses a nonce word (member) prefixed by a function (locking) and does not have a plain and ordinary meaning connoting specific structure to a skilled artisan. Thus, this limitation is limited to the corresponding structure disclosed in the specification and equivalents. See Figs. 1-9D, 8:33-49, 9:2-16, 10:14-44, Abstract. The Super Safety does not include a trigger or such a locking member that pivots around a pin going through an opening in the locking member, that is contacted by the bolt carrier assembly to rotate only in the clockwise direction but that is not contacted by the bolt carrier assembly to rotate counter-clockwise (which rotation can occur only due to spring bias), and that has a notch to receive a corner of a trigger member (extending upwards from its middle section, not from the trigger tail) and to prevent it from further clockwise rotation until the locking member is pivoted clockwise to release the trigger corner. Also, the specification and this claim limitation disclose that the locking member is cycled between its blocking and non-blocking positions each time the bolt carrier action cycles, regardless of the mode the firearm is set to. In contrast, the Super Safety cycles between a blocking and non-blocking position only if the firearm is in forced-reset mode. | I understand from counsel that absence of the word "means" creates a rebuttable presumption that § 112(f) does not apply, and that the presumption is overcome only if a POSITA would read the term as a nonce word rather than as connoting structure. A POSITA would understand "locking member" to connote structure. The term names a physical component in the firearms trigger art, as reflected in the '403 Patent itself and in the '223 Patent, which use "locking member" and "locking bar" as component names, and as reflected in Batzer's own use of "cam," "lever," and "detent bar" to identify parts. The claim itself recites the member's structure and structural relationships: it is movably mounted, it moves between a position in which it mechanically blocks the trigger member from moving to the released position and a position in which it does not, and it is moved by the cycling action. A POSITA would understand that recitation to describe a physical part, not a functional placeholder.<br><br>The Super Safety's locking member is its cam, as identified in my prior chart (Luettke II Decl. Ex. L). As assembled and used as intended in forced reset mode, the cam moves between a block position, in which the cam lobe mechanically blocks the trigger member from moving from the set position |

| Claim Element | Batzer’s Noninfringement Argument | Luettke Reply |
|---|---|---|
| | The Luettke Declaration, Ex. L, views the “cam lobes” as being the locking member. But these lobes bear no resemblance to the locking member disclosed in the patent, as discussed in the preceding paragraph. Furthermore, Ex. L shows two arrows pointing to the cam lobes: one to the lobe that interfaces with the trigger tail in forced-reset mode, and another lobe that interfaces with the trigger tail in safe mode. But in safe mode, the cam (and thus the lobe) remains in a fixed position and does not move between a non-block and block position; and in safe mode, the cam lobe always blocks the trigger tail. (While not indicated in the Luettke Declaration, the converse is true for standard semi-auto mode: the cam pivots, but the cam lobe does not block the trigger tail in any pivoting position.) The Super Safety cam itself is not contacted by the bolt carrier to either rotate or move axially among the three modes. The Super Safety lever does not do anything to the trigger – it does not even contact the trigger. | to the released position, and a non-block position, in which it does not. During rearward motion of the action, the bolt carrier drives the reset lever, which rotates the cam into the block position, with the cam lobe forcing the trigger member to the set position and holding it there. During forward motion of the action, the reset lever rotates the cam back into the non-block position. That is the movement this limitation recites.<br><br>Batzer’s requirements of a pivot pin passing through an opening in the locking member, rotation in only one direction by contact with the bolt carrier, return by spring bias, and a notch that receives a corner of the trigger member are features of one disclosed embodiment, not requirements of the claim.<br><br>His argument that the disclosed locking member cycles in every mode adds a further requirement the claim does not contain. This limitation recites how the locking member moves as the action cycles; it does not require that it do so in the standard semi-automatic mode. Claim 17 separately recites the standard and forced reset modes in its “wherein” clauses. As assembled and used as intended in forced reset mode, the Super Safety cam cycles between the blocking and non-blocking positions on every cycle of the action.<br><br>That the bolt carrier contacts the reset lever rather than the cam does not matter. The claim requires that the locking member be moved during the rearward and forward motion of the cyclic action, not that the action directly contact the locking member. Here, the bolt carrier moves the reset lever, and the engaged reset lever carries the cam with it. Likewise, it is the cam lobe that blocks the trigger member; that the reset lever does not itself contact the trigger is irrelevant.<br><br>Batzer’s observations about safe mode and standard semi-automatic mode also do not bear on this limitation. My analysis is directed to forced reset mode, in which the cam rotates between the recited positions. That a different portion of the cam also blocks the trigger in safe mode, and that the standard-fire groove relieves the cam lobe in standard semi-automatic mode, does not change how the cam operates in forced reset mode. Nor does it matter that the bolt carrier does not move the cam axially among the three modes. The user |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | slides the cam to select a mode; the claim does not require that the bolt carrier do so. |
| 17[e]. in a standard semi-automatic mode, after cycling of the action and while the trigger member is in the trigger released position, the trigger mechanism is configured such that the disconnector hook holds the hammer hook, at which point, rearward pressure on the trigger member must be reduced before the trigger member can be actuated, and | The Super Safety does not include a hammer, a disconnector, or a trigger member. If the Super Safety is installed in a firearm that includes the missing components and set to standard semi-automatic mode, rearward movement of a bolt carrier assembly during cycling of the action may cause rearward pivoting of the hammer such that a disconnector hook may hold the hammer hook while the user is still pulling the trigger (depending on the configuration and operation of the missing components). While the bolt carrier assembly remains rearwards, reducing pressure on the trigger will not allow the trigger to be re-actuated because the hammer would still be pressed downwards by the bolt carrier assembly. When the bolt carrier assembly thereafter moves forward into battery and finishes cycling, the firearm user would normally need to manually release the trigger to free the hammer from the disconnector to permit the hammer and trigger to pivot to their set positions so the user can pull the trigger to re-actuate it. | Batzer's missing-components argument is addressed at element 17[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the Super Safety installed and set to standard semi-automatic mode, the disconnector hook holds the hammer hook while the user is still pulling the trigger, and after the bolt carrier returns to battery the user must manually release the trigger to free the hammer before the trigger can be actuated again.<br><br>His remaining point, that reducing pressure while the bolt carrier is still rearward would not allow the trigger to be re-actuated, concerns a moment the claim does not address. The limitation recites the condition "after cycling of the action," and Batzer agrees that in that condition rearward pressure on the trigger member must be reduced before the trigger member can be actuated. |
| 17[f]. in a forced reset semi-automatic mode, the disconnector hook is prevented from holding the hammer hook, and the trigger member can be actuated when the cyclic semi-automatic action reaches a substantially in-battery position or an in-battery position. | The Super Safety does not include a hammer, a disconnector, or a trigger member. If the Super Safety is installed in a firearm that includes the missing components and set to forced-reset mode, the disconnector hook is not prevented from catching and holding the hammer hook; indeed, depending on the configuration and operation of the missing components, the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook. Continued rearward movement of the cycling bolt carrier would cause the lever to rotate the cam, which forces the trigger member to the set position, which would also cause the disconnector to release the hammer hook. When the bolt carrier thereafter moves forward into battery, it causes the lever to rotate the cam, unblocking the trigger and allowing the firearm user to pull the trigger to fire the firearm again. | Batzer's missing-components argument is addressed at element 17[pre].<br><br>Batzer concedes that in forced reset mode, the cycling bolt carrier causes the reset lever to rotate the cam, which forces the trigger member to the set position, and that when the bolt carrier moves forward into battery, the reset lever rotates the cam, unblocking the trigger so the user can actuate it.<br><br>Batzer's remaining argument rests on an incorrect factual premise. In the Super Safety, as assembled and used as intended, the disconnector hook never catches or holds the hammer hook in forced reset mode. As the bolt carrier travels rearward, it pivots the hammer rearward past the disconnector hook and continues to drive the hammer to a past-cocked position, in which the hammer hook is not in contact with the disconnector. Near the end of its rearward travel, with the hammer still past cocked, the bolt carrier drives the reset lever rearward, rotating the engaged cam, which forces the trigger member to its set position and moves the disconnector out of the path of the hammer hook. As the bolt carrier then moves forward, the hammer pivots forward, passes the disconnector, |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | which has been moved out of its path, and is held by the trigger member sear. At no point in that sequence does the disconnector hook catch or hold the hammer hook. That is what this limitation recites: in forced reset mode, the disconnector hook "is prevented from holding the hammer hook." Batzer's contrary statement that "the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook" does not describe how the Super Safety operates. |

**Claim 29**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 29[pre]. The trigger mechanism of claim 17, | See claim 17 above. | See claim 17 above. |
| 29[a]. comprising a safety selector, wherein the safety selector is selectable between at least the standard semi-automatic mode and the forced reset semi-automatic mode. | This claim (including its reliance on claim 17) recites (and the specification shows) discrete components that comprise the trigger mechanism, which presumptively means that they are distinct components (rather than one and the same structure). Thus, e.g., the recited safety selector and the locking member cannot be met by the same component. The Super Safety cam acts as a safety selector, and sliding the cam along its axis of rotation selects between at least standard semi-automatic mode and forced-reset mode. However, the Luettke Declaration, Ex. L, views the cam as meeting the locking member limitation, so the cam cannot also meet the safety selector limitation. Furthermore, the specification discloses that the claimed safety selector pivots/rotates to select a mode; in contrast, the Super Safety cam slides along its axis to select a mode. | Batzer concedes that the Super Safety cam "acts as a safety selector, and sliding the cam along its axis of rotation selects between at least standard semi-automatic mode and forced-reset mode." That is what this limitation requires. The claim does not require that the safety selector rotate; sliding is movement. That the safety selector of the disclosed embodiment pivots is a feature of one embodiment, not a requirement of the claim.<br><br>Batzer's argument that the safety selector and the locking member must be different components adds a requirement this claim does not contain. I understand from counsel that when one claim expressly recites a limitation and another does not, the other claim is presumed not to include it. Claim 30 expressly recites "a safety selector that is separate from the locking member." Claim 29 does not. In the Super Safety, the user slides the cam to select the mode, and the bolt carrier, through the reset lever, rotates the cam so that its lobe blocks and unblocks the trigger member. |

**Claim 32**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 32[pre]. A trigger mechanism for a semi-automatic firearm | The Consolidated Motion and the supporting Luettke Declaration generically refer to the Super Safety, without | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising: | distinguishing among Defendants (e.g., which Defendant sells which exact components in its Super Safety kit), even though the Luettke Declaration acknowledges that there are many Super Safety variants offered by the different Defendants. Thus, this response will focus on the base components of the Super Safety. The Super Safety is not a complete firearm trigger mechanism, as it consists only of a lever, a cam, and a detent, omitting other required components, as noted below. Similarly, these components individually are also not a firearm trigger mechanism. | AS Designs' install guides. As I explained in my prior declarations, the Super Safety is sold as a kit of purpose-designed components, including a pre-cut trigger, cam, reset lever, centering block, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the Super Safety as sold by AS Designs. Contrary to Batzer's description of those base components, AS Designs' Super Safety kit includes a pre-cut trigger.<br><br>As assembled, the mechanism is operable in both a standard semi-automatic mode and a forced reset semi-automatic mode. Batzer does not dispute that; he acknowledges that the Super Safety cam slides to select between standard semi-automatic and forced reset modes (element 32[d]). |
| 32[a]. a disconnector; | The Super Safety does not include a disconnector. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 32[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 32[b]. a trigger member, wherein the trigger member is forced into a trigger set position responsive to rearward motion of a cyclic semi-automatic action of the semi-automatic firearm; and | The Super Safety does not include a trigger. Furthermore, a firearm's trigger requires more than just cycling action (of the bolt carrier) to be forced to the set position (i.e., a standard semi-automatic firearm includes cycling action of the bolt carrier, but its trigger is not forced to the set position in response). The patent specification discloses that, only if the firearm is set to the forced-reset position, rearward travel of the bolt carrier assembly 92 forces the hammer 36 to press | Batzer's argument that the Super Safety does not include a trigger is incorrect as to AS Designs' Super Safety, which includes a pre-cut trigger, and his remaining missing-components argument is addressed at element 32[pre].<br><br>Batzer's remaining argument adds requirements the claim does not contain. The claim requires that the trigger member be forced to the set position "responsive to rearward motion of a cyclic semi-automatic action." It does not specify the |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| | down on a hump 58 of the trigger member 38, forcing it to rotate counter-clockwise, and allows the spring-biased locking member 72 to pivot counter-clockwise so that it locks and keeps the trigger member 38 in the set position. 10:1-44, Figs. 9A-D. In a firearm with a Super Safety, the cycling bolt carrier does not force the hammer to press down on a hump of a trigger to force the trigger to rotate to the set position, nor does the Super Safety include a spring-biased locking member that pivots to lock the trigger member in the set position once it has been re-set by the hammer. | mechanism through which the cycling action does so, and it does not require that the hammer press on a hump of the trigger member or that a spring-biased locking member pivot to hold it. Those are features of one disclosed embodiment. In the Super Safety, as assembled and used as intended in its forced reset mode, the rearward-moving bolt carrier drives the reset lever, the reset lever rotates the cam, and the cam lobe forces the trigger member to the set position. The trigger member is therefore forced to the set position by the cycling action, which is what the claim recites. |
| 32[c]. a locking member configured to move between a block position and a non-block position, wherein the block position mechanically blocks the trigger member from moving from the trigger set position to a trigger released position, wherein the non-block position permits the trigger member to be moved from the trigger set position to the trigger released position, wherein the locking member is moved into the block position during rearward motion of the cyclic semi-automatic action and moved into the non-block position during forward motion of the cyclic semi-automatic action; | "Locking member" is a means-plus-function limitation governed by §112(f), as it uses a nonce word (member) prefixed by a function (locking) and does not have a plain and ordinary meaning connoting specific structure to a skilled artisan. Thus, this limitation is limited to the corresponding structure disclosed in the specification and equivalents. See Figs. 1-9D, 8:33-49, 9:2-16, 10:14-44, Abstract. The Super Safety does not include a trigger or such a locking member that pivots around a pin going through an opening in the locking member, that is contacted by the bolt carrier assembly to rotate only in the clockwise direction but that is not contacted by the bolt carrier assembly to rotate counter-clockwise (which rotation can occur only due to spring bias), and that has a notch to receive a corner of a trigger member (extending upwards from its middle section, not from the trigger tail) and to prevent it from further clockwise rotation until the locking member is pivoted clockwise to release the trigger corner. Also, the specification and this claim limitation disclose that the locking member is cycled between its blocking and non-blocking positions each time the bolt carrier action cycles, regardless of the mode the firearm is set to. In contrast, the Super Safety cycles between a blocking and non-blocking position only if the firearm is in forced-reset mode. The Luettke Declaration, Ex. L, views the "cam lobes" as being the locking member. But these lobes bear no resemblance to the locking member disclosed in the patent, as discussed in the preceding paragraph. Furthermore, Ex. L shows two arrows pointing to the cam lobes: one to the lobe that interfaces with the trigger tail in forced-reset mode, and another lobe that interfaces with the trigger tail in safe mode. | I understand from counsel that absence of the word "means" creates a rebuttable presumption that § 112(f) does not apply, and that the presumption is overcome only if a POSITA would read the term as a nonce word rather than as connoting structure. A POSITA would understand "locking member" to connote structure. The term names a physical component in the firearms trigger art, as reflected in the '403 Patent itself and in the '223 Patent, which use "locking member" and "locking bar" as component names, and as reflected in Batzer's own use of "cam," "lever," and "detent bar" to identify parts. The claim itself recites the member's structure and structural relationships: it is movably mounted, it moves between a position in which it mechanically blocks the trigger member from moving to the released position and a position in which it does not, and it is moved by the cycling action. A POSITA would understand that recitation to describe a physical part, not a functional placeholder.<br><br>The Super Safety's locking member is its cam, as identified in my prior chart (Luettke II Decl. Ex. L). As assembled and used as intended in forced reset mode, the cam moves between a block position, in which the cam lobe mechanically blocks the trigger member from moving from the set position to the released position, and a non-block position, in which it does not. During rearward motion of the action, the bolt carrier drives the reset lever, which rotates the cam into the block position, with the cam lobe forcing the trigger member to the set position and holding it there. During forward motion of the action, the reset lever rotates the cam back into the non-block position. That is the movement this limitation recites. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | But in safe mode, the cam (and thus the lobe) remains in a fixed position and does not move between a non-block and block position; and in safe mode, the cam lobe always blocks the trigger tail. (While not indicated in the Luettke Declaration, the converse is true for standard semi-auto mode: the cam pivots, but the cam lobe does not block the trigger tail in any pivoting position.) The Super Safety cam itself is not contacted by the bolt carrier to either rotate or move axially among the three modes. The Super Safety lever does not do anything to the trigger – it does not even contact the trigger. | Batzer's requirements of a pivot pin passing through an opening in the locking member, rotation in only one direction by contact with the bolt carrier, return by spring bias, and a notch that receives a corner of the trigger member are features of one disclosed embodiment, not requirements of the claim.<br><br>His argument that the disclosed locking member cycles in every mode adds a further requirement the claim does not contain. This limitation recites how the locking member moves as the action cycles; it does not require that it do so in the standard semi-automatic mode. Claim 32 separately recites the standard and forced reset modes in its "wherein" clauses. As assembled and used as intended in forced reset mode, the Super Safety cam cycles between the blocking and non-blocking positions on every cycle of the action.<br><br>That the bolt carrier contacts the reset lever rather than the cam does not matter. The claim requires that the locking member be moved during the rearward and forward motion of the cyclic action, not that the action directly contact the locking member. Here, the bolt carrier moves the reset lever, and the engaged reset lever carries the cam with it. Likewise, it is the cam lobe that blocks the trigger member; that the reset lever does not itself contact the trigger is irrelevant.<br><br>Batzer's observations about safe mode and standard semi-automatic mode also do not bear on this limitation. My analysis is directed to forced reset mode, in which the cam rotates between the recited positions. That a different portion of the cam also blocks the trigger in safe mode, and that the standard-fire groove relieves the cam lobe in standard semi-automatic mode, does not change how the cam operates in forced reset mode. Nor does it matter that the bolt carrier does not move the cam axially among the three modes. The user slides the cam to select a mode; the claim does not require that the bolt carrier do so. |
| 32[d]. a safety selector, wherein the safety selector is selectable between at least the standard semi-automatic mode and the forced reset | This claim recites (and the specification shows) discrete components that comprise the trigger mechanism, which presumptively means that they are distinct components (rather than one and the same structure). Thus, e.g., the recited safety selector and the locking member cannot be met by the same component. The Super Safety cam acts as a safety selector, | Batzer concedes that the Super Safety cam "acts as a safety selector, and sliding the cam along its axis of rotation selects between at least standard semi-automatic mode and forced-reset mode." That is what this limitation requires. The claim does not require that the safety selector rotate; sliding is movement. That the safety selector of the disclosed |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| semi-automatic mode; and wherein: | and sliding the cam along its axis of rotation selects between at least standard semi-automatic mode and forced-reset mode. However, the Luettke Declaration, Ex. L, views the cam as meeting the locking member limitation, so the cam cannot also meet the safety selector limitation. Furthermore, the specification discloses that the claimed safety selector pivots/rotates to select a mode; in contrast, the Super Safety cam slides along its axis to select a mode. | embodiment pivots is a feature of one embodiment, not a requirement of the claim.<br><br>Batzer's argument that the safety selector and the locking member must be different components adds a requirement this claim does not contain. I understand from counsel that when one claim expressly recites a limitation and another does not, the other claim is presumed not to include it. Claim 30 expressly recites "a safety selector that is separate from the locking member." Claim 32 does not. In the Super Safety, the user slides the cam to select the mode, and the bolt carrier, through the reset lever, rotates the cam so that its lobe blocks and unblocks the trigger member. |
| 32[e]. in the standard semi-automatic mode, rearward pressure on the trigger member must be reduced to disengage a hammer from the disconnector before the trigger member can again be actuated; and | The Super Safety does not include a trigger, a hammer, or a disconnector. If the Super Safety is installed in a firearm that includes the missing components and set to standard semi-automatic mode, the hammer could be disengaged from the disconnector (depending on the configuration and operation of the missing components) by reducing rearward pressure on the trigger member, but only if the pressure was first applied to actuate the trigger and if the hammer and disconnector were first engaged, none of which the claim requires. Without these unrecited steps, reducing pressure on the trigger member will not disengage a hammer from a disconnector before the trigger can again be actuated. Furthermore, the bolt carrier must be cycled forward into battery for the reduction of pressure on the trigger to cause a disengagement of the hammer from the disconnector; otherwise, reducing pressure on the trigger will not disengage the hammer from the disconnector. | Batzer's missing-components argument is addressed at element 32[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the Super Safety installed and set to standard semi-automatic mode, the hammer is disengaged from the disconnector by reducing rearward pressure on the trigger member, and the trigger member can then be actuated again.<br><br>His argument that the claim omits necessary steps is not how a POSITA would read it. The limitation recites that pressure must be reduced "before the trigger member can again be actuated." The word "again" presupposes that the trigger member has been actuated and the firearm has cycled, so that the disconnector has caught the hammer. A POSITA would read the limitation as describing the ordinary standard semi-automatic firing cycle, which is how Batzer describes it. Nor does the claim say anything inconsistent with the bolt carrier first returning to battery. |
| 32[f]. in the forced reset semi-automatic mode, the trigger member is forced to the trigger set position and can be actuated without reducing pressure on the trigger member to fire another round when the cyclic semi-automatic action reaches a substantially in-battery | The Super Safety does not include a trigger or all other components necessary for cyclic action. If the Super Safety is installed in a firearm that includes the missing components and set to forced-reset mode, the trigger member could be forced to the set position depending on the configuration and operation of the missing components, but only if the force applied by the rotating cam to the trigger is greater than the force applied to the trigger by the user; otherwise, the user will need to reduce pressure on the trigger member to allow it to be re-set. Additionally, by reciting that the "cyclic semi- | Batzer's missing-components argument is addressed at element 32[pre].<br><br>Batzer concedes the recited operation: in forced reset mode, the bolt carrier drives the reset lever, which rotates the cam, forcing the trigger member to the set position, and the user can fire again once the bolt carrier returns. His remaining points add requirements the claim does not contain. The limitation says nothing about how much pressure the user applies to the trigger member. As Batzer himself describes at |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| position or an in-battery position. | automatic action reaches a substantially in-battery position or an in-battery position," it is unclear whether the cyclic action needs to move to or simply remain in an in-battery position; if the latter, the trigger member will not be forced to the set position. | element 14[g], the Super Safety cam forces the trigger member to the set position. As assembled and used as intended, it does so against the user's rearward pressure. That a user might, in some circumstance, apply more force than the mechanism is designed to overcome does not change how the mechanism operates as designed.<br><br>Batzer's argument about "reaches a substantially in-battery position or an in-battery position" does not create any uncertainty. A POSITA would read "reaches" in its ordinary sense: the action arrives at the in-battery or substantially in-battery position as the bolt carrier returns forward on each cycle. That is when the Super Safety reset lever rotates the cam back, so that the trigger member can be actuated. |

**Claim 38**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 38[pre]. A forced reset trigger mechanism, comprising: | The Consolidated Motion and the supporting Luettke Declaration generically refer to the Super Safety, without distinguishing among Defendants (e.g., which Defendant sells which exact components in its Super Safety kit), even though the Luettke Declaration acknowledges that there are many Super Safety variants offered by the different Defendants. Thus, this response will focus on the base components of the Super Safety. The Super Safety is not a complete trigger mechanism, as it consists only of a lever, a cam, and a detent, omitting other required components, as noted below. Similarly, these components individually are also not a trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the Super Safety is sold as a kit of purpose-designed components, including a pre-cut trigger, cam, reset lever, centering block, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the Super Safety as sold by AS Designs. Contrary to Batzer's description of those base components, AS Designs' Super Safety kit includes a pre-cut trigger.<br><br>As assembled, the mechanism is a forced reset trigger mechanism: in its forced reset mode, the bolt carrier drives the |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | reset lever, which rotates the cam so that the cam lobe forces the trigger member to its set position, as Batzer describes at element 14[g]. |
| 38[a]. a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; | The Super Safety does not include a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 38[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer hook and pivots on a transverse hammer pivot axis. Batzer does not dispute that. |
| 38[b]. a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis; | The Super Safety does not include a disconnector. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 38[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 38[c]. a trigger member; and | The Super Safety does not include a trigger member. | AS Designs' Super Safety includes a pre-cut trigger, which is the trigger member. Batzer's remaining missing-components argument is addressed at element 38[pre]. |
| 38[d]. a safety selector adapted to be movable between a standard semi-automatic position and a forced reset semi-automatic position, | The Super Safety cam acts as a safety selector, and sliding the cam along its axis of rotation selects between not just standard semi-automatic mode and forced-reset mode, but also safe mode. The specification discloses that the claimed safety selector pivots/rotates to select a mode; in contrast, the Super Safety cam slides along its axis to select a mode. | See element 15[a]. Batzer concedes that sliding the Super Safety cam along its axis selects between the standard semi-automatic and forced reset modes. That is what this limitation requires, and the claim does not require that the selector rotate.<br><br>That the selector also has a safe position does not matter. The claim recites a safety selector "movable between" the standard semi-automatic and forced reset positions, and the claim uses open "comprising" language. A selector that also has a third position still has the two recited positions. |
| 38[e]. wherein when the safety selector is in the standard semi-automatic position and the trigger member is rearwardly actuated, and after the hammer pivots rearward to a position where the hammer | The Super Safety does not include a hammer, a disconnector, or a trigger member. If the Super Safety is installed in a firearm that includes the missing components and ammunition and set to standard semi-automatic mode, pulling the trigger may cause rearward movement of a bolt carrier assembly during cycling of the action, which may cause rearward pivoting of the hammer such that a hammer hook may move past a disconnector hook (depending on the configuration and | Batzer's missing-components argument is addressed at element 38[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the Super Safety installed and set to standard semi-automatic mode, cycling of the action pivots the hammer rearward until the hammer hook is past the disconnector hook, and the user must then reduce rearward pressure on the trigger |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| hook is past the disconnector hook, rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm. | operation of the missing components). While the bolt carrier assembly remains moved rearwards, reducing pressure on the trigger will not allow the trigger to be re-actuated because the hammer would still be pressed downwards by the bolt carrier assembly. When the bolt carrier assembly thereafter moves forward into battery and finishes cycling, the firearm user would normally need to manually release the trigger to free the hammer from the disconnector to permit the hammer and trigger to pivot to their set positions so the user can pull the trigger to fire the firearm again. If the user reduces the rearward trigger pressure but not enough to cause the disconnector to release the hammer, then pulling the trigger again will not fire the firearm. | sufficiently for the disconnector to release the hammer before the trigger can be actuated to fire again.<br><br>His remaining points do not avoid this limitation. That the reduction in pressure must be sufficient to release the hammer, and that the bolt carrier must first return to battery, is consistent with what the claim recites: rearward pressure "must be reduced" before the trigger member can be actuated to fire again. |

**Claim 39**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 39[pre]. A forced reset trigger mechanism, comprising: | The Consolidated Motion and the supporting Luettke Declaration generically refer to the Super Safety, without distinguishing among Defendants (e.g., which Defendant sells which exact components in its Super Safety kit), even though the Luettke Declaration acknowledges that there are many Super Safety variants offered by the different Defendants. Thus, this response will focus on the base components of the Super Safety. The Super Safety is not a complete trigger mechanism, as it consists only of a lever, a cam, and a detent, omitting other required components, as noted below. Similarly, these components individually are also not a firearm trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the Super Safety is sold as a kit of purpose-designed components, including a pre-cut trigger, cam, reset lever, centering block, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the Super Safety as sold by AS Designs. Contrary to Batzer's description of those base components, AS Designs' Super Safety kit includes a pre-cut trigger.<br><br>As assembled, the mechanism is a forced reset trigger mechanism: in its forced reset mode, the bolt carrier drives the reset lever, which rotates the cam so that the cam lobe forces |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | the trigger member to its set position, as Batzer describes at element 14[g]. |
| 39[a]. a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; | The Super Safety does not include a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 39[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer hook and pivots on a transverse hammer pivot axis. Batzer does not dispute that. |
| 39[b]. a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis; | The Super Safety does not include a disconnector. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 39[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 39[c]. a trigger member; and | The Super Safety does not include a trigger member. | AS Designs' Super Safety includes a pre-cut trigger, which is the trigger member. Batzer's remaining missing-components argument is addressed at element 39[pre]. |
| 39[d]. a safety selector adapted to be movable between a standard semi-automatic position and a forced reset semi-automatic position, | The Super Safety cam acts as a safety selector, and sliding the cam along its axis of rotation selects between not just standard semi-automatic mode and forced-reset mode, but also safe mode. The specification discloses that the claimed safety selector pivots/rotates to select a mode; in contrast, the Super Safety cam slides along its axis to select a mode. | See element 15[a]. Batzer concedes that sliding the Super Safety cam along its axis selects between the standard semi-automatic and forced reset modes. That is what this limitation requires, and the claim does not require that the selector rotate.<br><br>That the selector also has a safe position does not matter. The claim recites a safety selector "movable between" the standard semi-automatic and forced reset positions, and the claim uses open "comprising" language. A selector that also has a third position still has the two recited positions. |
| 39[e]. wherein, when in either position, when the trigger member is pulled rearward, cycling of a firearm action rearwardly pivots the hammer to a position where the hammer hook is past the disconnector hook, | The Super Safety does not include a trigger, a hammer, or a disconnector. If the Super Safety is installed in a firearm that includes the missing components and ammunition, then when the trigger is pulled, cycling of the firearm's action may (depending on the configuration and operation of the missing components) rearwardly pivot the hammer until its hook is past the disconnector hook. This may be the case when the Super Safety is in either semi-automatic or forced-reset mode. However, the specification explains that when the safety | Batzer's missing-components argument is addressed at element 39[pre].<br><br>Batzer concedes the recited operation: with the Super Safety installed, when the trigger is pulled, cycling of the action rearwardly pivots the hammer until its hook is past the disconnector hook, and "[t]his may be the case when the Super Safety is in either semi-automatic or forced-reset mode." That is what this limitation recites. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | selector 110 is moved to forced-reset mode, the disconnector tail 66 is prevented from rising, which "disables" the disconnector 60 and prevents its hook 64 from catching the hammer hook 53 (i.e., prevents the hammer hook from moving past the disconnector hook). 9:28-39, Figs. 6A-B, 9A-D. The specification does not disclose an embodiment where the hammer hook moves past the disconnector hook in forced-reset mode, so this claim lacks written description support and enablement under §112(a). | His remaining argument, that the claim lacks written description support and enablement, is a validity argument, which I understand is addressed by Dr. Harrison. It does not bear on whether the Super Safety meets this limitation. |
| 39[f]. wherein if the safety selector is in the standard semi-automatic position, rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm, and | The Super Safety does not include a trigger. If the Super Safety is installed in a firearm that includes the missing components and set to standard semi-automatic mode, if the trigger is first pulled rearward to discharge the firearm, and if the disconnector catches and holds the hammer, then (depending on the configuration and operation of the missing components) rearward pressure on the trigger may need to be reduced sufficiently to allow the disconnector to release the hammer, so that the trigger member can then be actuated again to fire the firearm. Furthermore, the reduction in pressure must be sufficient to cause the disconnector to release the hammer; otherwise, the reduction will not allow the firearm to be discharged by actuating the trigger. Moreover, the bolt carrier must be cycled forward into battery for the reduction of pressure on the trigger to cause a disengagement of the hammer from the disconnector; otherwise, reducing pressure on the trigger will not disengage the hammer from the disconnector and thus will not allow actuation of the trigger to fire the firearm. | Batzer's missing-components argument is addressed at element 39[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the Super Safety installed and set to standard semi-automatic mode, cycling of the action pivots the hammer rearward until the hammer hook is past the disconnector hook, and the user must then reduce rearward pressure on the trigger sufficiently for the disconnector to release the hammer before the trigger can be actuated to fire again.<br><br>His remaining points do not avoid this limitation. That the reduction in pressure must be sufficient to release the hammer, and that the bolt carrier must first return to battery, is consistent with what the claim recites: rearward pressure "must be reduced" before the trigger member can be actuated to fire again. |
| 39[g]. wherein, if the safety selector is in the forced reset semi-automatic position, the trigger member is forced to move to a full reset position against rearward pressure on the trigger member and the rearward pressure on the trigger member does not need to be reduced to actuate the trigger to fire the firearm. | The Super Safety does not include a trigger. If the Super Safety is installed in a firearm that includes the missing components and set to forced-reset mode, the trigger member could be forced to the set position depending on the configuration and operation of the missing components, but only if the force applied by the rotating cam to the trigger is greater than the force applied to the trigger by the user; otherwise, the user will need to reduce pressure on the trigger member to allow it to be re-set and thereafter fire the firearm. Furthermore, the bolt carrier must be cycled forward into battery for the continued pressure on the trigger to cause a firing of the firearm; otherwise, maintaining pressure on the | Batzer's missing-components argument is addressed at element 39[pre].<br><br>Batzer concedes the recited operation: in forced reset mode, the bolt carrier drives the reset lever, which rotates the cam, forcing the trigger member to the set position, and the user can fire again once the bolt carrier returns. His remaining points add requirements the claim does not contain. The limitation says nothing about how much pressure the user applies to the trigger member. As Batzer himself describes at element 14[g], the Super Safety cam forces the trigger member to the set position. As assembled and used as |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | trigger will not fire the firearm because the bolt carrier will be holding down the hammer. | intended, it does so against the user's rearward pressure. That a user might, in some circumstance, apply more force than the mechanism is designed to overcome does not change how the mechanism operates as designed.<br><br>Batzer's point that the bolt carrier must return to battery before the firearm fires adds nothing. The limitation recites that the user does not need to reduce rearward pressure to fire again; it does not require that the firearm fire before the action returns to battery. The '403 Patent describes the trigger member being held until the bolt carrier returns, which is the same operation Batzer describes. |

## ARC-Fire

**Claim 14**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 14[pre]. A trigger mechanism for a firearm operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising: | The Consolidated Motion for Preliminary Injunction ("Consolidated Motion," ECF No. 7, §II.C.2.d) and the supporting Luettke Declaration (ECF No. 8, §IV.B) appear to refer to the ambidextrous version of the ARC-Fire, but without distinguishing among Defendants (e.g., which Defendant sells which configuration of the ARC-Fire), even though the Consolidated Motion states that the ARC-Fire is sold in several configurations. Thus, this response will focus on the base components of the ambidextrous ARC-Fire kit. The ARC-Fire is not a complete firearm trigger mechanism, as each consists only of a lever, a cam, a detent bar, a primary selector, an ambi selector, a safety detent, and a trigger, omitting other required components, as noted below. See also Luettke Decl. ¶20. Similarly, these components individually are also not a firearm trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the ARC-Fire is sold as a kit of purpose-designed components, including a pre-cut trigger, transfer (reset) lever, detent bar, cam, primary selector, ambidextrous selector, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the ARC-Fire as sold by AS Designs.<br><br>As assembled, the mechanism is operable in both a standard semi-automatic mode and a forced reset semi-automatic mode. Batzer does not dispute that; he acknowledges that the ARC-Fire selectors can be pivoted to select between the standard semi-automatic and forced reset modes (element 32[d]). |
| 14[a]. a hammer having a hammer sear catch and a hammer hook and adapted to pivot on a transverse hammer pivot axis between a set position and a released position, the hammer adapted to be pivoted rearward by rearward movement of a bolt means; | The ARC-Fire does not include a hammer or a bolt means. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 14[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer sear catch and a hammer hook, pivots on a transverse hammer pivot axis between set and released positions, and is pivoted rearward by rearward movement of the bolt carrier. Batzer does not dispute that.<br><br>A POSITA would understand "bolt means" to connote structure. It names a physical component that is standard and well understood in the firearms art, the reciprocating bolt or |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | bolt carrier, and the '403 Patent uses the term consistently with that ordinary meaning. Batzer himself identifies that structure as the bolt carrier assembly 92. |
| 14[b]. a trigger member having a trigger member sear and adapted to move between a set position and a released position, the trigger member being forced to the set position as a result of cycling action of the bolt means, such that the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member; | "Bolt means" is a means-plus-function limitation governed by §112(f) and is thus limited to the corresponding structure disclosed in the specification and its equivalents. The ARC-Fire does not include a bolt means or a hammer. The ARC-Fire includes a trigger that has a sear and can move between a set position and a released position when mounted in a lower receiver (which is not included). The trigger requires more than just cycling action of the bolt means to be forced to the set position (i.e., a standard semi-automatic firearm includes cycling action of the bolt means, but its trigger is not forced to the set position thereby). The patent specification discloses that, only if the firearm is set to the forced-reset position, rearward travel of the bolt carrier assembly 92 forces the hammer 36 to press down on a hump 58 of the trigger member 38, forcing it to rotate counter-clockwise, and allows the spring-biased locking member 72 to pivot counter-clockwise so that it locks and keeps the trigger member 38 in the set position. 10:1-44, Figs. 9A-D. In a firearm with an ARC-Fire, the bolt carrier does not force the hammer to press down on a hump of a trigger to force the trigger to rotate to the set position, nor does the ARC-Fire include a spring-biased locking member that pivots to lock the trigger member in the set position once it has been re-set by the hammer. | A POSITA would understand "bolt means" to connote structure. It names a physical component that is standard and well understood in the firearms art, the reciprocating bolt or bolt carrier, and the '403 Patent uses the term consistently with that ordinary meaning. Batzer himself identifies that structure as the bolt carrier assembly 92.<br><br>Batzer concedes the ARC-Fire includes a trigger member that has a sear and moves between set and released positions. His missing-components argument is addressed at element 14[pre].<br><br>Batzer's remaining argument adds requirements the claim does not contain. The claim requires that the trigger member be forced to the set position "as a result of cycling action of the bolt means." It does not specify the mechanism through which the cycling action does so, and it does not require that the hammer press on a hump of the trigger member or that a spring-biased locking member pivot to hold it. Those are features of one disclosed embodiment. In the ARC-Fire, as assembled and used as intended in its forced reset mode, the rearward-moving bolt carrier drives the lever, the lever rotates the cam, and the cam lobe forces the trigger member to the set position. The trigger member is therefore forced to the set position by the cycling action, which is what the claim recites. |
| 14[c]. wherein the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member, | Since the ARC-Fire does not include a hammer (with the sear catch), the ARC-Fire's trigger sear is not in engagement with the missing hammer's sear catch. | Batzer's only argument is that the kit as shipped omits the hammer. As addressed at element 14[pre], my analysis is directed to the assembled mechanism. In that mechanism, the trigger member sear engages the hammer sear catch in the set positions of the hammer and trigger member and is out of engagement in the released positions. Batzer does not dispute that operation. |
| 14[d]. a disconnector having a disconnector hook for | The ARC-Fire does not include a disconnector or a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 14[pre], my analysis is |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| engaging the hammer hook and adapted to pivot on a transverse disconnector pivot axis; and | | directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook for engaging the hammer hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 14[e]. a locking member adapted to be movably mounted, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position and adapted to be moved to the second position by forward movement of the bolt means, | "Locking member" is a means-plus-function limitation governed by §112(f), as it uses a nonce word (member) prefixed by a function (locking) and does not have a plain and ordinary meaning connoting specific structure to a skilled artisan. Thus, this limitation is limited to the corresponding structure disclosed in the specification and equivalents. See Figs. 1-9D, 8:33-49, 9:2-16, 10:14-44, Abstract. Furthermore, the specification explains that the "first position" is one where the locking member does not block the trigger member from moving upwards, while the "second position" is one where the locking member does block the trigger member from moving upwards (i.e., being pulled to by the user and moving to the released position); this is opposite to the "first position" and "second position" recited in this claim limitation, which renders it unclear and indefinite. The ARC-Fire does not include a bolt means or such a locking member that pivots around a pin going through an opening in the locking member, that is contacted by the bolt carrier assembly to rotate only in the clockwise direction but that is not contacted by the bolt carrier assembly to rotate counter-clockwise (which rotation can occur only due to spring bias), and that has a notch to receive a corner of a trigger member (extending upwards from its middle section, not from the trigger tail) and to prevent it from further clockwise rotation until the locking member is pivoted clockwise to release the trigger corner. Also, the specification and this claim limitation disclose that the locking member is cycled between its blocking and non-blocking positions each time the bolt carrier action cycles, regardless of the mode the firearm is set to. In contrast, the ARC-Fire cycles between a blocking and non-blocking position only if the firearm is in forced-reset mode. The Luettke Declaration, Ex. K, views the "cam lobe" as being the locking member. But the lobe bears no resemblance to the locking member | I understand from counsel that absence of the word "means" creates a rebuttable presumption that § 112(f) does not apply, and that the presumption is overcome only if a POSITA would read the term as a nonce word rather than as connoting structure. A POSITA would understand "locking member" to connote structure. The term names a physical component in the firearms trigger art, as reflected in the '403 Patent itself and in the '223 Patent, which use "locking member" and "locking bar" as component names, and as reflected in Batzer's own use of "cam," "lever," and "detent bar" to identify parts. The claim itself recites the member's structure and structural relationships: it is movably mounted, it moves between a position in which it mechanically blocks the trigger member from moving to the released position and a position in which it does not, and it is moved by the cycling action. A POSITA would understand that recitation to describe a physical part, not a functional placeholder.<br><br>The ARC-Fire's locking member is its cam, as identified in my prior chart (Luettke II Decl. Ex. K). As assembled and used as intended in forced reset mode, the cam is movably mounted and rotates between a first position, in which the cam lobe mechanically blocks the trigger member from moving to the released position, and a second position, in which it does not. As the bolt carrier returns forward, it moves the lever, and the engaged lever rotates the cam to the second position. The cam is therefore adapted to be moved to the second position by forward movement of the bolt means.<br><br>Batzer's argument about the order of the "first" and "second" positions does not create any uncertainty about what the claim requires. The claim defines each position by what the locking member does there: in the "first position" it "mechanically blocks the trigger member from moving to the released position," and in the "second position" it "does not |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | disclosed in the patent, as discussed in the preceding paragraph. The ARC-Fire cam itself is not contacted by the bolt carrier to move. The ARC-Fire lever does not do anything to the trigger – it does not even contact the trigger. | mechanically block the trigger member." A POSITA would apply those claim-defined positions, and the ARC-Fire cam occupies each of them. That the specification labels the corresponding positions of the disclosed embodiment differently does not change the definitions the claim itself supplies.<br><br>Batzer's requirements of a pivot pin passing through an opening in the locking member, rotation in only one direction by contact with the bolt carrier, return by spring bias, and a notch that receives a corner of the trigger member are features of one disclosed embodiment, not requirements of the claim.<br><br>His argument that the disclosed locking member cycles in every mode adds a further requirement the claim does not contain. This limitation recites how the locking member moves as the action cycles; it does not require that it do so in the standard semi-automatic mode. Claim 14 separately recites each mode, and element 14[g] recites the forced reset operation. As assembled and used as intended in forced reset mode, the ARC-Fire cam cycles between the blocking and non-blocking positions on every cycle of the action.<br><br>That the bolt carrier contacts the lever rather than the cam does not matter. The claim requires that the locking member be "adapted to be moved" to the second position "by forward movement of the bolt means," not that the bolt means directly contact the locking member. Here, the bolt carrier moves the lever, and the engaged lever carries the cam with it. Likewise, it is the cam lobe that blocks the trigger member; that the lever does not itself contact the trigger is irrelevant. |
| 14[f]. wherein in the standard semi-automatic mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook holds the hammer hook, at which time a user must manually reduce pressure on the trigger member to free the hammer from the | The ARC-Fire does not include a bolt means, a hammer, or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and set to standard semi-automatic mode, rearward movement of a bolt carrier assembly may cause rearward pivoting of the hammer such that a disconnector hook may hold the hammer hook (depending on the configuration and operation of the missing components). While the bolt carrier assembly remains rearwards, reducing pressure on the trigger will not free the hammer from the disconnector and would not permit the hammer and trigger to pivot to the set positions because the | Batzer's missing-components argument is addressed at element 14[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the ARC-Fire installed and set to standard semi-automatic mode, rearward movement of the bolt carrier pivots the hammer rearward, the disconnector hook holds the hammer hook, and the user must manually release the trigger to free the hammer from the disconnector so that the hammer and trigger member pivot to their set positions and the user can fire again. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| disconnector to permit the hammer and the trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm again; and | hammer would still be pressed downwards by the bolt carrier assembly. When the bolt carrier assembly thereafter moves forward into battery, the firearm user would normally need to manually release the trigger to free the hammer from the disconnector to permit the hammer and trigger to pivot to their set positions so the user can pull the trigger to fire the firearm. | His remaining point, that reducing pressure on the trigger while the bolt carrier is still rearward would not free the hammer, adds a requirement the claim does not contain. The claim does not require that the user be able to free the hammer at any particular instant during the cycle. It recites that, once the disconnector hook holds the hammer hook, the user must manually reduce pressure on the trigger member to free the hammer before firing again. Batzer agrees that is what the user must do. |
| 14[g]. wherein in the forced reset semi-automatic mode, rearward movement of the bolt means causes the trigger member to be forced to the set position, and the disconnector hook is prevented from holding the hammer hook, and thereafter when the bolt means reaches a substantially in-battery position or an in-battery position the user can actuate the trigger member to fire the firearm again. | The ARC-Fire does not include a bolt means, a hammer, or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and set to forced-reset mode, rearward movement of a bolt carrier assembly does not alone cause the trigger member to be forced to the set position. Since "bolt means" is a means-plus-function limitation that is limited to the corresponding structure disclosed in the specification and equivalents thereof, the patent specification discloses that (if the firearm is set to the forced-reset position) rearward travel of the bolt carrier assembly 92 forces the hammer 36 to press down on a hump 58 of the trigger member 38, forcing it to rotate counter-clockwise to the set position, and allows the spring-biased locking member 72 to pivot counter-clockwise so that it locks and keeps the trigger member 38 in the set position. 10:1-44, Figs. 9A-D. In a firearm with an ARC-Fire set to forced-reset mode, the bolt carrier does not force the hammer to press down on a hump of a trigger to force the trigger to rotate to the set position, nor does the ARC-Fire include a spring-biased locking member that pivots (upon release from contact with the bolt carrier assembly) to lock the trigger member in the set position once it has been re-set by the hammer. Furthermore, if a firearm with an ARC-Fire is set to forced-reset mode, the disconnector hook is not prevented from catching and holding the hammer hook as the bolt carrier assembly moves rearwards; indeed, depending on the configuration and operation of the missing components, the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook. Continued rearward movement of the bolt carrier would cause the lever to rotate the cam, which forces the trigger member to the set position, which would | Batzer's missing-components argument is addressed at element 14[pre], and his "bolt means" argument and his argument about how the trigger member is forced to the set position are addressed at element 14[b].<br><br>Batzer concedes that in forced reset mode, continued rearward movement of the bolt carrier causes the lever to rotate the cam, which forces the trigger member to the set position, and that when the bolt carrier moves forward into battery, it causes the lever to rotate the cam, unblocking the trigger and allowing the user to fire again.<br><br>Batzer's remaining argument rests on an incorrect factual premise. In the ARC-Fire, as assembled and used as intended, the disconnector hook never catches or holds the hammer hook in forced reset mode. As the bolt carrier travels rearward, it pivots the hammer rearward past the disconnector hook and continues to drive the hammer to a past-cocked position, in which the hammer hook is not in contact with the disconnector. Near the end of its rearward travel, with the hammer still past cocked, the bolt carrier drives the lever rearward, rotating the engaged cam, which forces the trigger member to its set position and moves the disconnector out of the path of the hammer hook. As the bolt carrier then moves forward, the hammer pivots forward, passes the disconnector, which has been moved out of its path, and is held by the trigger member sear. At no point in that sequence does the disconnector hook catch or hold the hammer hook. That is what this limitation recites: in forced reset mode, the disconnector hook "is prevented from holding the hammer hook." Batzer's contrary statement that "the rearward pivoting of the hammer would cause the disconnector hook to catch |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | also cause the disconnector to release the hammer hook. When the bolt carrier thereafter moves forward into battery, it causes the lever to rotate the cam, unblocking the trigger and allowing the firearm user to pull the trigger to fire the firearm again. | and hold the hammer hook" does not describe how the ARC-Fire operates. |

**Claim 15**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 15[pre]. The trigger mechanism of claim 14, | See claim 14 above. | See claim 14 above. |
| 15[a]. further comprising a safety selector, movement of which selects between at least standard semi-automatic mode and forced reset semi-automatic mode. | The Luettke Declaration, Ex. K, is unclear regarding the assertions regarding the safety selector. On claim 15, Ex. K points to the ARC-Fire cam as allegedly meeting this "safety selector" claim limitation. But it also incorporates by reference "all contentions disclosed in claims 14 and 38[D]." Presumably the incorporation of the claim 14 contentions is to address this claim's reference to claim 14; otherwise, the relevance of claim 14 (which does not recite a safety selector) is unclear. Regarding limitation 38[D], Ex. K points to the ARC-Fire primary selector (or perhaps the ambi selector – the Declaration is not clear) as meeting this claim limitation. But the cam, the primary selector, and the ambi selector are different components, which renders Plaintiffs' contentions unclear. This claim (including its reliance on claim 14) recites (and the specification shows) discrete components that comprise the trigger mechanism, which presumptively means that they are distinct components (rather than one and the same structure). Thus, e.g., the recited safety selector and the locking member cannot be met by the same component (e.g., the cam, according to the Luettke Declaration, Ex. K). Furthermore, movement of the ARC-Fire cam does not select between at least standard semi-automatic mode and forced-reset mode. | For clarity, the ARC-Fire's safety selector is its selector lever (primary selector), together with the ambidextrous selector and the detent bar, which form the selector shaft that the user rotates to choose the safe, standard semi-automatic, and forced reset ("ARC") positions. That is consistent with my prior chart, which identified the ARC-Fire's selector at element 38[D] (Luettke II Decl. Ex. K). Batzer concedes that the ARC-Fire's primary selector and ambi selector "can be pivoted to select between at least the standard semi-automatic mode and the forced-reset mode" (element 32[d]). That is what this limitation requires. Movement of the selector selects the mode because it determines whether the lever engages the cam: in forced reset mode the lever engages the cam, and in standard semi-automatic mode it does not.<br><br>The safety selector and the locking member are separate components. The locking member is the cam (elements 14[e], 17[d], and 32[c]). The cam is carried on the selector shaft, but it is a distinct part. Batzer's statement that movement of the cam does not select the mode is therefore consistent with my analysis; it is the selector, not the cam, that selects the mode. |

**Claim 17**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 17[pre]. A trigger mechanism for a semi-automatic firearm, comprising: | The Consolidated Motion and the supporting Luettke Declaration appear to refer to the ambidextrous version of the ARC-Fire, but without distinguishing among Defendants (e.g., which Defendant sells which configuration of the ARC-Fire), even though the Consolidated Motion states that the ARC-Fire is sold in several configurations. Thus, this response will focus on the base components of the ambidextrous ARC-Fire kit. The ARC-Fire is not a complete firearm trigger mechanism, as each consists only of a lever, a cam, a detent bar, a primary selector, an ambi selector, a safety detent, and a trigger, omitting other required components, as noted below. See also Luettke Decl. ¶20. Similarly, these components individually are also not a firearm trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the ARC-Fire is sold as a kit of purpose-designed components, including a pre-cut trigger, transfer (reset) lever, detent bar, cam, primary selector, ambidextrous selector, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the ARC-Fire as sold by AS Designs. |
| 17[a]. a hammer comprising a hammer hook; | The ARC-Fire does not include a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 17[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer hook. Batzer does not dispute that. |
| 17[b]. a disconnector comprising a disconnector hook for holding the hammer hook; | The ARC-Fire does not include a disconnector or a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 17[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook for holding the hammer hook. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 17[c]. a trigger member, wherein the trigger member can be forced into a trigger set position responsive to rearward motion of a cyclic | The ARC-Fire includes a trigger member. This limitation appears to include a typographical error, but the request for certificate of correction refers to a different claim location for such a correction. Thus, it is unclear whether the "forced into a trigger set position" limitation is optional, mandatory, or a capability. | Batzer concedes the ARC-Fire includes a trigger member. The language Batzer identifies was corrected by a Certificate of Correction signed August 18, 2026, which changes "wherein the trigger member can be is" at column 14, line 53 to "wherein the trigger member can be." As corrected, the limitation recites that the trigger member "can be forced into a |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| semi-automatic action of the semi-automatic firearm; and | | trigger set position responsive to rearward motion of a cyclic semi-automatic action." The ARC-Fire's trigger member can be. As assembled and used as intended in forced reset mode, the rearward-moving bolt carrier drives the lever, the lever rotates the cam, and the cam lobe forces the trigger member to the set position. |
| 17[d]. a locking member configured to move between a block position and a non-block position, wherein the block position mechanically blocks the trigger member from moving from the trigger set position to a trigger released position, wherein the non-block position permits the trigger member to be moved from the trigger set position to the trigger released position, wherein the locking member is moved into the block position during rearward motion of the cyclic semi-automatic action and moved into the non-block position during forward motion of the cyclic semi-automatic action, and wherein: | "Locking member" is a means-plus-function limitation governed by §112(f), as it uses a nonce word (member) prefixed by a function (locking) and does not have a plain and ordinary meaning connoting specific structure to a skilled artisan. Thus, this limitation is limited to the corresponding structure disclosed in the specification and equivalents. See Figs. 1-9D, 8:33-49, 9:2-16, 10:14-44, Abstract. The ARC-Fire does not include such a locking member that pivots around a pin going through an opening in the locking member, that is contacted by the bolt carrier assembly to rotate only in the clockwise direction but that is not contacted by the bolt carrier assembly to rotate counter-clockwise (which rotation can occur only due to spring bias), and that has a notch to receive a corner of a trigger member (extending upwards from its middle section, not from the trigger tail) and to prevent it from further clockwise rotation until the locking member is pivoted clockwise to release the trigger corner. Also, the specification and this claim limitation disclose that the locking member is cycled between its blocking and non-blocking positions each time the bolt carrier action cycles, regardless of the mode the firearm is set to. In contrast, the ARC-Fire cycles between a blocking and non-blocking position only if the firearm is in forced-reset mode. The Luettke Declaration, Ex. K, views the "cam lobe" as being the locking member. But the lobe bears no resemblance to the locking member disclosed in the patent, as discussed in the preceding paragraph. The ARC-Fire cam itself is not contacted by the bolt carrier to move. The ARC-Fire lever does not do anything to the trigger – it does not even contact the trigger. | I understand from counsel that absence of the word "means" creates a rebuttable presumption that § 112(f) does not apply, and that the presumption is overcome only if a POSITA would read the term as a nonce word rather than as connoting structure. A POSITA would understand "locking member" to connote structure. The term names a physical component in the firearms trigger art, as reflected in the '403 Patent itself and in the '223 Patent, which use "locking member" and "locking bar" as component names, and as reflected in Batzer's own use of "cam," "lever," and "detent bar" to identify parts. The claim itself recites the member's structure and structural relationships: it is movably mounted, it moves between a position in which it mechanically blocks the trigger member from moving to the released position and a position in which it does not, and it is moved by the cycling action. A POSITA would understand that recitation to describe a physical part, not a functional placeholder.<br><br>The ARC-Fire's locking member is its cam, as identified in my prior chart (Luettke II Decl. Ex. K). As assembled and used as intended in forced reset mode, the cam moves between a block position, in which the cam lobe mechanically blocks the trigger member from moving from the set position to the released position, and a non-block position, in which it does not. During rearward motion of the action, the bolt carrier drives the lever, which rotates the cam into the block position, with the cam lobe forcing the trigger member to the set position and holding it there. During forward motion of the action, the lever rotates the cam back into the non-block position. That is the movement this limitation recites.<br><br>Batzer's requirements of a pivot pin passing through an opening in the locking member, rotation in only one direction by contact with the bolt carrier, return by spring bias, and a |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| | | notch that receives a corner of the trigger member are features of one disclosed embodiment, not requirements of the claim.<br><br>His argument that the disclosed locking member cycles in every mode adds a further requirement the claim does not contain. This limitation recites how the locking member moves as the action cycles; it does not require that it do so in the standard semi-automatic mode. Claim 17 separately recites the standard and forced reset modes in its "wherein" clauses. As assembled and used as intended in forced reset mode, the ARC-Fire cam cycles between the blocking and non-blocking positions on every cycle of the action.<br><br>That the bolt carrier contacts the lever rather than the cam does not matter. The claim requires that the locking member be moved during the rearward and forward motion of the cyclic action, not that the action directly contact the locking member. Here, the bolt carrier moves the lever, and the engaged lever carries the cam with it. Likewise, it is the cam lobe that blocks the trigger member; that the lever does not itself contact the trigger is irrelevant. |
| 17[e]. in a standard semi-automatic mode, after cycling of the action and while the trigger member is in the trigger released position, the trigger mechanism is configured such that the disconnector hook holds the hammer hook, at which point, rearward pressure on the trigger member must be reduced before the trigger member can be actuated, and | The ARC-Fire does not include a hammer or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and set to standard semi-automatic mode, rearward movement of a bolt carrier assembly during cycling of the action may cause rearward pivoting of the hammer such that a disconnector hook may hold the hammer hook while the user is still pulling the trigger (depending on the configuration and operation of the missing components). While the bolt carrier assembly remains rearwards, reducing pressure on the trigger will not allow the trigger to be re-actuated because the hammer would still be pressed downwards by the bolt carrier assembly. When the bolt carrier assembly thereafter moves forward into battery and finishes cycling, the firearm user would normally need to manually release the trigger to free the hammer from the disconnector to permit the hammer and trigger to pivot to their set positions so the user can pull the trigger to re-actuate it. | Batzer's missing-components argument is addressed at element 17[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the ARC-Fire installed and set to standard semi-automatic mode, the disconnector hook holds the hammer hook while the user is still pulling the trigger, and after the bolt carrier returns to battery the user must manually release the trigger to free the hammer before the trigger can be actuated again.<br><br>His remaining point, that reducing pressure while the bolt carrier is still rearward would not allow the trigger to be re-actuated, concerns a moment the claim does not address. The limitation recites the condition "after cycling of the action," and Batzer agrees that in that condition rearward pressure on the trigger member must be reduced before the trigger member can be actuated. |
| 17[f]. in a forced reset semi-automatic mode, the disconnector hook is | The ARC-Fire does not include a hammer or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and set to forced-reset mode, the | Batzer's missing-components argument is addressed at element 17[pre]. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| prevented from holding the hammer hook, and the trigger member can be actuated when the cyclic semi-automatic action reaches a substantially in-battery position or an in-battery position. | disconnector hook is not prevented from catching and holding the hammer hook; indeed, depending on the configuration and operation of the missing components, the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook. Continued rearward movement of the cycling bolt carrier would cause the lever to rotate the cam, which forces the trigger member to the set position, which would also cause the disconnector to release the hammer hook. When the bolt carrier thereafter moves forward into battery, it causes the lever to rotate the cam, unblocking the trigger and allowing the firearm user to pull the trigger to fire the firearm again. | Batzer concedes that in forced reset mode, the cycling bolt carrier causes the lever to rotate the cam, which forces the trigger member to the set position, and that when the bolt carrier moves forward into battery, the lever rotates the cam, unblocking the trigger so the user can actuate it.<br><br>Batzer's remaining argument rests on an incorrect factual premise. In the ARC-Fire, as assembled and used as intended, the disconnector hook never catches or holds the hammer hook in forced reset mode. As the bolt carrier travels rearward, it pivots the hammer rearward past the disconnector hook and continues to drive the hammer to a past-cocked position, in which the hammer hook is not in contact with the disconnector. Near the end of its rearward travel, with the hammer still past cocked, the bolt carrier drives the lever rearward, rotating the engaged cam, which forces the trigger member to its set position and moves the disconnector out of the path of the hammer hook. As the bolt carrier then moves forward, the hammer pivots forward, passes the disconnector, which has been moved out of its path, and is held by the trigger member sear. At no point in that sequence does the disconnector hook catch or hold the hammer hook. That is what this limitation recites: in forced reset mode, the disconnector hook "is prevented from holding the hammer hook." Batzer's contrary statement that "the rearward pivoting of the hammer would cause the disconnector hook to catch and hold the hammer hook" does not describe how the ARC-Fire operates. |

**Claim 29**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| 29[pre]. The trigger mechanism of claim 17, | See claim 17 above. | See claim 17 above. |
| 29[a]. comprising a safety selector, wherein the safety selector is selectable between at least the standard semi-automatic mode and the forced reset semi-automatic mode. | The Luettke Declaration, Ex. K, is unclear regarding the assertions regarding the safety selector. Ex. K incorporates by reference "all contentions disclosed in claims 15, 17 and 38[D]." Presumably the incorporation of the claim 17 contentions is to address this claim's reference to claim 17; otherwise, the relevance of claim 17 (which does not recite a safety selector) is unclear. Regarding claim 15, Ex. K points | For clarity, the ARC-Fire's safety selector is its selector lever (primary selector), together with the ambidextrous selector and the detent bar, which form the selector shaft that the user rotates to choose the safe, standard semi-automatic, and forced reset ("ARC") positions. That is consistent with my prior chart, which identified the ARC-Fire's selector at element 38[D] (Luettke II Decl. Ex. K). Batzer concedes that |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | to the ARC-Fire cam as allegedly meeting this "safety selector" claim limitation. Regarding limitation 38[D], Ex. K points to the ARC-Fire primary selector (or perhaps the ambi selector – the Declaration is not clear) as meeting this claim limitation. But the cam, the primary selector, and the ambi selector are different components, which renders Plaintiffs' contentions unclear. This claim (including its reliance on claim 17) recites (and the specification shows) discrete components that comprise the trigger mechanism, which presumptively means that they are distinct components (rather than one and the same structure). Thus, e.g., the recited safety selector and the locking member cannot be met by the same component (e.g., the cam, according to the Luettke Declaration, Ex. K). Furthermore, the ARC-Fire cam does not select between at least standard semi-automatic mode and forced-reset mode. | the ARC-Fire's primary selector and ambi selector "can be pivoted to select between at least the standard semi-automatic mode and the forced-reset mode" (element 32[d]). That is what this limitation requires. Movement of the selector selects the mode because it determines whether the lever engages the cam: in forced reset mode the lever engages the cam, and in standard semi-automatic mode it does not.<br><br>The safety selector and the locking member are separate components. The locking member is the cam (elements 14[e], 17[d], and 32[c]). The cam is carried on the selector shaft, but it is a distinct part. Batzer's statement that movement of the cam does not select the mode is therefore consistent with my analysis; it is the selector, not the cam, that selects the mode. |

**Claim 30**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 30[pre]. The trigger mechanism of claim 17, | See claim 17 above. | See claim 17 above. |
| 30[a]. comprising a safety selector that is separate from the locking member. | The Luettke Declaration, Ex. K is unclear regarding the assertions regarding the safety selector. Ex. K incorporates by reference "all contentions disclosed in claims 15, 17, 14[E], and 38[D]." Presumably the incorporation of the claim 17 contentions is to address this claim's reference to claim 17; otherwise, the relevance of claim 17 (which does not recite a safety selector) is unclear. The incorporated claim 14[E] also does not recite a "safety selector," so presumably incorporation of those contentions are simply because claim 14[E] recites the "locking member." Regarding claim 15, Ex. K points to the ARC-Fire cam as allegedly meeting this "safety selector" claim limitation. Regarding limitation 38[D], Ex. K points to the ARC-Fire primary selector (or perhaps the ambi selector – the Declaration is not clear) as meeting this claim limitation. But the cam, the primary selector, and the ambi selector are different components, which renders Plaintiffs' contentions unclear. This claim (including its reliance on claim 17) recites (and the specification shows) | For clarity, the ARC-Fire's safety selector is its selector lever (primary selector), together with the ambidextrous selector and the detent bar, which form the selector shaft that the user rotates to choose the safe, standard semi-automatic, and forced reset ("ARC") positions. That is consistent with my prior chart, which identified the ARC-Fire's selector at element 38[D] (Luettke II Decl. Ex. K). Batzer concedes that the ARC-Fire's primary selector and ambi selector "can be pivoted to select between at least the standard semi-automatic mode and the forced-reset mode" (element 32[d]). That is what this limitation requires. Movement of the selector selects the mode because it determines whether the lever engages the cam: in forced reset mode the lever engages the cam, and in standard semi-automatic mode it does not.<br><br>The safety selector and the locking member are separate components. The locking member is the cam (elements 14[e], 17[d], and 32[c]). The cam is carried on the selector shaft, but it is a distinct part. Batzer's statement that movement of the |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | discrete components that comprise the trigger mechanism, which presumptively means that they are distinct components (rather than one and the same structure), as expressly confirmed by this claim. Thus, the recited safety selector and the locking member cannot be met by the same component (e.g., the cam, according to the Luettke Declaration, Ex. K). Furthermore, the ARC-Fire cam is not a selector. | cam does not select the mode is therefore consistent with my analysis; it is the selector, not the cam, that selects the mode. Batzer agrees that the cam, the primary selector, and the ambi selector are "different components." The user rotates the selector to choose a mode, and the bolt carrier, through the lever, rotates the cam between its block and non-block positions. |

**Claim 32**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 32[pre]. A trigger mechanism for a semi-automatic firearm operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising: | The Consolidated Motion and the supporting Luettke Declaration appear to refer to the ambidextrous version of the ARC-Fire, but without distinguishing among Defendants (e.g., which Defendant sells which configuration of the ARC-Fire), even though the Consolidated Motion states that the ARC-Fire is sold in several configurations. Thus, this response will focus on the base components of the ambidextrous ARC-Fire kit. The ARC-Fire is not a complete firearm trigger mechanism, as each consists only of a lever, a cam, a detent bar, a primary selector, an ambi selector, a safety detent, and a trigger, omitting other required components, as noted below. See also Luettke Decl. ¶20. Similarly, these components individually are also not a firearm trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the ARC-Fire is sold as a kit of purpose-designed components, including a pre-cut trigger, transfer (reset) lever, detent bar, cam, primary selector, ambidextrous selector, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the ARC-Fire as sold by AS Designs.<br><br>As assembled, the mechanism is operable in both a standard semi-automatic mode and a forced reset semi-automatic mode. Batzer does not dispute that; he acknowledges that the ARC-Fire selectors can be pivoted to select between the standard semi-automatic and forced reset modes (element 32[d]). |
| 32[a]. a disconnector; | The ARC-Fire does not include a disconnector. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 32[pre], my analysis is directed to the assembled mechanism. In that mechanism, the |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | disconnector of the AR-15 pattern fire control group has a disconnector hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 32[b]. a trigger member, wherein the trigger member is forced into a trigger set position responsive to rearward motion of a cyclic semi-automatic action of the semi-automatic firearm; and | The ARC-Fire includes a trigger. The trigger requires more than just cycling action (of the firearm's bolt carrier, which is not part of the ARC-Fire) to be forced to the set position (i.e., a standard semi-automatic firearm includes cycling action of the bolt carrier, but its trigger is not forced to the set position in response). The patent specification discloses that, only if the firearm is set to the forced-reset position, rearward travel of the bolt carrier assembly 92 forces the hammer 36 to press down on a hump 58 of the trigger member 38, forcing it to rotate counter-clockwise, and allows the spring-biased locking member 72 to pivot counter-clockwise so that it locks and keeps the trigger member 38 in the set position. 10:1-44, Figs. 9A-D. In a firearm with an ARC-Fire, the cycling bolt carrier does not force the hammer to press down on a hump of a trigger to force the trigger to rotate to the set position, nor does the ARC-Fire include a spring-biased locking member that pivots to lock the trigger member in the set position once it has been re-set by the hammer. | Batzer concedes the ARC-Fire includes a trigger member that has a sear and moves between set and released positions. His missing-components argument is addressed at element 32[pre].<br><br>Batzer's remaining argument adds requirements the claim does not contain. The claim requires that the trigger member be forced to the set position "responsive to rearward motion of a cyclic semi-automatic action." It does not specify the mechanism through which the cycling action does so, and it does not require that the hammer press on a hump of the trigger member or that a spring-biased locking member pivot to hold it. Those are features of one disclosed embodiment. In the ARC-Fire, as assembled and used as intended in its forced reset mode, the rearward-moving bolt carrier drives the lever, the lever rotates the cam, and the cam lobe forces the trigger member to the set position. The trigger member is therefore forced to the set position by the cycling action, which is what the claim recites. |
| 32[c]. a locking member configured to move between a block position and a non-block position, wherein the block position mechanically blocks the trigger member from moving from the trigger set position to a trigger released position, wherein the non-block position permits the trigger member to be moved from the trigger set position to the trigger released position, wherein the locking member is moved into the block position during rearward motion of the cyclic | "Locking member" is a means-plus-function limitation governed by §112(f), as it uses a nonce word (member) prefixed by a function (locking) and does not have a plain and ordinary meaning connoting specific structure to a skilled artisan. Thus, this limitation is limited to the corresponding structure disclosed in the specification and equivalents. See Figs. 1-9D, 8:33-49, 9:2-16, 10:14-44, Abstract. The ARC-Fire does not include such a locking member that pivots around a pin going through an opening in the locking member, that is contacted by the bolt carrier assembly to rotate only in the clockwise direction but that is not contacted by the bolt carrier assembly to rotate counter-clockwise (which rotation can occur only due to spring bias), and that has a notch to receive a corner of a trigger member (extending upwards from its middle section, not from the trigger tail) and to prevent it from further clockwise rotation until the locking member is pivoted clockwise to release the trigger corner. Also, the | I understand from counsel that absence of the word "means" creates a rebuttable presumption that § 112(f) does not apply, and that the presumption is overcome only if a POSITA would read the term as a nonce word rather than as connoting structure. A POSITA would understand "locking member" to connote structure. The term names a physical component in the firearms trigger art, as reflected in the '403 Patent itself and in the '223 Patent, which use "locking member" and "locking bar" as component names, and as reflected in Batzer's own use of "cam," "lever," and "detent bar" to identify parts. The claim itself recites the member's structure and structural relationships: it is movably mounted, it moves between a position in which it mechanically blocks the trigger member from moving to the released position and a position in which it does not, and it is moved by the cycling action. A |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| semi-automatic action and moved into the non-block position during forward motion of the cyclic semi-automatic action; | specification and this claim limitation disclose that the locking member is cycled between its blocking and non-blocking positions each time the bolt carrier action cycles, regardless of the mode the firearm is set to. In contrast, the ARC-Fire cycles between a blocking and non-blocking position only if the firearm is in forced-reset mode. The Luettke Declaration, Ex. K, views the "cam lobe" as being the locking member. But the lobe bears no resemblance to the locking member disclosed in the patent, as discussed in the preceding paragraph. The ARC-Fire cam itself is not contacted by the bolt carrier to move. The ARC-Fire lever does not do anything to the trigger – it does not even contact the trigger. | POSITA would understand that recitation to describe a physical part, not a functional placeholder.<br><br>The ARC-Fire's locking member is its cam, as identified in my prior chart (Luettke II Decl. Ex. K). As assembled and used as intended in forced reset mode, the cam moves between a block position, in which the cam lobe mechanically blocks the trigger member from moving from the set position to the released position, and a non-block position, in which it does not. During rearward motion of the action, the bolt carrier drives the lever, which rotates the cam into the block position, with the cam lobe forcing the trigger member to the set position and holding it there. During forward motion of the action, the lever rotates the cam back into the non-block position. That is the movement this limitation recites.<br><br>Batzer's requirements of a pivot pin passing through an opening in the locking member, rotation in only one direction by contact with the bolt carrier, return by spring bias, and a notch that receives a corner of the trigger member are features of one disclosed embodiment, not requirements of the claim.<br><br>His argument that the disclosed locking member cycles in every mode adds a further requirement the claim does not contain. This limitation recites how the locking member moves as the action cycles; it does not require that it do so in the standard semi-automatic mode. Claim 32 separately recites the standard and forced reset modes in its "wherein" clauses. As assembled and used as intended in forced reset mode, the ARC-Fire cam cycles between the blocking and non-blocking positions on every cycle of the action.<br><br>That the bolt carrier contacts the lever rather than the cam does not matter. The claim requires that the locking member be moved during the rearward and forward motion of the cyclic action, not that the action directly contact the locking member. Here, the bolt carrier moves the lever, and the engaged lever carries the cam with it. Likewise, it is the cam lobe that blocks the trigger member; that the lever does not itself contact the trigger is irrelevant. |
| 32[d]. a safety selector, wherein the safety selector is selectable between at least the | The Luettke Declaration, Ex. K, is unclear regarding the "safety selector" limitation, as explained above under claims 15, 29, and 30. The ARC-Fire has a primary selector and an | See element 15[a], which identifies the ARC-Fire's safety selector and addresses Batzer's criticism of my prior chart. Batzer concedes that the ARC-Fire's primary selector and |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| standard semi-automatic mode and the forced reset semi-automatic mode; and wherein: | ambi selector, which can be pivoted to select between at least the standard semi-automatic mode and the forced-reset mode. | ambi selector "can be pivoted to select between at least the standard semi-automatic mode and the forced-reset mode." That is what this limitation requires. |
| 32[e]. in the standard semi-automatic mode, rearward pressure on the trigger member must be reduced to disengage a hammer from the disconnector before the trigger member can again be actuated; and | The ARC-Fire does not include a hammer or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and set to standard semi-automatic mode, the hammer could be disengaged from the disconnector (depending on the configuration and operation of the missing components) by reducing rearward pressure on the trigger member, but only if the pressure was first applied to actuate the trigger and if the hammer and disconnector were first engaged, none of which the claim requires. Without these unrecited steps, reducing pressure on the trigger member will not disengage a hammer from a disconnector before the trigger can again be actuated. Furthermore, the bolt carrier must be cycled forward into battery for the reduction of pressure on the trigger to cause a disengagement of the hammer from the disconnector; otherwise, reducing pressure on the trigger will not disengage the hammer from the disconnector. | Batzer's missing-components argument is addressed at element 32[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the ARC-Fire installed and set to standard semi-automatic mode, the hammer is disengaged from the disconnector by reducing rearward pressure on the trigger member, and the trigger member can then be actuated again.<br><br>His argument that the claim omits necessary steps is not how a POSITA would read it. The limitation recites that pressure must be reduced "before the trigger member can again be actuated." The word "again" presupposes that the trigger member has been actuated and the firearm has cycled, so that the disconnector has caught the hammer. A POSITA would read the limitation as describing the ordinary standard semi-automatic firing cycle, which is how Batzer describes it. Nor does the claim say anything inconsistent with the bolt carrier first returning to battery. |
| 32[f]. in the forced reset semi-automatic mode, the trigger member is forced to the trigger set position and can be actuated without reducing pressure on the trigger member to fire another round when the cyclic semi-automatic action reaches a substantially in-battery position or an in-battery position. | The ARC-Fire does not include all components necessary for cyclic action. If the ARC-Fire is installed in a firearm that includes the missing components and set to forced-reset mode, the trigger member could be forced to the set position depending on the configuration and operation of the missing components, but only if the force applied by the rotating cam to the trigger is greater than the force applied to the trigger by the user; otherwise, the user will need to reduce pressure on the trigger member to allow it to be re-set. Additionally, by reciting that the "cyclic semi-automatic action reaches a substantially in-battery position or an in-battery position," it is unclear whether the cyclic action needs to move to or simply remain in an in-battery position; if the latter, the trigger member will not be forced to the set position. | Batzer's missing-components argument is addressed at element 32[pre].<br><br>Batzer concedes the recited operation: in forced reset mode, the bolt carrier drives the lever, which rotates the cam, forcing the trigger member to the set position, and the user can fire again once the bolt carrier returns. His remaining points add requirements the claim does not contain. The limitation says nothing about how much pressure the user applies to the trigger member. As Batzer himself describes at element 14[g], the ARC-Fire cam forces the trigger member to the set position. As assembled and used as intended, it does so against the user's rearward pressure. That a user might, in some circumstance, apply more force than the mechanism is designed to overcome does not change how the mechanism operates as designed.<br><br>Batzer's argument about "reaches a substantially in-battery position or an in-battery position" does not create any |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| | | uncertainty. A POSITA would read "reaches" in its ordinary sense: the action arrives at the in-battery or substantially in-battery position as the bolt carrier returns forward on each cycle. That is when the ARC-Fire lever rotates the cam back, so that the trigger member can be actuated. |

**Claim 38**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 38[pre]. A forced reset trigger mechanism, comprising: | The Consolidated Motion and the supporting Luettke Declaration appear to refer to the ambidextrous version of the ARC-Fire, but without distinguishing among Defendants (e.g., which Defendant sells which configuration of the ARC-Fire), even though the Consolidated Motion states that the ARC-Fire is sold in several configurations. Thus, this response will focus on the base components of the ambidextrous ARC-Fire kit. The ARC-Fire is not a complete trigger mechanism, as each consists only of a lever, a cam, a detent bar, a primary selector, an ambi selector, a safety detent, and a trigger, omitting other required components, as noted below. See also Luettke Decl. ¶20. Similarly, these components individually are also not a trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the ARC-Fire is sold as a kit of purpose-designed components, including a pre-cut trigger, transfer (reset) lever, detent bar, cam, primary selector, ambidextrous selector, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the ARC-Fire as sold by AS Designs.<br><br>As assembled, the mechanism is a forced reset trigger mechanism: in its forced reset mode, the bolt carrier drives the lever, which rotates the cam so that the cam lobe forces the trigger member to its set position, as Batzer describes at element 14[g]. |
| 38[a]. a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; | The ARC-Fire does not include a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 38[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer hook and pivots on a transverse hammer pivot axis. Batzer does not dispute that. |

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
|---|---|---|
| 38[b]. a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis; | The ARC-Fire does not include a disconnector. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 38[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |
| 38[c]. a trigger member; and | The ARC-Fire includes a trigger member. | Batzer concedes the ARC-Fire includes a trigger member. |
| 38[d]. a safety selector adapted to be movable between a standard semi-automatic position and a forced reset semi-automatic position, | The Luettke Declaration, Ex. K, is unclear regarding the "safety selector" limitation, as explained above under claims 15, 29, and 30. The ARC-Fire has a primary selector and an ambi selector, which can be pivoted to select not just the standard semi-automatic mode and the forced-reset mode, but also safe mode. | See element 15[a], which identifies the ARC-Fire's safety selector. Batzer concedes that the ARC-Fire's primary selector and ambi selector can be pivoted to select the standard semi-automatic mode and the forced reset mode. That is what this limitation requires.<br><br>That the selector also has a safe position does not matter. The claim recites a safety selector "movable between" the standard semi-automatic and forced reset positions, and the claim uses open "comprising" language. A selector that also has a third position still has the two recited positions. |
| 38[e]. wherein when the safety selector is in the standard semi-automatic position and the trigger member is rearwardly actuated, and after the hammer pivots rearward to a position where the hammer hook is past the disconnector hook, rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm. | The ARC-Fire does not include a hammer or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and ammunition and set to standard semi-automatic mode, pulling the trigger may cause rearward movement of a bolt carrier assembly during cycling of the action, which may cause rearward pivoting of the hammer such that a hammer hook may move past a disconnector hook (depending on the configuration and operation of the missing components). While the bolt carrier assembly remains moved rearwards, reducing pressure on the trigger will not allow the trigger to be re-actuated because the hammer would still be pressed downwards by the bolt carrier assembly. When the bolt carrier assembly thereafter moves forward into battery and finishes cycling, the firearm user would normally need to manually release the trigger to free the hammer from the disconnector to permit the hammer and trigger to pivot to their set positions so the user can pull the trigger to fire the firearm again. If the user reduces the rearward trigger pressure but not enough to cause the disconnector to release the hammer, then pulling the trigger again will not fire the firearm. | Batzer's missing-components argument is addressed at element 38[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the ARC-Fire installed and set to standard semi-automatic mode, cycling of the action pivots the hammer rearward until the hammer hook is past the disconnector hook, and the user must then reduce rearward pressure on the trigger sufficiently for the disconnector to release the hammer before the trigger can be actuated to fire again.<br><br>His remaining points do not avoid this limitation. That the reduction in pressure must be sufficient to release the hammer, and that the bolt carrier must first return to battery, is consistent with what the claim recites: rearward pressure "must be reduced" before the trigger member can be actuated to fire again. |

**Claim 39**

| Claim Element | Batzer's Noninfringement Argument | Luettke Reply |
| --- | --- | --- |
| 39[pre]. A forced reset trigger mechanism, comprising: | The Consolidated Motion and the supporting Luettke Declaration appear to refer to the ambidextrous version of the ARC-Fire, but without distinguishing among Defendants (e.g., which Defendant sells which configuration of the ARC-Fire), even though the Consolidated Motion states that the ARC-Fire is sold in several configurations. Thus, this response will focus on the base components of the ambidextrous ARC-Fire kit. The ARC-Fire is not a complete trigger mechanism, as each consists only of a lever, a cam, a detent bar, a primary selector, an ambi selector, a safety detent, and a trigger, omitting other required components, as noted below. See also Luettke Decl. ¶20. Similarly, these components individually are also not a trigger mechanism. | My analysis is directed to the trigger mechanism as assembled and installed in an AR-15 pattern firearm in accordance with AS Designs' install guides. As I explained in my prior declarations, the ARC-Fire is sold as a kit of purpose-designed components, including a pre-cut trigger, transfer (reset) lever, detent bar, cam, primary selector, ambidextrous selector, and detent, that are dimensioned and shaped to fit together in the single configuration the instructions describe, and I am not aware of any alternative assembly configuration that would result in a different mode of operation. Batzer's observation that the kit as shipped is not itself a complete trigger mechanism does not address that analysis. As assembled and installed as instructed, the resulting trigger mechanism includes each recited component, including each component addressed in the elements below. To the extent the preamble is limiting, it is met.<br><br>Batzer's statement that he addresses the "base components" of kits sold by several defendants does not change this analysis, which is directed to the ARC-Fire as sold by AS Designs.<br><br>As assembled, the mechanism is a forced reset trigger mechanism: in its forced reset mode, the bolt carrier drives the lever, which rotates the cam so that the cam lobe forces the trigger member to its set position, as Batzer describes at element 14[g]. |
| 39[a]. a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; | The ARC-Fire does not include a hammer. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 39[pre], my analysis is directed to the assembled mechanism. In that mechanism, the hammer of the AR-15 pattern fire control group has a hammer hook and pivots on a transverse hammer pivot axis. Batzer does not dispute that. |
| 39[b]. a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis; | The ARC-Fire does not include a disconnector. | Batzer's only argument is that the kit as shipped omits these components. As addressed at element 39[pre], my analysis is directed to the assembled mechanism. In that mechanism, the disconnector of the AR-15 pattern fire control group has a disconnector hook and pivots on a transverse disconnector pivot axis. Batzer does not dispute that; elsewhere in his chart he analyzes the disconnector hook catching, holding, and releasing the hammer hook in the installed firearm. |

| Claim Element | Batzer’s Noninfringement Argument | Luettke Reply |
|---|---|---|
| 39[c]. a trigger member; and | The ARC-Fire includes a trigger member. | Batzer concedes the ARC-Fire includes a trigger member. |
| 39[d]. a safety selector adapted to be movable between a standard semi-automatic position and a forced reset semi-automatic position, | The Luettke Declaration, Ex. K, is unclear regarding the “safety selector” limitation, as explained above under claims 15, 29, and 30. The ARC-Fire has a primary selector and an ambi selector, which can be pivoted to select not just the standard semi-automatic mode and the forced-reset mode, but also safe mode. | See element 15[a], which identifies the ARC-Fire’s safety selector. Batzer concedes that the ARC-Fire’s primary selector and ambi selector can be pivoted to select the standard semi-automatic mode and the forced reset mode. That is what this limitation requires.<br><br>That the selector also has a safe position does not matter. The claim recites a safety selector “movable between” the standard semi-automatic and forced reset positions, and the claim uses open “comprising” language. A selector that also has a third position still has the two recited positions. |
| 39[e]. wherein, when in either position, when the trigger member is pulled rearward, cycling of a firearm action rearwardly pivots the hammer to a position where the hammer hook is past the disconnector hook, | The ARC-Fire does not include a hammer or a disconnector. If the ARC-Fire is installed in a firearm that includes the missing components and ammunition, then when the trigger is pulled, cycling of the firearm’s action may (depending on the configuration and operation of the missing components) rearwardly pivot the hammer until its hook is past the disconnector hook. This may be the case when the ARC-Fire is in either semi-automatic or forced-reset mode. However, the specification explains that when the safety selector 110 is moved to forced-reset mode, the disconnector tail 66 is prevented from rising, which “disables” the disconnector 60 and prevents its hook 64 from catching the hammer hook 53 (i.e., prevents the hammer hook from moving past the disconnector hook). 9:28-39, Figs. 6A-B, 9A-D. The specification does not disclose an embodiment where the hammer hook moves past the disconnector hook in forced-reset mode, so this claim lacks written description support and enablement under §112(a). | Batzer’s missing-components argument is addressed at element 39[pre].<br><br>Batzer concedes the recited operation: with the ARC-Fire installed, when the trigger is pulled, cycling of the action rearwardly pivots the hammer until its hook is past the disconnector hook, and “[t]his may be the case when the ARC-Fire is in either semi-automatic or forced-reset mode.” That is what this limitation recites.<br><br>His remaining argument, that the claim lacks written description support and enablement, is a validity argument, which I understand is addressed by Dr. Harrison. It does not bear on whether the ARC-Fire meets this limitation. |
| 39[f]. wherein if the safety selector is in the standard semi-automatic position, rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm, and | If the ARC-Fire is installed in a firearm that includes the necessary missing components and set to standard semi-automatic mode, if the trigger is first pulled rearward to discharge the firearm, and if the disconnector catches and holds the hammer, then (depending on the configuration and operation of the missing components) rearward pressure on the trigger may need to be reduced sufficiently to allow the disconnector to release the hammer, so that the trigger member can then be actuated again to fire the firearm. Furthermore, the reduction in pressure must be sufficient to | Batzer’s missing-components argument is addressed at element 39[pre].<br><br>Subject only to that point, Batzer describes the recited operation: with the ARC-Fire installed and set to standard semi-automatic mode, cycling of the action pivots the hammer rearward until the hammer hook is past the disconnector hook, and the user must then reduce rearward pressure on the trigger sufficiently for the disconnector to release the hammer before the trigger can be actuated to fire again. |

| **Claim Element** | **Batzer's Noninfringement Argument** | **Luettke Reply** |
| --- | --- | --- |
| | cause the disconnector to release the hammer; otherwise, the reduction will not allow the firearm to be discharged by actuating the trigger. Moreover, the bolt carrier must be cycled forward into battery for the reduction of pressure on the trigger to cause a disengagement of the hammer from the disconnector; otherwise, reducing pressure on the trigger will not disengage the hammer from the disconnector and thus will not allow actuation of the trigger to fire the firearm. | His remaining points do not avoid this limitation. That the reduction in pressure must be sufficient to release the hammer, and that the bolt carrier must first return to battery, is consistent with what the claim recites: rearward pressure "must be reduced" before the trigger member can be actuated to fire again. |
| 39[g]. wherein, if the safety selector is in the forced reset semi-automatic position, the trigger member is forced to move to a full reset position against rearward pressure on the trigger member and the rearward pressure on the trigger member does not need to be reduced to actuate the trigger to fire the firearm. | If the ARC-Fire is installed in a firearm that includes the necessary missing components and set to forced-reset mode, the trigger member could be forced to the set position depending on the configuration and operation of the missing components, but only if the force applied by the rotating cam to the trigger is greater than the force applied to the trigger by the user; otherwise, the user will need to reduce pressure on the trigger member to allow it to be re-set and thereafter fire the firearm. Furthermore, the bolt carrier must be cycled forward into battery for the continued pressure on the trigger to cause a firing of the firearm; otherwise, maintaining pressure on the trigger will not fire the firearm because the bolt carrier will be holding down the hammer. | Batzer's missing-components argument is addressed at element 39[pre].<br><br>Batzer concedes the recited operation: in forced reset mode, the bolt carrier drives the lever, which rotates the cam, forcing the trigger member to the set position, and the user can fire again once the bolt carrier returns. His remaining points add requirements the claim does not contain. The limitation says nothing about how much pressure the user applies to the trigger member. As Batzer himself describes at element 14[g], the ARC-Fire cam forces the trigger member to the set position. As assembled and used as intended, it does so against the user's rearward pressure. That a user might, in some circumstance, apply more force than the mechanism is designed to overcome does not change how the mechanism operates as designed.<br><br>Batzer's point that the bolt carrier must return to battery before the firearm fires adds nothing. The limitation recites that the user does not need to reduce rearward pressure to fire again; it does not require that the firearm fire before the action returns to battery. The '403 Patent describes the trigger member being held until the bolt carrier returns, which is the same operation Batzer describes. |