[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| In Re: Rare Breed Triggers Patent Litigation | 4:26-md-03176-ALM<br>MDL 3176 |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AS DESIGNS, LLC, *et al.*,<br><br>Defendants. | Civil Action No. 4:26-cv-00370-ALM |

[redacted]

**SUR-REPLY DECLARATION OF ERIC J. PHILLIPS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

[redacted]

## Table of Contents


1. Qualifications ....4
2. Assignment ....4
3. Summary of Conclusions ....5
4. Eichmann's Reply Opinions on Adequacy of Monetary Damages ....7
    - 4.1. Quantifiability of Rare Breed's Harm (Section II) ....7
        - 4.1.1. The "Assumes the Conclusion" Charge Misses the Point. ....7
        - 4.1.2. Two-Supplier-Market Critique Misses the Point. ....8
        - 4.1.3. Extent of Competition is Not Identified. ....9
        - 4.1.4. Damages Are Not Intended to Literally Recreate the Past. ....9
        - 4.1.5. Other Hypothetical Harms are Not Demonstrated or Shown to be Unquantifiable. ....10
        - 4.1.6. Eichmann Makes No Showing of Unquantifiable Dealer/Channel Harm. ....10
        - 4.1.7. Speculative Harms Do Not Justify Burden-Shifting. ....11
    - 4.2. Evidence Regarding Price Erosion (Section III) ....12
        - 4.2.1. Eichmann Declines to Assert Price Erosion Causation. ....12
        - 4.2.2. Continuing Reference-Price Effects Are Speculative, Yet Could Later be Quantified. ....13
    - 4.3. AS Designs' Ability to Pay (Section IV) ....14
        - 4.3.1. Eichmann's Ability-to-Pay Opinions Have Significantly Shifted. ....15
        - 4.3.2. The "Complete Analysis" Standard is a Moving Target. ....15
        - 4.3.3. Fluctuations in Cash Balance is Not Evidence of Inability to Pay. ....16
        - 4.3.4. AS Designs Has Substantial Cash and Assets. ....16
        - 4.3.5. These Shareholder Distributions Support, Rather Than Undermine, Its Ability-to-Pay. ....16
        - 4.3.6. My Ability-To-Pay Analysis Considered a Reasonably Foreseeable Outcome. ....19
        - 4.3.7. "Material Uncertainty" Does Not Establish an Ability-to-Pay Conclusion. ....19
    - 4.4. Economic Effects / Balance of Harms (Section V) ....20
        - 4.4.1. Eichmann's Balance-of-Harms Opinions Have Significantly Shifted. ....20
        - 4.4.2. Asymmetry in the Effects of an Injunction is Not Shown. ....21
    - 4.5. Lead-Time/First-Mover Advantage Effects (Section VI) ....22
        - 4.5.1. "Earlier-Mover Advantages" Argument is Not Supported. ....22
        - 4.5.2. "Rapid Competitive Entry and Slower Recovery" Hypothesis is Not Demonstrated. ....23
        - 4.5.3. Damages Are Not Intended to Literally Recreate the Past. ....24
    - 4.6. Market Uncertainty, Reputation, and Third-Party Entry (Section VII) ....25

[redacted]


4.6.1. Eichmann Abandons His Uncertainty, Reputation, and Third-Party Entry Opinions.....25

4.6.2. Eichmann's Disavowals Were a Substantive Portion of the Harm Theories. .....25

4.7. Phillips's Preliminary Reasonable-Royalty Analysis (Section VIII).....26

4.7.1. Eichmann's Royalty Analysis Standard is Inappropriate. .....26

4.7.2. The $[redacted] ABC Royalty is Irrelevant to an Ability-to-Pay Royalty Analysis. .....27

4.7.3. Eichmann's Financial Analyses Support AS Designs' Ability to Pay. .....28

[redacted]

I, ERIC J. PHILLIPS, declare as follows:

## 1. Qualifications

1. I am President of VLF Consulting, Inc. ("VLF"), a business advisory firm that addresses accounting, financial, economic, and marketing issues in complex commercial disputes, frequently involving intellectual property, and in other valuation matters. During my 26 years specializing in intellectual property damages and valuation, I have assessed damages across a wide range of industries and valued patents, trademarks, copyrights, trade secrets, and know-how in bankruptcy proceedings, licensing negotiations and transactions, and joint ventures. I am also certified in business valuation and have provided business-valuation services.

2. I am a Certified Valuation Analyst (CVA) and a Master Analyst in Financial Forensics (MAFF) through the National Association of Certified Valuators and Analysts (NACVA). I am also a member of the Licensing Executives Society (LES). My curriculum vitae, including a listing of my prior testimony and publications, is attached hereto as Exhibit 1.

3. VLF is being compensated for my time on this matter at my current hourly rate. VLF's compensation is not dependent on any outcomes in this litigation.

## 2. Assignment

4. VLF was retained in this matter by Emerson, Thomson & Bennett, LLC, counsel for defendants AS Designs, LLC ("AS Designs"), Matthew S. Karlovic (an individual), Calvin Olson (an individual), and John Doe (an individual using the alias "s3igu2"), (collectively, "Defendants") in a suit brought by Rare Breed Triggers, Inc., ("Rare Breed") and ABC IP, LLC ("ABC IP"), (collectively, "Plaintiffs"), related to asserted infringement of several patents.

5. On July 4, 2026, I submitted the Declaration of Eric J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Phillips Rebuttal"). That declaration responded to the Declaration of Richard J. Eichmann dated April 24, 2026,[1] ("Eichmann Declaration") regarding irreparable harm and adequacy of monetary damages with respect to the ARC-Fire and Super Safety products sold by AS Designs. On August 6, 2026,

[1] Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction, April 24, 2026.

[redacted]

Plaintiffs submitted a reply declaration of Richard J. Eichmann responding to my rebuttal ("Eichmann Reply Declaration"). VLF has been asked to review and assess the Eichmann Reply Declaration.[2]

6. In developing the opinions reflected in this report, I relied upon various filings in this case, publicly available information, applicable legal and accounting principles, and my professional experience. A listing of documents reviewed or relied upon to date in connection with this report is attached as Exhibit 2 or referenced in the text and footnotes of this report.

7. I may be asked to testify at a deposition and/or hearing regarding these and related matters between the parties.[3] In connection with any such hearing testimony, I may prepare demonstrative exhibits and identify documents and testimony in this matter that may assist with my testimony. I have not yet prepared and/or identified such exhibits.

8. For the limited purposes of this declaration, I accept as assumptions most of the characterizations put forth in the Eichmann Declarations regarding the products, companies, and market. My assumptions are not intended to reflect agreement or endorsement of those characterizations, and I may later rebut aspects of those assumptions if appropriate, as documents, testimony, and other information are identified in the discovery process.

## 3. Summary of Conclusions

9. The Eichmann Reply Declaration identifies numerous theories as to why a later damages award allegedly would not provide an adequate remedy to Rare Breed. However, the primary claimed harm remains tied to lost sales and associated economic effects in a defined and observable market. By his own characterization, the relevant competition involves a limited number of products directed to a known customer base, and the alleged harm arises from identifiable transactions, pricing decisions, and customer purchasing behavior. Those are precisely the types of issues routinely evaluated through established lost-profits and reasonable-royalty methodologies.

[2] I do not opine on the infringement or the validity of the patents-in-suit, or their inventorship and ownership, nor am I offering any legal opinions.

[3] I may also be asked to eventually provide opinions as to damages suffered by Plaintiffs related to the alleged infringement of the patents-in-suit. Because only limited discovery has taken place, I reserve the right to modify opinions expressed herein based upon documents, testimony, and other information identified in the discovery process.

[redacted]

10. Throughout his Reply, Eichmann repeatedly declines to quantify diversion rates, price effects, recovery periods, follow-on sales, dealer impacts, or other alleged harms, asserting instead that those same effects render monetary damages inadequate. Yet the absence of a completed calculation does not demonstrate that such effects are unquantifiable. Rather, it reflects that the analyses have not yet been performed. Conventional market-reconstruction techniques, including application of the Panduit framework, customer-level sales analyses, price-erosion methodologies, and time-value-of-money adjustments, provide reliable tools for measuring the alleged economic effects identified by Eichmann.

11. Other categories of harm identified by Eichmann, including alleged loss of market position, customer-acquisition effects, follow-on purchases, delayed purchases, dealer-related effects, and future pricing consequences, likewise do not demonstrate irreparable injury. In multiple instances, Eichmann acknowledges that additional empirical analysis would be required to determine whether such effects exist, whether they are economically significant, and what their magnitude may be. For example, he expressly declines to estimate diversion rates, determine the extent of any continuing reference-price effects, quantify dealer impacts, calculate recovery periods, or identify the magnitude of alleged lead-time advantages. He also retreats from several opinions advanced in his original declaration, including assertions relating to market uncertainty, reputational harm, cascading third-party entry, the ability of AS Designs to redirect sales to other products, and comparative hardship between the parties. These limitations are significant because the remaining theories depend primarily on chains of hypothetical events rather than evidence demonstrating actual, imminent, and non-compensable economic harm. Even assuming those effects were ultimately proven, they remain susceptible to conventional economic measurement through analyses of customer behavior, sales patterns, profit margins, promotional expenditures, pricing decisions, dealer activity, and projected cash flows.

12. The Reply Declaration also does not establish that monetary relief would be unavailable or uncollectible. Rather than concluding that AS Designs is insolvent or unable to satisfy a judgment, Eichmann expressly disclaims such opinions. The financial information discussed in the Reply reflects that AS Designs reported over $[redacted] in cash (as of June 30, 2026), approximately $[redacted] in net assets (as of April 30, 2026), and substantial historical profitability. The Reply further confirms that AS Designs generated significant cash flow and distributed more than $[redacted] to its owners, demonstrating the company's ability to generate

[redacted]

earnings and accumulate cash. Although Eichmann raises questions concerning future liquidity, asset composition, and potential future financial conditions, those concerns amount to uncertainty inherent in any forward-looking financial analysis and do not establish a particular and substantial risk that a future damages award would be uncollectible. Accordingly, the economic record supports the conclusion that any proven harm to Plaintiffs can be reasonably quantified and compensated through monetary relief, and that the speculative harms identified in the Reply do not justify a finding of irreparable harm.

## 4. Eichmann's Reply Opinions on Adequacy of Monetary Damages

### 4.1. <u>Quantifiability of Rare Breed's Harm (Section II)</u>

13. In Section II, the Eichmann Reply addresses my prior conclusion that Eichmann's own characterizations of the market suggest that Plaintiff's lost sales would be "relatively easy to identify and quantify" in a conventional lost profits analysis (Phillips Rebuttal ¶¶10, 15). Eichmann's central contention is that while AS Designs' records establish the scale of its commercial activity, those records do not, by themselves, reflect or establish the but-for market (¶¶16, 17) or the "full economic effect" of the alleged infringement. (Section IIA title). Such asserted additional "economic effects" include: (a) purchases of alleged-infringing products cannot later be reversed (¶¶39-40); (b) AS Designs may receive repeat / follow-on sales (¶45); (c) delayed purchases (¶50); (d) lost/delayed entries of dealers in a Rare Breed dealer program (¶51); and (e) unspecified "customer, channel, pricing, and market timing effects" (¶55).

#### 4.1.1. The "Assumes the Conclusion" Charge Misses the Point.

14. In Subsection A, Eichmann asserts that Phillips "assumes the conclusion he is required to support" by characterizing the market reconstruction as "straightforward" before undertaking the full analysis (¶21). My point in the Rebuttal was not that the analysis would be trivial, but that the methodology—market reconstruction under the Panduit framework—is a standard, well-established approach for quantifying lost profits in patent cases, and the approach aligns with Eichmann's own characterization of the market (Phillips Rebuttal ¶¶15-23). The fact that a market reconstruction "does not observe the but-for market" (Eichmann Reply ¶17) is precisely what makes it a reconstruction; it is the accepted method for estimating the counterfactual. Eichmann's criticism—that Phillips offers affirmative conclusions of quantifiability without

[redacted]

performing the supporting empirical work—does not establish that the harm is unquantifiable. The appropriate question is whether the methodologies are reliable and the analyses are feasible, not whether they have been completed at this stage. Both of those questions are answered in the affirmative by the standard lost-profits framework that I identified, Federal Circuit rulings that I cited, and the market characterization provided by Eichmann.

15. Eichmann also provides a detailed product-level segmentation of AS Designs' [redacted] reported accused-product units, identifying that "at least [redacted], approximately [redacted] percent, are identified as complete Super Safety or ARC-Fire kits" and that "the remaining [redacted] reported units consist of components, selectors, precut triggers, platform-extension products, and other items" (¶19). Eichmann uses this to argue that the mixed unit total "cannot be converted mechanically into an equal number of complete-trigger transactions or a single lost-profits amount" (*Ibid.*). These metrics do not suggest an inadequacy of damages because: (1) the product-level data is available and can be used in a damages analysis, (2) the existence of different product types does not make the analysis infeasible, and (3) the Panduit framework and market reconstruction can accommodate product-specific calculations.

#### 4.1.2. Two-Supplier-Market Critique Misses the Point.

16. My Rebuttal explained that a market as characterized by Eichmann—direct competition between the plaintiff and defendant, and a lack of available acceptable non-infringing alternatives[4]— suggests a "two supplier market" analysis, a somewhat simplified form of the *Panduit* lost profits analysis where the plaintiff asserts it would have made all of defendant's sales in the "but-for" market reconstruction (Phillips Rebuttal ¶20). Eichmann asserts that this conflates concepts and that there are actually other market competitors (¶25). My reference to a two-supplier market was intended to describe this market reconstruction, not to describe the actual number of sellers in the market.

[4] Eichmann Declaration states "I understand that the alleged conduct relates to the core functionality of the products, and that the same functionality is not available in non-infringing alternative products" (¶10 at footnote 12, citing Luettke Declaration); and "When functionally similar accessory products are designed to operate with the same underlying platforms, **they compete directly** for the same pool of potential customers" (¶13, emphasis added).

[redacted]

#### 4.1.3. Extent of Competition is Not Identified.

17. Eichmann acknowledges the differences between the Accused Products and Rare Breed's products, such as configuration, included components, installation requirements, modularity, trigger characteristics, price, and customer preference (¶23). Despite that and "express[ing] no numerical opinion on that rate," Eichmann concludes that the "record establishes direct competitive displacement on an economically meaningful scale" (¶¶27, 36).

18. This standard is vague; Eichmann does not define "meaningful scale" of competition or estimate the corresponding diversion rate. The phrase could encompass a wide range of diverted sales; for example, even 5% to 10% might be described as meaningful. Without identifying the scale or estimating diversion, the conclusion does not establish any particular extent of competition between the products.

19. Even accepting that AS Designs caused economically meaningful displacement, the specific mechanisms Eichmann identifies as "irreparable"—channel lock-in, reference pricing, and lead-time loss—are either not supported by the record, are quantifiable through conventional methods, or are speculative. The existence of meaningful displacement does not, by itself, establish that the cumulative effects exceed what a damages award can capture. Eichmann has not identified a specific, non-compensable economic injury that falls outside the scope of a market reconstruction.

#### 4.1.4. Damages Are Not Intended to Literally Recreate the Past.

20. Eichmann states that if Rare Breed loses a sale to AS Designs, "a later injunction does not cause the purchaser to reverse that transaction or retrospectively purchase from Rare Breed" (¶39). Further, "[e]vidence that a customer may later change triggers does not restore the initial purchasing opportunity" (¶40).

21. This is true in a literal sense, but literal restoration of the past is not the function of a damages award. A damages analysis instead reconstructs the market that likely would have existed but for the assumed infringement and measures the resulting economic loss, and such market reconstructions have long been deemed appropriate by courts in patent cases. As I previously explained, "damages experts reconstruct the market to show, hypothetically, likely outcomes with infringement factored out of the economic picture," and "the Federal Circuit has affirmed lost profit awards based on a wide variety of reconstruction theories where the patentee

[redacted]

has presented reliable economic evidence of 'but for' causation."[5] Eichmann's observation that a later award cannot "reverse that transaction" is therefore not instructive.

### 4.1.5. Other Hypothetical Harms are Not Demonstrated or Shown to be Unquantifiable.

22. In Subsection D, Eichmann concedes that Rare Breed's "profit associated with an identifiable lost sale may be estimated" but asserts that this neglects other "customer-acquisition, channel, pricing, and market-timing effects associated with AS Designs' sale" (¶42).

23. But Eichmann provides no evidence of the magnitude of these "customer-acquisition, channel," or "market-timing effects," (see Section 4.2 for discussion of "pricing"), no explanation as to how the magnitude qualifies them as economically significant, and no explanation as to why they cannot be accounted for in a conventional damages analysis.

24. The asserted "customer-acquisition" effects appear to refer principally to follow-on sales (or perhaps hypothetical differences in repeat sales between the parties), which may be included in a damages analysis when supported by evidence. The asserted "channel" effects appears to refer to "the timing, scale, or economics of Rare Breed's dealer" program (see following discussion). The asserted "market-timing effects" appear to refer to delays in Rare Breed's actual or but-for sales. Such effects can be evaluated by identifying the affected sales, estimating the period of delay, and applying an appropriate discount or prejudgment-interest methodology to reflect the time value of money. Eichmann does not explain why those conventional tools would be inadequate here.

### 4.1.6. Eichmann Makes No Showing of Unquantifiable Dealer/Channel Harm.

25. In Subsection E, Eichmann starts with the observations that AS Designs sells some Accused Products to dealers (¶44),[6] and that dealer sales may result in "recurring purchases [that] can generate continuing sales (¶45). Yet Eichmann makes no attempt to explain or demonstrate

---

[5] Phillips Rebuttal 7/4/26, ¶16, citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc*., 246 F.3d 1336, 1355 (Fed. Cir. 2001).

[6] Eichmann also asserts that my Rebuttal Declaration "characterized AS Designs' dealer activity as an unsupported hypothetical" (¶43). However, the "unsupported hypothetical" language in my rebuttal refers to Eichmann's *presumption* that AS Designs was denying Rare Breed dealer access, not to AS Designs' actual dealer activity (Phillips Rebuttal ¶28). My rebuttal accepted the premise of AS Designs' dealer sales throughout the discussion (¶¶26-29).

[redacted]

how such follow-on sales fall outside a lost-profits analysis. Follow-on sales are additional alleged lost sales; they may be included when supported by evidence of causation and a reliable estimate of the sales and associated profits (see Phillips Rebuttal ¶¶15–23, describing the Panduit framework and market reconstruction).

26. Eichmann summarizes the issue thus: "The narrower economic issue is whether AS Designs' dealer [sales]… altered the timing, scale, or economics of Rare Breed's dealer" program (¶47). Notably, Eichmann frames this as a question, rather than an established fact. No details are provided about harm to the "timing, scale, or economics" of Rare Breed's dealer program, seemingly in line with Eichmann's earlier acknowledgement that Rare Breed has/had no dealer program (Eichmann Declaration ¶20 at footnote 28).

27. In any event, Eichmann does not conclude that these effects are significant, stating: "Whether those effects are separately measurable and economically significant would require additional dealer-level analysis" (¶48) Ultimately then, this is not evidence-based economic opinion; it is hypothesis.

28. Eichmann also refers to AS Designs dealer-related sales data, for example: [redacted] website "Dealer" orders; [redacted] unique dealer customer IDs "of which [redacted] approximately [redacted] percent, appear in more than one recorded order;" and $[redacted] in net sales to [redacted] new dealer customers after April 27, 2026 (¶¶43-44). These dealer-related metrics do not suggest an inadequacy of damages because: (1) the dealer activity, including repeat sales, is ongoing, identifiable, and can be captured in a damages analysis, and (2) the dealer data suggests that the market is active and that Rare Breed can compete and achieve dealer relationships after a post-trial injunction.

#### 4.1.7. Speculative Harms Do Not Justify Burden-Shifting.

29. Eichmann concludes the section by offering several hypothetical harms, each lacking in support:

a. AS Designs customers who would have otherwise purchased from Rare Breed, but who delayed for some period before ultimately making their AS Designs purchase (¶50);

b. Dealers who might have otherwise entered a Rare Breed dealer program earlier, and generated more Rare Breed sales (¶51);

c. "Customer, channel, pricing, and market-timing effects" as I detailed above;

[redacted]

30. Eichmann then asserts that for Phillips to support a conclusion that monetary relief will be adequate, Phillips "would need to establish either that all material harm is confined to identifiable completed transactions or that any unobserved effects are economically immaterial" (¶52). Finally, "Mr. Phillips has not shown that [his estimates of damages] exhaust the relevant harm or that retrospective monetary relief would provide a reasonable economic equivalent" for those effects (¶56). This formulation inverts the proper allocation of the burden. I understand that the plaintiff bears the ultimate burden of establishing that the alleged injury is irreparable. Eichmann's assertion that Phillips must affirmatively establish the completeness of the remedy is not supported by the legal standard governing preliminary injunctions. As I have explained, the question is whether Eichmann has demonstrated that the alleged harm is irreparable—not whether Phillips has proven that every conceivable economic effect is quantifiable.

31. Eichmann's specific unobserved effects—delayed purchases, lost dealer relationships, and "customer, channel, pricing, and market-timing effects"—are either not supported by the record, are speculative, or are quantifiable through conventional damages methodologies. Eichmann has not identified a specific, non-compensable economic injury that falls outside the scope of a market reconstruction.

## 4.2. <u>Evidence Regarding Price Erosion (Section III)</u>

### 4.2.1. Eichmann Declines to Assert Price Erosion Causation.

32. Eichmann concedes that AS Designs' monthly sales data "do not establish whether the ARC-Fire was commercially available before [Rare Breed's price reduction from $499 to $450] **or contributed to it**" (¶65, emphasis added).[7] This is a significant retreat from Eichmann's opening declaration, which asserted that "Rare Breed reduced the retail price of the FRT-15L3 from $499 to $450 in response to the influx of competing infringing FRT products" (Eichmann Declaration ¶25). Eichmann further concedes here that he cannot make an "economically supportable conclusion" that "AS Designs alone caused the entire $49 price reduction" because Rare Breed faced multiple lower-priced products and "the pricing decision also may have reflected customer demand, launch strategy, product availability, product mix, promotions, marketing

[7] Eichmann does note, however, that AS Designs' Super Safety was sold prior to Rare Breed's August 2025 price reduction, suggesting that Super Safety may remain a cause of the price reduction.

[redacted]

considerations, or other commercial conditions" (¶66). Eichmann here explicitly declines to assert price erosion causation related to AS Designs' top-selling ARC-Fire, the revenues of which have [redacted] its Super Safety sales.[8]

33. Eichmann also criticizes that "Mr. Phillips does not perform that analysis" of isolating AS Designs' incremental contribution to Rare Breed's price reduction, which requires analysis of numerous factors such as: the timing and quantity of AS Designs' Super Safety sales; Rare Breed's prices and volumes; prices and volumes of competing products; changes in customer and product mix; and promotional, bundling, and channel activity. (¶¶67-68). Yet here, Eichmann provides no explanation as to (1) why such analyses should be performed at this preliminary injunction stage, (2) why such analyses cannot be later performed based on information provided in the discovery process, or (3) how these analyses, or an inability to perform them, might support an inadequacy of damages opinion. Notably, Eichmann's identification of relevant price erosion analyses is apparently not at odds with my prior conclusion that Rare Breed's price erosion assertions can fit within a conventional price erosion framework (Phillips Rebuttal §4.5).

34. Here Eichmann merely concludes that evidence establishes "direct competitive price awareness and an **economically plausible mechanism** through which AS Designs' lower-priced offerings could affect Rare Breed's price, unit volume, or both" (¶63, emphasis added). This is a low standard and a weak conclusion. The fact that there is a plausible mechanism does not establish that the mechanism actually is operating and whether the resulting harm is quantifiable or not. Assuming *arguendo* that the asserted price erosion may be tied to AS Designs, my rebuttal concluded, again, the harm is compensable through monetary relief.

#### 4.2.2. Continuing Reference-Price Effects Are Speculative, Yet Could Later be Quantified.

35. Eichmann asserts possible "reference-price effects" – forward-looking pricing/volume/timing harm after a future injunction due to price-increase resistance by customers (¶¶70, 74-75). This proposed post-litigation harm depends on a series of unsupported hypotheticals: that Rare Breed's past or future price reductions are caused by ARC-Fire and/or its Super Safety; that a post-litigation injunction would issue; that Rare Breed thereafter would be

---

[8] See Exhibit 3.1, which shows AS Designs revenues from ARC-Fire [redacted] its revenues of Super Safety products, from December 2024 to approximately May 20, 2026.

[redacted]

unable to restore its price or would require significant time to do so; and that the resulting loss would not be captured in a damages award. As for evidence, Eichmann asserts only that the "AS Designs-specific record supplies a **factual mechanism** through which such an effect could occur (¶71, emphasis added). This, too, is a low standard and a weak conclusion. The fact that there is a plausible "factual mechanism" does not establish that the mechanism actually is operating (or will operate) and whether the resulting harm is quantifiable or not.

36. In any event, Eichmann suggests that any such reference-price effects are, in fact, quantifiable. After conceding that the "evidence does not currently establish the magnitude or duration of any continuing reference-price effect," Eichmann notes that "I have not analyzed customers' reservation prices, surveyed customer perceptions, estimated demand elasticity, or determined the amount by which AS Designs' pricing may have constrained Rare Breed after any particular date" (¶72).

37. This "narrower opinion" (¶76) is also a significant retreat from Eichmann's prior conclusion. Here Eichmann states that "I therefore do not conclude that all pricing effects are incapable of measurement, that AS Designs caused the entire historical $49 reduction, or that its advertised price differences translate directly into an equal amount of Rare Breed price erosion" (¶76). This is a significant concession; the initial declaration concludes that monetary relief fails to account for "a different pricing equilibrium that cannot be recreated through retrospective compensation" (Eichmann Declaration ¶29).

### 4.3. AS Designs' Ability to Pay (Section IV)

38. Turning to AS Designs' ability to pay, Eichmann's central contention is that my analysis relies on selected historical financial measures—reported revenue, gross margin, cash, and anticipated capital expenditures—rather than a complete entity-level ability-to-pay analysis. He argues that the produced financial records do not establish the amount of liquidity available to satisfy a future judgment, that historical revenue and profit do not establish that the resulting value remains within AS Designs, and that Phillips evaluates ability to pay only against an unestablished royalty measure. Eichmann concludes that the present record establishes "material uncertainty" concerning AS Designs' entity-level capacity to satisfy a judgment, but he explicitly disavows any opinion that AS Designs is insolvent or necessarily unable to pay (¶¶78, 88, 97, 99).

[redacted]

#### 4.3.1. Eichmann's Ability-to-Pay Opinions Have Significantly Shifted.

39. The Eichmann Reply reflects a significant shift in the basis of his collectability argument. In the initial declaration, Eichmann's collectability argument was based almost entirely on AS Designs being "newly formed" in December 2024 with "no publicly available financial information" (Eichmann Declaration ¶53). His argument was, in essence, that there "may be" a "risk of nonpayment" for a newly-formed company like AS Designs where no financial information is available or where an expected award exceeds a defendant's economic capacity (¶53). In the Reply, Eichmann now has actual financial data—$[redacted] in cash, $[redacted] in total assets, and approximately $[redacted] in reported gross profit (¶¶79, 83)—and his argument has shifted from "we do not know their finances" to "the financial data is incomplete and not fully reconcilable" (¶85). His conclusion then shifts from finding that there "may be…[a] risk of nonpayment" (Eichmann Declaration ¶53) to a finding of "material uncertainty" in AS Design' ability to pay an award of an amount he makes no attempt to estimate (¶99).

40. Second, in the initial declaration, Eichmann's argument was that AS Designs "may lack the retained earnings, asset base, or financing capacity to absorb a substantial adverse judgment" (¶53). In the Reply, he explicitly acknowledges that AS Designs has substantial cash and assets (¶¶83, 88) and that he "do[es] not opine that AS Designs is presently insolvent or that any particular judgment necessarily will be uncollectible" (¶78, 88, 97). This is a significant narrowing of his prior position.

#### 4.3.2. The "Complete Analysis" Standard is a Moving Target.

41. Eichmann critiques my rebuttal for not analyzing what he asserts are "require[d] consideration[s]" for an ability-to-pay analysis, namely: "cash and other liquid assets; existing liabilities; working-capital and operating requirements; taxes; debt and financing commitments; expected future cash flows; the liquidity and realizable value of inventory and fixed assets; distributions or transfers outside the entity; applicable insurance; and the period over which payment would be required" (¶80). Yet Eichmann cites to no authority that his proposed detailed analysis is required at the preliminary-injunction stage. Further, every such prospective financial analysis involves some degree of estimation and assumption; the fact that my analysis is not "complete" in the sense that Eichmann defines it does not undermine the conclusion that the available data supports a reasonable ability-to-pay conclusion.

[redacted]

#### 4.3.3. Fluctuations in Cash Balance is Not Evidence of Inability to Pay.

42. Eichmann points to the decline in the checking-account balance from $[redacted] on April 30, 2026 to $[redacted] on June 30, 2026 (¶84, footnote 60) and argues that "the reduction in the reported checking-account balance between April 30 and June 30 does not itself establish inability to pay, but it further demonstrates that a balance observed on one historical date is not a projection of the amount likely to remain when a judgment becomes due" (¶88). This is a reasonable point, but cuts both ways. The decline in the cash balance over a two-month period does not appear on its face inconsistent with normal business operations—purchasing inventory; paying suppliers, employees, and shareholders; and funding working capital. The fact that the balance declined over this two-month period does not suggest it will continue to decline before judgment is entered.

#### 4.3.4. AS Designs Has Substantial Cash and Assets.

43. Eichmann states that AS Designs' "produced records are not directly reconcilable" and that the "composition and encumbrance of the assets also matter" (¶¶85, 86) causing questions about AS Designs' "net liquidity likely to remain available when a judgment becomes due" (¶88). Despite certain accounting questions (e.g. treatment of property and machinery - ¶85; liens or financing of fixed assets - ¶86; resale value/timing/circumstances of hypothetical disposition of assets - ¶86), AS Designs' balance sheet indicates net assets of over $[redacted], most of which [redacted].[9] This cash balance also does not take into account the additional cash available to the company but for the owners' discretionary shareholder distributions, discussed below.

#### 4.3.5. These Shareholder Distributions Support, Rather Than Undermine, Its Ability-to-Pay.

44. Eichmann emphasizes that AS Designs' balance sheet reports "cumulative owner distributions of $[redacted]" (¶89) and that "funds were paid to the owners and to [redacted], an entity separately owned by Mr. Olson" (¶91). He argues that "historical revenue and profit do not necessarily remain within AS Designs as entity-level assets" (¶92). Yet this supports,

[9] Eichmann Reply ¶83. Net assets = total assets – total liabilities. It also equals total equity, which Eichmann correctly identifies as $[redacted] as of April 30, 2026.

[redacted]

rather than undermines, the conclusion that the company has the financial capacity to pay a judgment. First, the fact that the owners have taken [redacted] in distributions is direct evidence that the company has been generating cash and has had positive cash flow. Substantial cash flow is not surprising in light of the company's reported $[redacted] net profits on sales of $[redacted].[10] Second, for private companies such as AS Designs, shareholder distributions are considered discretionary—the money can remain within the company to be used as needed, or can be distributed to owners at their discretion. This is standard business practice, and in fact Plaintiff [redacted].[11]

45. In business valuation, standard practice is to evaluate expenses such as owner pay against some benchmark, such as an industry average compensation for officers or similar roles. Excess owner compensation is then "returned" to company cash flows for the purpose of measuring "normal" cash flows—this process is referred to as "normalization." In order to assess the portion of the $[redacted] in discretionary distributions that would normally be expected to contribute to cash flows (instead of owner compensation), I first analyzed salary data for similar positions. Based upon Bureau of Labor Statistics salary data for North Carolina for similar positions, I calculate that reasonable compensation for two managers engaged in activities like those of Mr. Karlovic and Mr. Olson would total approximately $[redacted] (which includes allowances for payroll taxes and benefits) over the time period December 2024 to April 2026.[12] Second, I analyzed officer compensation data as reported in ProSight's[13] Annual Statement Studies for the Small Arms industry group (a common source for officer compensation data). ProSight reports total officer compensation of up to 1.6% of sales (median of the upper quartile) for the most recent reported year.[14] Based on AS Designs' $[redacted] total revenues (Eichmann

---

[10] Eichmann calculates (¶79) AS Designs $[redacted] in net profits based on ASD_000046, which reflects $[redacted] of the company's total $[redacted] sales identified by Eichmann (¶94). As such, the company's total net profit would be greater than $[redacted] for this period.

[11] Deposition of Cole Leleux, 9/17/26, pp. 287-91 ([redacted]).

[12] Exhibit 3.1.

[13] ProSight, formerly RMA, compiles and publishes financial data for a number of industries. The data comes from financial information submitted to banks and other financial institutions for the purposes of obtaining letters of credit, lines of credit, loans and other financial transactions. ProSight/RMA data is generally considered to be representative of the industries on which it reports. The ProSight benchmarking data is a standard tool in business valuation for normalizing owner compensation, and its application here is appropriate for assessing the company's earnings capacity.

[14] Source: ProSight's Annual Statement Studies, 2025, for NAICS 332994, "Manufacturing – Small Arms, Ordnance, and Ordnance Accessories Manufacturing," which includes companies engaged in manufacturing small firearms and parts for small firearms.

[redacted]

Reply ¶94), the ProSight benchmark suggests that normalized total officer compensation would be approximately $[redacted].[15]

46. These data points indicate normalized officer compensation of $[redacted] to $[redacted] over the relevant period. As such, AS Designs' actual owner distributions of $[redacted] a normalized compensation level by [redacted].[16] If the owners had taken only normalized compensation, the company's cumulative cash generation would have been $[redacted], suggesting a cash-to-revenue ratio of [redacted]% rather than the actual [redacted]%.[17] This demonstrates that AS Designs has the financial capacity to accumulate cash sufficient to satisfy a reasonably foreseeable damages award, even if its actual cash balance is lower.

47. Additionally, Eichmann's calculation of AS Designs' $[redacted] in net profits on $[redacted] in revenues[18] (for a net profit rate of [redacted]% of sales) demonstrates that its net profits average over $[redacted] per month[19] (less taxes) that can be contributed to its cash balances. Further, the company's 2026 sales and profits are [redacted].[20]

48. Eichmann argues that "AS Designs did not have a strict written structure governing the amount distributed to its owners" (¶91). This is not relevant to the ability-to-pay question, which pertains to whether the company has the assets to pay a judgment, not whether it has a formal distribution policy. The fact that the company has distributed assets to its owners in the past does not mean it will do so in the future, and it does not mean it cannot pay a judgment.

49. Eichmann adds that "AS Designs' ability to generate approximately $[redacted] in accused-product revenue therefore does not, by itself, establish the amount that will remain available to satisfy a later judgment" (¶92). This is a reasonable general observation, but it is speculative in this context. Eichmann provides no evidence that the company will distribute its assets to a degree that it is unable to pay a judgment.

---

[15] Calculation: [redacted]% of sales × $[redacted] sales × [redacted] factor to include benefits and payroll taxes = $[redacted] (rounded).

[16] Calculation: $[redacted] distributions - $[redacted] normalized compensation = [redacted] excess distributions.

[17] Calculation: ($[redacted] cash as of 4/30/26 + $[redacted] excess distributions) ÷ $[redacted] cumulative revenues = [redacted]%. See also Phillips Rebuttal ¶59, footnote 86.

[18] Eichmann calculates (¶79) AS Designs $[redacted] in net profits based on ASD_000046, which reflects $[redacted] in revenues. Calculation: $[redacted] ÷ $[redacted] = [redacted]% of sales.

[19] Calculation: [redacted] ÷ [redacted] months = $[redacted] per month. See ASD_000046.

[20] ASD_000046, showing [redacted] sales during the more recent months as compared to all 18 months shown.

[redacted]

#### 4.3.6. My Ability-To-Pay Analysis Considered a Reasonably Foreseeable Outcome.

50. Eichmann argues that my reasonable royalty rate-based ability-to-pay analysis "does not address a judgment based on another damages measure" (¶¶95, 82). Yet Eichmann cites to no authority or requirement that an ability-to-pay analysis be measured against the largest conceivable award as opposed to a reasonably foreseeable damages outcome. The fact that other damages awards are possible does not undermine the conclusion that a reasonably foreseeable royalty-rate-based award is within AS Designs' ability to pay. Further, Eichmann identifies no particular amount of damages against which we should gauge AS Designs' ability to pay. Having identified no expected judgment amount, Eichmann's ultimate conclusion—that there is "material uncertainty" (¶99) in AS Designs ability to pay that unspecified judgment—is not meaningful.

#### 4.3.7. "Material Uncertainty" Does Not Establish an Ability-to-Pay Conclusion.

51. Eichmann concludes that "there is **material uncertainty** concerning AS Designs' entity-level capacity to satisfy the judgment that may ultimately result" (¶99, emphasis added). Every prospective financial analysis involves some degree of uncertainty. Eichmann cites to no authority holding that "material uncertainty"—as distinct from a likely inability to pay—suffices to establish the inadequacy of monetary damages at the preliminary-injunction stage. Eichmann expressly notes that his "material uncertainty" opinion "is not an opinion that nonpayment is more likely than payment" (¶98 at fn 69), and he does not present his "material uncertainty" as an independent basis for his conclusion concerning the inadequacy of monetary relief. To the contrary, he expressly states that his "principal opinion concerning the inadequacy of retrospective relief does not depend on collectability" (*ibid.*). He characterizes his ability-to-pay opinion instead as a "limitation on Mr. Phillips's affirmative conclusion," while stating that his principal inadequacy opinion "rests independently on the displacement, observability, pricing, channel, and market-timing considerations discussed above" (*ibid.*).

52. Eichmann's specific uncertainties—unreconciled balance sheets, a declining cash balance, owner distributions, and the absence of insurance—do not demonstrate a likely inability to pay a judgment. The company holds over $[redacted] in cash (¶84), $[redacted] in net assets (¶83), and has generated well over $[redacted] in net profit (¶79) at a net profit rate of [redacted]% of

[redacted]

sales.[21] Eichmann offers no measure of "material uncertainty" or the meaning of "material," provides no specific, quantified risk of nonpayment, identifies no potential damages amount by which to gauge AS Designs ability to pay, and does not present this "material uncertainty" as an independent basis for a conclusion of inadequacy of damages. Hence, this "material uncertainty" opinion has limited, if any, usefulness.

## 4.4. Economic Effects / Balance of Harms (Section V)

### 4.4.1. Eichmann's Balance-of-Harms Opinions Have Significantly Shifted.

53. The Eichmann Reply reflects a significant narrowing of the positions he took in his initial declaration. First, Eichmann initially asserted that for a diversified firm (such as AS Designs) "the effects of an injunction that limits specific product offerings may be more readily contained where business activities can be adjusted or redirected" (Eichmann Declaration ¶48). In the Reply, he explicitly disavows this: "I do not rely on an assumption that AS Designs could readily replace the affected revenue through increased sales of existing unrelated products" (¶101). Second, Eichmann initially relied on "AS Designs' own website [showing] they sell a broader range of firearm components beyond the Accused Products" as evidence that it could redirect its business (Eichmann Declaration ¶48, footnote 64). In the Reply, he explicitly disavows this: "I do not rely on the breadth of AS Designs' website catalog as evidence that it can readily replace accused-product revenue" (¶121). Third, in the initial declaration, Eichmann concluded that "the economic cost of denying injunctive relief may exceed the cost associated with granting it" (Eichmann Declaration ¶48). In the Reply, he explicitly disavows this: "I do not opine that Rare Breed's total economic hardship exceeds AS Designs' total economic hardship" (¶¶102, 121). These three narrowings are significant because they remove the principal factual and analytical support for his prior "asymmetric impact" argument, leaving only the more general, non-specific proposition that the parties' exposures "differ in their nature, timing, and potential reversibility" (¶103).

[21] Eichmann calculates (¶79) AS Designs [redacted] in net profits based on ASD_000046, which reflects $[redacted] in revenues. Calculation: $[redacted] ÷ $[redacted] = [redacted]% of sales.

[redacted]

#### 4.4.2. Asymmetry in the Effects of an Injunction is Not Shown.

54. Eichmann suggests some asymmetry regarding reversibility of the effects of an injunction, asserting that (a) Rare Breed's time period to earn a return on its "sunk" cost investments (R&D, testing, etc.) would be shortened, and that (b) a later damages award "does not permit Rare Breed to make those transactions at the time they otherwise would have occurred" or to acquire the associated "customer, channel, and market-development" benefits (¶¶106-107). Regarding Rare Breed's past investments, Eichmann concedes that 'Economically, they are sunk' costs (¶106). The economic relevance of these sunk costs is not that they simply exist or differ between the parties, but that the "opportunity to earn a return on [them] is time-dependent" (¶106). However, the time-value of the commercialization opportunity can be captured through prejudgment interest or a time-value-of-money adjustment in a damages analysis. Eichmann does not identify a specific, non-compensable 'lead-time' benefit that is distinct from the lost profits that would be captured in a market reconstruction. Hence, this fails to support Eichmann's arguments of asymmetric injunction effects. Regarding "customer, channel, and market-development" benefits associated with product sales, Eichmann offers no explanation as to how Rare Breed would be more harmed without a preliminary injunction than AS Designs would be harmed if one issues. Although Eichmann does not clearly define the nature of "customer, channel, and market-development" harms (see above Section 4.1 regarding such other hypothetical harms), such harms would appear to apply similarly to AS Designs.

55. Eichmann later adds a new opinion that AS Designs' "production is performed by third-party manufacturers" and therefore, it can mitigate damage from an injunction because "some future production purchases may be adjustable before they are ordered or incurred" (¶114). Yet [redacted],[22] so [redacted]. At any rate, Eichmann concedes that he "do[es] not offer a quantitative mitigation or redeployment opinion" (¶¶118, 121).

56. Eichmann's "limited" conclusion (¶123) then becomes: "an injunction would likely expose AS Designs to lost operating profit and possible impairment or underutilization of inventory, facilities, and equipment. Denial of relief would likely expose Rare Breed to continued effects on sunk, product-specific investments and time-dependent commercialization

[22] Deposition of Lawrence DeMonico, 9/16/26, p. 58 ([redacted]).

[redacted]

opportunities." As explained in this declaration, Eichmann undertakes no substantive qualitative or quantitative comparison of these effects, and each of the effects identified here by Eichmann applies to the opposing party as well. A consideration in the balance-of-harms analysis is that an injunction would put an end to [redacted]% of AS Designs' sales (Eichmann Reply ¶32), while continued sales by AS Designs would expose Rare Breed to displacement that Eichmann characterizes as "economically meaningful" (¶27)—although Eichmann declines to determine the corresponding diversion rate (¶27). AS Designs' loss of [redacted]% of its sales, combined with its [redacted], supports the conclusion that an injunction would impose significant economic costs on AS Designs, which is relevant to the balance-of-harms analysis.

### 4.5. Lead-Time/First-Mover Advantage Effects (Section VI)

#### 4.5.1. "Earlier-Mover Advantages" Argument is Not Supported.

57. Eichmann argues that the $[redacted] in Rare Breed historical sales that I identified "demonstrate that Rare Breed realized some economic value from its earlier entry" but "do not establish that the value of that position was exhausted" (¶129). This is the same argument made in the initial declaration (¶¶18–19) that I addressed in my Rebuttal. I explained that "any 'first-mover advantages and market structure' presumably lost by Rare Breed are not identified" and that "any such first-mover advantages come down to one amount—Rare Breed's profits on its sales in a known market" (Phillips Rebuttal ¶25). Eichmann's response in the Reply does not address this point. Eichmann continues to assert that the "value of lead time" was "not exhausted" (¶148), but he does not identify any specific first-mover advantage or market-structure benefit that was lost and not compensable.

58. In the Reply, Eichmann introduces AS Designs' own communications acknowledging that Rare Breed had a "3–4 year headstart" (¶127). This headstart refers to Rare Breed's earlier market entry, well before AS Designs' entry in 2025.[23] Again, economic value of that headstart was realized through Rare Breed's approximately $[redacted] in historical sales (Phillips Rebuttal ¶25 at fn 30) prior to AS Designs' market entry. The "headstart" language does

[23] The AS Designs communication in which this statement was made concerned the parties' MP5-platform offerings (Eichmann Reply ¶127), but the underlying point—that Rare Breed had a material timing advantage—is consistent with the record evidence that Rare Breed's FRT-15 was brought to market at the end of 2020 (DeMonico Declaration 4/24/26, ¶10).

[redacted]

not establish some aspect of additional, non-compensable lead-time value or that such non-compensable value remained unexhausted at the time of AS Designs' entry. Any remaining lead-time value can be captured in a conventional lost-profits calculation, which accounts for the sales and profits Rare Breed would have made during the relevant period absent the alleged infringement.

59. Eichmann also summarizes that the "relevant issue is whether AS Designs' subsequent expansion reduced Rare Breed's ability to continue converting its earlier investment and position into additional commercial benefits" (¶131). In other words, the "relevant issue" is whether or not AS Designs is diverting sales from Rare Breed.

#### 4.5.2. "Rapid Competitive Entry and Slower Recovery" Hypothesis is Not Demonstrated.

60. In Sections VI.C and VI.D, Eichmann argues that "there is no economic inconsistency between rapid competitive displacement and slower recovery" (¶138). This is the same internal inconsistency I identified in the Rebuttal (¶13). My point was that Eichmann makes "contradictory characterizations of the market – one where the market leader (such as Rare Breed) can be easily displaced by a competitor over a short period of time, but then has difficulty regaining its market share after the competitor exits the market" (Phillips Rebuttal ¶13). Eichmann responds that "there is no economic inconsistency" because "the completed purchases are not reversed and the commercial relationships formed during the intervening period do not automatically transfer to the earlier supplier" (¶138). However, the time-value of any such delayed recovery is an economic effect that can be captured through a time-value-of-money adjustment in a damages analysis. An asymmetry between entry and recovery does not establish that the harm is irreparable; it establishes that the timing of the recovery is a factor to be considered in the damages calculation.

61. Here again, Eichmann attempts to shift the burden of proof, stating that Phillips "does not analyze whether AS Designs dealers would shift to Rare Breed, the timing or extent of any such shift, the effect of existing dealer inventory, or the promotional and commercial effort required for Rare Breed to establish or expand those relationships" (¶144). I addressed this assertion in my Rebuttal (¶¶24, 27-28). Regarding the primary factor here—"whether AS Designs dealers would shift to Rare Breed" after a post-litigation injunction—we should first consider that these AS Designs dealers are only relevant to the diverted sales inquiry in the first place because of the presumption that they would have chosen Rare Breed but for AS Designs' alleged

[redacted]

infringement. With AS Designs removed from the market after a post-litigation injunction, the most reasonable presumption is that they would then purchase from Rare Breed going forward. The remaining effects are entirely speculative, would likely be far less significant effects, and could be addressed in a conventional damages analysis if sufficiently supported by the facts (e.g. the cost of "promotional and commercial effort[s] required for Rare Breed to establish" dealer relationships).

62. Eichmann also cites repeat purchasing activity by AS Designs' dealers as supposed evidence that channel effects may not "disappear immediately when AS Designs' future sales cease" (¶142). This conclusion does not follow. With AS Designs removed from the market, the option to make a repeat purchase with AS Designs is off the table, leaving these dealers with their presumably favored alternative, Rare Breed.

63. After declining to opine that "Rare Breed's earlier mover advantage was eliminated entirely" or that "Rare Breed could never recover some market position," Eichmann ultimately concedes that "[t]he magnitude and duration of any recovery would require additional empirical analysis" (¶147). Notably, Eichmann frames this as a question, rather than an established fact, thereby confirming the speculative nature of these assertions.

### 4.5.3. Damages Are Not Intended to Literally Recreate the Past.

64. Eichmann again repeatedly states that an award of damages and post-litigation injunction "does not cause the customer to reverse the completed purchase" (¶¶139, 138), "does not restore the initial sale" (¶140), "does not cause dealers automatically to reallocate historical purchases to Rare Breed" (¶141), and "would not reverse the commercial activity that already occurred" (¶148).

65. As explained above (see *supra*, **Section 4.1.4**), literal restoration of the past is not the function of a damages award. A damages analysis instead reconstructs the market that likely would have existed but for the assumed infringement and measures the resulting economic loss. Courts have long accepted such market reconstructions as a methodology of determining damages in patent cases (Phillips Rebuttal ¶16). Eichmann's observation that a later award cannot "reverse the completed purchase" is therefore beside the point.

[redacted]

### 4.6. Market Uncertainty, Reputation, and Third-Party Entry (Section VII)

#### 4.6.1. Eichmann Abandons His Uncertainty, Reputation, and Third-Party Entry Opinions.

66. Eichmann's opening declaration asserts market confusion (¶¶30-34), harm to Rare Breed's reputation (¶¶40-45), and cascading competitive entry by third-parties (¶¶35-39). My rebuttal declaration detailed the speculative nature of the assertions, lack of evidence, logical flaws, and inconsistencies with Eichmann's own opinion (Phillips Rebuttal ¶¶39-50). Now Eichmann concedes that "Mr. Phillips's criticisms justify narrowing the[se] opinions" (¶155), and he accordingly abandons each, replacing them merely with an unrelated observation that AS Designs increased its sales during this litigation (¶153).

67. Market Uncertainty. Eichmann's opening declaration asserts that "[t]he allegations in this case include conduct that may give rise to uncertainty regarding product identity, source, and legal status" (¶30) and that such "uncertainty can generate harm that is both immediate and difficult to fully capture through monetary damages" (¶34). In his Reply, Eichmann abandons this claim (¶152).

68. Harm to Rare Breed's Reputation. Eichmann's opening declaration asserts that customers in this market will consider the products' "uncertainty or adverse signals regarding reliability or legitimacy, [and] those effects may extend beyond the individual product to the supplier's broader product line or brand" (¶40). Such reputational harm can impact dealers' and customers' "expectations regarding quality, reliability, and risk." "[O]nce expectations are revised downward, they may not be fully restored even if the underlying source of uncertainty is later resolved" (¶¶44-45). In his Reply, Eichmann abandons this claim (¶150).

69. Cascading Competitive Entry. Eichmann's opening declaration asserts that AS Designs' continued presence may increase the likelihood of additional entry (¶35) and that the effects of the additional sellers "are not fully captured by firm-specific monetary damages and may persist even after the resolution of the underlying dispute" (¶39). In his Reply, Eichmann abandons this claim (¶151).

#### 4.6.2. Eichmann's Disavowals Were a Substantive Portion of the Harm Theories.

70. In the initial declaration, the three categories disavowed here were the entire sections III.E, III.F, and IV (¶¶30-45) and were presented as independent, cumulative mechanisms

[redacted]

of harm that "operate both independently and in combination to alter competitive conditions over time" (¶58). They were not peripheral; they were central to the conclusion that "monetary damages do not restore the market conditions that would have existed absent the alleged conduct" (¶60). Eichmann's disavowal of these three mechanisms suggests that the initial declaration's harm theory was, in substantial part, unsupported by logic and contradicted by the declaration itself, and that the disavowals were necessary to respond to my criticisms.

### 4.7. Phillips's Preliminary Reasonable-Royalty Analysis (Section VIII)

71. In Section VIII, Eichmann rebuts my review of firearm-related licensing rates and broader industry licensing rates that supported my opinion that a corresponding "reasonable royalty on the accused sales would likely be well within the company's ability to pay, based on its present sales, savings, and profit levels" (Phillips Rebuttal ¶¶10, 56-59). Eichmann contends that my royalty analysis is not a "completed valuation of the license the parties would have negotiated" (¶159); that I did not "conduct a complete hypothetical-negotiation analysis" (¶¶157–160); and that I did not show that the proposed royalty range accounts for the parties' competitive relationship (¶¶175–178).

#### 4.7.1. Eichmann's Royalty Analysis Standard is Inappropriate.

72. Eichmann argues that a reasonable royalty analysis for our purposes should consider a broad range of factors, such as the contribution of the patented technology to the accused products, available alternatives, the parties' competitive relationship, exclusivity, geographic and temporal scope, and several other factors (¶¶157-158) that, together, constitute a *Georgia-Pacific* factor analysis,[24] commonly performed by damages experts at the end of discovery.

73. First note that Eichmann devotes extensive discussion to AS Designs' cash balances, assets, sales levels, etc., in his ability-to-pay analysis (¶¶79, 83-87, 89-90, 94-96). But such an analysis ultimately falls flat, since Eichmann provides no suggested damages amount against which to compare the company's financial position. I, on the other hand, attempted to fill in that blank with a research-based inquiry into royalty rates.

[24] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120, 166 USPQ 235, 238 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir. 1971), cert. denied, 404 U.S. 870, 92 S.Ct. 1-5 (1971). *Georgia-Pacific* suggests basing the reasonable royalty on a hypothetical negotiation and a set of 15 factors relevant to the hypothetical negotiation.

74. Eichmann's suggested requirement, a discovery-supported *Georgia-Pacific* analysis, is not appropriate at this litigation stage. The argument effectively is that a discovery-supported finalized expert opinion on reasonable royalty damages must be done at the preliminary injunction stage, or else no preliminary estimate of damages can be used as a measure within the ability-to-pay analysis. If Eichmann's standard instead allows for some middle ground—an alternative estimate that Eichmann deems more reliable—then he could have provided it but declined to do so.

75. Eichmann's critique of the comparability of the four agreements (¶¶161–166) does not undermine their utility at this stage. I do not contend that any single agreement establishes the precise royalty for this matter. Rather, the four agreements provide a range of observed royalty rates in the firearms industry that, together with the RoyaltySource industry statistics, support a preliminary indication that a reasonable royalty in the range of 4.5% to 7.2% of sales is within the realm of economic reasonableness. A full royalty rate analysis, including perhaps adjustments for exclusivity, royalty base, and technology contribution, is appropriately performed at the damages phase following discovery. Eichmann's identification of differences among the agreements is consistent with a later analysis of such factors; it does not demonstrate that the preliminary range is unreliable or that no reasonable royalty estimate can be made at this stage.

76. Similarly, Eichmann's observation that the RoyaltySource industry royalty statistics encompass a broad range of agreements (¶¶167–170) is not inconsistent with their use as a preliminary benchmark. I do not rely on the category averages as a precise estimate of the royalty for this matter. Rather, the statistics provide context indicating that royalty rates in the relevant industry groups cluster in the 5–7% range, which is consistent with the 4.5% median from the four firearm-specific agreements. The breadth of the underlying distributions is precisely why I present a range rather than a single point estimate.

### 4.7.2. The $[redacted] ABC Royalty is Irrelevant to an Ability-to-Pay Royalty Analysis.

77. In examining royalty rates in my initial declaration, I explained that the $[redacted] per unit royalty paid by Rare Breed to ABC IP does not appear to represent an arms-length negotiation based on the DOJ's publicly-available January 2023 Complaint in *U.S. v. Rare Breed* that indicates shared ownership interests between the parties, and also because the resulting royalty rate of [redacted]%

[redacted]

"would be considered highly unusual and very unlikely to represent an arms-length transaction" (¶57). As such, the [redacted] rate is not useful for an ability-to-pay royalty analysis.

78. Here, Eichmann asserts that this "potentially imperfect existing license" (¶174) whose "terms are economically relevant" (¶173) should be considered in a reasonable-royalty-rate analysis. Yet Eichmann never addresses the pre-existing evidence (DOJ complaint) that the license was not arms-length and my conclusion—now confirmed—that the agreement was not arms-length and the $[redacted] per-unit rate would therefore be non-useful. Recent deposition testimony by [redacted].[25, 26] Since the [redacted] per unit "royalty" does not reflect an arms-length transaction, it is not useful as a royalty rate indicator.[27]

### 4.7.3. Eichmann's Financial Analyses Support AS Designs' Ability to Pay.

79. Finally, in Section VIII.F, Eichmann repeats his contention that my royalty analysis does not consider other measures or higher royalty rates. As noted above (see *supra* Section 4.3.6), Eichmann cites to no authority or requirement that an ability-to-pay analysis be measured against the largest conceivable award as opposed to a reasonably foreseeable damages outcome. The fact that other damages awards are possible does not undermine the conclusion that a reasonably foreseeable royalty-rate-based award is within AS Designs' ability to pay.

80. Eichmann then states that AS Designs' ability to pay the judgment "depends on the amount of the obligation, the assets remaining when payment is required, the liquidity of those assets, operating requirements, distributions, and other financial circumstances" (¶181). His

---

[25] For example, [redacted]. DeMonico dep. tr. 9/16/26 pp. 115-6. Both [redacted] (dep. tr. 9/16/26 pp. 49-51), and [redacted] DeMonico, Rare Breed's sole officer – see DeMonico dep. tr. 9/16/26 p. 23) and [redacted] (Cole Leleux dep. tr. 9/17/26, pp. 43-44, 47-48, 245-47).

[26] DeMonico and Leleux also testified that [redacted] (DeMonico dep. tr. 9/16/26 p. 94; Leleux dep. tr. 9/17/26 p. 161). Further, [redacted] (Leleux dep. tr. 9/17/26 p. 159).

[27] Additionally, ABC IP is [redacted] (Leleux dep. tr. 9/17/26 pp. 22-23, 38-39). [redacted] (*ibid.* at p. 41); as such , the [redacted].

[redacted] critique is that my royalty analysis and cash holdings comparison "does not resolve those issues" (¶181). But the question at this stage is not whether my analysis "resolves" all issues, but whether it provides a reasonable indication of the company's ability to pay.

81. My analysis showed that AS Designs maintains a cash savings rate, in the normal course of business, capable of paying a reasonably-estimated damages award. I explained that it could likely increase its cash savings rate [redacted] the estimated range of damages due to its [redacted] (¶59). Moreover, my analysis did not take into account additional cash generation from possible liquidation of assets or reduced shareholder distributions, both of which Eichmann identifies as relevant issues (¶¶86, 89-92, 181). As explained above (see *supra* Section 4.3.5) the company could have reasonably retained another approximately [redacted] of those shareholder distributions, indicating a potential cash savings rate [redacted] than that shown on its balance sheet—[redacted]% instead of its actual [redacted]% of sales.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: Nov 16, 2026

Eric J. Phillips

Exhibit 1 [redacted]

# Eric J. Phillips MBA, CVA, MAFF

President

**Chicago Area Office**
1945 Hitchcock Ave
Downers Grove, IL 60515
(312) 489-2483 direct
(773) 354-4644 mobile
ephillips@vlfconsulting.com

**Certifications**

Certified Valuation Analyst

Master Analyst in Financial Forensics

**Professional Affiliations**

National Association of Certified Valuators and Analysts

Licensing Executives Society

**Education**

Master of Business Administration (with honors), Kelley School of Business at Indiana University

Bachelor of Science, Mechanical Engineering (with Distinction), The Ohio State University

## Biography

Eric Phillips is President of VLF Consulting. Mr. Phillips has twenty-six years of experience in providing valuation and litigation advisory services to attorneys and corporate clients across a broad range of industries. With a focus on intellectual property litigation and valuation, Mr. Phillips has extensive experience in the valuation of patents, trademarks, copyrights, software, trade secrets, and know-how in such contexts as infringement litigation, bankruptcy proceedings, false marking, licensing negotiations and transactions, and joint ventures. His experience includes providing testimony in federal court proceedings regarding intellectual property damages. He has broad experience in damages – lost profits, reasonable royalties, past and future price erosion, convoyed sales, and prejudgment interest. He has also conducted flexible damages/valuation modeling, including probability trees, sensitivity analyses, and Monte Carlo analysis. As a Certified Valuation Analyst, he has also assisted clients with business valuation needs.

Mr. Phillips is a Certified Valuation Analyst (CVA) and a Master Analyst in Financial Forensics (MAFF) through the National Association of Certified Valuators and Analysts (NACVA). He is also a member of the Licensing Executives Society (LES).

## Professional Experience

- VLF Consulting, President, 2011 to present.
- FTI Consulting, Senior Director, 2009 to 2011.
- Charles River Associates (formerly InteCap), Principal, 2000 to 2009.
- Tadano Faun GmbH Mobile Cranes, Nuremberg, Germany, summer intern, 1999.
- Siemens Energy & Automation, Product Engineer, Development, 1995 to 1998.

## Industry Experience Examples

- Surgical products
- Pharmaceutical
- Measurement tools
- Construction products
- Medical testing products
- Semiconductors
- Computer hardware
- Computer software
- Consumer electronics
- Sports equipment
- Financial derivatives trading systems
- Non-profit organizations
- Automotive products
- Aviation
- Agricultural chemicals
- Biotech research tools
- Telecommunications equipment
- Wireless networking systems
- Petroleum refining
- Manufacturing

## Illustrative Intellectual Property Project Experience

- Assisted a sporting goods manufacturer defending itself in litigation involving several patents. In this make-or-break case between the two leading manufacturers of high-end products, Mr. Phillips rebutted a sweeping damages claim by the Plaintiff. Through complex analyses of the relevant products and their next-best alternatives, Mr. Phillips successfully narrowed the scope of the purported patented benefits, undermining Plaintiff's position on the importance of the patents, thereby leading to a highly favorable settlement.

[redacted]eding products, Mr. Phillips presented a broad array of damages, including profit disgorgement, lost profits, reasonable royalties, and pre-issuance reasonable royalties. Mr. Phillips's testimony achieved a complete damages victory for plaintiff, as the jury awarded all damages amounts exactly as presented.

- Engaged in multiple patent infringement disputes related to blood sampling devices for glucose monitoring, Mr. Phillips determined both lost profits and reasonable royalty damages in suits brought by a leading U.S. device manufacturer and designer.
- Supported a Tier 1 automotive supplier that had supplied electronic control modules to an auto manufacturer and had become embroiled in ensuing litigation due to its indemnifying the auto maker. Assistance included a thorough review of both plaintiff's and defendant's expert reports and a detailed analysis of 10+ years of Daubert rulings by the sitting judge in Texas. The results were successfully used to revise expert strategy and in indemnification negotiations.
- In a complex patent litigation case involving multiple patents and method and system claims related to auto-leveling systems for recreational vehicles, Mr. Phillips demonstrated the errors in plaintiff's lost profits claim and provided a reliable reasonable royalty approach that considered multiple types of value indicators.
- Determined the appropriate reasonable royalty damages for a worldwide leading tax stamp provider in a patent infringement case related to cigarette tax stamping technology. Mr. Phillips testified regarding numerous errors by Plaintiff's damages expert, opined on the appropriate royalties, and assisted the client in preparing a vigorous *Daubert* motion against the opposing expert regarding Entire Market Value Rule issues and other errors.
- Assisted a worldwide leader in heavy-haul over-the-road trailer systems who was accused of patent infringement regarding their dual-lane modular trailers. His particular expertise related to the Entire Market Value Rule was key in successfully limiting the scope of royalty damages, leading to a favorable settlement.
- In a highly complex dispute involving multiple plaintiffs, patents, and hammer mill technologies, Mr. Phillips determined lost profits, price erosion, and reasonable royalty damages for each plaintiff. Claims in the multiple lawsuits included patent infringement and false marking. Mr. Phillips' adroitness at navigating the complex legal and *Daubert* issues surrounding lost profits and price erosion led to rigorous and unassailable opinions and testimony.
- Assisted a German surgical products manufacturer in valuing its numerous trademarks used by international licensees. Mr. Phillips developed a multi-pronged valuation approach to arrive at an appropriate range of royalties that would adequately compensate the trademark owner for the use by the licensees. His opinions played a key role in negotiations and related litigation among the various international entities.
- Assisted a distributor of imported goods by valuing its proprietary enterprise management software system, a cloud-based system including both front-office and back-office applications. VLF's efforts supported the owners' strategic shift towards enhancement and commercialization of the software platform.
- Directed efforts to identify and quantify lost profits and reasonable royalty damages for dozens of clients, such as: a manufacturer of spinal implant products, a foreign maker of hard disk drives, a leading domestic computer maker, a worldwide supplier of airbag systems, and makers of branded pharmaceutical products.

[redacted]

- "A Comprehensive Guide on Apportioning Patent Damages: Tips and Strategies Explored," (co-presenter), live webcast, *The Knowledge Group*, November 2019.
- "Responding To Fed. Circ.'s Latest Patent Damages Test," E. Phillips and A. Parikh, *Law360.com*, August 2018.
- "Recent Rulings on the Entire Market Value Rule and Impacts on Patent Litigation and Valuation," E. Phillips and D. Boag, *Les Nouvelles* (journal of the Licensing Executives Society), March 2013.
- "Patent Damages Overview and Update on Current Issues," presented by E. Phillips and D. Haas, May 2011.
- "Apportionment Issues in IP Damages Cases," presented by E. Phillips and D. Haas, April 2011.
- "Judicial Impact on Patent Value," presented by E. Phillips and B. Burton, March 2011.
- "Intellectual Property," presented by E. Phillips, D. Haas, and S. Weingust to the China Appraisal Society, July 28, 2010.
- "Economic and Damages Issues in Pharma / ANDA Litigation," presented by E. Phillips and D. Haas, August 2009.
- "Using Monte Carlo Methods for Technology Valuation, Pricing, & Dealmaking," R. Razgaitis and E. Phillips. Presented by Mr. Phillips to AICPA/ASA National Valuation Conference, November 10, 2008.

**Prior Testimony (Client is Underlined)**

- *Munchkin, Inc., v. TOMY International, Inc.*, Northern District of Illinois, Case No. 1:18-cv-6337, Dec 2021 (deposition) and Sep 2025 (trial).
- *Ravin Crossbows, LLC v. Hunter's Mfg Co., Inc. d/b/a TenPoint Crossbow Techs*, Northern District of Ohio, Eastern Division, Case No. 5:23-cv-00598, Oct 2024.
- *Spectrum Dynamics Medical Limited v. General Electric Co., et al*., Southern District of New York, Case No.: 18-cv-11386, Oct 2023 and Sep 2021.
- *C&M Oilfield Rentals, LLC v. Apollo Lighting Solutions, et al.*, Western District of Texas, Waco Division, Civil Action No. 6:21-cv-00544, Jul 2022.
- *Days Corporation v. Lippert Components, Inc., and Innovative Design Solutions, Inc.*, Northern District of Indiana, Civil Action No. 3:17-cv-00208, Sep 2020.
- *Water Technology, LLC v. Kokido Development Ltd and Menard Inc.*, Eastern District of Missouri, Case No. 4:17-cv-01906, Sep 2019.
- *Bakko Bros., Inc. and Genesis III, Inc. v. Jacobs Corp.*, Southern District of Iowa, Central Division, Civil Case No. 4:14-cv-00015, May 2017.
- *Tax-Right, LLC v. SICPA Product Security LLC*, Eastern District of Virginia, Civil Action No.: 3:12-CV-657-REP, Aug 2013.

**Exhibit 2** [redacted]

*In Re: Rare Breed Triggers Patent Litigation*

*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

**Documents Reviewed or Relied Upon**

**AS Designs Documents**

| From | To |
|---|---|
| ASD 000001 | ASD 000049 |
| ASD 000438 | ASD 000438 |

**Legal Filings**

- 2025-12-30 Amended Complaint, *Rare Breed and ABC IP v. AS Designs,* MDNC-1-25-cv-01192-4
- 2026-04-27 Plaintiffs' Motion for Preliminary Injunction
    - 2026-04-24 Declaration of Richard J. Eichmann in Support of Motion for Preliminary Injunction
    - 2026-04-24 Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction
    - 2026-04-24 Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction
        - Exhibits A to I
- 2026-07-06 Declaration of Matthew S. Karlovic in Support of Defendants' Opp. to Pltfs' Mot. For Prelim. Injunction
- 2026-08-06 Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for Preliminary Injunction
- 2026-09-02 Plaintiffs' Motion for Temporary Restraining Order (re. ARHK)
    - 2026-09-02 Declaration of Matthew A. Colvin in Support of Pltfs' Mot. for Temp. Restraining Order (re. ARHK)
        - Exhibits 1 to 13
    - 2026-09-01 Declaration of Lawrence DeMonico (re. ARHK)
        - Exhibits 1 to 78
    - 2026-09-02 Declaration of Richard J. Eichmann in Support of Pltfs' Mot. For Temp. Restraining Order (re. ARHK)
- 2026-09-27 Declaration of Matthew S. Karlovic (in Support of Defendants' Opp. to Pltfs' Mot. For TRO re. ARHK)
- 2026-10-13 Reply Declaration of Richard J. Eichmann in Support of Plaintiffs' Motion for TRO (re. ARHK)
- 2026-10-27 Plaintiffs' Renewed Motion for Temporary Restraining Order (re. ARHK)
    - 2026-10-27 Declaration of Matthew A. Colvin in Support of Pltfs' Renewed Mot. for TRO (re. ARHK)
        - Exhibits A to E
    - 2026-10-27 Declaration of Brian Luettke in Support of Pltfs' Renewed Mot. for TRO (re. ARHK) (re. ARHK)
        - Exhibits 1 to 5

**Depositions**

- Deposition of Matthew S. Karlovic (AS Designs), 7/30/26, Personal
- Deposition of Matthew S. Karlovic (AS Designs), 7/30/26, 30(b)(6)
- Deposition of Lawrence DeMonico (Rare Breed), 9/16/26
- Deposition of Cole Leleux (ABC IP), 9/17/26

**Other / Public Domain Information**

- 2026-01-07 (*Rare Breed v. Hoffman, et al.* ) Plaintiffs' Motion for Preliminary Injunction
- 2026-01-23 (*Rare Breed v. Hoffman, et al.* ) Response to Plaintiffs' Motion for Preliminary Injunction
  Declaration of Timothy Hoffman in Support of Defendant's Response
  Letter to Hoffman re. notice of patent infringement
  Settlement Agreement, 5/13/25 between U.S. and Rare Breed, et al.
- 2026-02-11 (*Rare Breed v. Hoffman, et al.* ) Order granting preliminary injuction

**Exhibit 2** [redacted]
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

**Documents Reviewed or Relied Upon**

- 2026-01-15 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Complaint for Patent Infringement, False Patent Marking, and False Advertising
- 2026-01-16 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Plaintiffs' Motion for TRO and Prelim. Injunction
  Declaration of Samir P. Warty, Ph.D. in Support of Plaintiffs' Motion for TRO and Preliminary Injunction
- 2026-01-30 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Def's Resp. in Opp. to Pltfs' Mot. for TRO and PI
  Declaration of Scott W. Cragun
  Rebuttal Declaration of John Nixon
  Declaration of Michael Stakes
  Declaration of Ben Woods, incl. 2023-09-05 (*U.S. v. Rare Breed et al* .) Order of Preliminary Injunction
- 2026-02-13 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Order Denying Pltfs' Motion for TRO and PI
- 2026-05-14 (*Atrius Dvp. Group v. Rare Breet et al.* ) First Amended Complaint for Declaratory Judgment
- Fannon, Nancy J., *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys* , 2011 ed.
- Dunn, Robert L., *Recovery of Damages For Lost Profits* , 6th Ed. Vol. 1, Vol. 2, 2022 Supplement
- "Understanding Distribution Channels in Business: How They Function," at https://www.investopedia.com/terms/d/distribution-channel.asp
- "The Pros and Cons of Direct and Indirect Product Distribution," Business Development Bank of Canada, at https://www.bdc.ca/en/articles-tools/marketing-sales-export/marketing/how-bring-new-product-market
- Andjelkovic, A. and Marija Radosavljevic, "The Length of the Distribution Channel as a Factor of its Efficiency," Strategic Management, Vol. 25 (2020), No. 2, pp. 9-17.
- RoyaltySource and ktMINE royalty rate databases
- "Royalty Rate Industry Summary Report 2025," published by IPSCIO / RoyaltySource, 2026
- https://activesafetydesigns.com/
- https://rarebreedtriggers.com/
- https://archive.org/
- ProSight Annual Statement Studies, 2025, for NAICS 332994 ("Manufacturing - Small Arms, Ordnance, and Ordnance Accessories Manufacturing")
- Bureau of Labor Statistics wages data for North Carolina, May 2025, at https://www.bls.gov/oes/tables.htm

**Exhibit 3.1** [redacted]

*In Re: Rare Breed Triggers Patent Litigation*

*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

**AS Designs Normalized Officer/Manager Salaries**

| | **Occupational Code** | **Annual Median Wage** | **Description** |
|---|---|---|---|
| | [1] | [1] | [1] |
| Median annual wages by role | | | |
| General and Operations Managers | 11-1021 | $101,950 | Plan, direct, or coordinate the operations of public or private sector organizations, overseeing multiple departments or locations. Duties and responsibilities include formulating policies, managing daily operations, and planning the use of materials and human resources, but are too diverse and general in nature to be classified in any one functional area of management or administration, such as personnel, purchasing, or administrative services. Usually manage through subordinate supervisors. Excludes First-Line Supervisors. |
| Industrial Production Managers | 11-3051 | $125,940 | Plan, direct, or coordinate the work activities and resources necessary for manufacturing products in accordance with cost, quality, and quantity specifications. |
| Architectural and Engineering Managers | 11-9041 | $167,840 | Plan, direct, or coordinate activities in such fields as architecture and engineering or research and development in these fields. Excludes "Natural Sciences Managers" (11-9121). |
| [redacted] | | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | |

**Notes:**

[1] Median wages as reported by the Bureau of Labor Statistics, for North Carolina as of May 2025 ( the most recent data available). See state data at [redacted].

[2] Indirect costs are included to account for benefits and payroll taxes.

[3] Includes the time period Dec 2024 (AS Designs' first reported sales) to Apr 2026 (date of balance sheet ASD 000002). See also Deposition of Matthew Karlovic, 7/30/26, pp. 44-45 (shareholder distributions were over Dec 2024 to Apr 2026).

**Exhibit 4.1** [redacted]

*In Re: Rare Breed Triggers Patent Litigation*

*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

[redacted]

| | | | |
|---|---|---|---|
| | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

**<u>Notes:</u>**

[1] See Exhibit 4.2.

[2] See Exhibit 4.3.

[redacted]

**Exhibit 4.2**

*In Re: Rare Breed Triggers Patent Litigation*

*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

[redacted]

**Notes:**

[1] Source: ASD 000046. [redacted] -- see Declaration of Matthew Karlovic, 7/6/26, ¶20.

**Exhibit 4.3** [redacted]

*In Re: Rare Breed Triggers Patent Litigation*

*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |

**Exhibit 4.3** [redacted]

*In Re: Rare Breed Triggers Patent Litigation*

*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | |
|---|---|---|---|---|
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |

**Exhibit 4.3** [redacted]
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. AS Designs, LLC., et al.*

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | |
|---|---|---|---|---|
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | | |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | [redacted] | [redacted] |

__Notes:__
[1] Source: ASD 000047. [redacted] -- see Declaration of Matthew Karlovic, 7/6/26, ¶20.